FILED

1  **LEWIS BRISBOIS BISGAARD & SMITH LLP**
   JOHN L. BARBER, SB# 160317
2      E-Mail: barber@lbbslaw.com
   KENNETH D. WATNICK, SB# 150936
3      E-Mail: watnick@lbbslaw.com
   SONJA HARRINGTON, SB# 261053
4      E-Mail: sharrington@lbbslaw.com
   221 North Figueroa Street, Suite 1200
5  Los Angeles, California 90012
   Telephone: (213) 250-1800
6
   *Attorneys for MONTE CAHN, an individual*
7

2011 SEP -6  PM 3: 53

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

8

9

10          UNITED STATES DISTRICT COURT

11          CENTRAL DISTRICT OF CALIFORNIA

12

13  | | |
MONTE CAHN, an individual,        )  CASE NO.  CV11-03800 SVW (AGRx)
                                  )
14                                )  **SECOND AMENDED COMPLAINT**
        Plaintiff,                )  **FOR:**
15                                )
        v.                        )  1)  **BREACH OF CONTRACT -**
16                                )      **MANAGEMENT INCENTIVE**
OVERSEE.NET, a California         )      **PLAN**
17  corporation; JEFF KUPIETZKY, an )  2)  **BREACH OF CONTRACT -**
    individual; LAWRENCE NG, an    )      **COMMISSION PLAN**
18  individual; and Does 1 through 10 )  3)  **BREACH OF CONTRACT -**
                                  )      **RESTAURANTS.COM**
19      Defendants.               )  4)  **ACCOUNTING**
                                  )  5)  **FRAUD**
20                                )  6)  **CONVERSION**
                                  )  7)  **CONVERSION**
21                                )
                                  )
22                                )
                                  )
23                                )
                                  )
24                                )
                                  )
25                                )
                                  )
26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

1    Plaintiff Monte Cahn alleges for his Complaint against Defendants
2    Oversee.net, Jeff Kupietzky and Lawrence Ng (collectively "Defendants") as
3    follows:

### JURISDICTION AND VENUE

5    1.    This Court has diversity jurisdiction of this action under 28 U.S.C. §
6    1332, in that there is complete diversity of citizenship between the parties, and the
7    amount in controversy exceeds the sum or value of $75,000, exclusive of interest and
8    costs.

9    2.    Venue is proper in the Central District under 28 U.S.C. § 1391(a) in that
10   one or more of the defendants reside in this judicial district, and in particular, in the
11   Court of Los Angeles, and a substantial part of the events giving rise to the claim
12   occurred in this district.

### PARTIES

14   3.    Plaintiff Monte Cahn ("Cahn" or "Plaintiff") is, and at all times
15   mentioned was, an individual residing in Lauderdale by the Sea, Florida.

16   4.    Defendant Oversee.net ("Oversee") is, and at all times mentioned was, a
17   corporation, organized and existing under the laws of the State of California, with its
18   principal place of business in Los Angeles, California. Cahn is informed and
19   believes that Oversee is a wholly owned subsidiary of ODN Holding Corporation
20   ("ODN").

21   5.    Defendant Jeff Kupietzky ("Kupietzky") is and/or was, at all times
22   mentioned was, an individual residing in California. Kupietzky is the Director, Chief
23   Executive Officer and President of Oversee.

24   6.    Defendant Lawrence Ng ("Ng") is, and at all times mentioned was, an
25   individual residing in California. Ng is the Chairman of the Board and Co-Founder
26   of Oversee.

27   7.    The true names and capacities, whether individual, corporate, associate
28   or otherwise, of the defendants named herein as Does 1 through 100, are unknown to

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4840-3169-8698.1

-2-

SECOND AMENDED COMPLAINT

1  Cahn at this time.  Cahn is informed and believes that each of these fictitiously
2  named defendants is in some manner responsible for the events and damages alleged
3  herein and will seek leave of court to amend this Complaint to show the true names
4  and capacities when the same have been ascertained.

5  ## FACTS AND BACKGROUND

6      8.    Cahn is one of the leading pioneers of the domain name selling, valuing,
7  and auction concept, starting one of the first online domain brokerage businesses on
8  the Internet in 1996.

9      9.    Cahn formed Domain Systems, Inc. d/b/a Moniker.com ("Moniker") in
10  1999.  Moniker is a web-based service that provides users a streamlined interface to
11  search for, register and manage their domain names.  It provides domain sales,
12  brokerage, registration of domains, domain traffic monetization and parking, drop
13  and expired name back order and purchasing services, and domain management and
14  asset management services.

15      10.    Cahn successfully managed and operated the business as an owner until
16  2005, at which time Seevast Corp. ("Seevast") purchased Moniker.  Cahn remained
17  CEO and maintained management responsibilities for the company until 2007.
18  Through his work with Moniker, Cahn became a highly respected figure in the
19  domain industry.

20      11.    Oversee specializes in monetizing, registering, selling and developing
21  domain names through its various subsidiaries, including SnapNames,
22  DomainSponsor, DOMAINfest, LowFares.com, ShopWiki.com,
23  AboutAirportParking.com and CreditCards.org.

24      12.    In or around 2007, Oversee approached Seevast and Cahn with an offer
25  to purchase Moniker.  The parties engaged in extensive negotiations.  However,
26  Oversee stated that it would not purchase Moniker unless Cahn, as one of the leaders
27  in the industry, agreed to join Oversee for at least three years after the sale.  Cahn's
28  agreement to join Oversee was an explicit condition of the agreement to purchase

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4840-3169-8698.1
-3-
SECOND AMENDED COMPLAINT

1    Moniker from Seevast.

2         13.    Kupietzky and Ng were primarily responsible for the negotiations on

3    behalf of Oversee and for making several statements, the purpose of which were to

4    induce Cahn to join Oversee after the merger.  These statements were made in or

5    around the year 2007 while Oversee and Seevast were negotiating the terms of their

6    purchase agreement.  These statements were untrue, were intended to fraudulently

7    induce Cahn to join Oversee, and were relied upon by Cahn in electing not to pursue

8    alternative employment opportunities.  Defendants' false and fraudulent

9    representations have caused Cahn to lose millions of dollars in lost opportunities and

10   income.  Additionally, as confirmed by Oversee's recent conversion of valuable

11   assets, it is clear that Defendants' conduct was intentional, malicious, and despicable,

12   thereby warranting punitive and exemplary damages.

