William A. Delgado (Bar No. 222666)
wdelgado@willenken.com
Leemore Kushner (State Bar No. 221969)
lkushner@willenken.com
WILLENKEN WILSON LOH & LIEB LLP
707 Wilshire Blvd., Suite 3850
Los Angeles, CA 90017
Tel: (213) 955-9240
Fax: (213) 955-9250

Attorneys for Defendants
OVERSEE.NET, JEFFREY KUPIETZKY,
and LAWRENCE NG

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONTE CAHN, an individual, | Case No. CV-11-03800 SVW (AGRx) |
| Plaintiff, | **DEFENDANT OVERSEE.NET'S MEMORANDUM IN OPPOSITION TO *EX PARTE* APPLICATION TO CONTINUE PLAINTIFF'S DEADLINE FOR EXPERT REPORTS** |
| v. | |
| OVERSEE.NET, a California corporation; JEFF KUPIETZKY, an individual, LAWRENCE NG, an individual; and DOES 1 through 10 | [Declarations of Craig Snyder, William A. Delgado and Elizabeth Murray filed concurrently herewith] |
| Defendants. | Complaint Filed:  May 3, 2011<br>Trial Date:        January 17, 2012 |

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiff's third *ex parte* application effectively seeks to continue the trial date[1] in this matter on the basis of provably false contentions, the most notable of which is the untrue argument that Oversee maintained more than one set of books and records. His underlying premise – *i.e.*, that his experts are unable to complete their work – is not supported by any declaration by any expert who is allegedly working on this case.  The Court is left with a series of arguments that combine the merits of this dispute with misrepresentations about discovery to date, but no evidence that somewhere Cahn has an expert who honestly cannot complete a report because of alleged shortcomings in Oversee's document production.

Cahn also apparently seeks an order for production of documents as follows:

> "[T]he three different sets of records or calculations showing Moniker's performance and all other documents that show the performance and operating results of the four business segments that are the subject of the unpaid bonus claim . . . . [and] documents that would allow Cahn to evaluate and respond to Oversee's changing financial analysis of the Moniker performance."

Application at 14:4-10.  The description of those requested documents illustrates the chief issue:  Cahn, despite being the former President of Moniker, remains completely unwilling to identify the documents he supposedly needs.  If an expert actually were

---

[1] This Application asks that Cahn's expert report be due on a date after the December 6, 2011 hearing on his motion to compel.  Assuming that Cahn is seeking two weeks following that hearing to receive and review any additional production, he is asking that his expert report be due on December 20.  Pursuant to the Local Rules, that is 12 days after the deadline for the parties' pre-trial meet and confer (set for December 8), and one day after the deadline for the parties to file their Memorandum of Contentions of Fact and Law, Witness List, and Exhibit list (set for December 19).  That would also mean that Oversee's responsive expert reports would be due on the third day of trial.  It is for this reason that Oversee concludes that Cahn is, in fact, asking for a trial continuance.

working on this project, he or she would be able to provide a list of accounting records supposedly required to complete a report.  Either the expert already has those records or there is no such expert.

Oversee's Opposition consists of three parts.  First, Oversee provides a brief summary of the issues.  Second, Oversee describes the state of discovery to date.  Finally, Oversee addresses Cahn's efforts to mischaracterize the evidence.

## II.   SUMMARY OF ISSUES

Plaintiff's bifurcated First Claim for Relief alleges that Oversee failed to pay him bonuses to which he was entitled under Oversee's Management Incentive Plan ("MIP").  The MIP was created as part of a transaction in which Seevast Corporation sold Domain Systems, Inc. dba Moniker.com ("Moniker") to Oversee.  Second Amended Complaint ("SAC") ¶¶ 20, 23.

Plaintiff Cahn was CEO of Moniker both before and after its acquisition by Seevast.  *Id.* at ¶10.  Following the Oversee transaction, he joined Oversee as "President of Moniker."  *Id.* at ¶ 18.

The MIP created a "goal oriented bonus structure" under which Cahn could earn additional compensation during his tenure as President of Moniker based on the results of four business segments:  Registrar, TrafficClub, Domain Sales, and Oversee.  *Id.* at ¶ 20.  The Oversee Performance Goal was left as "TBD" or "to be determined."  *Id.* at ¶ 22.  The other three performance goals pertained to Moniker business segments, and were established in the MIP.  Cahn alleges that Oversee breached the MIP by manipulating the calculation of the Performance Goals and diverting revenue from Moniker business segments to business units whose performance was not included in the MIP calculations.  *Id.* at ¶ 40.

