William A. Delgado (Bar No. 222666)
wdelgado@willenken.com
Leemore Kushner (State Bar No. 221969)
lkushner@willenken.com
WILLENKEN WILSON LOH & LIEB LLP
707 Wilshire Blvd., Suite 3850
Los Angeles, CA 90017
Tel: (213) 955-9240
Fax: (213) 955-9250

Attorneys for Defendants
OVERSEE.NET, JEFFREY KUPIETZKY,
and LAWRENCE NG

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONTE CAHN, an individual,<br><br>Plaintiff,<br><br>v.<br><br>OVERSEE.NET, a California corporation; JEFF KUPIETZKY, an individual, LAWRENCE NG, an individual; and DOES 1 through 10<br><br>Defendants. | Case No. CV-11-03800 SVW (AGRx)<br><br>**DECLARATIONS OF CRAIG SNYDER; WILLIAM A. DELGADO AND ELIZABETH MURRAY IN SUPPORT OF OPPOSITION TO CAHN'S EX PARTE APPLICATION**<br><br>**Complaint Filed:** May 3, 2011<br>**Trial Date**         January 17, 2012 |

DECLARATIONS OF SNYDER, DELGADO AND MURRAY ISO OPP. TO EX PARTE

# DECLARATION OF CRAIG SNYDER

I, Craig Snyder, do hereby declare as follows:

1. I am over the age of eighteen. I am the General Manager of the Aftermarket and Registrar business units at Oversee.net ("Oversee"), defendant in this matter. I have personal knowledge of the facts stated herein and, if called as a witness, I could competently testify thereto.

2. I joined Oversee in August, 2009. My job duties place me in charge of two Oversee business segments: the Aftermarket business segment which is comprised of assets of both the Moniker Online Services, LLC and SnapNames.com, Inc. entities and their subsidiaries; and the Registrar business segment which is comprised of the assets of Moniker and its related subsidiaries. Moniker is the business unit that Oversee acquired from Seevast before I joined Oversee, and it is my understanding that this litigation largely concerns Oversee's accounting for Moniker revenues.

3. I understand that Mr. Cahn's counsel contends that, during my deposition I testified to the existence of two or three separate sets of corporate books and records – essentially implying that Oversee fraudulently accounted for Moniker revenues. That contention is false.

4. The true facts, as I testified in my deposition, are described below.

5. I testified that, as General Manager in charge of the Moniker and SnapNames business segments, I asked Oversee management to attribute to Moniker revenue arising from: (i) monetization of Moniker owned-and-operated domain names conducted through Oversee's DomainSponsor monetization platform and (ii) auctions for expiring and deleting auctions conducted through SnapNames. With respect to monetization, the issue arose because DomainSponsor was "monetizing" assets that I viewed as belonging to Moniker. So, while both business units were involved in generating the revenue, I requested that the revenue be attributed to Moniker for purposes of intra-company reporting. With respect to expiring auctions, a similar issue

arose in that two business units (SnapNames and Moniker) were involved in generating the revenue, and I requested that Moniker, not SnapNames, be attributed revenue.

6. Despite my request, Oversee management made the decision to attribute monetization revenue to DomainSponsor and expiring and deleting auction revenue to SnapNames. This was not a matter of keeping "two sets of books;" but rather this was a judgment call as to how to attribute revenue jointly generated by two business units.

7. On a related point, Oversee is presently entertaining offers for the purchase of Moniker. I confirmed in my deposition my understanding that potential purchasers were given revenue information that includes for Moniker: (i) monetization of Moniker owned-and-operated domain names and (ii) expiring and deleting auctions. My understanding is that they are being given this information since Moniker is one of the entities involved in creating these lines of revenue.

8. I understand that the second area of my testimony that is being called into question relates to the contention that I testified that Moniker maintains separate books and records that are used to track its performance. It is true that Moniker maintains a transactional database that contains information on the operational performance of the registrar; it is completely untrue that this database is a "second set" of books. Rather, Moniker has a website which allows customers to register domain names and the database which houses the transactional information (e.g., customer name, address, time period of registration, etc.)

9. The information in the transactional database is not a separate set of books. Rather, it is information that is a source of transactional data which can be and is aggregated and imported into Oversee's financial system on a periodic basis.

10. To be clear, however, I did not testify that there are multiple sets of corporate books and, to my knowledge, there are not. I also did not testify that financial records are surreptitiously manipulated. To my knowledge they are not.

