ORIGINAL

1  William A. Delgado (Bar No. 222666)
2  wdelgado@willenken.com
   Leemore Kushner (State Bar No. 221969)
3  lkushner@willenken.com
   WILLENKEN WILSON LOH & LIEB LLP
4  707 Wilshire Blvd., Suite 3850
5  Los Angeles, CA 90017
   Tel: (213) 955-9240
6  Fax: (213) 955-9250
7
8  Attorneys for Defendants
   OVERSEE.NET, JEFFREY KUPIETZKY,
9  and LAWRENCE NG

*lodged proposed order*

2011 NOV 16  PM 3: 55
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

FILED

10              UNITED STATES DISTRICT COURT
11             CENTRAL DISTRICT OF CALIFORNIA
12

13  MONTE CAHN, an individual,          Case No. CV-11-03800 SVW (AGRx)
14
           Plaintiff,                   APPLICATION TO FILE
15                                       DOCUMENTS RELATED TO
16      v.                               OVERSEE.NET'S MOTION FOR
                                         SUMMARY JUDGMENT UNDER
17  OVERSEE.NET, a California            SEAL
18  corporation; JEFF KUPIETZKY, an
    individual, LAWRENCE NG, an
19  individual; and DOES 1 through 10    DATE:   December 19, 2011
20                                       TIME:   1:30 p.m.
           Defendants.                   PLACE:  Crtrm. 6
21
22                                       Complaint Filed:    May 3, 2011
                                         Pretrial Conf. Date: January 9, 2012
23                                       Trial Date:         January 17, 2012
24
25
26
27
28

1

## APPLICATION

2    I.    Introduction

3         Pursuant to Local Rule 79-5, Defendant Oversee.net applies for permission to

4    file under seal the following documents related to its Motion for Summary Judgment

5    on Plaintiff's First Claim for Relief for Breach of Contract.  For purposes of the

6    following, the "MIP" refers to the Oversee.net 2007 Management Incentive Plan that is

7    at issue:

8         1.    An unreduced version of Oversee's Memorandum of Points and

9    Authorities in Support of its Motion for Summary Judgment ("Memo") which

10   references (i) confidential negotiations between Oversee and Seevast for the sale of

11   Moniker Online Services ("Moniker") and (ii) confidential business information (i.e.,

12   the percentages of performance targets achieved under the MIP).  As discussed below,

13   the MIP has been designated as CONFIDENTIAL pursuant to the Protective Order in

14   this case and has been previously sealed by this Court (Docket No. 46).

15        2.    The Declaration of Jeffrey Kupietzky which references the confidential

16   negotiations between Oversee and Seevast for the sale of Moniker, including

17   Moniker's offering documents that were provided to Oversee in connection with the

18   sale.  The offering documents have been designated as CONFIDENTIAL pursuant to

19   the Protective Order in this matter.

20        3.    The Declaration of Elizabeth Murray which references confidential

21   business information (i.e., targets and calculations under the MIP).  The MIP and its

22   information have been designated as CONFIDENTIAL pursuant to the Protective

23   Order in this matter, and the MIP was previously sealed by the Court.

24        4.    Exhibit C to the Murray Declaration which contains the MIP and the

25   confidential business information therein, has been designated as CONFIDENTIAL,

26   and has been previously sealed by the Court.

27        5.    Exhibit D to the Murray Declaration which contains a spreadsheet of

28   calculations under the MIP and how performance measured against the MIP goals.

1  This information is sensitive business information and has been designated as

2  CONFIDENTIAL under the Protective Order.

3      6.      Exhibit E to the Declaration of Todd Greene which contains the

4  Employment Agreement between Monte Cahn and Oversee.  The Employment

5  Agreement has sensitive financial information, including Cahn's compensation, and

6  has been designated as CONFIDENTIAL under the Protective Order.

7      7.      Exhibit F to the Declaration of Todd Greene which contains the 2008

8  Incentive Plan between Monte Cahn and Oversee.  The Incentive Plan has sensitive

9  financial information, including Cahn's potential compensation under the plan and has

10  been designated as CONFIDENTIAL under the Protective Order.

11      If these documents are not filed under seal, the Court will not have the ability to

12  consider them as part of Oversee's Motion for Summary Judgment.  Thus, they are

13  being filed with a request that the Court accept them under seal.

14

15  II.    Good Cause Exists for Filing Under Seal.

16      Local Rule 79-5 provides as follows:

17      No case or document shall be filed under seal without prior

18      approval by the Court.  Where approval is required, a written

19      application and a proposed order shall be presented to the judge

20      along with the document submitted for filing under seal.

21      Here, Judge Rosenberg has already determined that good cause exists for the

22  entry of a Protective Order in this case.  Docket No. 38.  The Protective Order allows

23  the parties to designate certain materials as "CONFIDENTIAL," thereby limiting their

24  disclosure to the parties and attorneys in this lawsuit and prohibiting dissemination of

25  designated materials to the public.  The documents referenced in this application have

26  all been designated as CONFIDENTIAL or, in the case of the Memo and Declarations,

27  reference information designated as CONFIDENTIAL.  The CONFIDENTIAL

28  designation is appropriate because the information at issue is Oversee's sensitive

1  business information which, if disclosed to the public, can be used by third parties and

2  competitors for their own competitive advantage and to Oversee's detriment.

