```
                                    FILED
                         CLERK, U.S. DISTRICT COURT

                              NOV 2 1 2011

                         CENTRAL DISTRICT OF CALIFORNIA
                         BY                      DEPUTY
```

1  LEWIS BRISBOIS BISGAARD & SMITH LLP
   JOHN L. BARBER, SB# 160317
2      E-Mail: barber@lbbslaw.com
   KENNETH D. WATNICK, SB# 150936
3      E-Mail: watnick@lbbslaw.com
   SONJA HARRINGTON, SB# 261053
4      E-Mail: sharrington@lbbslaw.com
   221 North Figueroa Street, Suite 1200
5  Los Angeles, California 90012
   Telephone: 213.250.1800
6  Facsimile: 213.250.7900

7  Attorneys for MONTE CAHN

8
                  UNITED STATES DISTRICT COURT
9
          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
10

11
   MONTE CAHN,                        CASE NO. CV11-03800 SVW (AGRx)
12
              Plaintiff,              The Hon. Stephen V. Wilson
13
        vs.
14                                    **THIRD AMENDED COMPLAINT
   OVERSEE.NET, a California          FOR:**
15 corporation; JEFF KUPIETZKY, an
   individual; LAWRENCE NG, an        1)  **BREACH OF CONTRACT -
16 individual; and Does 1 through 10,     MANAGEMENT INCENTIVE
                                          PLAN**
17            Defendants.             2)  **BREACH OF CONTRACT -
                                          COMMISSION PLAN**
18                                    3)  **BREACH OF CONTRACT -
                                          RESTAURANTS.COM**
19                                    4)  **ACCOUNTING**
                                     5)  **FRAUD**
20                                    6)  **CONVERSION**
                                     7)  **CONVERSION**
21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4817-7540-0206.1

1      Plaintiff Monte Cahn alleges for his Complaint against Defendants

2 Oversee.net, Jeff Kupietzky and Lawrence Ng (collectively "Defendants") as

3 follows:

### JURISDICTION AND VENUE

5     1.    This Court has diversity jurisdiction of this action under 28 U.S.C. §

6 1332, in that there is complete diversity of citizenship between the parties, and the

7 amount in controversy exceeds the sum or value of $75,000, exclusive of interest

8 and costs.

9     2.    Venue is proper in the Central District under 28 U.S.C. § 1391(a) in

10 that one or more of the defendants reside in this judicial district, and in particular, in

11 the Court of Los Angeles, and a substantial part of the events giving rise to the claim

12 occurred in this district.

### PARTIES

14     3.    Plaintiff Monte Cahn ("Cahn" or "Plaintiff") is, and at all times

15 mentioned was, an individual residing in Lauderdale by the Sea, Florida.

16     4.    Defendant Oversee.net ("Oversee") is, and at all times mentioned was,

17 a corporation, organized and existing under the laws of the State of California, with

18 its principal place of business in Los Angeles, California. Cahn is informed and

19 believes that Oversee is a wholly owned subsidiary of ODN Holding Corporation

20 ("ODN").

21     5.    Defendant Jeff Kupietzky ("Kupietzky") is and/or was, at all times

22 mentioned was, an individual residing in California. Kupietzky is the Director,

23 Chief Executive Officer and President of Oversee.

24     6.    Defendant Lawrence Ng ("Ng") is, and at all times mentioned was, an

25 individual residing in California. Ng is the Chairman of the Board and Co-Founder

26 of Oversee.

27     7.    The true names and capacities, whether individual, corporate, associate

28 or otherwise, of the defendants named herein as Does 1 through 100, are unknown

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4817-7540-0206.1

1

1  to Cahn at this time.  Cahn is informed and believes that each of these fictitiously

2  named defendants is in some manner responsible for the events and damages alleged

3  herein and will seek leave of court to amend this Complaint to show the true names

4  and capacities when the same have been ascertained.

5  <u>FACTS AND BACKGROUND</u>

6       8.    Cahn is one of the leading pioneers of the domain name selling,

7  valuing, and auction concept, starting one of the first online domain brokerage

8  businesses on the Internet in 1996.

9       9.    Cahn formed Domain Systems, Inc. d/b/a Moniker.com ("Moniker") in

10  1999.  Moniker is a web-based service that provides users a streamlined interface to

11  search for, register and manage their domain names.  It provides domain sales,

12  brokerage, registration of domains, domain traffic monetization and parking, drop

13  and expired name back order and purchasing services, and domain management and

14  asset management services.

15       10.   Cahn successfully managed and operated the business as an owner until

16  2005, at which time Seevast Corp. ("Seevast") purchased Moniker.  Cahn remained

17  CEO and maintained management responsibilities for the company until 2007.

18  Through his work with Moniker, Cahn became a highly respected figure in the

19  domain industry.

20       11.   Oversee specializes in monetizing, registering, selling and developing

21  domain names through its various subsidiaries, including SnapNames,

22  DomainSponsor, DOMAINfest, LowFares.com, ShopWiki.com,

23  AboutAirportParking.com and CreditCards.org.

24       12.   In or around 2007, Oversee approached Seevast and Cahn with an offer

25  to purchase Moniker.  The parties engaged in extensive negotiations.  However,

26  Oversee stated that it would not purchase Moniker unless Cahn, as one of the

27  leaders in the industry, agreed to join Oversee for at least three years after the sale.

28  Cahn's agreement to join Oversee was an explicit condition of the agreement to

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

1  purchase Moniker from Seevast.

2      13.    Kupietzky and Ng were primarily responsible for the negotiations on

3  behalf of Oversee and for making several statements, the purpose of which were to

4  induce Cahn to join Oversee after the merger.  These statements were made in or

5  around the year 2007 while Oversee and Seevast were negotiating the terms of their

6  purchase agreement.  These statements were untrue, were intended to fraudulently

7  induce Cahn to join Oversee, and were relied upon by Cahn in electing not to pursue

8  alternative employment opportunities.  Defendants' false and fraudulent

9  representations have caused Cahn to lose millions of dollars in lost opportunities and

10  income.  Additionally, as confirmed by Oversee's recent conversion of valuable

11  assets, it is clear that Defendants' conduct was intentional, malicious, and

12  despicable, thereby warranting punitive and exemplary damages.

13      14.    Throughout the negotiations, Ng and Kupietzky, and Oversee

14  represented to Cahn that Oversee could fully integrate, support, and enhance the

15  business activities of Moniker's operations.  These representations were knowingly

16  false, were intended to fraudulently induce Cahn to join Oversee, and were relied

17  upon by Cahn in electing not to pursue alternative employment opportunities.

18  Among other things, Ng and Kupietzky knew that Oversee had a contract with

19  Google that would render it impossible for Traffic Club to continue to operate in the

20  same manner after the merger.  TrafficClub was the business segment of Moniker

21  relating to the monetization of internet domain names through the rotation of the

22  domain names on third party parking platforms, e.g., Google and Yahoo.

23  TrafficClub utilized multiple feeds, whereas DomainSponsor, Oversee's

24  monetization segment utilized a single feed (Google).  Ng and Kupietzky were

25  aware that Oversee's contract with Google was inconsistent with Traffic Club's

26  business model and operations.   Kupietzky has admitted that it was the Google

27  contract that restricted Oversee's ability to use multiple feeds (a.k.a. TrafficClub).

28  Since Oversee's contract with Google was in place prior to the merger, Defendants

1    knew that they would not be able to operate TrafficClub in the manner represented

2    to Cahn.

3       15.    Also, Ng and Kupietzky knew that SnapNames was paying Moniker

4    substantial revenue share payments in connection with its registrar business. Ng and

5    Kupietzky knew that, after a merger, they could and/or would adjust or eliminate

6    these revenue share payments to Moniker, thereby reducing Moniker's EBITDA and

7    undermining Cahn's ability to reach the performance levels necessary for a bonus.

8    Because SnapNames lost Network Solutions as a client/customer, this adjustment

9    was critical to conceal and obscure the difficulties with the multimillion dollar

10    SnapNames' acquisition. Thus, based on Ng's and Kupietzky's false, fraudulent,

11    and misleading representations about the seamless integration, Cahn agreed not to

12    pursue alternative employment opportunities that would have enabled him to realize

13    millions of dollars in compensation.

14       16.    In or around December 2007, Ng, Kupietzky, and Oversee also

15    promised Cahn that there would be integration and cross-selling potential between

16    all of Oversee's subsidiaries. This included Moniker's ability to cross-promote and

17    advertise to the customers of each Oversee entity. Kupietzky assured Cahn that, if

18    Cahn joined Oversee, Oversee would not terminate or eliminate the positions of the

19    Moniker employees. These representations were knowingly false, were intended to

20    fraudulently induce Cahn to join Oversee, and were relied upon by Cahn in electing

21    not to pursue alternative employment opportunities.

22       17.    During the merger discussions, Ng made statements to Cahn regarding

23    his view that Moniker, pre-merger, was "understaffed" and its employees

24    "overworked." Based on this assessment, Ng promised Cahn that, if he joined

25    Oversee, the merger with Oversee would provide Moniker with the resources and

26    staffing it needed to flourish in the market. Ng, Jeff Navach, and others advised

27    Cahn that Oversee would increase Moniker's staff to 36 employees. Ng claimed

28    that, with the added resources, Cahn could realize income from employment at

1   Oversee that he could not receive from pursuing the other alternative employment
2   opportunities that Cahn was considering. Ng made these representations in an effort
3   to mislead Cahn, to deceive Cahn into joining Oversee, and to prevent Cahn from
4   establishing and/or assisting an alternative competitor to Oversee. These
5   representations were not true and were relied upon by Cahn in electing not to pursue
6   alternative employment opportunities. In fact, Oversee, Kupietzky, and Ng knew
7   that, after acquisition, Oversee planed to cut Moniker's staff and eliminate portions
8   of Moniker's business operations.

