1 William A. Delgado (Bar No. 222666)
wdelgado@willenken.com
2 Leemore Kushner (State Bar No. 221969)
3 lkushner@willenken.com
WILLENKEN WILSON LOH & LIEB LLP
4 707 Wilshire Blvd., Suite 3850
5 Los Angeles, CA 90017
Tel: (213) 955-9240
6 Fax: (213) 955-9250
7
8 Attorneys for Defendants
OVERSEE.NET, JEFFREY KUPIETZKY,
9 and LAWRENCE NG

10

11 **UNITED STATES DISTRICT COURT**

12 **CENTRAL DISTRICT OF CALIFORNIA**

13

| | |
|---|---|
| 14  MONTE CAHN, an individual, | Case No. CV11-03800 SVW (AGRx) |
| 15           Plaintiff, | **REDACTED VERSION** OF |
| 16     v. | **DEFENDANT OVERSEE.NET'S** |
| 17  OVERSEE.NET, a California | **MEMORANDUM OF POINTS AND** |
| 18  corporation; JEFF KUPIETZKY, an | **AUTHORITIES ISO MOTION FOR** |
| 19  individual, LAWRENCE NG, an | **SUMMARY JUDGMENT OR, IN** |
|     individual; and DOES 1 through 10 | **THE ALTERNATIVE, PARTIAL** |
| 20           Defendants. | **SUMMARY JUDGMENT** |
| 21 | DATE:   December 19, 2011 |
| 22 | TIME:   1:30 p.m. |
|    | PLACE:  Crtrm. 6 |
| 23 | |
| 24 | Complaint Filed:    May 3, 2011 |
|    | Pretrial Conf. Date: January 9, 2012 |
| 25 | Trial Date:         January 17, 2012 |
| 26 | |

27

28

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION………………………………………………………………………1

II. STATEMENT OF FACTS……………………………………………………………...1

   A. Oversee Purchases Moniker……………………………………………………1

   B. Oversee Negotiates a Financial Incentive Plan with Plaintiff……………...…2

   C. The Structure of the MIP……………………………………………………..4

   D. Moniker's Performance Fails to Reach Threshold Levels……………………...6

   E. The 2008 Amendment to the MIP……………………………………………...7

III. LEGAL STANDARD IN CASES INVOLVING CONTRACT INTERPRETATION……………………………………………………………8

IV. ARGUMENT……………………………………………………………………..9

   A. Because the Moniker Business Segments Did Not Reach the 70% Threshold of the Performance Goals, No Payment Was Required……………..9

     1. THE MONIKER SEGMENTS DID NOT ACHIEVE THEIR PERFORMANCE GOALS………………………………………………………………9

     2. CAHN CANNOT DEMONSTRATE THAT OVERSEE UNDERMINED THE MIP PERFORMANCE GOALS……………………………………………...11

   B. The Oversee Business Segment Provision Is Not Enforceable………………..12

   C. Cahn Is Not Entitled to Payments for the Oversee Business Segment During the First and Second Determination Periods………………..14

   D. As to All Four Segments, Damages Would Be Speculative As a Result of Cahn's Failure to Identify Participants……………………………...15

V. CONCLUSION……………………………………………………………………..16

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .......................................................................................... 8

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .......................................................................................... 8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .......................................................................................... 8

*Stevens v. Mavent, Inc.*,
  2008 WL 2824956 (C.D. Cal. July 21, 2008) ................................... 9, 13, 14

**State Cases**

*Guz v. Bechtel Nat. Inc.*,
  24 Cal. 4th 317 (2000) .................................................................................... 13

*Ladas v. California State Auto. Assn.*,
  19 Cal. App. 4th 761 (1993) .......................................................................... 13

*Neisendorf v. Levi Strauss & Co.*,
  143 Cal. App. 4th 509 (2006) ........................................................................ 10

*Oceanside 84, Ltd. v. Fidelity Federal Bank*,
  56 Cal. App. 4th 1441 (1997) ......................................................................... 8

*Palmer v. Truck Ins. Exchange*,
  21 Cal. 4th 1109 (1999) ................................................................................... 8

