COPY

1  LEWIS BRISBOIS BISGAARD & SMITH LLP
   JOHN L. BARBER, SB# 160317
2     E-Mail: barber@lbbslaw.com
   KENNETH D. WATNICK, SB# 150936
3     E-Mail: watnick@lbbslaw.com
   SONJA HARRINGTON, SB# 261053
4     E-Mail: sharrington@lbbslaw.com
   221 North Figueroa Street, Suite 1200
5  Los Angeles, California  90012
   Telephone: 213.250.1800
6  Facsimile: 213.250.7900

7  Attorneys for MONTE CAHN, an individual

8

9              UNITED STATES DISTRICT COURT

10     CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

11

12

13  MONTE CAHN, an individual,          CASE NO. CV11-03800 SVW (AGRx)

14          Plaintiff,
                                        The Hon. Stephen V. Wilson
15     v.                               [Magistrate Judge Alicia G. Rosenberg]

16  OVERSEE.NET, a California
    corporation; JEFF KUPIETZKY, an     **MONTE CAHN'S**
17  individual; LAWRENCE NG, an         **SUPPLEMENTAL BRIEF IN**
    individual; and Does 1 through 10,  **SUPPORT OF MOTION TO**
18                                      **COMPEL OVERSEE.NET TO**
            Defendants.                 **PRODUCE DOCUMENTS**
19                                      **RESPONSIVE TO FIRST**
                                        **REQUEST FOR PRODUCTION**
20                                      **[FILED UNDER SEAL]**
21
22                                      [Filed concurrently with Declaration of
23                                      Sonja Harrington]

24                                      Date:  December 6, 2011
25                                      Time:  10:00 a.m.
                                        Courtroom: D, 8th Floor
26
27                                      COMPLAINT FILED:  May 3, 2011
28                                      TRIAL DATE:       January 17, 2012

1810-4500-3534.1

MONTE CAHN'S  SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO COMPEL OVERSEE.NET TO
PRODUCE DOCUMENTS RESPONSIVE TO FIRST REQUEST FOR PRODUCTION

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

## I.    OVERSEE'S PRODUCTION IS INCOMPLETE

Oversee.net's ("Oversee") seeks to avoid full disclosure of the data and information necessary to confirm that Monte Cahn ("Cahn") achieved the performance goals under the Management Incentive Plan ("MIP"). Given the terms and conditions of the MIP, Oversee should have maintained contemporaneously prepared documentation that tracked and reported the activity and results related to the MIP targets. None of this information has been produced.

Instead, Oversee relies on a <u>one page summary document</u> by Elizabeth Murray as the "evidence" that Cahn did not achieve the MIP performance goals. (¶7 and Ex. D of Murray Decl., Ex. 1 to Harrington Decl.) Oversee should be required to produce the source data that allows Cahn to evaluate Murray's summary conclusions, including all drafts or versions of this one page report.

Also, recently obtained information confirms significant gaps in Oversee's production and raises questions about Oversee's financial reporting. During his recent deposition, Craig Snyder, a senior Oversee executive, admitted that Oversee maintained multiple sets of data, records, or information relating to the business operations of the domain sales and registrar business segments, two of the business segments in the MIP (Snyder referred to these segments are referred to as "Moniker"). (159:10-165:9, 167:22-174:24 of Snyder Depo., Ex. 2 to Harrington Decl.) Mr. Snyder confirmed that **the financial reports for the Moniker business were "not counting two of the most important revenue lines for the business."** (*Id.*, **at 170:11-13.) Mr. Snyder confirmed that Oversee's reports allocated certain Moniker revenues to other divisions of Oversee.** (159:10-165:9, 167:22-174:24 of Snyder Depo., Ex. 2 to Harrington Decl.) **Mr. Snyder explained that "[i]f you added those things back to Moniker it creates a different impression of the business."** (*Id.*, at 163:8-12.) **Mr. Snyder also confirmed that, in connection with Oversee's ongoing efforts to sell the Moniker business, Oversee had added at least some of these revenues back to Moniker's financial reports.**

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4810-4500-3534.1                                          1

MONTE CAHN'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO COMPEL OVERSEE.NET TO PRODUCE DOCUMENTS RESPONSIVE TO FIRST REQUEST FOR PRODUCTION

1  (65:10-167:13 of Snyder Depo. and ¶7 of Snyder Decl, Exs. 2 and 3 to Harrington

2  Decl.) Additionally, Mr. Snyder confirmed that Oversee had improperly assessed,

3  among other things, expense charges for credit card fees in connection with

4  transactions that did not involve a credit card. (154:15-24, 155:6-156:9, 158:17-

5  159:5 of Snyder Depo, Ex. 2 to Harrington Decl.) Oversee has not produced the

6  detailed accounting documents that relate to this alternative presentation.

7       Similarly, Oversee's former Vice President, Stephen O'Neill, confirmed that

8  he attended weekly meetings "where we went over the stats and profits and

9  EBITDA and . . . all the different revenue metrics." (72:5-15 of O'Neill Transcript,

10  Ex. 4 to Harrington Decl.) These documents have not been produced.

11       Also, on November 18, 2011, Oversee purported to supplement its production

12  with additional summary data. (Ex. 5 to Harrington Decl.) The belated production

13  includes spreadsheets that were purportedly prepared from the

14  ~~operational systems~~", certain ‘      ~~er~~ accounts on the ~~___      ~~ or operating

15  systems, Quickbooks, "      ~~Crystal Reports~~", a ‘      , report",

16  and a data source described "      ~~on~~". (*Id.*) The source data and detailed

17  transaction data has not been produced. Oversee also must produce unredacted

18  documents relating to the domain sponsor. (*See, e.g.*, Ex. 10 to Harrington Decl.)

19  **II.   OVERSEE'S MIP CALCULATIONS WERE NOT BASED ON THE**

20  **AUDITED FINANCIAL STATEMENTS**

21       Oversee claims that its production is complete because the "MIP targets are to

22  be calculated pursuant to Oversee's audited financial statements." (4:17-18 of Joint

23  Stip.) In contrast, Oversee's recently filed motion for summary judgment claimed

24  that Cahn did not meet the MIP goals but did not attach or rely upon Oversee's

25  audited financial statements. (*See, e.g.*, Oversee's Statement of Uncontroverted

26  Facts, Ex. 6 to the Harrington Decl.) Oversee relied on a one page, unsourced

27  spreadsheet. (¶7 and Ex. D to Murray Decl., Ex. 1 to Harrington Decl.)

28       Additionally, Ms. Murray and Mr. Snyder, Oversee's senior managers,

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   confirmed that revenue for the Moniker business segments were allocated to other

2   Oversee operating divisions. (159:10-165:9, 167:22-174:24 of Snyder Depo. and ¶5

3   of Murray Decl., Exs. 2 and 7 to Harrington Decl.)  Cahn cannot determine

4   Moniker's performance without the transactional data for the Moniker transactions

5   that were allocated to other Oversee business divisions of Oversee.

6        Also, within a month of acquiring Moniker, Oversee closed TrafficClub, one

7   of the business segments that are the subject of the MIP.  Oversee presents no

8   evidence that the financial statements tracked TrafficClub's performance.

9   **III.   OVERSEE'S PRODUCTION IS INSUFFICIENT**

10        Oversee claims that its production is "sufficient" to reflect the financial

11   performance of the MIP business units. (5:1-4 of Joint Stip.)  As explained above,

12   the testimony of Snyder and O'Neill confirms that there is missing data and

13   information relating to the performance of these business segments.  Oversee's

14   belated production, on November 18, 2011, references data sources that have not

15   been produced in litigation.  Also, the one page summary spreadsheet attached to

16   Ms. Murray's Declaration (Ex. 1 to Harrington Decl.) lacks evidentiary support.

17   Oversee should be required to produce such information.

18        Additionally, Oversee is providing potential purchasers of Moniker with

19   updated or alternative revenue information about Moniker. (¶7 of Snyder Decl., Ex.

20   3 to Harrington Decl.)  This information has not been produced.

21   **IV.   SPREADSHEETS ARE NOT A SUBSTITUTE FOR DATA**

22        Oversee claims that no further production is required because it produced

23   "summary" spreadsheets. (12:4-7 and 24-28, 13:5-9, 20:18, 24:16-16 of Joint Stip.)

24   Summary spreadsheets are not substitute for the actual data and information.  Cahn

25   is entitled to conduct his own evaluation of this information.

26   **V.   THE REQUESTS ARE NOT OVERBROAD**

27        Oversee disingenuously claims that the requests are overly broad.  Cahn has

28   requested the data and information relating to the performance of the business

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    segments that are the subject of the MIP.  Cahn should not be required to identify
2    the reports and data, by title or specific description.  The FRCP imposes no such
3    obligation.  Oversee's recent production of summary spreadsheets shows that it can
4    easily access the source data that relates to these business units.  More importantly,
5    Mr. Snyder and Ms. Murray confirmed that the revenues for the Moniker business
6    lines are spread out over multiple Oversee divisions.  (159:10-165:9, 167:22-174:24
7    of Snyder Transcript and ¶5 of second Murray Decl., Exs. 2 and 7 to Harrington
8    Decl.)  Thus, Oversee's specificity request improperly attempts to limit production
9    and to provide Oversee with a pretext to avoid the production of damaging data.

