1 | **LEWIS BRISBOIS BISGAARD & SMITH** LLP
JOHN L. BARBER, SB# 160317
2 |   E-Mail: barber@lbbslaw.com
KENNETH D. WATNICK, SB# 150936
3 |   E-Mail: watnick@lbbslaw.com
SONJA HARRINGTON, SB# 261053
4 |   E-Mail: sharrington@lbbslaw.com
221 North Figueroa Street, Suite 1200
5 | Los Angeles, California 90012
Telephone: 213.250.1800
6 | Facsimile: 213.250.7900

7 | Attorneys for MONTE CAHN

8 |

9 | UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10 |

11 |

| MONTE CAHN, | CASE NO. CV11-03800 SVW (AGRx) |
|---|---|
| Plaintiff, | |
| vs. | The Honorable Stephen V. Wilson |
| OVERSEE.NET, a California corporation; JEFF KUPIETZKY, an individual; LAWRENCE NG, an individual; and Does 1 through 10, | **MONTE CAHN'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW** |
| Defendants. | Date:   December 19, 2011<br>Time:   1:30 p.m.<br>Crtrm.: 6 |
| | Complaint Filed:   May 3, 2011<br>Final Pretrial Conf.: January 9, 2012<br>Trial Date:   January 17, 2012 |

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

Cahn - Memo of Contentions.doc

MONTE CAHN'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

## I.    __INTRODUCTION__

This lawsuit arises out of Defendant Oversee.net's ("Oversee") breach of Monte Cahn's ("Cahn") Management Incentive Plan ("MIP").  The MIP provided that Cahn would be entitled to bonus awards over a three year period if performance goals were achieved in 2008, 2009, and 2010 with respect to three different business segments as well as with respect to Oversee.net's EBITDA.  The first three segments are known as the "Moniker Business Segments", and each of the Moniker Business Segments had pre-determined performance goals for all three determination periods.  The performance goal for the fourth segment, Oversee EBITDA, was labeled "TBD" because overall Oversee budgets and EBITDA goals were not completed at the time the parties negotiated the MIP, and was to be set by the Board, in consultation with Cahn each year.   All of the business segments had pre-negotiated bonus awards ("baseline awards") for each determination period.

Starting immediately as Cahn began his employment term with Oversee, Oversee undertook numerous intentional actions, the purpose of which was to interfere with Cahn's performance under the MIP, and which directly breached the express terms of the MIP.  For example, just over one month after the merger Oversee shut down TrafficClub, moved all of TrafficClub's customers into DomainSponsor, and stopped tracking TrafficClub's performance under the MIP. The closure of TrafficClub eliminated an entire business segment under the MIP and one fourth of the available bonus under the MIP.  Based on these breaches, and the performance of the combined entities of TrafficClub and DomainSponsor, Cahn is entitled to a bonus under the MIP.

Oversee also improperly manipulated Moniker's financials, failing to credit it for revenues earned by Moniker and its employees, and improperly attributing expenses to Moniker that were not incurred by Moniker.  Oversee failed to provide Cahn with any contemporaneous financial accounting or reports of his MIP performance, and the Board failed to certify Moniker's financials during any of the

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   determination periods.  Additionally, Oversee removed Cahn from managerial
2   responsibility  for the business segments that would be the subject of the MIP
3   Performance Goals and then failed to make the requisite amendments to the MIP to
4   account for the material changes made to Cahn's responsibilities and the changes
5   made to the Moniker business segments.

6           Finally, since the performance goals for the Oversee EBITDA segment were
7   "TBD", the Board notified Cahn of the Oversee EBITDA goals each year.  Based on
8   these goals, Cahn reached his performance goals for all three determination periods.
9   Oversee breached the MIP by failing to provide Cahn his baseline awards when
10  Oversee reached its EBITDA goals in 2008, 2009 and 2010.

11

12  **II.    L.R. 16-4.1 – CLAIMS AND DEFENSES**

13          **A.    Claim 1:  Oversee Breached its Contract with Cahn**

14          Cahn has alleged that Oversee has breached the MIP as a result of numerous
15  intentional actions taken by Defendants in direct violation of the explicit terms of
16  the MIP, and its duty to act in good faith under the MIP.

