# EXHIBIT "1"

# *In The Matter Of:*

## *Monte Cahn*
### *v.*
## *Oversee.net*

### *Jeff Kupietzky VOL I*

### *October 26, 2011*

---



## BENHYATT
### Certified Deposition Reporters

17835 Ventura Blvd. Suite 310 Encino, CA 91316
P 888.272.0022 F 818.343.7119
www.benhyatt.com

BH CDR Job # **993639**
number of pages 340

*Word Index Included with this Condensed Transcript.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

MONTE CAHN, an individual,    )
                              )
            Plaintiff,        )
                              )
    vs.                       )
                              )   Case No.
OVERSEE.NET, a California     )   CV11-03800 SVW
corporation; JEFF KUPIETZKY,  )   (AGRx)
an individual; LAWRENCE NG,   )
an individual, and Does 1     )
through 10,                   )
                              )
            Defendants.       )
                              )
_____

DEPOSITION OF JEFF KUPIETZKY

taken at 221 North Figueroa Street, Suite 1100,

Los Angeles, California, commencing at

10:16 a.m., Wednesday, October 26, 2011,

before Nila Webber, CSR No. 4982.

PAGES 1 - 340

Jeff Kupietzky - 10/26/2011

| | | |
|---|---|---|
| 1 | intent? | 12:30 |
| 2 | A    These words do not reflect the entire body of | 12:30 |
| 3 | conversation we had about how this program was going to | 12:30 |
| 4 | be administered. | 12:30 |
| 5 | Q    Do these words reflect what you believe to be | 12:30 |
| 6 | the intent of the target EBITDA as to Oversee EBITDA? | 12:31 |
| 7 | MR. DELGADO:  Object to the extent that it | 12:31 |
| 8 | calls for a legal conclusion. | 12:31 |
| 9 | THE WITNESS:  What I believe is I wrote that | 12:31 |
| 10 | Oversee EBITDA would be determined from time to time by | 12:31 |
| 11 | the Board.  That's what we defined. | 12:31 |
| 12 | BY MR. WATNICK: | 12:31 |
| 13 | Q    To be determined by the Board when? | 12:31 |
| 14 | A    We didn't specify that. | 12:31 |
| 15 | Q    Would it be determined in 2007 for 2010? | 12:31 |
| 16 | A    I don't believe that was the intent. | 12:31 |
| 17 | Q    Was the intent in 2000 -- let me start again. | 12:31 |
| 18 | Was the intent of these words you used to | 12:31 |
| 19 | determine the Oversee EBITDA for 2010 in 2010? | 12:31 |
| 20 | A    Yes. | 12:31 |
| 21 | Q    Okay.  And you proposed that the Board would | 12:31 |
| 22 | get to determine that Oversee EBITDA; is that correct? | 12:31 |
| 23 | A    Yes. | 12:31 |
| 24 | Q    Okay.  So in 2010, the way you proposed it in | 12:31 |
| 25 | December 13, 2007, is the Board's going to announce a | 12:31 |

Page 99

Jeff Kupietzky - 10/26/2011

```
 1   recommendation -- a decision as to the Oversee EBITDA          12:31
 2   that would then be applied to item four on this.               12:31
 3   management incentive plan; is that correct?                    12:32
 4        MR. DELGADO:  Objection, it assumes facts not             12:32
 5   in evidence and it calls for a legal conclusion.               12:32
 6        THE WITNESS:  This segment, Oversee EBITDA, had           12:32
 7   a quantitative component and a qualitative component.          12:32
 8   The quantitative component needed to have been                 12:32
 9   determined at a date in the future.                            12:32
10   BY MR. WATNICK:                                                12:32
11        Q    Which would be 2010 for 2010?                        12:32
12        A    That was the expectation.                            12:32
13        Q    Right.  And so that quantitative component           12:32
14   would then be communicated to the employee, in this           12:32
15   case Mr. Cahn, so he knew what that goal was.  Isn't           12:32
16   that correct?  At least that's the way you would do it         12:32
17   as a good businessman right?                                   12:32
18        A    As a good business practice, if a goal was           12:32
19   determined, then the goal should be shared with the           12:33
20   employee.  So if a goal was come up with, it obviously         12:33
21   would have been shared with the employee.                      12:32
22        Q    So if the goal was -- let me start again.            12:32
23        Was the TBD determined for 2010?                          12:32
24        A    As it relates to this plan, is that what            12:32
25   you're referring to?                                           12:33
```

Page 100

Ben Hyatt Certified Deposition Reporters
888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com

Jeff Kupietzky - 10/26/2011

| | | |
|---|---|---|
| 1 | Club and Domain Sponsor, in which case they were | 02:20 |
| 2 | handled by their same account manager. Account | 02:20 |
| 3 | managers from Traffic Club were also responsible for | 02:20 |
| 4 | Domain Sponsor and vice versa, those customers were | 02:20 |
| 5 | being managed by the Domain Sponsor team. | 02:20 |
| 6 | Q I was trying to figure out whether there were | 02:20 |
| 7 | any Domain Sponsor employees given the task of trying | 02:20 |
| 8 | to grow the Traffic Club sector for new customers. | 02:20 |
| 9 | A Nobody on the Domain Sponsor team was solely | 02:20 |
| 10 | tasked with growing the Legacy Traffic Club customer | 02:20 |
| 11 | base. | 02:20 |
| 12 | Q What do you mean "Legacy"? | 02:20 |
| 13 | A Those that were previously identified as | 02:20 |
| 14 | coming from Traffic Club and not from some other | 02:20 |
| 15 | source. | 02:20 |
| 16 | Q And there was no one -- if one of these -- | 02:20 |
| 17 | if -- let me start again. | 02:20 |
| 18 | If someone within Domain Sponsor developed a | 02:20 |
| 19 | new customer, what credit would Traffic Club get for | 02:20 |
| 20 | that? | 02:20 |
| 21 | A If it wasn't identified previously as a | 02:21 |
| 22 | Traffic Club customer, it wasn't counted as Traffic | 02:21 |
| 23 | Club customer. | 02:21 |
| 24 | Q So if it wasn't identified as either a Domain | 02:21 |
| 25 | Sponsor customer or a Traffic Club customer, then | 02:21 |

Page 146

1   goals under that business segment?        02:58

2     A    There were a number of negative factors in the   02:58

3   business at the time, I think all of them were   02:58

4   contributing to making it a difficult goal to achieve.   02:58

5     Q   Well, if you cut out the business segment   02:58

6   that's going to be the source of his goal, how's he   02:58

7   going to achieve it?        02:58

8     A    I never said we cut out his business segment.   02:58

9   We consolidated the platform and moved the clients   02:58

10   over.        02:58

11     Q   And you also asked Mr. Cahn to become the VP   02:58

12   of Domain Sponsor?        02:58

13     A    I don't recall discussing a title, although   02:58

14   titles were very important to Mr. Cahn, but I did   02:58

15   remember talking to him about having sales   02:58

16   responsibility for part of the Domain Sponsor business.   02:58

17   But that wasn't in '08.        02:58

18     Q   Titles -- you just said titles were very   02:58

19   important to Mr. Cahn?        02:58

20     A    Yes.        02:58

21     Q   What does that mean?        02:58

22     A    Mr. Cahn, in my opinion, has low self-esteem   02:58

23   and titles were an important part of how he positioned   02:58

24   his self externally.        02:59

25     Q   So that was your psychoanalysis, that Mr. Cahn   02:59

Ben Hyatt Certified Deposition Reporters
888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com

Jeff Kupietzky - 10/26/2011

| | | |
|---|---|---|
| 1 | it calls for a legal conclusion. | 04:02 |
| 2 | BY MR. WATNICK: | 04:02 |
| 3 | Q   Why not? | 04:02 |
| 4 | A   Taking down Traffic Club was a business | 04:02 |
| 5 | response to a partner saying that they didn't | 04:02 |
| 6 | necessarily want to do business with us anymore.  Every | 04:02 |
| 7 | day there's hundreds of decisions and things that | 04:02 |
| 8 | happen in business that you have to respond to. | 04:02 |
| 9 | Q   Did it adversely affect Monte Cahn? | 04:02 |
| 10 | MR. DELGADO:  Objection, calls for speculation. | 04:02 |
| 11 | THE WITNESS:  The business had a lot of | 04:02 |
| 12 | challenges during the three years.  Whether one | 04:02 |
| 13 | specific incident had an impact on his compensation, I | 04:02 |
| 14 | can't comment on that. | 04:02 |
| 15 | BY MR. WATNICK: | 04:03 |
| 16 | Q   Was the closure of -- was it possible to | 04:03 |
| 17 | calculate the business results for Traffic Club and its | 04:03 |
| 18 | growth in 2009 in 2010 after its closure? | 04:03 |
| 19 | A   Yeah. | 04:03 |
| 20 | Q   When did Traffic Club stop having its results | 04:03 |
| 21 | reported to you? | 04:03 |
| 22 | A   Probably mid to late 2008. | 04:03 |
| 23 | Q   So you received regular reports on Traffic | 04:03 |
| 24 | Club throughout 2008? | 04:03 |
| 25 | A   I received regular reports on monetization and | 04:03 |

Page 209

Jeff Kupietzky - 10/26/2011

| | | |
|---|---|---|
| 1 | information from, as well. | 04:28 |
| 2 | Q    And would you receive that interim report | 04:28 |
| 3 | from -- let me start again. | 04:28 |
| 4 | Who in that interim report -- who in that | 04:28 |
| 5 | group provided you with those reports? | 04:28 |
| 6 | A    In what time period? | 04:28 |
| 7 | Q    2009. | 04:29 |
| 8 | A    2009.  I want to say it's probably Amber. | 04:29 |
| 9 | Q    Would you -- | 04:29 |
| 10 | A    Again, I'm sorry, the 2009, we were looking at | 04:29 |
| 11 | monetization without a customer breakdown. | 04:29 |
| 12 | Q    What do you mean without a customer breakdown? | 04:29 |
| 13 | A    We've talked about this.  In 2008 I had a more | 04:29 |
| 14 | granular view in some of the reports we were looking at | 04:29 |
| 15 | such that we could actually track customers by source. | 04:29 |
| 16 | Traffic Club, non-Traffic Club. | 04:29 |
| 17 | As we talked about, by 2009 it was no longer a | 04:29 |
| 18 | material part of the business, so we just tracked it by | 04:29 |
| 19 | an aggregate level. | 04:29 |
| 20 | Q    So by 2009 you stopped tracking by customer? | 04:29 |
| 21 | A    We didn't identify specifically the Traffic | 04:29 |
| 22 | Club customers. | 04:29 |
| 23 | Q    In your e-mail of December 20th to Tigran and | 04:29 |
| 24 | Jeff -- Navach? | 04:29 |
| 25 | A    Navach. | 04:29 |

Page 226

CERTIFIED SHORTHAND REPORTER'S CERTIFICATE


The undersigned Certified Shorthand Reporter, licensed by the State of California, does hereby certify:


That the foregoing deposition was taken before me at the time and place therein set forth, at which time the witness was duly sworn by me;

That said deposition was recorded stenographically by me and thereafter transcribed, said transcript being a true copy of my shorthand notes thereof.

In witness thereof I have subscribed my name this date: ___October 31_____2011


Nila Webber

Certificate No. 4932

**BEN HYATT**
**CERTIFIED DEPOSITION REPORTERS**
**(888) 272-0022**


95

Jeff Kupietzky - 10/26/2011

```
1              DECLARATION UNDER PENALTY OF PERJURY
2
3
4              I declare under penalty of perjury under the
5         laws of the State of California that the foregoing
6         transcription of my deposition testimony is true and
7         correct.
8              Executed at _____ _____, California,
9         this 26 day of _NOVEMBER_____, 2011
10
11
12
13
14              _____
15                        JEFF KUPIETZKY
16
17
18
19
20
21
22
23
24
25
```

Page 336

94

# EXHIBIT "2"

1  **LEWIS BRISBOIS BISGAARD & SMITH LLP**
   JOHN L. BARBER, SB# 160317
2     E-Mail: barber@lbbslaw.com
   KENNETH D. WATNICK, SB# 150936
3     E-Mail: watnick@lbbslaw.com
   SONJA HARRINGTON, SB# 261053
4     E-Mail: sharrington@lbbslaw.com
   221 North Figueroa Street, Suite 1200
5  Los Angeles, California 90012
   Telephone: 213.250.1800
6  Facsimile: 213.250.7900

7  Attorneys for MONTE CAHN

8                    UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10

11  MONTE CAHN,                          CASE NO. CV11-03800 SVW (AGRx)

12            Plaintiff,                 The Honorable Stephen V. Wilson

13      vs.                             **DECLARATION OF MONTE CAHN IN SUPPORT OF MONTE**
14                                      **CAHN'S OPPOSITION TO**
    OVERSEE.NET, a California           **OVERSEE'S MOTION FOR**
15  corporation; JEFF KUPIETZKY, an     **SUMMARY JUDGMENT OR, IN**
    individual; LAWRENCE NG, an         **THE ALTERNATIVE, PARTIAL**
16  individual; and Does 1 through 10,  **SUMMARY JUDGMENT**

17            Defendants.               Date:   December 19, 2011
                                        Time:   1:30 p.m.
18                                      Crtrm.: 6

19                                      Complaint Filed:      May 3, 2011
                                        Final Pretrial Conf.: January 9, 2012
20                                      Trial Date:           January 17, 2012

21

22

23

24

25

26

27

28

4827-1755-4190.1

DECLARATION OF MONTE CAHN

# DECLARATION OF MONTE CAHN

I, MONTE CAHN, declare and state as follows:

1. I am over the age of eighteen (18). I submit this declaration in support of Monte Cahn's Memorandum of Points and Authorities In Support Of His Opposition to Oversee's Motion For Summary Judgment Or, In The Alternative, Partial Summary Judgment. I have personal knowledge of the following facts and, if called as a witness, I could and would competently testify thereto.

2. In 1999, I formed Domain Systems, Inc. d/b/a Moniker.com ("Moniker"). Moniker is a web-based service that provides users the ability to search for, register, manage, monetize, and sell their domain names.

3. I managed and operated Moniker until 2005, at which time Seevast Corp. ("Seevast") purchased Moniker.

4. In 2007, Oversee entered into negotiations with Seevast regarding the purchase of Moniker. I was informed that as a condition to the purchase of Moniker, Oversee wanted to ensure that I would remain with Moniker and join Oversee for at least three years after the acquisition.

5. Oversee offered me an incentive program, which came to be known as the "Management Incentive Plan" ("MIP"). After negotiations, Oversee and I agreed upon the terms of the MIP, a copy of which is attached as Exhibit "4" to the Declaration of Kenneth D. Watnick (the "Watnick Decl.").

6. Under the terms of MIP, I would be able to earn up to $13,000,000 through a goal oriented bonus structure during my three year employment term at Oversee. The bonus structure set forth under the proposed MIP was based on my attainment of certain performance goals in four categories: the Registrar Business Segment, the Domain Sales Business Segment, the TrafficClub Business Segment, and Oversee EBITDA. In reliance on this large, and what was presented to me,

4827-1755-4190.1

DECLARATION OF MONTE CAHN

1  achievable, incentive program, I joined Oversee.

2      7.    The first three segments under the MIP are known as the "Moniker
3  Business Segments". TrafficClub was the business segment of Moniker relating to
4  the monetization of internet domain names through an optimization engine of
5  rotating third party parking/monetization platforms that used feeds from such
6  companies as Google and / or Yahoo and others. Each of the Moniker Business
7  Segments had pre-determined performance goals for all three determination periods.
8  However, the MIP also provided that the Board could amend my performance goals.
9  However, any material amendment or modification to the MIP which would
10  adversely affect me required my written approval.

11      8.    All of the business segments had pre-negotiated bonus awards for each
12  determination period. It was my understanding that these bonuses were funded by
13  the $10 million reduction in Oversee's purchase price for Moniker that was to be
14  applied to my MIP.

15      9.    The performance goals for the Oversee business segment were left
16  "TBD", or to be determined, because overall Oversee budgets and EBITDA goals
17  were not completed at the time we negotiated the MIP. The goal for each
18  determination period was to be set by the Oversee Board of Directors ("Board")
19  during that period, and the Board was to consult with me in setting the goals each
20  year. Oversee's representatives, Jeff Navach, Jeff Kupietzky, and Josh Armstrong,
21  agreed to this procedure. Oversee's representatives confirmed that the Board would
22  set the overall EBITDA goal at the beginning of the year. I was told that my
23  EBITDA goal would be the same as the Company EBITDA goal. During my
24  employment with Oversee, I was not informed of any alternative means of
25  calculating the Oversee EBITDA in the MIP. ..

26      10.    My attainment of the performance goals was to be determined, in good
27  faith, by the Board. In connection with calculating whether the goals had been

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-1755-4190.1

2
DECLARATION OF MONTE CAHN

1  attained, Oversee could not take any action to manipulate Moniker's financials if it

2  would have the effect of preventing my attainment of my goals under the MIP.

3       11.    Under the MIP, Oversee was also required to provide me with the

4  Interim Financial Statements or the Determination Period Financial Statements so

5  that I would be able to verify Moniker's financial performance each year. Oversee

6  failed to provide me with any such financial statements tracking my performance

7  under the MIP during the term of my employment with Oversee. In fact, Oversee

8  failed to provide me with any contemporaneous accounting and tracking of my

9  performance under the MIP.

10      12.    The MIP also required that the Board certify whether I had attained my

11  goals in each of the three determination periods. The Board failed to provide me

12  with any such certification, indicating whether I had attained my performance goals

13  under the MIP for any of the three determination periods.

14      13.    During the same time that I entered my MIP, I also entered into an

15  employment agreement with Oversee. The employment agreement confirmed that I

16  would serve as the President of Moniker. The employment agreement also

17  recognized that I would have managerial responsibilities for the business segments

18  that would be the subject to the performance goals in the MIP, including

19  TrafficClub, Moniker's Registrar and Moniker's Domain Sales.

20      14.    In January of 2008, just over one month after the acquisition, Oversee

21  unilaterally made the decision to shut down TrafficClub, one of the business

22  segments under the MIP. Oversee made this decision without my consent. Oversee

23  then moved all of TrafficClub's customers into DomainSponsor, a similar

24  "competing" business segment to TrafficClub owned by Oversee. After shutting

25  down TrafficClub, which accounted for one quarter of my MIP, Oversee did not

26  make any modifications to my MIP.

27      15.    In 2008, Oversee proposed and prepared a supplemental compensation

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-1755-4190.1

3
DECLARATION OF MONTE CAHN

1 | plan, the 2008 Incentive Compensation Plan ("ICP"). Oversee's in-house counsel,
2 | Todd Greene, drafted the ICP and advised me as to the meaning of the agreement.
3 | Mr. Greene and Mr. Kupietzky, explained that the ICP was not an amendment to the
4 | MIP, it was a supplemental plan that provided me with an alternative incentive
5 | program. It was agreed that I was to be bonused according to whichever plan
6 | provided the greater amount of compensation that year. Mr. Greene assured me that
7 | the ICP did not modify and was not intended to modify any of the existing terms of
8 | the MIP and that the MIP was still in full force and effect.

9 |      16.    After the merger Oversee made numerous accounting mistakes in its
10 | financial tracking and analysis of the Moniker business segments resulting in
11 | significant accounting problems and irregularities for Moniker and for my
12 | performance under my MIP. I would repeatedly bring these mistakes to the
13 | attention of Oversee's senior management, including Lawrence Ng, Jeff Kupietzky,
14 | Jeff Navach, Stacey Peterson and Josh Armstrong. In 2009, I would also bring these
15 | matters to the attention of Craig Snyder and Liz Murray.

16 |      17.    In February 2008, Jeff Navach advised me that during the acquisition
17 | of Moniker from Seevast, Oversee overlooked approximately $1.9 million in
18 | prepaid customer payments for Moniker's registration of domain names. After
19 | discovering this $1.9 liability, Mr. Navach advised me that until the liability was
20 | extinguished I would not receive any credit under my MIP for any domain
21 | registrations that related to these prepaid customer accounts. A true and correct
22 | copy of a February 29, 2008 email that I received from Jeff Navach is attached as
23 | Exhibit "13" to the Watnick Decl.

24 |      18.    I also discovered that Oversee was charging Moniker for fees that were
25 | not actually incurred by Moniker. Oversee was assessing Moniker with a flat
26 | merchant fee for its transactions even though the merchant fees were not actually
27 | being incurred by Moniker. The fees artificially increased costs of goods sold

28 |

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-1755-4190.1

4
DECLARATION OF MONTE CAHN

1 thereby decreasing gross profit.

2       19. Attached as Exhibit "17" to the Watnick Decl. is a true and correct 3 copy of a December 8, 2009 email that I sent to Craig Snyder which confirmed the 4 improper merchant charges.

5       20. In fact, there were numerous, unexplained discrepancies in expenses 6 that were attributed to Moniker, including various bank charges, consulting charges, 7 hosting charges, legal fees, improper charging of bonuses, salaries, healthcare, 8 marketing expenses, tradeshow and traveling expenses. I repeatedly conveyed my 9 objection to these accounting practices to the Senior Management of Oversee, 10 including Jeff Kupietzky, Stacey Peterson, Josh Armstrong and Lawrence Ng. 11 Attached as Exhibit "22" to the Watnick Decl.. is a true and correct copy of an 12 August 7, 2008 email that I sent to Stacey Peterson about these concerns.

13       21. During my tenure at Oversee, Oversee repeatedly claimed that the 14 Moniker business segments were underperforming. These claims did not make 15 sense. Upon further investigation, I realized that Oversee was diverting revenue 16 from Moniker into other divisions of Oversee that were not a part of my MIP, 17 including SnapNames and DomainSponsor, which also affected my performance 18 under the MIP. I voiced my repeated objections to this practice in written and oral 19 communications with numerous representatives of Oversee, including Jeff 20 Kupietzky who was a member of the board at the time that the adjusted goals were 21 presented to myself and the entire management team as well as all employees, Craig 22 Snyder, Jeff Navach, and Stacey Peterson. I was informed that the diversion of 23 Moniker revenue totaled millions of dollars. I am unable to determine the precise 24 amount of the diversion because Oversee repeatedly rejected my requests for 25 information about these practices. Attached as Exhibit "17" to the Watnick Decl. is 26 a true and correct copy of a December 8, 2009 which confirmed my understanding 27 of this diversion of revenues from the Registrar and Domain Sales business

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-1755-4190.1

5
DECLARATION OF MONTE CAHN

1  segments. Attached as Exhibit "20" to the Watnick Decl. is a true and correct copy
2  of a May 11, 2008 email I sent to Jeff Kupietzky regarding the improper accounting
3  of TrafficClub revenue.. Attached as Exhibit "26" to the Watnick Decl. is a true and
4  correct copy of an October 2010 email exchange between me and Craig Snyder
5  relating to the improper diversion of Moniker assets.

6       22.   In 2009 I was informed by Oversee that the Board had modified my
7  performance goals for both the domain sales and registrar business segments. I
8  attended meetings and participated in conferences with management personnel,
9  including Jeff Kupietzky, who was a member of the Board, and Stacey Peterson,
10  during which I was advised that that the performance goal in 2009 for the registrar
11  business was $1.2 million and my capital performance goal for the domain business
12  was (1.9 million). Ex. "8" to the Watnick Decl. is an accurate representation of my
13  recollection of what the approved goals for 2009 were and how they were
14  represented to me.

15       23.   In 2010 I was informed by Oversee that the Board had modified the
16  performance goals for both the domain sales and registrar business segments. I
17  attended meetings and participated in conferences with management personnel,
18  including Craig Snyder, Josh Armstrong, and Elizabeth Murray, during which these
19  revised goals were communicated. The revised performance goal in 2010 for these
20  business segments was $1,488,000. Ex. "9" to the Watnick Decl. is an accurate
21  representation of my recollection of the approved goals for 2010 were and how they
22  were represented to me.

23       24.   In 2009 I was also informed by Oversee that the Board had approved
24  the Oversee EBITDA goal for 2009. I attended meetings and participated in
25  conferences with management personnel, including Jeff Kupietzky and Stacey
26  Peterson, during which I was informed that the goal for 2009 was around $24
27  million. Ex. "8" to the Watnick Decl. is an accurate representation of my

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4827-1755-4190.1                          6
                          DECLARATION OF MONTE CAHN

1 recollection of what the approved goals for 2009 were, and how they were

2 represented to me.

3     25.   In 2010 I was also informed by Oversee that the Board had approved

4 the Oversee EBITDA goal for 2009. I attended meetings and participated in

5 conferences with management personnel, including Jeff Kupietzky, Craig Snyder

6 and Elizabeth Murray, during which I was advised that the goal for 2010 was around

7 $24.2 million Ex. "9" to the Watnick Decl. is an accurate representation of my

8 recollection of the what the approved goals for 2010 and were, and how they were

9 represented to me.

10     26.   Exhibit "6" to the Declaration of Watnick Decl. is a true and correct

11 copy of an October 17, 2008 email that I received from Jeff Kupietzky.

12     27.   Exhibit "10" to the Watnick Decl. is a true and correct copy of a

13 January 24, 2008 email I received from Steve Yeich.

14     28.   Exhibit "15" is a true and correct copy of an October 30, 2009 email I

15 received from Craig Snyder

16     I declare, under penalty of perjury, under the laws of the State of California

17 and of the United States of America that the statements contained in this declaration

18 are true and correct. Executed this 5th day of December, 2011 in Lauderdale by the

19 Sea, Florida.

20                                                    Monte Cahn

21                                                    Monte Cahn

22

23

24

25

26

27

28

LEWI
S
BRISBO    4827-1755-4190.1                       7

# EXHIBIT "3"

# In The Matter Of:

*Monte Cahn*

*v.*

*Oversee.net*

---

*Jeffrey Michael Navach VOL I*

*December 2, 2011*

---



### Certified Deposition Reporters

17835 Ventura Blvd. Suite 310 Encino, CA 91316
P 888.272.0022 F 818.343.7119
www.benhyatt.com

BH CDR Job # **994903**
number of pages 169

*Word Index Included with this Condensed Transcript.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

-------------------------------

MONTE CAHN, an individual,        )

                Plaintiff,    )

          v.               )No.: CV11-03800 SVW(AGRx)

OVERSEE.NET, a California         )

corporation; JEFF KUPIETZKY,    ) -

an individual; LAWRENCE NG,    .)

an individual; and DOES 1       )

through 10,                      )

             Defendants.   )

-------------------------------

PORTIONS OF THIS DEPOSITION ARE

CONFIDENTIAL AND ARE BOUND SEPARATELY

Videotaped deposition of JEFFREY MICHAEL NAVACH,

at 221 N. Figueroa Street, Suite 1200, Los Angeles,

California, commencing at 10:10 a.m., Friday, December

2, 2011, before SUSAN E. LANSING, CSR No. 6355.

PAGES 1 - 178

PAGES 14-16; 19-24 ARE CONFIDENTIAL

Jeffrey Michael Navach - 12/2/2011

1    APPEARANCES OF COUNSEL:

2

3

4        FOR THE PLAINTIFF:

5

6            LEWIS, BRISBOIS, BISGAARD & SMITH, LLP

7            BY: KENNETH D. WATNICK, ESQ.

8            221 N. Figueroa Street, Suite 1200

9            Los Angeles, California 90012

10           (213) 250-1800

11           watnick@lbbslaw.com

12

13

14       FOR THE DEFENDANTS:

15

16           WILLENKEN, WILSON, LOH & LIEB, LLP

17           BY: WILLIAM A. DELGADO, ESQ.

18           707 Wilshire Boulevard, Suite 3850

19           Los Angeles, California 90017

20           (213) 955.8023

21           williamdelgado@willenken.com

22

23

24       ALSO PRESENT: Paul Tassie, Videographer

25                     Todd Greene, Oversee.net

Case 2:11-cv-03800-SVW -AGR  Document 173-1  Filed 12/20/11  Page 25 of 56  Page ID #:3918
Jeffrey Michael Navach - 12/2/2011

Page 27

```
 1       A.   Yes.  Sorry, I just interrupted you.  Sorry.
 2   Yes.
 3       Q.   All of them?
 4       A.   Kupietzky, Armstrong, Ng.  Todd wasn't
 5   necessarily involved in the determination of these
 6   targets specifically in terms of numbers.
 7       Q.   The last target on the Exhibit A is "Oversee."
 8   Do you see that?
 9       A.   I do.
10       Q.   And it refers to "Oversee EBITDA" as "TBD."  Do
11   you see that?
12       A.   I do.
13       Q.   Did you have an understanding going in -- well,
14   let me withdraw that.
15            What does the "TBD" mean to you?
16       A.   "To Be Determined."
17       Q.   Did you have an understanding of how the TBD
18   was going to be determined?
19            MR. DELGADO:  Object to the extent it calls for
20   a legal conclusion.
21            THE WITNESS:  Well, first let's look at what it
22   says in here.  So, "Oversee EBITDA" refers to the
23   performance of the Oversee business.
24       Q.   BY MR. WATNICK:  Can I just interrupt?
25       A.   You may.
```

Jeffrey Michael Navach - 12/2/2011

1     Q.   You were referring to, you just referenced page

2   10, the definition of "Oversee EBITDA" in the MIP?

3     A.   I was scanning page 10, Item (m), as well as

4   page 11 Item (u).

5     Q.   Item (u) being the --

6     A.   "Target EBITDA."

7     Q.   Okay, so, why don't you read back what he was

8   saying before I interrupted, and I apologize.

9               (The record was read as follows:

10       "THE WITNESS:   Well, first let's look at what

11    it says in here.   So, 'Oversee EBITDA' refers to the

12    performance of the Oversee business.")

13         THE WITNESS:   When we, when we were completing

14   the transaction and the Management Incentive Plan we did

15   not yet have a budget set and targets for Oversee at

16   that time.   So, "TBD," To Be Determined, was put in here

17   because those numbers were not known at that time.

18     Q.   BY MR. WATNICK:   What do you mean "budgets"

19   and -- what was the other word you used, "budgets" and?

20     A.   I think I said "targets."

21     Q.   So, you didn't have the budgets and targets for

22   2008, 2009 and 2010?

23     A.   Correct.

24     Q.   And so the intent was, once you got those

25   budgets and targets for 2008, 2009 and 2010, they would

Case 2:11-cv-03800-SVW -AGR Document 173-1 Filed 12/20/11 Page 27 of 56 Page ID
#:3920
Jeffrey Michael Navach - 12/2/2011

Page 29

```
 1    be inserted?

 2              MR. DELGADO:  Objection; calls for speculation,

 3    lacks foundation, calls for a legal conclusion.

 4              THE WITNESS:  To answer your question

 5    specifically, I'm not, I don't recall whether the intent

 6    was to enter them into the document.

 7         Q.   BY MR. WATNICK:  Whether to enter them into the

 8    document or not, the intent was, in 2008 for example,

 9    they were going to set a budget or a target for Oversee?

10         A.   Yes.

11         Q.   That was going to be announced to the company;

12    correct?

13              MR. DELGADO:  Calls for speculation.

14              THE WITNESS:  "Announced to the company" is

15    broad.  It would be known by people including Monte

16    Cahn.

17         Q.   BY MR. WATNICK:  Okay.  And in 2009 the company

18    would set an EBITDA target and it would be known to

19    people such as Monte Cahn?

20         A.   Yes.

21         Q.   Senior Management?

22         A.   Yes.

23         Q.   And in 2010 --

24         A.   Also, yes, correct.

25         Q.   Let me just ask it.  In 2010 there would be a
```

1   disclosure to Senior Management including Mr. Cahn as to

2   the Oversee EBITDA target?

3       A.   You are using a word, "disclosure," which, so,

4   my assumption would be that, yes, Monte Cahn would be

5   aware of what the budget would be.

6       Q.   There would be a communication?

7       A.   Yes, exactly, yes, that's a fair word.

8       Q.   Someone would communicate to Senior Management

9   and Mr. Cahn these are the Oversee EBITDA targets for

10  2008; correct?

11      A.   Yes.

12      Q.   Somebody would communicate to Senior Management

13  and Mr. Cahn these are the Oversee targets for 2009?

14      A.   Yes.

15      Q.   Somebody would communicate to Mr. Cahn -- and

16  when you say "yes," the way I'm describing it --

17      A.   Well, if I was describing it I would say in

18  each of those years, 2008, 2009, 2010, Oversee and the

19  Board would agree upon a budget for that calendar year

20  and Monte Cahn would be aware of what that budget was.

21      Q.   And whatever that budget was, that was the TBD

22  for Oversee?

23           MR. DELGADO:  Objection; calls for a legal

24  conclusion, lacks foundation.

25           THE WITNESS:  The determination of the number

Case 2:11-cv-03800-SVW -AGR   Document 173-1   Filed 12/20/11   Page 29 of 56   Page ID
#:3922
Jeffrey Michael Navach - 12/2/2011

Page 32

1     document, what do you mean?

2         Q.  BY MR. WATNICK:  At least as it related to

3     these performance goals, you understood what was being

4     contemplated.  There was some sort of bonus payout based

5     upon achievement of certain goals?

6         A.  (Witness nods head affirmatively.)

7         Q.  Is that a yes?

8         A.  Yes.

9         Q.  Did you have discussions about this language

10    that says the -- on "Target EBITDA" on page 11 it talks

11    about, "...with respect to Oversee EBITDA as shall be

12    determined from time to time by the Board, in

13    consultation with Monte Cahn for so long as he is

14    employed by the company"?

15            MR. DELGADO:  You're excluding conversations

16    with counsel; right?

17            MR. WATNICK:  Sure, we'll exclude conversations

18    with counsel.

19            THE WITNESS:  Sorry, can you repeat your

20    question, just the first part.  I know where you're

21    referring, say the question again.

22            MR. WATNICK:  Did you have conversations as

23    to -- why don't you read back the question.

24                    (Record read.)

25            THE WITNESS:  This, to my recollection this

Case 2:11-cv-03800-SVW -AGR   Document 173-1   Filed 12/20/11   Page 30 of 56   Page ID
#:3923
Jeffrey Michael Navach - 12/2/2011

Page 33

1    language was developed in conjunction with Monte.

2         Q.    BY MR. WATNICK:    What did you understand the

3    phrase "as shall be determined from time to time by the

4    Board" to mean?

5              MR. DELGADO:    Objection to the extent that it

6    calls for a legal conclusion.

7              THE WITNESS:    What did I understand it to mean?

8              MR. WATNICK:    Yeah.

9              THE WITNESS:    So, what I understood it to mean

10   is that in terms of the target for Monte and the

11   Management Incentive Plan in conjunction with the

12   development of the Oversee budget the Board would work

13   with Monte and coordinate and inform him on what the,

14   what his target was through that process.

15        Q.    BY MR. WATNICK:    Did you understand that this

16   was an option of the Board to disclose a target?

17        A.    When you say "option," what do you mean?

18        Q.    On the one hand saying you can achieve this

19   goal, we're going to determine it in the future when

20   they talked to Monte, but in fact privately with you say

21   we're never going to disclose a target?

22             MR. DELGADO:    Objection; vague, ambiguous,

23   unintelligible.

24             THE WITNESS:    Yeah, you said --

25             MR. WATNICK:    Let me try again.

Case 2:11-cv-03800-SVW -AGR  Document 173-1  Filed 12/20/11  Page 31 of 56  Page ID
#:3924
Jeffrey Michael Navach - 12/2/2011

Page 34

 1            THE WITNESS:  Yeah.

 2       Q.   BY MR. WATNICK:  Did you understand that the

 3   Board had, under this agreement, an obligation to

 4   determine the target?

 5            MR. DELGADO:  Objection to the extent it calls

 6   for a legal conclusion.

 7            THE WITNESS:  It was my belief that the Board

 8   would do that, yes.

 9       Q.   BY MR. WATNICK:  And so the TBD had to be

10   filled in by the Board at some point in time?

11       A.   Yes.

12            MR. DELGADO:  Objection.  Strike that for

13   purposes of interposing the objection.  Calls for a

14   legal conclusion and it's leading.

15            MR. WATNICK:  I'm sorry, what was the second

16   objection?

17                      (Record read.)

18       Q.   BY MR. WATNICK:  So, did you have an

19   understanding as to the Board's obligation with respect

20   to determination of the Oversee EBITDA?

21            MR. DELGADO:  Objection to the extent that it

22   calls for a legal conclusion.

23            THE WITNESS:  Did I have an understanding about

24   the Board's obligation.  Well, I'm not sure that -- that

25   isn't necessarily how I think about it, I just, my

Jeffrey Michael Navach - 12/2/2011

1    that Monte would know that number.

2        Q.    BY MR. WATNICK:   Before the year?

3        A.    Before the year 2008, for instance.

4        Q.    Right.   For year 2008 would you have an

5    expectation that --

6        A.    My expectation would be that at some point in

7    the year Monte would know that.

8        Q.    And would you have the same expectation with

9    respect to 2009?

10       A.    You know, I would generally speaking, with

11   the -- first, I wasn't with the company in 2009 or for

12   very much of 2009, and second, there were adjustments to

13   budgets going on because of financial performance so,

14   you know, there was multiple times where it might have

15   been communicated.

16       Q.    Okay, but within your contemplation when you're

17   preparing this Management Incentive Plan, was it your

18   contemplation that that process would occur on a yearly

19   basis with respect to the Oversee EBITDA being

20   disclosed?

21       A.    Yes.   The contemplation was that these were

22   annual, these were annual targets and, therefore, in

23   order to determine them a goal would have to be set and

24   communicated.

25                            ///

Case 2:11-cv-03800-SVW -AGR   Document 173-1   Filed 12/20/11   Page 33 of 56   Page ID #:3926
Jeffrey Michael Navach - 12/2/2011

Page 63

1    what you previously described; is that correct?

2        A.    Yes.

3        Q.    But beyond that you talk about "Support Domain

4    Acquisition program."  What does that mean?

5        A.    These three, the -- I know you're asking me

6    about that specific bullet.  Those remaining three are

7    discussing various contributions Monte could play with

8    Oversee.  "Support Domain Acquisition program," to my

9    recollection that was referencing our, Oversee's buying

10   domain names for its owned-and-operated portfolio.

11            MR. WATNICK:  I'm sorry, can you read back what

12   he said.

13                        (Record read.)

14       Q.    BY MR. WATNICK:  What do you mean by support

15   for the owned-and-operated names?

16       A.    Monte Cahn, Monte Cahn was, you know, the

17   pioneer in, he was a pioneer in putting values, helping

18   put dollar values on domains and, you know, creating

19   this aftermarket where domain names, premium domain

20   names were being auctioned and sold for large sale

21   prices.  Higher than the registration fee.  So, one of

22   the -- I mentioned earlier that we viewed Monte Cahn as

23   an asset in the deal.  And one of the, one of the areas

24   of expertise that we thought, that we hoped Monte would

25   bring to Oversee, was in his ability to value, find high

Case 2:11-cv-03800-SVW -AGR   Document 173-1   Filed 12/20/11   Page 34 of 56   Page ID #:3027
Jeffrey Michael Navach - 12/2/2011

Page 64

1    value domain names, understand the value of domain

2    names, and be helpful in Oversee in continuing to expand

3    its own portfolio of domain names.

4        Q.    Would those names be also subject to credit

5    under the other segments that we have identified on

6    Exhibit 76 as "Management Incentive Categories and

7    Metrics" document?

8            MR. DELGADO:   Objection to the extent that it

9    calls for speculation or a legal conclusion.

10           THE WITNESS:   Would the names, would the names

11   be part of that, is that what --

12           MR. WATNICK:   Yes.

13           THE WITNESS:   Be part of these other

14   categories?

15           MR. WATNICK:   Yes.

16           THE WITNESS:   Oh, let me think about that for a

17   moment.   The names would not be part of the TrafficClub

18   component.   The, the names might contribute to the

19   Registrar component to the extent that as we acquired

20   names we registered them with our Registrar.   And for

21   Domain Sales there was certainly an opportunity for

22   Oversee to list names that it owned in those auctions as

23   well and contribute to the Domain Sales component.

24       Q.    BY MR. WATNICK:   These three other items that

25   you identified under the "Oversee Performance," did they

Case 2:11-cv-03800-SVW -AGR   Document 173-1   Filed 12/20/11   Page 35 of 56   Page ID
#:3928
Jeffrey Michael Navach - 12/2/2011

Page 106

1     upon closing of the transaction.

2         Q.    The third page of the document is "Integration

3     Team Structure."  Is this a -- who created this

4     structure?

5         A.    Me.

6         Q.    Who appointed the people to the positions?

7         A.    Well, that was a, that was an effort that was

8     sort of a combination of myself, Jeff Kupietzky, I don't

9     recall if, you know, if I talked to Monte about filling

10    in, you know, where some of his team members were filled

11    in.  I can tell from this document, because there's a

12    few pages that are blank still and in process, that this

13    was an early draft of this as well.  So, there's some To

14    Be Determineds still.  So, it was sort of a starting

15    point, kind of working document of who do we think, you

16    know, the key people in the relative functional areas

17    and businesses to, you know, to be responsible for these

18    areas.

19        Q.    In the Program Management section you're

20    identified as a person and a TBD.  Why is that "TBD"

21    there?

22        A.    The "TBD" was there because the intent was to

23    find an additional person to go into that role as well.

24        Q.    Someone within Oversee or outside?

25        A.    It was -- I don't recall, I don't recall if we

1   considered any internal candidates but, you know, the

2   primary thinking was it probably was going to be someone

3   outside of Oversee and Moniker.

4        Q.   Did you get someone in there?

5        A.   Yes, we did.

6        Q.   Who did you get?

7        A.   Steve Yeich.

8        Q.   Next page describes your responsibilities in

9   Program Management and one of them is to track progress

10  towards goals and assist in the removal of obstacles

11  impeding success; is that correct?

12       A.   Yes.

13       Q.   How did you do that?

14       A.   How did I do that?

15       Q.   Was there some sort of tracking memorandum that

16  you prepared?

17       A.   Well, so, first let me go back and clarify a

18  detail on your question.  Upon Steve Yeich's hire my

19  name was not in this box, so.

20       Q.   Okay.

21       A.   So, I was in there until we hired Steve Yeich.

22       Q.   How early in the process was that?

23       A.   How early in the process was it that we hired

24  Steve Yeich?

25       Q.   Yes.  Within -- I'm just trying --

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Case 2:11-cv-03800-SVW -AGR   Document 173-1   Filed 12/20/11   Page 37 of 56   Page ID
#:3930
Jeffrey Michael Navach - 12/2/2011

Page 135

1    three-year bonus structure associated with that

2    transaction as well.  So, there was, I believe this is

3    referencing the fact that there was performance targets

4    that we would have to consider both MIP-related and

5    related to the SnapNames acquisition.

6         "Impact on MIP."  That's suggesting does, does

7    the creation of this model fundamentally make, have any

8    changes to the MIP itself which is where I'm saying no.

9    So, that's what I'm referencing there, those items.

10        Q.   Did the legacy bonus problem with SnapNames

11   involve individuals getting bonuses?

12        MR. DELGADO:  Objection to the extent that it

13   calls for speculation.

14        THE WITNESS:  I don't recall how it was

15   structured because that acquisition was done before I

16   joined.  There was a payout to, to the, to, I believe

17   there was a payout to an entity and there was members

18   who were in that entity.

19        MR. WATNICK:  Okay.  Let me show you what we

20   marked as Exhibit 104.

21        Q.   Exhibit 104 is a Moniker Integration Weekly

22   Status Meeting document; is that correct?

23        A.   Yes, it is.

24        Q.   And you see --

25        A.   We can see Steve Yeich joined within a month.

Case 2:11-cv-03800-SVW -AGR  Document 173-1  Filed 12/20/11  Page 38 of 56  Page ID
#:3931
Jeffrey Michael Navach - 12/2/2011

Page 136

1        Q.   So, does this refresh your recollection as to

2    the general time frame when Steve Yeich joined the

3    company?

4        A.   Yes, it does.

5        Q.   And does it refresh your recollection where you

6    moved out of that Program Management role?

7        A.   Yes, it does.

8        Q.   And so by the end of January 2008 you were not

9    occupying the Program Management role for the Moniker

10   integration?

11       A.   Correct.

12       Q.   Would you be copied on these integration

13   reports though?

14       A.   I believe I was.  I was still, you know,

15   providing some oversight and support.

16       Q.   You were working, on page 3 of the document,

17   you were working to integrate the TrafficClub business

18   into DomainSponsor that's --

19       A.   Sorry, which page did you say?

20       Q.   231.  "Steve Yeich and Jeff Navach in Florida

21   next week"?

22       A.   Yes.

23       Q.   You were working on the migration of

24   TrafficClub?

25       A.   I was not working on the migration of

STATE OF CALIFORNIA        )  ss:

COUNTY OF ORANGE           )

I, SUSAN E. LANSING, C.S.R. No. 6355, a Certified Shorthand Reporter for the State of California, do hereby certify:

That, prior to being examined, JEFFREY MICHAEL NAVACH, was by me duly administered an oath to tell the truth, the whole truth, and nothing but the truth;

That the deposition of the witness in this proceeding was taken down by me in stenotype at the time and place therein named and thereafter reduced to typewriting by computer-aided transcription under my direction.

I further certify that I am neither counsel for nor related to any party to said action nor in any way interested in the outcome thereof.

WITNESS my hand this 13th day of December, 2011, at Seal Beach, California.

_____

SUSAN E. LANSING, CSR NO. 6355

169

# EXHIBIT "4"

# *In The Matter Of:*

## *Monte Cahn*
## *v.*
## *Oversee.net*

---

## *Stacey Peterson VOL I*

## *December 1, 2011*

---



# BENHYATT
## Certified Deposition Reporters

17835 Ventura Blvd. Suite 310 Encino, CA 91316
P 888.272.0022 F 818.343.7119
www.benhyatt.com

BH CDR Job # **995319**
number of pages 198

*Word Index Included with this Condensed Transcript.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

--------------------------------

MONTE CAHN, an individual,       )

            Plaintiff,       )

          v.               )No.: CV11-03800 SVW(AGRx)

OVERSEE.NET, a California        )

corporation; JEFF KUPIETZKY,     )

an individual; LAWRENCE NG,      )

an individual; and DOES 1        )

through 10,                      )

          Defendants.      )

--------------------------------


Videotaped deposition of STACEY PETERSON,
at 221 N. Figueroa Street, Suite 1200, Los Angeles,
California, commencing at 10:22 a.m., Thursday, December
1, 2011, before SUSAN E. LANSING, CSR No. 6355.


PAGES 1 - 198

```
 1    APPEARANCES OF COUNSEL:

 2

 3

 4       FOR THE PLAINTIFF:

 5

 6          LEWIS, BRISBOIS, BISGAARD & SMITH, LLP

 7          BY: KENNETH D. WATNICK, ESQ.

 8          221 N. Figueroa Street, Suite 1200

 9          Los Angeles, California 90012

10          (213) 250-1800

11          watnick@lbbslaw.com

12

13

14       FOR THE DEFENDANTS:

15

16          WILLENKEN, WILSON, LOH & LIEB, LLP

17          BY: MICHAEL C. LIEB, ESQ.

18          707 Wilshire Boulevard, Suite 3850

19          Los Angeles, California 90017

20          (213) 955.8023

21          mlieb@willenken.com

22

23

24       ALSO PRESENT: Paul Tassie, Videographer

25
```

1    reference to a TrafficClub business segment?

2        A.    Right, as defined in this agreement.

3        Q.    Right.  Were you given a responsibility --

4    well, let me start again.

5             How long did the integration of TrafficClub

6    into DomainSponsor take?

7        A.    I don't recall.  I don't know.

8        Q.    Do you recall that within months a decision had

9    been made to eliminate the TrafficClub name?

10       A.    I, I can't recall specifically eliminating the

11   name.  Let me clarify.  I did not -- I tracked Oversee's

12   business segments, not the business segments defined in

13   this Management Incentive Plan.

14       Q.    Did you track the TrafficClub -- well, turn to

15   page 12.  If you go back, go back one page.

16       A.    So, not 2429 but --

17       Q.    2428, I apologize.

18       A.    Yes.

19       Q.    Page 12 of the Management Incentive Plan.  Do

20   you see that?  And you see there's a definition of the

21   "TrafficClub business segment"?

22       A.    Right.

23       Q.    Item (z)?

24       A.    Uh-huh.

25       Q.    Is that a yes?

Ben Hyatt Certified Deposition Reporters
888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com

```
1        A.    Yes.

2        Q.    And there's also "TrafficClub Customers"?

3        A.    Yes, I see that.

4        Q.    Okay.  Did you ever track the TrafficClub

5   business sector -- let me start again.

6              Did you ever track the TrafficClub business

7   segment in 2008?

8        A.    Not -- I didn't.

9        Q.    Did anyone in your department under your

10  supervision track the TrafficClub business segment?

11       A.    Not to my knowledge, no.  Not specifically that

12  business segment.

13       Q.    If you turn to page 2426.

14       A.    Uh-huh.

15       Q.    You see there's a reference to a "Gross

16  Profit"?

17       A.    Yes.

18       Q.    And there's a definition, "means total revenues

19  from customers of the TrafficClub business segment less

20  all cost of goods...," and it continues on.  Do you see

21  that?

22       A.    Yes, uh-huh.

23       Q.    Did you track the total revenues from customers

24  of the TrafficClub business segment in 2008?

25       A.    Not separately, no.
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

STATE OF CALIFORNIA        )   ss:

COUNTY OF ORANGE           )


        I, SUSAN E. LANSING, C.S.R. No. 6355, a Certified

Shorthand Reporter for the State of California, do

hereby certify:

        That, prior to being examined, STACEY PETERSON, was

by me duly administered an oath to tell the truth, the

whole truth, and nothing but the truth;

        That the deposition of the witness in this

proceeding was taken down by me in stenotype at the time

and place therein named and thereafter reduced to

typewriting by computer-aided transcription under my

direction.

        I further certify that I am neither counsel for nor

related to any party to said action nor in any way

interested in the outcome thereof.

        WITNESS my hand this 13th day of December, 2011, at

Seal Beach, California.




                        _____

                        SUSAN E. LANSING, CSR NO. 6355

193

# EXHIBIT "5"

# In The Matter Of:

## Monte Cahn
### v.
## Oversee.net

### Stephen Rue O'Neill VOL I

### November 7, 2011



### BENHYATT
Certified Deposition Reporters

17835 Ventura Blvd. Suite 310 Encino, CA 91316
P 888.272.0022 F 818.343.7119
www.benhyatt.com

BH CDR Job # **994494**
number of pages 200

*Word Index Included with this Condensed Transcript.*

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

Case No. CV11-03800 SVW (AGRx)

VIDEO DEPOSITION OF STEPHEN RUE O'NEILL
November 7, 2011

MONTE CAHN,

Plaintiff,

vs.

OVERSEE.NET, a California corporation;
JEFF KUPIETZKY, an individual; LAWRENCE NG,
an individual; and Does 1 through 10,

Defendants.

_____

APPEARANCES:

        LEWIS BRISBOIS BISGAARD & SMITH, LLP
        By Sonja Harrington, Esq.
        221 North Figueroa Street
        Suite 1200
        Los Angeles, California  90012
        Appearing on behalf of Plaintiff

        WILLENKEN WILSON LOH & LIEB, LLP
        By Michael C. Lieb, Esq.
        707 Wilshire Boulevard, Suite 3850
        Los Angeles, California  90017
        Appearing on behalf of Defendants

Also Present: Monte Cahn
              Nick Borgia, CLVS

PAGES 1 - 200

Stephen Rue O'Neill - 11/7/2011

```
 1              Pursuant to Notice and the Colorado

 2    Rules of Civil Procedure, the video deposition of

 3    STEPHEN RUE O'NEILL, called by Plaintiff, was

 4    taken on Monday, November 7, 2011, commencing at

 5    9:33 a.m., at 216 - 16th Street, Suite 650,

 6    Denver, Colorado, before Tracy L. Harris,

 7    Certified Realtime Reporter, Registered Merit

 8    Reporter, and Notary Public within and for the

 9    State of Colorado.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 2

200

1    STATE OF COLORADO)

2                    )ss.    REPORTER'S CERTIFICATE

3    COUNTY OF DENVER )

4        I, Tracy L. Harris, do hereby certify that I

5    am a Certified Realtime Reporter, Registered Merit

6    Reporter, and Notary Public within the State of

7    Colorado; that previous to the commencement of the

8    examination, the deponent was duly sworn to

9    testify to the truth.

10       I further certify that this deposition was

11   taken in shorthand by me at the time and place

12   herein set forth, that it was thereafter reduced

13   to typewritten form, and that the foregoing

14   constitutes a true and correct transcript.

15       I further certify that I am not related to,

16   employed by, nor of counsel for any of the parties

17   or attorneys herein, nor otherwise interested in

18   the result of the within action.

19       In witness whereof, I have affixed my

20   signature and seal this 16th day of November,

21   2011.

22       My commission expires July 22, 2013.

23

24                   Tracy L. Harris, CRR, RMR, RPR
                     216 - 16th Street, Suite 650
25                   Denver, Colorado  80202

**212**

# EXHIBIT "6"

| | |
|---|---|
| From: | Monte Cahn |
| Sent: | Monday, May 12, 2008 5:10 PM |
| To: | Jeff Kupietzky |
| Cc: | Jeff Navach |
| Subject: | Re: domainsponsor credit |

I am aware of the spiff, however, not everyone started using the leads@oversee system until end of march.  Don Watters should also be keeping track of all our referrals and then revenue should be easier to track.  Also the MIP started in October 2007 not Jan and we said we do something about the skenzo rev share reduction and unexpected cut off which killed Dec and Jan.

Thanks
Monte Cahn

Founder / CEO
Moniker.com
Monte@moniker.com
954-861-3500

Moniker.com is the first and only provider of Domain Asset Management

Domain registrations, Live and extended domain auctions, domain sales, acquisitions, appraisals and escrow services

Sent from my BlackBerry, Please excuse any typos

----- Original Message -----
From: Jeff Kupietzky
To: Monte Cahn
Cc: Jeff Navach
Sent: Sun May 11 23:14:56 2008
Subject: RE: domainsponsor credit

Monte,

The MIP is to be calculated in January 2009.  I believe we can do a pacing report at the end of June and see where we're at for the first half of the year.  We're not sending any payments back for internal portfolios - they are all tracked, just kept within the company's other portfolios.  As for the team and commissions, we set up a spiff plan that would award them referral credit for each domain referred.  I'll check with Rob and Victor if they processed those yet since February 5 when we cut over.


Thanks

Jeff


-------
From: Monte Cahn

MCAHN000822

92

Sent: Sunday, May 11, 2008 7:23 AM
To: Jeff Kupietzky
Subject: domainsponsor credit

Jeff,

Want to make sure we are being tracked and credited properly for the parking revenue we are
sending as a result of the trafficclub conversion and our own accounts now on DS.  I have not
seen any payments come to us as a company from DS so I am figuring that this is being held
internally?  Also, my team has referred a ton of domains, customers, and traffic to Don
Watters and crew since January so we should be making up the gap on parking there.


How do we sort through this and check so it applies towards MIP


Best Regards,

Monte Cahn

Founder / President

Moniker.com is the world leader in Domain Asset Management including Domain Auctions & Sales,
Escrow, Appraisal, Monetization, Registration, Brand Protection, Acquisition, and Portfolio
Management.

Toll Free: 1-800-688-6311

O: 954-984-8445

F: 954-969-9155

ICQ: 292961812

MSN: moniker-man@hotmail.com

AIM/Yahoo: MonikerDotCom

MCAHN000823

# EXHIBIT "7"

Moniker.com is the world leader in Domain Asset Management including Domain Auctions & Sales, Escrow, Appraisal, Monetization, Registration, Brand Protection, Acquisition, and Portfolio Management.

Toll Free: 1-800-688-6311

O: 954-984-8445

F: 954-969-9155

ICQ: 292961812

MSN: moniker-man@hotmail.com <mailto:moniker-man@hotmail.com>

AIM/Yahoo: MonikerDotCom

From: Jeff Kupietzky [mailto:jkupietzky@oversee.net]
Sent: Tuesday, March 04, 2008 3:01 PM
To: Monte Cahn
Cc: Lawrence Ng
Subject: RE: mike berkens moving all names from skenzo to DS

Sounds great.  I expect with the promotion we should get a lot of these.

Jeff

From: Monte Cahn [mailto:monte@corp.moniker.com]
Sent: Tuesday, March 04, 2008 11:50 AM
To: Jeff Kupietzky
Cc: Lawrence Ng
Subject: mike berkens moving all names from skenzo to DS

We got mike to move all names from Skenzo to DS....want to make sure this is tracked accordingly

We will push a ton of others over.

Best Regards,

Monte Cahn

Founder / CEO

3

OVER001708