1  William A. Delgado (Bar No. 222666)
   wdelgado@willenken.com
2  Leemore Kushner (State Bar No. 221969)
3  lkushner@willenken.com
   WILLENKEN WILSON LOH & LIEB LLP
4  707 Wilshire Blvd., Suite 3850
5  Los Angeles, CA 90017
   Tel: (213) 955-9240
6  Fax: (213) 955-9250
7
8  Attorneys for Defendants
   OVERSEE.NET, JEFFREY KUPIETZKY,
9  and LAWRENCE NG
10

11              **UNITED STATES DISTRICT COURT**
12              **CENTRAL DISTRICT OF CALIFORNIA**
13

14  MONTE CAHN, an individual,        | Case No. CV11-03800 SVW (AGRx)
                                       |
15              Plaintiff,             |
                                       | **REDACTED VERSION OF**
16        v.                           | **DEFENDANT OVERSEE.NET'S**
                                       | **MEMORANDUM OF**
17                                     | **CONTENTIONS OF FACT AND**
18  OVERSEE.NET, a California          | **LAW**
    corporation; JEFF KUPIETZKY, an    |
19  individual, LAWRENCE NG, an        |
    individual; and DOES 1 through 10  |
20                                     |
21              Defendants.            |
                                       | Complaint Filed:    May 3, 2011
22                                     | Pretrial Conf. Date: January 9, 2012
                                       | Trial Date:         January 17, 2012
23                                     |
24                                     |
25                                     |
26  ─────────────────────────────────  |
27
28

# <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

I.   INTRODUCTION……………………………………………………...1

II.  CLAIMS AND DEFENSES (LOCAL RULE 16-14.1)………………………2

   A.   Summary Statement of Plaintiff's Claim for Breach of Contract……………2

   B.   Elements of Plaintiff's Claim for Breach of Contract……………………2

   C.   Summary of Defendant's Evidence to Rebut Plaintiff's Claim………………4

      1.   THE PERFORMANCE GOALS FOR THE MONIKER BUSINESS
           SEGMENTS WERE NOT MET………………………………………4

         a.   Moniker Did Not Meet Its Performance Goals Because
              They Were Set Based on Cahn's Aggressive 2007
              Projections, But the Market Experienced a Significant
              Downturn Beginning in 2008………………………………6

         b.   There are No Accounting "Irregularities" in the Oversee
              Account Records……………………………………………8

         c.   Oversee Did Not Impede Moniker from Reaching Its Goals………9

      2.   CAHN CANNOT RECOVER UNDER THE MIP OVERSEE BUSINESS
           SEGMENTS………………………………………………………11

         a.   The MIP Oversee Performance Goals Are Unenforceable………11

         b.   Even if the Oversee "TBD" Performance Goal Were
              Enforceable, Cahn Still Would Not Be Entitled to Payment……..12

         c.   The ICP Amended the MIP To Eliminate the Oversee
              EBITDA Goals in 2008 and 2009…………………………………15

   D.   Summary of Defendant's Affirmative Defenses……………………………16

      1.   ELEMENTS OF DEFENDANT'S AFFIRMATIVE DEFENSE………………16

      2.   SUMMARY OF DEFENDANT'S EVIDENCE IN SUPPORT OF ITS
           AFFIRMATIVE DEFENSES…………………………………………16

   E.   Identification of Anticipated Evidentiary Issues………………………16

   F.   Identification of Issues of Law……………………………………17

III. BIFURCATION OF ISSUES (LOCAL RULE 16-4.3)……………………17

IV.   JURY OR BENCH TRIAL (LOCAL RULE 16-4.4)……………………………18

V.    ATTORNEYS' FEES (LOCAL RULE 16-4.5)……………………………..18

VI.   ABANDONMENT OF ISSUES (LOCAL RULE 16-4.6)………………..…….18

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

### **Federal Cases**

4

*Granite State Ins. Co. v. Smart Modular Techs., Inc.*,

5    76 F.3d 1023 (9th Cir. 1996) ...................................................................... 18

6

*Okura & Co. (America), Inc. v. Careau Group*,

7    783 F. Supp. 482 (C.D. Cal. 1991) ............................................................ 18

8

*Stevens v. Mavent, Inc.*,

9    2008 WL 2824956 *2 (C.D. Cal. July 21, 2008) ................................. 3, 12

10

11

### **State Cases**

12

*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.*,

13    2 Cal. 4th 342 (1992) ................................................................................. 15

14

*Green v. Travelers Indemnity Co.*,

15    185 Cal. App.3d 544 (1986) ...................................................................... 16

16

*Ladas v. Cal. State Auto. Assoc.*,

17    19 Cal. App. 4th 761, 23 Cal. Rptr. 2d 810 (1993) ................................... 12

18

*MacDonald v. John P. Scripps Newspaper*,

19    210 Cal. App. 3d 100, 257 Cal. Rptr. 473 (1989) ....................................... 3

20

*Neisendorf v. Levi Strauss & Co.*,

21    143 Cal. App. 4th 509 (2006) ..................................................................... 3

22

*People v. Ledesma*,

23    16 Cal.4th 90 (1997) .................................................................................. 13

24

*US Ecology, Inc. v. State*,

25    129 Cal. App. 4th 887 (2005) .................................................................... 11

26

*Wolf v. Walt Disney Pictures and Television*,

27    162 Cal. App. 4th 1107 (2008) .................................................................. 14

28

**Rules**

LOCAL RULE 16-4.1 ................................................................................. 2

LOCAL RULE 16-4.3 ............................................................................... 17

LOCAL RULE 16-4.4 ............................................................................... 18

LOCAL RULE 16-4.5 ............................................................................... 18

LOCAL RULE 16-4.6 ............................................................................... 18

**Other Authorities**

1A Sutherland,
    *Statutory Construction* (5th ed.1993) pp. 763–769)................................. 14

## **MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

## **I.      INTRODUCTION.**

This lawsuit centers on a financial incentive plan called the Oversee.net 2007 Management Incentive Plan ("MIP") established by Oversee.net ("Oversee") for employees who primarily provided services to its wholly-owned subsidiary DomainSystems, Inc. (d/b/a Moniker.com, "Moniker"). The MIP was "designed to reward, through additional cash compensation, the Participants for significant contributions toward the continued or improved profitability and growth of [Oversee]." MIP, Section 1. The MIP is divided into four business segments (TrafficClub, Registrar, Domain Sales, and Oversee) and three determination periods (spanning from October 1, 2007 to December 31, 2010).

Consistent with its design, in order to trigger payment of the "additional cash compensation," the Moniker Business Segments (TrafficClub, Registrar, and Domain Sales) had to reach predetermined performance goals in each of the determination periods, as set forth in Schedule A of the MIP. The performance goal for the fourth business segment, Oversee, was not predetermined but, rather, left as "TBD" or "to be determined." Accordingly, it is easiest to analyze this case in two parts: what happened with respect to the Moniker Business Segments and what happened with respect to the Oversee Business Segment.

As is evident from his various complaints, Cahn does not truly believe that the Moniker Business Segments achieved the necessary performance so as to trigger a payment under the MIP in any Determination Period.[1] As Cahn himself conceded back in 2008, Moniker's performance was poor and certainly **not** contributing to the

---

[1]  In a recently-filed Opposition to Oversee's Motion for Summary Judgment, Cahn argued—for the first time—that the performance goals for the Moniker Business Segments were downwardly adjusted and that he met the lowered targets in 2009 and 2010. As will be explained in Oversee's Reply Memorandum (to be filed December 23, 2011), that argument is refuted by Cahn's own complaints, his own expert, and Cahn's deposition testimony.

"continued or improved profitability" of Oversee.  Rather, Cahn argues that Oversee impeded his ability to achieve the MIP performance goals and used accounting gimmicks to decrease Moniker's revenue and increase its expenses.  These contentions are simply untrue.  The reality is this: at the end of 2007, desperate to promote Moniker's sale to Oversee, Cahn provided Oversee with aggressive performance projections and then had little choice but to agree to the use of those projections as the basis for setting the MIP performance goals.

With respect to the fourth business segment (Oversee), it is evident from the MIP, which sets the performance goal for this segment as "TBD," that the parties never explicitly identified the target that needed to be achieved in order to trigger payment.  As a result, with respect to this fourth segment, the MIP merely represents an indefinite offer that cannot be enforced.  To rebut this inevitable conclusion, Cahn offers a bevy of arguments (e.g., that the MIP is a contract and not an offer; that the implied covenant of good faith and fair dealing limited the Board's absolute discretion in the setting of the Oversee performance goals; and that the Board actually did set the Oversee performance goals), all of which are incorrect as a matter of fact or law.

At its heart, this is a simple lawsuit.  Participants under the MIP would be provided a bonus **if and only if** Moniker did exceedingly well and/or Oversee did exceedingly well.  Both companies did poorly.  As a result, no performance goals were met, and no MIP bonuses were paid.

## II.   CLAIMS AND DEFENSES (LOCAL RULE 16-4.1).

### A.   Summary Statement of Plaintiff's Claim for Breach of Contract.

At issue is a single claim for breach of contract.  Cahn alleges that Oversee has failed to make payments that are owed to him pursuant to the MIP.

### B.   Elements of Plaintiff's Claim for Breach of Contract.

The MIP is not a contract.  It is a bonus plan or, more specifically, a financial performance plan.  "[E]ligibility for bonus payments is properly determined by the

1   bonus [plan's] specific terms and general contract principles." *Neisendorf v. Levi*
2   *Strauss & Co.*, 143 Cal. App. 4th 509, 523 (2006).  "California courts have consistently
3   characterized bonus and profit sharing plans as constituting an offer of the stated
4   benefits in exchange for the service of an employee, and **upon the employee's**
5   **completion of the required services in accordance with the terms of the plan**, a
6   binding contract is formed under which the employer is obligated to deliver the
7   promised benefits." *Id.* (emphasis added).

8         Here, the specific terms of the plan provided that "[t]he Plan is designed to
9   reward…the Participants for significant contributions toward the continued or
10  improved profitability and growth of the Company."  MIP, Section 1.  Consistent with
11  its stated intent, the promised benefits (i.e., Baseline Awards) are expressly conditioned
12  upon the meeting of various Performance Goals in each Determination Period.  MIP,
13  Section 4 and Schedule A.  The MIP also required that Cahn identify participants in the
14  MIP by January 15th of each year.  MIP, Section 5(a).  Therefore, to show that the MIP
15  transcended from offer to contract, Cahn must show that (i) the Performance Goals
16  were met in a manner that would entitle him to a payment and (ii) he complied with his
17  obligation to identify MIP participants at the beginning of each Determination Period.

18        If Cahn can show that the Performance Goals were met and that he identified
19  participants by the date set forth in the MIP, then non-payment under the MIP can be
20  analyzed as a breach of contract.  A classic breach of contract claims has four elements.
21  *Stevens v. Mavent, Inc.,* 2008 WL 2824956 *2 (C.D. Cal. July 21, 2008) ("A claim for
22  breach of contract requires evidence of (1) the contract's existence and its terms, (2)
23  performance by plaintiff, (3) breach by defendants, and (4) damages suffered by
24  plaintiff as a result.") *citing MacDonald v. John P. Scripps Newspaper,* 210 Cal. App.
25  3d 100, 104, 257 Cal. Rptr. 473 (1989).

26

27

28

**C.** **Summary of Defendant's Evidence to Rebut Plaintiff's Claim.**

**1.** **THE PERFORMANCE GOALS FOR THE MONIKER BUSINESS SEGMENTS WERE NOT MET.**

Participants in the MIP were eligible to earn performance awards as a result of different business segments reaching different performance goals in each of three determination periods. There are four different business segments: TrafficClub, Registrar, Domain Sales (collectively the "Moniker Business Segments") and Oversee. There are three determination periods: a First Determination Period running from October 1, 2007-December 31, 2008, a Second Determination Period running from January 1, 2009-December 31, 2009, and a Third Determination Period running from January 1, 2010-December 31, 2010. As a result, there are twelve (12) "buckets" of potential bonuses.

To receive an award for any of the twelve "buckets," a business segment had to achieve at least seventy-percent (70%) of its performance goal for a particular determination period. Alternatively, the MIP also contemplates that participants would receive a bonus for a Moniker Business Segment that met fifty-five percent (55%) of its performance goal but only if the performance of the three Moniker Business Segments combined achieved one hundred percent (100%) of their combined performance goal target for that determination period.

For purposes of the Moniker Business Segments (i.e., the first nine "buckets"), Oversee's financial records establish that neither mechanism for payment under the MIP was triggered. The Moniker Business Segments did not reach 70% of their respective performance goals in any of the First, Second, or Third Determination Periods. When combined, the Moniker Business Segments did not reach 100% of their combined performance goal target. In fact, they were not even close. The evidence will demonstrate the following results:

| Business Segment | Determination Period | Percentage of Performance Goal |
|---|---|---|
| TrafficClub | First | ▮ |
|  | Second | ▮ |
|  | Third | ▮ |
| Registrar | First | ▮ |
|  | Second | ▮ |
|  | Third | ▮ |
| Domain Sales | First | ▮ |
|  | Second | ▮ |
|  | Third | ▮ |

Notably, even Cahn recognized very early on that Moniker would not achieve its performance goals. In contemporaneous e-mails from mid-2008, Cahn lamented the fact that he would not be earning compensation under the MIP. At that time, he expressed to Oversee management that he no longer felt incented as a result of being unable to reach the MIP performance goals.

In response to Cahn's complaints about Moniker's inability to achieve any of the MIP performance goals, Oversee offered him an agreement that amended the MIP. That agreement, known as the Incentive Compensation Plan ("ICP") created an opportunity for Cahn to receive more modest bonus payments than were available under the MIP, but also provided him with a set of more attainable goals. Cahn received bonuses for 2008 and 2009 under the ICP (discussed in Section II.C.2.(c), *infra*). In 2010, Cahn also received a separate commission agreement, pursuant to which he earned the most money in any of his three years at Oversee.

a.   **Moniker Did Not Meet Its Performance Goals Because They Were Set Based on Cahn's Aggressive 2007 Projections, But the Market Experienced a Significant Downturn Beginning in 2008.**

Moniker's failure to achieve even 70% of any of the nine separate performance goals contained in the MIP is easily explained by two indisputable facts:  the performance goals were aggressive; the market and the economy declined.

First, the MIP targets were set during the negotiations to sell Moniker to Oversee – i.e., at a time when Mr. Cahn had far more information about Moniker's performance than Oversee had.  But, Cahn agreed to aggressive performance targets because the Moniker Offering Memorandum prepared by its investment bankers and reviewed and approved by Cahn utilized very aggressive projections.[2]

In fact, the 2008 MIP targets were actually on par with, or lower than, the projections in the Offering Memorandum.[3]  In other words, MIP participants were not even asked to meet Moniker's own projections; they were asked for *less*.  Furthermore,

---

[2]   In fact, Moniker did not even perform consistent with the Offering Memorandum in 2007.  At deposition, Cahn admitted that he knew that Moniker was not performing as expected.  Though the Offering Memorandum predicted 2007 EBITDA of ███ ███, Moniker only accomplished ████████████ in 2007.  So, by December 14, 2007, Cahn knew that Moniker's performance was declining, and he also knew that the MIP performance goals for 2008-2010 were built upon his original 2007 projections.  The total EBITDA target for the Moniker Business Segment for fiscal year 2008 was approximately ███████.  As a result, to achieve that target (and taking into account Moniker's poor performance in 2007), Moniker would have to grow by approximately 123% in 2008.  And, from there, *continue to grow* approximately 40% in 2009 and another 40% in 2010.

[3]   It is important to note that although Schedule A of the MIP presents performance goals for "2008" that "2008" goal actually represents the goal for the First Determination Period which includes the fourth quarter of 2007.  Thus, to compare the MIP performance goals to the projections in the Offering Memorandum, one needs to recognize that the Offering Memorandum 2008 projections consist of four quarters of business; the 2008 MIP targets include an extra quarter of earnings.

1  the MIP goals for 2009 and 2010 utilized a growth rate that was smaller than the

2  historic growth rates described in the Offering Memorandum.

3         So, there is no dispute that the MIP performance goals were intentionally made

4  aggressive because Cahn and Seevast aggressively projected Moniker's anticipated

5  performance in order to sell the company.  Whether those goals would have been

6  achieved in better times will never be known, but as discussed below, the performance

7  goals were doomed when external forces gravely damaged Moniker's earning

8  potential.

9         The market for Moniker's services, along with the economy as a whole,

10 experienced a severe downturn beginning in 2008.  Little needs to be said about the

11 economy as a whole in 2008 – the only legitimate debate is whether the economy

12 experienced a recession or a full depression.  But, the evidence also will demonstrate

13 that Moniker's business suffered unique setbacks that resulted in significantly lower

14 revenue generation.  Market forces in the domain name industry specifically (e.g., an

15 increase in the cost of registering domain names, a decrease in the amount of money

16 that could be made through domain name monetization, etc.) further suppressed

17 growth.  Unsurprisingly, Moniker did not grow at the rate necessary to achieve the MIP

18 performance goals.

19        When aggressive projections are coupled with both macro- and micro-economic

20 decline, there is no mystery about the reasons Moniker did not achieve its performance

21 goals.  Though Cahn is eager for someone to blame for Moniker's poor performance

22 (discussed below), there is no one to blame.  True to the old adage that "the higher the

23 risk, the higher the reward," Cahn provided and ultimately agreed to aggressive

24 performance goals, which, had they been met, would have entitled MIP participants to

25 millions of dollars.  But, those performance goals were designed to reward success.

26 Cahn was not successful; Moniker was not successful; and Oversee's overall

27 performance during the three-year period that covered the MIP ranged from one-half to

28 one-quarter of the expectations that prevailed in late 2007.

### b.     There Are No Accounting "Irregularities" in the Oversee Account Records.

Cognizant of his inability to demonstrate that the performance goals for the Moniker Business Segments were met, Cahn will undoubtedly attempt to distract the Court's attention by arguing that Oversee's accounting is filled with inaccuracies and irregularities.  Most of these alleged inaccuracies and irregularities are supported only by e-mails that Cahn himself drafted.  However, in the words of a former Oversee CFO, there is ample reason to doubt Cahn's claims given that he would often make wildly inaccurate assertions when it came to issues regarding accounting and finance. That is not surprising, given that Cahn did not work in the Oversee financial department and played no role whatsoever in reconciling the finance of Moniker and, therefore, had no personal knowledge about these issues.[4]

Nevertheless, a few specific allegations are worth addressing here.  First, Cahn argues that Moniker was "penalized" when Oversee made the post-acquisition discovery that Seevast had taken the revenues associated with $1.9 million in pre-paid customer credits.  It is unclear what "penalty" Cahn believes he suffered, but the evidence will demonstrate that Oversee accounted for these credits in accordance with GAAP, as required by the MIP.

Second, Cahn has complained of "a million dollars" of missing revenue.  Cahn's accusations are not based on anything concrete but, instead, disappointment over Moniker's performance.  When asked about this "missing revenue" at deposition, Oversee's Chief Financial Officer, Elizabeth Murray, explained that she investigated Cahn's purported concerns and determined that the missing money existed only in Cahn's imagination.

Lastly, Cahn complains about Moniker having been charged "phantom merchant fees" that were not attributable to Moniker.  That is simply not true.  Cahn intentionally

---

[4]    Even while Moniker was owned by Seevast, the finances of Moniker were handled by Seevast not by Cahn.

1   distorts the issue by arguing that the manner of allocating merchant fees to individual

2   Moniker employees (for purposes of determining their individual commissions) created

3   phantom fees.  In fact, all merchant fees allocated to Moniker as a whole were incurred

4   as a result of Moniker business.

5        Cahn will also certainly argue that Oversee improperly allocated Moniker

6   revenue to other parts of the company such as DomainSponsor and SnapNames.  Once

7   again, that argument reflects a misunderstanding of finance (and, specifically, financial

8   reporting).  Oversee has already explained this issue in past briefing but a summary is

9   merited.  Moniker is a registrar for third party domain names which, when monetized

10  by DomainSponsor or auctioned by SnapNames, generate revenue.  For internal

11  purposes and consistent with the principle of "segment reporting," revenue earned as a

12  result of "default DNS" monetization was reported under DomainSponsor (where all

13  monetization revenue was accounted for) and revenue earned as a result of expiring

14  auctions were reported under SnapNames (where all auction revenue was accounted

15  for).  Nevertheless, for purposes of calculating Moniker's performance under the MIP,

16  revenue from these two business lines was accounted for in the Registrar Business

17  Segment.  Or, put differently, Moniker received full credit for the revenues about

18  which Cahn complains; it just didn't make a difference.

19       **c.**    **Oversee Did Not Impede Moniker from Reaching Its**

20            **Goals.**

21       Unable to show that the performance goals of the Moniker Business Segments

22  were achieved and unable to show that Oversee's accounting is flawed, Cahn will

23  undoubtedly argue that Moniker was unable to meet the performance goals in the MIP

24  because Oversee "impeded" him.

25       As a preliminary matter, the argument is not credible on its face.  Cahn would

26  have this Court believe that Oversee purchased Moniker for ▮▮▮▮▮▮ so that it could

27  purposely destroy it.  In fact, there are better uses for ▮▮▮▮▮.  Further, Oversee

28  would have benefitted enormously if Moniker had performed consistent with Cahn's

1  projections, and the MIP awards would have been more than paid for by the revenues

2  generated.[5]

3          Nevertheless, in furtherance of his argument, Cahn complains that reasonable

4  and necessary Oversee business decisions really were efforts to avoid paying MIP

5  bonuses.  For example, Cahn complains that, in February 2008, Oversee shut down

6  TrafficClub, which is one of the business segments in the MIP.  Cahn contends that

7  Oversee did this to take away his managerial responsibility over that business segment

8  and to deprive him the opportunity to receive a performance award for TrafficClub.  In

9  reality, however, Cahn agreed before the Moniker transaction closed that he would **not**

10 manage TrafficClub.  In addition, Cahn attempts to gloss over the fact that Oversee

11 shut down TrafficClub because Skenzo, a provider of advertising feeds responsible for

12 generating more than ███ of revenue, terminated its relationship with TrafficClub in

13 early 2008.  Oversee executives consulted with Cahn, and Cahn agreed that, following

14 the Skenzo termination, TrafficClub should be subsumed within DomainSponsor.

15 After the move, Oversee could continue to track TrafficClub customers who were

16 moved to DomainSponsor for purposes of MIP calculations since these customers were

17 each given unique "OID" numbers in the DomainSponsor system.

18         Cahn also complains of budget cuts, particularly in the areas of public relations

19 and staffing.  The simplest response to that complaint (and several of Cahn's other

20 complaints) is that it is unrealistic.  The economy was declining, business was

21 declining, and budgets had to be cut.  Furthermore, there is no contract that guaranties

22 Moniker any particular level of resources.[6]  As a matter of law, there is no "breach"

23 where there is no obligation.

24 _____

25 [5]  The inherently incredible aspect of Cahn's lawsuit is that he wants to receive
      bonuses under a *performance* plan despite his acknowledgment of the *decline* in
26    Moniker's performance.

27 [6]  It is worth noting that the performance goals for the Registrar and Domain Sales
      business segments were tied to EBITDA.  Accordingly, satisfaction of these
28    performance goals was a function of revenue **minus** expenses.  While an increase in

Undoubtedly, Cahn will complain of other business decisions made by Oversee because, while Oversee was focused on company-wide shareholder return, Cahn was focused on his personal rate of return.  Nevertheless, his arguments will always run into two insurmountable legal hurdles: (i) the MIP does not constrain the ability of Oversee's board and executive manage to run their business in the manner they see fit and (ii) Cahn will never be able to show that any of these business decisions are the proximate cause for the decline in Moniker's performance.  *US Ecology, Inc. v. State*, 129 Cal. App. 4th 887, 909 (2005) ("Causation of damages in contract cases, as in tort cases, requires that the damages be proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain.  A proximate cause of loss or damage is something that is a substantial factor in bringing about that loss or damage.") (internal citations omitted).

## 2. CAHN CANNOT RECOVER UNDER THE MIP OVERSEE BUSINESS SEGMENTS.

As is discussed, below, the MIP Oversee Performance Goal provisions did not create an enforceable agreement.  Furthermore, even if those provisions were enforceable, the Board had complete discretion to set the Oversee Performance Goals, and it elected not to set them.

### a. The MIP Oversee Performance Goals Are Unenforceable.

During the negotiation of the MIP, the parties did not agree to a numeric performance goal for the Oversee business segment.  Instead, they left the Oversee EBITDA performance goal as "TBD" which is shorthand for "To Be Determined."  In addition, Section 15(u) the MIP makes it clear that the Oversee EBITDA performance goal was fully at the discretion of the Oversee Board: "Target EBITDA" shall be defined as "determined from time to time by the Board, in consultation with Monte

cost (e.g., a greater PR budget, more employees) is guaranteed to increase expense (and, therefore, decrease EBITDA), there is no guarantee such additional resources would have necessarily increased revenue.

1  Cahn for so long as he is employed by the Company."   No Oversee EBITDA

2  performance goal was ever set under the MIP.

3      "Under basic contract law an offer must be sufficiently definite, or must call for

4  such definite terms in acceptance that the performance promised is reasonably certain."

5  *Ladas v. Cal. State Auto. Assoc.,* 19 Cal. App. 4th 761, 770, 23 Cal. Rptr. 2d 810

6  (1993).  By leaving the Oversee performance goal "TBD" and leaving its definition to

7  a future determination entirely at the discretion of the board, the MIP's offer of bonus

8  compensation is too indefinite to be enforced.  *Stevens,* 2008 WL 2824956 at *2

9  (finding a bonus plan unenforceable where performance targets were left to the

10 discretion of the Board and never set).  It is not known (nor can it be retrospectively

11 determined by this Court) what performance would have been sufficient such that the

12 MIP's offer of bonus compensation would be deemed "accepted" for purposes of

13 creating a contractual obligation to pay.  That is not (and should not be) surprising.  *Id*.

14 ("It is to be expected that many alleged employer promises will be unable to cross this

15 threshold of definition to become enforceable claims.").

16          **b.      Even if the Oversee "TBD" Performance Goal Were**

17                   **Enforceable, Cahn Still Would Not Be Entitled to**

18                   **Payment.**

19      Cahn's claim to an Oversee bonus is based on three assumptions, none of which

20 is correct: (i) that the MIP is a contract (as opposed to an offer), (ii) that the language

21 of Section 15(u) obligated the Board to set Oversee EBITDA performance goals for

22 each Determination Period, and (iii) that for purposes of the MIP, the Oversee

23 EBITDA performance goals were equivalent to the company's EBITDA goals for

24 purposes of its budget.

25      Cahn's first assumption is obviously incorrect.  As explained, *supra*, the MIP

26 (which was not signed by any of the parties) is not a contract.  It is an incentive plan

27 adopted by the Oversee Board which offers the potential of bonus compensation in

28 exchange for certain performance (e.g., identifying participants and meeting

1   performance goals).  A contractual obligation arises only upon performance, which did

2   not occur here.  To date, Cahn has never explained how it is that the MIP is a contract,

3   as opposed to an offer.

4         Cahn's second assumption that the Board was obligated to set an Oversee

5   EBITDA performance goal is also incorrect.  The first fourteen sections of the MIP

6   provide for its "operation" (e.g., when participants would be identified, what

7   performance thresholds would trigger an award, when preliminary awards would be

8   made, how and when final awards would be reconciled to preliminary awards).

9   Nowhere in these first fourteen sections is there an obligation on the Board to set a

10   performance goal for Oversee EBITDA.  Instead, Cahn relies on the "Certain

11   Definitions" Section of the MIP (i.e., Section 15) to create a duty.  In particular, he

12   argues that section 15(u) *required* the Board to set an Oversee performance goal.

13   Section 15(u) reads: "Target EBITDA means…with respect to Oversee EBITDA **as**

14   **shall** be determined from time to time by the Board, in consultation with Monte Cahn

15   for so long as he is employed by the Company."  (emphasis added).  However, Section

16   15(u) merely provides a definition of "Target EBITDA," confirming that it is left to the

17   Board's unfettered discretion.  That is consistent with the other provisions in Section

18   15 which merely provide definitions and not operational obligations.

19         As a result, to reach his erroneous assumption and create an obligation, Cahn

20   effectively reads the word "as" out of the definition.  But, even if 15(u) provided more

21   than a definition, the phrase "as shall be determined . . . by the Board" plainly confers

22   authority, not an obligation.  In the context of the MIP, Section 15(u) says that only the

23   Oversee Board can set the MIP goals; it does not say that the Oversee Board is required

24   to do so.[7]  *See, also, People v. Ledesma*, 16 Cal.4th 90, 95(1997) ("'shall' can be

25

26   _____

[7]   For reasons that only he can explain, Cahn's counsel enjoys arguing with witnesses
27       about the meaning of Section 15(u), including those who played no role in
    negotiating the MIP.  At one point, he asked the Chairman of the Board of ODN
28       Holding Corporation (Oversee's parent corporation)  how he would interpret a sign

1   construed as either mandatory or directory as well as denote future operation")

2   (*quoting* 1A Sutherland, *Statutory Construction* (5th ed.1993) pp. 763–769).

3       Cahn's third argument is that the MIP required the Oversee EBITDA

4   performance goals to be the same as the Oversee EBITDA budget targets (which

5   triggered bonus opportunities for Oversee's senior executives).  Not only does that

6   requirement not appear anywhere in the MIP, but it is directly contrary to Section

7   15(u).  The plain language of the MIP provides the Board unfettered discretion to set

8   the Oversee MIP performance goals.  If the Oversee MIP performance goals were

9   *required* to be the same as any goals set for senior management, Section 15(u) would

10  be rendered meaningless.  In fact, during the negotiations of the MIP, Cahn requested

11  that MIP targets be identical to the company's budget targets, but as Cahn's own

12  attorney confirmed at deposition, Oversee rejected that proposal.

13      Having agreed to provide the Board with unfettered discretion, Cahn cannot now

14  complain that the Board violated the covenant of good faith and fair dealing when it

15  failed to equate the MIP's performance goals with the company's budget goals.

16  California law is clear that, when one party to a contract confers discretionary powers

17  on the other, the courts will **not** intervene to limit that discretion.  *See Wolf v. Walt*

18  *Disney Pictures and Television*, 162 Cal. App. 4th 1107 (2008).  In *Wolf*, the Court

19  held: "if the express purpose of the contract is to grant unfettered discretion, and the

20  contract is otherwise supported by adequate consideration, then the conduct is, by

21

22   at the airport saying: "You shall provide identification to security."  The witness
     agreed that, in that context, the sign would indicate an obligation.

23

24   But the more apropos question would have been:  how would you interpret a sign
     saying: "You must produce such identification as shall be demanded by security"?

25   That sign would require a passenger to produce identification on request; it would

26   **not**, however, require the security guard to demand identification.  Similarly, the
     provision stating that the performance goals will be those "as shall be determined"

27   by the Board demonstrates that the Board has the sole right to set the goals; it does

28   not require the Board to do so.

definition, within the reasonable expectation of the parties and 'can never violate an implied covenant of good faith and fair dealing.'" *Id.* at 1121 (*citing Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.*, 2 Cal. 4th 342, 374 (1992)).

In short, the Oversee Performance Goal provisions in the MIP are not enforceable. But, even if they were enforceable, the Board had complete discretion in the matter, and it elected not to set Oversee Performance Goals. Given the Board's decision not to act, there is no Performance Goal for Oversee's performance and, by definition, Cahn has no right to any bonus based on the results in that segment.

### c.    The ICP Amended the MIP To Eliminate the Oversee EBITDA Goals in 2008 and 2009.

As noted, *supra*, when Cahn realized in mid-2008 that he would not be eligible for performance awards under the MIP, he notified Oversee management that he was no longer incented to work at Oversee. In response, in November 2008, Oversee and Cahn negotiated the ICP. The ICP had three notable aspects:

- It amended the terms of the MIP to state that, for 2008 and 2009, Cahn would not be eligible for an Oversee "TBD" performance award unless at least one of the Moniker business segments reached its performance goal. Thus, unless Cahn can prove that at least one Moniker business segment met its performance goal in 2008 and 2009 (and he cannot) the dispute over the Oversee "TBD" performance goals is moot for 2008 and 2009.

- It provided Cahn with alternative, more achievable targets to receive more modest bonus compensation.

- It explicitly provided that Cahn could receive compensation under either the ICP or the MIP (whichever was higher) but not both.

As noted, above, the Moniker Business Segments did not meet their performance goals in either the 2008 or 2009 Determination Periods. As a result, Cahn would not

---

be entitled to a performance award for the Oversee business segment even if he could somehow establish that a performance goal had been set and met.

### D.   Summary of Defendant's Affirmative Defenses.

Defendants' motion to dismiss is still pending, and Oversee has not yet filed an answer in this matter.  Oversee intends to pursue an affirmative defense of equitable estoppel with respect to Plaintiff's first claim for breach of contract on the basis that Cahn accepted payment under the ICP.

#### 1.   ELEMENTS OF DEFENDANT'S AFFIRMATIVE DEFENSE.

The affirmative defense of equitable estoppel has four elements: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. *Green v. Travelers Indemnity Co.*, 185 Cal. App.3d 544, 556 (1986).

#### 2.   SUMMARY OF DEFENDANT'S EVIDENCE IN SUPPORT OF ITS AFFIRMATIVE DEFENSES.

As noted, *supra*, Cahn and Oversee entered into the ICP in November 2008. Pursuant to its terms, Cahn could receive payments under the ICP or the MIP but not both.  Cahn accepted payments under the ICP for 2008 and 2009.  Cahn never notified Oversee that he was accepting his ICP payments under protest, or that he reserved a claim that he should be paid under the MIP.  Oversee would not have paid Cahn under the ICP if Cahn had instead demanded payment under the MIP.  Having accepted his ICP payments, Cahn is estopped from seeking payments under the MIP for 2008 and 2009.

### E.   Identification of Anticipated Evidentiary Issues.

Oversee has filed five motions in *limine*:

1.   To exclude evidence and argument that the Oversee EBITDA Performance Goals in the MIP were set.

2.     To exclude argument that the Performance Goals of the Moniker Business Segments were downwardly amended.

3.     To exclude evidence and argument of other lawsuits involving Oversee.net

4.     To exclude evidence and argument of compensation by other Oversee employees.

5.     To exclude testimony by witnesses undisclosed by Monte Cahn.

In addition, Oversee had proposed sharply limiting disputes over document authenticity, but as of the preparation of this memorandum, for apparently strategic reasons, Cahn continues to object to the authenticity of emails and other documents of undisputed authenticity, such as audited financial statements.  Oversee thus has no choice but to take a similarly strategic view of the authentication process.

**F.**     **<u>Identification of Issues of Law.</u>**

Issues of the MIP's interpretation will need to be determined as a matter of law. These issues include:

- Whether the MIP's offer of bonus compensation in respect of the Oversee business segment for meeting a performance goal of "TBD" was sufficiently definite to be enforced as a contractual obligation.
- If the MIP is deemed a contract, whether there was an obligation on the Board to set a target for Oversee EBITDA.
- If there was an obligation on the Board to set a target for Oversee EBITDA, whether the implied covenant of good faith and fair dealing can be used to provide the target at this juncture.

**III.**     **<u>BIFURCATION OF ISSUES (LOCAL RULE 16-4.3).</u>**

This Court has already bifurcated this matter such that the only claim at issue is Plaintiff's first claim for breach of contract.

## IV.    <u>JURY OR BENCH TRIAL (LOCAL RULE 16-4.4).</u>

For the reasons set forth in Oversee's Motion to Strike Jury Demand (Docket No. 52), which are expressly incorporated herein, Oversee respectfully submits that the parties waived the right to jury trial in Cahn's Employment Agreement.  Even in diversity cases such as this one, the enforceability of contractual jury waiver provisions is governed by federal law which will uphold a knowing and voluntary jury waiver. *Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 76 F.3d 1023, 1026-27 (9th Cir. 1996) ("In a diversity action, federal law governs whether a party is entitled to a jury trial and if so, on what issues."); *Okura & Co. (America), Inc. v. Careau Group*, 783 F. Supp. 482 (C.D. Cal. 1991)(Wilson, J.) (federal law will uphold knowing and voluntary contractual jury waivers).

Here, Cahn's Employment Agreement with Oversee contains a broad jury waiver provision that applies to anything "relating to or arising in any way from [the] agreement or the matters contemplated [t]hereby." Given that the Employment Agreement specifically references the MIP and contains the operative language that entitles Cahn to participate in the MIP, the MIP clearly "relates" to the Agreement, thereby triggering the jury waiver provision.

## V.    <u>ATTORNEYS' FEES (LOCAL RULE 16-4.5).</u>

Attorneys' fees are not recoverable by either party.

## VI.    <u>ABANDONMENT OF ISSUES (LOCAL RULE 16-4.6).</u>

As noted above, Oversee has not filed an Answer.  But, in compliance with Local Rule 16-4.6, Oversee states that it has not abandoned any affirmative defenses.

Dated:  December 19, 2011                    WILLENKEN WILSON LOH & LIEB LLP


                                             By: */s/William A. Delgado*                    .
                                             William A. Delgado
                                             Attorneys for Defendants OVERSEE.NET,
                                             JEFFREY KUPIETZKY, and LAWRENCE NG