William A. Delgado (Bar No. 222666)
wdelgado@willenken.com
Leemore Kushner (State Bar No. 221969)
lkushner@willenken.com
WILLENKEN WILSON LOH & LIEB LLP
707 Wilshire Blvd., Suite 3850
Los Angeles, CA 90017
Tel: (213) 955-9240
Fax: (213) 955-9250

Attorneys for Defendants
OVERSEE.NET, JEFFREY KUPIETZKY,
and LAWRENCE NG

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONTE CAHN, an individual, | Case No. CV11-03800 SVW (AGRx) |
| Plaintiff, | **REDACTED REPLY MEMORANDUM ISO DEFENDANT OVERSEE.NET'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** |
| v. | |
| OVERSEE.NET, a California corporation; JEFF KUPIETZKY, an individual, LAWRENCE NG, an individual; and DOES 1 through 10 | |
| Defendants. | DATE: January 9, 2012<br>TIME: 1:30 p.m.<br>PLACE: Crtrm. 6 |
| | Complaint Filed: May 3, 2011<br>Pretrial Conf. Date: January 9, 2012<br>Trial Date: January 17, 2012 |

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION……………………………………………………..………….1

II. ARGUMENT………..…………………………………..………………..………1

    A. The Moniker Performance Goals Were Neither Amended Nor Met………….1

        1. The Moniker performance goals were not amended………………….....1

        2. The performance goals were not met…………………………………..3

        3. Cahn Consented to the Closure of TrafficClub and Has Not Shown that TrafficClub Met Its Performance Goal………………………4

    B. The ICP Bars Cahn's Recovery of Any Award for the "Oversee EBITDA" Performance Goal in 2008 and 2009……………………5

    C. The Court Should Not Engage in *Ex Post Facto* Speculation as to How the Board Would Have Set the Performance Goals for Oversee EBITDA……………………………………………………………..6

        1. The Board's discretion was unfettered and unaffected by the implied covenant of good faith and fair dealing……………………..6

    D. Cahn's Failure to Identify MIP Participants Bars His Claim…………….......9

    E. The Company's Budget Targets Do Not Apply to Cahn……………………..10

III. PLAINTIFFS' RULE 56(d) REQUEST SHOULD BE DENIED………………..11

IV. CONCLUSION……………………………………………………………….....12

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Blough v. Holland Realty, Inc.*,
  574 F.3d 1084 (9th Cir. 2009) .................................................................................. 11

*Siegel v. Warner Bros. Entmt., Inc.*,
  542 F. Supp. 2d 1098 (C.D. Cal. 2008) ................................................................. 1, 6

*Union Mut. Life Ins. Co. v. Mowry*,
  96 U.S. 544 (1877) ..................................................................................................... 8

**State Cases**

*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.*,
  2 Cal. 4th 342 (1992) ................................................................................................. 8

*Lazar v. Hertz Corp.*,
  143 Cal. App. 3d 128 (1983) ..................................................................................... 9

*Perdue v. Crocker National Bank*,
  38 Cal. 3d 913 (1985) ................................................................................................ 9

*Wolf v. Walt Disney Pictures and Television*,
  162 Cal. App. 4th 1107 (2008) .............................................................................. 7, 8

**Rules**

Fed. R. Civ. P. 56(d) ............................................................................................... 11, 12

Fed. R. Civ. P. 56(f) ..................................................................................................... 11

## I. INTRODUCTION

Because Mr. Cahn has no evidence to support a claim for payment under the Management Incentive Plan ("MIP"), he offers up a broad range of arguments supporting his claims to be paid under a contract he could not actually negotiate, based upon performance outcomes that failed to materialize. The issue before the Court on Cahn's First Claim for Relief is whether Cahn is entitled to payment under the MIP. As a matter of undisputed fact, he is not, and that should be the end of the inquiry.

## II. ARGUMENT

### A. The Moniker Performance Goals Were Neither Amended Nor Met.

#### 1. The Moniker performance goals were not amended.

In an effort to avoid the inescapable fact that the Moniker business segments fell far short of the MIP Performance Goals, Cahn argues that Oversee orally agreed to amend the goals for the 2009 and 2010 segments downward.[1] That argument has no evidentiary support. Cahn provides no resolution of the Board amending the MIP nor any unanimous written consent agreed to by the Board amending the MIP. Further, it contradicts Cahn's prior admissions.

First, in all four complaints Cahn has filed with this Court, he affirmatively alleged that the MIP was not modified. *See, e.g.*, Third Amended Complaint at ¶ 27(c) ("[n]o explicit changes were made to modify Cahn's performance goals under the MIP . . . .") and ¶ 43 (alleging breach because of a failure to "make the requisite amendments" to the contract).[2] For that reason alone, Cahn's sudden reversal should be disregarded since "factual assertions in pleadings . . . are considered judicial admissions that bind the party who made them." *Siegel v. Warner Bros. Entmt., Inc.*, 542 F. Supp. 2d 1098, 1133 (C.D. Cal. 2008).

---

[1] Cahn makes no such argument with respect to 2008 thereby making summary adjudication for 2008 particularly appropriate.

[2] The MIP did not contain any language *requiring* Oversee to amend it; in contrast, it simply allows the Board discretion to amend the MIP. *See,* MIP, ¶ 9.

<u>Second</u>, Cahn's argument is supposedly based on the premise that someone told him that the Board had amended the MIP or, in other words, inadmissible hearsay. This supposed amendment of the performance goals is certainly not memorialized in a formal document amending the MIP that was adopted by the Board.

<u>Third</u>, Cahn's argument is refuted by his own expert witness who affirmatively states in his expert report that he "is not aware of modification or amendments to Mr. Cahn's 2007 MIP that altered the terms of the agreement, the Baseline Award amounts, **or the Performance Goals amounts**." Expert Report of Daniel Gallagher at p. 6 (Lieb Decl. at Ex. I) (emphasis added).

<u>Fourth</u>, this argument was refuted by Cahn himself during his deposition. Cahn testified that he discussed the re-forecasting of EBITDA in 2008 and 2009 and that he "**assumed**" he was operating under the re-forecast numbers. He did not recall "the words MIP and the reforecast…being in the same sentence." Deposition Transcript of Monte Cahn, taken November 15, 2011 (Cahn Depo. Tr.) at 227:14-232:18 attached as Lieb Decl. Ex. G.

<u>Finally</u>, the argument is so lacking in credibility that it refutes itself. For example, Cahn argues that, in 2009, the Board amended the MIP to reduce the Registrar Performance Goal from ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ but retained the same ▓▓▓▓▓▓ Performance Award. According to Cahn, then, instead of receiving a bonus roughly equal to ▓▓▓▓▓▓▓ earned by that segment, MIP participants would receive almost all the earnings – a total of ▓▓▓. Cahn further argues that the Board amended the Domain Sales 2009 Performance Goal from ▓▓▓▓▓▓▓ ▓▓▓▓▓▓, and that he was entitled to a Performance Award of ▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Opp. at 24:3-19. That runs contrary to the MIP's design. MIP, Section 1 ("The Plan is designed to reward…the Participants for significant contributions **toward the continued or improved profitability and growth** of the Company.") (emphasis added).

### 2. The performance goals were not met.

Given that the Performance Goals for the Moniker Business Segments were not amended and that payment under the MIP is conditioned on meeting the goals as they appear in the MIP, Cahn has the burden of establishing a triable issue of fact on the issue of whether any business segment met its MIP Performance Goal in any performance period. Plaintiff's opposition fails to carry this burden.

Rather, Cahn simply argues about the existence of "accounting irregularities." In fact, there is no actual, admissible evidence of so-called "accounting irregularities," and Mr. Cahn is not competent to testify otherwise. Cahn's specific arguments are just that – arguments without evidentiary support. For example, Cahn argues that Oversee penalized him by refusing to recognize $█████████ in revenue because of a liability that existed on the books of DomainSystems, LLC for prepaid customer accounts at the time of Oversee's acquisition. There was no "penalty," and the $████████ liability did *not* affect the calculations of whether the Moniker business segments met the performance goals. *See* Second Declaration of Elizabeth Murray, dated December 12, 2011 at ¶¶ 2-4.

Cahn further argues that Oversee charged "phantom merchant fees" to Moniker (Opp. at 7:21-24). That is also false. All merchant fees charged against Moniker were actually incurred. *Id.* at ¶¶ 5-9. Cahn cannot raise a triable issue of fact based on the fact that someone (usually Cahn himself) complained about something that wasn't true.

Lastly, Cahn claims that Moniker did not receive credit for two different revenue lines that were allocated to other divisions of Oversee (i.e., monetization revenue went to DomainSponsor and expiry auction revenue went to SnapNames).[3] However, as

---

[3] In support of his corollary assertion that such revenues exceeded $1 million a year, Cahn cites to an e-mail he prepared where he makes that statement. At the same time, Cahn has complained that Oversee never provided him with the requisite financial information necessary to make such a determination. *See* TAC at ¶ 38. That e-mail is just one example where Cahn would make wild assertions that were completely untethered from reality.

Exhibit D shows, those two revenue lines *were* included as registrar revenue for purposes of the MIP calculations.  Murray Decl. Ex. D (under Section 2 "Registrar EBITDA", there are line items for monetization and expiring auctions).

Furthermore, even if Cahn could raise a triable issue of fact concerning some element of accounting under the MIP (and he has not), he would need to show causation.  In other words, Cahn cannot simply second-guess the accounting; he must offer an alternate accounting that would produce a right to payment under the MIP.  He utterly fails to do so.  As Oversee's accounting shows (Murray Decl. Ex. D), the Moniker business segments never came close to hitting any of their performance goals.  Cahn's response, as contained in the Declaration of David Callaghan, consists of nothing more than Callaghan's statement that he is "unable to verify the conclusions presented in Exhibit D . . . ."  Callaghan declaration, ¶ 6.  As a matter of law, that testimony fails to create a triable issue of fact.

This is not the pleading stage of the case.  Cahn needed to produce admissible evidence that raised a triable issue of fact as to whether the MIP performance goals were met.  He has not done that.  He has made random arguments, unsupported by expert analysis.  But he has failed to offer any evidence to demonstrate that any MIP target was achieved.

    3. <u>Cahn Consented to the Closure of TrafficClub and Has Not Shown that TrafficClub Met Its Performance Goal</u>.

With respect to the TrafficClub business segment, Cahn argues that "Oversee unilaterally made the decision to shut down TrafficClub….Oversee made this decision without my consent.  Oversee then moved all of TrafficClub's customers into DomainSponsor…"  Declaration of Monte Cahn at ¶ 14.  But, Cahn's own deposition testimony explains why Oversee *actually* shut down TrafficClub, and his contemporaneous email demonstrates that he agreed with the decision.

Concerning the reason for the shut down, Mr. Cahn explained that, after Oversee acquired Moniker, Skenzo—a third party company that provided an advertising feed to

TrafficClub and accounted for more than 80% of TrafficClub revenues—unexpectedly terminated its feed. Cahn Depo Tr. at 236:22-237:25 (Lieb Decl. Ex. G). Shortly after that happened, Mr. Cahn prepared an email that he now asks this Court to ignore. Cahn's contemporaneous email reads, in pertinent part: "I have been thinking more and more about the future for TrafficClub and what makes sense for the overall organization as well as our customers. I think I would be willing to move towards a full transition to DomainSponsor rather than trying to migrate TC." Cahn Depo. Ex. 90 (Lieb Decl. Ex. G). In light of this evidence, Cahn cannot demonstrate that the decision to shut down TrafficClub breached the MIP.

Unable to prove breach of contract, Cahn argues that Oversee misled him by concealing from him the alleged fact that Oversee knew, before finalizing the MIP, that Oversee's contract with Google would require Oversee to shut down TrafficClub. However, Cahn frames his argument concerning the supposedly concealed Google contract as a claim for fraud. *See,* TAC, ¶ 69(a). For purposes of his claim for breach of contract, the reason for the alleged breach is not relevant. All that matters is whether Oversee breached the MIP by closing TrafficClub. The undisputed evidence demonstrates that Cahn supported that decision.

B. <u>The ICP Bars Cahn's Recovery of Any Award for the "Oversee EBITDA" Performance Goal in 2008 and 2009</u>.

In his opposition, Cahn essentially claims that the Incentive Compensation Plan ("ICP") does *not* amend the MIP. Cahn simplistically and misleadingly cites to the first page of the ICP, which states: "each of the terms and provisions of the MIP shall remain in full force and effect in accordance with their terms." Opp. at 20:24-25. But, the ICP actually says:

> …this letter agreement, including Schedule I attached hereto, **hereby amends the terms of the MIP** in accordance with the terms hereof. **Except as expressly provided in this letter agreement**, each of the terms and provisions of the MIP shall remain in full force and effect in accordance with their terms.

ICP cover page (attached as Greene Decl. Ex. F), emphasis added. As is discussed in Oversee's Motion and further addressed below, the ICP specifically *does* amend the MIP by requiring Cahn to surrender any claim to payment under the MIP's Oversee "TBD" goals unless at least one of the three Moniker business segments hit its target during the relevant year.[4] *See,* ICP, Interaction with MIP (attached as Greene Decl., Ex. F).[5] Because *Moniker* did not meet any of its performance goals during the first two determination periods, the ICP barred Cahn from receiving any bonus based upon *Oversee* EBITDA for either determination period. Thus, even if this Court were to conclude that the Board's failure to set Oversee EBITDA goals under the MIP raises a traible issue of fact, the ICP moots that issue for 2008 and 2009. In the absence of a triable issue of fact concerning whether any of the three Moniker business segments achieved their performance goals, Cahn was not entitled to an Oversee EBITDA award for 2008 and 2009.

    C.    The Court Should Not Engage in *Ex Post Facto* Speculation as to How the Board Would Have Set the Performance Goals for Oversee EBITDA.

        1.    The Board's discretion was unfettered and unaffected by the implied covenant of good faith and fair dealing.

Cahn argues that "[w]here a contract confers on one party discretionary power affecting the rights of the other party, the law implies a duty to exercise that discretion

---

[4] Cahn, in fact, admitted in his original complaint that the ICP *did* amend the MIP: "[o]n or around November 18, 2008, Oversee **proposed an amendment to the MIP**. Oversee offered Cahn an Incentive Compensation Plan ('ICP') which provided an alternative bonus structure to the MIP." Complaint at ¶ 20 (emphasis added) (Docket No. 1). Cahn cannot now argue the opposite. *Siegel,* 542 F. Supp. 2d at, 1133 (factual allegations in pleadings are generally binding).

[5] Cahn speciously claims he was "advised" by Oversee's counsel about the ICP. In fact, William Gross, Cahn's personal attorney who negotiated the MIP and the Employment Agreement, admitted that he advised Cahn concerning the ICP. Deposition Transcript of William Gross, dated December 5, 2011, at p. 12:25-17:21 (attached as Lieb Decl. Ex. H).

in good faith and in accordance with fair dealing." Opp. at 15 11-13. But, as discussed in Oversee's Motion, the MIP (like other bonus compensation plans) is not a contract. It is simply an offer, and, as a result of the parties' decision to leave Oversee EBITDA as "TBD", an *indefinite* one at that, which cannot be enforced. Nevertheless, even if the MIP were to be analyzed as a contract, Cahn's argument is notable for its concession that the MIP conferred discretionary power on the Board.[6] *See also* Cahn Depo. Tr. 163:24-165:6 (Lieb Decl. Ex. G). The legal argument that follows Cahn's concession, however, is wrong.

California law is clear that, when one party to a contract confers discretionary powers on the other, the courts will **not** intervene to limit that discretion. In *Wolf v. Walt Disney Pictures and Television*, 162 Cal. App. 4th 1107 (2008), the Court of Appeal flatly rejected the contention that the implied covenant of good faith and fair dealing could limit discretion granted under a contract. The facts of *Wolf* have particular application here. In *Wolf*, Plaintiff entered into licensing agreements with Disney to exploit characters from the film *Who Framed Roger Rabbit?*. The contract gave Disney the right to exploit the characters as it "saw fit." Plaintiff was entitled to royalties calculated based on "gross receipts."

Plaintiff argued that Disney violated the implied covenant of good faith and fair dealing when it licensed the characters for non-monetary consideration that did not generate any gross receipts. The Court of Appeal rejected plaintiff's argument as a matter of law:

> It is not enough to say that without the proposed implied covenant, the contract would be improvident or unwise or would operate

---

[6] In another section of his Opposition, Cahn argues that the MIP required the Board to set Oversee EBITDA goals under the MIP. In fact, Section 15(u) (which appears in the section of "Certain Definitions") does not say that the Board "shall" determine performance goals. Rather it provides a definition for "Target EBITDA" and that definition, with respect to Oversee EBITDA, is "**as** shall be determined…" by the Board (emphasis added). The provision does not require the Board to do anything; it simply provides what Target EBITDA "means."

> unjustly.  Parties have the right to make such agreements . . . . [Plaintiff] was free to accept or reject the bargain offered and cannot look to the courts to amend the terms that prove unsatisfactory.

*Id*. at 1122.  Responding to the argument that Disney assumed an implied obligation to enter into licensing agreements "fairly and in good faith so as not to deliberately thwart Cry Wolf's opportunity to obtain a royalty," the Court of Appeal held:

> That argument rests on a distortion of the language of the 1983 Agreement . . . [which] conferred the express authority to 'grant licenses' to third parties . . . in any manner it 'saw fit.'  As explained, recognizing an implied term that would limit the unfettered discretion given to Disney to license the characters as it saw fit would be at odds with the express terms of the agreement.

*Id*. at 1122-23.  Summarizing the law, the Court held: "if the express purpose of the contract is to grant unfettered discretion, and the contract is otherwise supported by adequate consideration, then the conduct is, by definition, within the reasonable expectation of the parties and 'can never violate an implied covenant of good faith and fair dealing.'"  *Id*. at 1121 (*citing Carma Developers, infra*).

   The *Wolf* case speaks clearly here.  Cahn agreed to vest complete discretion in the Oversee Board to set the Oversee "TBD" goals.  It could have set any goal it wanted, and, just as surely, it could have elected not to create any goal at all.  No implied covenant can alter the express terms of the MIP.  Cahn had an opportunity to negotiate specific Oversee performance goals or to negotiate limits on the Board's otherwise unlimited authority in that area.  He nonetheless chose to accept the MIP without any limitations on the Board's discretion, and it is not the role of the courts to alter the terms of Cahn's deal, no matter how unwise it may have been. *See also Union Mut. Life Ins. Co. v. Mowry*, 96 U.S. 544, 548 (1877) ("For compliance with arrangements respecting future transactions, parties must provide by stipulations in their agreements when reduced to writing."); *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.*, 2 Cal. 4th 342, 374 (1992) ("As to acts and

conduct authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct. And if defendants were given the right to do what they did by the express provisions of the contract there can be no breach.").

In his opposition, Cahn cites to *Perdue v. Crocker National Bank*, 38 Cal. 3d 913 (1985) and *Lazar v. Hertz Corp.,* 143 Cal. App. 3d 128 (1983), for the proposition that the implied covenant of good faith and fair dealing limited Oversee's discretionary power to set Oversee TBD goals. Both cases, however, addressed the use of the implied covenant to fill in blank terms in a contract – not to impose limits on discretionary rights expressed in a contract. In *Perdue* the plaintiffs argued that the defendant bank's signature card, which authorized the bank to charge NSF fees but was silent on the amount of the charge, was an unenforceable agreement because it was silent on the amount of fees to be charged. In *Lazar,* plaintiffs made the same argument about an open term concerning the amount Hertz could charge for gasoline. Both courts rejected plaintiffs' arguments. In both cases, the courts ruled that, because the contracts were *silent* on the issue, they were not unenforceable. Rather, the unspecified term would be inserted based upon the implied covenant of good faith and fair dealing.

This is not a case where the contract is *silent* on an open issue. The MIP specifically addresses how Oversee EBITDA performance goals are to be set to the extent the Board wishes to set them. The MIP gives Oversee complete discretion in the matter without limit. Having negotiated and agreed to that provision, Cahn cannot turn to the implied covenant of good faith and fair dealing to limit the discretion that he expressly negotiated away.

D. <u>Cahn's Failure to Identify MIP Participants Bars His Claim</u>.

As Oversee noted in its moving papers, Cahn had the obligation to designate Participants under the MIP. He admits that he did not. Cahn Depo Tr. at 144:17-21, 145:3-9 (Lieb. Decl. Ex. G). Cahn now argues that his failure to designate participants

meant that he would be the sole Participant. But, the MIP does not say that. It imposes on Cahn a duty to affirmatively identify Participants by a certain date (January 15th).[7] In fact, given that Cahn's Employment Agreement merely states that Cahn would be "entitled to participate" in the MIP (Employment Agreement §3(d)), but does not actually state that he *was* a Participant, the ironic reality is this: Cahn never even submitted his own name for participation in the MIP.

As a result, Cahn is actually asking this Court to engage in dual speculation: first, as to how the Board would have exercised its discretion in each of three different determination periods to set the MIP targets; and, second, despite Mr. Cahn never having submitted to the Board a list of MIP participants, to speculate how any applicable award would have been distributed among a group of unknown and unquantifiable participants.

### E. The Company's Budget Targets Do Not Apply to Cahn.

As Oversee anticipated, in an attempt to escape the speculative nature of his claim with respect to Oversee EBITDA, Cahn argues that the Company's budget numbers for Oversee EBITDA for 2009 and 2010 (which were used for determining the bonuses of other senior executives) also applied to his MIP.[8] If that were true, one would have expected Section 15(u) to simply say that Target EBITDA "with respect to Oversee EBITDA shall be the same under this agreement as for other senior executives participating in other plans." However, the MIP does not say that, and it is not reasonably susceptible to that interpretation. The MIP grants the Board unfettered discretion to set Oversee EBITDA targets, and, Oversee respectfully submits, this

---

[7] In fact, the MIP states that Cahn "shall" identify Participants by a date certain. According to his own opposition, this language is mandatory. So, on the one hand, Cahn claims that Oversee breached the MIP by failing to set the Oversee TBD goals, but on the other hand, he claims that his duty to designate MIP participants was merely permissive.

[8] Once again, Cahn makes no argument for a bonus as to Oversee EBITDA for 2008 leaving that "bucket" particularly suitable for summary disposition.

1  Court does not have the power to impose a limit on the Board's discretion that Cahn
2  was unable to negotiate.

3  In addition, Cahn's argument once again results in an absurdity. In 2009, for
4  example, the MIP contemplated the following performance from two of the Moniker
5  business segments: Registrar EBITDA of ▮▮▮▮ and Domain Sales EBITDA of
6  ▮▮▮▮. On the other hand, the *budget* number for Oversee EBITDA for 2009
7  (roughly ▮▮▮▮) was based on a Registrar EBITDA target of ▮▮▮▮ and an
8  Aftermarket (i.e. Domain Sales) target of ▮▮▮▮. Watnick Decl. Ex. 8.
9  Clearly, the MIP and the budget contemplated two different scenarios. The MIP—
10 consistent with its design of showing "continued or improved profitability"—
11 contemplates Registrar and Domain Sales generating a positive EBITDA of
12 ▮▮▮▮. The budget—consistent with reality—contemplates these segments as
13 having a ▮▮▮▮. Accordingly, the Oversee
14 EBITDA budget targets and the MIP Oversee EBITDA targets would necessarily be
15 different. The MIP was an incentive plan that would provide for payments in exchange
16 for outstanding performance based on Cahn's projections and the generation of
17 millions of dollars in EBITDA. It was not a plan that provided for large payments in
18 exchange for sub-standard performance ▮▮▮▮
19 ▮▮▮▮

20 **III.     PLAINTIFFS' RULE 56(d) REQUEST SHOULD BE DENIED.**

21 Under Rule 56(d), a party seeking to defer consideration of a motion for
22 summary judgment must make "(a) a timely application which (b) specifically
23 identifies (c) relevant information, (d) where there is some basis for believing that the
24 information sought actually exists." *Blough v. Holland Realty, Inc.,* 574 F.3d 1084,
25 1091 (9th Cir. 2009) (citations omitted; construing Rule 56(f)). "The burden is on the
26 party seeking additional discovery to proffer sufficient facts to show that the evidence
27 sought *exists*, and that it *would prevent* summary judgment." *Id.* (citation omitted;
28 emphases added).

        Cahn seeks to avoid summary judgment by identifying deponents who fall into two categories. Several deponents allegedly negotiated the MIP with Cahn. If they have any relevant testimony to offer, it would be in the form of parol evidence of communications during those negotiations. As the counter-party to those negotiations, Cahn would have the same information. Second, Cahn identifies Ms. Murray (since deposed), who prepared Exhibit D. Cahn fails to demonstrate why he is unable to attack exhibit D without Murray's deposition (or why he waited so long to depose Oversee's Chief Financial Officer). Cahn also argues that Oversee provided financial information to a third party, but he fails to describe why he needs that information. Finally, Cahn claims that he filed a motion to compel that seeks documents he may need to attack Oversee's calculations. But he <u>still</u> (after three prior *ex parte* applications to stay his expert disclosure deadline) fails to say what documents he needs. Indeed, Cahn's expert, Mr. Callaghan, who claims expertise in "accounting investigations" and "forensic accounting," claims that he cannot verify exhibit D, but he makes no effort to identify the materials he would need to do so.

        This is all a stall. Cahn was the President of Moniker. He knows what documents exist and if there were any documents that he thought could help him, he could have identified them. His Rule 56(d) request amounts to nothing more than a statement that he doesn't have every piece of paper that Oversee has. He hasn't shown that there is evidence that <u>exists</u> and <u>would prevent summary judgment</u>, as the statute requires.

## IV. **CONCLUSION**

        For all these reasons, Oversee respectfully requests that its motion be granted.

Dated: December 22, 2011        WILLENKEN WILSON LOH & LIEB LLP

        By: */s/William A. Delgado*
        William A. Delgado
        Attorneys for Defendants OVERSEE.NET, JEFFREY KUPIETZKY, and LAWRENCE NG