William A. Delgado (Bar No. 222666)
wdelgado@willenken.com
Leemore Kushner (State Bar No. 221969)
lkushner@willenken.com
WILLENKEN WILSON LOH & LIEB LLP
707 Wilshire Blvd., Suite 3850
Los Angeles, CA 90017
Tel: (213) 955-9240
Fax: (213) 955-9250

Attorneys for Defendants
OVERSEE.NET, JEFFREY KUPIETZKY,
and LAWRENCE NG

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONTE CAHN, an individual, | Case No. CV-11-03800 SVW (AGRx) |
| Plaintiff, | **DIRECT EXAMINATION OF GEORGE G. STRONG, JR.** |
| v. | |
| OVERSEE.NET, a California corporation; JEFF KUPIETZKY, an individual, LAWRENCE NG, an individual; and DOES 1 through 10 | Complaint Filed:     May 3, 2011<br>Pretrial Conference: January 10, 2012<br>Trial Date:             January 24, 2012 |
| Defendants. | |

DIRECT EXAMINATION OF GEORGE G. STRONG, JR.

123021.1

## **DIRECT TESTIMONY OF GEORGE G. STRONG, JR.**

I, George G. Strong, Jr., do hereby declare as follows:

1.      I am Managing Director and General Counsel at Cornerstone Research, Inc. ("Cornerstone").  I have been retained by counsel to Oversee.net to provide expert testimony in this matter.  A copy of the Rebuttal Report of George G. Strong, Jr. ("Report") is attached hereto as Exhibit A.  Also included as Exhibit B is an errata to that Report.  All of the matters stated in my Report and all of the matters stated herein are true and correct of my own personal knowledge or represent opinions I have reached based upon my review of evidence and data, all as described herein and in the Report.  I hereby testify to all of the statements contained herein and all of the statements and opinions contained in the Report.

**A.    Credentials**

2.      My background and credentials are described in Appendix A to my Report.  I will briefly summarize them here.  I received a B.A. in Economics from Yale University in 1969, an MBA from Harvard University in 1971, and a J.D. from University of San Diego School of Law in 1974.  I am a Certified Public Accountant, licensed by the States of California and Hawaii.  In addition, I am accredited by the AICPA in business valuation (ABV), certified in financial forensics (CFF), and I am a Certified Management Consultant.

3.      As more particularly described in Appendix A, I spent more than 20 years with Price Waterhouse LLP and its later incarnation PriceWaterhouseCoopers LLP (collectively, "PWC").  From 1987 through 2002, I was a PWC partner and served in various capacities on PWC Boards and Committees, as more fully described in Appendix A to the Report.  From 2002 through the present, I have been Managing Director and General Counsel to Cornerstone.  I have testified in a wide variety of matters at deposition, trial, and arbitration, all as more fully described in Appendix A to my Report.

**B.**     <u>**Assignment**</u>

4.     My initial assignment was to review the expert witness report of Mr. Cahn's expert, Mr. Callaghan, including evaluating whether Mr. Cahn earned any bonus payments under the 2007 MIP, and comment on his conclusions (*See* Report, pp. 1–2, ¶ 5).  My Report reflects the opinions I formed concerning Mr. Callaghan's report.

5.     I understand that this phase of the trial has been narrowed to two issues.

6.     First, I understand that the Court will address the definition of TrafficClub Customers for purposes of measuring performance under the Management Incentive Plan ("MIP").  That is an issue that I specifically noted as open in my Report (*see, e.g.,* Report, ¶ 9).  Because of the dispute over this issue, I did not express an opinion concerning the TrafficClub Performance Goal in my Report.  If Mr. Callaghan is called as a witness to express any views concerning that issue, I may be able to offer testimony in response.  But, as of now, I do not believe that either my Report or the testimony extracted from my Report and summarized below addresses the TrafficClub Issue.

7.     Second, the Court will address the obligation of the ODN Board to set an Oversee EBITDA Performance Goal.  I understand from the Court's ruling on Oversee's motion for summary judgment that the Court is evaluating whether a failure to set an Oversee Performance Goal constitutes a breach of the implied covenant of good faith and fair dealing, and if so, whether or to what extent such a failure caused Mr. Cahn to suffer damages as a result.  I believe that there are portions of my Report that are potentially relevant to the Court's analysis of that issue and I highlight them in the remainder of this testimony.

**C.**     <u>**Underlying Issue**</u>

8.     It is not my intent to offer any opinion concerning the legal issue framed by the Court.  However, to explain the relevance of my testimony, I offer the following understanding of the implied covenant of good faith and fair dealing in order to explain

1  why certain of the conclusions reflected in my Report may be of assistance to the Court

2  in evaluating that issue.

3      9.      As I understand it, the covenant of good faith and fair dealing is implied

4  into every contract governed by California law.  I have been provided with the

5  following description of the role of the implied covenant of good faith and fair dealing

6  is typical:  An implied covenant "exists merely to prevent one contracting party from

7  unfairly frustrating the other party's right to receive the *benefits of the agreement*

8  *actually made*."  *Guz v. Bechtel Nat., Inc.*, 24 Cal. 4th 317, 349 (2000) (emphasis in

9  original).  I understand that there are other issues that come into play in evaluating the

10  impact of the implied covenant, such as an analysis of whether a party seeks to use the

11  implied covenant to vary the express terms of the contract.  *See, e.g., in Carma*

12  *Developers (Cal.), Inc. v. Marathon Development California, Inc.,* 2 Cal. 4th 342

13  (1992).

14      10.     It is not, however, my intention to opine on any legal issues, including

15  contract interpretation.  Rather, I believe that the analysis and conclusions reflected in

16  my Report, and highlighted below, may be relevant to the Court's evaluation of

17  whether a failure by the Board to set an Oversee EBITDA Performance Goal unfairly

18  frustrated Mr. Cahn's rights to receive the benefits conferred by the Management

19  Incentive Plan ("MIP").

20  **D.    Analysis**

21      11.     I believe the analysis provided in more detail in my Report supports the

22  following conclusions that are potentially relevant to the Court's analysis:

23          a. The Moniker Business Segment Performance Goals identified in the

24              MIP are consistent with Oversee's contention that the MIP

25              Performance Goals were intended to reward the participants for

26              achieving earnings and revenue growth consistent with the claims

27              made to Oversee in the Offering Documents and related presentation

28              materials (trial exhibits 72, 73) that I understand were prepared by

Seevast's investment bankers, Jordan, Edmiston Group, Inc. *See,* Report, § VI, pp. 3, 10-11; ¶¶ 11, 29-32, and Ex. 5 thereto.

b. I measured the performance of the Domain Sales and Registrar Business Segments in relation to the MIP Performance Goals and determined that the performance of those Business Segments fell far below the MIP Performance Goals. *See,* Report, § V.B., pp. 6-7, ¶¶ 22-23, and Exs. 2 and 3, thereto. I further performed a sensitivity analysis on these results and concluded that it is unlikely that efforts to question the assumptions that underlie my analysis would change the conclusion that the Domain Sales and Registrar actual performance fell significantly below each of the MIP Performance Goals for those Business Segments. *See,* Report, § V.C., pp. 8-9, ¶¶ 25-27, and ex. 4 thereto.

c. I also analyzed the overall performance of the Internet domain name management industry and compared it to Moniker's performance during the term covered by the MIP. This effort was designed to analyze whether there is a basis to conclude that 1) Moniker's failure to achieve its Performance Goals was consistent with the industry as a whole, and 2) the extent to which the collapsing industry and economic environments explain a significant part, if not all, of the performance shortfall of the Moniker Business Segments. I concluded that Moniker's poor performance was consistent with the declining industry as a whole, which supports Oversee's contention that Moniker results were neither manipulated nor artificially depressed to prevent attainment of the MIP Performance Goals. *See,* Report, § VII, pp. 11-15, ¶¶ 33-41, and ex. 6 thereto.

---

DIRECT EXAMINATION OF GEORGE G. STRONG, JR.
4

**E.      Relevance**

12.      It is not my place to judge the relevance of these analyses and conclusions, but I offer the following explanation of my views of their relevance.

13.      First, I understand that Oversee contends that the MIP was derived from an earn-out structure that relied upon growth forecasts based on recent history at the time (2007) that were presented to Oversee by Moniker, presumptively as reasonable, during the sale process.  My analysis summarized in paragraph 11.a is consistent with that contention and is <u>not</u> consistent with the contention that the MIP was intended as a device to deliver financial rewards to participants in the event that performance declined rather than increased.

14.      If indeed it is determined by the Court that Oversee had a duty to specify the Performance Goals of the fourth Business Segment defined in the MIP, Oversee EBITDA, at the time (2007) and in a similar manner to the Performance Goals it specified for the Moniker Business Segments (TrafficClub, Domain Sales, and Registrar) the result, in my opinion, would likely have indicated similar, rapid growth as in the yearly projections for the other Business Segments.

15.      In light of Oversee's actual financial results, as reflected in its audited financial statements (trial exhibits 127, 130, 131), Oversee's contention that the setting of Oversee Performance Goals would have been an idle act is reasonable.  Stated differently, if the Court concludes that the Oversee Performance Goal was intended, consistent with the Moniker Performance Goals, to reward growth on a level consistent with the projections contained in the Offering Documents, it is my opinion that the failure to set an Oversee Performance Goal did not ultimately result in economic damage to the MIP participants.

16.      The analyses of actual results, as summarized in paragraphs 11.b and 11.c, above, demonstrate that the actual financial performance of at least two of the Moniker business segments missed the projections in the Offering Documents by a wide margin, thus supporting the conclusion that the actual results of operations reflected

deterioration or stagnation in the business, rather than the significant growth anticipated and projected. Thus, if the Court concludes that the Oversee Performance Goals were intended to reward growth in the business as a whole, the analysis of actual results confirms that it is highly unlikely that any Oversee Performance Goals set in 2007 consistent with that premise would have been met.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed this 13th day of January, 2012, at Los Angeles, California.

George G. Strong, Jr.

## __CERTIFICATE OF SERVICE__

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the Electronic Service List for this Case.

Dated:  January 13, 2012                    WILLENKEN WILSON LOH & LIEB LLP


By: _/s/ William A. Delgado_                     .
     William A. Delgado
     Attorneys for Defendants OVERSEE.NET,
     JEFFREY KUPIETZKY, and LAWRENCE
     NG