1  **LEWIS BRISBOIS BISGAARD & SMITH LLP**
   JOHN L. BARBER, SB# 160317
2    E-Mail: barber@lbbslaw.com
   KENNETH D. WATNICK, SB# 150936
3    E-Mail: watnick@lbbslaw.com
   SONJA HARRINGTON, SB# 261053
4    E-Mail: sharrington@lbbslaw.com
   221 North Figueroa Street, Suite 1200
5  Los Angeles, California 90012
   Telephone: 213.250.1800
6  Facsimile: 213.250.7900

7  Attorneys for MONTE CAHN

8                  UNITED STATES DISTRICT COURT

9        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10

11 | MONTE CAHN,                         | CASE NO. CV11-03800 SVW (AGRx)

12 |          Plaintiff,

13 |     vs.                             | The Honorable Stephen V. Wilson

14 | OVERSEE.NET, a California           | **DIRECT TESTIMONY**
15 | corporation; JEFF KUPIETZKY, an     | **DECLARATION OF MONTE**
   | individual; LAWRENCE NG, an         | **CAHN**
16 | individual; and Does 1 through 10,

17 |          Defendants.                | Complaint Filed:    May 3, 2011
                                          Final Pretrial Conf.: January 9, 2012
18                                        Trial Date:          January 17, 2012

19

20

21

22

23

24

25

26

27

28

4840-8190-2094.1

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

## DECLARATION OF MONTE CAHN

I, MONTE CAHN, declare and state as follows:

1.     I am over the age of eighteen (18).  I submit this declaration in accordance with the Court's Civil Trial Preparation Order [Doc. 23].  I have personal knowledge of the following facts and, if called as a witness, I could and would competently testify thereto.

## BACKGROUND

2.     I grew up in Cincinnati, Ohio where my parents ran a successful furniture business.  My grandmother lived in San Diego and would constantly send me articles about the biotech industry that was booming in San Diego at that time.  It was these news articles that inspired me to pursue a career in the medical field.

3.     In 1983 I attended the University of Kentucky.  I graduated in 1987 with degrees in marketing, biology, and business administration.   Shortly before graduation I had started my own business, marketing specialized cardiology equipment.

4.     In 1988 I was offered a position with IVAC Corporation as a sales executive.  IVAC Corp. was a subsidiary of Eli Lilly Corporation.   The Miami South Florida territory ranked near the bottom of Eli Lilly's national territories at #111 of 114 in the country.  During my two years at IVAC, I succeeded in moving my territory up from #111 to the #4 best performing territory in sales volume and revenue.  I left IVAC in 1990.

5.     In January 1990 I joined a group of other senior managers from IVAC and we helped form Pyxis Corporation.  Pyxis was based in San Diego, where my original medical dreams had started with those letters from my grandmother.   At Pyxis we invented automated medication and supply distribution systems that are

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

now used in almost every hospital in America and around the world.  In 1995, after going Public on NASDAQ, we sold Pyxis to Cardinal Health, one of the world's largest drug distributors.

6.      Between January 1996 and November 1999 I worked for MedicaLogic as a Sr. Sales Manager where I was in charge of sales of the Southeast Territory and strategic growth of the company through our Public offering in 1998.

7.      In 1995 I was introduced to a brand new field, the domain name industry, through the son of one of my Pyxis customers.  I was asked to read his thesis paper about how domain names were the electronic equivalent of real estate when he was a Senior in College.  I was intrigued and saw the potential for an emerging business.  We formed a business together, acquired more than 1000 domain names, and starting the first domain brokerage on the net called NameShop.com.  I also started building my own portfolio, and after three years decided I wanted to branch out on my own and pursue more valuable domain names and broker valuable names held by others.

**MONIKER.COM**

8.      In 1999 I left NameShop and formed HitDomains.com.  After selling a series of multi-million dollar domain names in 1999, HitDomains.com merged with SolutionHome.com in 2000, forming Domain Systems, Inc. d/b/a Moniker.com ("Moniker").  Moniker is a web-based service that provides users the ability to search for, register, manage, monetize, and sell their domain names.

9.      Moniker was comprised of three business segments: TrafficClub, the Registrar and Domain Sales.

10.     TrafficClub was the division of Moniker that created linguistically targeted 1 page websites and parking pages for domain names owned by others,  and earned money from the advertising published on those websites using a unique

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  combination of advertising content feeds from Google, Yahoo and others, which

2  were rotated to provide the maximum revenue to Traffic Club and its customers.

3  Traffic Club also earned and managed revenue for default DNS (domain name

4  server) traffic from the Registrar and its customers (running advertising on websites

5  at domain names as soon as they are registered but before the owner of the name

6  points that name to another website.)

7       11.    The Registrar managed revenue for default DNS traffic for its

8  customers as well as the securing, registering and renewing of internet domain

9  names.  It also generated revenue from expired name auctions and sales from

10  registrar customers that did not renew their own domain names as well as other

11  ancillary services such as Whois Privacy and forwarding.

12       12.    The Domain Sales business segment was involved in the auction,

13  escrowing, appraising and brokerage of domain names in the Aftermarket.

14

15  **PURCHASE BY SEEVAST**

16       13.    I managed and operated Moniker as a successful business until 2005, at

17  which time Kanoodle, which later was renamed as Seevast Corp. ("Seevast"),

18  purchased Moniker.  I thought that the sale of Moniker to Seevast would be a good

19  partnership.  Seevast agreed to keep Moniker autonomous, and Seevast was also

20  looking to go public, which made it attractive at the time.  Additionally, as part of

21  the transaction Seevast and Moniker agreed that if Seevast did not have a change of

22  control or go public within two years of the sale that Moniker's executives could

23  request that the board put Moniker back up for sale.

24       14.    While at Seevast I continued as CEO and successfully managed and

25  grew Moniker, generating $3.6 in EBITDA (earnings before interest, taxes,

26  depreciation and amortization) for 2006 and $4.1 in 2007.  (See Trial Exhibits 302

27  and 392.)

28

**LEWIS**
**BRISBOIS**
**BISGAARD**
**& SMITH LLP**
ATTORNEYS AT LAW

15.     In February 2007 DomainSponsor, a division of Oversee, and one of our partners in our TrafficClub feed, unilaterally decided to pull out of TrafficClub. At the same time, Oversee, at the direction of Jeff Kupietzky, directly contacted all of TrafficClub's customers to inform them that DomainSponsor was pulling out, and attempted to move TrafficClub's customers over to DomainSponsor, in violation of DomainSponsor and TrafficClub's partnership agreement.  Oversee indicated that DomainSponsor's partnership with Moniker violated its contract with Google, and that they couldn't have a feed from a competitive system like Yahoo or Yahoo partners, which existed on the TrafficClub system.

16.     In late 2006, early 2007, two years after Seevast's purchase of Moniker, Seevast had not had a change of control or gone public, and Moniker requested from the Seevast Board to have it resold again.  The Board agreed.  There were around twenty different companies that were interested in the sale of Moniker at the time.

**NEGOTIATIONS FOR PURCHASE OF MONIKER**

17.     Tucows, Sedo, Millennium, Baker Capital and two other private equity firms made offers for the purchase of Moniker.  However, Oversee, which was initially excluded from the purchase process due to the customer poaching incident earlier that year, had the highest bid through a creative tiered purchase offer and Seevast entered into an exclusivity agreement with Oversee.  In mid 2007, Oversee entered into negotiations with Seevast regarding the purchase of Moniker.

18.     Oversee's initial offer for Moniker was around $50 million.

19.     During the negotiations I was informed that as a condition to the purchase of Moniker, Oversee wanted to ensure that I would remain with Moniker and join Oversee for at least three years after the acquisition.  (See Trial Exhibit 394.)  Representatives of Seevast initially communicated this information to me

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  through Jeff Navach.  Josh Armstrong also communicated to me that my continued

2  employment was a condition of the transaction.

3      20.    Oversee further demonstrated their intention in my Employment

4  Agreement.  Section 4 of my Employment Agreement specifically provides for a

5  three year employment term.  Further, the Employment Agreement was a condition

6  to the consummation of the transaction.  (Trial Exhibit 9.)

7      21.    As an incentive to stay with Moniker, Oversee offered me an incentive

8  program, which came to be known as the "Management Incentive Plan" ("MIP").

9  (Trial Exhibit 1.)  Instead of adding the cost of the MIP to the purchase price,

10  Oversee decided to take the cost of the MIP off of the purchase price and use the

11  difference to fund the MIP.

12      22.    After due diligence, negotiations, and the MIP payment price reduction,

13  the final purchase price of Moniker was around $24.1 million.  (Trial Exhibit 127.)

14      23.    After the negotiations with Seevast were finalized, Oversee and I

15  finalized the terms of both my employment agreement and the MIP.  (See Trial

16  Exhibits 1 and 9.)

17      24.    The sale of Moniker to Oversee was completed on December 14, 2007.

18  (Trial Exhibit 127.)

19

20  **THE MANAGEMENT INCENTIVE PLAN ("MIP")**

21      25.    Under the terms of MIP, I would be able to earn up to $13,000,000

22  ($10,000,000 of which had been funded by the discount provided by Seevast on the

23  Moniker Purchase) through a goal oriented bonus structure during my three year

24  employment term at Oversee.

25      26.    In reliance on this large, and what was presented to me, achievable,

26  incentive program, I joined Oversee.  (Schedule A to MIP, Trial Exhibit 1.)

27      27.    The bonus structure set forth under the proposed MIP was based on my

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4840-8190-2094.1
5
DECLARATION OF MONTE CAHN

1  attainment of certain performance goals in four categories: the Registrar Business
2  Segment, the Domain Sales Business Segment, the TrafficClub Business Segment,
3  and Oversee EBITDA.

4       28.    The first three segments under the MIP are known as the "Moniker
5  Business Segments".  Each of the Moniker Business Segments had pre-determined
6  performance goals for all three determination periods.  (Schedule A to MIP, Trial
7  Exhibit 1.)

8       29.    The MIP also provided that the Board could amend my performance
9  goals.  (¶3(b) to MIP, Trial Exhibit 1.)  However, any material amendment or
10 modification to the MIP which would adversely affect me, required my written
11 approval.   (See ¶¶2, 3(b) and 9 of the MIP, Trial Exhibit 1.)

12      30.    All of the business segments also had pre-negotiated bonus awards for
13 each determination period.  (Schedule A to MIP, Trial Exhibit 1.)  It was my
14 understanding that these bonuses were funded by the $10 million reduction in
15 Oversee's purchase price for Moniker and that was to be applied to my MIP.

16      31.    The performance goals for the Oversee business segment were left
17 "TBD", or to be determined, because Oversee's overall budgets and EBITDA goals
18 were not completed at the time we negotiated the MIP.  (Schedule A to MIP, Trial
19 Exhibit 1.)   Jeff Navach, one of Oversee's negotiators, explained to me that the
20 Oversee EBITDA needed to be left "TBD" so that it could be determined on an
21 annual basis.  Mr. Navach explained to me that the Oversee EBITDA goal would be
22 determined in good faith so that my interests were properly aligned with that of
23 Oversee's.

24      32.    The goal for each determination period was to be set by the Oversee
25 Board of Directors ("Board") during that period, and the Board was to consult with
26 me in setting the goals each year.  (¶15(u) of the MIP, Trial Exhibit 1.)  Oversee's
27 representatives, Lawrence Ng, Jeff Navach, Jeff Kupietzky, and Josh Armstrong,
28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   agreed to this procedure.  The above mentioned Oversee representatives told me that

2   the Board would set the overall EBITDA goal at the beginning of the year.

3       33.    I understood that there was only one EBITDA goal that was set for the

4   company, and I understood that my EBITDA goal would be the same as the

5   Company EBITDA goal that all other Sr. Executives and employees were to be

6   measured by.  During my employment with Oversee, I was not informed of any

7   alternative means of calculating the Oversee EBITDA in the MIP.

8       34.    Under the MIP, the Board was supposed to determine the Oversee

9   EBITDA goal in consultation with me.  The Board never consulted with me.

10  Instead, the Board approved a target EBITDA for the company as a whole.  I

11  understood and believed that the company would compensate me based on this goal.

12      35.    According to the MIP, my attainment of the performance goals was to

13  be determined, in good faith, by the Board.  In connection with calculating whether

14  the goals had been attained, Oversee could not take any action to manipulate

15  Moniker's financials if it would have the effect of preventing my attainment of my

16  goals under the MIP.  (¶14(a) of the MIP, Trial Exhibit 1.)

17      36.    Under the MIP, Oversee was also required to provide me with the

18  Interim Financial Statements or the Determination Period Financial Statements so

19  that I would be able to verify Moniker's financial performance each year.  (¶4(a) of

20  the MIP, Trial Exhibit 1.)  Oversee failed to provide me with any such financial

21  statements tracking my performance under the MIP during the term of my

22  employment with Oversee.  In fact, Oversee failed to provide me with any

23  contemporaneous accounting and tracking of my performance under the MIP.  I

24  requested financial statements and accounting numerous times during my

25  employment without success.  (Trial Exhibits 64, 247.)

26      37.    The MIP also required that the Board certify whether I had attained my

27  goals in each of the three determination periods.  (¶2 of the MIP, Trial Exhibit 1.)

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4840-8190-2094.1

7

DECLARATION OF MONTE CAHN

1  The Board failed to provide me with any such certification, indicating whether I had

2  attained my performance goals under the MIP for any of the three determination

3  periods.

4       38.    During the same time that I entered my MIP, I also entered into an

5  employment agreement with Oversee.  (Trial Exhibit 9.)  The employment

6  agreement confirmed that I would serve as the President of Moniker.  (§2 of

7  Employment Agreement, Trial Exhibit 9.)  The employment agreement thus

8  recognized that I would have managerial responsibilities for the business segments

9  that would be the subject to the performance goals in the MIP, including

10  TrafficClub, Moniker's Registrar and Moniker's Domain Sales.

11       39.    Although Oversee was in breach of numerous obligations under the

12  MIP, at all relevant times, I fully performed my responsibilities to the company.

13  Beginning in 2008, Oversee's management requested that I assume responsibility

14  for other business segments, including Oversee's SnapNames division.   Moniker

15  was based in Florida while SnapNames was based in Oregon.  I agreed to this

16  request.

17       40.    Additionally, beginning in 2008, Oversee's management stripped me of

18  my responsibilities as the President of Moniker, in violation of section 2(a) of my

19  Employment Agreement.  (Trial Exhibit 9.)  Instead of reporting directly to the CEO

20  of the Company, as also required by section 2(a) of my Employment Agreement, I

21  was directed to report to other executives.   I was also told that I would no longer

22  have managerial responsibilities.  Although I disagreed with these decisions, and

23  told Oversee that I disagreed, I agreed to follow the direction and request of the

24  Oversee management team.

25  / / /

26  / / /

27  / / /

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4840-8190-2094.1

8

DECLARATION OF MONTE CAHN

# TRAFFICCLUB COMBINES WITH DOMAINSPONSOR

41. In January of 2008, just over one month after the acquisition, Oversee unilaterally made the decision to combine TrafficClub and DomainSponsor, a similar "competing" business segment to TrafficClub owned by Oversee.

42. The combination of DomainSponsor and TrafficClub was a material modification of the terms of the MIP.

43. I told Oversee that I would only agree to this merger if I received the appropriate credit under my MIP for the revenues of the combined division. I also understood that if I expanded any existing customers of DomainSponsor, I would also receive credit under my MIP since the two entities were now combined as one. (Trial Exhibit 18.)

44. After the two divisions were combined, I was appointed as the Vice President Sales for DomainSponsor with sales responsibly for the combined entity. As the Vice President of Sales I was responsible for growing the number of DomainSponsor customers by bringing in new customers, and by increasing the portfolio of the existing customers.

45. After Oversee combined TrafficClub and DomainSponsor, I was told to grow the combined entity by both bringing in new customers to DomainSponsor and by adding domain names to existing DomainSponsor customer accounts, and I would receive credit under the MIP for both bringing in new customers and by adding names to existing DomainSponsor accounts. (MCHAN003776-3777, attached as Exhibit "1" hereto.)

46. Additionally, Oversee told me that the Moniker team and I would earn bonuses based on new account referrals to DomainSponsor, and for new names added to existing DomainSponsor accounts. Oversee called this the DomainSponsor "SPIF". (MCHAN003776-3777, attached as Exhibit "1" hereto.)

47. On or around March 4, 2008 I advised Oversee that I had persuaded

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   Mike Berkens to move all names from Skenzo to DomainSponsor and requested that

2   Oversee make sure that these names were tracked accordingly under the MIP.

3   (OVER001708, attached hereto as Exhibit "2".)

4       48.    I also met with Jan Barta in 2008 and worked with him and his team

5   over a period of months to help put together a finance deal where Mr. Barta

6   borrowed $3 million and then paid the loan off by monetizing domains that he had

7   registered at Moniker through DomainSponsor.  I visited him and his company in

8   Prague to also secure this relationship.

9       49.    Some other large business development deals that I helped to monetize

10   through DomainSponsor after it combined with TrafficClub included: Manila,

11   Nokta, Jordan Levinson / Marlon Philips, Rick Schwartz, Roy Messer, TuCows,

12   Marchex, and numerous others.

13       50.    However, I discovered that I was not receiving any credit under the

14   MIP for my referrals of monetization business to DomainSponsor in 2008, 2009 and

15   2010.

16       51.    After the integration, in early 2008, Oversee had stopped tracking

17   TrafficClub and failed to account for the revenue of this combined entity under the

18   MIP.  (Trial Exhibits 92 and 247.)

19       52.    Additionally, Oversee had failed to make payments to me and the

20   Moniker team under the SPIF, and I never received any accounting reports under the

21   SPIF for the referrals from Moniker to DomainSponsor.  (Trial Exhibits 92 and

22   247.)

23

24   **THE INCENTIVE COMPENSATION PLAN**

25       53.    In 2008, Oversee proposed and prepared a supplemental compensation

26   plan, the 2008 Incentive Compensation Plan ("ICP").  (Trial Exhibit 242.)

27       54.    Oversee's in-house counsel, Todd Greene, drafted the ICP and advised

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4840-8190-2094.1

10

DECLARATION OF MONTE CAHN

1  me as to the meaning of the agreement.

2      55.    Mr. Greene and Mr. Kupietzky, explained that the ICP was not an

3  amendment to the MIP, it was a supplemental plan that provided me with an

4  alternative incentive program.

5      56.    It was agreed that I was to be bonused according to whichever plan

6  provided the greater amount of compensation that year.  Mr. Greene assured me that

7  the ICP did not modify, and was not intended to modify, any of the existing terms of

8  the MIP and that the MIP was still in full force and effect.

9

10  **FINANCIAL TRACKING OF THE MIP GOALS**

11      57.    After the merger Oversee made numerous accounting mistakes in its

12  financial tracking and analysis of the Moniker business segments resulting in

13  significant accounting problems and irregularities for Moniker and for my

14  performance under my MIP.  I would repeatedly bring these mistakes to the

15  attention of Oversee's senior management, including Lawrence Ng, Jeff Kupietzky,

16  Jeff Navach, Stacey Peterson and Josh Armstrong.  In 2009, I would also bring these

17  matters to the attention of Craig Snyder and Liz Murray.  (Trial Exhibit 23, 48, 54,

18  133, 135, 136.)

19      58.    In February 2008, Jeff Navach advised me that during the acquisition

20  of Moniker from Seevast, Oversee overlooked approximately $1.9 million in

21  prepaid customer payments for Moniker's registration of domain names.  After

22  discovering this $1.9 liability, Mr. Navach advised me that until the liability was

23  extinguished I would not receive any credit under my MIP for any domain

24  registrations that related to these prepaid customer accounts.  (Trial Exhibit 22.)

25      59.    I also discovered that Oversee was charging Moniker for fees that were

26  not actually incurred by Moniker.  Oversee was assessing Moniker with a flat

27  merchant fee for all its transactions even though the merchant fees were not actually

28



LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  being incurred by Moniker.  The fees artificially increased costs of goods sold

2  thereby decreasing gross profit.  (Trial Exhibits 133 and 135.)

3      60.    In fact, there were numerous, unexplained discrepancies in expenses

4  that were attributed to Moniker, including various bank charges, consulting charges,

5  hosting charges, legal fees, improper charging of bonuses, salaries, healthcare,

6  marketing expenses, tradeshow and traveling expenses.  I repeatedly conveyed my

7  objection to these accounting practices to the Senior Management of Oversee,

8  including Jeff Kupietzky, Stacey Peterson, Josh Armstrong and Lawrence Ng.

9  (Trial Exhibit 23, 48, 54, 133, 135, 136.)

10     61.    During my tenure at Oversee, Oversee repeatedly claimed that the

11  Moniker business segments were underperforming.  These claims did not make

12  sense.  Upon further investigation, I realized that Oversee was diverting revenue

13  from Moniker into other divisions of Oversee that were not a part of my MIP at the

14  time of merger, including SnapNames and DomainSponsor, which also affected my

15  performance under the MIP.  I voiced my repeated objections to this practice in

16  written and oral communications with numerous representatives of Oversee,

17  including Jeff Kupietzky who was a member of the board at the time.  I was

18  informed that the diversion of Moniker revenue totaled millions of dollars.  (Trial

19  Exhibit 23, 48, 54, 133, 135, 136.)

20

21  **AMENDMENT OF GOALS UNDER THE MIP**

22     62.    In 2008 I was told by Jeff Kupetizky and Lawrence Ng that the Oversee

23  EBITDA goal had been adjusted downward.  I do not recall the precise goal that was

24  communicated to me at that time.

25     63.    In 2009 I was informed by Oversee that the Board had modified my

26  performance goal for the domain sales business segment.  I attended meetings and

27  participated in conferences with management personnel, including Jeff Kupietzky,

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4840-8190-2094.1                                   12
                                    DECLARATION OF MONTE CAHN

1   who was a member of the Board, and Stacey Peterson, during which I was advised

2   that that the performance goal in 2009 for the domain sales business segment was

3   adjusted to (1.4 million).  (Trial Exhibit 140.)  I have reviewed Exhibit 140 and it is

4   consistent with my recollection of the domain sales performance goal that was

5   communicated to me in 2009.

6       64.    It is my understanding and belief that the domain sales business

7   segment met its goal of (1.4 million) in 2009.  (Trial Exhibit 140.)  I have reviewed

8   Exhibit 140 and it is consistent with my recollection that the domain sales

9   performance goal that was met in 2009.

10      65.    In 2009 I was informed by Oversee that the Board had also modified

11   my performance goal for the registrar business segment.  I attended meetings and

12   participated in conferences with management personnel, including Jeff Kupietzky,

13   who was a member of the Board, and Stacey Peterson, during which I was advised

14   that that the performance goal in 2009 for the registrar business was adjusted to $1.2

15   million.  (Trial Exhibit 140.)  I have reviewed Exhibit 140 and it is consistent with

16   my recollection of the registrar performance goal that was communicated to me in

17   2009.

18      66.    In 2009 I was also informed by Oversee that the Board had approved

19   the Oversee EBITDA goal for 2009.  I attended meetings and participated in

20   conferences with management personnel, including Josh Armstrong, Lawrence Ng,

21   Jeff Kupietzky and Stacey Peterson, during which I was informed that the Oversee

22   EBITDA goal for 2009 was around $24 million.  (Trial Exhibit 140.)  I have

23   reviewed Exhibit 140 and it is consistent with my recollection of the Oversee

24   EBITDA performance goal that was communicated to me in 2009.

25      67.    I understood that the Oversee EBITDA goal communicated to me in

26   2009 applied to all Oversee employees.  Nobody at Oversee communicated to me

27   that I was excluded from this goal.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

68.    It is my understanding and belief that the Oversee met its EBITDA goal of $24 million in 2009. (Trial Exhibit 140.)  I have reviewed Exhibit 140 and it is consistent with my recollection that the Oversee EBITDA performance goal was met in 2009.

69.    Craig Snyder also communicated to me that Oversee achieved its 2009 Oversee EBITDA goal.

70.    It is my understanding that all of the other Senior Executives were bonused in 2009 based on Oversee's attainment of its 2009 Oversee EBITDA goal.

71.    In 2010 I was informed by Oversee that the Board had modified the performance goals for both the domain sales and registrar business segments.  I attended meetings and participated in conferences with management personnel, including Craig Snyder, Jeff Kupietzky, and Elizabeth Murray, during which these revised goals were communicated.  The revised performance goal in 2010 for these business segments was $1,488,000. (Trial Exhibit 141.)  I have reviewed Exhibit 141 and it is consistent with my recollection of the domain sales and registrar business segments goal that was communicated to me in 2010.

72.    In 2010 I was also informed by Oversee that the Board had approved the Oversee EBITDA goal for 2010.  I attended meetings and participated in conferences with management personnel, including Jeff Kupietzky, Craig Snyder, Peter Celeste and Elizabeth Murray, during which I was advised that the goal for 2010 was around $24 million. (Trial Exhibit 141.)   I have reviewed Exhibit 141 and it is consistent with my recollection of the Oversee EBITDA performance goal that was communicated to me in 2010.

73.    I understood that the Oversee EBITDA goal communicated to me in 2010 applied to all Oversee employees.  Nobody at Oversee communicated to me that I was excluded from this goal.

74.    It is my understanding and belief that Oversee met its EBITDA goal of

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4840-8190-2094.1
14
DECLARATION OF MONTE CAHN

in 2010.  (Trial Exhibit 141.)  I have reviewed Exhibit 141 and it is consistent with my recollection that the Oversee EBITDA performance goal was met in 2010.

75.    It is my understanding that all of the other Senior Executives were bonused in 2010 based on Oversee's attainment of its 2010 Oversee EBITDA goal.

76.    During my employment with Oversee I had multiple conversations with Jeff Kupietzky.  During these conversations Mr. Kupietzky repeatedly complained that my salary and bonus structure far exceeded that of all of the other executives. In response, I reminded him that my MIP had been negotiated as part of the Seevast transaction.  I also reminded him that Seevast had agreed to a $10 million reduction in the purchase price so that Oversee could fund the MIP.


I declare, under penalty of perjury, under the laws of the State of California and of the United States of America that the statements contained in this declaration are true and correct.  Executed this 13th day of January, 2012 in Lauderdale by the Sea, Florida.


_____          _____
Monte Cahn

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

# EXHIBIT "1"

4822-5156-6595.1

Redacted

**From:** "Victor Pitts"
**Subject: DomainSponsor SPIF - effective immediately**
**Date:** March 24, 2008 2:26:38 PM EDT
**To:** "'Albert Michaels'", "'Bari Meyerson'", "Chris Leggatt", "Don Lyons", "Howard Kopp",
"'Keith Soifer'" <keith@corp.moniker.com>, "'Peter Brooks'", "Richard Boyer", "John
Mauriello", "'Tony Clark'"
**Cc:** "Monte Cahn", "Rob McClinton"

**Attention Moniker Sales:** Please start referring PPC business to DomainSponsor.

**Program Goal:** Increase leads to DS Sales from Moniker Sales referrals

**Program Detail:**
1) Brand New Account referrals (no previous OID)
   a. 0-500 domains          $25
   b. 500-1,000 domains      $100
   c. 1,001-5,000 domains    $500
   d. 5,001-10,000 domains   $1,000
   e. 10,000 plus domains    $2,500

2) New names added to existing account (would be new AID)
   a. 0-1,000 domains        $100
   b. 1,001 - 5,000 added    $250
   c. 5,001-10,000 domains   $500
   d. 10,001 plus domains    $1,000

**Note: Domains must have traffic to be eligible for this SPIF.**

Process:
- Create Email that includes the leads contact info (name, address, city, state, zip, country, phone, email address) and a list of a few of their domains with any other descriptions for portfolio size/quality. Note whether they are new to PPC or at another competitor.
- Send lead to leads@oversee.net.
- Make subject read "LEAD to Oversee – CLIENT NAME – from YOUR NAME

1

MCAHN003776

Domainsponsor creates and optimize custom landing pages for each of your client's domains, and deliver relevant ads and content precisely targeted to your visitors' needs.  DomainSponsor provides the industry's fastest payout: Net 7.

Regards,

Victor H. Pitts
*Vice President Sales and Client Services*
vpitts@moniker.com

Toll free in the U.S. and Canada: 1.800.841.7686 ext 3532
Outside the U. S. and Canada: 1.954.861-3532
Fax:  954-969-9155
ICQ: 286-038-862

http://www.Moniker.com
ICANN Accredited Domain Registrar, Premium Domain Sales & Escrow Services

**"Moniker is the first and only provider of Domain Asset Management."**

Redacted

MCAHN003777

# EXHIBIT "2"

4822-5156-6595.1

Moniker.com is the world leader in Domain Asset Management including Domain Auctions & Sales, Escrow, Appraisal, Monetization, Registration, Brand Protection, Acquisition, and Portfolio Management.

Toll Free: 1-800-688-6311

O: 954-984-8445

F: 954-969-9155

ICQ: 292961812

MSN: moniker-man@hotmail.com <mailto:moniker-man@hotmail.com>

AIM/Yahoo: MonikerDotCom


From: Jeff Kupietzky [mailto:jkupietzky@oversee.net]
Sent: Tuesday, March 04, 2008 3:01 PM
To: Monte Cahn
Cc: Lawrence Ng
Subject: RE: mike berkens moving all names from skenzo to DS


Sounds great. I expect with the promotion we should get a lot of these.

Jeff


_____

From: Monte Cahn [mailto:monte@corp.moniker.com]
Sent: Tuesday, March 04, 2008 11:50 AM
To: Jeff Kupietzky
Cc: Lawrence Ng
Subject: mike berkens moving all names from skenzo to DS


We got mike to move all names from Skenzo to DS....want to make sure this is tracked accordingly


We will push a ton of others over.


Best Regards,

Monte Cahn

Founder / CEO

3

OVER001708