**LEWIS BRISBOIS BISGAARD & SMITH** LLP
JOHN L. BARBER, SB# 160317
  E-Mail: barber@lbbslaw.com
KENNETH D. WATNICK, SB# 150936
  E-Mail: watnick@lbbslaw.com
SONJA HARRINGTON, SB# 261053
  E-Mail: sharrington@lbbslaw.com
221 North Figueroa Street, Suite 1200
Los Angeles, California 90012
Telephone: 213.250.1800
Facsimile: 213.250.7900

Attorneys for MONTE CAHN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MONTE CAHN,<br><br>          Plaintiff,<br><br>     vs.<br><br>OVERSEE.NET, a California corporation; JEFF KUPIETZKY, an individual; LAWRENCE NG, an individual; and Does 1 through 10,<br><br>          Defendants. | CASE NO. CV11-03800 SVW (AGRx)<br><br>The Honorable Stephen V. Wilson<br><br>**MONTE CAHN'S TRIAL BRIEF PURSUANT TO LOCAL RULE 16-10**<br><br>Complaint Filed:    May 3, 2011<br>Final Pretrial Conf.: January 9, 2012<br>Trial Date:            January 24, 2012 |

4841-8099-3038.1

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1
2

## **TABLE OF CONTENTS**

**Page**

3  I.  BACKGROUND ...........................................................................................1

4      A.  The Purchase of Moniker ...............................................................1

5      B.  The MIP ...........................................................................................3

6      C.  The ICP ............................................................................................3

7      D.  The Oversee EBITDA Goals ..........................................................4

8      E.  The TrafficClub Business Segment ................................................4

9  II. ISSUES RAISED BY THE COURT ..........................................................6

10     A.  The Oversee EBITDA Goal Under the MIP....................................6

11         1.  Oversee Communicated its EBITDA Goals in 2009 and
               2010 to Both Cahn and its Employees. .................................8

12
13         2.  Oversee Provided Bonus Payouts to Oversee Senior
               Management Based on Oversee's EBITDA Goal. ................11

14         3.  Cahn Was a Senior Manager and Subject to the Same
               Oversee EBITDA Goals. .....................................................11

15
       B.  The TrafficClub Business Segment. ..............................................12

16
17         1.  The Merger of DomainSponsor and TrafficClub. ...............13

           2.  Expanding DomainSponsor Customers After the Merger. ........14

18
19         3.  Oversee Has Misinterpreted the Terms of the MIP.............15

20 III. CONCLUSION ..........................................................................................18

21
22
23
24
25
26
27
28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1

## TABLE OF AUTHORITIES

2

*Brandon & Tibbs v. George Kevorkian Accountancy Corp.,*
226 Cal. App. 3d 442 (1990) ...................................................................12

3

*Ghk Associates v. Mayer Group,*
224 Cal. App. 3d 856 (1990) ...................................................................12

4

5

*Goldberg v. City of Santa Clara,*
21 Cal. App. 3d 857 (1971) .................................................................7, 10

6

*Hardy v. Hardy,*
23 Cal. 2d 244 (1943) .........................................................................7, 9

7

8

*Lazar v. Hertz Corp.,*
143 Cal. App. 3d 128 (1983) ....................................................................7

9

*Martin v. U-Haul Co. of Fresno,*
204 Cal. App. 3d 396 (1988) ...................................................................12

10

11

*Perdue v. Crocker National Bank,*
38 Cal. 3d 913 (1985) .........................................................................7, 9

12

*Powell v. Central California Federal Savings & Loan Assn.,*
59 Cal. App. 3d 540 (1976) ....................................................................7, 9

13

14

*Sabatini v. Hensley,*
161 Cal. App. 2d 172 (1958) ...................................................................10

15

*Scudder v. Perce,*
159 Cal. 429 (1911) ...........................................................................7, 9

16

## STATUTES

17

18

Cal. Gov Code § 14 ...............................................................................7

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    Plaintiff Monte Cahn ("Cahn") hereby submits his Trial Brief in accordance

2  with Local Rule 16-10 to supplement his Memorandum of Contentions of Fact and

3  Law.  Based on the Court's Order during the January 10, 2012 Final Pretrial

4  Conference, Cahn has limited his trial brief to the two issues for trial identified by

5  the Court during the January 10, 2012 pretrial conference.  These issues have been

6  identified as:  (1) Oversee's treatment of the Oversee EBITDA performance goal

7  under the MIP; and (2) The determination of TrafficClub customers for the purpose

8  the MIP after the combination of TrafficClub into DomainSponsor.

9

10  **I.**      **BACKGROUND**

11    This lawsuit arises out of Defendant Oversee.net's ("Oversee") breach of

12  Monte Cahn's ("Cahn") Management Incentive Plan ("MIP").  Oversee committed

13  multiple breaches of the MIP, including failing to properly track the TrafficClub

14  Business Segment under the MIP, breaching its duty of good faith and fair dealing

15  in administering the MIP, and failing to award Cahn his Baseline Awards under the

16  MIP for meeting the Performance Goals under the both the TrafficClub and Oversee

17  Business Segments in 2008, 2009 and 2010.

18  **A.**      **The Purchase of Moniker**

19    Cahn is one of the pioneers of the domain name selling, valuing and auction

20  concept.  In 1999 Cahn formed Domain Systems, Inc. d/b/a Moniker.com

21  ("Moniker"), a web-based service that provides users an interface to search for,

22  register and manage domain names.  Moniker was comprised of three business

23  segments: TrafficClub, the Registrar and Domain Sales.

24    TrafficClub was the division of Moniker that created websites for domain

25  names owned by others, and earned money from the advertising published on those

26  websites using a unique combination of advertising content feeds from Google,

27  Yahoo and others, which were rotated to provide the maximum revenue to Traffic

28  Club and its customers.  Traffic Club also earned and managed revenue for default

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1

1

1   DNS (domain name server) traffic from the Registrar and its customers (running

2   advertising on websites at domain names as soon as they are registered but before

3   the owner of the name points that name to another website.)  The Registrar managed

4   revenue for default DNS traffic for its customers as well as the securing, registering

5   and renewing of internet domain names.  It also generated revenue from expired

6   name auctions and sales from registrar customers that did not renew their own

7   domain names.  And the Domain Sales business segment was involved in the

8   auction, escrowing, appraising and brokerage of domain names.

9       Cahn managed and operated Moniker as a successful business until 2005, at

10  which time Kanoodle, which later was renamed as Seevast Corp. ("Seevast"),

11  purchased Moniker.  Cahn believed that the sale of Moniker to Seevast would be a

12  good partnership.  Seevast agreed to keep Moniker autonomous, and Seevast was

13  also looking to go public, which made it attractive at the time.  Additionally, as part

14  of the transaction Seevast and Moniker agreed that if Seevast did not have a change

15  of control or go public within two years of the sale that Moniker's executives could

16  request that the board put Moniker back up for sale.

17      While at Seevast Cahn continued as CEO and successfully managed and grew

18  Moniker, generating $3.6 in EBITDA (earnings before interest, taxes, depreciation

19  and amortization) for 2006 and $4.1 in 2007.  (See Trial Exhibits 302 and 392.)

20      In late 2006, early 2007, two years after Seevast's purchase of Moniker,

21  Seevast had not had a change of control or gone public, and Moniker requested from

22  the Seevast Board to have it resold again.  The Board agreed.  There were around

23  twenty different companies that were interested in the sale of Moniker at the time.

24      In 2007 Oversee began negotiations with Seevast Corp. for the purchase of

25  Moniker.  Cahn, as the Founder and CEO of Moniker, was an invaluable asset to

26  Moniker.  As a result, Oversee conditioned the purchase of Moniker on Cahn's

27  continued management of Moniker while at Oversee in addition to helping Oversee

28  grow overall as a company.  In order to incentivize Cahn to agree to the sale of

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1

2

MONTE CAHN'S TRIAL BRIEF

1   Moniker and join Oversee, Oversee negotiated a $10 million discount from Seevast

2   to fund a very large incentive program which it offered to Cahn, known as the

3   "Management Incentive Plan" ("MIP").  However, instead of adding the cost of the

4   MIP to the purchase price, Oversee decided to take the cost of the MIP off of the

5   purchase price and use the difference to fund the MIP.

6          The sale of Moniker to Oversee was completed on December 14, 2007.

7          **B.     The MIP**

8          Under the MIP, Cahn would be able to earn up to $13,000,000 through a three

9   year goal oriented bonus structure.  The bonus structure in the proposed MIP was

10  based on performance goals in four categories: the Registrar, Domain Sales,

11  TrafficClub, and Oversee EBITDA.  (Trial Exhibit 1.)  The first three segments are

12  known as the "Moniker Business Segments", and each of the Moniker Business

13  Segments had pre-determined performance goals for all three determination periods.

14  (Trial Exhibit 1.)   The performance goal for the fourth segment, Oversee EBITDA,

15  was labeled "TBD" because the 2008-2010 overall Oversee budgets and EBITDA

16  goals were not completed at the time the MIP was negotiated, and was to be set by

17  the Board, in consultation with Cahn each year.  (Trial Exhibit 1.)  This would allow

18  the parties to take into account market conditions and Oversee's current

19  performance each year in setting a reasonable goal.

20         **C.     The ICP**

21         In late 2008, Oversee proposed and prepared a supplemental compensation

22  plan, the 2008 Incentive Compensation Plan ("ICP").  (Trial Exhibit 28.)  The ICP

23  confirmed that the MIP was to remain in full force and effect in accordance with its

24  terms.  (Trial Exhibit 28.)  Cahn was to be entitled to payments under either the MIP

25  or the ICP, whichever provided him with the higher amount.  (Trial Exhibit 28.)

26  Additionally, under the ICP, Cahn was entitled to earn as bonus compensation an

27  amount equal to at least the average bonus earned by members of the Senior

28  Management Team.  (Trial Exhibit 28.)  The ICP, thus, was an alternative incentive

**LEWIS**
**BRISBOIS**
**BISGAARD**
**& SMITH LLP**
ATTORNEYS AT LAW

4841-8099-3038.1

3

1  program and was not intended to nullify the existing terms of the MIP.  (Trial

2  Exhibit 28.)

3    **D.    The Oversee EBITDA Goals**

4    In 2008, 2009 and 2010, the Board approved Oversee's EBITDA goals and

5  presented them to the company and its employees.  Lawrence Ng, the founder and

6  former CEO of Oversee, testified that in 2008, Oversee achieved the Board

7  approved overall Oversee EBITDA performance goal.  In 2009, the Board approved

8  an Oversee's EBITDA goal of $24 million, and in 2010 it approved an EBITDA

9  goal of $24.2 million.  In 2009, Oversee achieved more than 100% of its EBITDA

10  goal, earning $24.8 million in EBITDA.  And in 2010, Oversee also achieved more

11  than 100% of its EBITDA target, earning $25.3 million.  Oversee used these goals

12  in both incentivizing its employees and to determine its employees' year-end

13  bonuses.  The senior management team was bonused in 2008, 2009 and 2010 based

14  on Oversee's attainment of these Oversee EBITDA goals.  However, Oversee

15  breached the MIP in failing to provide Cahn his Oversee EBTIDA award under the

16  MIP when Oversee achieved its goals in 2008, 2009 and 2010.

17    **E.    The TrafficClub Business Segment**

18    Additionally, Oversee breached its duties under the MIP by failing to properly

19  account for Cahn's performance under the MIP.  In addition to the numerous

20  accounting irregularities discovered in Oversee's financial accounting of Moniker,

21  and as admitted by Oversee's own employees, just over one month after the

22  acquisition of Moniker Oversee unilaterally decided to integrate TrafficClub into

23  DomainSponsor.  TrafficClub was the business segment of Moniker relating to the

24  monetization of internet domain names through an optimization engine of rotating

25  third party parking/monetization platforms that used feeds from such companies as

26  Google and/or Yahoo and others. DomainSponsor is Oversee's monetization

27  segment and unlike TrafficClub, only utilizes a single platform (Google).  When

28  Cahn negotiated the terms of the MIP, he negotiated the agreement with the

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1
4
MONTE CAHN'S TRIAL BRIEF

1  expectation that TrafficClub would continue to operate as its own subsidiary of

2  Oversee and be supported by both Overseee and DomainSponsor sales and

3  management.  However, this was not what Oversee had planned for TrafficClub.

4  Oversee had previously demonstrated its desire to integrate TrafficClub's customers

5  into DomainSponsor back in February of 2007 when it attempted to poach

6  TrafficClub's customers.  Oversee finally achieved the result it originally desired.

7        After TrafficClub and DomainSponsor were combined, Cahn was appointed

8  the Vice President of the DomainSponsor business division, with sales responsibility

9  for the combined division.  Cahn and the Moniker team was told to grow the

10  combined entity by bringing in new customers to DomainSponsor and by adding

11  domain names to existing DomainSponsor customer accounts, and he would receive

12  credit under the MIP for both bringing in new customers and by adding names to

13  existing DomainSponsor accounts.  However, after Oversee merged TrafficClub

14  with DomainSponsor, Oversee failed to amend the MIP to account for the material

15  change in operations of TrafficClub, and change in Cahn responsibilities, including

16  how Oversee now tracked customers of TrafficClub and DomainSponsor.

17        Additionally, in order to make the integration of TrafficClub and

18  DomainSponsor more palatable to the Moniker team, Oversee  implemented a new

19  program for the Moniker employees whereby the Moniker team and Cahn would

20  earn bonuses based on new account referrals to DomainSponsor, and for adding new

21  names to existing DomainSponsor accounts.  Oversee called this the

22  DomainSponsor "SPIF".  However, as par for the course for Oversee, Oversee failed

23  to make payments to Cahn and the Moniker team under the SPIF.  (Trial Exhibits 92

24  and 247.)   Cahn also never received any accounting reports under the SPIF for the

25  referrals from Moniker to DomainSponsor.  (Trial Exhibits 92 and 247.)

26  Additionally, Oversee admits that it failed to track TrafficClub's performance under

27  the MIP, and confirmed that Cahn did not receive any credit under the TrafficClub

28  business segment for any new monetization customers, expansion of existing

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1                                    5
                        MONTE CAHN'S TRIAL BRIEF

1   DomainSponsor customers, or revenues that it generated after TrafficClub merged

2   with DomainSponsor.   However, the evidence will show that Cahn achieved his

3   performance goals under the TrafficClub business segment of the MIP, and is

4   entitled to his baseline awards in the amount of $1.6 million.

5        It is also important to note that Oversee's failure to award Cahn his

6   performance awards under the MIP resulted in a $10 million windfall to Oversee.

7   Oversee specifically negotiated a reduction in the purchase price of Moniker with

8   Seevast with the agreement that $10 million would be set aside for funding Cahn's

9   MIP, while never intending to make the funds available to Cahn.  From the

10  beginning, Oversee failed to properly track, account for and administer the MIP, all

11  the while deceiving and defrauding Cahn.  Oversee should not be rewarded for its

12  fraudulent and deceptive conduct, and numerous intentional breaches of the MIP.

13

14  **II.    ISSUES RAISED BY THE COURT**

15       **A.    The Oversee EBITDA Goal Under the MIP.**

16       At the time the MIP was executed, the performance goals for the Oversee

17  business segment were "TBD" for all three determination periods.  Pursuant to

18  Oversee's own representations, these goals were to be determined after closing.

19  (¶15(u) of the MIP, Trial Exhibit 1.)  While Oversee has argued that the Board had

20  discretion to set Cahn's Oversee EBITDA goal under the MIP, the MIP specifically

21  provides that the Oversee EBITDA goal "**shall** be determined from time to time by

22  the Board, in consultation with Monte Cahn for so long as he is employed by the

23  Company."  (¶15(u) of the MIP, Trial Exhibit 1.)  Oversee claims that it failed to set

24  Cahn's Oversee EBITDA goal for any of three determination periods.  (12:15-17 of

25  Oversee's Motion for Summary Judgment [Doc. No. 91].)  When asked to explain

26  this conduct, Oversee's Board members were unable to provide any explanation as

27  to why they breached their contractual obligations to set an Oversee EBITDA.

28       Where a contract confers on one party discretionary power affecting the rights

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1

6

1  of the other party, the law implies a duty to exercise that discretion in good faith and

2  in accordance with fair dealing.  (*Perdue v. Crocker National Bank*, 38 Cal. 3d 913,

3  923 (1985).)  The propriety of a party's exercise of discretion will be determined by

4  reference to whether that party's conduct was objectively reasonable under the

5  circumstances.  (*Lazar v. Hertz Corp.*, 143 Cal. App. 3d 128, 141 (1983).)

6  Additionally, contractual use of the term "**shall**" establishes a mandatory and

7  definite duty.  (*See*, *Hardy v. Hardy*, *23 Cal. 2d 244*, 246 (1943), *Scudder v. Perce*,

8  159 Cal. 429, 432 (1911); *Powell v. Central Cal. Fed. Sav. & Loan Assn.*, 59 Cal.

9  App. 3d 540, 548 (1976).)  California statutes repeatedly confirm that the term

10  "shall" creates a mandatory obligation.  (Cal Gov Code § 14 ("'Shall' is mandatory

11  and 'may' is permissive."); Cal Bus & Prof Code § 19; Cal Lab Code § 15.)  Thus,

12  under California law, "an open term in a contract must be filled in by the party

13  having discretion within the standard of good faith and fair dealing." (*Id.*)

14       As the Court here has already recognized, "Oversee was bound by the implied

15  covenant of good faith and fair dealing to set such a target."  (P. 5 of Court's Order

16  re Defendant's Motion for Summary Judgment [Doc. No. 209].)   The MIP "is more

17  plausibly read as vesting Oversee with discretion as to where to set the applicable

18  target or goal that would be used to determine whether a bonus payment was due,

19  not unfettered discretion as to whether to set a target or goal at all."  (*Id.*)  Further

20  "the fact that Oversee claims it never set such a Performance Goal means that

21  Oversee arguably acted so as to frustrate the MIP because the MIP clearly required

22  Oversee to set an Oversee Performance Goal. Moreover, had Oversee set a goal that

23  was purposefully formulated to award no incentive or a nominal incentive, that too

24  could be grounds for a finding of breach."  (*Id.* at fn. 8, *citing Goldberg v. City of*

25  *Santa Clara*, 21 Cal. App. 3d 857, 860-861 (1971).)

26  / / /

27  / / /

28  / / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1

7

MONTE CAHN'S TRIAL BRIEF

1.   *Oversee Communicated its EBITDA Goals in 2009 and 2010 to Both Cahn and its Employees.*

Lawrence Ng, the founder and former CEO of Oversee, testified that in 2008, Oversee achieved the Board approved overall Oversee EBITDA performance goal.

Additionally, contrary to Oversee's assertion that the Board never set Cahn's Oversee EBITDA performance goal, the evidence reflects the contrary.  In both 2009 and 2010 Oversee communicated its EBITDA goal to both its employees and to Cahn.  (¶¶ 111 and 128 of the Direct Examination of Jeffrey Kupietzky [Doc. No. 225].)  In 2009, the Board approved an Oversee's EBITDA goal of $23.9 million.  (Trial Exhibit 140, ¶ 111 of the Direct Examination of Jeffrey Kupietzky [Doc. No. 225].)  This goal was communicated to both the Oversee employees and to Cahn.  (¶¶ 66, 67 of the Direct Testimony Declaration of Monte Cahn [Doc. No. 227].)  Oversee achieved more than 100% of its 2009 EBITDA goal, earning $24.8 in EBITDA.  (Trial Exhibit 140, ¶ 115 of the Direct Examination of Jeffrey Kupietzky [Doc. No. 225], ¶ 68 of the Direct Testimony Declaration of Monte Cahn [Doc. No. 227].)

In 2010, Oversee set an organic EBITDA forecast of $23.2 million and a non-organic (which accounts for Oversee's acquisitions of other companies with positive EBITDA) forecast of $25.2 million.  (Trial Exhibit 141, ¶ 128 of the Direct Examination of Jeffrey Kupietzky [Doc. No. 225].)   Again, this goal was communicated to both the Oversee employees and to Cahn.  (¶¶ 72, 73 of the Direct Testimony Declaration of Monte Cahn [Doc. No. 227].)  Oversee again achieved over 100% of its 2010 EBITDA target, earning $25.7 million.  (Trial Exhibit 141, ¶ 139 of the Direct Examination of Jeffrey Kupietzky [Doc. No. 225], ¶ 74 of the Direct Testimony Declaration of Monte Cahn [Doc. No. 227].)

Oversee does not argue that it didn't achieve its Oversee EBITDA goals in 2008, 2009 and 2010, rather, it argues that the MIP did not contemplate a downward growth pattern of Oversee's EBITDA, and therefore Cahn is not entitled to his

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1

8

MONTE CAHN'S TRIAL BRIEF

1   bonus under the MIP.  However, the MIP does not provide Oversee with discretion

2   to decide whether or not to set its MIP targets, or whether or not to pay Cahn his

3   baseline awards, based on the state of the economy or any other extraneous

4   condition for that matter.  Furthermore, during the merger negotiations Oversee

5   reduced its original bid price of $50 million to $24.1 million.  A portion of the price

6   reduction was attributed to Cahn's MIP, and was to be set aside for the bonus

7   payments payable by Oversee to Cahn under the MIP.  Therefore any subsequent

8   changes to the economy, or downward growth patterns of Oversee's EBITDA, are

9   of no consequence as the funding for the MIP was accounted for at the time of the

10   merger.

11        Oversee has recently argued that setting the Oversee EBITDA goal would

12   have been an "idle act".  This argument has already been rejected by the Court.  (P.

13   5 of Court's Order re Defendant's Motion for Summary Judgment [Doc. No. 209].)

14   First, Oversee had an affirmative duty to set the Oversee EBITDA goal.  (*See*,

15   *Hardy v. Hardy*, *23 Cal. 2d 244*, 246 (1943), *Scudder v. Perce*, 159 Cal. 429, 432

16   (1911); *Powell v. Central Cal. Fed. Sav. & Loan Assn.*, 59 Cal. App. 3d 540, 548

17   (1976).)   Second, Oversee had a duty of good faith and fair dealing in its setting of

18   the Oversee EBITDA goal.  (*Perdue v. Crocker National Bank*, 38 Cal. 3d 913, 923

19   (1985).)   Oversee did not have the discretion to decide whether or not it wished to

20   set the goal.  Oversee only had the discretion as to what amount to set the goal at.

21   Oversee's contention that it did not have to set the Oversee EBITDA goal because

22   of the downturn in the economy is simply further evidence of Oversee's fraud.  As

23   the Court has already recognized, the MIP "is more plausibly read as vesting

24   Oversee with discretion as to where to set the applicable target or goal that would be

25   used to determine whether a bonus payment was due, not unfettered discretion as to

26   whether to set a target or goal at all."  (P. 5 of Court's Order re Defendant's Motion

27   for Summary Judgment [Doc. No. 209].)   Further "the fact that Oversee claims it

28   never set such a Performance Goal means that Oversee arguably acted so as to

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1

MONTE CAHN'S TRIAL BRIEF

1  frustrate the MIP because the MIP clearly required Oversee to set an Oversee

2  Performance Goal.  Moreover, had Oversee set a goal that was purposefully

3  formulated to award no incentive or a nominal incentive, that too could be grounds

4  for a finding of breach."  (*Id.* at fn. 8, *citing Goldberg v. City of Santa Clara*, 21 Cal.

5  App. 3d 857, 860-861 (1971).)   Third, Oversee's "idle act" defense was

6  manufactured after the Court denied Oversee's motion for summary judgment and

7  was not supported by the testimony of Oversee's representatives, Mr. Ng, Mr.

8  Kupietzky, Ms. Peterson, Ms. Murray, or Mr. Navach.

9        Finally, Oversee has argued that the MIP is not a contract, but a financial

10  performance plan, and therefore an offer, not a contract.  However, the Court has

11  also previously rejected this argument stating that "[t]he Court disagrees with

12  Oversee's argument that the MIP is not a contract. Rather, as Plaintiff notes, Courts

13  recognize incentive plan offered to induce employment as binding contractual

14  agreements.  *See, e.g. Sabatini v. Hensley*, 161 Cal. App. 2d 172, 175 (1958).

15  ("When an employer promises a prospective employee a fixed salary and an

16  indeterminate bonus, each promise is made to induce undertaking of the

17  employment. Acceptance of the employment is consideration for the promise of a

18  bonus, and this promise thus is enforceable.") (internal citation omitted)."  (P. 3, fn.

19  6 of Court's Order re Defendant's Motion for Summary Judgment [Doc. No. 209].)

20        Oversee had an affirmative obligation to set the MIP targets, and an

21  affirmative obligation to provide Cahn his MIP awards if those targets were met.

22  Oversee failed to meet its obligations under the MIP and therefore Cahn is entitled

23  to damages in the amount of $3.2 million, the amount of the Oversee EBITDA

24  baseline award under the MIP.

25  / / /

26  / / /

27  / / /

28  / / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

**2.**   ***Oversee Provided Bonus Payouts to Oversee Senior***
***Management Based on Oversee's EBITDA Goal.***

All of the members of the Senior Management, excluding Cahn, had bonus
plans in place whereby they would receive a yearly bonus based on their
performance relating to their individual goals.  Cahn's bonus plan was the MIP.  The
number one goal for each Senior Manager was to "achieve financial targets for
Company performance according to approved Plan."  (Trial Exhibit 265.)   For
2009, part of this goal was a total EBITDA of $23.9 million for each Senior
Manager.  (Trial Exhibit 265.)   Similarly, in 2010, the number one goal for each
Senior Manager was to achieve the Company's financial targets.  (Trial Exhibit
267.)   For 2010, part of this goal was a total EBITDA of $25 million for each
Senior Manager.  (Trial Exhibit 267.)   Based on Oversee's achievement of its
EBITDA goals in 2009 and 2010, all of the Senior Management, except for Cahn,
received a bonus payment based on Oversee's EBITDA.  (¶ 119, 139 of the Direct
Examination of Jeffrey Kupietzky [Doc. No. 225], ¶¶ 70, 75 of the Direct Testimony
Declaration of Monte Cahn [Doc. No. 227].)

**3.**   ***Cahn Was a Senior Manager and Subject to the Same Oversee***
***EBITDA Goals.***

During his employment with Oversee, Cahn was a member of the Senior
Management team, and subject to the same goals as the other members of the Senior
Management team.

The Employment Agreement provides that Cahn was to "serve as the
President of Moniker, and shall have the normal duties, responsible, functions and
authority as are normally associated with and appropriate for such position."  (¶2(a)
of Employment Agreement, Trial Exhibit 9.)   Additionally, during the MIP
negotiations, Cahn made it clear that he was to be treated like other members of the
senior management in the setting of his goals.  (Trial Exhibit 82.)  This was again
confirmed in Cahn's 2008 Incentive Compensation Plan, which stated that Cahn was

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1
11
MONTE CAHN'S TRIAL BRIEF

1  "entitled to earn as bonus compensation an amount equal to at least the average

2  bonus earned by members of the Senior Team."   (Trial Exhibit 28.)  Additionally,

3  Stacey Peterson, Oversee's CFO from 2006-2009, confirmed that Oversee only set

4  one overall Oversee EBITDA target for the entire company.  As such, it is clear that

5  Cahn was a member of the Senior Management team, and was subject to the same

6  goals as the other members of the Senior Management team.

7        Just like the other members of the Senior Management, Cahn achieved the

8  Oversee EBITDA goals in 2008, 2009 and 2010.  As a result, Cahn is entitled to

9  damages in the amount of $3.2 million, the amount of the Oversee EBITDA

10  baseline awards under the MIP.  (*See Martin v. U-Haul Co. of Fresno*, 204 Cal.

11  App. 3d 396, 409 (1988) [finding that damages for breach of contract are intended to

12  give the injured party the benefit of his or her bargain]; *Brandon & Tibbs v. George*

13  *Kevorkian Accountancy Corp.,* 226 Cal. App. 3d 442, 468 (1990) [damages should

14  place the injured party in as good a position as he would have been in had

15  performance been rendered as promised]; and *Ghk Assocs. v. Mayer Group*, 224

16  Cal. App. 3d 856, 874 (1990) [when the wrongful acts of the defendant have caused

17  plaintiff to not realize a profit to which that party is entitled, the law requires only

18  that some reasonable basis of computation of damages be used].)

19        **B.    The TrafficClub Business Segment.**

20        TrafficClub was the business segment of Moniker relating to the monetization

21  of internet domain names through an optimization engine of rotating third party

22  parking/monetization platforms that used feeds from such companies as Google

23  and/or Yahoo and others.  It created linguistically targeted single page websites and

24  parking pages for domain names owned by others, and earned money from the

25  advertising published on those websites using a unique combination of advertising

26  content feeds from Google, Yahoo and others, which were rotated to provide the

27  maximum revenue to Traffic Club and its customers.  TrafficClub also earned and

28  managed revenue for default DNS (domain name server) traffic from the Registrar

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1

1   and its customers (running advertising on websites at domain names as soon as they

2   are registered but before the owner of the name points that name to another

3   website.)  DomainSponsor was Oversee's monetization platform and, unlike

4   TrafficClub, only utilized a single feed from Google.

5        In connection with Oversee's acquisition of Moniker, Oversee's

6   representatives assured Cahn that Oversee was committed to the expansion of the

7   TrafficClub platform.  Oversee represented to Cahn that it would use the synergy of

8   Moniker and Oversee to grow TrafficClub, that DomainSponsor personnel would

9   work to grow the TrafficClub business, that Cahn would receive credit under the

10  MIP for the expansion of Oversee's monetization business (regardless of whether

11  the growth was under the TrafficClub or DomainSponsor name), and that Oversee's

12  contract with Google would not interfere with the continued operation of

13  TrafficClub.  None of these representations were true.

14               **1.**   ***The Merger of DomainSponsor and TrafficClub.***

15       On January 31, 2008, just over one month after the merger of Oversee and

16  Moniker, Oversee unilaterally decided to combine TrafficClub into DomainSponsor.

17  Cahn only agreed to the merger under the condition that he would receive the

18  appropriate credit under his MIP for the revenues of the combined division.  It was

19  also his understanding that if he expanded any existing customers of

20  DomainSponsor, he would receive credit under his MIP since the two entities were

21  now combined as one.  (Trial Exhibit 18.)  With this understanding, Cahn agreed to

22  the merger, and the two entities were combined.

23       After the two divisions were combined, Cahn was appointed the Vice

24  President of the DomainSponsor business division, with sales responsibility for the

25  combined division.  Also, based on the combination of TrafficClub and

26  DomainSponsor, account managers from Traffic Club were also responsible for

27  DomainSponsor and vice versa.

28  / / /

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1                                    13
                              MONTE CAHN'S TRIAL BRIEF

## 2.   *Expanding DomainSponsor Customers After the Merger.*

After Oversee combined TrafficClub and DomainSponsor, Cahn was told to that it was his responsibility to now grow the combined entity by both bringing in new customers to DomainSponsor and by adding domain names to existing DomainSponsor customer accounts, and he would receive credit under the MIP for both of these growth scenarios.  (Trial Exhibit 263.)  Additionally, Oversee told Cahn that he and his Moniker team would earn bonuses based on any new account referrals to DomainSponsor, and for new names added that they added to existing DomainSponsor accounts.  Oversee dubbed this program the DomainSponsor "SPIF".  (*Id.*)

Based on the understanding that Cahn was to receive credit for expanding existing DomainSponsor accounts, on or around March 4, 2008 Cahn advised Oversee that he had persuaded Mike Berkens to move all of his names from Skenzo to DomainSponsor and requested that Oversee make sure that these names were tracked accordingly under the MIP.  (Trial Exhibit 264.)  Cahn also met with Jan Barta in 2008 and worked with him and his team over a period of months to help put together a finance deal where Mr. Barta borrowed $3 million and then paid the loan off by monetizing domains that he had registered at Moniker through DomainSponsor.  Cahn visited him and his company in Prague to also secure this relationship.  Additionally, some other large business development deals that Cahn helped to monetize through DomainSponsor after it combined with TrafficClub included: Manila, Merlin Kaufman, Nokta, Jordan Levinson / Marlon Philips, Rick Schwartz, Roy Messer, TuCows, Marchex, and numerous others.

However, after the merger, Cahn discovered that neither he nor his staff were receiving any credit under the MIP for his referrals of monetization business to DomainSponsor in 2008, 2009 and 2010.  Oversee admits not to have credited Cahn or his staff for such referrals.  Additionally, Oversee failed to make payments to Cahn and the Moniker team under the SPIF, and he never received any accounting

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  reports under the SPIF for the referrals from Moniker to DomainSponsor.  (Trial

2  Exhibits 92 and 247.)  In fact, Oversee had stopped tracking the TrafficClub

3  Business Segment, as defined under the MIP.  Oversee admitted that Cahn did not

4  did not receive any credit for any new or increased monetization customers or

5  revenues that were generated as a result of Moniker's efforts after TrafficClub was

6  combined with DomainSponsor.

7           **3.**     *Oversee Has Misinterpreted the Terms of the MIP.*

8        Oversee has argued that Cahn is not entitled to credit under the MIP for

9  increased or expanded revenues from existing DomainSponsor customers who were

10  not customers of TrafficClub as of December 14, 2007.  Oversee's interpretation is

11  based on an incorrect analysis of the defined terms "Gross Profit" and "TrafficClub

12  Business Segment" under the MIP.

13        The term "Gross Profit" is defined under the MIP as:

14            …total revenues from customers of the **TrafficClub**

15            **Business Segment** less all cost of goods sold relating

16            thereto (including revenue share payments); provided,

17            however, in the case of **Shared Customers**, **Gross Profit**

18            shall be determined by multiplying (i) the **Gross Profit**

19            from such **Shared Customers** by (ii) the **Applicable**

20            **Shared Customer Percentage**.

21  (Section 15(k) of MIP, Trial Exhibit 1. (Emphasis added).  The MIP used initial

22  capitals to identify defined terms in the MIP.)

23        The term "TrafficClub Business Segment" is defined to mean:

24            …the business of Moniker relating to the monetization of

25            internet domain names through rotation of such internet

26            domain names on third party parking platforms.

27  (Section 15(a) of the MIP, Trial Exhibit 1.)

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1

15

MONTE CAHN'S TRIAL BRIEF

1    "Shared Customers" is defined to mean existing customers of Moniker's

2 TrafficClub Business Segment and DomainSponsor as of December 14, 2007.  This

3 definition was contained within the definition of "TrafficClub Club Customers".  It

4 stated as follows:

5        (iii) those customers of Moniker's TrafficClub Business

6        Segment as of the date of this plan that were also

7        customers of DomainSponsor (such customers in this

8        clause (iii) referred to as, 'Shared Customers').

9 (Section 15(aa) of the MIP, Trial Exhibit 1.)

10    And the term "'Applicable Customer Percentage" means:

11        the percentage determined as follows: (i) the gross

12        revenues received by Moniker from its upstream advertiser

13        partners in respect of the domain names owned by all

14        Shared Customers participating in the TrafficClub

15        Business Segment during the full month preceding the

16        adoption date of this Plan (the "Moniker Shared Customer

17        Revenue") divided by (ii) the sum of (A) the Moniker

18        Shared Customer Revenue and (B) the gross revenues

19        received by the Company from its upstream advertiser

20        partners in respect of the domain names owned by all

21        Shared Customers participating in the DomainSponsor

22        monetization platform during the full month preceding the

23        adoption date of this Plan.

24 (Section 15(a) of the MIP, Trial Exhibit 1.)

25    Thus, the term "Gross Profit" is based on the defined terms:  "TrafficClub

26 Business Segment" (Section 15(z) of the MIP, Trial Exhibit 1); "Shared Customers

27 (Section 15(a)(iii) of the MIP, Trial Exhibit 1); and "Applicable Shared Customer

28 Percentage" (Section 15(a) of the MIP, Trial Exhibit 1).  Given these definitions,

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1

16

1   Oversee cannot argue that the phrase "TrafficClub Customers" or the definitions in

2   Sections 15(aa)(i) and (ii) of the MIP are considered in calculating TrafficClub

3   Gross Profit.  Rather, Cahn is owed bonuses based on the Gross Profits of the

4   TrafficClub Business Segment.

5   Also, Sections 15(a)(i) and (ii) of the MIP do not discuss or relate to whether

6   Cahn is entitled to credit under the TrafficClub Gross Profit Business Segment for

7   the expansion of existing DomainSponsor customer accounts.  Section 15(a)(i)

8   relates to existing customers of Moniker's TrafficClub Business Segment who were

9   not customers of DomainSponsor.  Section 15(a)(ii) relates to **new** customers of

10  Moniker or DomainSponsor.  Neither provision discusses the treatment or

11  characterization of Cahn's expansion of the monetization revenues for existing

12  customers of the combined TrafficClub/DomainSponsor division.  Based on this

13  fundamental misinterpretation of the MIP, Oversee has not properly accounted for

14  numerous revenues associated with the combined monetization business of

15  TrafficClub and DomainSponsor.

16  An argument could be made that as a result of Oversee's failure to track

17  TrafficClub, and Cahn's subsequent management of the combined DomainSponsor

18  entity, the combined entity of TrafficClub and DomainSponsor is the proper metric

19  to measure Cahn's performance under the MIP.  Therefore, either Oversee breached

20  the MIP by failing to track and account for TrafficClub's performance, and Cahn is

21  entitled to his baseline awards for 2008, 2009 and 2010; that the combined entity

22  met the TrafficClub Performance Goal and Cahn is entitled to his baseline awards

23  for 2008, 2009 and 2010; or Cahn is entitled to access to Oversee's database in order

24  to retrieve data and track the new customers and expanded existing customers that

25  Moniker contributed to the combined DomainSponsor platform during the term of

26  the MIP.  Once Cahn obtains all the relevant information on TrafficClub's

27  performance, the evidence will show that Cahn achieved his performance goals

28  under the TrafficClub business segment of the MIP, and is entitled to his baseline

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1                                    17
MONTE CAHN'S TRIAL BRIEF

1  awards in the amount of $1.6 million.

2

3  **III.**  **CONCLUSION**

4          As a result of Oversee's egregious conduct in manipulating Moniker's

5  financial statements, ignoring its affirmative obligations under the MIP, and

6  breaching its duty of good faith and fair dealing, Cahn is entitled to significant

7  damages under the MIP.  Specifically, for the two business segments at issue during

8  this phase of the trial, Cahn is entitled to at least $4.8 million in damages for

9  Oversee's breach of the MIP as it relates to the TrafficClub and Oversee Business

10  Segments of the MIP.

11

12

13  DATED: January 17, 2012          JOHN L. BARBER

14                                   KENNETH D. WATNICK
                                     SONJA HARRINGTON

15                                   LEWIS BRISBOIS BISGAARD & SMITH LLP

16

17

18                                   By:  _____/s/ Kenneth D. Watnick_____

19                                        Kenneth D. Watnick
                                          Attorneys for MONTE CAHN

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW