William A. Delgado (Bar No. 222666)
wdelgado@willenken.com
Leemore Kushner (State Bar No. 221969)
lkushner@willenken.com
WILLENKEN WILSON LOH & LIEB LLP
707 Wilshire Blvd., Suite 3850
Los Angeles, CA 90017
Tel: (213) 955-9240
Fax: (213) 955-9250

Attorneys for Defendants
OVERSEE.NET, JEFFREY KUPIETZKY,
and LAWRENCE NG

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONTE CAHN, an individual, | Case No. CV11-03800 SVW (AGRx) |
| Plaintiff, | |
| v. | **DEFENDANT OVERSEE.NET'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| OVERSEE.NET, a California corporation; JEFF KUPIETZKY, an individual, LAWRENCE NG, an individual; and DOES 1 through 10 | |
| Defendants. | Complaint Filed:    May 3, 2011<br>Pretrial Conf. Date: January 10, 2012<br>Trial Date:         January 24, 2012 |

Defendant Oversee.net ("Oversee") respectfully submits its proposed findings of fact and conclusions of law.

I.      **PROPOSED FINDINGS OF FACT**

     A.      **Parties**

1.      Plaintiff Monte Cahn ("Cahn") is an individual and a citizen of the State of Florida.

2.      Defendant Oversee is a California corporation with its principal place of business in Los Angeles, California.

3.      Non-party ODN Holding Corporation ("ODN") is a Delaware corporation and is the parent and sole shareholder of Oversee.

4.      Cahn is the founder of a company known as DomainSystems, Inc. d/b/a Moniker.com ("Moniker").

5.      Moniker operated three business lines:  TrafficClub, Registrar, and Domain Sales.  The TrafficClub business line operated as a rotating domain monetization service.  The Registrar business line registered domain names on behalf of registrants. The Domain Sales business line sold internet domain names through both a private brokerage service and through live auctions.

6.      Oversee operated several internet-related business lines.  As relevant to the issues tried in this phase of the trial, Oversee operated its own domain monetization service known as DomainSponsor®.

     B.      **Background**

7.      In or around 2005, Cahn sold Moniker to a company then known as "Kanoodle" and now known as Seevast Corp. ("Seevast").  As part of the consideration for the sale of Moniker to Seevast, Cahn received Seevast stock.

8.      Because Seevast stock was not publicly traded, Seevast and Cahn agreed that Moniker's management could force Seevast to put Moniker up for sale if Seevast shares did not become publicly traded within two years of Seevast's acquisition of Moniker.

9.    By 2007, Seevast shares still had not been publicly listed and Cahn asked Seevast to place Moniker up for sale.

10.   Seevast hired The Jordan, Edmiston Group, Inc. ("Jordan, Edmiston") to act as its investment bankers in connection with the sale of Moniker.

11.   In consultation with Seevast and Mr. Cahn, Jordan, Edmiston prepared documents describing Moniker's historical financial results and projections of Moniker's anticipated growth.  Those documents (hereinafter, "Offering Documents") are in evidence as exhibits 72 and 73.

### C.   **Oversee Purchase of Moniker**

12.   On or about July 13, 2007, Oversee offered to purchase Moniker on terms stated in a proposed letter of intent ("LOI").  Ex. 394.  Under the terms of the LOI, approximately 1/3 of the proposed purchase price would be payable pursuant to the terms of an "earn-out" structure in which further consideration would be paid only if Moniker achieved certain performance targets following the closing of the transaction. As originally proposed, the earn-out would be paid if Moniker's 2008 performance matched the projections contained in the Offering Documents.  The earn-out would be split between Seevast and the Moniker team.

13.   The offer that Oversee made in the LOI was conditioned upon Oversee conducting further due diligence regarding Moniker.

14.   In the course of conducting its due diligence, Oversee revised its offer both by lowering the overall purchase price and the amount of the earn-out.  In addition, the earn-out was restructured as a payment solely to the Moniker team to the extent certain performance targets were achieved.

15.   Once the earn-out became directed solely to the Moniker team, Mr. Cahn and his counsel, Mr. Gross, negotiated the terms of the earn-out directly with Oversee.

16.   The terms of the earn-out ultimately were memorialized in the December 14, 2007 Management Incentive Plan ("MIP").  Ex. 1.  The MIP contains an integration clause (¶ 10), and both parties agree that it is intended to be the full and

1   complete expression of the parties' agreement.  *See, e.g.,* Third Amended Complaint, ¶

2   41.

3        **D.   The Determination of MIP Performance Goals**

4        17.   The MIP allows "Participants," whom Mr. Cahn was required to identify by

5   January 15 of each year, the opportunity to receive Performance Awards based upon

6   year-end results in four Business Segments during three Determination Periods that

7   extended from the Q4, 2007 time period through year-end 2010.

8        18.   At no time did Cahn ever identify MIP Participants.

9        19.   Three of the four Business Segments in the MIP identified specific financial

10  Performance Goals for each of the three Performance Periods.  These were:

11  TrafficClub, Registrar, and Domain Sales (hereafter, the "Moniker Performance

12  Goals").  Consistent with their genesis as an earn-out originally described in the LOI,

13  the Moniker Performance Goals were negotiated based on the projections identified in

14  the Offering Documents.

15       20.   For purposes of this first trial phase, the only issue to be determined with

16  respect to these Moniker Performance Goals is the definition of TrafficClub Customers

17  for purposes of determining whether the TrafficClub Business Segment achieved its

18  Performance Goals during any of the three Determination Periods.

19       21.   The MIP defines TrafficClub Customers in ¶15(aa).

20       22.   The fourth Business Segment in the MIP is identified as "Oversee."

21  Attainment of the Oversee Performance Goals was based upon Oversee EBITDA,

22  measured as defined in the MIP, ¶ 15(m).  The MIP does not identify the financial

23  result to be incorporated into an Oversee Performance Goal in any Determination

24  Period.  Rather, the MIP defines the Oversee Performance Goals as "TBD," meaning

25  "to be determined."

26       23.   The MIP further defines the Oversee Performance Goal in the "Certain

27  Definitions" Section of the MIP.  It states:

28

"Target EBITDA" means, with respect to each Determination Period, the Registrar EBITDA, Oversee EBITDA or Domain Sales EBITDA, as applicable, with respect to which 100% of the Business Segment Baseline Award with respect to such applicable Business Segment would be awarded, in the case of Registrar EBITDA and Domain Sales EBITDA as set forth on Schedule A, *and with respect to Oversee EBITDA as shall be determined from time to time by the Board, in consultation with Monte Cahn for so long as he is employed by the Company.*"

MIP, ¶ 15(u) (emphasis added).

24.   The definition of Oversee EBITDA makes reference to "the Board."  At the time the MIP was negotiated, the Board would have referred to the Board of Oversee.net.  However, soon after the creation of the MIP, ODN was created, and the duties of the Oversee.net Board were assumed by the ODN Board.

25.  Neither the Oversee.net Board nor the ODN Board ever took formal action to determine an Oversee EBITDA Performance Goal, Cahn never consulted with either Board on the issue, and Cahn never requested either Board to consult with him in setting the Oversee EBITDA Performance Goals for purposes of the MIP.

**E.   Parol Evidence: TrafficClub Customers**

26.  Neither party identified any admissible parol evidence that bears on the meaning of TrafficClub Customers.

27.  The evidence demonstrated that, at the time they negotiated the MIP, the parties contemplated that TrafficClub might be integrated into Oversee's existing DomainSponsor business.

28.  The definition of TrafficClub (MIP, ¶ 15(aa)) recognizes the possible integration or combination of TrafficClub and DomainSponsor.

29.  Cahn contends that the definition of TrafficClub Customers includes business generated by existing DomainSponsor customers who were not Shared Customers but whose business with DomainSponsor increased substantially as a result of Cahn's efforts or those of his Moniker team (hereinafter, "Enhanced Customers").

30.  Cahn does not contend that the definition of TrafficClub Customers includes business generated by existing DomainSponsor customers who were not Shared Customers and whose business with DomainSponsor decreased after the Oversee acquisition of Moniker.

31.  Oversee contends that the extent of TrafficClub Customers is covered by the language of paragraph 15(aa).  Shared Customers (i.e., customers of DomainSponsor and TrafficClub) are credited to TrafficClub under a set formula contained in paragraph 15(a) of the MIP.  Enhanced Customers are not credited to TrafficClub under the MIP irrespective of Cahn's actions.

32.  There is no evidence that the results of the TrafficClub Business Segment were intended by the parties to include Enhanced Customers, and the language of the MIP is not reasonably susceptible to such an interpretation.

### F.  **Parol Evidence: Oversee Performance Goals**

33.  The evidence demonstrated that the parties heavily negotiated the definition of the Oversee Performance Goals.

34.  During those negotiations, Cahn repeatedly demanded that the setting of the Oversee Performance Goal should be based on the same metric used to determine eligibility of Oversee's senior management for bonus compensation.

35.  Oversee repeatedly rejected Cahn's demands and demanded that the Board retain discretion to set the Oversee Performance Goal without regard to the bonus rights of Oversee senior management.

36.  Ultimately, Oversee prevailed on this issue and Cahn agreed to Oversee's formulation.

37.  The MIP does not contain any limitations on the Board's discretion to set the Oversee Performance Goals.  It is thus not reasonably susceptible to Cahn's contention that the Board was required to fix the Oversee Performance Goal to be the same as, or consistent with, any bonus targets set for Oversee senior management or the Oversee annual budget.

### G.   The Incentive Compensation Plan

38.   In November, 2008, Cahn and Oversee executed the Incentive Compensation Plan ("ICP").  Ex. 28.

39.   Cahn was advised by the same counsel, Mr. Gross, who negotiated the MIP with Oversee.  Cahn contends that he received legal advice on the MIP from Oversee's in-house counsel, Todd Greene.  Mr. Greene could not have advised Mr. Cahn as his counsel, and the evidence, including Mr. Gross' admission that he advised Mr. Cahn in connection with the ICP, does not support that Greene acted as Cahn's counsel.

40.   The ICP offered Cahn the possibility of bonus compensation as an alternative to the MIP.  It provided Cahn with compensation at much lower levels than potentially available under the MIP if Cahn met much lower targets than the targets in the MIP.

41.   The ICP's primary bonus measure utilized "Company Budget" to determine the amount of Cahn's bonus.  As defined in the ICP, the term "Company Budget" is identical to the figure that Cahn contends Oversee agreed to use to establish the Oversee Performance Goals in the MIP.

42.   It would not have made sense for Cahn to have executed the ICP if he believed that Oversee had agreed to use the "Company Budget," as that term is used in the ICP, as the MIP's Oversee Performance Goals.  Under the ICP, achievement of Company Budget triggered far lower payments than would have been available under the MIP if the Company Budget were, in fact, the same as the Oversee Performance Goal; and the ICP surrendered Cahn's rights to any payment under the Oversee Performance Goals in 2008 and 2009 unless one of the Moniker Business Segments achieved its Performance Goal in each Determination Period.

43.   Thus, Cahn could not reasonably have believed that "Company Budget" was the same as the MIP's Oversee Performance Goal because if he had held that belief he would not have executed the ICP as the use of "Company Budget" in the ICP resulted in much lower payments to him under the ICP.

44.  In 2008 and 2009, Cahn received bonuses under the ICP; he did not receive any payments under the MIP.  Cahn did not complain, following receipt of his 2008 or 2009 ICP payments about not receiving any payment under the MIP.

**H.   The Absence of Oversee Performance Goals.**

45.  The Board did not act to set an Oversee Performance Goal under the MIP for any Determination Period.

46.  Oversee contends that setting an Oversee Performance Goal would have been an idle act.  Oversee contends that, like the Moniker Performance Goals, any Oversee Performance Goal would have reflected continued and substantial growth in the financial performance of Oversee following the 2007 fiscal year.

47.  From 2008 through 2010, Oversee experienced a significant economic decline compared to 2007.  Its financial results declined year over year in each of the 2008 and 2009 fiscal years, and its results in 2010 were basically flat as compared with 2009.  Because any Oversee Performance Goal would have reflected business growth, the setting of an Oversee Performance Goal would have been an idle act.

48.  Furthermore, Cahn's conduct was not consistent with his present contention that the Board was required to set an Oversee Performance Goal.  He did not consult with the Board on the setting of an Oversee Performance Goal; he did not ever identify MIP Participants, as required by ¶5(a) of the MIP; and he signed the ICP (and accepted payments under the ICP) without complaining about the absence of an Oversee Performance Goal in the MIP.

49.  Cahn contends that the MIP required the Board to set an Oversee Performance Goal by the use of the word "shall" in paragraph 15(u).  Even if that were correct, that contention would not alter the fact that setting an Oversee Performance Goal would have been an idle act, and the failure to set an Oversee Performance Goal did not cause financial harm to Cahn.

//

//

## II.   PROPOSED CONCLUSIONS OF LAW

### A.   Jurisdiction and Venue

1.   Federal jurisdiction exists under 28 U.S.C. § 1332.  The Doe Defendants are dismissed.  The parties are citizens of different states and the amount in controversy exceeds $75,000.  Venue is proper in the Central District of California because the principle place of business of Oversee lies in this judicial district.  28 U.S.C. § 1391.

### B.   Issues Determined in Phase I

2.   Cahn's Third Amended Complaint is the operative complaint in this matter.  By prior court order, the Court bifurcated Cahn's claims and announced that it would try only Cahn's First Claim for Breach of Contract in the first bifurcated trial.

3.   Cahn's First Claim for Relief alleges that Oversee is liable for breach of contract because it allegedly breached the MIP.

4.   By order dated December 20, 2011, the Court struck Cahn's demand for jury trial in connection with his First Claim for Relief, finding that the jury trial waiver in Cahn's Employment Agreement (ex. 9) applies to his First Claim.  This case was thus tried to the court without a jury.

5.   At the pretrial conference held January 10, 2012, the Court exercised its discretion to try the First Claim for Relief in phases.  This phase of the trial addressed only the following two issues: (i) the definition of TrafficClub Customers under the MIP; and (ii) the determination of the parties' dispute concerning the setting of the Oversee Performance Goal.

6.   The MIP states that California law governs the terms of the MIP.  The parties thus agree that California law applies.

7.   "A cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1367, 108 Cal. Rptr. 3d 682 (2010) (citations omitted).

## C.     TrafficClub Customers

8.     Oversee acknowledges that, in calculating TrafficClub's gross profit for purposes of determining whether any of the Oversee Performance Goals were met, Oversee did not include results generated by Enhanced Customers.

9.     In construing the terms of a contract, the court must provisionally consider any parol evidence proffered by the parties, and determine whether the contract is reasonably susceptible to the interpretation allegedly supported by the parol evidence. *See Blumenfeld v. R.H. Macy & Co.,* 92 Cal. App. 3d 38, 45, 154 Cal. Rptr. 652 (1979).

10.   After allowing Cahn an opportunity to offer parol evidence on the issue, the court finds that the MIP is not reasonably susceptible to the contention that TrafficClub Gross Profits were required to include the results generated by Enhanced Customers.

11.   Oversee thus did not breach the MIP when it declined to credit the results generated by Enhanced Customers in calculating gross profits under the TrafficClub Business Segment.

## D.     The Oversee Performance Goals

12.   The Court gave provisional consideration to the parol evidence offered by the parties concerning the establishment of Performance Goals for the Oversee Business Segment.

13.   Parol evidence may properly include evidence of the parties' negotiations. *Wagner v. Columbia Pictures Industries, Inc.*, 146 Cal.App.4th 586, 590 n. 7 (2007). The parties' negotiations demonstrate that the MIP was not intended to tie the Oversee Performance Goals to company budgets or to any performance goals or other metrics used to justify or trigger bonuses to Oversee senior management or other employees.

14.   Furthermore, the language of the MIP is not reasonably susceptible to the interpretation that the Board was required to set the Oversee Performance Goals to be equal to the company budget or to be the same as, or consistent with bonus triggers used to award bonuses to other Oversee employees or senior executives.

15. "When a contract is ambiguous a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court."  *Rosen v. E.C. Losch Co.*, 234 Cal. App. 2d 324, 330-31 (1965); *accord, Smith v. Arthur D. Little, Inc.,* 276 Cal.App.2d 391, 400, 81 Cal.Rptr. 140 (1969).

16. As explained in *Employers Reins. Co. v. Superior Court,* 161 Cal. App. 4th 906, 921, 74 Cal. Rptr. 3d 733 (2008):

> The rationale for the admission of course of performance evidence is a practical one. "[W]hen a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court. The reason underlying the rule is that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract, and *a practical construction placed by the parties upon the instrument is the best evidence of their intention*."

(Emphasis added; citations omitted); *accord, In re Tobacco Cases I,* 186 Cal. App. 4th 42, 52, 111 Cal. Rptr. 3d 313 (2010).

17. By his conduct in executing the ICP and accepting bonuses under it, Cahn demonstrated that his pre-dispute construction of the MIP, like Oversee's, was that the Oversee Performance Goals were not to be set based on the company budget and were not tied to metrics that triggered bonuses payable to other Oversee employees.

18. The MIP further describes the parameters to measure and set Performance Goals.  By its silence on any limitations on the Board's discretion on that issue, the MIP manifests an intent not to limit the Board's discretion in the setting of the Oversee Performance Goals.  *See, Vasquez v. Cargill, Inc.,* 509 F. Supp. 2d 903, 909-10 (C.D. Cal. 2007) ("expressio unius est exclusio alterius – the expression of one thing is the exclusion of another"); *Colangelo v. Norwest Mortg., Inc.,* 598 N.W. 2d 14, 17-18

(Minn. App. 1999) (observing that the maxim provides that "expression of specific things in a contract implies the exclusion of all not expressed.").

19.  Every contract contains an implied covenant of good faith and fair dealing providing that no party to the contract will do anything that would deprive another party of the benefits of the contract. *Digerati Holdings, LLC v. Young Money Entertainment, LLC*, 194 Cal. App. 4th 873, 885, 123 Cal.Rptr.3d 736 (2011).

20.  An implied covenant, however, "exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*."  *Guz v. Bechtel Nat., Inc.*, 24 Cal. 4th 317, 349 (2000) (emphasis in original).

21.  The duty of good faith and fair dealing cannot introduce new contract terms. *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.*, 2 Cal. 4th 342 (1992).  Nor can the implied covenant of good faith and fair dealing impose on a contracting party the duty to act with restraint in exploiting the advantages given to it under a written contract.  *Wolf v. Walt Disney Pictures and Television,* 162 Cal. App. 4th 1107 (2008).

22.  Here, the agreement the parties actually made contemplated that the Board would have discretion to set the Oversee Performance Goals.  The MIP did not require the Board to set the Oversee Performance Goal in any particular amount or to base it on the Oversee budget or on other metrics used to award bonuses to Oversee employees.

23.  Oversee thus did not breach the implied covenant of good faith and fair dealing when it failed to set the Oversee Performance Goals at the same level as the Oversee budget or in a manner consistent with the metrics used to award bonuses to other Oversee personnel.

24.  The issue remains whether the Board could refuse to act at all.

25.  In determining whether the Board's failure to set an Oversee Performance Goal, breached the implied covenant of good faith and fair dealing by unfairly

frustrating Cahn's rights to receive the benefits of the MIP, the Court must determine the effect on Cahn of any failure by the Board failure to set a MIP Performance Goal.

26.  To interpret the intent of the MIP's Oversee Performance Goal, the court may consider the circumstances surrounding the negotiation of the MIP "so that the judge may be placed in the position of those whose language he is to interpret."  Cal. Code Civ. Proc. §1860.

27.  Oversee contends that, if any Oversee Performance Goal had been set, it would have been at a level far in excess of any achievable figure because, while the MIP was designed to reward significant growth in Oversee's business, the business of Oversee declined dramatically during the term of the MIP.  Thus, if the Board had set an Oversee Performance Goal, it would have been set at a level that, in view of Oversee's actual results, would have been unachievable.

28.  The MIP evolved from an earn-out that contained aggressive performance projections based on the contents of Moniker's own Offering Documents.  The evolution of the MIP is consistent with Oversee's contention that the Board would not have set – and never agreed to set – an Oversee Performance Goal that would have been achievable when Oversee's business was undergoing a dramatic contraction.

29.  "The law neither does nor requires idle acts."  Cal. Civ. Code § 3532.

30.  Any act of the Board in setting an Oversee Performance Goal would have been an idle act.

31.  Thus, the Board's failure to set an Oversee Performance Goal did not breach the implied covenant of good faith and fair dealing because it did not deprive Cahn of any of the benefits for which he negotiated under the MIP.

32.  Because the Board's failure to set an Oversee Performance Goal did not breach the implied covenant of good faith and fair dealing, Cahn cannot prevail on his First Claim for Relief to the extent that claim is based on asserting a right to recover under the Oversee Performance Goals.

**E.     The Oversee Performance Goals.**

33.  Because the parties left the Oversee Performance Goals in the MIP as "TBD," meaning "to be determined," without providing an objective metric or a definite time by which the goals must be determined, there was no "meeting of the minds" as to what the Oversee Performance Goals would be and, therefore, that aspect of the MIP constitutes an indefinite promise that cannot be enforced.  *Goldberg v. City of Santa Clara*, 21 Cal. App. 3d 857, 860-61 (1971) (finding as unenforceable a contract where a payment contingency was left for future determination in the discretion of a party to the contract); *Scott v. Pacific Gas & Electric, Co.*, 11 Cal. 4th 454 (1995) *disapproved on other grounds*, *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 352 n. 17 (2000) ("[C]ourts will not enforce vague promises about the terms and conditions of employment that provide no definable standards for constraining an employer's inherent authority to manage its enterprise.").

Dated:  January 17, 2012                WILLENKEN WILSON LOH & LIEB LLP


                                        By: */s/ William A. Delgado*                .
                                        William A. Delgado
                                        Attorneys for Defendants OVERSEE.NET,
                                        JEFFREY KUPIETZKY, and LAWRENCE NG