| | |
|---|---|
| 1 | **LEWIS BRISBOIS BISGAARD & SMITH LLP**<br>JOHN L. BARBER, SB# 160317 |
| 2 | E-Mail: barber@lbbslaw.com<br>KENNETH D. WATNICK, SB# 150936 |
| 3 | E-Mail: watnick@lbbslaw.com<br>SONJA HARRINGTON, SB# 261053 |
| 4 | E-Mail: sharrington@lbbslaw.com<br>221 North Figueroa Street, Suite 1200 |
| 5 | Los Angeles, California 90012<br>Telephone: 213.250.1800 |
| 6 | Facsimile: 213.250.7900 |
| 7 | Attorneys for MONTE CAHN |

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MONTE CAHN,<br><br>            Plaintiff,<br><br>      vs.<br><br>OVERSEE.NET, a California corporation; JEFF KUPIETZKY, an individual; LAWRENCE NG, an individual; and Does 1 through 10,<br><br>            Defendants. | CASE NO. CV11-03800 SVW (AGRx)<br><br>The Honorable Stephen V. Wilson<br><br>**PLAINTIFF MONTE CAHN'S SUPPLEMENTAL TRIAL BRIEF IN RESPONSE TO DEFENDANT OVERSEE'S ARGUMENT REGARDING "IDLE ACTS"**<br><br>Complaint Filed:    May 3, 2011<br>Final Pretrial Conf.: January 9, 2012<br>Trial Date:              January 24, 2012 |

4820-2309-0958.1

PLAINTIFF MONTE CAHN'S SUPPLEMENTAL TRIAL BRIEF IN RESPONSE TO DEFENDANT OVERSEE'S ARGUMENT REGARDING "IDLE ACTS"

Plaintiff Monte Cahn ("Cahn") hereby submits his Supplemental Trial Brief in response to Oversee's new argument that the setting of the Oversee EBITDA Performance Goals would have been an "idle act".

## I. INTRODUCTION.

On December 19, 2011, the parties filed their Memorandum of Contentions of Facts and Law. Pursuant to Local Rule 16-10, "each party may serve and file a trial brief which may: (a) Update the Memorandum of Contentions of Fact and Law by citing newly decided cases; (b) Brief such issues as directed by the Court; and (c) Reply to the Memorandum of Contentions of Fact and Law of any other party." (Local Rule 16-10.) On January 17, 2012 both parties filed their respective trial briefs. However, after reviewing Oversee's Trial Brief, Cahn discovered that Oversee has improperly used its Trial Brief to allege a new defense that was not raised in its Memorandum of Contentions. In its Trial Brief Oversee has set forth a new defense of "idle acts", an argument that Oversee has not previously raised. (*See* 25:16-29:2 of Oversee's Trial Brief, Doc. No. 228.) As such, Cahn will use this Supplemental Trial Brief to provide the Court with a brief response to Oversee's new defense of "idle acts".

## II. THE DEFENSE OF "IDLE ACTS" IS INAPPLICABLE AS THE SETTING OF THE OVERSEE EBITDA PERFORMANCE GOALS WAS NOT A MERE FORMALITY.

In its Trial Brief, Oversee has improperly asserted a defense of idle acts to justify its failure to set Oversee's EBITDA Performance Goals under Cahn's MIP. In support of its argument, Oversee cites to California Civil Code § 3532 which states that "The law neither does nor requires idle acts." (25:18-19 of Oversee's Trial Brief [Doc. No. 228].) However, California Civil Code § 3532 is only applicable in instances where the presence of an act is a mere formality and the

absence of the act does not produce a contrary result. (*See, e.g.*, *Barth v. Firestone Tire & Rubber Co.*, 673 F. Supp. 1466, 1478 (N.D. Cal. 1987) (holding plaintiff may assert claim for equitable relief despite failure to exhaust legal remedies because "plaintiff need not specifically exhaust legal remedies by filing unnecessary and futile pleadings in search of such a remedy. 'The law neither does nor requires idle acts.' [citation]."); *Candelaria v. Avitia,* 219 Cal. App. 3d 1436, 1441 (1990) (default judgment for plaintiff upheld despite plaintiff's failure to serve defendant with statement of damages "because the whereabouts of a defendant are unknown, compliance with the requirements of that section is futile; therefore, it is excused. 'The law neither does nor requires idle acts.' [citation].").)

In contractual disputes, Civil Code § 3532 is limited to similar circumstances, and only excuses a failure to comply with mere contractual formalities, not essential contractual duties. (*See*, *Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.,* 66 Cal. App. 3d 101, 152 (1977) (despite plaintiff's failure to provide defendant with written demand for performance as required under agreement, "a formal demand for performance would have been an idle act" because other notice was already provided.); *Schultz v. Los Angeles Dons, Inc.*, 107 Cal. App. 2d 718, 724 (1951) (holding that requiring plaintiff to provide defendant with written notice of failure to perform would be an idle act because defendant received sufficient non-written notice); *see also, Esau v. Briggs,* 89 Cal. App. 2d 427, 436 (1948) ("As a general rule it is necessary for a party attempting to rescind a contract to restore, or offer to restore, the benefits received as a condition precedent to bringing the action. If there is nothing to restore, however, such offer is not required. . . [plaintiff may bring an action for rescission because] an offer to restore on the part of plaintiff would obviously have been an idle act."); *and  Gross v. Raeburn,* 219 Cal. App. 2d 792, 807 (1963) (despite failure to formally tender performance, plaintiff's claim for specific performance is valid because "[t]he law does not require the performance of an idle act, and a formal tender of performance is excused by the refusal in

advance of the party to accept the performance owing." (citations omitted).)

Here, Oversee improperly claims that its failure to set the Oversee EBITDA Performance Goals under the MIP would have been an idle act. However, the defense of "idle acts" does not apply here as the setting of the Oversee EBITDA Performance Goal was not a mere formality, but rather an affirmative obligation and a condition precedent to Cahn receiving his baseline awards under the MIP. (§15(u) of the MIP, Trial Exhibit 1.) Oversee's setting the Oversee EBITDA Performance Goals, per Oversee's contractual obligation, would have created a specific and concrete prerequisite for Cahn's receipt of his bonuses, regardless of the market conditions or his ability to actually meet these goals. However, Oversee's absolute failure to determine ANY Performance Goals effectively rendered Cahn's receipt of his bonuses impossible, no matter how well he may have performed. Therefore, it is apparent from these incongruous results that the setting of the Oversee EBITDA Performance Goals was not a mere formality, but a necessity for Cahn to receive his benefits under the MIP. Thus, Oversee's failure to set Performance Goals cannot be considered an "idle act".

Additionally, in negotiating the terms of the MIP, the parties specifically decided to leave the Oversee EBITDA Performance Goal "TBD" in order to take into account Oversee's performance and market conditions. (28:13-37:24 to the Deposition of Jeff Navach, attached hereto as Exhibit "1".) As such, a purported decline in Oversee's business, Moniker's business, or in the economy as a whole is of no consequence to the setting and attainment of the Oversee EBITDA Performance Goal since it was specifically left "TBD" in order to account for this possible change in performance and market conditions. In fact, Oversee's decision to leave the goal "TBD" indicates that Oversee *expected* conditions to change, or it would have set all of the Oversee EBITDA Performance Goals in 2007, when the MIP was originally negotiated. However, instead, Oversee purposefully and intentionally left the Performance Goals "TBD". Oversee's argument now, that in

light of the change in conditions, the setting of the Oversee EBITDA Performance Goals was an idle act, directly contradicts its own intent in leaving the goals "TBD". Therefore, Oversee's failure to set the Oversee EBITDA Performance Goals cannot be considered an "idle act".

DATED: January 19, 2012

JOHN L. BARBER
KENNETH D. WATNICK
SONJA HARRINGTON
LEWIS BRISBOIS BISGAARD & SMITH LLP

By: /s/ Sonja Harrington
Sonja Harrington
Attorneys for MONTE CAHN

# EXHIBIT "1"

4822-5156-6595.1

# In The Matter Of:

*Monte Cahn*

*v.*

*Oversee.net*

_____

*Jeffrey Michael Navach VOL I*

*December 2, 2011*

_____



BENHYATT
Certified Deposition Reporters

17835 Ventura Blvd. Suite 310 Encino, CA 91316
P 888.272.0022  F 818.343.7119
www.benhyatt.com

BH CDR Job # **994903**
number of pages 169

***Word Index Included with this Condensed Transcript.***

```
                    UNITED STATES DISTRICT COURT

         CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION



     ------------------------------
     MONTE CAHN, an individual,       )
                        Plaintiff,    )
                 v.                   )No.: CV11-03800 SVW(AGRx)
     OVERSEE.NET, a California        )
     corporation; JEFF KUPIETZKY,     )
     an individual; LAWRENCE NG,      )
     an individual; and DOES 1        )
     through 10,                      )
                        Defendants.   )
     ------------------------------
                  PORTIONS OF THIS DEPOSITION ARE
              CONFIDENTIAL AND ARE BOUND SEPARATELY


         Videotaped deposition of JEFFREY MICHAEL NAVACH,
     at 221 N. Figueroa Street, Suite 1200, Los Angeles,
     California, commencing at 10:10 a.m., Friday, December
     2, 2011, before SUSAN E. LANSING, CSR No. 6355.



     PAGES 1 - 178
     PAGES 14-16; 19-24 ARE CONFIDENTIAL
```

```
 1      Q.   You were referring to, you just referenced page
 2   10, the definition of "Oversee EBITDA" in the MIP?
 3      A.   I was scanning page 10, Item (m), as well as
 4   page 11 Item (u).
 5      Q.   Item (u) being the --
 6      A.   "Target EBITDA."
 7      Q.   Okay, so, why don't you read back what he was
 8   saying before I interrupted, and I apologize.
 9           (The record was read as follows:
10           "THE WITNESS:  Well, first let's look at what
11      it says in here.  So, 'Oversee EBITDA' refers to the
12      performance of the Oversee business.")
13           THE WITNESS:  When we, when we were completing
14   the transaction and the Management Incentive Plan we did
15   not yet have a budget set and targets for Oversee at
16   that time.  So, "TBD," To Be Determined, was put in here
17   because those numbers were not known at that time.
18      Q.   BY MR. WATNICK:  What do you mean "budgets"
19   and -- what was the other word you used, "budgets" and?
20      A.   I think I said "targets."
21      Q.   So, you didn't have the budgets and targets for
22   2008, 2009 and 2010?
23      A.   Correct.
24      Q.   And so the intent was, once you got those
25   budgets and targets for 2008, 2009 and 2010, they would
```

```
 1   be inserted?
 2         MR. DELGADO:  Objection; calls for speculation,
 3   lacks foundation, calls for a legal conclusion.
 4         THE WITNESS:  To answer your question
 5   specifically, I'm not, I don't recall whether the intent
 6   was to enter them into the document.
 7      Q.  BY MR. WATNICK:  Whether to enter them into the
 8   document or not, the intent was, in 2008 for example,
 9   they were going to set a budget or a target for Oversee?
10      A.  Yes.
11      Q.  That was going to be announced to the company;
12   correct?
13         MR. DELGADO:  Calls for speculation.
14         THE WITNESS:  "Announced to the company" is
15   broad.  It would be known by people including Monte
16   Cahn.
17      Q.  BY MR. WATNICK:  Okay.  And in 2009 the company
18   would set an EBITDA target and it would be known to
19   people such as Monte Cahn?
20      A.  Yes.
21      Q.  Senior Management?
22      A.  Yes.
23      Q.  And in 2010 --
24      A.  Also, yes, correct.
25      Q.  Let me just ask it.  In 2010 there would be a
```

```
 1    disclosure to Senior Management including Mr. Cahn as to
 2    the Oversee EBITDA target?
 3         A.   You are using a word, "disclosure," which, so,
 4    my assumption would be that, yes, Monte Cahn would be
 5    aware of what the budget would be.
 6         Q.   There would be a communication?
 7         A.   Yes, exactly, yes, that's a fair word.
 8         Q.   Someone would communicate to Senior Management
 9    and Mr. Cahn these are the Oversee EBITDA targets for
10    2008; correct?
11         A.   Yes.
12         Q.   Somebody would communicate to Senior Management
13    and Mr. Cahn these are the Oversee targets for 2009?
14         A.   Yes.
15         Q.   Somebody would communicate to Mr. Cahn -- and
16    when you say "yes," the way I'm describing it --
17         A.   Well, if I was describing it I would say in
18    each of those years, 2008, 2009, 2010, Oversee and the
19    Board would agree upon a budget for that calendar year
20    and Monte Cahn would be aware of what that budget was.
21         Q.   And whatever that budget was, that was the TBD
22    for Oversee?
23              MR. DELGADO:   Objection; calls for a legal
24    conclusion, lacks foundation.
25              THE WITNESS:   The determination of the number
```

```
 1   for this is set out in this Definition (u), right.  So,
 2   "...as set forth on Schedule A, and with respect to
 3   Oversee EBITDA as shall be determined from time to time
 4   by the Board, in consultation with Monte Cahn..."
 5          So, that process, okay, of determining that
 6   number is different than what was just the budget for
 7   Oversee.  Those two items are not, it's not, I don't
 8   know that it was necessarily the same number.
 9      Q.  BY MR. WATNICK:  How was it explained to Mr.
10   Cahn by you?
11      A.  How was it explained by me?
12      Q.  Yeah.
13      A.  I'm trying to recollect if I'm the one who
14   explained it to him.  I don't remember specifically,
15   like, how it was explained to Monte.  In terms of the
16   actual determination of what the basis for the, that
17   goal number there specifically, I don't remember that,
18   like, what conversations at this point.
19      Q.  Okay.  You read the language of "Target
20   EBITDA"; correct?
21      A.  Yes.
22      Q.  And you understood the document when it was
23   being drafted; is that correct?
24          MR. DELGADO:  Objection; lacks foundation.
25          THE WITNESS:  When you say I understood the
```

1  document, what do you mean?

2      Q.   BY MR. WATNICK:  At least as it related to
3  these performance goals, you understood what was being
4  contemplated.  There was some sort of bonus payout based
5  upon achievement of certain goals?

6      A.   (Witness nods head affirmatively.)

7      Q.   Is that a yes?

8      A.   Yes.

9      Q.   Did you have discussions about this language
10 that says the -- on "Target EBITDA" on page 11 it talks
11 about, "...with respect to Oversee EBITDA as shall be
12 determined from time to time by the Board, in
13 consultation with Monte Cahn for so long as he is
14 employed by the company"?

15     MR. DELGADO:  You're excluding conversations
16 with counsel; right?

17     MR. WATNICK:  Sure, we'll exclude conversations
18 with counsel.

19     THE WITNESS:  Sorry, can you repeat your
20 question, just the first part.  I know where you're
21 referring, say the question again.

22     MR. WATNICK:  Did you have conversations as
23 to -- why don't you read back the question.

24         (Record read.)

25     THE WITNESS:  This, to my recollection this

```
 1    language was developed in conjunction with Monte.
 2        Q.    BY MR. WATNICK:   What did you understand the
 3    phrase "as shall be determined from time to time by the
 4    Board" to mean?
 5              MR. DELGADO:   Objection to the extent that it
 6    calls for a legal conclusion.
 7              THE WITNESS:   What did I understand it to mean?
 8              MR. WATNICK:   Yeah.
 9              THE WITNESS:   So, what I understood it to mean
10    is that in terms of the target for Monte and the
11    Management Incentive Plan in conjunction with the
12    development of the Oversee budget the Board would work
13    with Monte and coordinate and inform him on what the,
14    what his target was through that process.
15        Q.    BY MR. WATNICK:   Did you understand that this
16    was an option of the Board to disclose a target?
17        A.    When you say "option," what do you mean?
18        Q.    On the one hand saying you can achieve this
19    goal, we're going to determine it in the future when
20    they talked to Monte, but in fact privately with you say
21    we're never going to disclose a target?
22              MR. DELGADO:   Objection; vague, ambiguous,
23    unintelligible.
24              THE WITNESS:   Yeah, you said --
25              MR. WATNICK:   Let me try again.
```

```
 1              THE WITNESS:  Yeah.
 2       Q.    BY MR. WATNICK:  Did you understand that the
 3   Board had, under this agreement, an obligation to
 4   determine the target?
 5              MR. DELGADO:  Objection to the extent it calls
 6   for a legal conclusion.
 7              THE WITNESS:  It was my belief that the Board
 8   would do that, yes.
 9       Q.    BY MR. WATNICK:  And so the TBD had to be
10   filled in by the Board at some point in time?
11       A.    Yes.
12              MR. DELGADO:  Objection.  Strike that for
13   purposes of interposing the objection.  Calls for a
14   legal conclusion and it's leading.
15              MR. WATNICK:  I'm sorry, what was the second
16   objection?
17                   (Record read.)
18       Q.    BY MR. WATNICK:  So, did you have an
19   understanding as to the Board's obligation with respect
20   to determination of the Oversee EBITDA?
21              MR. DELGADO:  Objection to the extent that it
22   calls for a legal conclusion.
23              THE WITNESS:  Did I have an understanding about
24   the Board's obligation.  Well, I'm not sure that -- that
25   isn't necessarily how I think about it, I just, my
```

 1   understanding was that the Board would coordinate with
 2   Monte and, you know, agree upon his targets, absolutely.
 3   That was, that was the plan.
 4        Q.   BY MR. WATNICK:  The claim, that was the claim,
 5   that was the --
 6        A.   That was the plan.
 7        Q.   That was the plan.  Did you ever have a
 8   discussion with anyone within Oversee during which it
 9   was disclosed that that was not the plan?  In other
10   words, that the Board was never going to ever disclose
11   an Oversee EBITDA target?
12        A.   No, I did not.
13        Q.   Did you have an understanding that the Board
14   set an Oversee EBITDA target under the MIP for 2008?
15             MR. DELGADO:  Objection to the, that it calls
16   for speculation.
17             THE WITNESS:  I'm going into my memory banks.
18             The, I wasn't directly involved in that
19   component of the MIP very much post closing, so, I don't
20   recall, I don't recall if a specific number was
21   articulated to him and if so when in the calendar year.
22        Q.   BY MR. WATNICK:  Based upon your involvement in
23   the MIP negotiations, did you have an expectation as to
24   whether the Board would issue that Oversee EBITDA amount
25   to Mr. Cahn?

```
 1            MR. DELGADO:  Objection; vague and ambiguous.
 2            MR. WATNICK:  Maybe I'm repeating the same
 3   question.
 4            THE WITNESS:  No, yeah, I mean, obviously
 5   you're sort of coming at it in several angles and I'm
 6   sensitive to that.  I, you know, my recollection, my
 7   belief, was that at some point in time Monte would know
 8   this target.
 9       Q.   BY MR. WATNICK:  And it was your belief that
10   Mr. Cahn would be informed of the Oversee target as a
11   process relating to the budgets preparation?
12       A.   There was never any, there was never a specific
13   linkage that said upon completion of the budget, for
14   instance, Monte will be told.  So, to be honest - I
15   don't know why I said that again - I don't know when,
16   you know, there's nothing, we didn't clearly lay out the
17   timing of the disclosure of it, right.  So, whether it
18   was, the budget is done, therefore, here it is, or it
19   was later in the year, I'm not, I don't recall
20   specifically, you know, when we set that expectation.
21       Q.   Would it be your expectation that Mr. Cahn
22   would receive that information before that year
23   completed?
24            MR. DELGADO:  Objection; vague and ambiguous.
25            THE WITNESS:  Yes, it would be my expectation
```

```
 1   that Monte would know that number.
 2       Q.   BY MR. WATNICK:  Before the year?
 3       A.   Before the year 2008, for instance.
 4       Q.   Right.  For year 2008 would you have an
 5   expectation that --
 6       A.   My expectation would be that at some point in
 7   the year Monte would know that.
 8       Q.   And would you have the same expectation with
 9   respect to 2009?
10       A.   You know, I would generally speaking, with
11   the -- first, I wasn't with the company in 2009 or for
12   very much of 2009, and second, there were adjustments to
13   budgets going on because of financial performance so,
14   you know, there was multiple times where it might have
15   been communicated.
16       Q.   Okay, but within your contemplation when you're
17   preparing this Management Incentive Plan, was it your
18   contemplation that that process would occur on a yearly
19   basis with respect to the Oversee EBITDA being
20   disclosed?
21       A.   Yes.  The contemplation was that these were
22   annual, these were annual targets and, therefore, in
23   order to determine them a goal would have to be set and
24   communicated.
25                             ///
```