William A. Delgado (Bar No. 222666)
wdelgado@willenken.com
Leemore Kushner (State Bar No. 221969)
lkushner@willenken.com
WILLENKEN WILSON LOH & LIEB LLP
707 Wilshire Blvd., Suite 3850
Los Angeles, CA 90017
Tel: (213) 955-9240
Fax: (213) 955-9250

Attorneys for Defendants
OVERSEE.NET, JEFFREY KUPIETZKY,
and LAWRENCE NG

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONTE CAHN, an individual,<br><br>          Plaintiff,<br><br>    v.<br><br>OVERSEE.NET, a California corporation; JEFF KUPIETZKY, an individual, LAWRENCE NG, an individual; and DOES 1 through 10<br><br>          Defendants. | Case No. CV-11-03800 SVW (AGRx)<br><br>**REDACTED DIRECT EXAMINATION DECLARATION OF JEFFREY KUPIETZKY**<br><br>Complaint Filed:  May 3, 2011<br>Pretrial Date:    January 10, 2012<br>Trial Date:       January 24, 2012 |

## <u>DECLARATION OF JEFFREY KUPIETZKY</u>

I, Jeffrey Kupietzky, do hereby declare as follows:

1.      I am over the age of eighteen (18). I have personal knowledge of the facts stated herein and, if called as a witness, I could competently testify thereto.

**I.      <u>Education and Work Experience.</u>**

2.      I graduated from Colombia College in New York City in 1993 with a Bachelor of Arts degree in economics.

3.      After graduating from Colombia, I worked for two years as a Business Analyst for McKinsey & Company, a consulting firm in New York City where I provided analytic support to our clients.

4.      In 1995, I started working at Movado Watch Group in Lyndhurst, New Jersey as a Sales Support Analyst.

5.      In 1996, I left Movado to go to Harvard Business School.  I graduated from Harvard Business School in 1998 with a Masters in Business Administration degree.

6.      After graduating from Harvard in 1998, I began working for Siebel Systems as a Product Manager.  Siebel sold enterprise software for customer relationship management.  I left Siebel after two years

7.      In 2000, I joined a company in Silicon Valley, California called LoudCloud as a Senior Product Manager.  LoudCloud provided a managed service for data center operations.  Eventually, I was promoted to Head of Product Management, a position wherein I supervised sixty-five (65) people.  I left LoudCloud because I wanted to move back to Los Angeles.

8.      In 2002, I moved to Los Angeles to become Vice-President of a company called Digital Insight, a provider of online bill payment and Internet banking products. I was responsible for the consumer banking product line and had approximately seven

people reporting to me.  After approximately three years, I left to pursue an earlier-stage opportunity with a younger company.

9.      In 2005, I joined X1 Technologies, a company that had only been in business for two years when I joined it, as a Vice President responsible for marketing, inside sales and products.  Approximately eight to ten people reported to me in that position.  I worked at X1 for approximately one year.

10.      After leaving X1, I began doing some consulting work for various companies including TRG and Oversee.net.

11.      As a consultant, I assisted TRG, a firm that consults to companies with data center operations, by providing analytic services to help people determine whether to outsource their data center.

12.      As a consultant, I assisted Oversee with setting up a compensation plan for individuals in their sales department.

13.      For purposes of setting up the sales compensation plan, I suggested to Jack Nelson, the Head of Human Resources at Oversee, that the plan have an objective component (wherein compensation would be tied to revenue) as well as a subjective component to incent team behavior and cooperation among participants.

14.      I remained a consultant for Oversee between April 2006 and December 2006.  Between August 2006 and December 2006, Oversee was my only client.

15.      In December 2006, I joined Oversee as Executive Vice President of Domain Services, responsible for the DomainSponsor® product line.  At that time, approximately forty (40) people reported to me.  I remained Executive Vice President until November 2008.

16.      In November, 2008, I became President of Oversee.net.  In August, 2009, I became Chief Executive Officer of Oversee.net.  I held that position through August, 2011.  During my terms as President and CEO, I also served on the board of directors of ODN Holding Corporation ("ODN Board"), the parent company of Oversee, as well as on the board of directors of Oversee.net ("Oversee Board")..

**II.     Description of Underlying Businesses.**

17.     There are three types of internet-related functions that are useful to an understanding of both Oversee.net's business and the business segments acquired as part of the acquisition of DomainSystems, Inc. (d/b/a Moniker.com) ("Moniker") and identified in the Management Incentive Plan ("MIP").  I describe those three segments below.

**A.     Registrar:  Domain Name Registration**

18.     The Internet consists of a public world-wide network of computers.  A "domain name" is essentially an address on the Internet..

19.     Domain names are read from right to left starting with the top level domain and then reaching the secondary level domain.  One example of a domain name is <google.com>.  In that example, the ".com" is the top level domain and the secondary level is "google."

20.     Anyone can register a domain name for a particular amount of time.  Generally speaking, most registrants register domain names for a one year period.  Over time, the cost of obtaining a domain name has dropped from approximately $70 for a two year registration to less than $8 for a one year registration.

21.     The organization responsible for keeping track of who owns domain names for a particular top-level domain name is known as the "registry."  For the ".com" and ".net" top level domains, the registry is a company called VeriSign.

22.     A person who wishes to register a domain name (i.e., a potential "registrant") must first determine if the domain name is available for registration.  However, registrants cannot interface directly with the registry.  They must utilize a "go between" known as the "registrar" who has been accredited by Internet Corporation for Assigned Names and Numbers ("ICANN").  ICANN is, in substance, the non-profit corporation responsible for overseeing various Internet related tasks.

23.    Moniker included a registrar business and, as the MIP discloses, the MIP participants had the prospect of compensation awards if the Moniker registrar business met or exceeded certain Performance Goals.

24.    Predominantly, the overall process by which the Moniker registrar generated revenues works as follows:

(a)    The potential registrant visits the website of the registrar (Moniker.com) and provides the registrar with the domain name that they wish to register.

(b)    The registrar sends a query to the registry to check the availability of the domain name.

(c)    The registry responds to the query and informs the registrar as to the availability of the domain name identified.

(d)    The registrar then informs the potential registrant as to the availability of the domain name.

(e)    If the name is not available, the process either ends or begins anew with a different query for a different domain name.

(f)    If the name is available, the potential registrant can pay a registration fee to the registrar, and the registrar will then inform the registry that the domain name has been registered and, therefore, will not be available to future users.

(g)    The registration fee paid by the registrant is comprised of three elements: (i) a fee to the registry for its service, (ii) a fee to ICANN and (iii) the fee charged by the registrar for its service.

(h)    Thus, the Moniker Registrar business generated earnings based upon the volume of registrations it processed on behalf of registrants.

**B.    TrafficClub:  Domain Name Monetization.**

25.    Moniker also operated a business segment called TrafficClub, which was a domain name monetization business.  Oversee.net owned its own domain name monetization business called DomainSponsor®.  During the course of negotiations, we

recognized the possibility that the two monetization businesses would be combined and, in fact, the MIP provides a mechanism for rewarding MIP participants for TrafficClub gross profits following such a combination. *See,* MIP, ¶15(aa) (Exhibit 1 in this matter).

26.   Generally, "domain name monetization" refers to the business practice of using a domain name to make money. More specifically, it refers to the business practice of generating revenues from a domain name (e.g., www.lawoffices.com) by populating the domain name with keywords and hyperlink advertisements from advertisers. The process works as follows:

(a)   Having registered a domain name (or, more typically, hundreds or thousands of domain names) a registrant will submit his domain name(s) to a monetization platform or "parking company." While registrars refer to their customers as "registrants," parking companies typically refer to their customers who have submitted their domain names for monetization as "publishers."

(b)   The parking company has a direct contractual relationship with an upstream provider (typically a search company such as Google, Yahoo, etc.) who can provide keywords and advertisements that the parking company can use to populate the web site of the domain name. In the parlance of the industry, these are referred to as "feeds" so that it is common for the parking companies to note whether they have a "Google feed" or a "Yahoo feed." So, in the example provided, a parking company would populate the domain name www.lawoffices.com with keywords and hyperlink advertisements that relate to the legal profession, provided by its upstream provider.

(c)   When a visitor to the domain name clicks on a hyperlink advertisement, they are transported from the domain name (www.lawoffices.com) to the website of the advertiser who provided the hyperlink advertisement.

(d)    As consideration for that "traffic" (which represents a potential customer to the advertiser), the advertiser will pay a certain amount of money to the upstream provider.  That provider will keep some of the money for itself and pay some to the parking company.  In turn, the parking company will keep some of the money for itself and pay some to the registrant-publisher.  The amount of money that is split between the parking company and the publisher is determined by a "revenue share" percentage or "rev share."

(e)    TrafficClub and DomainSponsor® operated somewhat differently, as discussed below, but they both operated as domain name monetizing businesses providing advertising links to publishers in exchange for a share of revenue.

**C.    <u>Domain Sales:  Domain Name Sales and Auctions</u>.**

27.    Moniker also operated a Domain Sales platform.  As discussed below, Oversee.net acquired a domain name auction company called SnapNames shortly before Oversee acquired Moniker.  The Moniker Domain Sales platform was expected to complement the SnapNames platform.

28.    A domain name, like other property, can be leased and sold.  And, like other property, the sale of domain names can occur in different ways, including:

(a)    A registrant can find a purchaser for his domain name and sell it to that purchaser directly.

(b)    A registrant can retain the services of a broker who will market the name and assist in its sale in exchange for a percentage of the selling price in the same way that a real estate broker will market a real estate listing in exchange for a brokerage fee that is a percentage of the selling price.

(c)    A registrant can submit his domain name for a domain name auction where the domain name will be sold to the highest bidder, much like an art auction.

(d)    A registrant can submit his domain name in an online domain name auction where the domain name will be sold to the highest bidder in the online auction, much like what occurs on the popular online auction platform, eBay.

29.    As with stocks, savvy registrants can make a considerable amount of money through speculation in the domain name market.  For example, a speculator might come across an online auction where they see <widgets.com> for sale for $10,000.  If that person believes that <widgets.com> is underpriced, he can buy <widgets.com> for $10,000 and then attempt to sell <widgets.com> at a higher price. However, as with stocks, willingness to speculate in the domain name industry is market-driven.  In a good economy, there is a greater willingness to engage in speculation than in a bad economy.

30.    Moniker operated as a broker (i.e., matching a buyer and seller in a private sale), and it also managed periodic "live" auctions at which domain names would be sold to the highest bidder in a live auction not much different than an art auction. SnapNames, as discussed below, ran an online domain auction platform similar to eBay.

## III.    The Business Strategy Behind the 2007 Acquisitions.

31.    In 2007, Oversee negotiated the acquisition of and ultimately acquired a company called SnapNames.com based in Portland, Oregon.  I was part of Oversee's due diligence team.

32.    SnapNames is a domain name auction marketplace where customers could buy and sell domain names through an online platform.

33.    In conjunction with the acquisition of SnapNames, the potential acquisition of a customer-facing registrar looked particularly attractive to Oversee because it would allow Oversee to provide domain name services to "domainers" (the industry term for customers) throughout the "domain name life cycle."  By acquiring SnapNames and a customer-facing registrar, Oversee could provide domainers with:

(a)     the ability to register a domain name (through the Moniker registrar);

(b)     the opportunity to monetize the domain names they registered (through
DomainSponsor® and/or TrafficClub); and

(c)     the ability to sell their domain names either through an online auction
platform (through SnapNames) or through private brokerage or a live
auction (through the Moniker Domain Sales business).

34.     In theory, Oversee could become a "one-stop shop" for all of a domainer's
domain name service needs.

35.     With this potential business model in mind, Oversee set out to negotiate
the acquisition of Moniker, a company recognized for its registrar business and its live
auction business.

**IV.    Negotiations to Acquire Moniker.com**

36.     Oversee commenced negotiating with Seevast Corp., the owner of
Moniker in the Spring of 2007.  I was part of Oversee's due diligence team and
towards the end was more active in the negotiations.

37.     In connection with the negotiations with Seevast, Oversee received an
Offering Memorandum from Seevast's investment banker, The Jordan, Edmiston
Group, Inc., a true and correct copy of which is Exhibit 72.  The Offering
Memorandum contained information regarding the historical financial performance of
Moniker as well as projected financial performance in 2007 and 2008.

38.     I also attended a management presentation organized to promote the sale
of Moniker in the Spring of 2007.  Plaintiff Monte Cahn was present.  Exhibit 73 is a
true and correct copy of the Management Presentation provided to Oversee, and it, too,
contains the historical financial performance of Moniker as well as projected financial
performance for 2007 and 2008.  I collectively refer to Exhibits 72 and 73 as the
"Offering Documents."

39.     On July 13, 2007, Oversee proposed in a Letter of Intent ("LOI") a
purchase structure contingent, in part, on Moniker achieving the 2008 forecasts

contained in the Offering Documents.  A true and correct copy of that letter is exhibit

394.  The structure proposed in the LOI called for: (i) ████████ due at closing and

(ii) ████████ to be paid based on Moniker's achievement of its 2008 EBITDA

forecast of ████████, as identified in the Offering Documents – a structure

commonly known as an "earn-out."  The LOI further proposed that ████████ of the

████████ earn-out be paid to Moniker management.

40.     Subsequent to its initial proposal and based on the results of its due

diligence, Oversee downwardly adjusted its proposed purchase price for Moniker to

████████ (from ████████).  The earn-out to Seevast was eliminated, but the

revised proposal retained the contingent payment of ████████ to Moniker employees

to be based on the terms of a performance-based incentive plan.  Rather than utilizing

the single-year 2008 performance as the sole benchmark for performance, the incentive

plan was to stretch across three years following the closing.  This proposal became the

basis on which the parties negotiated their final set of agreements.

41.     The performance-based incentive plan, which ultimately became known

as the Oversee.net 2007 Management Incentive Plan ("MIP"), provided for aggregate

payments of up to ████████ if actual performance exceeded the targets set forth in

the MIP.

42.     The stock purchase agreement reflecting the terms of the purchase and

sale of Moniker between Seevast and Oversee was negotiated directly between Seevast

and Oversee.

43.     The details and terms of Mr. Cahn's Employment Agreement with

Oversee and the MIP were negotiated between members of the Oversee negotiation

team and Oversee's outside counsel from Kirkland & Ellis, on the one hand, and Mr.

Cahn and his outside counsel from Tripp Scott, on the other.  Those negotiations

occurred between October and December 2007.

44.     The performance goals in the MIP, though aggressive, were based

primarily upon the financial benchmarks and projections contained in the Offering

1  Documents and referenced in the LOI, with some adjustments (including, most

2  notably, the three-year performance period).

3      45.     One adjustment that was made at Mr. Cahn's request was expanding the

4  First Determination Period from just 2008 to include the fourth quarter of 2007 so that

5  the First Determination Period ran from October 1, 2007 to December 31, 2008.  That

6  was a concession on Oversee's part since it would not be receiving any of the revenue

7  from fourth quarter 2007 prior to acquisition but would nevertheless be liable for a

8  potential payment for performance during that time.

9      46.     As Schedule A of the MIP shows, the Performance Goals increased

10  aggressively in 2009 and 2010 meaning, as a practical matter, that if the 2008

11  Performance Goals were not met, the goals for the succeeding Performance Periods

12  became even more difficult to attain.  All of these goals, however, were built on the

13  Offering Documents.

14      47.     Ultimately, the negotiations between Oversee and Mr. Cahn produced a

15  three year plan that also allowed for compensation based upon the *partial* achievement

16  of production goals.  Nevertheless, the MIP is structured to rely on the 2008

17  projections in the Offering Documents and to grow those projections at an aggressive

18  rate year after year through 2010.

19      48.     At Cahn's request and after discussion between Oversee's negotiation

20  team and Cahn, Oversee also agreed to add an "Oversee EBITDA" Performance Goal

21  to the MIP in order to align MIP participants with Oversee's overall goals instead of

22  just rewarding them for performance related solely to Moniker.  The parties exchanged

23  various drafts, and the parties discussed the "Oversee EBITDA" Performance Goal,

24  including Exhibits 85-88 which are true and correct copies of e-mails on which I was

25  copied.

26      49.     During the negotiation of the MIP, Mr. Cahn and his counsel requested

27  that the Oversee Performance Goal in the MIP be identical to whatever budget metric

28

would be used  for the purpose of evaluating bonus eligibility for Oversee's senior executives.

50.     On behalf of Oversee, I was the person who rejected that request. Payments under the MIP, including payments in respect of the Oversee EBITDA business segment, were to be triggered as a result of significant contributions by MIP participants to the continued or increased growth and profitability of Oversee.  It was not a profit-sharing plan by which MIP participants would be entitled to significant awards based on Oversee merely meeting its budget in any given year, irrespective of what that performance was or how much Moniker contributed to that performance.

51.     On December 13, 2007, I e-mailed Mr. Cahn and informed him that the MIP's Oversee EBITDA Performance Goal would be discretionary, and that our anticipation was that the MIP goal would be *different* than the Oversee budget and would include the aggressive Moniker Performance Goals from the MIP.  *See,* Exhibit 3.

52.     This exchange built on the premise for the MIP – it derived from an earn-out structure under which first Seevast, and then, as changed, the Moniker employees, would be rewarded for meeting the projections contained in the Offering Documents.

53.     There was never any discussion of changing that basic premise of growth, which we also incorporated into the "Purpose" section of the MIP, which reads:  "The Plan is designed to reward, through additional cash compensation, the Participants for significant contributions toward the continued or improved profitability and growth of the Company."  Ex. 1, p. 1, ¶ 1.

54.     After I sent Mr. Cahn my December 13 email (ex. 3), I had a telephone conversation with Mr. Cahn.  I understand that Mr. Cahn claimed at deposition that during the conversation, I withdrew the explanation in my e-mail about reserving discretion over the matter and about incorporating the aggressive Moniker Performance Goals into any Oversee EBITDA Performance Goal.

---

55.     That statement is false.  I can definitively state that I did not retreat at all from the statements in ex. 3, and given the purpose of the MIP, it would not make any sense for me to have done so.  The only concession I made on December 13, 2007 was that I would agree that Mr. Cahn would have the right to be "consulted" on the Oversee EBITDA Performance Goal.  Ultimately, the conversation ended with me telling him we would propose new language for Section 15(u) that was consistent with the concept described in exhibit 3.

56.     Following our phone call, I sent Mr. Cahn proposed language.  Exhibit 86 is a true and correct copy of my email to Mr. Cahn.  After I sent that email, I realized that I had left out the "consultation" language, and I sent Mr. Cahn a follow-up email to add that language.  A true and correct copy of my follow-up email is exhibit 88.  The phrasing identified in exhibits 86 and 88 is the language that appears in the MIP (with two minor word changes – changing "as long" to "so long" and changing "Monte" to "he").  *See* Exhibit 1, p. OVER002427, ¶ 15(u).

**V.     The Transitioning of TrafficClub into DomainSponsor.**

57.     As noted above, monetization represented one area of overlap between Moniker and Oversee.  Moniker provided monetization services through its TrafficClub platform.  Oversee.net provided monetization through DomainSponsor®.

58.     DomainSponsor® primarily utilized a real-time advertising feed from Google.

59.     During my time as Executive Vice-President, Domain Services, I became aware of Moniker's TrafficClub monetization platform, which was a slightly different monetization platform from that of DomainSponsor®.

60.     In contrast to DomainSponsor®, Moniker's TrafficClub monetization platform was a *rotator* monetization service whereby Moniker was able to choose to monetize its domains and those of its third party customers on different monetization platforms with which it had contractual relationships.

61.     TrafficClub did not have a direct contractual relationship with an upstream advertising provider such as Google.  Instead, TrafficClub had relationships with the various domain monetization companies such as DomainSponsor®, also known as "parking companies," which in turn had the relationships with the upstream advertising partners.  In fact, until February 2007, TrafficClub used DomainSponsor® as one of its rotating feeds.

62.     If one considers the chain of money that an advertiser pays for a hyperlink click, a rotator service essentially sits in between the parking company and the owner of the domain name, referred to as a registrant/publisher, so that the flow of money is changed from:  Upstream provider → Parking Company → Registrant/Publisher to Upstream provider → Parking Companies → **Rotator Service** → Registrant Publisher.

63.     In theory, the benefit to the customer of the rotator service lies in its ability to choose among the different advertising feeds utilized by the various different parking companies, thereby finding the monetization platform that provides the most amount of money for a particular domain name.

64.     Additionally, most parking companies require publishers to have minimum business thresholds to qualify for higher revenue share percentages. Typically, a publisher who generates minimal revenue by utilizing a parking company's monetization service will not receive as high a revenue share as a publisher who generates significant revenue.  If however, a number of publishers are aggregated together, such as through the Traffic Club platform, it is possible for the revenue generated from the domains of *all* of those customers to utilize the monetization service to generate higher revenues and, thus, receive a higher revenue share.

65.     The business model of a rotator service like TrafficClub is dependent on its contractual relationship with the parking companies.  If the perceived benefit of being able to "rotate" among various providers goes away, and/or customers are provided direct access to the feeds of the parking company at the same rate provided to the rotator service, the business model of the rotator service is necessarily impaired.

66.     Prior to February 2007, Oversee's DomainSponsor® platform was a feed utilized by TrafficClub's service.

67.     In February 2007, Oversee learned that Google did not approve of Oversee being a partner of TrafficClub because Google required Oversee to have a direct relationship with the registrant/publisher.  By allowing its DomainSponsor® platform to be utilized by Traffic Club customers, Oversee had a relationship with TrafficClub but not with the registrant/publishers of the domains.

68.     As a result, Oversee terminated its relationship with TrafficClub in February 2007.

69.     As early as October 2007, Oversee mentioned the possibility that, post-merger, the TrafficClub Business Segment would be managed by the DomainSponsor® team at Oversee and not by Mr. Cahn.  *See* Exhibit 76.  Mr. Cahn agreed in an e-mail concerning the MIP terms that TrafficClub should be managed by Oversee.  *See* Exhibit 305.  Because of his loss of control over that segment, he proposed in that same email that the MIP awards for TrafficClub be lowered (with corresponding increases in the other business segments).

70.     During the negotiations of the MIP, I also discussed with Mr. Cahn the possibility of transitioning TrafficClub customers into DomainSponsor® at some point in time because both business segments were providing the same service to customers (i.e., domain name monetization).  On December 13, 2007, I sent an e-mail discussing potential synergies between Oversee and Moniker and the potential transition is a point I mentioned.  *See* Exhibit 7.

71.     The MIP was written to account for the potential transition of TrafficClub into DomainSponsor in two ways:

    a. The Performance Goals for the TrafficClub Business Segment were determined on a "Gross Profit" basis instead of on an EBITDA basis like the other three segments.

---

b. The term "TrafficClub Customer" (for purposes of the MIP gross profit calculation) was defined to include new DomainSponsor® customers brought in as a result of the substantial efforts by Mr. Cahn or another person working for Moniker, provided, however, they were not an existing or prior customer of Oversee as set forth in Section 15(aa) of the MIP.

72.   By the date of the Moniker acquisition (December 14, 2007), no decision had been made as to whether and/or when to transition TrafficClub customers to DomainSponsor®.

## VI.   <u>Setting the Oversee Budget in 2008</u>.

73.   As Executive Vice President, Domain Services, I assisted Lawrence Ng, Oversee's Chief Executive Officer, in preparing financial projections for the company for purposes of the budgeting process.

74.   Once I became President of Oversee in November 2008, I had access to and reviewed Oversee's historical financial information for purposes of the budgeting process going forward.

75.   Annually, Oversee sets a budget.  The Chief Executive Officer's job is to prepare a budget and propose it to the Board.  Although the CEO and the Board will compare year-end results to the budget for the purpose of deciding bonus compensation, the main purpose of the budget is far more basic – it is to anticipate the company's expected income and expenses with the goal of ensuring that the company can pay its bills, comply with applicable loan covenants, make strategic decisions, and earn a profit.  The budgeting process requires an arduous examination of the company's operations and anticipated results.  Consistent with a budget's overriding purposes, the goal of the budget is to anticipate what the results will be based upon the realities then observed.

76.   In fact, if, as the year progresses, Oversee determines that economic reality is no longer in line with its budget, Oversee will adjust its discretionary

spending.  So, for example, if early results show that revenue is trending below budget, spending will be adjusted with real-life implications, such as layoffs and freezes on capital expenditures, and likely lower year-end compensation.

77.    Certain Oversee employees are eligible for year-end bonuses that are completely discretionary in nature.  At the end of each year, a bonus pool is created. That bonus pool is ████████████████████████████████████████████. Because of some unique aspects of the business, the EBITDA figure in the budget, and from which the bonus pool calculation is made, is not a GAAP figure.  As President and, later, CEO, I would make bonus pool recommendations to the Board's Compensation Committee and the Committee would consider my recommendations and advise me of its determination of a bonus pool.  I would then inform department heads how much money they could distribute as bonuses in their departments.

78.    In my requests to the Compensation Committee I would address, among other elements, Oversee's results in relation to budget.  But "meeting" budget did not trigger any automatic result.  It was a metric that was reviewed in the context of the overall performance of the Company.  ████████████████████████ ████████████████████████████████████████████████████.

79.    In 2008 and 2009, in addition to an overall bonus pool request, I also made proposals regarding Mr. Cahn's bonus compensation under the ICP.

80.    As noted above, during negotiations, I specifically rejected Mr. Cahn's proposals to incorporate the budgets approved by the Board into the MIP.  The Oversee budgets, which are based on the economic reality of the company in a particular year, are irrelevant to the MIP Performance Awards, which are keyed to significant growth as in the Moniker Performance Goals.  Nonetheless, I understand that Mr. Cahn contends otherwise, so I will address that issue here.

81.    Oversee EBITDA in 2007, as calculated for budgeting purposes was ████ ████.

82.    As of November 2007, the Oversee Board considered setting a preliminary 2008 budget with a projected EBITDA figure of ███████.

83.    At the time, Oversee's senior executives, including myself, were also formulating a three year plan which assumed year over year earnings growth between 2008 and 2010.  In other words, Oversee EBITDA would be greater in 2008 than in 2007, greater in 2009 than in 2008, and greater in 2010 than in 2009.

84.    However, by January 31, 2008, performance in the domain name industry had already begun to decline –a fact which Oversee management communicated to its employees.  At the same time, we advised the employees of, and implemented, some internal restructuring to compensate for the decline in performance.  *See* Exhibit 17.

85.    In April 2008, the ODN Board approved the 2008 budget.  The budget includes an EBITDA forecast of ██████.

86.    Mr. Cahn never asked to consult with the Board, and never did consult with the Board on any MIP Oversee EBITDA Performance Goal for 2008, and none was set.  Mr. Cahn also never advised the Board at any time during my tenure of the identities of the MIP participants in accordance with paragraph 5(a) of the MIP.

███████████████████████████████████
█████████████████

88.    ████████████████████████████████
███████████████████████████████████
███████████████████████████████
███████████████████████████████████
████████████████████████████████.

89.    DomainSponsor's experience was typical for the industry.

90.    Combined, macroeconomic conditions, the decrease in domain monetization revenue available to publishers, and the elimination of the practice of "domain name tasting," also negatively affected the Registrar Business Segment and

the Domain Sales Business Segment.  Simply put, throughout 2008 and into 2009 and 2010, the economy was in decline generally, and the domain name business was hard hit.  Fewer people were interested in registering or buying and subsequently monetizing or selling domain names because it was not as profitable as it had been previously.

## VII.  Negotiation of the Incentive Compensation Plan.

91.    In the summer of 2008, Mr. Cahn approached me and informed me he was no longer incented to work at Oversee because of the inability of Moniker to achieve the performance goals of the MIP as a result of the economy.  My goal was to keep Mr. Cahn at the company and to find an alternative way to reward him for his services given that his opportunities for compensation under the MIP had virtually evaporated.

92.    Mr. Cahn *never* asserted during our discussions that he believed that he should be entitled to compensation under the Oversee EBITDA component of the MIP or that the Board's failure to set a MIP Oversee EBITDA Performance Goal was improper or inappropriate.

93.    I certainly understood that, in light of Moniker's poor performance and the overall declines in Oversee and the industry as a whole, setting an Oversee MIP Performance Goal, premised on aggressive growth in both Moniker and Oversee, would have been an idle act.  I assumed that Mr. Cahn viewed the matter the same way, and he never led me to believe differently.  By summer 2008, it was clear that the MIP Performance Goals were not practically achievable.

94.    In response to Mr. Cahn's concern that the MIP was no longer achievable, I worked with in-house counsel, Todd Greene, to prepare an amendment to the MIP called the "Incentive Compensation Plan" ("ICP") which would provide Mr. Cahn a set of attainable goals for 2008 and 2009 which, if met, would entitle him to a bonus in each of those years.

95.     I communicated with Oversee's Chief Executive Officer and Chairman of the ODN Board, Lawrence Ng, and Jack Nelson, the head of human resources about the terms of the proposed ICP.  *See* Exhibit 149.

96.     Ultimately, Mr. Greene and I provided Mr. Cahn a draft of the ICP, and we engaged in an e-mail discussion regarding the terms of the amendment.  *See* Exs. 207-211.

97.     The parties executed the ICP on or about November 18, 2008.  *See* Exhibit 28.

**VIII.  End of Year Performance for 2008.**

98.     In November 2008, Lawrence Ng stepped down as Chief Executive Officer of Oversee and ODN, its parent company.  I was promoted to President of Oversee and ODN and assumed his responsibilities of running the company on a day-to-day basis.

99.     On November 21, 2008 I also joined the ODN and Oversee Boards.  I remained on both Boards into 2011.

100.    Exhibit 417 is a true and correct copy of a presentation to the ODN Board entitled "Financial Overview – Q4 2008 Board of Directors Meeting, February 11, 2009."  I prepared this presentation by compiling information from different business segments of Oversee and Oversee's financial data which would have been regularly recorded in the ordinary course of business in accordance with Oversee's practices

101.    As reported to the ODN Board, the final Oversee EBITDA number for 2008 was calculated as ██████████████████████████████ ██████.

102.    As President, I was responsible for proposing bonus compensation for all company employees to the compensation committee of the ODN Board for 2008.

103.    Based on the company's performance in 2008, I recommended to the budget committee of the ODN Board that Oversee's senior executives receive, on average, ██████████████████████████████████████.

1    104.   ███████████████████████████████████████
2    ████████████████████████████████████████████████████
3    ████████████████████████████████████████████████████
4    ████████████████████████████.

5    105.   On December 31, 2008, I e-mailed Mr. Cahn to inform him that his 2008

6    bonus would be calculated pursuant to the terms of the ICP.  A true and correct copy of

7    my email to Mr. Cahn is Exhibit 261.

8    106.   Based on the terms of Section 14 of the ICP, I proposed to the

9    compensation committee that Mr. Cahn receive a 2008 bonus in the amount of

10   ███████   This number is based on paragraph 14 of the ICP, which calls for Cahn's

11   bonus, subject to discretionary adjustment, to be the greater of  the percentage of bonus

12   payable for all members of the Senior Team multiplied by ████████, or the average of

13   their bonuses less specified deductions.  So, my recommendation was based on the

14   █████████████.

15   107.   On January 20, 2009, Mr. Cahn sent me an e-mail acknowledging that the

16   overall MIP target was not achieved and that there was a "total miss on all company

17   goals and targets."  A true and correct copy of Mr. Cahn's email is Exhibit 300.

18   108.   Exhibit 127 is a true and correct copy of the Consolidated Financial

19   Statements, ODN Holding Corporation, Years Ended December 31, 2008 and 2007

20   with Report of Independent Auditors.  It is based on the company's financial data at the

21   time, which would have been regularly recorded in the ordinary course of business in

22   accordance with Oversee's practices, as audited by Oversee's Independent Auditors,

23   Ernst & Young.

24   109.   As Page 10 of Exhibit 127 indicates, domain services revenue (i.e.,

25   domain monetization) ████████████████████████████████

26   ████████████████████████████████████

27   ████████████████████████████████████████

28   ██████████████████████.



## IX.   <u>Setting the Oversee Budget for 2009</u>.

110.   For purposes of helping the ODN Board set the budget for 2009, I assumed that every business segment in Oversee would further deteriorate in 2009 as a result of macroeconomic and domain name industry conditions.

111.   Ultimately, the Oversee budget included an EBITDA figure of ████ ████.   Put in perspective, this forecast represented ███████████████ ███████████████████████████████.

112.   Mr. Cahn never asked to consult with the ODN Board, and never did consult with the ODN Board on any MIP Oversee EBITDA Performance Goal for 2009, and none was set.

## X.   <u>End of Year Performance for 2009</u>.

113.   I was appointed Chief Executive Officer of Oversee and ODN in August 2009.

114.   On December 31, 2009, Oversee acquired the business known as Credit Card 3-2-1.

115.   As expected, market conditions caused Oversee's financial results to further deteriorate in 2009.  As reported to the ODN Board, the final Oversee EBITDA number for 2009 was ███████████. .

116.   So, while the company's EBITDA exceeded its budget in 2009, EBITDA ██████████████████████████████████████████ ████.

117.   Exhibit 130 is a true and correct copy of the Consolidated Financial Statements, ODN Holding Corporation, Years Ended December 31, 2009 and 2008 with Report of Independent Auditors.  It is based on the company's financial data at the time, which would have been regularly recorded in the ordinary course of business in accordance with Oversee's practices, as audited by Oversee's Independent Auditors.

118.   As Page 10 of Exhibit 130 indicates, domain monetization revenue ████ ████████████████████████████████████

1     ███████████████████████████████████████████████████

2     ███

3        119.    Based, in part, on the fact that Oversee EBITDA exceeded the forecast of

4     ██████████, Oversee senior management received in excess of their target bonus.

5        120.    Pursuant to the terms of Section 14 of the ICP, I calculated Mr. Cahn's

6 2009 bonus as the "average of the year-end bonuses for the members of the Senior

7 Team for the 2009 calendar year less, any amounts payable to [him] pursuant to the

8 DomainSponsor and Aftermarket & Registrar payout amounts for the 2009 calendar

9 year, in each case subject to the Discretionary Adjustment."

10        121.    There were no DomainSponsor payouts under the ICP in 2009.

11        122.    The Aftermarket & Registrar payout amounts under the ICP for 2009 were

12 approximately ██████.

13        123.    To calculate the Discretionary Adjustment, I solicited input from other

14 members of the Oversee Senior Team regarding Mr. Cahn, his skills, and his

15 contribution to Oversee.  Exhibit 42 contains the responses from the Senior Team

16 which were all negative.

17        124.    Based on the negative comments of the senior team, Mr. Cahn received a

18 2009 bonus in the amount of approximately ██████ which included the Aftermarket

19 & Registrar payout amount of approximately ██████.  This final number represented a

20 downward adjustment from the average year-end bonus of the Senior Team in 2009.

21        125.    Mr. Cahn and I had numerous discussions, verbally and by e-mail,

22 regarding his compensation.  In fact, I had more conversations with Mr. Cahn about the

23 subject of his compensation than with any other employee of Oversee about their

24 compensation.  He was never shy in telling me when he believed he was owed

25 additional compensation.

26        126.    At no point did Mr. Cahn ever advise me that he believed he had any

27 entitlement to a payment under the MIP in lieu of his ██████ ICP bonus.  He never

28 stated that he believed any of the Moniker Business Segment Performance Goals had

been met; he never questioned the absence of an Oversee EBITDA Performance Goal; and he certainly never advised me that he believed that, instead of the ████████ payment he received under the ICP, he was entitled to a ████████████ because Oversee's 2009 EBITDA exceeded the budget EBITDA number, thus triggering his 2009 ████████ baseline award for Oversee EBITDA under the MIP.  In fact, on February 2, 2010, after receiving his bonus under the ICP, Mr. Cahn sent me an e-mail inquiring as to the methodology of how his bonus was calculated under the ICP.  A true and correct copy of Mr. Cahn's email is exhibit 230.  Despite knowing that the management bonuses were triggered largely on Oversee 2009 EBITDA exceeding budget, Mr. Cahn never claimed that the achievement of that EBITDA result triggered payment under the MIP.

**XI.    Setting the Oversee Budget for 2010.**

127.   For purposes of helping the ODN Board set the Oversee Budget for 2010, I assumed that Oversee's financial performance in 2010 would approximate its performance in 2009.

128.   Ultimately, the budget approved by the ODN Board included an organic EBITDA forecast for 2010 of ████████ and the non-organic (i.e., accounting for acquisitions of other companies with positive EBITDA) Oversee EBITDA forecast for 2010 of ████████.

129.   Mr. Cahn never asked to consult with the Board, and never did consult with the Board on any MIP Oversee EBITDA Performance Goal for 2010, and none was set.

**XII.   The 2010 Commission Plan.**

130.   The ICP only covered 2008 and 2009.  At the beginning of 2010, Mr. Cahn requested a new alternative plan which would enable him to earn money in addition to his base salary and retention bonus.

131.   As a result, I asked Craig Snyder and Elizabeth Murray to work with Mr. Cahn to develop an alternative plan for 2010.

132.   Mr. Cahn made it clear that he was seeking a plan to maximize his compensation.

133.   Consistent with his request for a plan that allowed him to maximize his earnings and the views of senior management that Mr. Cahn's strength was in domain name sales (a view which I shared), Oversee presented Mr. Cahn with an uncapped commission plan for 2010 that focused exclusively on domain name sales.  *See* Exhibit 10.

134.   There was no registrar or DomainSponsor® component at all, because both Oversee and Mr. Cahn agreed that he could make more money in commissions for domain name sales than he could under the ICP.  At the time the Commission Plan was negotiated and executed, achievement of the Performance Goals in MIP was, for all practical purposes, unachievable.

135.   Oversee and Mr. Cahn agreed to the 2010 Commission Plan, a copy of which is Exhibit 10, on or about May 24, 2010.

136.   Under the 2010 Commission Plan, Mr. Cahn received over ▆▆▆▆ in commissions in 2010, nearly the equivalent of his base salary and significantly more than what he earned in 2008 and 2009 under the ICP's structure which tied his bonus to the greater of some percentage of ▆▆▆▆ or the average senior executives' bonus.

**XIII.  End of Year Performance in 2010.**

137.   On April 13, 2010, Oversee acquired the business known as About Airport Parking.

138.   On November 10, 2010, Oversee acquired all of the issued and outstanding capital stock of ShopWiki Corp., a business engaged in the retail lead generation vertical.

139.   As reported to the ODN Board and used to measure the bonus pool, the final Oversee EBITDA figure for 2010 was calculated as ▆▆▆▆.

140.   Exhibit 131 is a true and correct copy of the Consolidated Financial Statements, ODN Holding Corporation, Years Ended December 31, 2010 and 2009

with Report of Independent Auditors.  It is based on the company's financial data at the time, which would have been regularly recorded in the ordinary course of business in accordance with Oversee's practices, as audited by Oversee's Independent Auditors.

141.   As Page 11 of Exhibit 131 indicates, domain monetization revenue ███ ███████████████████████████████████████████████████████████ ██████

142.   Over the course of the three years between 2007 and 2010, domain name monetization revenue ████████████████████████████████████████████ █████████████████████

143.   Mr. Cahn's Employment Agreement with Oversee had a three year term. His last date of employment was December 31, 2010.  In accordance with his Employment Agreement, during his three years of employment with Oversee, Mr. Cahn received an annual salary of approximately ████████, a signing bonus of ██████, and annual retention bonuses of $█████.  Ex. 9, § 3(a), (e), (f).  He also received the ICP bonuses described above, and, in 2010, in excess of ██████ in commissions under the Commission Plan.

144.   So, in 2007, Mr. Cahn received a ██████ signing bonus plus a pro-rata base salary for the last two weeks of the year.  Mr. Cahn received compensation in the amount of, approximately, ██████ for his work in 2008.  He received compensation in the amount of, approximately, ██████ for his work in 2009.  He received compensation in the amount of, approximately, ██████ for his work in 2010. During his tenure with Oversee, Mr. Cahn made in excess of ██████.

145.   I offered Mr. Cahn the opportunity to stay with the company in 2011 under the same terms with the same compensation plan as in the 2010 Commission Plan.  He did not accept that offer.

146.   It was not until after Mr. Cahn's employment was coming to an end that he advised me that he believed he was entitled to compensation under the MIP.

## XIV.  **MIP Amendments and Oversee EBITDA Performance Goal**.

147.    The Oversee.net Board of Directors never amended any of the Performance Goals of the Moniker Business Segments during the time period that I was a director between November 2008 and August 2011.

148.    The ODN Board never amended any of the performance goals of the Moniker Business Segments during the time period that I was a director between November 2008 and September 2011.

149.    If either Board had amended the Moniker Performance Goals in the MIP before I began my service, I would have learned of such an amendment as a Board member, President, and eventually, as CEO.  There is no information or evidence I have ever seen that the Board ever amended the Performance Goals of the Moniker Business Segments in the MIP at any time.

150.    During my tenure, Mr. Cahn never met with either the Oversee.net Board or the ODN Board and, to my knowledge, never asked to meet with either board, to discuss the setting of an Oversee EBITDA Performance Goal for the MIP, to discuss any request to amend any of the MIP terms, or to advise the Board that he believed that the terms of the MIP had, in fact, been amended.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed the _13_ day of January, 2012, at _Ra'anana_ , Israel.


_____

Jeffrey Kupietzky