13        14.    For example, in or around December 2007, Ng and Kupietzky and

14   Oversee promised Cahn that, post merger, Moniker would receive adequate

15   marketing and public relations assistance from Oversee.  During this same time

16   period, Ng and Kupietzky also represented to Cahn that Oversee could and would

17   centralize the operations of both Moniker and Oversee so that there was a seamless

18   integration of software and a uniform way to respond to intellectual property

19   disputes, litigation, audit and survey responses and complaints from customers.  Ng

20   and Kupietzky made these representations in an effort to induce Cahn to forego the

21   alternative, lucrative business opportunities that Cahn was considering.  These

22   representations were knowingly false and were relied upon by Cahn in electing not to

23   pursue alternative employment opportunities.

24        15.    Throughout the negotiations, Ng and Kupietzky, and Oversee

25   represented to Cahn that Oversee could fully integrate, support, and enhance the

26   business activities of Moniker's operations.  These representations were knowingly

27   false, were intended to fraudulently induce Cahn to join Oversee, and were relied

28   upon by Cahn in electing not to pursue alternative employment opportunities.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4840-3169-8698.1                          -4-
                              SECOND AMENDED COMPLAINT

1    Among other things, Ng and Kupietzky knew that Oversee had a contract with
2    Google that would render it impossible for Traffic Club to continue to operate in the
3    same manner after the merger.  Ng and Kupietzky were aware that Oversee's contract
4    with Google was inconsistent with Traffic Club's business model and operations.
5    Also, Ng and Kupietzky knew that SnapNames was paying Moniker substantial
6    revenue share payments in connection with its registrar business.  Ng and Kupietzky
7    knew that, after a merger, they could and/or would adjust or eliminate these revenue
8    share payments to Moniker, thereby reducing Moniker's EBITDA and undermining
9    Cahn's ability to reach the performance levels necessary for a bonus.  Because
10    SnapNames lost Network Solutions as a client/customer, this adjustment was critical
11    to conceal and obscure the difficulties with the multimillion dollar SnapNames'
12    acquisition.  Thus, based on Ng's and Kupietzky's false, fraudulent, and misleading
13    representations about the seamless integration, Cahn agreed not to pursue alternative
14    employment opportunities that would have enabled him to realize millions of dollars
15    in compensation.

16       16.    In or around December 2007, Ng, Kupietzky, and Oversee also
17    promised Cahn that there would be integration and cross-selling potential between all
18    of Oversee's subsidiaries.  This included Moniker's ability to cross-promote and
19    advertise to the customers of each Oversee entity.  Kupietzky assured Cahn that, if
20    Cahn joined Oversee, Oversee would not terminate or eliminate the positions of the
21    Moniker employees.  These representations were knowingly false, were intended to
22    fraudulently induce Cahn to join Oversee, and were relied upon by Cahn in electing
23    not to pursue alternative employment opportunities.

24       17.    During the merger discussions, Ng made statements to Cahn regarding
25    his view that Moniker, pre-merger, was "understaffed" and its employees
26    "overworked."  Based on this assessment, Ng promised Cahn that, if he joined
27    Oversee, the merger with Oversee would provide Moniker with the resources and
28    staffing it needed to flourish in the market.  Ng claimed that, with the added

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4840-3169-8698.1

SECOND AMENDED COMPLAINT

1   resources, Cahn could realize income from employment at Oversee that he could not

2   receive from pursuing the other alternative employment opportunities that Cahn was

3   considering. Ng made these representations in an effort to mislead Cahn, to deceive

4   Cahn into joining Oversee, and to prevent Cahn from establishing and/or assisting an

5   alternative competitor to Oversee. These representations were not true and were

6   relied upon by Cahn in electing not to pursue alternative employment opportunities.

7      18.   During the negotiations with Ng, Kupietzky, and Oversee, it was

8   determined and agreed upon that, if Cahn were to join Oversee, he would serve as the

9   President of Moniker, and would have the normal duties, responsibilities, functions

10  and authority as are normally associated with and appropriate for such position.

11     19.   During negotiations, Ng and Kupietzky, and Oversee told Cahn that

12  Cahn would report directly to Ng, who was then the CEO, ensuring Cahn had

13  adequate authority and dominion to carry out and achieve Moniker's performance

14  goals within Oversee's infrastructure. Because Cahn had a great professional

15  relationship with Ng, it was important for Cahn that Ng be the individual to which he

16  would report. Further, Ng knew and understood that Cahn considered Ng's promise

17  and assurance of a direct reporting relationship critical to any successful merger of

18  Oversee and Moniker. In contradiction to defendants' representations and

19  assurances to Cahn, Ng was in the process of resigning as the CEO of Oversee.

20  Cahn relied on defendants' false representations in deciding not to pursue alternative

21  employment opportunities. If Ng, Kupietzky, and Oversee had told the truth about

22  Ng's plans and intentions, Cahn would have pursued the alternative employment

23  opportunities that Kupietzky and Ng induced Cahn to forego.

24     20.   As an additional inducement for Cahn to join Oversee.net, Oversee,

25  through Ng and Kupietzky, proposed a "Management Incentive Plan" ("MIP")

26  whereby Cahn would be able to earn up to $13,000,000 through a goal oriented

27  bonus structure. The MIP was to be in effect from October 1, 2007 through

28  December 31, 2010, and divided into three "determination periods." The bonus

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

1   structure set forth under the proposed MIP was based on Cahn's attainment of certain

2   performance goals in four categories: the Registrar Business Segment, the Domain

3   Sales Business Segment, the TrafficClub Business Segment, and Oversee EBITDA.

4   Cahn's performance was to be determined, in good faith, by the Oversee board of

5   directors, and was based upon Oversee's Interim Financial Statements or the

6   Determination Period Financial Statements.  Based upon the events that transpired,

7   Cahn now believes that Oversee and its representatives, including Kupietzky and Ng,

8   had no intention of acting in good faith with respect to the creation and performance

9   of the MIP.  Rather, Oversee and its representatives, including Kupietzky and Ng,

10  made numerous false and misleading statements to Cahn and made whatever

11  statement they thought necessary to induce Cahn to join Oversee and to prevent Cahn

12  from pursuing an alternative opportunity.

13      21.   Ng and Kupietzky were primarily responsible for making the false

14  representations and assurances to Cahn that he would be able to earn up to

15  $13,000,000 in bonuses under the MIP.  Ng and Kupietzky, as representatives of

16  Oversee, made these false representations because they wanted to ensure that Cahn

17  did not pursue employment opportunities with a competitor.  Cahn relied on these

18  false and fraudulent representations by Ng, Kupietzky, and Oversee in electing not to

19  pursue alternative employment opportunities.

20      22.   Kupietzky, on behalf of all Defendants, represented to Cahn during the

21  negotiations that the overall Oversee EBITDA in the MIP would be adjusted, either

22  up or down, from the time the merger took place throughout the term of the MIP, and

23  those calculations would be the controlling benchmarks.  Similarly, during the

24  negotiations, other defendant representatives, including Todd Greene and Hamed

25  Meshki, represented and assured Cahn that if the performance goals for Oversee

26  EBITDA could not be determined before the merger, the parties would meet in good

27  faith and develop objective criteria for determining these goals.  Defendants'

28  representatives assured Cahn that these goals would be the same as the goals for

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4840-3169-8698.1

1   other senior management.  Josh Armstrong and Jeff Navach also have knowledge
2   and information relating to these representations.  When Defendants made these
3   representations and assurances, Cahn was considering whether to pursue various
4   employment opportunities.  Based on Defendants' representations about Moniker's
5   ability to successfully integrate with Oversee, assurances that Cahn would have the
6   ability to earn up to $13,000,000 in payments under the MIP, and assurances that
7   Cahn would realize additional benefits from joining Oversee, Cahn was induced to
8   forego other lucrative business opportunities, and continue in his management and
9   oversight of Moniker.  Defendants' representations were not true, were fraudulently
10  made, and were relied upon by Cahn to his detriment.

11        23.    The parties reached a mutual agreement regarding the terms of the sale
12  of Moniker to Oversee on or around December 14, 2007.

13        24.    Cahn is informed and believes, and on the basis of such information and
14  belief alleges that sometime on or around December 2007, but on a date presently
15  unknown to Cahn, Defendants formed the intent, and actively concealed and
16  misrepresented the true fact that they intended to fully subjugate Moniker and Cahn,
17  taking for themselves the full benefit of Moniker's great public reputation and
18  industry value at the time of merger while simultaneously jettisoning and reducing
19  Cahn's staff, influence and ability to properly manage and lead Moniker.  In doing
20  so, Defendants intended to and did make it impossible for Cahn to obtain benefits
21  under the MIP.  Also, Defendants acted in this deceitful manner in an effort to
22  fraudulently persuade Cahn not to pursue alternative employment opportunities
23  before and during his employment at Oversee.  Cahn relied on these false, fraudulent,
24  and misleading representations to his detriment.

25        25.    Post merger, Defendants took numerous affirmative actions in direct
26  contradiction to the express and implied representations by Ng, Kupietzky, and
27  Oversee.  These actions, include, but are not limited to, the following:

28              a.     While acting as President of Moniker at Oversee, Oversee

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4840-3169-8698.1                                    -8-
                                    SECOND AMENDED COMPLAINT

1    delegated Cahn the additional responsibility of running the

2    SnapNames and DomainSponsor divisions of Oversee, and

3    removed Cahn's oversight and control from the Registrar

4    Business Segment. No explicit changes were made to modify

5    Cahn's performance goals under the MIP, as required under the

6    terms of the MIP, to take into account the additional

7    responsibilities that Cahn would incur, and the changes that the

8    additional subdivisions would have on Monikers' EBITDA.

9    Based upon their representations and assurances, Defendants had,

10   at a minimum, an implied obligation to factor these additional

11   responsibilities into Cahn's performance goals.

12   b.   Prior to the merger Oversee purchased SnapNames. At the time,

13        SnapNames was the leading drop catching, back order and

14        expired name services company in the industry. Moniker was the

15        second best performing registrar. Shortly after the acquisition

16        SnapNames lost its largest client, Network Solutions. In order to

17        disguise and prevent the Oversee Board and others from

18        recognizing the disastrous effect of the departure of Network

19        Solutions, after the merger, Oversee improperly diverted

20        Moniker's registrar revenue to SnapNames, thereby artificially

21        deflating Moniker's EBITDA. More specifically, before the

22        merger, Moniker was receiving 70 or 80% revenue share payment

23        from SnapNames. After the merger, Oversee directed that all

24        revenue and profit go to SnapNames such that Moniker lost

25        substantial revenue and profit recognition, and SnapNames

26        reported 100% of Moniker's revenue as their profit. This deflated

27        Moniker's EBITDA by more than $700,000 annually and

28        increased SnapNames by the same amount.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4840-3169-8698.1                    -9-
                      SECOND AMENDED COMPLAINT

c.  Oversee improperly diverted substantial revenues and profits from Moniker to other subsidiaries of Oversee. For example, Oversee diverted Moniker's default DNS traffic and revenue / profit directly to DomainSponsor, again deflating Moniker EBITDA by that same amount and reporting 100% of that revenue as profit to DomainSponsor.

d.  Oversee shut down the TrafficClub operation and diverted all of its revenues to other subsidiaries of Oversee. Unbeknownst to Cahn, Oversee was required by its contract with Google to terminate or substantially alter the operations of TrafficClub. In closing this business, Ng, Kupietzky and Oversee successfully denied Cahn the benefit of the bargain that they had promised and contradicted their express representations that Moniker's business would be integrated and enhanced by the merger.

e.  Cahn's staff at Moniker was reduced by more than 33% despite Ng's promises that Moniker would be infused with resources to alleviate its pre-merger under staffing issues.

f.  Oversee improperly and incorrectly reported Moniker's Selling, General & Administrative Expenses, which had the effect of making it seem as if Moniker underperforming. Oversee also improperly and wrongfully included non-Moniker expenses from SnapNames and Oversee Corporate.

g.  Oversee severely restrained the marketing and public relations budget available to Moniker, reserving those funds almost exclusively for Oversee's use despite Kupietzky's promises to provide Moniker with adequate support in this area, and cutting/eliminating Moniker's domain auctions. This negatively impacted Cahn and Moniker's abilities to reach their performance

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

1      goals.

2   h.   Oversee placed severe restrictions on Moniker's ability to transact

3        in adult domain names which, pre-merger, comprised a substantial

4        portion of Moniker's business. This negatively impacted Cahn

5        and Moniker's abilities to reach their performance goals and

6        contradicted defendants' assurances and representations that

7        Moniker's business would not change post-merger.

8   i.   Moniker was explicitly denied the opportunity to cross-market to

9        other Oversee subsidiaries' customers despite Kupietzky's and

10        Oversee's promises that the Oversee business units would work

11        together in this regard.  Defendants' failure to act in accordance

12        with their representations and assurances negatively affected

13        Cahn's and Moniker's ability to achieve their goals.

14   j.   Oversee, through Ng and Kupietzky, purposely delayed

15        implementing infrastructure and technology integration between

16        Moniker and Oversee which resulted in Moniker's inability to

17        fully monitor, account for and measure its own performance

18        levels, impacted Moniker's revenue, and its achievement of its

19        EBITDA goals.

20   k.   Oversee implemented a nine month freeze on development of new

21        products and services post-merger which hampered Moniker's

22        ability to adjust to their new role within Oversee's infrastructure

23        and keep up with the inherently quick-paced technological

24        environment in which they all worked, as a result Moniker lost its

25        competitive advantage in the market, and its highly regarded

26        reputation and customers.

27   l.   Despite the agreements between the parties, Cahn's reporting

28        relationship was changed several times throughout his tenure with

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4840-3169-8698.1                          -11-
                          SECOND AMENDED COMPLAINT

Oversee so that he was no longer reporting to the CEO. This had the effect of relegating Cahn to a non-senior executive position and stripping Cahn of his ability to effectively manage Moniker.

m.  As part of the change in Cahn's reporting, Cahn had to go through Kupietzky and his subordinates in order to approve expenses for Moniker's employees and pricing some of the products Moniker offered. Oversee also denied Cahn any budget decision making capability. These tasks are critical, if not essential, parts of the normal duties, responsibilities, functions and authority normally associated with and appropriate for Cahn's position as President of Moniker. When these responsibilities were taken away, Cahn no longer had the full ability to perform in his role as President.

n.  Oversee stalled and ultimately did not obtain a California escrow license for Moniker so that it could legally perform its auctions in California, the state in which Oversee was based. This adversely affected Moniker's ability to earn revenue through its live domain auctions and escrow revenue and profit which Moniker was an industry leading provider of.

o.  Oversee drastically reduced Moniker's staff and its staff training budget which Cahn needed to properly invest in one of Moniker's largest commodities - its employees.

p.  Post-merger, and due to the conduct delineated above, customers began to lose confidence in Moniker, sending numerous complaints and even taking their business elsewhere. Despite Cahn's repeated complaints to Defendants about the lack of commitment from Oversee to maintaining the integrity of Moniker's business operations, Defendants' intentional actions had the effect of causing Moniker to lose customers, negatively

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4840-3169-8698.1

-12-

SECOND AMENDED COMPLAINT

1                  affecting Cahn and Moniker's abilities to achieve their

2                  performance goals.

3        q.      Additionally, knowing Cahn wanted to work for Ng directly due

4                  to their professional relationship, Oversee and Ng represented to

5                  Cahn that he would report directly to Ng post-merger. However,

6                  Cahn is informed and believes, and on that basis alleges that at

7                  the time that representation was made, Ng knew that he would be

8                  stepping down as CEO in the very near future and was already

9                  looking for his replacement. Had Cahn known this fact he would

10                  not have agreed to work with Oversee.

11      26.     Due to Defendants' intentional acts as outlined above, Cahn was

12 prevented from earning benefits under the MIP. Cahn is informed and believes, and

13 on the basis of such information and belief alleges that in 2009 Oversee was within

14 at least seventy percent of its yearly EBITDA goal, entitling Cahn, at a minimum, to

15 the Oversee EBITDA award for 2009 under the MIP. In direct violation of the MIP,

16 Oversee failed to provide Cahn his award.

17      27.     Cahn is informed and believes, and on the basis of such information and

18 belief alleges that in 2010 Oversee met its yearly EBITDA goal, entitling Cahn, at a

19 minimum, to the Oversee EBITDA award for 2010 under the MIP. In direct

20 violation of the MIP, Oversee failed to provide Cahn his award. During his

21 employment term with Oversee Cahn did not receive one cash award under the MIP.

22      28.     Additionally, due to Defendants' deceitful conduct used to induce Cahn

23 to join Moniker, Cahn lost the opportunity to realize additional, substantial

24 compensation from alternative employment opportunities. Cahn believes that these

25 lost opportunity and other economic damages total in excess of several millions of

26 dollars.

27      29.     On or around June 4, 2010, Oversee offered Cahn an additional form of

28 compensation through a commission plan ("Commission Plan"). Oversee's goal was

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4840-3169-8698.1

-13-

1  to leverage Cahn's skill set in order to achieve their corporate Gross Profit and
2  Revenue goals for 2010.  Oversee utilized Cahn's expertise to close individual sales
3  transactions with particular reference to high-value names sales, and Cahn was to
4  receive a pre-determined percentage based on the prescribed scale.  This
5  compensation was to be in addition to that delineated in the MIP.

6      30.   Through their improper diversion of revenue and accounting errors,
7  Defendants denied Cahn full compensation under the Commission Plan.

8      31.   During his employment term with Oversee Cahn performed all of his
9  duties and responsibilities as required under both the terms of his employment, and
10  under the conditions of the MIP, the Commission Plan and the additional
11  responsibilities bestowed upon him, beyond those required under the terms of the
12  contracts.

13      32.   Additionally, throughout his employment with Oversee, Cahn was
14  directed to assume additional responsibilities relating to additional parts of Oversee's
15  business.  Based upon Kupietzky's, Ng's, and Oversee's assurances, Cahn
16  reasonably understood that his compensation and bonus arrangement would reflect
17  these additional responsibilities.  However, after securing the benefits of Cahn's
18  expertise and inducing Cahn to forego alternative employment, Oversee, Kupietzky,
19  and Ng refused to provide Cahn with any financial recognition.

20      33.   Instead, Cahn believes that Kupietzky engaged in deliberate, bad faith
21  efforts to prejudice and undermine Cahn's ability to realize the performance
22  standards set forth in the MIP.  Cahn believes that Kupietzky, with the knowledge
23  and/or approval of Ng, was responsible for directing his subordinates to misdirect
24  and misapply revenue so that Cahn would not realize his bonuses.  The misdirection
25  of resources may also have been part of an effort by Kupietzky to prevent Oversee's
26  Board of Directors to discover the true facts about various, disappointing
27  transactions that Kupietzky had engineered, supported, or negotiated on behalf of
28  Oversee.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4840-3169-8698.1

-14-

1    34.    Cahn's employment with Oversee expired on December 31, 2010. The

2  agreement was not renewed.

3    35.    Since Cahn's employment terminated, Oversee and its representatives

4  have refused to provide Cahn with the information to calculate the amount owed for

5  the MIP or to understand the diversion and misapplication of revenues in Oversee's

6  operations. Instead, Oversee and its representatives have implemented a delay

7  strategy that they used with at least two other former representatives of Oversee.

8  This deceitful strategy consists of denying Oversee's obligations, forcing the former

9  employee to institute litigation and incur substantial legal fees, delaying disclosure of

10 complete information about Oversee's debts and obligations, and ultimately offering

11 to compromise for a fraction of the amount owed. Oversee acts in this manner

12 because it believes that it has substantial resources that can be used to overwhelm the

13 resources of its former representatives.

14                 **FIRST CLAIM FOR RELIEF**

15   **BREACH OF CONTRACT - 2007 MANAGEMENT INCENTIVE PLAN**

16                    **(Against Oversee)**

17    36.    Cahn incorporates Paragraphs 1 through 35 as though fully set forth

18 herein.

19    37.    Cahn entered into a valid, enforceable, written 2007 Management

20 Incentive Plan on December 14, 2007, which provided Cahn with additional cash

21 compensation upon the attainment of the delineated performance goals.

22    38.    Pursuant to paragraph 10 of the contract, the MIP contains the entire

23 agreement between the parties with respect to Cahn's supplemental compensation for

24 the attainment of his performance goals, and supercedes all prior agreements or

25 understandings, whether written or oral, between the parties relating to such subject

26 matter.

27    39.    Cahn performed all the conditions, covenants and promises required on

28 his part to be performed, to the extent his duties and obligations have not been

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4840-3169-8698.1                        -15-
                            SECOND AMENDED COMPLAINT

1  excused, frustrated or prevented by the wrongful acts and omissions of Oversee.

2      40.     Oversee's conduct, as alleged herein, constitutes a material breach of the

3  MIP in that, amongst other acts, Oversee (i) failed to pay awards under the MIP for

4  each determination period upon attainment of the performance goals, as established

5  by the contract; (ii) failed to determine, in good faith, the attainment of the

6  performance goals as set forth in the contract; (iii) failed to make the requisite

7  amendments to the contract, and failed to take into consideration, the acquisition of

8  new business segments and the change in management and control of other business

9  segments in the determination of the performance goals under the MIP; (iv)

10 intentionally took actions for the sole purpose of manipulating the Registrar

11 EBITDA, Oversee EBITDA, Domain Sales EBITDA and the Gross Profit with

12 respect to the Traffic Club Business Segment; (v) improperly diverted revenue and

13 profit from Moniker to SnapNames; and (vi) improperly diverted revenue from

14 Moniker to DomainSponsor.

15     41.     As a direct, actual and proximate result of the conduct alleged herein,

16 Cahn has suffered, and continues to suffer, significant damages in an amount to be

17 proven at trial, but that exceeds $75,000, together with interest thereon at the legal

18 rate.

19                    **SECOND CLAIM FOR RELIEF**

20          **BREACH OF CONTRACT - COMMISSION PLAN 2010**

21                         **(Against Oversee)**

22     42.     Cahn incorporates Paragraphs 1 through 35 as though fully set forth

23 herein.

24     43.     Cahn entered into a valid, enforceable, written Commission Plan on

25 May 24, 2010, which provided Cahn a reward and incentive for his sale of both third

26 party and owned and operated domain names.   This plan was in addition to the MIP

27 and the ICP.

28     44.     Cahn performed all the conditions, covenants and promises required on

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4840-3169-8698.1                          -16-
                              SECOND AMENDED COMPLAINT

1 | his part to be performed, to the extent his duties and obligations have not been

2 | excused, frustrated or prevented by the wrongful acts and omissions of Oversee.

3 |     45.   Oversee's conduct, as alleged herein, constitutes a material breach of the

4 | Commission Plan in that Oversee has failed to pay Cahn his rewards pursuant to the

5 | terms of the Commission Plan. Additionally, there were deals that Cahn closed

6 | before his employment ended to which he is due commission pursuant to the

7 | Commission Plan. Oversee's failure to pay these commissions constitutes a material

8 | breach of the Commission Plan.

9 |     46.   As a direct, actual and proximate result of the conduct alleged herein,

10 | Cahn has suffered, and continues to suffer, significant damages in an amount to be

11 | proven at trial, but that exceeds $75,000, together with interest thereon at the legal

12 | rate.

13 | ### THIRD CLAIM FOR RELIEF

14 | ### BREACH OF CONTRACT - RESTAURANTS.COM

15 | **(Against Oversee)**

16 |     47.   Cahn incorporates Paragraphs 1 through 35 as though fully set forth

17 | herein.

18 |     48.   Cahn and Oversee entered into a valid and binding agreement that upon

19 | the closing of Restaurants.com sale, Cahn would be entitled to a commission

20 | payment as an outside broker, and was to receive fifty-percent of the payable

21 | commission. The payable commission on Restaurants.com was negotiated at 20

22 | percent of the gross profit of the sale. Cahn's commission agreement for the sale of

23 | Restaurants.com was confirmed by Defendants, including confirmation from Craig

24 | Snyder, General Manager of Oversee, in a February 9, 2011 email from Snyder to

25 | Cahn.

26 |     49.   Cahn performed all the conditions, covenants and promises required on

27 | his part to be performed, to the extent his duties and obligations have not been

28 | excused, frustrated or prevented by the wrongful acts and omissions of Oversee.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4840-3169-8698.1

-17-

50.  Cahn successively brokered the sale of Restaurants.com, and the deal closed in February 2011. Oversee failed to provide Cahn his commission payment.

51.  Oversee's conduct, as alleged herein, constitutes a material breach of the contract in that Oversee has failed to pay Cahn his commission pursuant to the terms of the agreement.

52.  As a direct, actual and proximate result of the conduct alleged herein, Cahn has suffered, and continues to suffer, significant damages in an amount to be proven at trial, but that exceeds $75,000, together with interest thereon at the legal rate.

## FOURTH CLAIM FOR RELIEF

### ACCOUNTING

### (Against Oversee)

53.  Cahn incorporates Paragraphs 1 through 35 as though fully set forth herein.

54.  Oversee represented to Cahn that he would have the ability to receive up to $13,000,000 in payments under the MIP. Unbeknownst to Cahn at the time, Oversee never had the intent to pay Cahn under the MIP. Oversee also wrongfully interfered with Cahn's ability to achieve his performance goals under the terms of MIP, ensuring that he would not collect his bonus payments under the MIP.

55.  Had Cahn known Oversee's true intent at the time the contract was entered, Cahn would not have agreed to the assist in the sale of Moniker by entering into the MIP, and maintaining his position as President of Moniker, for the benefit of Oversee.

56.  Cahn and Oversee also entered into a Commission Plan on May 24, 2010 which provided Cahn a reward and incentive for his sale of both third party and owned and operated domain names. Unbeknownst to Cahn at the time, Oversee never had the intent to fully pay Cahn under the Commission Plan.

57.  Had Cahn known Oversee's true intent at the time the contract was

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

-18-

SECOND AMENDED COMPLAINT

1   entered, Cahn would not have agreed to expend valuable time and energy in

2   consummating the domain sales for the benefit of Oversee while foregoing other

3   valuable business opportunities.

4       58.   Cahn is informed and believes that he is entitled to cash awards pursuant

5   to the MIP and the Commission Plan.  The parties mutually agreed to the terms of the

6   MIP and the Commission Plan, and Oversee failed to abide by the express terms of

7   the contracts.  Oversee has failed to make any payments to Cahn under either the

8   MIP or the Commission Plan.

9       59.   Cahn is informed and believes, and on the basis alleges that he cannot

10   ascertain what is rightfully due and owed to him without an accounting.

11   **FIFTH CLAIM FOR RELIEF**

12   **FRAUD**

13   **(Against All Defendants)**

14       60.   Cahn incorporates Paragraphs 1 through 35 as though fully set forth

15   herein.

16       61.   During the negotiations in December 2007, Cahn was well known in the

17   industry as one of the leaders in domain name sales, valuing, auctioning and parking,

18   and was a direct competitor with Oversee.

19       62.   As a direct competitor, Oversee had an interest in acquiring Moniker as

20   a business, and Cahn as an employee.  Oversee, Kupietzky, and Ng were keenly

21   aware that, unless they induced Cahn to join Oversee as part of the merger

22   transaction, Cahn would join or create a new company which would likely reduce the

23   value and profitability of the Oversee-Moniker merger.

24       63.   In order to appear more desirable in the bidding process, Oversee

25   inflated its bid to push out the other bidders, two of which were private equity firms

26   who offered Cahn very enticing and lucrative business opportunities.

27       64.   Once Seevast commenced negotiations with Oversee, Oversee reduced

28   its bid.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4840-3169-8698.1

-19-

SECOND AMENDED COMPLAINT

1   65. However, in order to secure Cahn's employment at Oversee, and to

2 prevent Cahn from joining a competitor or starting a competing venture, Defendants

3 intentionally made numerous fraudulent and false representations, some of which

4 were set forth above.  These representations, which occurred during the pre-

5 employment negotiations, also included, but are not limited to, the following:

6    a. Kupietzky and Ng represented that the employment offer and

7      opportunity presented to Cahn was more lucrative than any other

8      offer currently available to him;

9    b. Kupietzky and Ng represented that Cahn would be establishing a

10     long-term prosperous relationship with Oversee and that Oversee

11     would ensure that Cahn had a viable platform to develop and

12     grow his various business opportunities;

13    c. Kupietzky and Ng represented that in addition to the MIP, Cahn

14     could expect additional salary, bonuses, commission, and other

15     lucrative business opportunities through his relationship with

16     Oversee;

17    d. Kupietzky represented that joining Oversee would maximize

18     Moniker's profitability because of the marketing, public relations

19     resources, technology and integration provided by Oversee;

20    e. Ng represented that joining Oversee would maximize Moniker's

21     profitability because of the increased staffing and company

22     resources that Oversee would provide Moniker;

23    f. Ng represented that Cahn would report directly to him, as the

24     CEO of Oversee, which was instrumental in Cahn carrying out his

25     duties as President of Moniker;

26    g. Kupietzky and Ng represented that Cahn would be treated in the

27     same manner as all of the other Oversee executives;

28    h. Kupietzky and Ng represented that they would provide Cahn all

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
 4840-3169-8698.1       -20-
SECOND AMENDED COMPLAINT

1    of the resources and integration he needed in order to develop his

2    platform at Oversee;

3    i.    Kupietzky represented to Cahn during the negotiations that the

4          overall Oversee EBITDA in the MIP would be adjusted, either up

5          or down, from the time the merger took place throughout the term

6          of the MIP, and those calculations would be the controlling

7          benchmarks. Similarly, during the negotiations, other Defendant

8          representatives, including Todd Greene and Hamed Meshki

9          represented and assured Cahn that if the performance goals for

10         Oversee EBITDA could not be determined before the merger, the

11         parties would meet in good faith and develop objective criteria for

12         determining these goals. Defendants' representatives assured

13         Cahn that these goals would be the same as the goals for other

14         senior management;

15   j.    Kupietzky and Ng represented that Cahn would directly report to

16         Ng and that Ng intended to remain as the CEO of Oversee for the

17         foreseeable future;

18   k.    Kupietzky and Ng represented that there would be a seamless

19         transition of Moniker's business activities into Oversee and that

20         the Moniker staff would prosper by the merger of the companies;

21   l.    Kupietzky and Ng represented that Cahn would enjoy a leadership

22         role in Oversee; and

23   m.    Ng and Kupietzky represented to Cahn that Oversee could fully

24         integrate, support, and enhance the business activities of

25         Moniker's operations. These representations were untrue, were

26         intended to fraudulently induce Cahn to join Oversee, and were

27         relied upon by Cahn in electing not to pursue alternative

28         employment opportunities. Among other things, Ng and

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4840-3169-8698.1

-21-

SECOND AMENDED COMPLAINT

Kupietzky knew that Oversee had a contract with Google that would render it impossible for TrafficClub to continue to operate in the same manner after the merger. Ng and Kupietzky were aware that Oversee's contract with Google was inconsistent with TrafficClub's business model and operations. Also, Ng and Kupietzky knew that SnapNames was paying Moniker substantial revenue share payments in connection with its registrar business. Ng and Kupietzky knew that, after a merger, they could and/or would adjust or eliminate these revenue share payments to Moniker, thereby reducing Moniker's EBITDA and undermining Cahn's ability to reach the performance levels necessary for a bonus. Because SnapNames had lost Network Solutions as a client/customer, this adjustment was critical to conceal and obscure the difficulties with the multimillion dollar SnapNames' acquisition.

66.   At the time these statements were made, Oversee, Kupietzky and Ng knew that the statements were false and misrepresented the true fact that they intended to fully subjugate Moniker and Cahn, taking for themselves the full benefit of Moniker's great public reputation and industry value at the time of merger.

67.   At the time the statements were made, Ng and Oversee knew that he would be stepping down as CEO and leaving Oversee, Ng and Oversee also knew that his relationship with Cahn was crucial to Cahn's decision to join Oversee.

68.   At the time these statements were made, Oversee, Kupietzky and Ng knew that Oversee had no intention of allowing Cahn to realize any of the bonuses or employment opportunities that were discussed in the negotiations.

69.   Defendants made these statements to Cahn with the deliberate intent to eliminate their primary competition at a discounted rate, knowing that the incentives promised to Cahn would never materialize.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4840-3169-8698.1

-22-

SECOND AMENDED COMPLAINT

70.     During the time of the negotiations, Cahn had numerous other lucrative opportunities available to him including accepting employment at various private equity firms, purchasing Moniker for himself or starting his own competitive domain related business.

71.     However, based on the aforementioned representations, and based on the incentives offered by Oversee, Cahn was induced to forgo the other lucrative business opportunities, and accepted employment with Oversee.  If Defendants had told Cahn the truth, he never would have agreed to join Oversee.

72.     As a direct, actual and proximate result of the conduct alleged herein, Cahn has suffered, and continues to suffer, significant damages in an amount to be proven at trial, but that exceeds $75,000, together with interest thereon at the legal rate.  These damages included, but are not limited, to the millions of dollars in lost opportunities and other damages that resulted directly from Defendants' false and fraudulent representations and assurances.

73.     Defendants' misleading conduct, false and fraudulent representations, and false and fraudulent assurances were intentional, despicable, and malicious. Defendant Oversee authorized and ratified the despicable conduct of Kupietzky, Ng, and Oversee's other representatives.  Defendants are therefore guilty of malice, oppression, or fraud, warranting an assessment of exemplary damages in an amount appropriate to punish Defendants and to deter others from engaging in similar misconduct.

## SIXTH CLAIM FOR RELIEF

### CONVERSION

#### (Against Oversee)

74.     Cahn incorporates Paragraphs 1 through 35 as though fully set forth herein.

75.     At the time of the merger, Oversee intended to obtain possession of all of Moniker's owned and operated domain names.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4840-3169-8698.1

-23-

SECOND AMENDED COMPLAINT

76.     After the merger, Oversee did in fact obtain possession of all of Moniker's owned and operated domain names.

77.     After the merger, Cahn discovered that approximately 4,500 of his personal domain names were combined with Moniker's owned and operated names at the time of the merger, and were within Oversee's possession.

78.     While Cahn's personal domain names were in Oversee's possession, Oversee received advertising revenue through DNS monetization of his personal domain names.

79.     Cahn made repeated demands to Oversee for the information related to the actual revenue earned by Oversee though Cahn's personally owned names while they were in Oversee's possession, to which there has been no response. As such, Oversee prevented Cahn from accessing, and refused to return the revenue earned from Cahn's personal property.

80.     Oversee still remains in possession of approximately 200 of Cahn's personal domain names which Oversee has been monetizing and receiving revenue on, to Cahn's detriment, for at least three years.

81.     As the rightful owner of the domain names, Cahn is entitled to all advertising revenue produced through Oversee's intentional parking of Cahn's personal domains while the domain names were within its possession.

82.     Cahn is also entitled to the return of the remaining domain names still in Oversee's possession.

83.     As a direct, actual and proximate result of the conduct alleged herein, Cahn has suffered, and continues to suffer, significant damages in an amount to be proven at trial, but that exceeds $75,000, together with interest thereon at the legal rate.

## SEVENTH CLAIM FOR RELIEF

### CONVERSION

**(Against Oversee)**

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

1    84.   Cahn incorporates Paragraphs 1 through 35 as though fully set forth
2 herein.

3    85.   On August 16, 2011, Rick Terry, an employee of Oversee, was directed
4 by the Oversee legal department to confiscate Cahn's personal account.

5    86.   On August 16, 2011, Cahn was locked out of his personal account with
6 Oversee that contained in excess of 3,000 personal domain names.

7    87.   The DNS on Cahn's personal domain names was redirected to Oversee.
8 As a result Oversee received the stream of revenue from Cahn's personally owned
9 domain names.

10    88.   Cahn's account was restored on August 31, 2011.  However, in the
11 meantime Cahn's private information, as the owner of the domain names, was
12 improperly disclosed to the public.

13    89.   As the rightful owner of the domain names, Cahn is entitled to all
14 revenue produced from Oversee's intentional monetization of Cahn's domain names
15 while they were within its possession.

16    90.   As a direct, actual and proximate result of the conduct alleged herein,
17 Cahn has suffered, and continues to suffer, significant damages in an amount to be
18 proven at trial, but that exceeds $75,000, together with interest thereon at the legal
19 rate.

20

21                     **PRAYER FOR RELIEF**

22    Wherefore, Cahn prays for judgment in his favor and against Defendants as
23 follows:

24    1.   For judgment in his favor, and against Defendants, for compensatory
25 damages in an amount to be proven at trial, but exceeding $75,000;

26    2.   For punitive damages in an amount to be determined by the trier of fact;

27    3.   For an accounting to determine the amounts due to Cahn under the
28 terms of the MIP, which would have been received by Cahn but for the wrongful

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4840-3169-8698.1

-25-

SECOND AMENDED COMPLAINT

conduct of Defendants;

    4.    For restitution of all wrongfully withheld amounts and disgorgement of all ill-gotten profits, in an amount according to proof;

    5.    For costs of suit;

    6.    For prejudgment and post-judgment interest; and

    7.    For such other relief as the Court may deem just and proper.


DATED: September 6, 2011    JOHN L. BARBER
    KENNETH D. WATNICK
    **LEWIS BRISBOIS BISGAARD & SMITH LLP**

By_____
    Kenneth D. Watnick
    Attorneys for MONTE CAHN, an individual


## DEMAND FOR JURY TRIAL

Cahn hereby demand trial by jury to the full extent permitted by law.


DATED: September 6, 2011    JOHN L. BARBER
    KENNETH D. WATNICK
    **LEWIS BRISBOIS BISGAARD & SMITH LLP**

By_____
    Kenneth D. Watnick
    Attorneys for MONTE CAHN, an individual

LEWIS BRISBOIS BISGAARD & SMITH LLP

1

# FEDERAL COURT PROOF OF SERVICE
Monte Cahn v. Oversee Net, et al.

2   USDC Central District of California Case No: CV-11-03800 SVW (AGRx)

3   STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

4   At the time of service, I was over 18 years of age and not a party to the action.

5   My business address is 221 North Figueroa Street, Suite 1200, Los Angeles, California  90012.  I am employed in the office of a member of the bar of this Court at whose direction the service was made.

6

7   On September 6, 2011, I served the following document(s): **SECOND AMENDED COMPLAINT FOR:**

8   **1)   BREACH OF CONTRACT - MANAGEMENT INCENTIVE PLAN**
**2)   BREACH OF CONTRACT - COMMISSION PLAN**

9   **3)   BREACH OF CONTRACT - RESTAURANTS.COM**
**4)   ACCOUNTING**
**5)   FRAUD**

10  **6)   CONVERSION**
**7)   CONVERSION**

11

12  I served the documents on the following persons at the following addresses (including fax numbers and e-mail addresses, if applicable):

13  **Attorney for Defendants:**
William Delgado

14  WILLENKEN WILSON LOH & LIEB LLP
707 Wilshire Boulevard, Suite 3850

15  Los Angeles, CA 90017
E-Mail: WDelgado@willenken.com

16  (213) 955-8026 ofc.
(213) 250-7900 fax

17  The documents were served by the following means:

18  [X] (BY U.S. MAIL) I enclosed the documents in a sealed envelope or package

19  addressed to the persons at the addresses listed above and (specify one):

20  [ ] Deposited the sealed envelope or package with the U.S. Postal Service, with the postage fully prepaid.

21  [X] Placed the envelope or package for collection and mailing, following our

22  ordinary business practices.  I am readily familiar with the firm's practice for collection and processing correspondence for mailing.  Under that practice, on the

23  same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the U.S. Postal Service, in a sealed envelope of

24  package with the postage fully prepaid.

25  I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

26

27  Executed on September 6, 2011, at Los Angeles, California.

28  _____
Diana Larenas