## III.   DISCOVERY HISTORY

### A.   Oversee's Document Productions

To date, Oversee has produced more than 22,000 pages of documents including the following financial documents:

- Oversee's audited GAAP financial statements for each of 2007, 2008, 2009, and 2010;

- A comprehensive spreadsheet showing Moniker's performance for 2007-2010;

- Historical Moniker spreadsheets from the due diligence period (i.e., for the 2007 year);

- Six spreadsheets tracking the performance of the MIP with variance analyses that show the deviation between performance and MIP targets;

- Preliminary forecasts for Moniker from the acquisition period

- Moniker and SnapNames[2] Statements of Operations for 2008-2010, which includes revenue and costs for brokered and escrowed sales;

- Fixed Asset reports containing a depreciation schedule for aftermarket physical assets and software;

- Pacing reports for the Registrar, Domain Sales and SnapNames business units;

- Moniker's ledger for 2008-2010, which reflects Moniker's operating expenses by line item;

- Domain Sponsor's Statements of Operations;

- Additional spreadsheets evidencing the financial performance of the various business lines.

Declaration of William A. Delgado ("Delgado decl."), ¶ 6.

### B.   Cahn's Vague Document Demands

Oversee made the above-described production in spite of vague and overbroad demands typified by demand no. 1 (which is part of Cahn's Motion to Compel):

> "All DOCUMENTS that RELATE TO the financial performance (actual and projected) of TrafficClub.com from December 2007 through January 2011, including but not limited to capital

---

[2] One of Cahn's allegations is that revenue was diverted from Moniker to SnapNames.  SAC, ¶ 40(v).

investment, revenue, cost and expenses, operating income and loss, interest expense, depreciation, amortization, gross and net profit or loss, cash flow, return on investment, profits earned or losses suffered or expected by YOU."

*See,* Application, Harrington Declaration, ex. 4.   Cahn propounded similarly-worded demands for each business segment, including those not relevant to the MIP, and including the same request as to Oversee as a whole.   *Id.* (demand nos. 3, 5, 7, 9, 11, 13).   There is little dispute that these demands fail to comply with Federal Rule of Civil Procedure 34(b)(1)(A).[3]   Indeed, each of these demands literally requests every document with a number on it, because any document that records any part of a financial transaction would "relate to" the financial performance of the Oversee or one of its business units.   These are the demands that Cahn claims must be fully complied with before he can provide an expert report.   *See,* Application at 4:24-5:1; 8:21; 9:6; 9:28; 13:2.

Oversee objected to each demand on, *inter alia,* overbreadth grounds, and agreed to produce sufficient documents to evidence the financial performance of the requested business units.   *Id.*   Oversee served its response on October 10, 2011.

Oversee also requested a protective order as a condition to producing financial documents because Mr. Cahn, who has left Oversee, intends to compete with Oversee.[4] In fact, Oversee had proposed the terms of a protective order far in advance of serving its written responses, but Cahn's counsel refused to sign.   That led to the unusual step of Oversee filing an *ex parte* application with Magistrate Judge Rosenberg asking that she enter a protective order in order to allow Oversee to make its document production. [Dkt. 32-34].   Cahn opposed the *ex parte* – seeking further delay.   [Dkt. 35].   Judge

---

[3]   Federal Rule of Civil Procedure 34(b)(1)(A) states: "The request: [¶] (A) must describe *with reasonable particularity* each item or category of items to be inspected."   (Emphasis added).

[4]   Cahn's Employment Agreement contains a non-compete clause that expires at the end of this year.   Delgado decl., ¶ 11.

Rosenberg, however, granted the Application [Dkt. 37], and Oversee promptly made its document production.

In the upcoming motion to compel, set for hearing on December 6, Judge Rosenberg will still be left to deal with one of the protective order issues left unresolved. Oversee asked Cahn to sign a two-tier protective order that included an "Attorneys' Eyes Only" ("AEO") designation. Eventually, Oversee sought a one-tier protective order in the *ex parte* application granted by Judge Rosenberg, stating that it would log as privileged documents that it was willing to produce under an AEO designation. In the motion to compel set for hearing on December 6, Cahn is challenging Oversee's right to seek an AEO designation.

## IV.   Cahn's Arguments in Favor of Further Delay.

Cahn argues for further delay by ignoring the scope of Oversee's document production and patently mischaracterizing both the extent of that production and the content of deposition testimony. Oversee will address each of Cahn's contentions below.

### A.   The "Three Different Sets of Books."

Based on a stark misrepresentation of Mr. Snyder's deposition testimony, Cahn argues that Oversee kept three different sets of books. Application at 2:14; 12:10-15. Cahn cites approximately 15 pages of testimony from Mr. Snyder's deposition for the proposition that "Oversee maintained at least three sets of books relating to the financial performance of the Moniker business segments . . . ." Application at 12:11-12. There is no such testimony in the cited pages or in any other part of Mr. Snyder's deposition transcript.

In fact as more fully described in his declaration filed herewith, Mr. Snyder testified that he disagreed with decisions to allocate certain revenues to segments outside of his authority when that revenue, in Snyder's view, could have been allocated to business segments under his control. On the issue of accuracy of the books, however, Snyder was clear: "The numbers were accurate. It was just the – where they

decided to credit the numbers if that makes [sense]."  Harrington decl., ex. 3 (Snyder rough transcript at 174:18-21).  Mr. Snyder also testified that no data was destroyed, and the numbers could be compiled to allocate revenue in different ways.  *Id.* (Snyder rough transcript at 165:1-6).  To further refute Cahn's bad faith claim that Oversee kept two separate sets of books, Oversee has attached declarations by both Mr. Snyder and by Oversee's CFO, Elizabeth Murray.

In addition to the fact that Cahn's argument is patently false, the implication in that argument is equally wrong.  It is not true that Cahn was penalized by the allocation of revenues described in Mr. Snyder's deposition.  Rather, for purposes of calculating the MIP targets, the revenues described in Mr. Snyder's testimony were counted. Murray decl., ¶ 5.  Indeed, the spreadsheet identified by Ms. Murray shows precisely how this was done:

| 2. Registrar EBITDA | | | |
|---|---|---|---|
| | Q4, 07 and 2008 | 2009 | 2010 |
| Revenue per FS | Redacted[5] | Redacted | Redacted |
| Plus | | | |
|    Monetization | 56,848 | 51,832 | 82,201 |
|    Expiring Auctions | 558,122 | 516,967 | 453,113 |
| Adj Revenue | Redacted | Redacted | Redacted |
| COGS | Redacted | Redacted | Redacted |
| Opex (40% Moniker) | Redacted | Redacted | Redacted |
| **Registrar EBITDA Actual** | **Redacted** | **Redacted** | **Redacted** |
| **Target EBITDA** | **Redacted** | **Redacted** | **Redacted** |
| Achievement | -19% | 27% | 23% |
| (70% Minimum Target) | | | |
| **Incentive Payment** | **$0** | **$0** | **$0** |

As this chart reflects, Registrar MIP targets were calculated by beginning with Financial Statement Revenue and adding "Monetization" and "Expiring Auctions."

---

[5]   All of the "Redacted" data was produced unredacted to Cahn, and is simply presented here as redacted to avoid the need to file under seal.

Similarly, the spreadsheets reflects adjustments to "Domain Sales" EBITDA to demonstrate that the MIP targets were calculated in accordance with the very allocations that Snyder advocated.

The bottom line is: (i) there have never been two or three sets of books and records; (ii) MIP performance results were calculated consistent with Mr. Snyder's testimony about how he wanted his Business Segments to receive credit; and (iii) Cahn's counsel knows this and has all of this information.

**B.   "Phantom" Merchant Fees.**

Relying again on Mr. Snyder's deposition testimony, Cahn also contends that Oversee has withheld documents that "identify the 'phantom' merchant fee charges that were used to reduce the profitability" of the MIP business segments.  Application at 12:19-23.  But the testimony cited by Cahn (and attached as exhibit 3 to the Harrington declaration) rejects the notion of "phantom" charges:  "I didn't find the situation where there were any phantom charges.  I just thought the costs were higher than normal."  Snyder depo., 154:12-14 (Harrington decl., ex. 3).  Snyder went on to discuss that the disputed charges were "obviously relatively small" and that this was "an issue that I didn't think was [impactful] for the business."  *Id.* at 156:19-157:10.

**C.   Documents Identified in the Kupietzky Deposition.**

During the deposition of Jeffrey Kupietzky, Oversee's former Chief Executive Officer, he was asked about a number of interim reports, including monthly pacing reports, monthly financials, quarterly presentations, and daily reports compiled by a person named Tigran.  Application at 7:5-8:4.  Many of these documents have been produced.  Delgado decl., ¶¶ 6, 10.  Some, such as PowerPoint presentations, were only requested in Cahn's Fourth Demand for Production to which Oversee is required to respond on November 15.  *Id.* at ¶ 7.  However, it is completely untrue to state or imply that these documents were hidden.

First, as noted above, Cahn's document demands basically asked for every piece of paper that pertained in any way to any financial transaction of Oversee during a

three-year period. Oversee made a selection of documents that it believed would be most useful to Cahn – including the audited GAAP financial statements of the company. The issue is not Oversee's unwillingness to produce documents; it is Cahn's unwillingness to describe the documents he wants with the reasonable particularity required by the Federal Rules. Cahn's refusal to serve proper demands is particularly inexcusable in light of the fact that he served as Moniker's President until 2010 – he thus has broad knowledge of the financial records generated during his tenure.

Second, and as also noted above, counsel for Mr. Cahn' refused to stipulate to a protective order containing an AEO level of protection. For that reason, certain documents were redacted before production. But the redactions *only* addressed business lines not relevant to the MIP. Delgado decl., ¶ 5. Oversee has repeatedly offered unredacted versions of documents, including those attached as examples to the Harrington declaration, under an AEO designation. Oversee has made clear that the AEO designation would be provisional – Oversee was not demanding that Cahn waive his right to challenge the designation. Nonetheless, at present, Cahn's counsel refuses to agree to the production of any AEO documents and given Cahn's intention to become an Oversee competitor, Oversee has no choice but to redact competitively-sensitive information.

In short, Mr. Kupietzky's deposition did not reveal a store of hidden documents. Rather, he testified about additional, cumulative financial documents, most of which must have been known to Moniker's former President, that Cahn never requested with reasonable particularity in any document demand.

### D.    The O'Neill Deposition

Cahn makes so many misrepresentations about the O'Neill Deposition that they require a separate section of this brief. Each is addressed below.

- **Documents from "Weekly Meetings:"** Cahn argues Oversee withheld documents from weekly meetings that O'Neill held with Mr. Kupietzky to discuss revenues and EBITDA. Application at 3:9-12. First, the quoted

---

testimony does not mention Mr. Kupietzky as an attendee at the "weekly meetings." Second, Mr. O'Neill testified that Ryan Berryman (not Mr. Kupietzky) was the chair of the meetings. O'Neill Rough at 69:18-21 (Delgado decl., ex. A). Third, O'Neill never testified that there were written presentations prepared for these meetings.

- **Oversee Tracking of TrafficClub Performance:** Cahn argues that O'Neill testified that during 2008, Oversee "had not tracked the performance of the TrafficClub business segment." Application at 3:11-15. Cahn argues that this shows that he was not given credit for TrafficClub revenues. However, again, Cahn is just mischaracterizing testimony. O'Neill testified that, although Oversee was not tracking the TrafficClub business segment as of the time he left in July, 2008 (*id.* at 60:8-14), the process of transferring TrafficClub customers to DomainSponsor was ongoing, and it was technologically possible for Oversee to track those customers. *Id.* at 160:10-164:9.

- **Efforts to "Force" Cahn Out:** Cahn argues that O'Neill testified to a plot to force Mr. Cahn out of Oversee before he could earn his bonuses. Application at 3:18-23. Again, Cahn is mischaracterizing testimony. O'Neill testified that he specifically asked for help getting Mr. Cahn out of his (O'Neill's) way on technical integration issues, and that he also understood that Oversee management wanted to place Mr. Cahn in the position where he could be most effective. *Id.* at 138:23-144:14.[6]

As the foregoing reveals, there is not a single honest characterization of Mr. O'Neill's deposition testimony. He did not testify that there were weekly meetings that

---

[6]    Mr. O'Neill specifically did not testify about Oversee trying to force Mr. Cahn out of the company. Rather, he recalled discussions about, "[m]oving him into a position where he would be more effective, because he was not effective in their opinion, nor mine, making technical decisions that he wasn't qualified to make." O'Neill depo. at 5-9.

produced reports; he did not testify that Oversee was unable to track TrafficClub customers when they were shifted to DomainSponsor; and he certainly did not testify to an Oversee plot to force Mr. Cahn out of the company.

### E.   Cahn's Demands for Other Executives' Compensation Information.

Cahn argues that he should be entitled to compensation information on other Oversee senior executives because "Cahn was to be treated like all of the other members of senior management in regard to the fourth business segment – Oversee's EBITDA." Application at 10:17-18. To support this contention, Cahn relies on a December 13 email exchange that is exhibit 12 to the Harrington declaration.[7]

In fact, the email exchange reflects the exact opposite of Cahn's contention. Cahn's email does state that he believed he "was to be treated the same as you, Josh, etc in terms of this 20% part of my MIP." Harrington decl., ex. 12. Mr. Kupietzky responded, however, by rejecting that characterization:

> "Our intent is the legacy pieces will be the same *and then your total Oversee target will reflect the legacy EBITDA plus the Moniker pieces to get to a total.* Remember, the 20% won't be just EBITDA only, there is some subjective components that Lawrence and the Board will set to incent strategic initiatives that benefit the overall company (i.e., *your help* on M&A, helping on sales strategies, etc.) I expect all these items get clarified in Q1 when the rest of the execs get their 2008 plans as well. All our plans have both a quantitative and qualitative component that Lawrence assesses after the year ends. The only difference is the other execs will get a different Moniker component added to their legacy number reflecting finance's plan for overall company earnings."

Harrington decl., ex. 12 (emphases added). The exchange is very clear. Cahn claims he is to be treated like the other executives. Mr. Kupietzky responds by rejecting that contention and stating expressly that: (i) the other executives would have a different Oversee EBITDA target; and (ii) everyone's entitlement to a bonus would have a subjective component and not be tied solely to Oversee EBITDA. Thus, under the

---

[7] Cahn incorrectly states that the document is exhibit 8.

false pretense that Cahn was promised that the MIP Oversee "TBD" target would be identical to those of other senior executives, Cahn is seeking personal financial information of those other executives.[8]

Nonetheless, Oversee has, in fact, offered to produce compensation information for other senior executives under an AEO designation.  Delgado declaration, ¶ 9. Cahn's counsel have refused to agree to such a production.

## V.   **CONCLUSION**

This is Plaintiff's third request to extend the expert disclosure deadline, and this request would result in a trial postponement of at least two months.  Rather than offer the type of persuasive evidence necessary to justify a trial continuance, however, Mr. Cahn has resorted to manipulative arguments that bear almost no relation to the true facts, and that seek to conceal the absence of a truly persuasive declaration by an expert claiming an inability to prepare a report.  Based on the foregoing, this Application is not supported and it should be denied.

Dated:  November 15, 2011            WILLENKEN WILSON LOH & LIEB LLP


By: */s/ William A. Delgado*                          .
      William A. Delgado
      Attorneys for Defendants OVERSEE.NET,
      JEFFREY KUPIETZKY, and LAWRENCE
      NG

---

[8]     Cahn also cites an October 17, 2008 email that is exhibit 13 (mis-identified by Cahn's counsel as exhibit 9) to the Harrington declaration.  That email concerns Cahn's "new compensation plan."  Harrington decl., ex. 13.  In fact, in November, 2008, Cahn did execute a document called "Incentive Compensation Plan Monte Cahn."  That is what is referenced in exhibit 13, and Cahn has not sued for breach of that agreement.

1

## **CERTIFICATE OF SERVICE**

2

3      I hereby certify that I electronically filed the foregoing with the Clerk of the Court

4   using the CM/ECF system which will send notification of such filing to the Electronic

5   Service List for this Case.

6

7   Dated:  November 16, 2011          WILLENKEN WILSON LOH & LIEB LLP

8

9                                      By:*/s/ William A. Delgado*_____

10                                     William A. Delgado,
                                           Attorneys for Defendants OVERSEE.NET,

11                                         JEFFREY KUPIETZKY, and LAWRENCE
                                           NG

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28