11. Finally, no part of my testimony addressed the attribution of Moniker revenue under the 2007 Management Incentive Plan ("MIP"). I have no personal knowledge as to how MIP targets were calculated.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed the 14th day of November, 2011, at Fort Lauderdale, Florida.

Craig Snyder

# DECLARATION OF WILLIAM A. DELGADO

I, William A. Delgado, declare as follows:

1. I am a partner in Willenken Wilson Loh & Lieb, counsel in the within matter to defendants Oversee.net, Jeff Kupietzky and Lawrence Ng. All of the matters stated herein are true of my own personal knowledge, and if called upon to testify thereto, I could and would competently so testify.

2. I am the attorney primarily in charge of the defense of this matter and I have personal knowledge of, and personally supervised the entirety of the Oversee.net document production.

3. Shortly after the August 29, 2011 Scheduling Conference before this Court, on my own initiative, I prepared a draft protective order containing two tiers of protection for documents and information (i.e. "CONFIDENTIAL" and "ATTORNEYS' EYES ONLY") and sent the draft to Ken Watnick, counsel for Plaintiff, on September 8, 2011. I did not receive any response from Mr. Watnick to my September 8th e-mail, so I re-sent the draft protective order to Mr. Watnick on September 23, 2011. Between September 23 and September 30, I exchanged various e-mails with Mr. Watnick in an attempt to resolve this issue, and we had an in-person meet and confer at my office.

4. Ultimately, Mr. Watnick was unwilling to agree to a protective order so I filed Oversee's *Ex Parte* Application for a Protective Order. I asked the Court to enter a one-tier protective order, stating that Oversee would log documents that would require an AEO designation and Cahn's counsel could decide then how they wished to proceed. This Court (Judge Rosenberg) entered a Protective Order with one level of protection for documents designated as "Confidential." The Order allows for possible modification and amendment.

5. In light of Plaintiff's and his counsel's refusal to agree to accept documents as "Attorneys' Eyes Only," I described documents that Oversee would have designated as AEO and would not produce absent such a designation on a

"Competition Sensitive Log" and provided that log to counsel. Documents that contained information that could be produced under a "CONFIDENTIAL" designation but also information that Oversee would deem "Competition Sensitive" were redacted to eliminate this latter category of information and produced as CONFIDENTIAL. We did not redact information that pertained to any of the Moniker Business Segments listed in the MIP, except where it was impossible to redact around those segments.

6. On October 14, 2011 and October 19, 2011, Oversee produced the following documents to Plaintiff's counsel:

a. Oversee's audited financial statements for each of 2007, 2008, 2009, and 2010;

b. A comprehensive spreadsheet showing Moniker's performance for 2007-2010;

c. Historical Moniker spreadsheets from the due diligence period (i.e., for the 2007 year)

d. Six spreadsheets tracking the performance of the MIP with variance analyses that show the deviation between performance and MIP targets;

e. Preliminary forecasts for Moniker from the acquisition period;

f. Financial models for the acquisition, including bank models with forecasts;

g. A Moniker forecast.

h. Moniker's and SnapNames' Statements of Operations for 2008-2010, which includes revenue and costs for brokered and escrowed sales;

i. Fixed Asset reports containing a depreciation schedule for aftermarket physical assets and software;

j. A Pacing report for Moniker's Registrar, Domain Sales and SnapNames business units, which provides an operational view of the business units and which would be distributed to general managers,

including Cahn, to provide a snapshot in time as to how the units were progressing;

k. Moniker's ledger for 2008-2010, which reflects Moniker's operating expenses by line item;

l. A spreadsheet ("Moniker Quickbooks 2007") which was provided by Cahn to Oversee prior to the acquisition and in which adjustments were made to account for post-acquisition expenses for the 2007 year, and in which adjustments were made to calculate EBITDA;

m. A spreadsheet reflecting the revenue and costs for the Domain Sales and Registrar business units for 2009-2010 that are attributed to Moniker and which were used to calculate performance under the MIP, including sales in the "P2P" category;

n. Domain Sponsor's Statements of Operations;

o. Additional spreadsheets evidencing the financial performance of the various business lines, which support the audited financial statements.

p. Three spreadsheets related to TrafficClub, which, together, reflect (1) the shares attributable to each customer of TrafficClub; (2) the identities of the customers attributable to TrafficClub; and (3) workpapers reflecting the gross profits, including revenues, costs and commissions, associated with TrafficClub-legacy customers for 2008-2010.

7. Cahn's *ex parte* complains about Oversee's failure to produce year-end presentation documents. In fact, Cahn did not request those documents until his Fourth Set of Requests for Production, in which Cahn requested the 2007-2010 year-end presentations given by Jeff Kupietzky to Oversee's board of directors and employees. Oversee's response is due on November 15.

8. Attached hereto as Exhibit A is a true and correct copy of excerpts from the "rough" transcript of the deposition of Mr. O'Neill.

9. With respect to Mr. Cahn's request for compensation on other senior executives, here are the facts. On October 19, 2011, Cahn's counsel sent me a meet and confer letter to discuss various the requests for production in dispute. A series of meetings and discussion ensued. At one point, Cahn's counsel agreed to accept production of this information under an AEO designation. They then stated that this was not acceptable. I have offered repeatedly to produce this information as AEO.

10. Since November 2, 2011, Oversee has been diligently working to locate and produce the specific categories identified in Plaintiff's Second *Ex Parte* Application, which is the first time Plaintiff's counsel identified any of these documents with reasonable particularity. The vast majority of such documents (including presentations to the board, presentations to the bank, presentations to Oversee employees, and reports showing monthly financial information for the Registrar and Aftermarket divisions) have been produced. It is also my understanding that they are all cumulative of the financial statements produced at the inception of this case.

11. Mr. Cahn's Employment Agreement with Oversee contains a non-compete provision that expires on December 31, 2011.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed the 14th day of November, 2011, at Los Angeles, California.

/s/William A. Delgado
William A. Delgado

4
DECLARATION OF WILLIAM A. DELGADO

# DECLARATION OF ELIZABETH MURRAY

I, Elizabeth Murray, declare as follows:

1.  I am the Executive Vice President and Chief Financial Officer for Oversee.net. I have more than 25 years of experience in financial management, strategic investment and M&A activity, with particular focus on technology and Internet companies. I hold a bachelor's degree in Business Studies from Robert Gordon University in Scotland and I am a Chartered Accountant and Member of the Institute of Chartered Accountants of Scotland. I am familiar with the accounting records of Oversee.net and I am the person ultimately responsible for the reporting of Oversee's financials. All of the matters stated herein are true of my own personal knowledge, and if called upon to testify thereto, I could and would competently so testify.

2.  I understand that counsel for Mr. Cahn claims that Oversee fraudulently maintains two or three inconsistent sets of books and records. There is no fraudulent record-keeping at Oversee. I understand that Mr. Cahn's counsel claim to receive the understanding that there are different books and records from the deposition testimony of Mr. Snyder. I do not know Mr. Snyder's precise testimony on the issue, but he could not have testified truthfully that there are two or three fraudulenty-maintained inconsistent sets of Oversee books and records.

3.  Based on information from counsel, I understand that there are two contentions about the "two or three sets" of books and records.

4.  One contention is that there are separate records for Moniker kept in Florida, which is Moniker's base of operations. In fact, the customer transactions from the Florida-managed website are routinely imported into Oversee's accounting software called Navision. That software is the accounting system used to record all Oversee business transactions in accordance with GAAP. The Oversee GAAP financial statements, along with thousands of pages of backup, have been produced in discovery by Oversee.

---

1
DECLARATION OF ELIZABETH MURRAY

5. The second contention appears to be that, for internal analysis purposes, management allocated certain revenues to DomainSponsor and SnapNames – business segments not covered by the MIP – that could have been attributed to legacy Moniker business segments that are identified in the MIP. This was a judgment call due to the fact that more than one business segment contributed to generating these revenues. However, for purposes of calculating the MIP targets, <u>all</u> of the revenues that Mr. Snyder describes as revenues he wanted to have allocated to Moniker business segments was, in fact, so allocated, and we have produced in discovery spreadsheets (OVER18659-18663) showing how this was done. Despite that allocation, none of the Moniker business segments ever came close to their MIP Performance Goals.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct and that this declaration was executed the 15th day of November, 2011 at Los Angeles, California.

_____
ELIZABETH MURRAY

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the Electronic Service List for this Case.

Dated: November 16, 2011　　　　　WILLENKEN WILSON LOH & LIEB LLP


By: */s/ William A. Delgado*
William A. Delgado,
Attorneys for Defendants OVERSEE.NET, JEFFREY KUPIETZKY, and LAWRENCE NG