3      Specifically, Items No 1-4 contains sensitive financial information regarding

4  Moniker, an Oversee subsidiary.  Oversee is currently in the process of selling Moniker

5  and, in connection with that sale, has made Moniker's financial information available

6  to prospective purchasers on a confidential basis and subject to a non-disclosure

7  agreement.  Public dissemination of Moniker's financial information which appears in

8  Item Nos. 1-4 would put Oversee at a disadvantage in the marketplace and would run

9  contrary to the expectations of potential purchasers who do not expect the financial

10  information of the company they are considering purchasing to be publicly available.

11      To preserve the proper balance between the public's right to view documents in

12  a legal proceeding and Oversee's need for confidentiality of sensitive business

13  information, Oversee has prepared a redacted version of its Memo which is attached as

14  Exhibit 1 hereto.  This version redacts only the sensitive information that is at issue.

15  Oversee respectfully requests that it be permitted to file this redacted version through

16  the CM/ECF system.

17      Item Nos. 5-6 reference two agreements between Cahn and Oversee that contain

18  Cahn's compensation and potential compensation.  Such information is not only

19  sensitive to Oversee (in that it does not want its competitors to know how much it pays

20  its employees), it is also sensitive to Cahn because it is his compensation information

21  which would be available to the public.

22  //

23  //

24

25

26

27

28

1    For the foregoing reasons, Oversee respectfully requests that the foregoing
2  documents be filed under seal by the Clerk of the Court so that the Court can
3  nevertheless review them in connection with Oversee's Motion for Summary
4  Judgment.

5
6  Dated:  November 16, 2011          WILLENKEN WILSON LOH & LIEB LLP
7
8                                   By: _____
9                                       William A. Delgado
10                                      Attorneys for Defendants OVERSEE.NET,
                                        JEFFREY KUPIETZKY, and LAWRENCE
11                                      NG
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1   William A. Delgado (Bar No. 222666)
2   wdelgado@willenken.com
   Leemore Kushner (State Bar No. 221969)
3   lkushner@willenken.com
   WILLENKEN WILSON LOH & LIEB LLP
4   707 Wilshire Blvd., Suite 3850
5   Los Angeles, CA 90017
   Tel: (213) 955-9240
6   Fax: (213) 955-9250
7
8   Attorneys for Defendants
   OVERSEE.NET, JEFFREY KUPIETZKY,
9   and LAWRENCE NG

10

11            **UNITED STATES DISTRICT COURT**

12            **CENTRAL DISTRICT OF CALIFORNIA**

13

14   MONTE CAHN, an individual,      |   Case No. CV11-03800 SVW (AGRx)

15          Plaintiff,               |   **REDACTED VERSION OF**

16                      |   **DEFENDANT OVERSEE.NET'S**

17    v.                        |   **MEMORANDUM OF POINTS AND**
                        |   **AUTHORITIES ISO MOTION FOR**

18   OVERSEE.NET, a California     |   **SUMMARY JUDGMENT OR, IN**
   corporation; JEFF KUPIETZKY, an  |   **THE ALTERNATIVE, PARTIAL**

19   individual, LAWRENCE NG, an    |   **SUMMARY JUDGMENT**
   individual; and DOES 1 through 10  |

20                         |   DATE:    December 19, 2011
          Defendants.          |   TIME:      1:30 p.m.

21                         |   PLACE: Crtrm. 6

22                         |

23                         |   Complaint Filed:    May 3, 2011

24                         |   Pretrial Conf. Date: January 9, 2012

25                         |   Trial Date:        January 17, 2012

26

27                **LODGED UNDER SEAL**
       **PURSUANT TO PENDING APPLICATION TO SEAL AND**

28                  **[PROPOSED] ORDER**

1
2
3

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION...........................................................................1

II.   STATEMENT OF FACTS............................................................1

   A.   Oversee Purchases Moniker.................................................1

   B.   Oversee Negotiates a Financial Incentive Plan with Plaintiff....................2

   C.   The Structure of the MIP......................................................4

   D.   Moniker's Performance Fails to Reach Threshold Levels..........................6

   E.   The 2008 Amendment to the MIP.........................................7

III.  LEGAL STANDARD IN CASES INVOLVING CONTRACT
      INTERPRETATION..................................................................8

IV.   ARGUMENT...............................................................................9

   A.   Because the Moniker Business Segments Did Not Reach the 70%
          Threshold of the Performance Goals, No Payment Was Required.................9

      1.   THE MONIKER SEGMENTS DID NOT ACHIEVE THEIR
                PERFORMANCE GOALS.............................................9

      2.   CAHN CANNOT DEMONSTRATE THAT OVERSEE UNDERMINED
                THE MIP PERFORMANCE GOALS...............................11

   B.   The Oversee Business Segment Provision Is Not Enforceable....................12

   C.   Cahn Is Not Entitled to Payments for the Oversee Business
          Segment During the First and Second Determination Periods....................14

   D.   As to All Four Segments, Damages Would Be Speculative As a
          Result of Cahn's Failure to Identify Participants................................15

V.    CONCLUSION.........................................................................16

24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

### Federal Cases

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) .................................................................................. 8

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) .................................................................................. 8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986) .................................................................................. 8

*Stevens v. Mavent, Inc.,*
   2008 WL 2824956 (C.D. Cal. July 21, 2008) .................................. 9, 13, 14

### State Cases

*Guz v. Bechtel Nat. Inc.,*
   24 Cal. 4th 317 (2000) .......................................................................... 13

*Ladas v. California State Auto. Assn.,*
   19 Cal. App. 4th 761 (1993) .................................................................. 13

*Neisendorf v. Levi Strauss & Co.,*
   143 Cal. App. 4th 509 (2006) ................................................................ 10

*Oceanside 84, Ltd. v. Fidelity Federal Bank,*
   56 Cal. App. 4th 1441 (1997) .................................................................. 8

*Palmer v. Truck Ins. Exchange,*
   21 Cal. 4th 1109 (1999) ........................................................................... 8

*Rochlis v. The Walt Disney Company,*
   19 Cal. App. 4th 201 (1993) .................................................................. 14

*Scott v. Pacific Gas & Electric Co.,*
   11 Cal. 4th 454 (1995) .......................................................................... 13

1

2

*Small v. Fritz Companies, Inc.*,
   30 Cal. 4th 167 (2003) ........................................................................... 11

3

4

*Turner v. Anheuser-Busch, Inc.*,
   7 Cal. 4th 1238 (1994) .......................................................................... 14

5

6

*US Ecology, Inc. v. State*,
   129 Cal. App. 4th 887 (2005) ................................................................ 11

7

8

9

**Rules**

FED. R. CIV. P. 56 ..................................................................................... 8

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

## MEMORANDUM OF POINTS AND AUTHORITIES

3

## I. INTRODUCTION

4    Plaintiff Monte Cahn's ("Cahn") First Claim for Relief alleges that Oversee.net

5    ("Oversee") is liable for breach of contract because it failed to pay participants in the

6    Oversee.net 2007 Management Incentive Plan ("MIP") any bonuses under that plan.

7    As is shown below, payment of bonuses under the MIP was conditioned upon the

8    achievement of financial "Performance Goals" by certain identified business segments

9    of Oversee. As a matter of undisputed fact, three of those business segments did not

10   achieve the Performance Goals identified in the MIP. The MIP submitted the

11   establishment of a Performance Goal for the fourth business segment to the discretion

12   of Oversee's board of directors, which did not create Performance Goals for that unit.

13   Because, as a matter of clear contractual interpretation, Cahn's right to receive bonuses

14   as a participant in the MIP was never triggered, his First Claim for Relief must fail.

15   Furthermore, the MIP was not, as Cahn's complaint implies, a bonus plan for

16   Mr. Cahn. Rather, the MIP was established for the benefit of certain participants

17   designated to the board of directors by Mr. Cahn. Reflective of his recognition that the

18   MIP bonus provisions would not be triggered, Mr. Cahn failed to provide the board of

19   directors with a list of MIP participants. While that fact is probative of Cahn's

20   recognition that his present claim is baseless, it is relevant to this Motion because

21   Cahn's failure to identify MIP participants would render any award speculative.

22

23

## II. STATEMENT OF FACTS

24   A.   Oversee Purchases Moniker.

25   In 2005, Plaintiff Monte Cahn sold Domain Systems, Inc. d/b/a Moniker.com

26   ("Moniker") to Seevast Corporation. Second Amended Complaint ("SAC"), ¶ 9. Cahn

27   remained Moniker's CEO and maintained management responsibilities for Moniker

28   until 2007. *Id.* at ¶ 10. Subsequently, Seevast Corporation marketed Moniker for sale

1 using The Jordan Edmiston Group, Inc. as its investment bankers.  Declaration of

2 Jeffrey Kupietzky, dated November 12, 2011("Kupietzky Decl.") at ¶ 2.  On December

3 14, 2007, Oversee acquired Moniker from Seevast.  *Id.*; SAC, ¶ 23.  Seevast had been

4 seeking ███████████████████ for Moniker and largely justified that price on the

5 basis of aggressive growth projections.  Kupietzky Decl. at ¶ 3.  Those growth

6 projections were contained in an Offering Memorandum and a Management

7 Presentation (collectively, "Offering Documents").  *Id.* at ¶ 3, Exs. A and B.

8         B.    <u>Oversee Negotiates a Financial Incentive Plan with Plaintiff</u>.

9       While the growth projections in the Offering Documents arguably justified the

10 asking price, Oversee was not willing to assume the accuracy of those projections and

11 pay Seevast's asking price in full at the closing of the transaction.  *Id.* at ¶ 4.  Initially,

12 Oversee offered to pay Seevast ████████████████, but structured the

13 proposed consideration as follows: (i) ████████████ and (ii) ███████

14 ████████████████████████████████████████████

15 ████████████████████████████████████████████

16 ████████████████████████████."  *Id.* at ¶ 5.  It

17 was Oversee's understanding that under that proposed structure, ███████████

18 ████████████████████████████████████████

19 ████████████████████.  *Id.* at ¶ 5.

20       Subsequent to its initial proposal, and based on the results of its due diligence,

21 Oversee ████████████ its proposed purchase price for the Moniker business as

22 follows: (i) ██████████████████████████ and (ii) a

23 ████████████████████████████████████████████

24 ██████████.  *Id.* at ¶ 6.  The payments under the incentive plan ██████

25 to ████████ if █████████████████████.  *Id.*

26       Seevast and Oversee negotiated the terms of Oversee's acquisition of Moniker,

27 but under the structure described in the preceding paragraph, Oversee negotiated the

28 proposed incentive plan that would, in final form become the MIP, directly with Mr.

1  Cahn. *Id.* at ¶ 7; Declaration of Tigran Sinanyan, dated November 11, 2011
2  ("Sinanyan Decl.") at ¶¶ 3-6.  For purposes of that negotiation, Oversee used the
3  performance metrics and projections in the Offering Documents as a starting point for
4  the Moniker Business Segments Performance Goals.  Kupietzky Decl. at ¶ 8; Sinanyan
5  Decl. at ¶ 4.  In the course of the negotiations, the parties agreed to modify the MIP's
6  structure in two ways – both to the benefit of the MIP participants.  Those adjustments
7  are described below.

8      First, Oversee agreed to *reduce* the performance goals for the three Moniker
9  Business Segments mentioned in the MIP (TrafficClub, Domain Sales and Registrar)
10 slightly *below* the projections in the Offering Documents.  Kupietzky Decl. at ¶ 9;
11 Sinanyan Decl. at ¶ 5.  So, for calendar year 2008, while the Offering Documents
12 forecast a combined EBITDA across all three business segments of ten million dollars
13 ($10 million), the MIP set a combined EBITDA goal of $8.7M.[1]  Sinanyan Decl. at
14 5(a).  For calendar years 2009 and 2010, the MIP utilized a 40% growth rate even
15 though Moniker claimed it had grown 70% year-to-year from 2006 to 2007 and
16 projected a 51% growth rate in 2008.  *Id.*  In addition, Cahn negotiated for partial
17 payment based upon the partial achievement of performance goals.  Kupietzky Decl. at
18 ¶ 9.

19     Thus, while the MIP set targets based on aggressive growth projections, these
20 projections were derived from projections created by Moniker management (where
21 Cahn was CEO); the projections were adjusted downward to create Performance Goals;
22 and the MIP provided for partial payments in the event that the Performance Goals
23 were partially met.  Nonetheless, and based on the representations of Moniker
24 management, the MIP Performance Goals intentionally continued to reflect significant

---

[1]  The MIP's First Determination Period includes the fourth quarter of 2007.  By
the time Oversee acquired Moniker on December 14, 2007, the data for 4Q 2007
was largely historic as opposed to forecasts.  So, the Performance Goals for the
First Determination Period are a combination of: (i) historic 4Q 2007 data and
(ii) the calendar year 2008 projections of $8.7M.

1 | and sustained growth in the Moniker business segments. Kupietzky Decl. ¶ 9. And,
2 | because the performance goals increased each year over the MIP's three year period, it
3 | would have been impossible to meet the Moniker Performance Goals if Moniker's
4 | business declined. *Id.*

5 |     <u>Second</u>, at Cahn's request, Oversee agreed to add an "Oversee" performance
6 | goal to the MIP, but Oversee insisted that the Performance Goal with respect to
7 | Oversee EBITDA for each determination period be set at the discretion of the Oversee
8 | board of directors. *Id.* Cahn requested the separate Oversee Performance Goal
9 | because he claimed that he wanted to make sure that his interests were aligned with
10 | those of Oversee. *Id.*

11 |     The MIP negotiations therefore produced a performance-based incentive plan
12 | under which the MIP participants would benefit financially if the Moniker business
13 | continued to improve, as the Offering Documents represented it would. Further, it
14 | also provided an incentive to the MIP participants to the extent that the performance of
15 | the Moniker business contributed to increased performance of Oversee. However, if
16 | Moniker's business remained flat or declined, the MIP would not trigger any bonus
17 | payments. As described, below, the Moniker business declined following the Oversee
18 | acquisition, and, therefore, none of the Performance Goals was achieved.

19 |     C.   <u>The Structure of the MIP.</u>

20 |     The MIP is not a contract between Cahn and Oversee. The MIP is a financial
21 | incentive plan that "is applicable to those employees of Oversee.net…who perform
22 | services primarily for its wholly-owned subsidiary, Domain Systems, Inc. (d/b/a
23 | Moniker.com, "Moniker") and its direct subsidiaries, in each case as determined in
24 | accordance with the provisions [of the Plan]." MIP, Section 1 (attached as Exhibit C to
25 | the Declaration of Elizabeth Murray, dated November16, 2011). Mr. Cahn's Oversee
26 | Employment Agreement allowed him to participate in the MIP. Employment
27 | Agreement, Section 3(d) (attached as Exhibit E to the Declaration of Todd Greene,
28 | dated November 16, 2011). Cahn also was required to identify the other Participants in

1  the MIP "[w]ithin fifteen (15) days following the first day of each of the Company's
2  next three fiscal years." MIP, Section 5(a). In theory, Cahn and the Board would
3  subsequently determine how to split any "Total Award Amount" among the
4  Participants. *Id.* However, in breach of Section 5(a), Cahn never provided Oversee
5  with a list of eligible Participants. Greene Decl. at ¶ 3.

6      The MIP is divided into four Business Segments: TrafficClub, Registrar,
7  Domain Sales, and Oversee. MIP, Schedule A. It is also divided into three time
8  Determination Periods: a First Determination Period (October 1, 2007- December 31,
9  2008), a Second Determination Period (January 1, 2009 through December 31, 2009),
10 and a Third Determination Period (January 1, 2010 through December 31, 2010). MIP,
11 Section 15(e).[2] As a result, there are twelve potential award "buckets."

12     For the three Moniker Business Segments (TrafficClub, Registrar, and Domain
13 Sales), the MIP provides a "Target Metric" (i.e., the metric by which performance
14 would be measured), a baseline award for 100% performance, and financial
15 Performance Goals for each Determination Period. MIP, Schedule A. For the Oversee
16 Business Segment, the Target Metric is given as "Oversee EBITDA", but the
17 Performance Goal is left as "TBD" or "to be determined." *Id.* Section 15(u) of the
18 MIP provides that "Target EBITDA" "means…with respect to Oversee EBITDA, as
19 shall be determined from time to time by the Board, in consultation with Monte Cahn
20 for so long as he is employed by the Company." MIP, Section 15(u).

21     As noted, above, the MIP permits partial payments at a threshold less than 100%
22 of a Performance Goal. If, in a given Determination Period, performance of a Business
23 Segment reached at least 70% of the Performance Goal, Participants would be entitled
24 to a pro-rata award. MIP, Section 3(c)(i). That same section also provides for an
25 award that exceeds 100% (up to 110%) if performance exceeds the target. *Id.* The

26

27   [2]  Though Schedule A of the MIP simply references the years 2008, 2009, and
     2010, the "2008" year actually includes the fourth quarter of 2007 (i.e., it is the
28      "First Determination Period"). MIP, Section 15(e)(i).

MIP also provides for a Segment Award if an individual Moniker Business Segment reaches at least 55% of a Performance Goal **and** the Total Actual Moniker Performance is equal to at least 100% for that Determination Period. MIP, Section 3(c)(ii).

As Cahn has admitted, the MIP is a fully integrated document. MIP, Section 10 ("This Plan contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter"). *See also,* SAC, ¶ 38.

D. Moniker's Performance Fails to Reach Threshold Levels.

In hindsight, the 2007 Moniker acquisition took place at the front end of the worst U.S. economic decline since the Great Depression. None of the three Moniker Business Segments achieved 70% of its Performance Goal for any of the Determination Periods. Murray Decl. at ¶¶ 2-26. Further, the Total Actual Moniker Performance, which is the sum of the TrafficClub, Registrar, and Domain Sales Business Segments, did not meet or exceed one hundred percent (100%) of the Total Moniker Performance Goals for any of the First, Second or Third Determination Periods. *Id.* at ¶ 7.

Oversee does not expect that Cahn will deny that the Moniker performance goals were not met. Oversee expects him, instead, to make two arguments, each of which is addressed briefly below. In summary, Cahn argues that Oversee management undermined the performance of the Moniker business segments, and that Oversee accounting manipulated Moniker results in a way that prevented the Moniker business segments from reaching their goals. Those arguments are baseless, but for purposes of this motion, the critical fact is that the Moniker performance goals were derived from Moniker's own forecasts of earnings growth that were difficult to achieve in light of external economic forces that were brought to bear on the industry starting in 2008. It is not enough for Cahn to lob criticisms at management decisions or to second-guess

1    accounting attributions. To create a triable issue of fact, Cahn must produce evidence
2    that the Moniker business segments would have achieved their prescribed MIP targets
3    but for conduct by Oversee that is prohibited under the MIP. There is no such
4    evidence.

5        E.    The 2008 Amendment to the MIP.

6        Undoubtedly cognizant of his inaccurate projections and growing inability to
7    ever meet the Performance Goals of the MIP, Cahn asked for—and received—an
8    alternative bonus compensation plan in November 2008 which covered the First and
9    Second Determination Periods. *See,* Incentive Compensation Plan Monte Cahn,
10   Schedule I (hereinafter, the "2008 Amendment") (attached as Greene Decl. Ex. F).[3]
11   The 2008 amendment to the MIP gave Cahn (but only Cahn) new goals and target
12   metrics, while leaving the original MIP in place in the event that, somehow, Moniker's
13   business performance turned around. 2008 Amendment, *passim.* Nevertheless, that
14   agreement had two key components:

15       1.    It stated than Cahn would be paid under the new plan or the MIP
16             (whichever was higher) but not both. 2008 Amendment, "Interaction with
17             MIP" ("The benefits being offered to Employee under this Plan are not in
18             addition to the payments payable to Employee under the MIP. Employee
19             shall be entitled to payments either under this Plan or the MIP, but not
20             both.")

21       2.    It clarified that, for purposes of measuring performance under the MIP, no
22             payments would be due in respect of the Oversee Performance Goal
23             unless at least one of the segments for which the MIP set a financial
24             Performance Goal (TrafficClub, Registrar, or Domain Sales) achieved its
25             MIP target.

26   _____

27   [3]   He again asked for and received a new plan in 2010 but that agreement is the
           basis of a different cause of action not currently at issue in this phase as a result
28         of the Court's August 29, 2011 bifurcation order.

1    In 2008 and 2009, Cahn received bonuses under the 2008 Amendment but not

2    the MIP because the MIP performance goals were not achieved.  Greene Decl., ¶ 8.

3

4    **III.    LEGAL STANDARD IN CASES INVOLVING CONTRACT**

5            **INTERPRETATION.**

6            Summary judgment or summary adjudication is appropriate if no genuine issue

7    of material fact exists, and the moving party is entitled to judgment/adjudication as a

8    matter of law.  FED. R. CIV. P. 56.  The party moving for summary judgment bears the

9    initial burden of "informing the district court of the basis for its motion, and identifying

10   those portions of [the record] which it believes demonstrate the absence of a genuine

11   issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  The

12   burden then shifts to the non-moving party to establish the existence of a genuine issue

13   for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-587

14   (1986).  To meet this burden, the non-movant "must do more than simply show that

15   there is some metaphysical doubt as to the material facts."  *Id.* at 586.  Rather, he must

16   "come forward with specific facts showing that there is a *genuine issue for trial.*"  *Id.*

17   at 587 (citation omitted).  Defendants must produce more than a mere scintilla of

18   evidence; there must be evidence on which a jury could reasonably find for the

19   defendants.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  If there is no

20   genuine issue of material fact, the court must grant summary judgment in favor of the

21   moving party.  FED. R. CIV. P. 56(c).

22           In the present case, the MIP states that its terms shall be governed by California

23   law.  MIP, Section 13.  Where a summary judgment motion addresses the

24   interpretation of a contract, California law is clear: except where interpretation turns on

25   the credibility of parol evidence, interpretation of a contract is the province of the judge

26   and should therefore be made as a matter of law.  *Oceanside 84, Ltd. v. Fidelity*

27   *Federal Bank*, 56 Cal. App. 4th 1441 (1997); *Palmer v. Truck Ins. Exchange*, 21 Cal. 4th

28   1109, 1115 (1999).

The only claim presently at issue is Plaintiff's claim for Breach of Contract with respect to the MIP. As explained in *Stevens v. Mavent, Inc.,* 2008 WL 2824956 (C.D. Cal. July 21, 2008), a case almost identical to this one:

> A claim for breach of contract requires evidence of (1) the contract's existence and its terms, (2) performance by plaintiff, (3) breach by defendants, and (4) damages suffered by plaintiff as a result. [Citation.] Under basic contract law an offer must be sufficiently definite, or must call for such definite terms in acceptance that the performance promised is reasonably certain. [Citation].

*Stevens*, 2008 WL 2824956 at *2.

## IV.  ARGUMENT

### A.  Because the Moniker Business Segments Did Not Reach the 70% Threshold of the Performance Goals, No Payment Was Required.

#### 1.  THE MONIKER SEGMENTS DID NOT ACHIEVE THEIR PERFORMANCE GOALS.

As explained above, the MIP is clear on its face: to trigger payment of an award with respect to a particular Moniker Business Segment within a determination period, one of two things had to happen: (i) the performance of such Moniker Business Segment in that determination period had to reach a minimum of 70% of the Performance Goal (MIP Section 3(c)(i)) or (ii) the performance of such Moniker Business Segment in that determination period had to reach a minimum of 55% of the Performance Goal while, at the same time, the total Moniker performance for all three Moniker Business Segments in that determination period reached at least 100% (Section 3(c)(ii)). As explained in the Declaration of Elizabeth Murray, Moniker realized neither scenario. Below is a chart summarizing Moniker Business Segment Performance:

| Business Segment | Determination Period | Percentage of Performance Goal |
|---|---|---|
| TrafficClub | First | ■ |
|  | Second | ■ |
|  | Third | ■ |
| Registrar | First | ■ |
|  | Second | ■ |
|  | Third | ■ |
| Domain Sales | First | ■ |
|  | Second | ■ |
|  | Third | ■ |

Murray Decl. Exhibit D.  As shown above, none of the Business Segments achieved even 55% of its Performance Goal in any of the Determination Periods, and the three segments combined obviously did not reach 100% of target.

Mr. Cahn's "eligibility for bonus payments is properly determined by the bonus [plan's] specific terms and general contract principles." *Neisendorf v. Levi Strauss & Co.*, 143 Cal. App. 4th 509, 523 (2006).  "California courts have consistently characterized bonus and profit sharing plans as constituting an offer of the stated benefits in exchange for the service of an employee, and upon the employee's completion of the required services in accordance with the terms of the plan, a binding contract is formed under which the employer is obligated to deliver the promised benefits." *Id.*

Here, the specific terms of the MIP call for performance at certain specified levels before payment is triggered.  That performance was not achieved in any period, and, therefore, no payment was owed in any period.  As a result, with respect to the Moniker Business Segments, Oversee did not breach a contract.

## 2. CAHN CANNOT DEMONSTRATE THAT OVERSEE UNDERMINED THE MIP PERFORMANCE GOALS.

As noted above, Oversee expects that Cahn will generally argue that Oversee undermined the MIP Performance Goals through management decisions and accounting gimmicks. While those contentions are untrue, Oversee does not presently know how Cahn will try to support those, thus far, vague contentions. Therefore, while Oversee will respond to Cahn's evidence in its Reply, for present purposes, Oversee can only note the following two points.

First, Oversee did not assume any duty to Cahn to manage the company to benefit Cahn. Indeed, a corporation's officers and directors owe fiduciary duties to the shareholders, and it is the interests of those shareholders that must be paramount. *See, e.g., Small v. Fritz Companies, Inc.*, 30 Cal. 4th 167, 179, 65 P.3d 1255 (2003) ("Officers and directors owe a fiduciary duty to stockholders.") (citations omitted). The MIP specifically says that participants are *not* stockholders by virtue of their participation in the MIP: "Neither the adoption of this Plan nor the granting of any Award, shall confer upon any Participant any rights of a stockholder in the Company…" MIP, Section 7. Thus, recognizing the overriding obligations of Oversee's directors and officers to act in the best interests of the corporation and its shareholders, Cahn assumed the risk that those decisions could affect his compensation. Cahn has no right to second-guess business decisions regardless of their impact on MIP Performance Goals.

Second, even if Cahn could demonstrate a legal right to question management or accounting decisions made by Oversee, he must demonstrate proximate cause. *US Ecology, Inc. v. State*, 129 Cal. App. 4th 887, 909 (2005) ("Causation of damages in contract cases, as in tort cases, requires that the damages be proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain. A proximate cause of loss or damage is something that is a substantial factor in bringing about that loss or damage.") (internal citations omitted). Specifically, Cahn must show

1  that Oversee business or accounting decisions kept Moniker business segments from
2  achieving Performance Goals that they otherwise would have achieved. He cannot
3  meet that challenge. There was no chance that any of the three Moniker business
4  segments could have achieved any of their Performance Goals in any of the
5  measurement periods. And the reason – although not directly relevant to this Motion –
6  is worth noting: Cahn overstated Moniker's anticipated growth trajectory and he
7  agreed to accept the risk that his projections were wrong. In a turbulent economy,
8  those projections proved to be horribly wrong, and that is why Moniker did not come
9  close to hitting any of its Performance Goals.

10      **B.     The Oversee Business Segment Provision Is Not Enforceable.**

11      As noted, above, the parties did not set, nor did the MIP contain, a numeric
12  Performance Goal for the Fourth Business Segment, Oversee. Rather, they ultimately
13  agreed to leave the Performance Goal as "TBD" and to grant discretion to the Board to
14  set that that Performance Goal. Section 15(u) (stating that Oversee EBITDA Target
15  Metric would be determined "from time to time by the Board…."). Neither the
16  Oversee Board nor the Board of Directors of ODN Holding Corporation[4] ever set a
17  MIP Performance Goal for Oversee EBITDA.[5] Greene Decl. ¶ 5.

18  _____

19  [4]   On December 20, 2007, in preparation for a pending investment by investors,
20        which was consummated in February 2008, Oversee reorganized and became a
        wholly-owned subsidiary of ODN Holding Corporation, a holding company
21        whose sole asset was and is the ownership of the stock of Oversee. Oversee and
        ODN have separate boards of directors. Greene Decl. at ¶ 4. Neither Board set
22        a Performance Goal for Oversee EBITDA under the MIP. *Id.* at ¶ 5; Deposition
23        Transcript of Jeffrey Kupietzky, taken October 26, 2011 ("Kupietzky Depo."), at
24        110:4-10 (attached as Delgado Decl. Ex. G).

25  [5]   Cahn's Complaint alleges that the Board did set Oversee EBITDA goals, and
26        that those goals were partially met in 2009 and fully met in 2010. SAC, ¶¶ 26,
        27. From 2008-2010, the ODN board of directors set an Oversee EBITDA goal
27        used to measure the performance of Oversee. These goals were the basis from
        which discretionary bonuses payable to employees of Oversee who participated
28        in Oversee' annual discretionary bonus plan were set. That bonus plan is

1    This set of facts is nearly identical to those in *Stevens, supra*. In *Stevens*, the
2    Plaintiff was eligible for a bonus, for which the Board would set quarterly targets in its
3    discretion based on company objectives every year. *Stevens*, 2008 WL 2824956 *1.
4    However, at no point during Plaintiff's employment did the Board actually set a target
5    for him. *Id*. Like Cahn claims with respect to the Fourth Business Segment, "Stevens
6    does not know the criteria by which to determine whether he qualified or earned any
7    quarterly performance bonus pursuant to the Agreement, nor does he know whether he
8    actually qualified or earned the bonuses." *Id*. When Stevens asked to be paid quarterly
9    bonuses, he was informed "[T]hese bonuses are based on threshold goals being met
10   and exceeded and are to be established by the Board of Directors. The Board has not
11   set those thresholds and therefore Mavent is unable to determine if you have satisfied
12   the criteria to receive these bonuses." *Id*.

13   On facts nearly identical to the ones here, the Court entered summary judgment
14   for the Defendant on Plaintiff's claim for breach of contract. The Court commenced by
15   citing long-standing California law that "[c]ourts will not enforce vague promises
16   about the terms and conditions of employment that provide no definable standards for
17   constraining an employer's inherent authority to manage its enterprise. It is to be
18   expected that many alleged employer promises will be unable to cross this threshold of
19   definition to become enforceable claims." *Id*. at *2, *citing, inter alia, Scott v. Pacific
20   Gas & Electric Co.*, 11 Cal. 4th 454, 473 (1995), *disapproved on other grounds, Guz v.
21   Bechtel Nat. Inc.*, 24 Cal. 4th 317, 352, n. 17 (2000); *see also Ladas v. California State
22   Auto. Assn.*, 19 Cal. App. 4th 761, 814 (1993) ("To be enforceable, a promise must be

23

24   ───────────────────────────────

     separate and distinct from the MIP. Greene Decl., ¶ 6. Those EBITDA goals
25   were not applicable to the MIP, a point made clear during the MIP negotiations,
     when Oversee rejected Cahn's request to equate the EBITDA targets for Oversee
26   legacy management to the MIP Oversee "TBD" Performance Goals. Kupietzky
27   Depo at 106:5-19; Ex. 3 (e-mail informing Cahn that "the other execs will get a
     **different** Moniker component added to their legacy Oversee number.")
28   (emphasis added).

definite enough that a court can determine the scope of the duty and the limits of
performance must be sufficiently defined to provide a rational basis for the assessment
of damages.)

Ultimately, the *Stevens* Court concluded that, because the targets for attaining
the bonus were to be determined in the discretion of the Board, and the Board did not
set those targets, the claim for breach of contract failed as a matter of law because "the
Agreement has no definable standards and is too indefinite to be enforced." *Id.* The
Court concluded its analysis by noting that the claim also failed because "the absence
of standards for determining performance bonus eligibility renders damages
speculative." *Id.*

So it is here. Because the board of directors (either the Oversee Board or the
ODN Board) never set a Performance Goal for Oversee EBITDA under the MIP,
Cahn's claim is speculative. This Court's task is to enforce the agreement as drafted,
and not to try to go back in time to figure out what performance goals Oversee
executives would have set in the course of managing their company. *Rochlis v. The
Walt Disney Company*, 19 Cal. App. 4th 201, 214 (1993) ("Litigation cannot become a
vehicle for the micromanagement of day to day corporate affairs."), *disapproved on
other grounds, Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238 (1994).

Because the MIP did not set the Oversee performance targets, that aspect of the
MIP is unenforceable as a matter of law.

C.    **Cahn Is Not Entitled to Payments for the Oversee Business Segment
During the First and Second Determination Periods.**

Even if Cahn were correct that the Oversee targets set by the Board applied to
MIP participants (and they did not), Cahn agreed to amend the MIP, as applied to
himself, to state that, for 2008 and 2009, he would not receive an Oversee performance
bonus unless at least one of his Moniker segments hit its Performance Goal target

1 during that year.[6] In November 2008, Cahn and Oversee executed the 2008
2 Amendment. The 2008 Amendment (which unfortunately does not contain page nos.
3 or paragraph nos.) states that if the performance of the Moniker Business Segments
4 (i.e., TrafficClub, Registrar, Domain Sales) did not trigger a MIP payment for those
5 segments, then Cahn would not be entitled to payment under the Oversee Performance
6 Goal. *See,* 2008 Amendment (at OVER002435-36). As demonstrated, above, no MIP
7 payments for any of the Moniker business segments were triggered in the First and
8 Second Determination periods. Section III, A, *supra.* The 2008 Amendment thus
9 precludes Cahn's claim to an Oversee TBD bonus for the 2008 and 2009 determination
10 periods.

11     **D.**    **As to All Four Segments, Damages Would Be Speculative As a Result**
12        **of Cahn's Failure to Identify Participants.**

13     Oversee is entitled to summary judgment on a separate basis: even if some
14 award under the MIP had been required for some Business Segment in some
15 Determination Period, damages would be speculative because Cahn never identified
16 the MIP participants to the Board. At the beginning of each calendar year 2008, 2009,
17 and 2010, the MIP required Cahn to provide the Board with a list of Plan participants.
18 MIP, Section 5(a). The foundation of an incentive plan is that it incents participants to
19 achieve their goals. It cannot serve that purpose if the participants are never told they
20 are eligible to earn an incentive. But, Cahn never identified the MIP participants to the
21 Board. Cahn's failure to notify the Board of the MIP participants at the inception of
22 the calendar year in which those participants were expected to work to achieve their
23 incentives renders relief speculative, because it is now impossible to determine how an
24 award would have been divided among multiple participants.

25

---

26 [6]   The SAC alleges that Oversee EBITDA goals were partially met in 2009 and
27     fully met in 2010. SAC, ¶¶ 26, 27. As a result, even Cahn implicitly admits that
    the Oversee EBITDA goal was *not* met at the requisite 70% threshold level in
28     2008 (i.e., the First Determination Period).

1    Undoubtedly, Cahn will now argue that, because the designation of participants
2    was in his discretion, he could and would have designated himself as sole participant.
3    That is not how an incentive plan works. As noted above, the MIP participants were to
4    be identified at the beginning of the year. Cahn cannot now avoid the mutiny that
5    would have ensued if he had designated himself as the sole Plan participant by
6    remaining silent when the MIP was in place and appointing himself sole participant
7    after he has left the company. In short, Cahn's failure to identify MIP participants
8    when he was required to do so renders his First Claim for Relief speculative.

9    **V.     CONCLUSION**

10   Cahn's claim for breach of contract categorically fails. First, no Moniker
11   Business Segment achieved its specified Performance Goal during any Determination
12   Period, and, thus, no payments were due. Second, any bonus in respect of the Oversee
13   Business Segment bonus is unenforceable because the performance goals were left to
14   the discretion of the Board, and, as to 2008 and 2009, Cahn was not entitled to such
15   payments anyway because of the 2008 Amendment. Finally, as to all four business
16   segments, damages would be speculative because Cahn failed to identify the other
17   Participants in the MIP.

18   For all these reasons, Oversee respectfully requests summary judgment on
19   Plaintiff's First Claim for Breach of Contract. In the alternative, Oversee respectfully
20   requests partial summary judgment on the issue of whether an award was merited
21   under any specific Business Segment.

22

23   Dated:  November 16, 2011            WILLENKEN WILSON LOH & LIEB LLP

24

25                                       By: _____
26                                       William A. Delgado,
27                                       Attorneys for Defendants OVERSEE.NET,
                                         JEFFREY KUPIETZKY, and LAWRENCE NG
28