9       18.    During the negotiations with Ng, Kupietzky, and Oversee, it was
10  determined and agreed upon that, if Cahn were to join Oversee, he would serve as
11  the President of Moniker, and would have the normal duties, responsibilities,
12  functions and authority as are normally associated with and appropriate for such
13  position. None of these representations were true. In truth, Defendants planned to
14  remove Cahn from management responsibility and sought to insult Cahn into
15  resigning.

16      19.    During negotiations, Ng and Kupietzky, and Oversee told Cahn that
17  Cahn would report directly to Ng, who was then the CEO, ensuring Cahn had
18  adequate authority and dominion to carry out and achieve Moniker's performance
19  goals within Oversee's infrastructure. Because Cahn had a great professional
20  relationship with Ng, it was important for Cahn that Ng be the individual to which
21  he would report. Further, Ng knew and understood that Cahn considered Ng's
22  promise and assurance of a direct reporting relationship critical to any successful
23  merger of Oversee and Moniker. In contradiction to defendants' representations and
24  assurances to Cahn, Ng was in the process of resigning as the CEO of Oversee.
25  Cahn relied on defendants' false representations in deciding not to pursue alternative
26  employment opportunities. If Ng, Kupietzky, and Oversee had told the truth about
27  Ng's plans and intentions, Cahn would have pursued the alternative employment
28  opportunities that Kupietzky and Ng induced Cahn to forego.

20.     In or around December 2007, Ng and Kupietzky and Oversee promised Cahn that, post merger, Moniker would receive adequate marketing and public relations assistance from Oversee. During this same time period, Ng and Kupietzky also represented to Cahn that Oversee could and would centralize the operations of both Moniker and Oversee so that there was a seamless integration of software and a uniform way to respond to intellectual property disputes, litigation, audit and survey responses and complaints from customers. Ng and Kupietzky made these representations in an effort to induce Cahn to forego the alternative, lucrative business opportunities that Cahn was considering. These representations were knowingly false and were relied upon by Cahn in electing not to pursue alternative employment opportunities.

21.     As an additional inducement for Cahn to join Oversee.net, Oversee, through Ng and Kupietzky, proposed a "Management Incentive Plan" ("MIP") whereby Cahn would be able to earn up to $13,000,000 through a goal oriented bonus structure. The MIP was to be in effect from October 1, 2007 through December 31, 2010, and divided into three "determination periods." The bonus structure set forth under the proposed MIP was based on Cahn's attainment of certain performance goals in four categories: the Registrar Business Segment, the Domain Sales Business Segment, the TrafficClub Business Segment, and Oversee EBITDA. Cahn's performance was to be determined, in good faith, by the Oversee board of directors, and was based upon Oversee's Interim Financial Statements or the Determination Period Financial Statements. Based upon the events that transpired, Cahn now believes that Oversee and its representatives, including Kupietzky and Ng, had no intention of acting in good faith with respect to the creation and performance of the MIP. Rather, Oversee and its representatives, including Kupietzky and Ng, made numerous false and misleading statements to Cahn and made whatever statement they thought necessary to induce Cahn to join Oversee and to prevent Cahn from pursuing an alternative opportunity. Moreover,

1    the fraudulent statements about the MIP were designed to enrich Oversee at the

2    expense of Cahn and Seevast. Oversee, through Jeff Kupietzky, Jeff Navach, and

3    possibly others, represented to Seevast and Cahn that Oversee needed to reduce the

4    purchase price in order to allow Cahn the opportunity to achieve the compensation

5    benefits of the MIP. In truth, Kupietzky and Oversee never intended to honor the

6    terms of the MIP. Rather, Kupietzky and Oversee intended to use the promise of

7    MIP compensation in an effort to allow Oversee to obtain a $13 million windfall.

8        22.    Ng and Kupietzky were primarily responsible for making the false

9    representations and assurances to Cahn that he would be able to earn up to

10   $13,000,000 in bonuses under the MIP. Ng and Kupietzky, as representatives of

11   Oversee, made these false representations because they wanted to ensure that Cahn

12   did not pursue employment opportunities with a competitor. Cahn relied on these

13   false and fraudulent representations by Ng, Kupietzky, and Oversee in electing not

14   to pursue alternative employment opportunities.

15       23.    Kupietzky, on behalf of all Defendants, represented to Cahn during the

16   negotiations that the overall Oversee EBITDA in the MIP would be adjusted, either

17   up or down, from the time the merger took place throughout the term of the MIP,

18   and those calculations would be the controlling benchmarks. Similarly, during the

19   negotiations, other defendant representatives, including Todd Greene and Hamed

20   Meshki, represented and assured Cahn that if the performance goals for Oversee

21   EBITDA could not be determined before the merger, the parties would meet in good

22   faith and develop objective criteria for determining these goals. Defendants'

23   representatives assured Cahn that these goals would be the same as the goals for

24   other senior management. Josh Armstrong and Jeff Navach also have knowledge

25   and information relating to these representations. Additionally, Kupietzky

26   represented to Cahn that Oversee would set the Oversee EBITDA in Cahn's MIP

27   each year. Oversee EBITDA was supposed to be set by the Board each year in

28   consultation with Cahn. In fact, Kupietzky never intended to set Oversee's

1 EBITDA goals. Kupietzky admitted that he stopped tracking Cahn's MIP in 2008,

2 and that he never discussed Cahn's Oversee EBITDA goals with the Board.

3     24.   When Defendants made these representations and assurances, Cahn

4 was considering whether to pursue various employment opportunities. Based on

5 Defendants' representations about Moniker's ability to successfully integrate with

6 Oversee, assurances that Cahn would have the ability to earn up to $13,000,000 in

7 payments under the MIP, and assurances that Cahn would realize additional benefits

8 from joining Oversee, Cahn was induced to forego other lucrative business

9 opportunities, and continue in his management and oversight of Moniker.

10 Defendants' representations were not true, were fraudulently made, and were relied

11 upon by Cahn to his detriment.

12     25.   The parties reached a mutual agreement regarding the terms of the sale

13 of Moniker to Oversee on or around December 14, 2007.

14     26.   Cahn is informed and believes, and on the basis of such information

15 and belief alleges that sometime on or around December 2007, but on a date

16 presently unknown to Cahn, Defendants formed the intent, and actively concealed

17 and misrepresented the true fact that they intended to fully subjugate Moniker and

18 Cahn, taking for themselves the full benefit of Moniker's great public reputation and

19 industry value at the time of merger while simultaneously jettisoning and reducing

20 Cahn's staff, influence and ability to properly manage and lead Moniker. In doing

21 so, Defendants intended to and did make it impossible for Cahn to obtain benefits

22 under the MIP. Also, Defendants acted in this deceitful manner in an effort to

23 fraudulently persuade Cahn not to pursue alternative employment opportunities

24 before and during his employment at Oversee. Cahn relied on these false,

25 fraudulent, and misleading representations to his detriment.

26     27.   Post merger, Defendants took numerous affirmative actions in direct

27 contradiction to the express and implied representations by Ng, Kupietzky, and

28 Oversee. These actions, include, but are not limited to, the following:

LEWIS
BRISBOIS
BISGAARD

1          a.    Beginning in 2007, Oversee and Mr. Kupietzky devised a plan to

2    poach customers from the TrafficClub business segment, in an effort to inflate the

3    revenues and profits of one of Oversee's divisions, Domain Sponsor. Mr.

4    Kupietzky aggressively pursued this goal because his performance bonuses related,

5    in large part, to the operation of Domain Sponsor. Mr. Kupietzky recognized that

6    TrafficClub was a far better alternative to Domain Sponsor and that TrafficClub's

7    continued success and expansion would damage Domain Sponsor and adversely

8    affect Mr. Kupietzky's bonuses. Because of its obligations under a contract with

9    Google, in 2007, Oversee cancelled a contract between Oversee and TrafficClub.

10   Immediately thereafter, Domain Sponsor, at the direction of Mr. Kupietzky,

11   attempted to poach all of TrafficClub's customers. This unethical business practice

12   was unsuccessful. Thereafter, in connection with Oversee's efforts to purchase

13   Moniker, Kupietzky and Oversee represented to Cahn that Oversee would expand

14   the TrafficClub operations, post merger. In fact, Oversee and Kupietzky knew that

15   it was required to shut down the TrafficClub operation. Oversee and Kupietzky shut

16   down TrafficClub less than 2 months after acquiring Moniker. Unbeknownst to

17   Cahn, Oversee was required by its contract with Google to terminate or substantially

18   alter the operations of TrafficClub. In closing this business, Ng, Kupietzky and

19   Oversee successfully denied Cahn the benefit of the bargain that they had promised,

20   and contradicted their express representations that Moniker's business would be

21   integrated and enhanced by the merger. They also contradicted their representations

22   and assurances to expand, not destroy TrafficClub.

23         b.    In an effort to defraud Cahn, Oversee kept multiple sets of

24   books/accounting records/numbers/information that it used to represent to various

25   parties, including Cahn in relation to his MIP goals, its own employees, the Board of

26   Directors, the Bank, and potential purchasers. Craig Snyder, the General Manager

27   of the Aftermarket and Registrar business units at Oversee, confirmed in a sworn

28   declaration that Oversee  kept multiple sets of books/accounting

LEWIS
BRISBOIS
BISGAARD

1  records/numbers/information for the various Oversee business segments, and

2  Oversee reported different sets of information to different parties. Additionally,

3  Elizabeth Murray, the Executive Vice President and Chief Financial Officer for

4  Oversee, also confirmed in a sworn declaration that Moniker's Florida office kept its

5  own set of records, separate and apart from Oversee, and that the revenues from

6  Moniker were improperly allocated to DomainSponsor and SnapNames. Based

7  upon this information it is clear that no reasonable person can rely on the accuracy

8  of Oversee's financial records. During the relevant period in question, Oversee

9  deliberately manipulated and misrepresented the performance of the Moniker

10 business segments in a deceitful effort to prevent Cahn from securing the benefits of

11 the MIP. In fact, Cahn understands that this manipulation and misrepresentation of

12 Oversee's financial records continues through this day.

13          c.      While acting as President of Moniker at Oversee, Oversee

14 delegated Cahn the additional responsibility of running the SnapNames and

15 DomainSponsor divisions of Oversee, and removed Cahn's oversight and control

16 from the Registrar Business Segment. No explicit changes were made to modify

17 Cahn's performance goals under the MIP, as required under the terms of the MIP, to

18 take into account the additional responsibilities that Cahn would incur, and the

19 changes that the additional subdivisions would have on Monikers' EBITDA. Based

20 upon their representations and assurances, Defendants had, at a minimum, an

21 implied obligation to factor these additional responsibilities into Cahn's

22 performance goals.

23          d.      Prior to the merger Oversee purchased SnapNames. At the time,

24 SnapNames was the leading drop catching, back order and expired name services

25 company in the industry. Moniker was the second best performing registrar.

26 Shortly after the acquisition SnapNames lost its largest client, Network Solutions.

27 In order to disguise and prevent the Oversee Board and others from recognizing the

28 disastrous effect of the departure of Network Solutions, after the merger, Oversee

1  improperly diverted Moniker's registrar revenue to SnapNames, thereby artificially

2  deflating Moniker's EBITDA, and inflating SnapNames.  More specifically, before

3  the merger, Moniker was receiving 70 or 80% revenue share payment from

4  SnapNames.  After the merger, Oversee directed that all revenue and profit go to

5  SnapNames such that Moniker lost substantial revenue and profit recognition, and

6  SnapNames reported 100% of Moniker's revenue as their profit.  This deflated

7  Moniker's EBITDA by more than $700,000 annually and increased SnapNames by

8  the same amount.

9      e. Oversee improperly diverted substantial revenues and profits

10  from Moniker to other subsidiaries of Oversee.  For example, Oversee diverted

11  Moniker's default DNS traffic and revenue /profit directly to DomainSponsor, again

12  deflating Moniker EBITDA by that same amount and reporting 100% of that

13  revenue as profit to DomainSponsor.  Oversee also diverted other revenue to

14  SnapNames.  Oversee failed to track TrafficClub's performance as a business

15  segment, closed its operation within a month of merger, and, over Cahn's repeated

16  objection, intentionally failed to credit this business segment for various revenues

17  that were directly achieved by the Moniker staff.  These diversions were intended to

18  prevent Cahn from achieving his performance goals.

19      f. Oversee artificially increased the costs and expenses of the

20  Moniker operations.  Oversee imposed phantom merchant fee expense charges.

21  Also, in an effort to prevent Cahn from achieving the Registrar performance goals,

22  Oversee artificially inflated the costs of goods sold.

23      g. Cahn's staff at Moniker was reduced by more than 33% despite

24  Ng's and Oversee's promises that Moniker would be infused with resources to

25  alleviate its pre-merger under staffing issues.  Additionally, Oversee provided Cahn

26  with a projection that the Moniker staff would increase from 28 to 36.  Oversee

27  reneged on the promised staff increases shortly after Oversee entered into a separate

28  transaction with Oak Hill Investments in January 2008.  Cahn believes that Oak Hill

1  directed Oversee to reduce, rather, than increase staffing and costs of operations.

2  Because Cahn's business segments were disfavored, Kupietzky recommended

3  substantial cuts in all of Moniker's operations, including staffing, marketing, and

4  auctions.

5        h.     Oversee improperly and incorrectly reported Moniker's Selling,

6  General & Administrative Expenses, which had the effect of making it seem as if

7  Moniker underperforming.  Oversee also improperly and wrongfully included non-

8  Moniker expenses from SnapNames and Oversee Corporate.

9        i.     Oversee severely restrained the marketing and public relations

10  budget available to Moniker, reserving those funds almost exclusively for Oversee's

11  use despite Kupietzky's promises to provide Moniker with adequate support in this

12  area, and cutting/eliminating Moniker's domain auctions.  This negatively impacted

13  Cahn and Moniker's abilities to reach their performance goals.

14        j.     Oversee placed severe restrictions on Moniker's ability to

15  transact in adult domain names which, pre-merger, comprised a substantial portion

16  of Moniker's business. This negatively impacted Cahn and Moniker's abilities to

17  reach their performance goals and contradicted defendants' assurances and

18  representations that Moniker's business would not change post-merger.

19        k.     Moniker was explicitly denied the opportunity to cross-market to

20  other Oversee subsidiaries' customers despite Kupietzky's and Oversee's promises

21  that the Oversee business units would work together in this regard.  Defendants'

22  failure to act in accordance with their representations and assurances negatively

23  affected Cahn's and Moniker's ability to achieve their goals.

24        l.     Oversee, through Ng and Kupietzky, purposely delayed

25  implementing infrastructure and technology integration between Moniker and

26  Oversee which resulted in Moniker's inability to fully monitor, account for and

27  measure its own performance levels, impacted Moniker's revenue, and its

28  achievement of its EBITDA goals.

LEWIS
BRISBOIS
BISGAARD

4817-7540-0206.1

12

1         m.    Oversee implemented a nine month freeze on development of

2 new products and services post-merger which hampered Moniker's ability to adjust

3 to their new role within Oversee's infrastructure and keep up with the inherently

4 quick-paced technological environment in which they all worked, as a result

5 Moniker lost its competitive advantage in the market, and its highly regarded

6 reputation and customers.

7         n.    Despite the agreements between the parties, Cahn's reporting

8 relationship was changed several times throughout his tenure with Oversee so that

9 he was no longer reporting to the CEO.  This had the effect of relegating Cahn to a

10 non-senior executive position and stripping Cahn of his ability to effectively manage

11 Moniker.

12         o.    As part of the change in Cahn's reporting, Cahn had to go

13 through Kupietzky and his subordinates in order to approve expenses for Moniker's

14 employees and pricing some of the products Moniker offered.  Oversee also denied

15 Cahn any budget decision making capability.  These tasks are critical, if not

16 essential, parts of the normal duties, responsibilities, functions and authority

17 normally associated with and appropriate for Cahn's position as President of

18 Moniker.  When these responsibilities were taken away, Cahn no longer had the full

19 ability to perform in his role as President of Moniker.

20         p.    Oversee stalled and ultimately did not obtain a California escrow

21 license for Moniker so that it could legally perform its auctions in California, the

22 state in which Oversee was based.  This adversely affected Moniker's ability to earn

23 revenue through its live domain auctions and escrow revenue and profit which

24 Moniker was an industry leading provider of.

25         q.    Oversee drastically reduced Moniker's staff and its staff training

26 budget which Cahn needed to properly invest in one of Moniker's largest

27 commodities - its employees.

28         r.    Post-merger, and due to the conduct delineated above, customers

LEWIS
BRISBOIS
BISGAARD

4817-7540-0206.1

13

1  began to lose confidence in Moniker, sending numerous complaints and even taking

2  their business elsewhere.  Despite Cahn's repeated complaints to Defendants about

3  the lack of commitment from Oversee to maintaining the integrity of Moniker's

4  business operations, Defendants' intentional actions had the effect of causing

5  Moniker to lose customers, negatively affecting Cahn and Moniker's abilities to

6  achieve their performance goals.

7          s.    Additionally, knowing Cahn wanted to work for Ng directly due

8  to their professional relationship, Oversee and Ng represented to Cahn that he would

9  report directly to Ng post-merger.  However, Cahn is informed and believes, and on

10  that basis alleges that at the time that representation was made, Ng knew that he

11  would be stepping down as CEO in the very near future and was already looking for

12  his replacement.  Had Cahn known this fact he would not have agreed to work with

13  Oversee.

14      28.    Due to Defendants' intentional acts as outlined above, Cahn was

15  prevented from earning benefits under the MIP.  Oversee stopped tracking

16  TrafficClub revenue and closed down the TrafficClub business segment and,

17  consistent with their preconceived strategy, prevented any possible growth of the

18  business.  Oversee intentionally misrepresented the performance of the registrar and

19  domain sales business segments.

20      29.    Despite these active misrepresentations, Cahn is informed and believes,

21  and on the basis of such information and belief alleges that in 2009 Oversee was

22  within at least seventy percent of its yearly EBITDA goal, entitling Cahn, at a

23  minimum, to the Oversee EBITDA award for 2009 under the MIP.  In direct

24  violation of the MIP, Oversee failed to provide Cahn his award.

25      30.    Cahn is informed and believes, and on the basis of such information

26  and belief alleges that in 2010 Oversee met its yearly EBITDA goal, entitling Cahn,

27  at a minimum, to the Oversee EBITDA award for 2010 under the MIP.  In direct

28  violation of the MIP, Oversee failed to provide Cahn his award.  During his

LEWIS
BRISBOIS
BISGAARD

4817-7540-0206.1

1  employment term with Oversee Cahn did not receive one cash award under the MIP.

2      31.   Additionally, due to Defendants' deceitful conduct used to induce Cahn

3  to join Moniker, Cahn lost the opportunity to realize additional, substantial

4  compensation from alternative employment opportunities.  Cahn believes that these

5  lost opportunity and other economic damages total in excess of several millions of

6  dollars.

7      32.   On or around June 4, 2010, Oversee offered Cahn an additional form of

8  compensation through a commission plan ("Commission Plan").  Oversee's goal

9  was to leverage Cahn's skill set in order to achieve their corporate Gross Profit and

10 Revenue goals for 2010.  Oversee utilized Cahn's expertise to close individual sales

11 transactions with particular reference to high-value names sales, and Cahn was to

12 receive a pre-determined percentage based on the prescribed scale.  This

13 compensation was to be in addition to that delineated in the MIP.

14     33.   Through their improper diversion of revenue and accounting errors,

15 Defendants denied Cahn full compensation under the Commission Plan.

16     34.   During his employment term with Oversee Cahn performed all of his

17 duties and responsibilities as required under both the terms of his employment, and

18 under the conditions of the MIP, the Commission Plan and the additional

19 responsibilities bestowed upon him, beyond those required under the terms of the

20 contracts.

21     35.   Additionally, throughout his employment with Oversee, Cahn was

22 directed to assume additional responsibilities relating to additional parts of

23 Oversee's business.  Based upon Kupietzky's, Ng's, and Oversee's assurances,

24 Cahn reasonably understood that his compensation and bonus arrangement would

25 reflect these additional responsibilities.  However, after securing the benefits of

26 Cahn's expertise and inducing Cahn to forego alternative employment, Oversee,

27 Kupietzky, and Ng refused to provide Cahn with any financial recognition.

28     36.   Instead, Cahn believes that Kupietzky engaged in deliberate, bad faith

1  efforts to prejudice and undermine Cahn's ability to realize the performance

2  standards set forth in the MIP.  Cahn believes that Kupietzky, with the knowledge

3  and/or approval of Ng, was responsible for directing his subordinates to misdirect

4  and misapply revenue so that Cahn would not realize his bonuses.  The misdirection

5  of resources may also have been part of an effort by Kupietzky to prevent Oversee's

6  Board of Directors from discovering the true facts about various, disappointing

7  transactions that Kupietzky had engineered, supported, or negotiated on behalf of

8  Oversee.

9      37.  Cahn's employment with Oversee expired on December 31, 2010.  The

10  agreement was not renewed.

11      38.  Since Cahn's employment terminated, Oversee and its representatives

12  have refused to provide Cahn with the information to calculate the amount owed for

13  the MIP or to understand the diversion and misapplication of revenues in Oversee's

14  operations.  Instead, Oversee and its representatives have implemented a delay

15  strategy that they used with at least two other former representatives of Oversee.

16  This deceitful strategy consists of denying Oversee's obligations, forcing the former

17  employee to institute litigation and incur substantial legal fees, delaying disclosure

18  of complete information about Oversee's debts and obligations, and ultimately

19  offering to compromise for a fraction of the amount owed.  Oversee acts in this

20  manner because it believes that it has substantial resources that can be used to

21  overwhelm the resources of its former representatives.

22  **FIRST CLAIM FOR RELIEF**

23  **BREACH OF CONTRACT - 2007 MANAGEMENT INCENTIVE PLAN**

24  **(Against Oversee)**

25      39.  Cahn incorporates Paragraphs 1 through 38 as though fully set forth

26  herein.

27      40.  Cahn entered into a valid, enforceable, written 2007 Management

28  Incentive Plan on December 14, 2007, which provided Cahn with additional cash

1   compensation upon the attainment of the delineated performance goals.

2       41.    Pursuant to paragraph 10 of the contract, the MIP contains the entire

3   agreement between the parties with respect to Cahn's supplemental compensation

4   for the attainment of his performance goals, and supercedes all prior agreements or

5   understandings, whether written or oral, between the parties relating to such subject

6   matter.

7       42.    Cahn performed all the conditions, covenants and promises required on

8   his part to be performed, to the extent his duties and obligations have not been

9   excused, frustrated or prevented by the wrongful acts and omissions of Oversee.

10      43.    Oversee's conduct, as alleged herein, constitutes a material breach of

11  the MIP in that, amongst other acts, Oversee (i) failed to pay awards under the MIP

12  for each determination period upon attainment of the performance goals, as

13  established by the contract; (ii) failed to determine, in good faith, the attainment of

14  the performance goals as set forth in the contract; (iii) failed to make the requisite

15  amendments to the contract, and failed to take into consideration, the acquisition of

16  new business segments and the change in management and control of other business

17  segments in the determination of the performance goals under the MIP; (iv)

18  intentionally took actions for the sole purpose of manipulating the Registrar

19  EBITDA, Oversee EBITDA, Domain Sales EBITDA and the Gross Profit with

20  respect to the Traffic Club Business Segment; (v) improperly diverted revenue and

21  profit from Moniker to SnapNames; and (vi) improperly diverted revenue from

22  Moniker to DomainSponsor.

23      44.    As a direct, actual and proximate result of the conduct alleged herein,

24  Cahn has suffered, and continues to suffer, significant damages in an amount to be

25  proven at trial, but that exceeds $75,000, together with interest thereon at the legal

26  rate.

27  ///

28  ///

LEWIS
BRISBOIS
BISGAARD

4817-7540-0206.1                                    17

## SECOND CLAIM FOR RELIEF

## BREACH OF CONTRACT - COMMISSION PLAN 2010

### (Against Oversee)

45.    Cahn incorporates Paragraphs 1 through 38 as though fully set forth herein.

46.    Cahn entered into a valid, enforceable, written Commission Plan on May 24, 2010, which provided Cahn a reward and incentive for his sale of both third party and owned and operated domain names.  This plan was in addition to the MIP and the ICP.

47.    Cahn performed all the conditions, covenants and promises required on his part to be performed, to the extent his duties and obligations have not been excused, frustrated or prevented by the wrongful acts and omissions of Oversee.

48.    Oversee's conduct, as alleged herein, constitutes a material breach of the Commission Plan in that Oversee has failed to pay Cahn his rewards pursuant to the terms of the Commission Plan.  Additionally, there were deals that Cahn closed before his employment ended to which he is due commission pursuant to the Commission Plan.  Oversee's failure to pay these commissions constitutes a material breach of the Commission Plan.

49.    As a direct, actual and proximate result of the conduct alleged herein, Cahn has suffered, and continues to suffer, significant damages in an amount to be proven at trial, but that exceeds $75,000, together with interest thereon at the legal rate.

## THIRD CLAIM FOR RELIEF

## BREACH OF CONTRACT - RESTAURANTS.COM

### (Against Oversee)

50.    Cahn incorporates Paragraphs 1 through 38 as though fully set forth herein.

51.    Cahn and Oversee entered into a valid and binding agreement that upon

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4817-7540-0206.1

THIRD AMENDED COMPLAINT

1   the closing of Restaurants.com sale, Cahn would be entitled to a commission

2   payment as an outside broker, and was to receive fifty-percent of the payable

3   commission. The payable commission on Restaurants.com was negotiated at 20

4   percent of the gross profit of the sale. Cahn's commission agreement for the sale of

5   Restaurants.com was confirmed by Defendants, including confirmation from Craig

6   Snyder, General Manager of Oversee, in a February 9, 2011 email from Snyder to

7   Cahn.

8       52.   Cahn performed all the conditions, covenants and promises required on

9   his part to be performed, to the extent his duties and obligations have not been

10   excused, frustrated or prevented by the wrongful acts and omissions of Oversee.

11       53.   Cahn successively brokered the sale of Restaurants.com, and the deal

12   closed in February 2011. Oversee failed to provide Cahn his commission payment.

13       54.   Oversee's conduct, as alleged herein, constitutes a material breach of

14   the contract in that Oversee has failed to pay Cahn his commission pursuant to the

15   terms of the agreement.

16       55.   As a direct, actual and proximate result of the conduct alleged herein,

17   Cahn has suffered, and continues to suffer, significant damages in an amount to be

18   proven at trial, but that exceeds $75,000, together with interest thereon at the legal

19   rate.

20                 **FOURTH CLAIM FOR RELIEF**

21                       **ACCOUNTING**

22                   **(Against Oversee)**

23       56.   Cahn incorporates Paragraphs 1 through 38 as though fully set forth

24   herein.

25       57.   Oversee represented to Cahn that he would have the ability to receive

26   up to $13,000,000 in payments under the MIP. Unbeknownst to Cahn at the time,

27   Oversee never had the intent to pay Cahn under the MIP. Oversee also wrongfully

28   interfered with Cahn's ability to achieve his performance goals under the terms of

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4817-7540-0206.1

THIRD AMENDED COMPLAINT

1  MIP, ensuring that he would not collect his bonus payments under the MIP.

2      58.    Had Cahn known Oversee's true intent at the time the contract was

3  entered, Cahn would not have agreed to the assist in the sale of Moniker by entering

4  into the MIP, and maintaining his position as President of Moniker, for the benefit

5  of Oversee.

6      59.    Cahn and Oversee also entered into a Commission Plan on May 24,

7  2010 which provided Cahn a reward and incentive for his sale of both third party

8  and owned and operated domain names.  Unbeknownst to Cahn at the time, Oversee

9  never had the intent to fully pay Cahn under the Commission Plan.

10     60.    Had Cahn known Oversee's true intent at the time the contract was

11  entered, Cahn would not have agreed to expend valuable time and energy in

12  consummating the domain sales for the benefit of Oversee while foregoing other

13  valuable business opportunities.

14     61.    Cahn is informed and believes that he is entitled to cash awards

15  pursuant to the MIP and the Commission Plan.  The parties mutually agreed to the

16  terms of the MIP and the Commission Plan, and Oversee failed to abide by the

17  express terms of the contracts.  Oversee has failed to make any payments to Cahn

18  under either the MIP or the Commission Plan.

19     62.    Cahn is informed and believes, and on the basis alleges that he cannot

20  ascertain what is rightfully due and owed to him without an accounting.

21                    **FIFTH CLAIM FOR RELIEF**

22                           **FRAUD**

23                   **(Against All Defendants)**

24     63.    Cahn incorporates Paragraphs 1 through 38 as though fully set forth

25  herein.

26     64.    Beginning in the summer or fall of 2007,  Defendants initiated and

27  implemented a fraudulent scheme to defraud Cahn out of millions of dollars.  As

28  part of this scheme, during the summer and fall of 2007, defendants Ng and

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4817-7540-0206.1                               20

THIRD AMENDED COMPLAINT

1 Kupietzky, on behalf of Oversee, made numerous false promises and representations

2 to Cahn about the opportunities at Oversee, the ability to integrate the TrafficClub

3 monetization business into Oversee's operations, the ability to obtain bonuses under

4 the MIP, the certification process for the MIP bonus, the availability of resources to

5 grow the operations of all of the business segments subject to the MIP, the existence

6 of a plan to cross-market and develop the Moniker business brand, and the

7 expansion of the Moniker operation. In furtherance of this scheme, and in direct

8 contradiction to the representations made by Ng and Kupietzky during the

9 negotiations in the summer and fall of 2007, defendants devised and implemented a

10 plan to manipulate Oversee's books and records in an effort to mask the profitability

11 of the business segments that were subject to the MIP. In direct contradiction to the

12 representations made by Ng and Kupietzky during the negotiations in the summer

13 and fall of 2007, defendants developed and implemented a plan to strip Cahn of

14 authority, strip the MIP business segments of critical resources for their business

15 operations, and to drive Cahn out of Oversee. In direct contradiction to defendants

16 Kupietzky's and Ng's representations and assurances in the summer and fall of

17 2007, Oversee adopted a plan to close the TrafficClub business segment, before

18 Cahn could achieve any of the bonuses for this business segment.

19      65.    During the negotiations in the summer and fall of 2007, Cahn was well

20 known in the industry as one of the leaders in domain name sales, valuing,

21 auctioning and parking, and was a direct competitor with Oversee.

22      66.    As a direct competitor, Oversee had an interest in acquiring Moniker as

23 a business, and Cahn as an employee. Oversee, Kupietzky, and Ng were keenly

24 aware that, unless they induced Cahn to join Oversee as part of the merger

25 transaction, Cahn would join or create a new company which would likely reduce

26 the value and profitability of the Oversee-Moniker merger. Further, at the time of

27 the negotiation, Kupietzky had supervisory responsibility for Domain Sponsor,

28 which was a competitor to TrafficClub. Cahn understands that the structure of

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4817-7540-0206.1                                21
                                    THIRD AMENDED COMPLAINT

1  Kupietzky's bonus provided him with a  financial interest in ensuring that Cahn did

2  not join an alternative company, in ensuring the closure of TrafficClub, and in

3  ensuring that Cahn had no possible way of achieving the TrafficClub business

4  segment performance goal.  Cahn understands that Kupietzky developed and

5  implemented a fraudulent scheme to divert TrafficClub revenues to the Domain

6  Sponsor balance sheet.

7       67.    In order to appear more desirable in the bidding process, Oversee

8  inflated its bid to push out the other bidders, two of which were private equity firms

9  who offered Cahn very enticing and lucrative business opportunities.

10       68.    Once Seevast commenced negotiations with Oversee, Oversee reduced

11  its bid.

12       69.    However, in order to secure Cahn's employment at Oversee, and to

13  prevent Cahn from joining a competitor or starting a competing venture, Defendants

14  intentionally made numerous fraudulent and false representations, some of which

15  were set forth above.  These representations, which occurred during the pre-

16  employment negotiations, also included, but are not limited to, the following:

17          a.    Ng and Kupietzky represented to Cahn that Oversee could fully

18  integrate, support, and enhance the business activities of Moniker's operations.

19  These representations were untrue, were intended to fraudulently induce Cahn to

20  join Oversee, and were relied upon by Cahn in electing not to pursue alternative

21  employment opportunities.  Among other things, Ng and Kupietzky knew that

22  Oversee had a contract with Google that would render it impossible for Traffic Club

23  to continue to operate in the same manner after the merger.  TrafficClub was the

24  business segment of Moniker relating to the monetization of internet domain names

25  through the rotation of the domain names on third party parking platforms, e.g.,

26  Google and Yahoo.  TrafficClub utilized multiple feeds, whereas DomainSponsor,

27  Oversee's monetization segment utilized a single feed (Google).  Ng and Kupietzky

28  were aware that Oversee's contract with Google was inconsistent with Traffic

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4817-7540-0206.1

1  Club's business model and operations.   Kupietzky has admitted that it was the
2  Google contract that restricted Oversee's ability to use multiple feeds (a.k.a.
3  TrafficClub).   Since Oversee's contract with Google was in place prior to the
4  merger, Defendants knew that they would not be able to operate TrafficClub in the
5  manner represented to Cahn.
6         b.      Kupietzky and Ng represented that there would be a seamless
7  three month integration of Moniker's business activities into Oversee and that the
8  Moniker staff would prosper by the merger of the companies.  This representation
9  was not true and was intended to fraudulently induce Cahn to join Oversee, and was
10  relied upon by Cahn in electing not to pursue alternative employment opportunities.
11  Kupietzky knew that the integration could not be completed in the timeframe
12  represented as Oversee did not have the requisite staffing to complete the integration
13  in the time-frame represented.  At the time these statements were made, O'Neil, the
14  former CTO of Oversee, testified that at or around the time of the merger he was
15  under resourced and had requested additional staffing from Kupietzky to aid in the
16  integration in order to meet the integration timeline.  He represented to Kupietzky
17  that his staff was overworked and "burning to the ground".  His requests were
18  denied by Kupietzky.  As a result, what was represented as a seamless three month
19  transition was still not completed in July of 2008, over seven months after the initial
20  integration began.
21         c.      When Oversee was negotiating Moniker's purchase price,
22  Oversee received a substantial discount on the sale price in return for offering Cahn
23  a bonus compensation plan (e.g. the MIP), under which he was to receive up to $13
24  million.  This was a tactic by Oversee to reduce the purchase price.  Oversee,
25  Kupietzky and Ng never intended to abide by the representation that Cahn would
26  earn up to $13 million under the MIP.  Before and after the merger Oversee,
27  Kupietzky and Ng immediately took steps to prevent Cahn from reaching the
28  performance goals under the MIP, and to avoid paying Cahn $13 million under the

1  MIP.  Among other things, before merger, Oversee planned to close TrafficClub,

2  planned to strip Cahn of his authority, and planned to deny the Moniker business

3  segments of the resources necessary to achieve the goals.  Post-merger, defendants

4  implemented this scheme by, among other things, closing TrafficClub, deliberately

5  misallocating Moniker business revenues to non-Moniker business segments,

6  deliberately inflating Moniker's expenses, substantially reducing Moniker's

7  marketing and operations budget, firing Moniker employees, and eliminating Cahn's

8  decisionmaking authority.  Unbeknownst to Cahn, Kupietzky and senior managers

9  repeatedly discussed means and methods to charge Cahn's MIP for various expenses

10  that would reduce the profitability of the Moniker business segments.

11         d.    Kupietzky and Ng represented that the employment offer and

12  opportunity presented to Cahn was more lucrative than any other offer currently

13  available to him.  This representation was not true and was intended to fraudulently

14  induce Cahn to join Oversee, and was relied upon by Cahn in electing not to pursue

15  alternative employment opportunities.  Kupietzky, in fact, believed that Cahn was a

16  glorified salesman who was not entitled to a fraction of the $13 million bonus

17  contemplated by the MIP.  Kupietzky, with the knowledge, approval, and/or consent

18  of Ng, had an undisclosed intention of actively prejudicing Cahn's ability from

19  securing the resources, information, and opportunity to achieve any of the

20  performance goals.

21         e.    According to the deposition testimony of Stephen O'Neill, a

22  former executive of Oversee, Kupietzky represented to David Subar, a former CTO

23  of Oversee, and others that Oversee intended to push Cahn out from the start.  This

24  is further confirmed by Kupietzky's fraudulent efforts to conceal and/or never set

25  Oversee's EBITDA goals under Cahn's MIP.  Also, Kupietzky admitted that he

26  stopped tracking Cahn's MIP in 2008, and that he never discussed Cahn's Oversee

27  EBITDA goals with the Board.

28         f.    Kupietzky and Ng represented that Cahn would be establishing a

LEWIS
BRISBOIS
BISGAARD

1    long-term prosperous relationship with Oversee and that Oversee would ensure that

2    Cahn had a viable platform to develop and grow his various business opportunities.

3    This representation was not true and was intended to fraudulently induce Cahn to

4    join Oversee, and was relied upon by Cahn in electing not to pursue alternative

5    employment opportunities.

6           g.     Kupietzky and Ng represented that in addition to the MIP, Cahn

7    could expect additional salary, bonuses, commission, and other lucrative business

8    opportunities through his relationship with Oversee.  This representation was not

9    true and was intended to fraudulently induce Cahn to join Oversee, and was relied

10    upon by Cahn in electing not to pursue alternative employment opportunities.   On

11    information and belief, according to the testimony of O'Neill, Kupietzky made a

12    representation to Subar that they intended to push Cahn out from the start.

13           h.     Ng and Kupietzky represented that joining Oversee would

14    maximize Moniker's profitability because of the increased staffing and company

15    resources that Oversee would provide Moniker, including the marketing, public

16    relations resources, technology and integration that would be provided by Oversee.

17    Oversee, through Ng, Jeff Navach, and Kupietzky, represented that Oversee would

18    increase Moniker's staff to 36 within months of the closing of the transaction.  Ng

19    and Kupietzky knew that these representations were not true when made and were

20    intended to fraudulently induce Cahn to join Oversee, and was relied upon by Cahn

21    in electing not to pursue alternative employment opportunities.   At the time of the

22    merger Oversee was in the middle of negotiations with Oak Hill Capital Partners

23    ("Oak Hill") for a substantial investment from Oak Hill.  Therefore Oversee needed

24    to show an increase in revenue and a decrease in expenses.  As a result, at the time

25    of the merger, Oversee was already in the process of cutting its budgets, including

26    its marketing, public relations and staffing resources.  This is further demonstrated

27    by the cuts that were immediately made to Moniker's budget and staffing when it

28    joined Oversee.

LEWIS
BRISBOIS
BISGAARD

1     i.  Kupietzky and Ng represented that Cahn would directly report to

2 Ng and that Ng intended to remain as the CEO of Oversee for the foreseeable future,

3 which was instrumental in Cahn carrying out his duties as President of Moniker.  Ng

4 knew this representation was not true, and it was intended to fraudulently induce

5 Cahn to join Oversee, and was relied upon by Cahn in electing not to pursue

6 alternative employment opportunities.  Cahn understands that Ng was planning to

7 step down as President of Oversee and intended to have Kupietzky take his place.

8 Further, Kupietzky and Ng agreed upon a strategy to deny Cahn access to the CEO

9 of Oversee.  This was never communicated to Cahn, and would have impacted his

10 decision to join Oversee.

11     j.  Kupietzky and Ng represented that Cahn would be treated in the

12 same manner as all of the other Oversee executives.  This representation was not

13 true and was intended to fraudulently induce Cahn to join Oversee, and was relied

14 upon by Cahn in electing not to pursue alternative employment opportunities.  At

15 the time these statements were made, prior to Cahn joining Oversee, there was a

16 concerted effort by Oversee and Kupietzky to hire Cahn and then push Cahn into a

17 sales position in order to prevent Oversee's competitors from obtaining Moniker's

18 technology and the benefit of Cahn's experience.  Stephen O'Neil, the former CTO

19 of Oversee, testified that Kupietzky intended to push Cahn out from the very

20 beginning.  Mr. O'Neil also testified that Kupietzky wanted to restrict Cahn to a

21 sales position, thereby depriving him of all his management authority of Moniker.

22 Kupietzky never intended to abide by the representations he made to Cahn when he

23 induced him to join Oversee.

24     k.  Kupietzky represented to Cahn that Oversee would set the

25 Oversee EBITDA in consultation with Cahn.  This representation was not true and

26 was intended to fraudulently induce Cahn to join Oversee, and was relied upon by

27 Cahn in electing not to pursue alternative employment opportunities.   In fact,

28 Kupietzky confirmed, in conversations with David Subar and others, that he

LEWIS
BRISBOIS
BISGAARD

4817-7540-0206.1

1 intended to take affirmative steps to prejudice Cahn's ability to achieve the Oversee

2 EBITDA goals. Kupietzky admitted that he stopped tracking Cahn's MIP in 2008,

3 and that he never discussed Cahn's Oversee EBITDA goals with the Board.

4         1.     Kupietzky represented to Cahn during the negotiations that the

5 overall Oversee EBITDA in the MIP would be adjusted, either up or down, from the

6 time the merger took place throughout the term of the MIP, and those calculations

7 would be the controlling benchmarks. Similarly, during the negotiations, other

8 Defendant representatives, including Todd Greene and Hamed Meshki represented

9 and assured Cahn that if the performance goals for Oversee EBITDA could not be

10 determined before the merger, the parties would meet in good faith and develop

11 objective criteria for determining these goals. Defendants' representatives assured

12 Cahn that these goals would be the same as the goals for other senior management.

13 Defendants knew these representations were not true, and they were intended to

14 fraudulently induce Cahn to join Oversee, and were relied upon by Cahn in electing

15 not to pursue alternative employment opportunities. Kupietzky admitted that his

16 intent regarding the Oversee EBITDA at the time of the negotiations was different

17 than what was communicated to Cahn. Contrary to what was represented to Cahn,

18 Kupietzky's and Oversee's undisclosed intention was to prevent Cahn from

19 receiving the Oversee EBITDA award if he did not meet the TrafficClub, Registrar

20 and Domain Sales goals. Kupietzky also recently testified that his intent was that

21 Cahn not be treated exactly like the other senior managers. Instead, Kupietzky

22 believed that Cahn was a "glorified" salesman who was already receiving too much

23 compensation from Oversee. This is further demonstrated by Kupietzky's

24 admission that he stopped tracking Cahn's MIP in 2008, and that he never discussed

25 Cahn's Oversee EBITDA goals with the Board in 2008, 2009 or 2010, and that

26 Kupietzky failed to provide Cahn a bonus when all of the other senior managers

27 received bonuses in 2008, 2009 and 2010.

28         m.     Because of Kupietzky's misconduct in seeking to poach

1   TrafficClub's customers in 2007, Ng and Kupietzky represented to Cahn that the

2   Board would certify the performance results under the MIP. This representation

3   was not true and was intended to fraudulently induce Cahn to join Oversee, and was

4   relied upon by Cahn in electing not to pursue alternative employment opportunities.

5   The lack of intent can be inferred from Oversee and Kupietzky's conduct in refusing

6   to provide the Board with the necessary financial information to allow them to

7   certify the results. Kupietzky admitted that he never provided interim financial

8   statements, other than in mid-2008, to Cahn or the Board showing Cahn's

9   performance relative to the goals set in the MIP. Additionally, Oversee and

10  Kupietzky never provided Cahn or the Board with contemporaneous reporting of his

11  performance goals under the MIP.

12          n.      Cahn is informed and believes that, in contrast to their express

13  representations to Cahn, defendants never intended to have the Board certify any

14  performance results. Kupietzky and Ng knew that Oversee's management was

15  allocating and/or manipulating data and information in a manner that was intended

16  to provide a false portrayal of the performance of various business segments of

17  Oversee. Kupietzky attempted to allocate revenues from Moniker to Domain

18  Sponsor because his bonus was based, in part, on the performance of this business

19  unit. Also, in order to avoid disclosure of their disastrous business decisions,

20  Kupietzky and Ng acted, in concert, to overstate the revenues of SnapNames, at the

21  expense of the Moniker business segments that were part of the MIP. The

22  fraudulent intent in these activities may be inferred from Oversee's subsequent

23  conduct in reversing these improper allocations, in an effort to provide a different

24  portrayal of the performance of the Moniker business segments. This manipulation

25  of financial information was intended to prejudice Cahn, was deceitful, and was

26  fraudulent.

27          o.      Kupietzky and Ng represented that Cahn would enjoy a

28  leadership role in Oversee. This representation was not true and was intended to

1  fraudulently induce Cahn to join Oversee, and was relied upon by Cahn in electing

2  not to pursue alternative employment opportunities.  At the time these statements

3  were made, prior to Cahn joining Oversee, there was a concerted effort by Oversee

4  and Kupietzky to hire Cahn and then push Cahn into a sales position in order to

5  prevent Oversee's competitors from obtaining Moniker's technology and the benefit

6  of Cahn's experience.  Mr. O'Neil testified that Kupietzky intended to push Cahn

7  out from the very beginning.  Mr. O'Neil also testified that Kupietzky wanted to

8  restrict Cahn to a sales position, thereby depriving him of all his management

9  authority of Moniker.  Kupietzky never intended to abide by the representations he

10  made to Cahn when he induced him to join Oversee.

11          p.     Ng and Kupietzky knew that SnapNames was paying Moniker

12  substantial revenue share payments in connection with its registrar business.  Ng and

13  Kupietzky knew that, after a merger, they could and/or would adjust or eliminate

14  these revenue share payments to Moniker, thereby reducing Moniker's EBITDA and

15  undermining Cahn's ability to reach the performance levels necessary for a bonus.

16  Because SnapNames had lost Network Solutions as a client/customer, this

17  adjustment was critical to conceal and obscure the difficulties with the multimillion

18  dollar SnapNames' acquisition.  This misallocation of revenue was confirmed by

19  both Craig Snyder, the General Manager of the Aftermarket and Registrar business

20  units at Oversee, and Elizabeth Murray, the Executive Vice President and Chief

21  Financial Officer for Oversee.  Snyder confirmed in a sworn declaration that

22  Oversee kept multiple sets of books/accounting records/numbers/information for the

23  various Oversee business segments, and Oversee reported different sets of

24  information to different parties.  Additionally, Murray also confirmed in a sworn

25  declaration that Moniker's Florida office kept its own set of records, separate and

26  apart from Oversee, and that the revenues from Moniker were improperly allocated

27  to DomainSponsor and SnapNames.  Based upon this information it is clear that no

28  reasonable person can rely on the accuracy of Oversee's financial records.

LEWIS
BRISBOIS
BISGAARD

4817-7540-0206.1

1        q.    During the negotiations, Oversee, through Kupietzky and Ng,

2  promised to make changes in the MIP in the event that Cahn's responsibilities

3  changed. While acting as President of Moniker at Oversee, Oversee delegated Cahn

4  the additional responsibility of running the SnapNames and DomainSponsor

5  divisions of Oversee, and removed Cahn's oversight and control from the Registrar

6  Business Segment. No explicit changes were made to modify Cahn's performance

7  goals under the MIP, as required under the terms of the MIP, to take into account the

8  additional responsibilities that Cahn would incur, and the changes that the additional

9  subdivisions would have on Monikers' EBITDA. Based upon their representations

10  and assurances, Defendants had, at a minimum, an implied obligation to factor these

11  additional responsibilities into Cahn's performance goals.

12        r.    Prior to the merger Oversee purchased SnapNames. At the time,

13  SnapNames was the leading drop catching, back order and expired name services

14  company in the industry. Moniker was the second best performing registrar.

15  Shortly after the acquisition SnapNames lost its largest client, Network Solutions.

16  In order to disguise and prevent the Oversee Board and others from recognizing the

17  disastrous effect of the departure of Network Solutions, after the merger, Oversee

18  improperly diverted Moniker's registrar revenue to SnapNames, thereby artificially

19  deflating Moniker's EBITDA, and inflating SnapNames. More specifically, before

20  the merger, Moniker was receiving 70 or 80% revenue share payment from

21  SnapNames. After the merger, Oversee directed that all revenue and profit go to

22  SnapNames such that Moniker lost substantial revenue and profit recognition, and

23  SnapNames reported 100% of Moniker's revenue as their profit. This deflated

24  Moniker's EBITDA by more than $700,000 annually and increased SnapNames by

25  the same amount.

26        s.    Oversee improperly diverted substantial revenues and profits

27  from Moniker to other subsidiaries of Oversee. For example, Oversee diverted

28  Moniker's default DNS traffic and revenue /profit directly to DomainSponsor, again

LEWIS
BRISBOIS
BISGAARD

4817-7540-0206.1

1  deflating Moniker EBITDA by that same amount and reporting 100% of that

2  revenue as profit to DomainSponsor.

3         t.    Oversee shut down the TrafficClub operation and diverted all of

4  its revenues to other subsidiaries of Oversee.  Unbeknownst to Cahn, Oversee was

5  required by its contract with Google to terminate or substantially alter the operations

6  of TrafficClub.  In closing this business, Ng, Kupietzky and Oversee successfully

7  denied Cahn the benefit of the bargain that they had promised, and contradicted their

8  express representations that Moniker's business would be integrated and enhanced

9  by the merger.

10         u.    Cahn's staff at Moniker was reduced by more than 33% despite

11  Ng's promises that Moniker would be infused with resources to alleviate its pre-

12  merger under staffing issues.

13         v.    Oversee improperly and incorrectly reported Moniker's Selling,

14  General & Administrative Expenses, which had the effect of making it seem as if

15  Moniker underperforming.  Oversee also improperly and wrongfully included non-

16  Moniker expenses from SnapNames and Oversee Corporate.

17         w.    Oversee severely restrained the marketing and public relations

18  budget available to Moniker, reserving those funds almost exclusively for Oversee's

19  use despite Kupietzky's promises to provide Moniker with adequate support in this

20  area, and cutting/eliminating Moniker's domain auctions.  This negatively impacted

21  Cahn and Moniker's abilities to reach their performance goals.

22         x.    Oversee placed severe restrictions on Moniker's ability to

23  transact in adult domain names which, pre-merger, comprised a substantial portion

24  of Moniker's business. This negatively impacted Cahn and Moniker's abilities to

25  reach their performance goals and contradicted defendants' assurances and

26  representations that Moniker's business would not change post-merger.

27         y.    Moniker was explicitly denied the opportunity to cross-market to

28  other Oversee subsidiaries' customers despite Kupietzky's and Oversee's promises

LEWIS
BRISBOIS
BISGAARD

4817-7540-0206.1

1 that the Oversee business units would work together in this regard.  Defendants'

2 failure to act in accordance with their representations and assurances negatively

3 affected Cahn's and Moniker's ability to achieve their goals.

4         z.     Oversee, through Ng and Kupietzky, purposely delayed

5 implementing infrastructure and technology integration between Moniker and

6 Oversee which resulted in Moniker's inability to fully monitor, account for and

7 measure its own performance levels, impacted Moniker's revenue, and its

8 achievement of its EBITDA goals.

9         aa.   Oversee implemented a nine month freeze on development of

10 new products and services post-merger which hampered Moniker's ability to adjust

11 to their new role within Oversee's infrastructure and keep up with the inherently

12 quick-paced technological environment in which they all worked, as a result

13 Moniker lost its competitive advantage in the market, and its highly regarded

14 reputation and customers.

15         bb.   Despite the agreements between the parties, Cahn's reporting

16 relationship was changed several times throughout his tenure with Oversee so that

17 he was no longer reporting to the CEO.  This had the effect of relegating Cahn to a

18 non-senior executive position and stripping Cahn of his ability to effectively manage

19 Moniker.

20         cc.   As part of the change in Cahn's reporting, Cahn had to go

21 through Kupietzky and his subordinates in order to approve expenses for Moniker's

22 employees and pricing some of the products Moniker offered.  Oversee also denied

23 Cahn any budget decision making capability.  These tasks are critical, if not

24 essential, parts of the normal duties, responsibilities, functions and authority

25 normally associated with and appropriate for Cahn's position as President of

26 Moniker.  When these responsibilities were taken away, Cahn no longer had the full

27 ability to perform in his role as President of Moniker.

28         dd.   Oversee stalled and ultimately did not obtain a California escrow

LEWIS
BRISBOIS
BISGAARD

1  license for Moniker so that it could legally perform its auctions in California, the

2  state in which Oversee was based.  This adversely affected Moniker's ability to earn

3  revenue through its live domain auctions and escrow revenue and profit which

4  Moniker was an industry leading provider of.

5          ee.    Oversee drastically reduced Moniker's staff and its staff training

6  budget which Cahn needed to properly invest in one of Moniker's largest

7  commodities - its employees.

8          ff.    Post-merger, and due to the conduct delineated above, customers

9  began to lose confidence in Moniker, sending numerous complaints and even taking

10  their business elsewhere.  Despite Cahn's repeated complaints to Defendants about

11  the lack of commitment from Oversee to maintaining the integrity of Moniker's

12  business operations, Defendants' intentional actions had the effect of causing

13  Moniker to lose customers, negatively affecting Cahn and Moniker's abilities to

14  achieve their performance goals.

15          70.    Defendants' conduct with respect to TrafficClub is clear evidence of

16  their fraud.  In 2007, Oversee was providing a feed to TrafficClub in connection

17  with its successful monetization business.  However, because of its contractual

18  obligation to Google, Oversee was required to terminate this feed and the

19  contractual relationship between Oversee and TrafficClub.  Immediately upon

20  termination in 2007, Oversee, at the direction of Kupietzky and with the knowledge,

21  consent, and/or approval of Ng, began poaching all of TrafficClub's customers.

22  These poaching efforts were unsuccessful based, in large part, on the undisputed fact

23  that the TrafficClub product was far superior to the Oversee product provided

24  through Domain Sponsor, an Oversee division.

25          71.    In 2007, when Oversee, Kupietzky, and Ng were discussing the

26  acquisition with Cahn, they represented that the TrafficClub product could be

27  integrated into Oversee, that Domain Sponsor customers would be introduced to

28  TrafficClub, and that TrafficClub would be provided additional revenue sources that

LEWIS
BRISBOIS
BISGAARD

4817-7540-0206.1

33

1  were part of Oversee.  These representations were knowingly false and contrary to

2  defendants' intentions and knowledge.  Defendants knew that TrafficClub employed

3  business practices that were inconsistent with the terms of Oversee's contract with

4  Google.  Further, defendants had no intention of expanding the TrafficClub business

5  segment.  Instead, defendant Kupietzky's intention, before, during and after the

6  negotiation, was to close TrafficClub and ensure that Domain Sponsor's profitability

7  would not be reduced by TrafficClub's operations.  Kupietzky and the other

8  defendants closed TrafficClub within a month of Oversee acquiring Moniker.

9      72.    In direct contradiction to defendants' representations and assurances

10  that Cahn would be entitled to the opportunity to realize the benefits of the MIP,

11  defendants adopted tactics that were intended to misrepresent the performance of the

12  business segments that were subject to the MIP.  In an effort to defraud Cahn,

13  Defendants, at the direction of Mr. Kupietzky allocated revenue away from business

14  segments that were subject to the MIP and to other business divisions that were not

15  directly subject to the MIP.  This conduct was deceitful and fraudulent.  In fact,

16  Oversee and its senior management have implicitly conceded this fact.  Oversee

17  "reallocated" some portion of the revenue back to the business segments that were

18  the subject of the MIP.  Oversee and the defendants reallocated these revenues

19  because it serves Oversee's current business purposes and because they did not

20  anticipate that Cahn would discover Oversee's manipulation of its business records.

21  Cahn is not fully aware of the extent of Oversee's manipulation of its financial data.

22      73.    During the negotiations in 2007, Kupietzky, Ng, Armstrong, and other

23  representatives of Oversee informed Cahn that Oversee was reducing the sales price

24  for Moniker so that it would have funds available for the MIP.  These

25  representations were knowingly false when made.  Oversee never set aside any of

26  the proceeds for the MIP.  Instead, defendants adopted tactics and procedures that

27  were intended to prejudice and thwart Cahn's ability to achieve the MIP goals.

28      74.    On behalf of Oversee, Kupietzky, Ng, and others told Cahn that

LEWIS
BRISBOIS
BISGAARD

4817-7540-0206.1                    34

1   Oversee would not take any actions that were intended to interfere or prejudice

2   Cahn's ability to achieve the MIP goals.  These representations were false.  Within a

3   month of acquiring Moniker, Kupietzky, Ng, and Oversee closed the TrafficClub

4   business segment in its entirety, stopped tracking TrafficClub revenues, refused to

5   credit the TrafficClub operations for substantial revenues, and acted to ensure that

6   Cahn could not achieve the performance goals for TrafficClub in 2009 and 2010.

7          75.    In contrast to their representations, Kupietzky, with the knowledge and

8   approval of Ng, stripped Cahn of his decision making responsibilities for the

9   business segments that were the subject of the MIP.   Despite promises to expand

10  the business segments that were the subject of the MIP, Kupietzky, with the with the

11  knowledge and approval of Ng, eliminated portions of these business segments and

12  reassigned the revenues to other business divisions of Oversee.  Kupietzky advised

13  other senior executives that he had a plan to force Cahn to resign from the company,

14  before he could achieve his bonuses.

15         76.    At the time these statements were made, Oversee, Kupietzky and Ng

16  knew that the statements were false and misrepresented the true fact that they

17  intended to fully subjugate Moniker and Cahn, taking for themselves the full benefit

18  of Moniker's great public reputation and industry value at the time of merger.

19         77.    At the time these statements were made, Oversee, Kupietzky and Ng

20  knew that Oversee had no intention of allowing Cahn to realize any of the bonuses

21  or employment opportunities that were discussed in the negotiations.

22         78.    Defendants made these statements to Cahn with the deliberate intent to

23  eliminate their primary competition at a discounted rate, knowing that the incentives

24  promised to Cahn would never materialize.

25         79.    During the time of the negotiations, Cahn had numerous other lucrative

26  opportunities available to him including accepting employment at various private

27  equity firms, purchasing Moniker for himself or starting his own competitive

28  domain related business.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP

4817-7540-0206.1                                         35

80.     However, based on the aforementioned representations, and based on the incentives offered by Oversee, Cahn was induced to forgo the other lucrative business opportunities, and accepted employment with Oversee. If Defendants had told Cahn the truth, he never would have agreed to join Oversee.

81.     Furthermore, in direct contradiction to their representations and assurances, Oversee, Ng and Kupietzky decided to manipulate Oversee's books and records, allocate Moniker's revenue to other divisions of Oversee, and assess Moniker's business segments with additional, improper, and/or phantom charges and expenses.  Oversee kept multiple sets of books/accounting records/numbers/information that it used to represent to various parties, including Cahn in relation to his MIP goals, its own employees, the Board of Directors, the Bank, and potential purchasers.  Craig Snyder, the General Manager of the Aftermarket and Registrar business units at Oversee, confirmed in a sworn declaration that Oversee  kept multiple sets of books/accounting records/numbers/information for the various Oversee business segments, and Oversee reported different sets of information to different parties.  Additionally, Elizabeth Murray, the Executive Vice President and Chief Financial Officer for Oversee, also confirmed in a sworn declaration that Moniker's Florida office kept its own set of records, separate and apart from Oversee, and that the revenues from Moniker were improperly allocated to DomainSponsor and SnapNames.  Based upon the changing financial presentations, it is clear that no reasonable person can rely on the accuracy of Oversee's financial records and reports.  Cahn understands that Oversee continues to misrepresent and reallocate these revenues in order to advance its current business purposes. Cahn understands that Oversee's current financial presentation of at least two of the business segments subject to the MIP is materially different than the information that was disclosed to Oversee's employees, Board, and bankers in 2008, 2009, and 2010.

82.     As a direct, actual and proximate result of the conduct alleged herein,

1  Cahn has suffered, and continues to suffer, significant damages in an amount to be

2  proven at trial, but that exceeds $75,000, together with interest thereon at the legal

3  rate.  These damages included, but are not limited, to the millions of dollars in lost

4  opportunities and other damages that resulted directly from Defendants' false and

5  fraudulent representations and assurances.

6        83.    Defendants' misleading conduct, false and fraudulent representations,

7  and false and fraudulent assurances were intentional, despicable, and malicious.

8  Defendant Oversee authorized and ratified the despicable conduct of Kupietzky, Ng,

9  and Oversee's other representatives.  Defendants are therefore guilty of malice,

10  oppression, or fraud, warranting an assessment of exemplary damages in an amount

11  appropriate to punish Defendants and to deter others from engaging in similar

12  misconduct.

13                        **SIXTH CLAIM FOR RELIEF**

14                              **Conversion**

15                            **(Against Oversee)**

16        84.    Cahn incorporates Paragraphs 1 through 37 as though fully set forth

17  herein.

18        85.    At the time of the merger, Oversee intended to obtain possession of all

19  of Moniker's owned and operated domain names.

20        86.    After the merger, Oversee did in fact obtain possession of all of

21  Moniker's owned and operated domain names.

22        87.    As a DNS monetization service provider, Oversee was holding Cahn's

23  domain names in escrow, and therefore owed Cahn a fiduciary duty to act in good

24  faith and not take any action to impair Cahn's rights to his personal property.

25        88.    After the merger, Cahn discovered that approximately 4,500 of his

26  personal domain names were combined with Moniker's owned and operated names

27  at the time of the merger, and were within Oversee's possession.  By virtue of this

28  transaction, Oversee became a trustee of Cahn's property and assumed all of the

LEWIS
BRISBOIS
BISGAARD          4817-7540-0206.1                    37

1 obligations of a trustee with respect to Cahn's property.

2     89.    While Cahn's personal domain names were in Oversee's possession,

3 Oversee received advertising revenue through DNS monetization of his personal

4 domain names. As a trustee, Oversee had an obligation to transmit this money to

5 Cahn and to take appropriate steps to safeguard and segregate Cahn's money.

6     90.    Each time Oversee received revenue for Cahn's personal domain

7 names, it committed an independent actionable breach, and in turn breached the

8 duties that it assumed to Cahn as the trustee and fiduciary of Cahn's property.

9     91.    Cahn made repeated demands to Oversee for the information related to

10 the actual revenue earned by Oversee though Cahn's personally owned names while

11 they were in Oversee's possession, to which there has been no response. As such,

12 Oversee prevented Cahn from accessing, and refused to return the revenue earned

13 from Cahn's personal property. This breach continues, to this day,

14     92.    Cahn alleges that Oversee received and continues to receive money

15 from Cahn's personal domain names that was intended for the exclusive use of

16 Cahn.

17     93.    Oversee still remains in possession of approximately 200 of Cahn's

18 personal domain names which Oversee has been monetizing and receiving revenue

19 on, to Cahn's detriment. Cahn only recently discovered this information because of

20 Oversee's concealment.

21     94.    As the rightful owner of the domain names, Cahn is entitled to all

22 advertising revenue produced through Oversee's intentional parking of Cahn's

23 personal domains while the domain names were within its possession.

24     95.    Cahn is also entitled to the return of the remaining domain names still

25 in Oversee's possession. Further, Cahn is entitled to other appropriate relief,

26 including the return of Cahn's property, an injunction preventing Oversee from

27 continuing to use Cahn's property, the disgorgement of Oversee's ill gotten gain,

28 and an accounting of all of the revenue that Oversee obtained in breach of its duties

1 │ to Cahn.

2 │ 96.    As a direct, actual and proximate result of the conduct alleged herein,

3 │ Cahn has suffered, and continues to suffer, significant damages in an amount to be

4 │ proven at trial, but that exceeds $75,000, together with interest thereon at the legal

5 │ rate.

6 │ **SEVENTH CLAIM FOR RELIEF**

7 │ **(Against Oversee)**

8 │ 97.    Cahn incorporates Paragraphs 1 through 37 and 82 through 95 as

9 │ though fully set forth herein.

10 │ 98.    On August 16, 2011, Rick Terry, an employee of Oversee, was directed

11 │ by the Oversee legal department to confiscate Cahn's personal account.

12 │ 99.    On August 16, 2011, Cahn was locked out of his personal account with

13 │ Oversee that contained in excess of 3,000 personal domain names.

14 │ 100.   While Oversee was in possession of Cahn's domain names, there was

15 │ an implied-in-fact contract between Cahn and Oversee, with Oversee acting as

16 │ Cahn's DNS monetization service provider, that Cahn would receive all

17 │ monetization revenue received from Oversee's possession of Cahn's personal

18 │ domain names.

19 │ 101.   As a DNS monetization service provider, Oversee was holding Cahn's

20 │ domain names in escrow, and therefore owed Cahn a fiduciary duty to act in good

21 │ faith and not take any action to impair Cahn's rights to his personal property.

22 │ 102.   Cahn's account was restored on August 31, 2011. However, in the

23 │ meantime Cahn's private information, as the owner of the domain names, was

24 │ improperly disclosed to the public.

25 │ 103.   As a result Cahn lost fifteen days of revenue from his personally owned

26 │ domain names.

27 │ 104.   As the rightful owner of the domain names, Cahn is entitled to all

28 │ revenue lost as a result of Oversee's misconduct. Further, Cahn is entitled to other

1  appropriate relief, including an injunction preventing Oversee from continuing to

2  use Cahn's property and an accounting of all of the revenue that Oversee obtained in

3  breach of its duties to Cahn.

4       105.   As a direct, actual and proximate result of the conduct alleged herein,

5  Cahn has suffered, and continues to suffer, significant damages in an amount to be

6  proven at trial, but that exceeds $75,000, together with interest thereon at the legal

7  rate.

8

9                              **PRAYER FOR RELIEF**

10      Wherefore, Cahn prays for judgment in his favor and against Defendants as

11  follows:

12      1.    For judgment in his favor, and against Defendants, for compensatory

13  damages in an amount to be proven at trial, but exceeding $75,000;

14      2.    For punitive damages in an amount to be determined by the trier of

15  fact;

16      3.    For an accounting to determine the amounts due to Cahn under the

17  terms of the MIP, which would have been received by Cahn but for the wrongful

18  conduct of Defendants and the amounts owed to Cahn for Cahn's domain names

19  that were maintained by Oversee as a trustee;

20      4.    For restitution of all wrongfully withheld amounts and disgorgement of

21  all ill-gotten profits, in an amount according to proof;

22      5.    For the return of Cahn's domain names;

23      6.    For an injunction precluding Oversee from using or deriving any

24  revenue from Cahn's domain names;

25      7.    For costs of suit;

26      8.    For prejudgment and post-judgment interest; and

27      9.    For such other relief as the Court may deem just and proper.

28

LEWIS
BRISBOIS
BISGAARD

4817-7540-0206.1

40

DATED: November 21, 2011

JOHN L. BARBER
KENNETH D. WATNICK
SONJA HARRINGTON
LEWIS BRISBOIS BISGAARD & SMITH LLP

By: _____

Kenneth D. Watnick
Attorneys for MONTE CAHN

## DEMAND FOR JURY TRIAL

Cahn hereby demands trial by jury to the full extent permitted by law.

DATED: November 21, 2011

JOHN L. BARBER
KENNETH D. WATNICK
SONJA HARRINGTON
LEWIS BRISBOIS BISGAARD & SMITH LLP

By: _____

Kenneth D. Watnick
Attorneys for MONTE CAHN

LEWIS
BRISBOIS

41

## FEDERAL COURT PROOF OF SERVICE
## MONTE CAHN V. OVERSEE.NET, ET AL.
### FILE NO. 31555-002

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

At the time of service, I was over 18 years of age and not a party to the action. My business address is 221 North Figueroa Street, Suite 1200, Los Angeles, CA 90012. I am employed in the office of a member of the bar of this Court at whose direction the service was made.

On November 21, 2011, I served the following document(s): **THIRD AMENDED COMPLAINT FOR: 1) BREACH OF CONTRACT – MANAGEMENT INCENTIVE PLAN; 2) BREACH OF CONTRACT – COMMISSION PLAN; 3) BREACH OF CONTRACT – RESTAURANTS.COM; 4) ACCOUNT; 5) CONVERSION; AND 6) CONVERSION**

I served the documents on the following persons at the following addresses (including fax numbers and e-mail addresses, if applicable):

Attorneys for Defendant

William Delgado, Esq.
WILLENKEN WILSON LOH & LIEB LLP
707 Wilshire Boulevard
Suite 3850
Los Angeles, California  90017
E-Mail: WDelgado@willenken.com
(213) 955-8026 – (Office)

The documents were served by the following means:

☒ (BY U.S. MAIL) I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses listed above and (specify one):

☒ Deposited the sealed envelope or package with the U.S. Postal Service, with the postage fully prepaid.

☐ Placed the envelope or package for collection and mailing, following our ordinary business practices. I am readily familiar with the firm's practice for collection and processing correspondence for mailing. Under that practice, on the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the U.S. Postal Service, in a sealed envelope or package with the postage fully prepaid.

I declare under penalty of perjury under the laws of the State of CALIFORNIA that the foregoing is true and correct.

Executed on November 21, 2011, at Los Angeles, California.

Joann Lenard

LEWIS
BRISBOIS

4813-3165-7742.1