*Rochlis v. The Walt Disney Company*,
  19 Cal. App. 4th 201 (1993) .......................................................................... 14

*Scott v. Pacific Gas & Electric Co.*,
  11 Cal. 4th 454 (1995) ................................................................................... 13

*Small v. Fritz Companies, Inc.*,
    30 Cal. 4th 167 (2003) .................................................................................................. 11

*Turner v. Anheuser-Busch, Inc.*,
    7 Cal. 4th 1238 (1994) .................................................................................................. 14

*US Ecology, Inc. v. State*,
    129 Cal. App. 4th 887 (2005) ...................................................................................... 11

**Rules**

FED. R. CIV. P. 56 .................................................................................................................. 8

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

Plaintiff Monte Cahn's ("Cahn") First Claim for Relief alleges that Oversee.net ("Oversee") is liable for breach of contract because it failed to pay participants in the Oversee.net 2007 Management Incentive Plan ("MIP") any bonuses under that plan. As is shown below, payment of bonuses under the MIP was conditioned upon the achievement of financial "Performance Goals" by certain identified business segments of Oversee.  As a matter of undisputed fact, three of those business segments did not achieve the Performance Goals identified in the MIP.  The MIP submitted the establishment of a Performance Goal for the fourth business segment to the discretion of Oversee's board of directors, which did not create Performance Goals for that unit. Because, as a matter of clear contractual interpretation, Cahn's right to receive bonuses as a participant in the MIP was never triggered, his First Claim for Relief must fail.

Furthermore, the MIP was not, as Cahn's complaint implies, a bonus plan for Mr. Cahn.  Rather, the MIP was established for the benefit of certain participants designated to the board of directors by Mr. Cahn.  Reflective of his recognition that the MIP bonus provisions would not be triggered, Mr. Cahn failed to provide the board of directors with a list of MIP participants.  While that fact is probative of Cahn's recognition that his present claim is baseless, it is relevant to this Motion because Cahn's failure to identify MIP participants would render any award speculative.

## II.  STATEMENT OF FACTS

### A.  Oversee Purchases Moniker.

In 2005, Plaintiff Monte Cahn sold Domain Systems, Inc. d/b/a Moniker.com ("Moniker") to Seevast Corporation.  Second Amended Complaint ("SAC"), ¶ 9.  Cahn remained Moniker's CEO and maintained management responsibilities for Moniker until 2007.  *Id.* at ¶ 10.  Subsequently, Seevast Corporation marketed Moniker for sale

using The Jordan Edmiston Group, Inc. as its investment bankers. Declaration of Jeffrey Kupietzky, dated November 12, 2011("Kupietzky Decl.") at ¶ 2. On December 14, 2007, Oversee acquired Moniker from Seevast. *Id*.; SAC, ¶ 23. Seevast had been seeking ████████████████ for Moniker and largely justified that price on the basis of aggressive growth projections. Kupietzky Decl. at ¶ 3. Those growth projections were contained in an Offering Memorandum and a Management Presentation (collectively, "Offering Documents"). *Id*. at ¶ 3, Exs. A and B.

   B. <u>Oversee Negotiates a Financial Incentive Plan with Plaintiff</u>.

While the growth projections in the Offering Documents arguably justified the asking price, Oversee was not willing to assume the accuracy of those projections and pay Seevast's asking price in full at the closing of the transaction. *Id*. at ¶ 4. Initially, Oversee offered to pay Seevast ████████████████, but structured the proposed consideration as follows: (i) ████████████████ and (ii) ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." *Id*. at ¶ 5. It was Oversee's understanding that under that proposed structure, ████████████████████████████████████████████████████████████████████████████████████████. *Id*. at ¶ 5.

Subsequent to its initial proposal, and based on the results of its due diligence, Oversee ████████████ its proposed purchase price for the Moniker business as follows: (i) ████████████████████████████████ and (ii) a ████████████████████████████████████████████████████████████████. *Id*. at ¶ 6. The payments under the incentive plan ████████ to ████████ if ████████████████████████████████. *Id*.

Seevast and Oversee negotiated the terms of Oversee's acquisition of Moniker, but under the structure described in the preceding paragraph, Oversee negotiated the proposed incentive plan that would, in final form become the MIP, directly with Mr.

Cahn. *Id*. at ¶ 7; Declaration of Tigran Sinanyan, dated November 11, 2011 ("Sinanyan Decl.") at ¶¶ 3-6. For purposes of that negotiation, Oversee used the performance metrics and projections in the Offering Documents as a starting point for the Moniker Business Segments Performance Goals. Kupietzky Decl. at ¶ 8; Sinanyan Decl. at ¶ 4. In the course of the negotiations, the parties agreed to modify the MIP's structure in two ways – both to the benefit of the MIP participants. Those adjustments are described below.

First, Oversee agreed to *reduce* the performance goals for the three Moniker Business Segments mentioned in the MIP (TrafficClub, Domain Sales and Registrar) slightly *below* the projections in the Offering Documents. Kupietzky Decl. at ¶ 9; Sinanyan Decl. at ¶ 5. So, for calendar year 2008, while the Offering Documents forecast a combined EBITDA across all three business segments of ten million dollars ($10 million), the MIP set a combined EBITDA goal of $8.7M.[1] Sinanyan Decl. at 5(a). For calendar years 2009 and 2010, the MIP utilized a 40% growth rate even though Moniker claimed it had grown 70% year-to-year from 2006 to 2007 and projected a 51% growth rate in 2008. *Id*. In addition, Cahn negotiated for partial payment based upon the partial achievement of performance goals. Kupietzky Decl. at ¶ 9.

Thus, while the MIP set targets based on aggressive growth projections, these projections were derived from projections created by Moniker management (where Cahn was CEO); the projections were adjusted downward to create Performance Goals; and the MIP provided for partial payments in the event that the Performance Goals were partially met. Nonetheless, and based on the representations of Moniker management, the MIP Performance Goals intentionally continued to reflect significant

---

[1] The MIP's First Determination Period includes the fourth quarter of 2007. By the time Oversee acquired Moniker on December 14, 2007, the data for 4Q 2007 was largely historic as opposed to forecasts. So, the Performance Goals for the First Determination Period are a combination of: (i) historic 4Q 2007 data and (ii) the calendar year 2008 projections of $8.7M.

and sustained growth in the Moniker business segments.  Kupietzky Decl. ¶ 9.  And, because the performance goals increased each year over the MIP's three year period, it would have been impossible to meet the Moniker Performance Goals if Moniker's business declined.  *Id*.

Second, at Cahn's request, Oversee agreed to add an "Oversee" performance goal to the MIP, but Oversee insisted that the Performance Goal with respect to Oversee EBITDA for each determination period be set at the discretion of the Oversee board of directors.  *Id*.  Cahn requested the separate Oversee Performance Goal because he claimed that he wanted to make sure that his interests were aligned with those of Oversee.  *Id*.

The MIP negotiations therefore produced a performance-based incentive plan under which the MIP participants would benefit financially if the Moniker business continued to improve, as the Offering Documents represented it would.   Further, it also provided an incentive to the MIP participants to the extent that the performance of the Moniker business contributed to increased performance of Oversee.  However, if Moniker's business remained flat or declined, the MIP would not trigger any bonus payments.  As described, below, the Moniker business declined following the Oversee acquisition, and, therefore, none of the Performance Goals was achieved.

C.     The Structure of the MIP.

The MIP is not a contract between Cahn and Oversee.  The MIP is a financial incentive plan that "is applicable to those employees of Oversee.net…who perform services primarily for its wholly-owned subsidiary, Domain Systems, Inc. (d/b/a Moniker.com, "Moniker") and its direct subsidiaries, in each case as determined in accordance with the provisions [of the Plan]."  MIP, Section 1 (attached as Exhibit C to the Declaration of Elizabeth Murray, dated November16, 2011).  Mr. Cahn's Oversee Employment Agreement allowed him to participate in the MIP.  Employment Agreement, Section 3(d) (attached as Exhibit E to the Declaration of Todd Greene, dated November 16, 2011).  Cahn also was required to identify the other Participants in

the MIP "[w]ithin fifteen (15) days following the first day of each of the Company's next three fiscal years." MIP, Section 5(a). In theory, Cahn and the Board would subsequently determine how to split any "Total Award Amount" among the Participants. *Id*. However, in breach of Section 5(a), Cahn never provided Oversee with a list of eligible Participants. Greene Decl. at ¶ 3.

The MIP is divided into four Business Segments: TrafficClub, Registrar, Domain Sales, and Oversee. MIP, Schedule A. It is also divided into three time Determination Periods: a First Determination Period (October 1, 2007- December 31, 2008), a Second Determination Period (January 1, 2009 through December 31, 2009), and a Third Determination Period (January 1, 2010 through December 31, 2010). MIP, Section 15(e).[2] As a result, there are twelve potential award "buckets."

For the three Moniker Business Segments (TrafficClub, Registrar, and Domain Sales), the MIP provides a "Target Metric" (i.e., the metric by which performance would be measured), a baseline award for 100% performance, and financial Performance Goals for each Determination Period. MIP, Schedule A. For the Oversee Business Segment, the Target Metric is given as "Oversee EBITDA", but the Performance Goal is left as "TBD" or "to be determined." *Id*. Section 15(u) of the MIP provides that "Target EBITDA" "means…with respect to Oversee EBITDA, as shall be determined from time to time by the Board, in consultation with Monte Cahn for so long as he is employed by the Company." MIP, Section 15(u).

As noted, above, the MIP permits partial payments at a threshold less than 100% of a Performance Goal. If, in a given Determination Period, performance of a Business Segment reached at least 70% of the Performance Goal, Participants would be entitled to a pro-rata award. MIP, Section 3(c)(i). That same section also provides for an award that exceeds 100% (up to 110%) if performance exceeds the target. *Id*. The

---

[2] Though Schedule A of the MIP simply references the years 2008, 2009, and 2010, the "2008" year actually includes the fourth quarter of 2007 (i.e., it is the "First Determination Period"). MIP, Section 15(e)(i).

MIP also provides for a Segment Award if an individual Moniker Business Segment reaches at least 55% of a Performance Goal **and** the Total Actual Moniker Performance is equal to at least 100% for that Determination Period. MIP, Section 3(c)(ii).

As Cahn has admitted, the MIP is a fully integrated document. MIP, Section 10 ("This Plan contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter"). *See also,* SAC, ¶ 38.

D.  <u>Moniker's Performance Fails to Reach Threshold Levels</u>.

In hindsight, the 2007 Moniker acquisition took place at the front end of the worst U.S. economic decline since the Great Depression. None of the three Moniker Business Segments achieved 70% of its Performance Goal for any of the Determination Periods. Murray Decl. at ¶¶ 2-26. Further, the Total Actual Moniker Performance, which is the sum of the TrafficClub, Registrar, and Domain Sales Business Segments, did not meet or exceed one hundred percent (100%) of the Total Moniker Performance Goals for any of the First, Second or Third Determination Periods. *Id*. at ¶ 7.

Oversee does not expect that Cahn will deny that the Moniker performance goals were not met. Oversee expects him, instead, to make two arguments, each of which is addressed briefly below. In summary, Cahn argues that Oversee management undermined the performance of the Moniker business segments, and that Oversee accounting manipulated Moniker results in a way that prevented the Moniker business segments from reaching their goals. Those arguments are baseless, but for purposes of this motion, the critical fact is that the Moniker performance goals were derived from Moniker's own forecasts of earnings growth that were difficult to achieve in light of external economic forces that were brought to bear on the industry starting in 2008. It is not enough for Cahn to lob criticisms at management decisions or to second-guess

REDACTED VERSION OF DEFENDANT OVERSEE.NET'S MEMO OF P&A ISO MSJ
-6-

accounting attributions. To create a triable issue of fact, Cahn must produce evidence that the Moniker business segments would have achieved their prescribed MIP targets but for conduct by Oversee that is prohibited under the MIP. There is no such evidence.

E. The 2008 Amendment to the MIP.

Undoubtedly cognizant of his inaccurate projections and growing inability to ever meet the Performance Goals of the MIP, Cahn asked for—and received—an alternative bonus compensation plan in November 2008 which covered the First and Second Determination Periods. *See,* Incentive Compensation Plan Monte Cahn, Schedule I (hereinafter, the "2008 Amendment") (attached as Greene Decl. Ex. F).[3] The 2008 amendment to the MIP gave Cahn (but only Cahn) new goals and target metrics, while leaving the original MIP in place in the event that, somehow, Moniker's business performance turned around. 2008 Amendment, *passim*. Nevertheless, that agreement had two key components:

1. It stated than Cahn would be paid under the new plan or the MIP (whichever was higher) but not both. 2008 Amendment, "Interaction with MIP" ("The benefits being offered to Employee under this Plan are not in addition to the payments payable to Employee under the MIP. Employee shall be entitled to payments either under this Plan or the MIP, but not both.")

2. It clarified that, for purposes of measuring performance under the MIP, no payments would be due in respect of the Oversee Performance Goal unless at least one of the segments for which the MIP set a financial Performance Goal (TrafficClub, Registrar, or Domain Sales) achieved its MIP target.

---

[3] He again asked for and received a new plan in 2010 but that agreement is the basis of a different cause of action not currently at issue in this phase as a result of the Court's August 29, 2011 bifurcation order.

In 2008 and 2009, Cahn received bonuses under the 2008 Amendment but not the MIP because the MIP performance goals were not achieved. Greene Decl., ¶ 8.

### III. LEGAL STANDARD IN CASES INVOLVING CONTRACT INTERPRETATION.

Summary judgment or summary adjudication is appropriate if no genuine issue of material fact exists, and the moving party is entitled to judgment/adjudication as a matter of law. FED. R. CIV. P. 56. The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The burden then shifts to the non-moving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-587 (1986). To meet this burden, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. Rather, he must "come forward with specific facts showing that there is a *genuine issue for trial*." *Id.* at 587 (citation omitted). Defendants must produce more than a mere scintilla of evidence; there must be evidence on which a jury could reasonably find for the defendants. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If there is no genuine issue of material fact, the court must grant summary judgment in favor of the moving party. FED. R. CIV. P. 56(c).

In the present case, the MIP states that its terms shall be governed by California law. MIP, Section 13. Where a summary judgment motion addresses the interpretation of a contract, California law is clear: except where interpretation turns on the credibility of parol evidence, interpretation of a contract is the province of the judge and should therefore be made as a matter of law. *Oceanside 84, Ltd. v. Fidelity Federal Bank,* 56 Cal. App. 4th 1441 (1997); *Palmer v. Truck Ins. Exchange,* 21 Cal. 4th 1109, 1115 (1999).

REDACTED VERSION OF DEFENDANT OVERSEE.NET'S MEMO OF P&A ISO MSJ
-8-

The only claim presently at issue is Plaintiff's claim for Breach of Contract with respect to the MIP. As explained in *Stevens v. Mavent, Inc.,* 2008 WL 2824956 (C.D. Cal. July 21, 2008), a case almost identical to this one:

> A claim for breach of contract requires evidence of (1) the contract's existence and its terms, (2) performance by plaintiff, (3) breach by defendants, and (4) damages suffered by plaintiff as a result. [Citation.] Under basic contract law an offer must be sufficiently definite, or must call for such definite terms in acceptance that the performance promised is reasonably certain. [Citation].

*Stevens*, 2008 WL 2824956 at *2.

## IV. ARGUMENT

### A. Because the Moniker Business Segments Did Not Reach the 70% Threshold of the Performance Goals, No Payment Was Required.

#### 1. THE MONIKER SEGMENTS DID NOT ACHIEVE THEIR PERFORMANCE GOALS.

As explained above, the MIP is clear on its face: to trigger payment of an award with respect to a particular Moniker Business Segment within a determination period, one of two things had to happen: (i) the performance of such Moniker Business Segment in that determination period had to reach a minimum of 70% of the Performance Goal (MIP Section 3(c)(i)) or (ii) the performance of such Moniker Business Segment in that determination period had to reach a minimum of 55% of the Performance Goal while, at the same time, the total Moniker performance for all three Moniker Business Segments in that determination period reached at least 100% (Section 3(c)(ii)). As explained in the Declaration of Elizabeth Murray, Moniker realized neither scenario. Below is a chart summarizing Moniker Business Segment Performance:

| Business Segment | Determination Period | Percentage of Performance Goal |
|---|---|---|
| TrafficClub | First | ■ |
|  | Second | ■ |
|  | Third | ■ |
| Registrar | First | ■ |
|  | Second | ■ |
|  | Third | ■ |
| Domain Sales | First | ■ |
|  | Second | ■ |
|  | Third | ■ |

Murray Decl. Exhibit D.  As shown above, none of the Business Segments achieved even 55% of its Performance Goal in any of the Determination Periods, and the three segments combined obviously did not reach 100% of target.

Mr. Cahn's "eligibility for bonus payments is properly determined by the bonus [plan's] specific terms and general contract principles." *Neisendorf v. Levi Strauss & Co.*, 143 Cal. App. 4th 509, 523 (2006).  "California courts have consistently characterized bonus and profit sharing plans as constituting an offer of the stated benefits in exchange for the service of an employee, and upon the employee's completion of the required services in accordance with the terms of the plan, a binding contract is formed under which the employer is obligated to deliver the promised benefits." *Id.*

Here, the specific terms of the MIP call for performance at certain specified levels before payment is triggered.  That performance was not achieved in any period, and, therefore, no payment was owed in any period.  As a result, with respect to the Moniker Business Segments, Oversee did not breach a contract.

### 2. CAHN CANNOT DEMONSTRATE THAT OVERSEE UNDERMINED THE MIP PERFORMANCE GOALS.

As noted above, Oversee expects that Cahn will generally argue that Oversee undermined the MIP Performance Goals through management decisions and accounting gimmicks. While those contentions are untrue, Oversee does not presently know how Cahn will try to support those, thus far, vague contentions. Therefore, while Oversee will respond to Cahn's evidence in its Reply, for present purposes, Oversee can only note the following two points.

First, Oversee did not assume any duty to Cahn to manage the company to benefit Cahn. Indeed, a corporation's officers and directors owe fiduciary duties to the shareholders, and it is the interests of those shareholders that must be paramount. *See, e.g., Small v. Fritz Companies, Inc.*, 30 Cal. 4th 167, 179, 65 P.3d 1255 (2003) ("Officers and directors owe a fiduciary duty to stockholders.") (citations omitted). The MIP specifically says that participants are *not* stockholders by virtue of their participation in the MIP: "Neither the adoption of this Plan nor the granting of any Award, shall confer upon any Participant any rights of a stockholder in the Company…" MIP, Section 7. Thus, recognizing the overriding obligations of Oversee's directors and officers to act in the best interests of the corporation and its shareholders, Cahn assumed the risk that those decisions could affect his compensation. Cahn has no right to second-guess business decisions regardless of their impact on MIP Performance Goals.

Second, even if Cahn could demonstrate a legal right to question management or accounting decisions made by Oversee, he must demonstrate proximate cause. *US Ecology, Inc. v. State*, 129 Cal. App. 4th 887, 909 (2005) ("Causation of damages in contract cases, as in tort cases, requires that the damages be proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain. A proximate cause of loss or damage is something that is a substantial factor in bringing about that loss or damage.") (internal citations omitted). Specifically, Cahn must show

that Oversee business or accounting decisions kept Moniker business segments from achieving Performance Goals that they otherwise would have achieved. He cannot meet that challenge. There was no chance that any of the three Moniker business segments could have achieved any of their Performance Goals in any of the measurement periods. And the reason – although not directly relevant to this Motion – is worth noting: Cahn overstated Moniker's anticipated growth trajectory and he agreed to accept the risk that his projections were wrong. In a turbulent economy, those projections proved to be horribly wrong, and that is why Moniker did not come close to hitting any of its Performance Goals.

### B. The Oversee Business Segment Provision Is Not Enforceable.

As noted, above, the parties did not set, nor did the MIP contain, a numeric Performance Goal for the Fourth Business Segment, Oversee. Rather, they ultimately agreed to leave the Performance Goal as "TBD" and to grant discretion to the Board to set that that Performance Goal. Section 15(u) (stating that Oversee EBITDA Target Metric would be determined "from time to time by the Board…."). Neither the Oversee Board nor the Board of Directors of ODN Holding Corporation[4] ever set a MIP Performance Goal for Oversee EBITDA.[5] Greene Decl. ¶ 5.

---

[4] On December 20, 2007, in preparation for a pending investment by investors, which was consummated in February 2008, Oversee reorganized and became a wholly-owned subsidiary of ODN Holding Corporation, a holding company whose sole asset was and is the ownership of the stock of Oversee. Oversee and ODN have separate boards of directors. Greene Decl. at ¶ 4. Neither Board set a Performance Goal for Oversee EBITDA under the MIP. *Id.* at ¶ 5; Deposition Transcript of Jeffrey Kupietzky, taken October 26, 2011 ("Kupietzky Depo."), at 110:4-10 (attached as Delgado Decl. Ex. G).

[5] Cahn's Complaint alleges that the Board did set Oversee EBITDA goals, and that those goals were partially met in 2009 and fully met in 2010. SAC, ¶¶ 26, 27. From 2008-2010, the ODN board of directors set an Oversee EBITDA goal used to measure the performance of Oversee. These goals were the basis from which discretionary bonuses payable to employees of Oversee who participated in Oversee' annual discretionary bonus plan were set. That bonus plan is

This set of facts is nearly identical to those in *Stevens, supra*. In *Stevens*, the Plaintiff was eligible for a bonus, for which the Board would set quarterly targets in its discretion based on company objectives every year. *Stevens*, 2008 WL 2824956 *1. However, at no point during Plaintiff's employment did the Board actually set a target for him. *Id*. Like Cahn claims with respect to the Fourth Business Segment, "Stevens does not know the criteria by which to determine whether he qualified or earned any quarterly performance bonus pursuant to the Agreement, nor does he know whether he actually qualified or earned the bonuses." *Id*. When Stevens asked to be paid quarterly bonuses, he was informed "[T]hese bonuses are based on threshold goals being met and exceeded and are to be established by the Board of Directors. The Board has not set those thresholds and therefore Mavent is unable to determine if you have satisfied the criteria to receive these bonuses." *Id*.

On facts nearly identical to the ones here, the Court entered summary judgment for the Defendant on Plaintiff's claim for breach of contract. The Court commenced by citing long-standing California law that "[c]ourts will not enforce vague promises about the terms and conditions of employment that provide no definable standards for constraining an employer's inherent authority to manage its enterprise. It is to be expected that many alleged employer promises will be unable to cross this threshold of definition to become enforceable claims." *Id*. at *2, *citing, inter alia, Scott v. Pacific Gas & Electric Co.*, 11 Cal. 4th 454, 473 (1995), *disapproved on other grounds, Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 352, n. 17 (2000); *see also Ladas v. California State Auto. Assn.*, 19 Cal. App. 4th 761, 814 (1993) ("To be enforceable, a promise must be

---

separate and distinct from the MIP. Greene Decl., ¶ 6. Those EBITDA goals were not applicable to the MIP, a point made clear during the MIP negotiations, when Oversee rejected Cahn's request to equate the EBITDA targets for Oversee legacy management to the MIP Oversee "TBD" Performance Goals. Kupietzky Depo at 106:5-19; Ex. 3 (e-mail informing Cahn that "the other execs will get a **different** Moniker component added to their legacy Oversee number.") (emphasis added).

definite enough that a court can determine the scope of the duty and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages.)

Ultimately, the *Stevens* Court concluded that, because the targets for attaining the bonus were to be determined in the discretion of the Board, and the Board did not set those targets, the claim for breach of contract failed as a matter of law because "the Agreement has no definable standards and is too indefinite to be enforced." *Id*. The Court concluded its analysis by noting that the claim also failed because "the absence of standards for determining performance bonus eligibility renders damages speculative." *Id*.

So it is here. Because the board of directors (either the Oversee Board or the ODN Board) never set a Performance Goal for Oversee EBITDA under the MIP, Cahn's claim is speculative. This Court's task is to enforce the agreement as drafted, and not to try to go back in time to figure out what performance goals Oversee executives would have set in the course of managing their company. *Rochlis v. The Walt Disney Company*, 19 Cal. App. 4th 201, 214 (1993) ("Litigation cannot become a vehicle for the micromanagement of day to day corporate affairs."), *disapproved on other grounds, Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238 (1994).

Because the MIP did not set the Oversee performance targets, that aspect of the MIP is unenforceable as a matter of law.

### C. Cahn Is Not Entitled to Payments for the Oversee Business Segment During the First and Second Determination Periods.

Even if Cahn were correct that the Oversee targets set by the Board applied to MIP participants (and they did not), Cahn agreed to amend the MIP, as applied to himself, to state that, for 2008 and 2009, he would not receive an Oversee performance bonus unless at least one of his Moniker segments hit its Performance Goal target

during that year.[6] In November 2008, Cahn and Oversee executed the 2008 Amendment. The 2008 Amendment (which unfortunately does not contain page nos. or paragraph nos.) states that if the performance of the Moniker Business Segments (i.e., TrafficClub, Registrar, Domain Sales) did not trigger a MIP payment for those segments, then Cahn would not be entitled to payment under the Oversee Performance Goal. *See,* 2008 Amendment (at OVER002435-36). As demonstrated, above, no MIP payments for any of the Moniker business segments were triggered in the First and Second Determination periods. Section III, A, *supra*. The 2008 Amendment thus precludes Cahn's claim to an Oversee TBD bonus for the 2008 and 2009 determination periods.

### D. As to All Four Segments, Damages Would Be Speculative As a Result of Cahn's Failure to Identify Participants.

Oversee is entitled to summary judgment on a separate basis: even if some award under the MIP had been required for some Business Segment in some Determination Period, damages would be speculative because Cahn never identified the MIP participants to the Board. At the beginning of each calendar year 2008, 2009, and 2010, the MIP required Cahn to provide the Board with a list of Plan participants. MIP, Section 5(a). The foundation of an incentive plan is that it incents participants to achieve their goals. It cannot serve that purpose if the participants are never told they are eligible to earn an incentive. But, Cahn never identified the MIP participants to the Board. Cahn's failure to notify the Board of the MIP participants at the inception of the calendar year in which those participants were expected to work to achieve their incentives renders relief speculative, because it is now impossible to determine how an award would have been divided among multiple participants.

---

[6] The SAC alleges that Oversee EBITDA goals were partially met in 2009 and fully met in 2010. SAC, ¶¶ 26, 27. As a result, even Cahn implicitly admits that the Oversee EBITDA goal was *not* met at the requisite 70% threshold level in 2008 (i.e., the First Determination Period).

Undoubtedly, Cahn will now argue that, because the designation of participants was in his discretion, he could and would have designated himself as sole participant. That is not how an incentive plan works. As noted above, the MIP participants were to be identified at the beginning of the year. Cahn cannot now avoid the mutiny that would have ensued if he had designated himself as the sole Plan participant by remaining silent when the MIP was in place and appointing himself sole participant after he has left the company. In short, Cahn's failure to identify MIP participants when he was required to do so renders his First Claim for Relief speculative.

## V. CONCLUSION

Cahn's claim for breach of contract categorically fails. First, no Moniker Business Segment achieved its specified Performance Goal during any Determination Period, and, thus, no payments were due. Second, any bonus in respect of the Oversee Business Segment bonus is unenforceable because the performance goals were left to the discretion of the Board, and, as to 2008 and 2009, Cahn was not entitled to such payments anyway because of the 2008 Amendment. Finally, as to all four business segments, damages would be speculative because Cahn failed to identify the other Participants in the MIP.

For all these reasons, Oversee respectfully requests summary judgment on Plaintiff's First Claim for Breach of Contract. In the alternative, Oversee respectfully requests partial summary judgment on the issue of whether an award was merited under any specific Business Segment.

Dated: November 16, 2011            WILLENKEN WILSON LOH & LIEB LLP


                                    By:/s/William A. Delgado                .
                                    William A. Delgado
                                    Attorneys for Defendants OVERSEE.NET,
                                    JEFFREY KUPIETZKY, and LAWRENCE NG

REDACTED VERSION OF DEFENDANT OVERSEE.NET'S MEMO OF P&A ISO MSJ
-16-