10        Moreover, given the terms of the MIP, Oversee must have maintained certain
11   tracking reports and documents, including, for example, summary level analyses and
12   supporting information for the different business segments, transaction level details,
13   data related to revenue and cost items to support summaries or analysis of results
14   related to MIP components, Board reports, resolutions, and certifications, and
15   reconciliations of data.  Oversee should be required to produce such information.

16        Oversee's claim that it has produced some documents in its disorganized
17   information does not discharge its obligations under the FRCP.  It does not excuse
18   Oversee from producing the missing source data and transactional detail.[1]

## VI.    BONUS INFORMATION FOR OTHER EXECUTIVES IS RELEVANT

19        Information about the performance targets and  bonus awards for other
20   executives may provide relevant information as to the actual amount of the Oversee
21   EBITDA target in 2008, 2009, and 2010 (The MIP provides that this amount is
22   "TBD") and the performance of the business segments at issue.  For example, Craig
23   Snyder confirmed that his bonus was based on the overall performance of Oversee

---

[1] Oversee claims (p. 13, fn. 4 of Joint tip.) that it should not have to produce a file
folder of financial information because Kupietzky incorrectly claimed that it was on
Todd Greene's desk.  Oversee cannot avoid production by claiming that Kupietzky
was mistaken as to the location of the folder.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4810-4560-3534.1

4

MONTE CAHN'S  SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO COMPEL OVERSEE.NET TO
PRODUCE DOCUMENTS RESPONSIVE TO FIRST REQUEST FOR PRODUCTION

1  and the performance of the registrar and aftermarket divisions (that are the subject

2  of the MIP). (Snyder Depo., 39:1-13, Ex. 2 to Harrington Decl.)  Mr. Snyder

3  confirmed that, with respect to the overall performance of Oversee, there was a

4  "combination of numbers that have to do with both revenue performance and

5  profitability performance, so I would include in that – in those set of numbers

6  revenue, gross profit and EBITDA." (*Id.*, at 40:22-41:12.)  Snyder also confirmed

7  that he received a full bonus (pro rated) in 2009 and 90% bonus in 2010. (*Id.*, at

8  70:7-71:8 and 81:25-82:6.)  Similarly, Jeff Kupietzky testified that Mr. Snyder

9  received a bonus in 2010 because the registrar business achieved its gross profit

10  target of ⸺  ⸺⸺⸺  ⸺re. (302:15-303:9 of Kupietzky Depo., Ex. 8 to

11  Harrington Decl.)  This information conflicts with Murray's claim that the registrar

12  bonus was approximately  ⸺ ⸺⸺⸺ in 2010. (Ex. D to Murray Decl, Ex. 1 to

13  Harrington Decl.)  Therefore, discovery of information about the bonus targets and

14  payments to Mr. Snyder or other executives may provide relevant information.  It is

15  necessary to resolve the conflicting information about registrar performance and

16  Oversee's overall performance.

17      Oversee disingenuously claims that bonus information requires a "higher

18  level of protection" than that provided for in the protective order.  On November 18,

19  Oversee produced employee salary and bonus information and designated this

20  information as "confidential." (Ex. 9 to Harrington Decl.)  Oversee fails to show

21  why executive bonus information should be subject to different protections.

22  **VII.   THE GOOGLE CONTRACT SHOULD BE PRODUCED PURSUANT**

23  **TO THE PROTECTIVE ORDER**

24      Oversee concedes that the Google contract should be produced but requests

25  that the document be designated as highly confidential.  This contract is critical to

26  Cahn's case.  Cahn is the individual who can  determine the effect that the Google

27  contract had on the closure of the TrafficClub business.  Cahn is aware of his

28  obligations under the existing Protective Order.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4810-4500-3534.1                                5
MONTE CAHN'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO COMPEL OVERSEE.NET TO
PRODUCE DOCUMENTS RESPONSIVE TO FIRST REQUEST FOR PRODUCTION

1    DATED: November 22, 2011     JOHN L. BARBER
                                  KENNETH D. WATNICK
2                                 SONJA HARRINGTON
                                  **LEWIS BRISBOIS BISGAARD &**
3                                 **SMITH** LLP

4
                                  By:
5                                      Sonja Harrington
                                       Attorneys for MONTE CAHN
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4810-4500-3534.1                              6
MONTE CAHN'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO COMPEL OVERSEE.NET TO
PRODUCE DOCUMENTS RESPONSIVE TO FIRST REQUEST FOR PRODUCTION

# DECLARATION OF SONJA HARRINGTON

I, SONJA HARRINGTON, declare:

1.    I am an attorney duly licensed to practice before the courts of the State of California and am an associate with the law firm of Lewis, Brisbois, Bisgaard & Smith, LLP, attorneys of record for Plaintiff Monte Cahn ("Cahn"). I have personal knowledge of the facts stated herein and as such could and would testify competently thereto as follows.

2.    Attached hereto as Exhibit 1 is a true and correct copy of the Declaration Of Elizabeth Murray In Support Of Oversee.Net's Motion For Summary Judgment.

3.    Attached hereto as Exhibit 2 is a true and correct copy of the deposition transcript for the deposition of Craig Andrew Snyder, pages 39:1-13, 70:7-71:8, 81:25-82:6, 154:15-24, 155:6-156:9, 158:17-159:5, 159:10-165:9, 165:10-167:13, and 167:22-174:24.

4.    Attached hereto as Exhibit 3 is a true and correct copy of the Declaration Of Craig Snyder In Support Of Opposition To Cahn's Ex Parte Application.

5.    Attached hereto as Exhibit 4 is a true and correct copy of the deposition transcript for the deposition of Stephen Rue O'Neill, pages 72:5-15.

6.    Attached hereto as Exhibit 5 are true and correct copies of excerpts from the November 18 production of documents.

7.    Attached hereto as Exhibit 6 is a true and correct copy of Defendant Oversee.Net's Separate Statement Of Uncontroverted Facts In Support Of Motion For Summary Judgment.

8.    Attached hereto as Exhibit 7 is a true and correct copy of the Declaration Of Elizabeth Murray.

9.    Attached hereto as Exhibit 8 is a true and correct copy of the deposition transcript for the Deposition Of Jeff Kupietzky, pages 302:15-303:9.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4810-4500-3534.1                                7
MONTE CAHN'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO COMPEL OVERSEE.NET TO PRODUCE DOCUMENTS RESPONSIVE TO FIRST REQUEST FOR PRODUCTION

10.     Attached hereto as Exhibit 9 is a true and correct copy of salary information as contained in the Operating Expenses Headcount Adjustment 2008.

11.     Attached hereto as Exhibit 10 is a true and correct copy of a produced document redacted as "Competition Sensitive".


I declare, under penalty of perjury, under the laws of the United States of America that the foregoing is true and correct.  Executed this 22nd day of November 2011 in Los Angeles, California.

SONJA HARRINGTON

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4810-4500-3534.1

8

MONTE CAHN'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO COMPEL OVERSEE.NET TO PRODUCE DOCUMENTS RESPONSIVE TO FIRST REQUEST FOR PRODUCTION

EXHIBIT 1

# FILED UNDER SEAL

EXHIBIT 2

11-8-11%20Cahn%20Case%2  %20Snyder%20Depo%20PAGES%20ROU  .20ASCII%20COMPLETE[1]

ROUGH DRAFT DISCLAIMER

THE STENOGRAPHIC NOTES TAKEN IN THIS
DEPOSITION ARE BEING TRANSLATED INSTANTANEOUSLY INTO
THEIR ENGLISH EQUIVALENT THROUGH AN AUTOMATED PROCESS
CALLED REAL-TIME TRANSLATION.

THIS TRANSCRIPT HAS BEEN ROUGH EDITED BUT
NOT PROOFREAD BY THE CERTIFIED SHORTHAND REPORTER.
THE REAL-TIME DRAFT IS UNCERTIFIED AND MAY CONTAIN
UNTRANSLATED STENOGRAPHIC SYMBOLS, AN OCCASIONAL
REPORTER'S NOTE, A MISSPELLED PROPER NAME AND/OR
NONSENSICAL WORD COMBINATIONS.

ALL SUCH ENTRIES WILL BE CORRECTED ON THE
FINAL CERTIFIED TRANSCRIPT, WHICH WILL BE DELIVERED
TO YOU IN ACCORDANCE WITH STANDARD DELIVERY TERMS OR
ON AN EXPEDITED BASIS, AS REQUESTED.

DUE TO THE NEED TO CORRECT ENTRIES PRIOR TO
CERTIFICATIONS, THIS ROUGH REAL-TIME DRAFT CAN ONLY
BE USED FOR THE PURPOSE OF AUGMENTING COUNSEL'S NOTES
AND NOT TO BE USED IN ANY COURT PROCEEDING OR TO
DISTRIBUTE TO OTHER PARTIES.

1

1        UNCERTIFIED ROUGH TRANSCRIPT
2        DEPOSITION OF CRAIG ANDREW SNYDER
3               *********
4     LOS ANGELES, CALIFORNIA, TUESDAY, NOVEMBER 8, 2011

11-8-11%20Cahn%20Case%...-%20Snyder%20Depo%20PAGES%20ROU...%20ASCII%20COMPLETE[1]

23    very evident to someone if we had people at the trade

24    shows and we did spend a lot of money sending

25    individuals to trade shows that were adult oriented.
                                                            38

1         Q   Were there restrictions on your ability to

2    be speakers at these adult trade shows?

3         A   I don't remember that ever coming up as to

4    when I was there where we had an opportunity to be a

5    speaker at a show and it was -- it never came to my

6    attention something something.

7         Q   Separate from you being there, did you

8    become aware of the people under you having that

9    restriction or did you impose that rest distribution

10   on any people?

11        A   Speaking at a trade show?

12        Q   A trade show related to an adult --

13        A   No.

14        Q   You were hired in what position at Oversee?

15        A   I think the title was VP of registrar and

16   aftermarket -- excuse me.  General manager of

17   registrar and aftermarket.

18        Q   How long did you stay the general manage

19   ever of registrar and aftermarket?

20        A   I still am today.

21        Q   You mentioned when you were involved in

22   these discussions with Mr. Kupietzky and Mr. Celeste

23   one element was the economics.

24        A   Um-hum.

25        Q   Did it make sense financially to you.  Is
                                                            39

1    that correct?

11-8-11%20Cahn%20Case%...   %20Snyder%20Depo%20PAGES%20ROU   ..%20ASCII%20COMPLETE[1]

11   that that was communicated that we achieved that

12   target.

13        Q   In terms of your targets for your sectors

14   was that communicated to you at the beginning of

15   2010?

16        A   Yes.  There was a financial plan laid out in

17   2010 where the numbers were laid out.

18        Q   Did you share that with people?

19        A   I did.

20        Q   You shared that and did you achieve those

21   targets?

22        A   I believe we did.  I can't say if every

23   business line achieved its target but I believe

24   overall in terms of revenue and gross profit and

25   EBITDA we achieved our targets spell.

                                                        69

1        MR. DELGADO:  Can we take a bathroom break we've

2   been going for about an hour and a half? BY MR.

3   WATNICK:  Sure which business lines.

4        THE WITNESS:  That would be the registrar and

5   the aftermarket.

6        Q   And let me just finish up but do you have an

7   understanding as to any business line that did not

8   achieve its target?

9        A   I don't.  You know, I know that there were

10   businesses that did not achieve their target in 2010,

11   but I couldn't speak to them specifically.

12        MR. WATNICK:  Let's take a break.

13        THE VIDEOGRAPHER:  This is the end of tape No. 1

14   and we are off the record.  The time is 11:26.

15            (A recess was taken.)

16        THE VIDEOGRAPHER:  We are on the record.  It is

11-8-11%20Cahn%20Case%   %20Snyder%20Depo%20PAGES%20RO%   %20ASCII%20COMPLETE[1]

17   11:40.  This is the beginning of tape No. 2.

18      MR. WATNICK:  (Addressing the reporter) Do you

19   have any stickers?

20      THE REPORTER:  Can we go off?

21      THE VIDEOGRAPHER:  We are off the record.  The

22   time is 11:40.

23         (A recess was taken.)

24      THE VIDEOGRAPHER:  We are on the record.  It is

25   11:41.

                                                    70

1      Q   BY MR. WATNICK:  Before the break we

2   discussing your bonuses.  Did you receive a bonus in

3   2010?

4      A   Yes, I did.

5      Q   And you received a bonus in 2009?

6      A   Yes, I did.

7      Q   In 2009 when you signed the employment

8   agreement you were told that you would receive a

9   discretionary bonus up to x; is that correct, amount?

10      A   I believe that is the way it's written.  I

11   believe it's up to a certain amount.

12      Q   What percentage of that amount did you

13   receive?

14      MR. DELGADO:  Objection.  Vague as to time.

15      MR. WATNICK:  2009.

16      THE WITNESS:  I was only there for a partial

17   year in 2009.

18         (Check objection) but I believe if you

19   prorate it it would have been about a little over a

20   hundred percent of the target.

21      Q   BY MR. WATNICK:  So your employment

22   agreement said you would receive a discretionary

11-8-11%20Cahn%20Case%   %20Snyder%20Depo%20PAGES%20ROU   %20ASCII%20COMPLETE[1]

23      bonus of up to x amount?

24          A   Right.

25          Q   And you received x plus a percentage?

71

1           A   On a pro rata basis, right.  In other words,

2   you know, I was only there for I think a little more

3   than -- a little less than half the year, maybe, you

4   know, whatever I think my start date was in August.

5   Based on those number of days.

6           Q   Okay so on a pro rata basis you received a

7   hundred plus percent of your bonus.

8           A   That's correct.

9           Q   In 2010 what percentage -- let me start

10  again.  In 2010 were you told if you achieved certain

11  performance levels you would receive a bonus?

12          A   No.  I knew it was always discretionary and

13  subject to approval.  You know, my assumption was if

14  the company hit its goal and the business performed

15  well that I would receive a bonus but I knew there

16  were discretionary components in there.

17          Q   Well did your letter, employment agreement

18  specify a bonus range for 2009?

19          A   It did.

20          Q   Did it specify how a bonus range would be

21  calculated for years after 2009?

22          A   You know, it's a continuum, so I would

23  assume the calculation for 010 is the same as it is

24  for 09.

25          Q   In terms of the target levels or the bonus

72

1   amount?

11-8-11%20Cahn%20Case_ _-%20Snyder%20Depo%20PAGES%20ROU_.%20ASCII%20COMPLETE[1]

11      MR. DELGADO:  I don't see how it's at all

12    relevant.  I'll give you some leeway but I'm not

13    going to let him sit here and talk about the sale of

14    Moniker.

15      THE WITNESS:  The two businesses we had looked

16    at that were both SnapNames and Moniker.

17      Q   BY MR. WATNICK:  Who's we?

18      A   I would say one of my discussions were with

19    Jeff and Jeff had obvious discussions with the board

20    of directors.

21      Q   Whose board of directors?

22      A   The Oversee board of directors.

23      Q   Anyone in particular?

24      MR. DELGADO:  Objection calls for speculation.

25      THE WITNESS:  You know, I don't know.  Again,

80

1    I'm not sure of the exact divesty you're process that

2    was followed.

3      Q   BY MR. WATNICK:  Did Mr. Kupietzky explain

4    to you why Oversee wanted to sell the Moniker

5    business?

6      A   I think, you know, his view was -- I

7    remember him telling this to me, you know, he felt

8    that there were higher margin businesses out there

9    that the company could pursue and there were better

10    options for the business.

11      Q   Were you tasked with providing financials to

12    potential suitors about the Moniker business?

13      A   That would be through the CFO.

14      Q   Who's that?

15      A   Liz Murray.

16      Q   Did you provide potential suitors with

11-8-11%20Cahn%20Case%_   %20Snyder%20Depo%20PAGES%20ROU_   _20ASCII%20COMPLETE[1]

17    packages of information about Moniker's performance

18    over the last four years?

19         MR. DELGADO:  Objection.  Cause for speculation

20    and lacks foundation.

21         THE WITNESS:  Me personally?

22         Q    BY MR. WATNICK:  Yes.

23         A    No.

24         Q    Are you aware of that information being

25    provided to potential suitors?

                                                        81

1          A    Yes.

2          Q    Was that information accurate?

3          MR. DELGADO:  Objection calls for speculation

4     lacks foundation.

5          THE WITNESS:  I'm not exactly sure when you say

6     what information.

7          Q    BY MR. WATNICK:  The financial information.

8          A    It was audited financial information, it was

9     provided by the CFO.  I didn't have any reason to

10    question its accuracy.

11         Q    Audited financial information for particular

12    sectors?

13         A    Well even if it was done for the

14    consolidated business they would have to audit those

15    segments of the business to audit the consolidateds

16    is my understanding although I'm not involved in the

17    audit process so I don't know.

18         Q    Did you receive some sort of audited or

19    unaudited financial statements on a yearly basis

20    relating to the sectors of businesses for which you

21    were the general manager?

22         A    I would receive reports.  I don't believe

11-8-11%20Cahn%20Case%20-%20Snyder%20Depo%20PAGES%20ROUG...%0ASCII%20COMPLETE[1]

23    those were audited reports through our audit provider

24    on the performance of the business.

25         Q    You said going back to your bonuses you said
                                                                82

1    you received a bonus for 2010; is that correct?

2         A    That's correct.

3         Q    And in terms of the target bonus what

4    percentage did you receive?

5         A    I think it was between 90 and a hundred

6    percent.  I don't remember the exact amount.

7         Q    ^And is the bonus you're going to be paid

8    for the sale of Moniker and SnapNames more or less

9    than the bonus that you received in 2010?

10         MR. DELGADO:  Objection.  It calls for a

11    constitutional right of privacy.  I'm going to

12    instruct the witness not to answer the question.

13              Don't answer the question.

14         MR. WATNICK:  I'm not asking for a number.

15         MR. DELGADO:  Still you're asking for a relative

16    amount.

17         THE WITNESS:  It depends.  It's a multivariable

18    equation.

19         Q    BY MR. WATNICK:  What do you mean?

20         A    Meaning there are multiple components to

21    that financial structure.

22         Q    So it depends on what portions of the

23    business are sold and for what amounts.

24         A    It depends on a number of factors.  One is,

25    you know, my retention, the second is if one or both
                                                              83

1    businesses are sold.

11-8-11%20Cahn%20Case%...-%20Snyder%20Depo%20PAGES%20ROU...%20ASCII%20COMPLETE[1]

20   had been with the business for two months, so I

21   wanted to really make sure I understand the budget.

22          So it might be understanding merchant costs

23   and understanding what legal charges got charged to

24   me versus the corporate business.  It may have been

25   understanding all the head count and payroll taxes

153

1   and how PTO was accounted for.  It was the whole

2   budget we were going through.

3       Q   What do you mean by merchant costs?

4       A   Any time a credit card is used in

5   processing, the credit card exchange will charge you

6   a cost, so I was trying to understand why those

7   numbers were where they were.

8       Q   In your profit and loss, did you discover

9   that you were being charged a merchant fee for

10   transactions where there was no credit card cost?

11       A   I didn't find the situation where there were

12   any phantom charges.  I just thought the costs were

13   higher than normal.

14       Q   Did you discover that in certain situations

15   it appears for whatever reason there was a merchant

16   fee being charged for wire transfers or Pay Pal

17   transactions that were inappropriate?

18       A   Yes.  We had one or two situations that I'm

19   aware of where they kind of did a percentage base

20   charge to the business and we had to go back to

21   finance and say this didn't make sense because this

22   was a sale that occurred via wire and therefore

23   shouldn't incur this percentage base charge.

24       Q   You said one or two transactions did you

25   discover that this practice had existed before your

154

11-8-11%20Cahn%20Case%2  %20Snyder%20Depo%20PAGES%20ROU   .0ASCII%20COMPLETE[1]

1    tenure?

2        A    You know, I'm not sure if we went back and

3    looked at it, but it was an issue that we had to deal

4    with.

5        Q    Why was it an issue that you had to deal

6    with?

7        A    Because it affected people's commissions.

8        Q    How so?

9        A    So if, you know, they were being paid on

10   gross profit and part of the gross profit equation

11   was merchant payments was subtracted between revenue

12   and gross profit so if they had done a transaction

13   where there was a wire we would up charge the

14   customer to offset any cost to the company and

15   therefore it would pass right from revenue to gross

16   profit as opposed to if something had a credit card

17   charge associated with it, then you would expect a

18   difference between the revenue and gross profit.

19       Q    Did you also understand that that problem

20   existed with respect to Pay Pal transactions?

21       A    It was probably the same issue.  If Pay Pal

22   was used and we would gross up the charge to Pay Pal

23   customers to offset any costs, so in the case of wire

24   or pay pals, it would generally be a neutral

25   transaction where if we actually did it via credit

                                                        155


1    card we wouldn't incur costs, so yes, I was -- there

2    were several conversations we had around that issue.

3        Q    who did you have those conversations with?

4        A    Generally they came up mainly in terms of

11-8-11%20Cahn%20Case%...%20Snyder%20Depo%20PAGES%20ROL...%20ASCII%20COMPLETE[1]

5    when we were paying commissions to the sales team or

6    to the account managers and I'd have them with

7    finance and that would include David Coombs was

8    primarily the guy we'd have the conversations with.

9       Q  Isn't it true that every registration and

10   renewal transaction included a merchant fee?

11      A  I don't think that's the case.  I think what

12  happened in some cases is they applied a fee as if it

13  was a credit card charge when that was not the case.

14     Q  And isn't it true that you had to spend

15  considerable time and resources trying to correct

16  that transactional error?

17     A  Yes.  I think we spent more time than I

18  would like dealing with an issue that I didn't think

19  was impact full for the business.

20     Q  Did your efforts result in a correction of

21  the books as it related to your -- profit -- as it

22  related to your business segment?

23    MR. DELGADO:  Objection.  Calls for speculation.

24    THE WITNESS:  I don't remember if it did or --

25     Q  BY MR. WATNICK:  what was the magnitude of

156

1  this error?

2    MR. DELGADO:  Objection.  Assumes facts not in

3  evidence.

4    THE WITNESS:  You know, what it would have been.

5  It would have been a basis point error, not, you

6  know, because the charges are obviously relatively

7  small in that two to three percent range so it would

8  have been backing out those charges in the case of

9  Pay Pal and wire transactions.

10     Q  BY MR. WATNICK:  In terms of the volume can

11-8-11%20Cahn%20Case%...-%20Snyder%20Depo%20PAGES%20ROU...%20ASCII%20COMPLETE[1]

11    you give me an estimate?

12         A    I don't.  I wouldn't have that.  I'd be

13    guessing.

14         Q    Can you give me any estimate of a number?

15    More than a dollar, more than a thousand, more than

16    10,000, more than a hundred thousand?

17         A    I don't know what it would be.

18         Q    Can you give me a reasonable range without

19    nothing a specific number?

20         A    No, I don't know and it would vary depending

21    on -- you know, it's going to vary depending on, you

22    know, the transactions and the transaction size? I

23    apologize.  My question was what was the aggregate of

24    this.

25         A    It would depend again on the number of

                                                          157


1    transactions and things like that.

2         Q    When you finally were able to resolve it did

3    you ever an understanding of the magnitude of the

4    issue.

5         A    I don't remember.

6         Q    Give me your best estimate of that.

7         A    I don't remember what it was but it was, you

8    know, it was probably in the tens of thousands.

9         Q    Did you try to correct the problem for any

10    prior years?

11         MR. DELGADO:  Objection assumes facts not in

12    evidence.

13         THE WITNESS:  No, we didn't.  We have corrected

14    it and worked on the reporting since to get it, you

15    know, kind of accurate.

16         Q    BY MR. WATNICK:  How long after you took the

11-8-11%20Cahn%20Case%.   %20Snyder%20Depo%20PAGES%20ROL   .20ASCII%20COMPLETE[1]

17    reins did you discover this problem?

18        A    It was probably, you know, a quarter or so

19    because we went through a full commission psych and

20    will that's when it came up so it was probably in the

21    first quarter of 2010.

22        Q    That the problem was corrected?

23        A    That we started dealing with it and

24    correcting it accordingly.

25        Q    So how long was it completed -- was the

                                                          158

1     problem resolved by the ends of the first quarter.

2            (Dashes?

3        A    I don't know if it got fully resolved.   We

4    still would have one off cases of an issue.^ check

5        Q    But for the most part it was resolved --

6        A    Yes.   People paid attention to it and made

7    sure that it was -- you know, it was in good standing

8    at that point.

9        Q    Did you have any other problems with the

10    accounting of expenses?

11        A    I don't know how are you describing a

12    problem?  Is this like the way they were recorded,

13    how they were recorded, the way they were recorded?

14    I'm not sure exactly I'm following you.

15        Q    Incorrectly recorded.

16        A    I wouldn't say incorrectly recorded no.   How

17    they were recorded and attributed to each of the

18    business from an intra company perspective yes.

19        Q    What do you mean?

20        A    In other words we had you know businesses in

21    a particular -- at Moniker and let's -- you know,

22    there's certain lines of business there from an intra

11-8-11%20Cahn%20Case%2o-%20Snyder%20Depo%20PAGES%20ROU....%20ASCII%20COMPLETE[1]

23      company perspective we accounted for the revenue in a

24      different place.

25          Q   What do you mean?

                                                                        159

1           A   So if you had monetization revenue from

2       Moniker customers while they were an expiree, that

3       got counted at DomainSponsor.

4           Q   Instead of Moniker.

5           A   Instead of Moniker.

6           Q   What was the magnitude of that problem?

7           A   You know, it's tracked at DomainSponsor so

8       you can go pull up all the records and see what it

9       was.

10          Q   When did you discover that problem?

11          A   This is one thing we talked about when I got

12      onboard one of the questions was, you know, we do

13      things a certain way from an intra company

14      perspective.

15              (Go back and check answer and question) it

16      was my view that if they were Moniker customers and

17      the revenue was coming off of Moniker customer that

18      even if we tracked it to do main sponsor we should

19      have ability to talk about it in a logical way which

20      is great, you can track it anyway you want from an

21      intra company perspective but make sure that if we

22      have a conversation about Monday core profit tilt we

23      bring it back into the equation.

24          Q   When did that Moniker -- when did that

25      transaction get brought back into the equation?

                                                                        160

1           A   It's still tracked that way from an intra

11-8-11%20Cahn%20Case%... .%20Snyder%20Depo%20PAGES%20ROU .20ASCII%20COMPLETE[1]

2    company perspective but I think people are much more

3    aware of the fact that that any sort of profitability

4    conversation we have around Moniker should include

5    that revenue line.

6        Q   So in other words if I wanted to figure out

7    the profitability for Moniker for a particular

8    business quarter or something like that, I needed to

9    take into account this revenue that's tracked as part

10   of DomainSponsor.

11       A   That's correct.

12       Q   What were the other problems?

13       A   It would be that one and I would also say

14   the -- with regard to Moniker the revenue associated

15   with the expiree auction where SnapNames was given a

16   hundred percent of the credit for that revenue, and

17   again, this was known and tracked to the penny.  It's

18   just when you'd have a conversation about Moniker

19   profitability you would need to include those two

20   line items that were tracked inside other businesses.

21       Q   What do you mean this auction was tracked to

22   SnapNames?

23       A   In other words, Moniker would have names

24   that belonged to their customers that were auction ed

25   off and they tracked all the revenue because it was,

                                                       161


1    you know, it was a corporate decision to track all

2    the revenue at SnapNames and not attribute that

3    revenue on a reported basis to Moniker.

4            So if you were considering the profitability

5    of Moniker, that would be one of the lines of

6    business that you'd have to consider in that vein.

7        Q   How did you become aware of this problem

11-8-11%20Cahn%20Case%zu-%20Snyder%20Depo%20PAGES%20ROUG...20ASCII%20COMPLETE[1]

8    with the auction?

9        A    Just going through, you know, when I started

10   going through the financials and seeing how it was

11   tracked, this was one of the things that would, you

12   know, come up is why do you account for the revenue

13   in this way and why do you account for the revenue in

14   that way.

15       Q    Well what what's the magnitude of this

16   problem?

17       A    Well, you know, it's all tracked, so it was

18   whatever -- you know, they have a line item for it

19   and again, my issue was not was it tracked and not

20   was it recorded.  It was.

21           My issue was more of if you want to make an

22   effective evaluation of the Moniker business, these

23   lines that come from Moniker customer also should be,

24   you know, looked at that way or if you have to look

25   at it that way.

                                                    162

1        Q    What was the magnitude of the profitability?

2        MR. DELGADO:  Objection.  Calls for speculation.

3        THE WITNESS:    I don't know but the numbers are

4    certain -- and it would vary month to month based on

5    the transactions that were occurring but certainly

6    you had the ability to go back and attribute that

7    reporting directly back to the business.

8        Q    BY MR. WATNICK:  Did you try to determine --

9    this was a problem that existed before your tenure;

10   is that correct?

11       A    Yeah that's correct.

12       Q    Did you try to track the magnitude of the

13   problem before your tenure to see whether it was

11-8-11%20Cahn%20Case%...  %20Snyder%20Depo%20PAGES%20ROL   ...20ASCII%20COMPLETE[1]

14   worth your time to try to argue about this?

15        A    Yeah I did and I had -- I had you know

16   several arguments with Jeff and also the CFO about

17   this, and the arguments weren't around is it tracked

18   or how is it tracked or why is it tracked, but the

19   question is if we're going to discuss a business's

20   profitability, then, you know, do you have account

21   for the fact that that revenue was being generated

22   from Moniker customers.

23        Q    Why did Mr. Kupietzky disagree?

24        A    You know, he said look that was a corporate

25   decision that we made it's an intra to decision we

163

1   make that money whether it's at Moniker or SnapNames

2   or DomainSponsor so that's the way we've done it and

3   that's the way we're going to leave it.

4        Q    But from your perspective that was not fair

5   to the analysis of the profitability of Moniker.

6        A    It's not that it wasn't fair.  It inflated

7   or gave an impression if you were an outsider and you

8   didn't understand that that one business was a lot

9   more profit than another which was not the case.  If

10   you added those things back to Moniker it creates a

11   different impression of the business.

12        So my thought was as a business leader, you

13   want to try to have the most accurate representation

14   at a strategic level of the business as possible and

15   not that the money wasn't recorded and not how the

16   money was recorded.

17        It was just that you had to do math and go

18   over here and grab it and put it over there and then

19   you had to go over there and grab it and put it over

20   there instead of accounting for it where I thought,

21   you know, from a business perspective it should have

22   been accounted and, you know, I was responsible for

23   those businesses so in a parochial way I wanted them

24   represented in what I thought was an accurate way.

25        Q   Did you receive reports that reallocated

164

1   that information?

2        A   I didn't.  I never -- I know they're

3   available and they're in the system but, you know, on

4   the SnapNames side I certainly was able to see all

5   the Moniker revenue tracked the penny.

6            The other revenue that went to DomainSponsor

7   since I wasn't, you know, getting the benefit of that

8   and it wasn't part of my system, I didn't track.

9        Q   When you were involved in the sale of the

10  Moniker and SnapNames businesses and you wanted to

11  present this accurate portrayal, did you make sure

12  that the business presentation reflected this

13  information?

14       A   Yes.

15       Q   Okay.  So a potential suitor would have seen

16  the accurate information, not the information where

17  for example that money was allocated to DomainSponsor

18  is that correct?

19       A   Right, and again, the information is

20  accurate.  It's just how they -- which business that

21  they allocated it to so you're absolutely correct.

22           In a divestiture we want to represent all of

23  that money as Moniker money because it's generated

24  from Moniker customers.

25       Q   So if I were to look at those divestiture

165

11-8-11%20Cahn%20Case%.    %20Snyder%20Depo%20PAGES%20ROL    20ASCII%20COMPLETE[1]

```
 1   documents I'd be able to see that money as Moniker
 2   money.
 3       A   Yes.
 4       Q   Oh day, and but you're saying in terms of
 5   the company tracking it would show up as domain name
 6   money or SnapName money.
 7       A   That's correct.  The company made a decision
 8   that they were going to track things on an intra
 9   company way different than that.
10       Q   But for purposes of sale of these different
11   coils you believe it was -- it needed to be
12   reallocated?
13       A   It was reallocated.
14       Q   It was reallocated.
15       A   Well for purposes of putting together the
16   sale documents those revenues are in the sale
17   documents.
18       Q   So this was a material fact in terms of the
19   finances of those companies, that warranted this
20   reconsideration.
21       A   Right.
22       MR. DELGADO:  Objection vague and ambiguous.
23       THE WITNESS:  You know, the money and the
24   tracking of the money is there, just the way, you
25   know, and the places it was accounted for, you know,
```
166

```
 1   that money has to do with Moniker customers.  Moniker
 2   customers are obviously going to go with the sale of
 3   Moniker and therefore should be -- you know, it's
 4   tracked according to that.
```

11-8-11%20Cahn%20Case%...   %20Snyder%20Depo%20PAGES%20ROU   J20ASCII%20COMPLETE[1]

5          Q    BY MR. WATNICK:   For how many years?

6          A    I'm not sure however back, you know, the

7     documents went like that but it's my understanding

8     that that's been -- you know, I can say that's the

9     way it's been ever since I got there and my

10    understanding was at least I know in 2009 it was

11    there and I think it was also done that way in 2008

12    but that's speculating.

13         Q    Did Mr. Cahn tell you this tracking problem

14    existed with respect to the Moniker profitability?

15         A    Yes, I think we probably had several

16    conversations about it.  I'm not sure if it was him

17    bringing it to me or me bringing it to him but I know

18    we discussed that when we looked at the overall

19    profitability of the business this part of the

20    business certainly had to be considered.

21         Q    And was this one of Mr. Cahn's complaints,

22    that he wasn't getting credit for the profitability

23    of this business in full?

24         A    Yeah.  I think -- you know, it was almost

25    like two-fold because if you took all the money out

                                                        167


1     of that and gave to it someone else, my concern was a

2     little bit different as an executive because you say

3     well you've used money from these customers on this

4     side of the business which is available but then

5     people became able to say well look at Moniker and

6     it's not very profitable well yes until you added

7     those other pieces back in then the picture changed

8     significantly.

9          So you know, I think -- you know, we wanted

10    to make sure that people were aware that, you know,

11    hey, there had been a couple of elements revenue

12    generating elements of the business that were being

13    credited somewhere else fully credited, but that

14    those needed to be added back into any equation where

15    you judge the profitability of Moniker.

16        Q    And that's what you told Mr. Kupietzky?

17        A    Yes.

18        Q    And Mr. Kupietzky said for purposes of

19    ongoing yearly accounting he's not going to do it.

20        A    That's correct.

21        Q    But then when it came time for you to be

22    tasked with selling the company you made the same

23    presentation to Mr. Kupietzky.

24        A    When it came time to sell the company, you

25    know, those assets which are clear assets of Moniker

                                                        168


1    I don't think there was ever any doubt that that

2    wasn't the case himself were part of the divestiture

3    presentation.

4        Q    Well, in terms of -- what you're saying is

5    Mr. Kupietzky exercised his discretionary authority

6    to allocate those resources elsewhere.

7        A    That's correct.

8        Q    However, when it came time to tell Moniker

9    in order to make Moniker appear more let me start

10   again.

11            However, when it came time to sell Moniker,

12   Mr. Kupietzky agreed that it would be better to

13   provide a more complete and accurate presentation of

14   Moniker's profitability?

15       MR. DELGADO:    Objection.    Assumes facts not in

16   evidence.

17      THE WITNESS: I don't think there was ever a

18 question of whether that money was being generated

19 off Moniker customers. They put it in different

20 buckets that was outside of Moniker when it came time

21 to sell they wanted the complete and full picture of

22 how that was so it was yes placed back into Moniker's

23 financials.

24      Q    BY MR. WATNICK: You would see regular

25 reports about Moniker's performance; is that correct?

169

1      A    That's correct.

2      Q    And you would look at those reports and you

3 realized they needed to be adjusted in some manner.

4      A    Yes. I mean my concerns stemmed from the

5 fact that, you know, you're always trying to get

6 better and more accurate business intelligence.

7           My concern in this matter was don't make a

8 judgment on whether -- on profitability until you've

9 added these two pieces of the business back in.

10      Q    Did you explain to Mr. Kupietzky that your

11 employees needed to be treated fairly by including

12 that business back in when you evaluated the Moniker

13 employees?

14      MR. DELGADO: Objection. Vague and ambiguous.

15      THE WITNESS: It was less so -- well, you know,

16 the morale consideration was always there. It was

17 more of trying to make sure that there was a

18 transparent view of the business.

19           So I thought, you know, if -- you know,

20 flashing forward, if you're going to represent the

21 business that way in a divestiture which is certainly

22 the case, just look at it that way, when you're

23  running it internally.

24      Q   In terms of the value of employees in terms

25  of your value as the general manager of the business

                                                                170

1   you need to consider all that; isn't that correct?

2       A   I think there was -- I think and I remember

3   having just an issue -- not an issue but there was a

4   concern based on the fact that there were some people

5   had -- would say Moniker is unprofitable and that

6   became a situation where he said well how do you know

7   that until you're adding back in those -- and and

8   this is what I found when I got to the company I said

9   well you know there's this impression that the

10  business is entirely unprofitable not you're not

11  counting two of the most important revenue lines for

12  the business.

13      Q   Those some people that you just mentioned in

14  your answer, do they have names?

15      A   It had --

16      Q   Let me ask the question more directly.  I

17  apologize.  Thos some people, one of those names was

18  Jeff Kupietzky, wasn't it?

19      A   Well occasionally he would say that and I'd

20  say let's, you know -- we have to add that, you know,

21  we have to look at that picture completely so yes

22  probably conversation everything's with him on that.

23      Q   Other than Mr. Kupietzky who were the other

24  people who were employing that tack kick i.e. the

25  tactic of saying Moniker was unprofitable because

                                                                171

1   this profitable sector of the business was not

11-8-11%20Cahn%20Case%.   %20Snyder%20Depo%20PAGES%20ROU   .20ASCII%20COMPLETE[1]

2    included?

3         A    I had conversations with the CFO around that

4    time.

5         Q    Who was that?

6         A    Ms. Murray.

7         Q    What did she tell you?

8         A    She said hey that's the way we accounted for

9    it and I said, you know, my concern was not again in

10   the reporting of the numbers but just that on its

11   face the interpretation it would give people without

12   a full understanding.

13        I was concerned hey if that gets to the

14   board without a full vetting that, you know, maybe

15   people come up with the wrong impression.

16        So my concern was more of how is this

17   business interpreted.  You know, there was probably

18   some concern on hey, you know, what effect would it

19   have on employees thinking they're working for an un

20   profitable business and also you want to make good

21   sound business judgments in having everything

22   allocated in the right way.

23        Q    Other than Ms. Murray and Mr. Kupietzky, who

24   were the others who had this approach?

25        A    You know, I don't -- I don't know.

                                                172

1    Obviously if Jeff was portraying this in a company

2    meeting, you would only see the way they had it

3    allocated, so I think the concern was it could be,

4    you know, anybody that was seeing the numbers.

5         Q    That's a good point.  In the company

6    meetings did Mr. Kupietzky portray Moniker as

7    unprofitable because these two revenue lines were --

8      A   I don't know if he was portraying it as

9   unprofitable, but when he portrayed it, these two

10   revenue lines were not included in Moniker.

11      Q   When Mr. Kupietzky presented these

12   presentations to employees Moniker appeared un

13   profitable is that correct?

14      MR. DELGADO:  Objection calls for speculation.

15      THE WITNESS:  I don't remember.  It would have

16   been when -- you know, there are probably points when

17   it was profitable and wasn't but I can tell you that

18   when he did present it these two revenue lines were

19   not included in that overall Moniker performance.

20      Q   Whatever those presentations were from your

21   perspective they were incomplete as to the Moniker

22   profitability.

23      A   Well, in my mind, any decision around

24   Moniker profitability needed to include those two

25   revenue lines.  How they wanted to do the things

173

?

1   intra company despite, you know, I said look if it's

2   going to cause lots of administrative burden and we

3   don't think this is the right way but let's make sure

4   at the senior level as we begin to think about

5   decisions on the business that this is part of the

6   complete picture.

7      Q   And let's not penalize the employees for an

8   internal allocation; is that correct?

9      A   I wouldn't -- you know, I wouldn't

10   want to -- I don't think there was any penalization

11   of the employees for how they allocated the dollars

12   but certainly I think from a morale perspective you

13   would want everybody to understand this business as

14   contributing at a high level.

15       Q   But from your perspective double Moniker --

16   let me start again.

17           From your perspective, did you believe

18   Oversee should penalize any employees based upon this

19   internal allocation?

20       A   No.  I mean I think -- I think the

21   allocation should be -- it is what it is and if you

22   know the line items were tracked and should be

23   tracked accordingly.

24       Q   Let's just say someone's bonus depended upon

25   the profitability of the particular Moniker line.

174

1   would you expect the company to share that

2   information with the employee so he could figure out

3   his bonus?

4       A   If they had a bonus that was attributed like

5   gross profit, they would certainly want to know

6   exactly how that number was determined I would agree

7   with that.

8       Q   How about EBITDA?

9       A   You know, I don't know if we did -- you

10   know, from when I was there, the IBITDA functions

11   just because of the you know accounting vagaries that

12   went in there, so most of the people that we were

13   dealing with on commission plans were handled at the

14   gross profit level hence the credit card discussion.

15       Q   Other than those two areas that we've talked

16   about, can you recall other inaccuracies?

17       A   Again. I wouldn't categorize it as an

18   inaccuracy.  The numbers were accurate.  It was just

19   the -- where they decided to credit the numbers if

EXHIBIT 3

1  William A. Delgado (Bar No. 222666)
2  wdelgado@willenken.com
   Leemore Kushner (State Bar No. 221969)
3  lkushner@willenken.com
   WILLENKEN WILSON LOH & LIEB LLP
4  707 Wilshire Blvd., Suite 3850
5  Los Angeles, CA 90017
6  Tel: (213) 955-9240
   Fax: (213) 955-9250
7
8  Attorneys for Defendants
   OVERSEE.NET, JEFFREY KUPIETZKY,
9  and LAWRENCE NG

10          UNITED STATES DISTRICT COURT
11          CENTRAL DISTRICT OF CALIFORNIA
12

13  MONTE CAHN, an individual,          Case No. CV-11-03800 SVW (AGRx)
14              Plaintiff,              **DECLARATIONS OF CRAIG**
15                                      **SNYDER; WILLIAM A. DELGADO**
                                        **AND ELIZABETH MURRAY IN**
16       v.                             **SUPPORT OF OPPOSITION TO**
17  OVERSEE.NET, a California           **CAHN'S EX PARTE APPLICATION**
18  corporation; JEFF KUPIETZKY, an
    individual, LAWRENCE NG, an         **Complaint Filed: May 3, 2011**
19  individual; and DOES 1 through 10   **Trial Date       January 17, 2012**
20              Defendants.
21
22
23
24
25
26
27
28

DECLARATIONS OF SNYDER, DELGADO AND MURRAY ISO OPP. TO EX PARTE

## DECLARATION OF CRAIG SNYDER

I, Craig Snyder, do hereby declare as follows:

1.      I am over the age of eighteen. I am the General Manager of the Aftermarket and Registrar business units at Oversee.net ("Oversee"), defendant in this matter. I have personal knowledge of the facts stated herein and, if called as a witness, I could competently testify thereto.

2.      I joined Oversee in August, 2009. My job duties place me in charge of two Oversee business segments: the Aftermarket business segment which is comprised of assets of both the Moniker Online Services, LLC and SnapNames.com, Inc. entities and their subsidiaries; and the Registrar business segment which is comprised of the assets of Moniker and its related subsidiaries. Moniker is the business unit that Oversee acquired from Seevast before I joined Oversee, and it is my understanding that this litigation largely concerns Oversee's accounting for Moniker revenues.

3.      I understand that Mr. Cahn's counsel contends that, during my deposition I testified to the existence of two or three separate sets of corporate books and records – essentially implying that Oversee fraudulently accounted for Moniker revenues. That contention is false.

4.      The true facts, as I testified in my deposition, are described below.

5.      I testified that, as General Manager in charge of the Moniker and SnapNames business segments, I asked Oversee management to attribute to Moniker revenue arising from: (i) monetization of Moniker owned-and-operated domain names conducted through Oversee's DomainSponsor monetization platform and (ii) auctions for expiring and deleting auctions conducted through SnapNames. With respect to monetization, the issue arose because DomainSponsor was "monetizing" assets that I viewed as belonging to Moniker. So, while both business units were involved in generating the revenue, I requested that the revenue be attributed to Moniker for purposes of intra-company reporting. With respect to expiring auctions, a similar issue

11.   Finally, no part of my testimony addressed the attribution of Moniker revenue under the 2007 Management Incentive Plan ("MIP"). I have no personal knowledge as to how MIP targets were calculated.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed the 14th day of November, 2011, at *Fort Lauderdale* Florida.

Craig Snyder

**EXHIBIT 4**

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

Case No. CV11-03800 SVW (AGRx)

VIDEO DEPOSITION OF STEPHEN SUE O'NEILL
November 7, 2011

MONTE CAHN,

Plaintiff,

vs.

OVERSEE.NET, a California corporation;
JEFF KUPIETZKY, an individual; LAWRENCE NG,
an individual; and Does 1 through 10,

Defendants.

CERTIFIED COPY

APPEARANCES:

        LEWIS BRISBOIS BISGAARD & SMITH, LLP
        By Sonja Harrington, Esq.
        221 North Figueroa Street
        Suite 1200
        Los Angeles, California  90012
        Appearing on behalf of Plaintiff

        WILLENKEN WILSON LOH & LIEB, LLP
        By Michael C. Lieb, Esq.
        707 Wilshire Boulevard, Suite 3850
        Los Angeles, California  90017
        Appearing on behalf of Defendants

Also Present: Monte Cahn
              Nick Borgia, CLVS

PAGES 1 - 100


BENHYATT
Certified Deposition Reporters
17835 Ventura Blvd. Suite 310 Encino, CA 91316
P 888.272.0022 F 818.343.7119

```
 1      Q     Okay.

 2      A     And that's a big difference.

 3      Q     Back to my original question.

 4      A     Uh-huh.

 5      Q     What was the product council?

 6      A     This was --  It was really an extension

 7   of our weekly meeting.  I will state that that's

 8   my opinion, but --  We had a weekly meeting that I

 9   told you about before where we went over the stats

10   and profits and EBITDA and blah, blah, blah, all

11   the different revenue metrics.  And I believe that

12   this was an extension of this to talk about the

13   different integrations, how we were going to fit

14   all the little pieces of the puzzle together, who

15   was going to own what, so forth and so on, okay.

16      Q     Okay.  Who --  Do you know who came up

17   with the idea of this product council?

18      A     I wasn't privy to that.  If I had to

19   take an educated guess --

20            THE DEPONENT:  Is that allowed?  Are

21   you going to object to this?

22            MR. LIEB:  I haven't heard the answer

23   yet.

24      A     It would be Kupietzky or Lawrence.

25            MR. LIEB:  I'll move to strike on the
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Stephen Rue O'Neill - 11' '2011

1          I, STEPHEN RUE O'NEILL, do hereby

2    certify that I have read the foregoing transcript

3    and that the same and accompanying amendment

4    sheets, if any, constitute a true and complete

5    record of my testimony.

6

7

8                              _____
                               Signature of Deponent
9
                               (  ) No amendments
10                             (  ) Amendments attached

11

12          Subscribed and sworn to before me this

13    _____ day of _____, 2011.

14

15          Notary Public: _____

16          Address: _____

17

18          My commission expires _____

19          Seal:

20

21

22

23

24    TLH

25

Ben Hyatt Certified Deposition Reporters
988.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

209

1    STATE OF COLORADO)

2                        )ss.   REPORTER'S CERTIFICATE

3    COUNTY OF DENVER )

4         I, Tracy L. Harris, do hereby certify that I

5    am a Certified Realtime Reporter, Registered Merit

6    Reporter, and Notary Public within the State of

7    Colorado; that previous to the commencement of the

8    examination, the deponent was duly sworn to

9    testify to the truth.

10        I further certify that this deposition was

11   taken in shorthand by me at the time and place

12   herein set forth, that it was thereafter reduced

13   to typewritten form, and that the foregoing

14   constitutes a true and correct transcript.

15        I further certify that I am not related to,

16   employed by, nor of counsel for any of the parties

17   or attorneys herein, nor otherwise interested in

18   the result of the within action.

19        In witness whereof, I have affixed my

20   signature and seal this 16th day of November,

21   2011.

22        My commission expires July 22, 2013.

23

24                              Tracy L. Harris, CRR, RMR, RPR
                                216 - 16th Street, Suite 650
25                              Denver, Colorado  80202

EXHIBIT 5

# FILED UNDER SEAL

EXHIBIT 6

1  William A. Delgado (Bar No. 222666)
   wdelgado@willenken.com
2  Leemore Kushner (State Bar No. 221969)
3  lkushner@willenken.com
   WILLENKEN WILSON LOH & LIEB LLP
4  707 Wilshire Blvd., Suite 3850
5  Los Angeles, CA 90017
   Tel: (213) 955-9240
6  Fax: (213) 955-9250
7
8  Attorneys for Defendants
   OVERSEE.NET, JEFFREY KUPIETZKY,
9  and LAWRENCE NG

10

11              UNITED STATES DISTRICT COURT

12             CENTRAL DISTRICT OF CALIFORNIA

13

14  MONTE CAHN, an individual,          |  Case No. CV11-03800 SVW (AGRx)
                                        |
15            Plaintiff,                 |
                                        |
16       v.                             |  DEFENDANT OVERSEE.NET'S
                                        |  SEPARATE STATEMENT OF
17                                       |  UNCONTROVERTED FACTS IN
   OVERSEE.NET, a California            |  SUPPORT OF MOTION FOR
18  corporation; JEFF KUPIETZKY, an     |  SUMMARY JUDGMENT
   individual, LAWRENCE NG, an          |
19  individual; and DOES 1 through 10   |
                                        |
20            Defendants.               |
                                        |
21                                       |  DATE:    December 19, 2011
                                        |  TIME:    1:30 p.m.
22                                       |  PLACE:   Crtrm. 6
                                        |
23                                       |
                                        |  Complaint Filed:  May 3, 2011
24                                       |  Trial Date:       January 17, 2012
25

26

27

28

Case 2:11-cv-03800-SVW -AGR   Document 138   Filed 12/14/11   Page 52 of 69   Page ID
#:2628
Case 2:11-cv-03800-SVW -AGR   Document 65   Filed 11/16/11   Page 2 of 5   Page ID #:1486

1    Pursuant to Local Rule 56-1, Defendant Oversee.net hereby submits its Separate

2    Statement of Uncontroverted Facts and Conclusions of Law in support of its Motion

3    for Summary Judgment, or in the Alternative, Summary Adjudication:

4

| **Uncontroverted Facts** | Evidence |
|---|---|
| 1.  Monte Cahn entered into an Employment Agreement ("Employment Agreement") with Oversee.net on December 14, 2007. | 1. Employment Agreement, attached as Exhibit E to the Declaration of Todd Greene, dated November 14, 2011. |
| 2.  The Employment Agreement allowed Cahn to participate in a financial incentive plan called the Oversee 2007 Management Incentive Plan ("MIP"). | 2. Employment Agreement, Section 3(d). |
| 3.  The MIP was divided into three determination periods: a First Determination Period (October 1, 2007-December 31, 2008), a Second Determination Period (January 1, 2009 through December 31, 2009) and a Third Determination Period (January 1,2010 through December 31, 2010). | 3.  MIP, Section 15(e), attached as Exhibit C to the Declaration of Elizabeth Murray, dated November 14, 2011. |
| 4.  The MIP was further divided into four business lines: TrafficClub, Registrar, Domain Sales, and Oversee. | 4. MIP, Schedule A. |
| 5.  The performance targets and baseline awards for each business line for each determination period are set forth in | 5. MIP, Schedule A. |

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | | |
|---|---|---|
| 1 | Schedule A of the MIP. | |
| 2 | 6.  The performance goal for the | 6. MIP, Schedule A. |
| 3 | "Oversee" business line was left as | |
| 4 | "TBD" or "To Be Determined." | |
| 5 | 7.  The TrafficClub performance goals | 8. Murray Decl. ¶¶ 7, 14 and Exhibit D. |
| 6 | were not met for any of the First, Second, | |
| 7 | or Third Determination Periods. | |
| 8 | 8.  The Registrar performance goals were | 9. Murray Decl. ¶¶ 7, 21 and Exhibit D. |
| 9 | not met for any of the First, Second, or | |
| 10 | Third Determination Periods. | |
| 11 | 9.  The Domain Sales performance goals | 10. Murray Decl. ¶¶ 7, 26 and Exhibit D. |
| 12 | were not met for any of the First, Second, | |
| 13 | or Third Determination Periods. | |
| 14 | 10. Section 5(a) of the MIP requires that | 11. MIP, Section 5(a). |
| 15 | Monte Cahn designate the Participants | |
| 16 | under the MIP within the first (15) days | |
| 17 | 11. Monte Cahn never designated the | 12. Greene Declaration, ¶ 3. |
| 18 | Participants for the MIP for any of the | |
| 19 | Determination Periods as required by | |
| 20 | Section 5(a) of the MIP. | |
| 21 | 12. The MIP provides that "Target | 13. MIP, Section 15(u). |
| 22 | EBITDA" with respect to Oversee | |
| 23 | EBITDA "shall be determined from time | |
| 24 | to time by the Board, in consultation with | |
| 25 | Monte Cahn for so long as he is employed | |
| 26 | by the Company." | |
| 27 | 13. Neither the Board of Oversee nor the | 14. Greene Decl., ¶ 4; Deposition |
| 28 | | |

| | |
|---|---|
| Board of ODN Holding Corporation, the parent corporation of Oversee, ever calculated a Target EBITDA for Oversee EBITDA. | Transcript of Jeffrey Kupietzky, taken October 26, 2011 ("Kupietzky Depo."), at 110:4-10 (attached as Delgado Decl. Ex. G). |
| 14. In November 2008, Cahn and Oversee entered into an agreement amending the goals and bonuses under the MIP for Cahn, specifically. | 15. 2008 Amendment (attached as Greene Decl. Ex. F). |
| 15. Under the 2008 Amendment, payment for the MIP's Oversee Business Segment is conditioned upon first receiving a payment under any of the MIP's Moniker Business Segments. | 16. *Id.*, "Interaction with MIP" Section. |

Dated:  November 16, 2011                      WILLENKEN WILSON LOH & LIEB LLP


                                               By:/s/ *William A. Delgado*
                                               William A. Delgado,
                                               Attorneys for Defendants OVERSEE.NET,
                                               JEFFFREY KUPIETZKY, and LAWRENCE
                                               NG

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the Electronic Service List for this Case.

Dated:  November 16, 2011          WILLENKEN WILSON LOH & LIEB LLP


                                   By:/s/ William A. Delgado
                                   William A. Delgado,
                                   Attorneys for Defendants OVERSEE.NET,
                                   JEFFREY KUPIETZKY, and LAWRENCE NG

EXHIBIT 7

# DECLARATION OF ELIZABETH MURRAY

I, Elizabeth Murray, declare as follows:

1.    I am the Executive Vice President and Chief Financial Officer for Oversee.net. I have more than 25 years of experience in financial management, strategic investment and M&A activity, with particular focus on technology and Internet companies. I hold a bachelor's degree in Business Studies from Robert Gordon University in Scotland and I am a Chartered Accountant and Member of the Institute of Chartered Accountants of Scotland. I am familiar with the accounting records of Oversee.net and I am the person ultimately responsible for the reporting of Oversee's financials. All of the matters stated herein are true of my own personal knowledge, and if called upon to testify thereto, I could and would competently so testify.

2.    I understand that counsel for Mr. Cahn claims that Oversee fraudulently maintains two or three inconsistent sets of books and records. There is no fraudulent record-keeping at Oversee. I understand that Mr. Cahn's counsel claim to receive the understanding that there are different books and records from the deposition testimony of Mr. Snyder. I do not know Mr. Snyder's precise testimony on the issue, but he could not have testified truthfully that there are two or three fraudulenty-maintained inconsistent sets of Oversee books and records.

3.    Based on information from counsel, I understand that there are two contentions about the "two or three sets" of books and records.

4.    One contention is that there are separate records for Moniker kept in Florida, which is Moniker's base of operations. In fact, the customer transactions from the Florida-managed website are routinely imported into Oversee's accounting software called Navision. That software is the accounting system used to record all Oversee business transactions in accordance with GAAP. The Oversee GAAP financial statements, along with thousands of pages of backup, have been produced in discovery by Oversee.

5.      The second contention appears to be that, for internal analysis purposes, management allocated certain revenues to DomainSponsor and SnapNames – business segments not covered by the MIP – that could have been attributed to legacy Moniker business segments that are identified in the MIP. This was a judgment call due to the fact that more than one business segment contributed to generating these revenues. However, for purposes of calculating the MIP targets, all of the revenues that Mr. Snyder describes as revenues he wanted to have allocated to Moniker business segments was, in fact, so allocated, and we have produced in discovery spreadsheets (OVER18659-18663) showing how this was done. Despite that allocation, none of the Moniker business segments ever came close to their MIP Performance Goals.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct and that this declaration was executed the 15 day of November, 2011 at Los Angeles, California.

ELIZABETH MURRAY

1

## CERTIFICATE OF SERVICE

2

3   I hereby certify that I electronically filed the foregoing with the Clerk of the Court

4   using the CM/ECF system which will send notification of such filing to the Electronic

5   Service List for this Case.

6

7   Dated: November 16, 2011            WILLENKEN WILSON LOH & LIEB LLP

8

9   By: /s/ William A. Delgado

10              William A. Delgado,
               Attorneys for Defendants OVERSEE.NET,
11      JEFFREY KUPIETZKY, and LAWRENCE NG

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 8

# In The Matter Of:

### Monte Cahn
### v.
### Oversee.net

*Jeff Kupietzky VOL I*

*October 26, 2011*



# BENHYATT
## Certified Deposition Reporters

17835 Ventura Blvd. Suite 310 Encino, CA 91316
P 888.272.0022 F 818.343.7119
www.benhyatt.com

BH CDR Job # **993639**
number of pages 340

*Word Index Included with this Condensed Transcript.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

MONTE CAHN, an individual,

                    Plaintiff,

        vs.                                    Case No.
                                               CV11-03800 SVW
OVERSEE.NET, a California                       (AGRx)
corporation; JEFF KUPIETZKY,
an individual; LAWRENCE NG,
an individual, and Does 1
through 10,

                    Defendants.
_____

DEPOSITION OF JEFF KUPIETZKY

taken at 221 North Figueroa Street, Suite 1100,

Los Angeles, California, commencing at

10:16 a.m., Wednesday, October 26, 2011,

before Nila Webber, CSR No. 4982.

PAGES 1 - 340

Jeff Kupietzky - 10/26/2011

| | | |
|---|---|---|
| 1 | A | Gross profit. |
| 2 | Q | Was knocked up you said? |
| 3 | A | No, Nokta. |
| 4 | Q | Nokta.  I'm sorry. |
| 5 | | For what years? |
| 6 | A | Just for 2010. |
| 7 | Q | So gross profit assigned to what unit? |
| 8 | A | The registrar. |
| 9 | Q | Was there any effort made to determine, in |

10   October of 2010, whether there had been any problems in

11   the assignment of any other registrar revenue in 2009

12   or 2008 similar to the Nokta?

13      A    No, this was a very specific issue that was

14   identifiable.

15      Q    Did Mr. Snyder receive a performance bonus

16   based upon this adjustment in the allocation of Nokta?

17      A    So I didn't characterize it as an adjustment,

18   we recognized the revenue in the December month.

19   Mr. Snyder received his bonus based on the totality of

20   his performance in 2010, so as part of 2010 he got

21   credited for all the months in the year.

22      Q    Did you give Mr. Snyder targets for the

23   registrar business for 2010?

24      A    I did.

25      Q    Do you have a recollection of what those

06:37
06:37
06:38
06:38
06:38
06:38
06:38
06:38
06:38
06:38
06:38
06:38
06:38
06:38
06:38
06:39
06:39
06:39
06:39
06:39
06:39
06:39
06:39
06:39
06:39

Ben Hyatt Certified Deposition Reporters
888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com

Jeff Kupietzky - 10/26/11

1   targets were?

2       A    Not -- not specifically.

3       Q    Ballpark?

4       A    Something on the order of maybe a million

5   dollars in contribution, maybe a half million in

6   contribution, top line of 20 million in revenue, GP of

7   about 4 -- these are order of magnitude, though.

8       Q    Gross profit of around $4 million?

9       A    Might have been more.

10      Q    And the Nokta revenue was 1 million plus in

11  gross profit?

12      A    The changes in December led to an increase in

13  GP for December of a million dollars.  I don't know if

14  exactly all that million was Nokta, because we had more

15  than one financing agreement in place.  But this was a

16  material change in the performance of the registrar.

17      Q    About -- if we assume your recollection of $4

18  million is correct, it's about a 25-percent boost?

19      A    I would characterize it as had we not done

20  this financing agreement with Nokta, then the business

21  unit would have underperformed in 2010.

22          (Exhibit 24 was marked for

23          identification and is attached hereto.)

24  BY MR. WATNICK:

25      Q    24 is an e-mail dated March 26, 2008 from you

Page 303

Jeff Kupietzky - 10/26/2011

```
1              CERTIFIED SHORTHAND REPORTER'S CERTIFICATE

2

3

4

5              The undersigned Certified Shorthand Reporter,

6    licensed by the State of California, does hereby

7    certify:

8

9              That the foregoing deposition was taken before

10   me at the time and place therein set forth, at which

11   time the witness was duly sworn by me;

12             That said deposition was recorded

13   stenographically by me and thereafter transcribed, said

14   transcript being a true copy of my shorthand notes

15   thereof.

16             In witness thereof I have subscribed my name

17   this date:_____.

18

19

20

21

22

23        _____

24        Nila Webber

25        Certificate No. 4982
```

Page 337

EXHIBIT 9

FILED
UNDER
SEAL

EXHIBIT  10

# FILED UNDER SEAL