17          **B.    Elements Required to Establish Breach of Contract**

18          To establish its claim for breach of contract, Cahn must prove:

19                  **1.**    *The existence of a contract;*

20                  **2.**    *Plaintiff's performance or excuse for non-performance;*

21                  **3.**    *Defendant's breach; and*

22                  **4.**    *Resulting damage to plaintiff.*

23  (See Judicial Counsel of California Civil Jury Instructions, 303 (2011); *and EPIS,*
24  *Inc. v. Fidelity Guarantee Life Insu. Co.*, 156 F. Supp.2d 1116, 1124 (N.D. Cal.
25  2001).)

26  / / /
27  / / /
28  / / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

Cahn - Memo of Contentions.doc                2
MONTE CAHN'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

C.    **Key Evidence in Support of Cahn's Claim for Breach of Contract.**

Cahn entered into a valid, enforceable, written 2007 Management Incentive Plan on December 14, 2007, which provided Cahn with additional cash compensation upon the attainment of the delineated performance goals.

### 1.    *Oversee's Closure of TrafficClub.*

On January 31, 2008, only one month after the merger, Oversee, without Cahn's consent, shut down TrafficClub and moved all of TrafficClub's customers to DomainSponsor.   Oversee stopped tracking TrafficClub's performance under the MIP.  In fact, up until at least July of 2008, Stephen O'Neill, the former Vice President of Technology for Oversee, testified that Oversee had not developed any technology to track the financial performance of TrafficClub after it was migrated to DomainSponsor.  Further, Cahn repeatedly identified the failure in tracking TrafficClub business revenues, post-closure.

More importantly, the TrafficClub closure was a material change to the Performance Goals of the MIP, had a material and significant effect on Cahn's ability to reach his Performance Goals under the MIP, and was done in contravention of the MIP provision requiring Cahn's written content.  The TrafficClub closure also materially affected Cahn's ability to attain his performance goals under the two additional calculation methods for his awards.  The MIP provides two alternative calculations for achieving his performance awards, entitling Cahn to payment of his award if either one or two of the Moniker segments achieve between 55% - 70% of the goal, and the total Moniker performance is equal to at least 100% of the total Moniker performance goal.  By shutting down TrafficClub, Oversee frustrated Cahn's ability to achieve his performance goals under these two alternative calculations.

Additionally, there is evidence that reflects that Cahn should have received credit for substantial referrals of monetization business to DomainSponsor in 2008, 2009, and 2010.   For example, a March 4, 2008 email confirms that Cahn

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

persuaded a customer "to move all names from Skenzo to DS [Domain Sponsor]" and requested that Oversee "make sure this is tracked accordingly [under the MIP]." This revenue was never attributed to Cahn or Moniker under the MIP.  Cahn has also confirmed numerous other missing account that were not properly credited to Moniker.

### 2.    *Oversee Improperly Manipulated Moniker's Financials.*

Pursuant to the terms of MIP, Oversee was to provide Cahn with the Interim Financial Statements or the Determination Period Financial Statements in order for Cahn to verify Moniker's financial performance.  Oversee failed to provide Cahn with any such financial statements tracking his performance under the MIP during the term of his employment with Oversee.

The MIP also required that the Board certify whether Cahn had attained his goals in each of the three determination periods.  The Board failed to provide any certification, one way or another, as to whether Cahn attained his performance goals under the MIP for any of the three determination periods.  There was a complete failure by Oversee to provide contemporaneous accounting or reporting of Moniker's performance pursuant to the terms of the MIP during the three determination periods.  Oversee's failure to conduct and provide contemporaneous accounting of Moniker created a lack of integrity in Oversee's financial reporting of Moniker's data.

Oversee's questionable financial accounting was confirmed by the testimony of Craig Snyder, Oversee's General Manager in charge of Moniker and SnapNames. Snyder confirmed that Oversee's financial reports and presentations did not accurately reflect the revenues and performance of the Moniker division of Oversee, *i.e.*, the registrar and domain sales business segments of Cahn's MIP.  Snyder confirmed that the financial reports for the Moniker business were "not counting two of the most important revenue lines for the business."  And that "[i]f you added those things back to Moniker it creates a different impression of the business."

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    More importantly, Snyder confirmed that in connection with Oversee's recent effort

2    to sell the Moniker business, Oversee had reallocated these revenues back to the

3    Moniker division.  In addition, Snyder confirmed that Oversee's accounting

4    department improperly assessed phantom "merchant" fees with respect to numerous

5    Moniker transactions.  In fact, for the fourth quarter of 2009, Cahn understands that

6    a substantial portion of the $134,000 in "merchant fees" were phantom expenses

7    intended to reduce the profitability of Moniker's operations.[1]  Snyder also confirmed

8    that Oversee used inflated or incorrect costs of goods sold with respect to certain

9    inventory sales, thus unfairly diminishing the profitability of certain transactions

10   that were the subject of the MIP.  Also, after the closure of TrafficClub, Oversee

11   failed to accurately account for TrafficClub revenues. Since Moniker's registrar

12   costs and revenues did not add up, it created credibility issues with the employees.

13          As further evidence of Oversee's questionable accounting practices relating to

14   the Moniker Business Segments, in February of 2008 Oversee discovered a $1.9

15   million liability as a result of the merger.  Oversee placed this liability on Moniker's

16   books, and took it into account in calculating Cahn's performance under the MIP.

17          Similarly, Oversee's former senior executive confirmed that there were

18   unexplained questions as to the appropriate treatments of approximately $667,0000

19   in Moniker revenue in 2008.   There was also a discrepancy as to over $1 million in

20   Moniker's gross profit in 2010.  In fact, Cahn confirmed that there were numerous,

21   unexplained discrepancies in expenses that were attributed to Moniker.  Oversee's

22   accounting irregularities were effecting Moniker's bonus integrity.

23          Oversee's inconsistent financial calculations and selective reporting of its

24   financial data further demonstrates its unreliable financial reporting.  These facts

25   certainly call into question the documents and information that Oversee has used in

26

27   [1] Snyder also testified that Moniker's Florida office maintained separate data relating to its financial performance than at Oversee's home office in Los Angeles.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  contending that Cahn did not meet his performance goals, including Ex. "D" to the

2  Elizabeth's Murray Declaration in Support of its Summary Judgment.  Oversee's

3  current and former managers admit that the inconsistent treatment of financial

4  records raises questions about the integrity and accuracy of the accounting results.

5              **3.    *Oversee Removed Cahn From Managerial Responsibility.***

6         Concurrent with the MIP, Cahn entered into an employment agreement with

7  Oversee.  The Agreement confirmed that Cahn would serve as the President of

8  Moniker and have the "normal duties, responsibilities, functions and authority as are

9  normally associated with and appropriate for such position."  It provided that Cahn

10  would report directly to Oversee's Chief Executive Officer.  The Agreement, thus,

11  recognized Cahn's managerial responsibilities for the business segments that would

12  be the subject of the MIP Performance Goals.  Additionally, Cahn's 2009

13  performance appraisal confirmed that "[g]iven the uncertainty in the economy, our

14  best hope for success lies in Monte's personal selling expertise."

15         Notwithstanding the foregoing, Oversee removed Cahn from authority for the

16  business segments that were the subject of the MIP.  Oversee's President, Jeff

17  Kupietzky confirmed that, after he reconfigured Cahn's position, Cahn was nothing

18  more than a "glorified salesman".  Kupietzky appointed other individuals to serve as

19  senior executives of the business segments that were the subject of Cahn's MIP.  ".

20              **4.    *Oversee Achieved its Overall EBITDA Goals.***

21         At the time the MIP was executed, the performance goals for the Oversee

22  business segment were "TBD" for all three determination periods.  Pursuant to

23  Oversee's own representations, these goals were to be determined after closing.

24  Specifically, the MIP provides that the Oversee EBITDA goal "shall be determined

25  from time to time by the Board, in consultation with Monte Cahn for so long as he is

26  employed by the Company."

27         Since the performance goals for the Oversee EBITDA segment were "TBD",

28  the Board notified Cahn of the Oversee EBITDA goals each year.  Based on these

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    communicated goals, Cahn reached his Oversee EBITDA performance goals under
2    the MIP for all three determination periods.  Oversee breached the MIP by failing to
3    provide Cahn his baseline awards when Oversee reached its EBITDA goals in 2008,
4    2009 and 2010.

5         **D.      Statement of Oversee's Counterclaims and Affirmative Defenses.**

6         To date, Oversee has not filed an answer to Cahn's Complaint, as a result,
7    without resorting to pure speculation, Cahn is unable to provide any statement on
8    any counterclaims or affirmative defenses that Oversee may intend to pursue.

9         **E.      Anticipated Evidentiary Issues.**

10            **1.**     Cahn's Motion in Limine to exclude any summaries or
11                  compilations based on voluminous records which Ovesee has
12                  failed to produce to Cahn during discovery so that he and his
13                  expert could review the data prior to trial.

14            **2.**     Cahn's Motion in Limine to exclude any parol evidence that
15                  weeks to revise and/or contradict the definitions of "Oversee
16                  EBITDA" and "Target EBITDA" in the MIP.

17            **3.**     Cahn's Motion in Limine to exclude evidence of participants
18                  under the MIP.

19            **4.**     Oversee's Motion in Limine to exclude evidence regarding
20                  Oversee's Board of Directors setting the Oversee EBITDA
21                  performance goal.

22            **5.**     Oversee's Motion in Limine to exclude evidence of any
23                  amendment by the Board of the Directors of Cahn's performance
24                  goals under the MIP.

25            **6.**     Oversee's Motion in Limine to exclude evidence of other
26                  lawsuits.

27            **7.**     Oversee's Motion in Limine to exclude evidence regarding the
28                  compensation of other executives.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

Cahn - Memo of Contentions.doc                     7
MONTE CAHN'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1          **8.**     Oversee's Motion in Limine to exclude undisclosed witnesses.

2     **F.**     **Issues of law.**

3         To prevail on his claim for breach of contract Cahn must establish the

4 existence of a valid contract between Cahn and Oversee.  (*EPIS, Inc. v. Fidelity*

5 *Guarantee Life Insu. Co.*, 156 F. Supp.2d 1116, 1124 (N.D. Cal. 2001).)   Cahn

6 must also demonstrate Oversee's breach of the agreement, which is set forth above.

7 (*Id.*)   Finally, Cahn must establish the damages that he suffered as a result of

8 Oversee's breach of the MIP.  (*Id.*)

9

10 **III.**     **L.R. 16-4.3 Bifurcation of Issues.**

11         Pursuant to the Court's August 29, 2011 Order [Doc. No. 26], the Court has

12 bifurcated all of Cahn's claim except for the first claim for breach of contract.  The

13 parties are only proceeding to trial on Cahn's first claim for breach of the MIP.

14

15 **IV.**     **L.R. 16-4.4 Jury Trial.**

16         A demand for jury trial was requested by Cahn with the filing of his Third

17 Amended Complaint on November 21, 2011 [Doc. No. 87].  Oversee has filed a

18 Motion to Strike Cahn's jury demand.  [Doc. No. 52.]  Oversee claims that through

19 a provision of the Employment Agreement, Cahn has waived his right to jury trial.

20 However, the MIP contains an integration clause, providing that the MIP represents

21 the "entire agreement between the parties hereto with respect to the subject matter

22 contained herein and supersedes all prior agreements or prior understandings,

23 whether written or oral, between the parties relating to such subject matter."  The

24 MIP does NOT provide for any waiver of a right to jury trial in connection with

25 claims, such as the instant claim. Even the Employment Agreement specifically

26 provides for Cahn's participation in the MIP "subject to and in accordance with the

27 terms and conditions of the MIP."  The MIP does not contain a jury waiver

28 provision and does contain a choice of law provision providing for the application of

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

Cahn - Memo of Contentions.doc          8

MONTE CAHN'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1  California law.  California law expressly prohibits a pre-dispute, contractual waiver

2  of the right to a jury trial, such as that requested here by Oversee.  (*See*, *Fin. Tech.*

3  *Partners L.P. v. FNX Ltd*., 2009 U.S. Dist. LEXIS 18657, 1-5 (N.D. Cal. Feb. 24,

4  2009); *see also*, *Grafton Partners L.P. v. Superior Court*, 36 Cal. 4th 944, 967

5  (2005).)

6       The hearing on Oversee's motion is currently set for January 9, 2012 at

7  1:30pm.  [Doc. No. 130.]

8

9  **V.**    **L.R. 16-4.5 Attorneys' Fees.**

10       The MIP does not contain an attorneys' fees provision, as such, Cahn is not

11  claiming any attorneys' fees under the First Cause of Action for Breach of the MIP.

12

13  **VI.**    **L.R. 16-4.6 Abandonment of Issues.**

14       No claims have been abandoned by Cahn at this time.

15

16  DATED: December 19, 2011       JOHN L. BARBER

17                              KENNETH D. WATNICK

18                              SONJA HARRINGTON

                            LEWIS BRISBOIS BISGAARD & SMITH LLP

19

20

21                         By:        */s/ Sonja Harrington*

22                              Sonja Harrington

                            Attorneys for MONTE CAHN

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

MONTE CAHN'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW