1  William A. Delgado (Bar No. 222666)
2  wdelgado@willenken.com
   Leemore Kushner (Bar No. 221969)
3  lkushner@willenken.com
4  WILLENKEN WILSON LOH & LIEB LLP
   707 Wilshire Blvd., Suite 3850
5  Los Angeles, CA 90017
   Tel: (213) 955-9240
6  Fax: (213) 955-9250
7
8  Attorneys for Defendants
   OVERSEE.NET, JEFFREY KUPIETZKY,
9  and LAWRENCE NG
10
11              **UNITED STATES DISTRICT COURT**
12              **CENTRAL DISTRICT OF CALIFORNIA**
13

14  MONTE CAHN, an individual,           |  Case No. CV11-03800 SVW (AGRx)
                                          |
15              Plaintiff,                |  **DEFENDANT OVERSEE.NET'S**
                                          |  **REDACTED TRIAL BRIEF**
16         v.                             |
                                          |
17  OVERSEE.NET, a California             |
18  corporation; JEFF KUPIETZKY, an       |
    individual, LAWRENCE NG, an           |
19  individual; and DOES 1 through 10     |  Complaint Filed:    May 3, 2011
                                          |  Pretrial Conf. Date: January 9, 2012
20              Defendants.               |  Trial Date:         January 24, 2012
21                                        |
                                          |
22                                        |
                                          |
23                                        |
                                          |
24  _____     |
25
26
27
28

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION……………………………………………………1

II.     QUESTIONS PRESENTED……………………………………………1

III.    SHORT ANSWERS……………………………………………..2

    A.    TrafficClub Calculations………………………………………..2

    B.    Oversee "TBD" EBITDA………………………………………3

IV.    THE DOMAIN NAME INDUSTRY……………………………………3

    A.    Registrar:  Domain Name Registration………………………..…3

    B.    TrafficClub:  Domain Name Monetization……………………………5

    C.    Domain Sales…………………………………………...7

V.     BACKGROUND………………………………………...9

    A.    Oversee's Acquisition of SnapNames®………………………..9

    B.    The Moniker Acquisition……………………………………9

    C.    The MIP Performance Goals Were Not Met……………………11

    D.    The Incentive Compensation Plan………………………………12

    E.    Issues to Be Decided…………………………………………15

VI.    DEFINING TRAFFICCLUB CUSTOMERS………………………………15

    A.    Description of TrafficClub……………………………………15

    B.    The MIP Does Not Recognize Expanded Customers as TrafficClub Customers……………………………………17

    C.    Cahn's Change of Duties………………………………...19

    D.    Change of Control…………………………………………20

VII.   OVERSEE PERFORMANCE GOALS………………………………20

    A.    The Oversee EBITDA Business Segment Is Vague and Unenforceable…………………………………………22

    B.    Both Parties Understood that Setting the Oversee EBITDA Performance Goal Would Have Been an Idle Act………………………25

C.  Both the Parol Evidence and the Parties' Practical Construction of the MIP Demonstrate that Cahn Cannot Prevail……………………...29

1.  THE PAROL EVIDENCE RULE…………………………………29

a.  Application of the Parol Evidence Rule:  Surrounding Circumstances……………………………………………...32

b.  Application of the Parol Evidence Rule:  Negotiations……33

c.  Application of the Parol Evidence Rule:  Integration……...37

d.  Application of Parol Evidence Rule:  *Expressio Unius est Exclusio Alterius*…………………………………...37

2.  PRACTICAL CONSTRUCTION…………………………………38

D.  Conclusion on Oversee EBITDA…………………………………40

VIII.  CONCLUSION…………………………………………………………40

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Colangelo v. Norwest Mortg., Inc.,*
    598 N.W. 2d 14 (Minn. App. 1999) ................................................................ 31

*Stevens v. Mavent, Inc.,*
    2008 WL 2824956 *3 (C.D. Cal. July 21, 2008) ...................................... 25

*Vasquez v. Cargill, Inc.,*
    509 F. Supp. 2d 903 (C.D. Cal. 2007) .............................................. 31, 37

*Union Mut. Life Ins. Co. v. Mowry,*
    96 U.S. 544 (1877) .............................................................................. 31

## State Cases

*Bank of America Nat'l Trust and Sav. Ass'n v. Lamb Finance Company,*
    179 Cal. App. 2d 498 (1960) ............................................................. 31

*Beck v. Am. Health Group Internat., Inc.,*
    211 Cal. App. 3d 1555 (1989) ........................................................... 26

*Blumenfeld v. R.H. Macy & Co.,*
    92 Cal. App. 3d 38, 154 Cal. Rptr. 652 (1979) .......................... 30, 31

*Employers Reins. Co. v. Superior Court,*
    161 Cal. App. 4th 906, 74 Cal. Rptr. 3d 733 (2008) .................... 38

*Goldberg v. City of Santa Clara,*
    21 Cal. App. 3d 857 (1971) ....................................................... passim

*Guz v. Bechtel Nat. Inc.,*
    24 Cal. 4th 317 (2000) ........................................................................ 24

*In re Tobacco Cases I,*
    186 Cal. App. 4th 42, 111 Cal. Rptr. 3d 313 (2010) .................... 38

*Ladas v. California State Auto. Assn.*,
   19 Cal. App. 4th 761 (1993) ......................................................................... 25

*Lazar v. Hertz Corp.*,
   143 Cal. App. 3d 141 (1983) .................................................................. 22, 25

*Pacific Gas and Electric Co. v. G.W. Thomas Drayage & Rigging Co.*,
   69 Cal. 2d 33, 442 P.2d 641, 69 Cal. Rptr. 561 (1968) ............................ 30

*Rosen v. E.C. Losch Co.*,
   234 Cal. App. 2d 324 (1965) ....................................................................... 38

*Sabatini v. Hensley*,
   161 Cal. App. 2d 172 (1958) .................................................................. 24, 25

*Scott v. Pacific Gas & Electric, Co.*,
   11 Cal. 4th 454 (1995) ........................................................................... 24, 25

*Smith v. Arthur D. Little, Inc.*,
   276 Cal.App.2d 391, 81 Cal.Rptr. 140 (1969) .......................................... 38

*Vaillette v. Fireman's Fund Ins. Co.*,
   18 Cal. App. 4th 680 (1993) ....................................................................... 31

*Wagner v. Columbia Pictures Industries, Inc.*,
   146 Cal. App. 4th 586 (2007) ..................................................................... 31


**Statutes**

Cal. Civ. Code § 1625......................................................................... 31, 37

Cal. Civ. Code § 3515............................................................................. 17

Cal. Civ. Code § 3532............................................................................. 25

Cal. Code Civ. Proc. §1856(a).............................................................. 29

Cal. Code Civ. Proc. §1860................................................................... 31

# I.       **INTRODUCTION.**

At issue in this case is the Oversee.net 2007 Management Incentive Plan ("MIP"), which was adopted as part of Oversee.net's ("Oversee") acquisition of DomainSystems, Inc., d/b/a Moniker.com ("Moniker").  The MIP is not a profit-sharing plan or a typical bonus plan.  Rather, the MIP was a performance-based incentive plan structured to operate like an "earn-out," a provision often found in purchase and sale agreements to provide additional purchase price to the seller of a business based on the subsequent performance of the asset being sold.  The structure was originally proposed by Oversee in its negotiations regarding the proposed acquisition of Moniker.  Originally, it included payments both to Seevast, the seller of Moniker, and to the Moniker team who remained with the company post-closing.  Eventually, the payment to Seevast was eliminated, and the MIP provided only for payments to the Moniker employees who were to be specified by Mr. Cahn.

As is common with earn-outs, the MIP was designed to allocate to the seller certain financial risks associated with the acquisition.  The evidence at trial will demonstrate that the MIP was designed to allow participants opportunities for extremely lucrative payouts **if but only if** Moniker performed as successfully as Moniker claimed it would.  Instead, Moniker did not come close to meeting the projections on which the MIP was based.  As a result, the MIP participants received nothing under the MIP.

# II.      **QUESTIONS PRESENTED.**

At issue in this portion of the bifurcated trial are the following two questions:

1.       Does the MIP, which excludes existing customers of only DomainSponsor® from the definition of TrafficClub customers, require that gross profits generated by existing DomainSponsor customers be counted in the TrafficClub

calculation if Mr. Cahn and his staff "substantially increased" the gross profits generated by that customer?[1]

       2.      In light of the undisputed fact that the Board of Directors did not set an Oversee EBITDA Performance Goal, is there any basis for making an award to MIP Participants on account of the MIP Oversee Performance Goals?

## III.    <u>SHORT ANSWERS.</u>

###     A.    <u>TrafficClub Calculations.</u>

Under paragraph 15(aa) of the MIP, customers whose DomainSponsor® business increased as a supposed result of Cahn's efforts are excluded from the definition of "TrafficClub Customers" and thus not included in the MIP calculations. Paragraph 15(aa) imposes two requirements on new customers for whom MIP participants are entitled to credit, neither of which is satisfied by the contention that the customer increased their business with Oversee.

<u>First</u>, the customer must be "added after the adoption date of this Plan."  MIP ¶ 15(aa).  An existing customer whose business simply increased cannot have been *added* after the adoption date of the Plan; that customer was always there.  <u>Second</u>, the added customer cannot have done business with Oversee in any capacity during the preceding 12-month period.  So, even a customer who "came back" to Oversee "substantially as a result of the efforts of" Mr. Cahn or his staff, would not be a new customer if he had done even $1.00 worth of business with Oversee during the prior year.  Against these tight limitations, there is no basis to create a new category of TrafficClub customer based on a vague (and ultimately undefinable) description of an "Enhanced Customer."

---

[1]  The definition of TrafficClub customers does include "Shared Customers" (i.e., people who were customers of both DomainSponsor *and* TrafficClub).

**B.    Oversee "TBD" EBITDA.**

The MIP left the Oversee Performance Goals as "TBD" but unequivocally committed to the Board's discretion the setting of such goals.  The parol evidence to be offered at trial will demonstrate that Oversee rejected any efforts to remove or limit the Board's discretion in this respect.  Oversee, in fact, specifically rejected Cahn's request to require the Board to equate the MIP's Oversee MIP Performance Goal with the budget number that triggered bonus opportunities for senior executives.

Ultimately, Cahn has no claim for breach of contract arising from the Oversee Performance Goals because they were left as "TBD" and, thus, are unenforceable under *Goldberg, infra,* and *Scott, infra.*  Moreover, even if the Board had attempted to set the Performance Goals for 2008-2010, it would have been an idle act.  The MIP, which is premised on substantial growth, confirms the parties' intention that both the Performance Awards and the Performance Goals would increase year after year.  Nevertheless, Oversee's financial performance declined starting in January 2008.  As a result, there was no point in setting an ever-increasing Performance Goal over the three year period.

**IV.    THE DOMAIN NAME INDUSTRY.**

Before addressing the merits of the issues before the Court, in this section IV., Oversee provides a description of the businesses that underlie this dispute.[2] Particularly in light of the fact that the MIP ties payouts to various business segments, it is helpful to understand the underlying business in order to understand the MIP Performance Goal results and to place into context some of the testimony the Court will hear.

**A.    Registrar:  Domain Name Registration.**

"Registrar" is the second of the four MIP business segments (but it is helpful to describe it first for purposes of explaining the overall business).  A registrar registers

---

[2] A Glossary of key terms is attached as Exhibit A.

domain names on behalf of persons or entities who would like to utilize the domain name to publish content, often in the form of a website, when a user visits that domain name.  It functions as follows.

The Internet consists of a public world-wide network of computers.  To navigate the Internet, people must know (or must be able to retrieve) the Internet Protocol ("IP") address of where they want to go.  One example of an IP address is 74.125.224.72.  As can be seen from the example, an IP address, which consists solely of seemingly random numbers, can be difficult to remember.  As a result, people and companies who host a website on a computer connected to the Internet do not rely on their (or their customer's) ability to remember these numeric addresses.  Instead, they rely on "domain names" which are alphanumeric representations of these numeric IP addresses.  In essence, then, a domain name becomes a person's or company's "address" on the Internet.

Domain names are read from right to left starting with the top level domain and then reaching the secondary level domain.  For the example given above, the domain name for the IP address 74.125.224.72 is <google.com>.   In that example, the ".com" is the top level domain and the secondary level is "google."  Other examples of domain names include <westlaw.com> and <cacd.uscourts.gov>, which is the domain name used by this Court.

Anyone can register a domain name for a particular amount of time.  Generally, registrants register domain names for a one-year period.  Over time, the cost of obtaining a domain name has dropped significantly.  It now costs approximately $8 to register a domain name for one year.

The organization responsible for keeping track of who owns domain names for a particular top-level is known as the "registry."  For the ".com" and ".net" top level domains, the registry is a company called VeriSign.  A person who wishes to register a domain name (i.e., a potential "registrant") must first determine if the domain name is available for registration.  However, registrants cannot interface directly with the

registry.  They must utilize a "go between" known as the "registrar" who has been accredited by ICANN (which, at a very high level, can be thought of as the organization responsible for running the Internet's infrastructure).  Moniker is an ICANN-accredited registrar and the second of the four MIP Business Segments is based on the financial results of that aspect of its business.

The domain name registration process works as follows:

- The potential registrant visits the website of the registrar (e.g., Moniker.com) and provides the registrar with the domain name that it wishes to register.

- The registrar sends a query to the registry to check the availability of the domain name.

- The registry responds to the query and informs the registrar whether the domain name is available.

- The registrar then informs the potential registrant.

- If the name is not available, the process either ends or begins anew with a different query for a different domain name.

- If the name is available, the potential registrant can pay a registration fee to the registrar, and the registrar will then inform the registry that the domain name has been registered and, therefore, will not be available to future users.

- The registration fee paid by the registrant is comprised of three elements: (i) a fee to the registry for its service, (ii) a fee to ICANN and (iii) the fee charged by the registrar (e.g., Moniker.com) for its service.

**B.**  **TrafficClub:  Domain Name Monetization.**

Generally, "domain name monetization" refers to the business practice of using a domain name to make money.  More specifically, it refers to the business practice of generating revenues from a domain name (e.g., www.lawoffices.com) by populating

the domain name with keywords and hyperlink advertisements from advertisers (also referred to as "pay-per-click" advertising).

Moniker operated a monetization service known as TrafficClub, which is the first of the four MIP business segments. As discussed below, Oversee also operates a monetization service, known as DomainSponsor®. The MIP recognized this overlap and provided for the likely consolidation or joint management of TrafficClub and DomainSponsor®.

The monetization process works as follows:

- Having registered a domain name (or, more typically, hundreds or thousands of domain names) a registrant will submit his or her domain name(s) to a monetization platform or "parking company," such as DomainSponsor® or TrafficClub.[3]

- Generally (although not in the case of TrafficClub), the parking company has a direct contractual relationship with an upstream advertising provider (typically a search company such as Google, Yahoo, etc.) that provides keywords and/or advertisements that the parking company can use to populate the web site of the domain name. In the parlance of the industry, these are referred to as advertising "feeds" so that it is common for the parking companies to note whether they have, for example, a "Google feed" or a "Yahoo feed."

- The object of monetization is to populate a domain name with relevant advertising links. So, for example, a parking company would populate the domain name www.lawoffices.com with keywords and hyperlink advertisements, supplied by its upstream advertising provider, that relate to the legal profession.

---

[3]  While registrars refer to their customers as "registrants," parking companies typically refer to their customers who have submitted their domain names for monetization as "publishers."

- When a website visitor clicks on a hyperlink advertisement, he or she is transported from the website associated with the domain name <www.lawoffices.com> to the website of the advertiser who provided the hyperlink advertisement to the upstream advertising provider.

- As consideration for that "traffic" (which represents a potential customer to the advertiser), the advertiser will pay a certain amount of money to the upstream provider. That provider will keep some of the money for itself and pay some to the parking company. In turn, the parking company will keep some of the money for itself and pay some to the registrant-publisher.

- TrafficClub and DomainSponsor® both generated revenue from this "pay-per-click" advertising arrangement.

As is discussed below, in 2008, and continuing through 2009 and 2010, the pay-per-click business suffered a series of setbacks that resulted in that market contracting significantly. Also, the relationship between monetization and registrar is self-evident – when it became less profitable to monetize domain names, the financial proposition for registering domain names became less attractive. This, in turn, fed into the third identified MIP Business Segment known as Domain Sales.

### C.   **Domain Sales.**

A domain name, like other property, can be leased and sold.[4]  The sale of domain names can occur in different ways, including:

- Private Sale:  A registrant can find a purchaser for his domain name and sell it to that purchaser.

- Brokered Sale:  A registrant can retain the services of a broker who will market the name and assist in its sale in exchange for a commission.

---

[4]   Given that a domain name is intangible property, technically, it is the rights to use the domain name registration which can be leased or sold.

- • **Live Auction:** A registrant can submit his domain name to a domain name live auction where the domain name will be sold to the highest bidder, much like an art auction.

- • **Online Auction:** A registrant can offer his domain name in an online domain name auction, where the domain name will be sold to the highest bidder in the online auction, much like what occurs on the popular online auction platform, eBay.

Moniker manages live auctions and also brokers private domain name sales. Shortly before Oversee acquired Moniker, Oversee acquired a company called SnapNames®. SnapNames® operates an online domain name auction platform. So, the Moniker acquisition was expected to complement SnapNames® by offering domain owners brokerage, live auction, and internet auction sales services. Because these services focused on sales of existing domain names, domain owners typically refer to this segment of the industry as the domain name "aftermarket."

As with stocks, savvy registrants can make a considerable amount of money through speculation in the domain name market. For example, a speculator might come across an online auction where they see <widgets.com> for sale for $10,000. If that person believes that <widgets.com> is underpriced, he can buy it for $10,000, and then attempt to re-sell <widgets.com> at a higher price.

However, as with stocks, willingness to speculate is market-driven. A contracting overall economy[5], coupled with several factors unique to the domain name industry and cut-backs in advertising spends by stressed companies attempting to conserve capital, lowered the value of domain names, cleared many speculators out of the market, and sharply decreased the commissions available in those transactions that were consummated.

---

[5] The U.S. recession began in December, 2007, according to the National Bureau of Economic Research.

1
2
3
4

As is shown from the above, the MIP business segments were all interrelated. All would be expected to experience similar trends; all were vulnerable to general economic conditions; and all were particularly vulnerable to specific additional factors affecting the internet pay-per-click advertising business model.

5  ## V.    BACKGROUND.

6  ### A.    Oversee's Acquisition of SnapNames®.

7
8
9
10
11
12

By 2007, Oversee had established itself as a leading provider in domain name monetization through its patented DomainSponsor® monetization platform.  In mid-2007, Oversee purchased SnapNames®, a company that provided an online domain name auction platform.  After acquiring SnapNames®, and then having the ability to offer customers monetization and auction services, Oversee turned its attention to acquiring a registrar.  Moniker seemed to be an attractive acquisition target.

13  ### B.    The Moniker Acquisition

14
15
16
17
18
19
20
21
22
23
24

Plaintiff Monte Cahn is the co-founder of Moniker.  In 2005, Cahn and his partner sold Moniker to a company called Kanoodle, which later changed its name to Seevast Corp. ("Seevast").  Though Seevast paid some cash to acquire Moniker, Cahn and the other shareholders received a substantial portion of the purchase price in the form of Seevast stock and options.  Seevast's stock was not publicly traded and thus largely illiquid.  So, as part of the transaction, Cahn negotiated the right to force Seevast to sell Moniker if Seevast stock did not become publicly traded within two years.   When Seevast failed to go public by 2007, Cahn invoked his rights to force Seevast to sell Moniker.  Seevast redeemed some of Cahn's stock as part of the sale to Oversee, but much of the payout to Cahn was tied to an incentive plan, which eventually became the MIP.

25
26
27

Coming on the heels of its acquisition of SnapNames®, the potential acquisition of Moniker looked particularly attractive because it would allow Oversee to provide domain name services to "domainers" (the industry term for customers whose business

28

is investing in domain names) throughout the "domain name life cycle."  By acquiring SnapNames® and Moniker, Oversee could:

- Provide domainers with the ability to register a domain name (through the Moniker registrar, which was a customer-facing brand).

- Provide domainers with the ability to monetize the domain names they registered (through DomainSponsor® and/or TrafficClub).

- Provide domainers with the ability to buy and sell their domain names in the aftermarket either through an online auction platform (through SnapNames) or through private brokerage or a live auction format (through Moniker).

In theory, Oversee could become a "one-stop shop" for all of a domainer's domain name product and service needs.  With this potential business model in mind, Oversee negotiated the acquisition of Moniker.

The process got off to a rocky start.  At Mr. Cahn's request, Seevast originally excluded Oversee from the sales process.  Even when Seevast agreed to consider a bid from Oversee, according to Mr. Cahn, Seevast was simply looking to use that bid from Oversee to drive up the price for the other participants.  Nevertheless, as the sales process continued, other potential buyers dropped out, and only Oversee remained.  Oversee originally submitted a Letter of Intent ("LOI") that called for approximately 1/3 of the purchase price to be structured as an earn-out.  Ex. 394.  The earn-out was to be shared between Seevast and the Moniker team.  As originally proposed, the earn-out would be paid if Moniker's 2008 financial results met the projections in the offering documents circulated by Moniker and its investment bankers.  Exs. 72, 73.

Following due diligence and noting that Moniker was falling short of its 2007 projections, Oversee reduced its offer, and the earn-out – originally payable both to Seevast and the Moniker team  – transformed into the MIP, payable only to the Moniker team .  Using the premise of the original earn-out structure, and based on the projections in the offering documents, the MIP extended the performance goals and

corresponding payments over three years using growth rates in the MIP consistent with those provided by Seevast and Mr. Cahn in the Offering Documents and its financial model.

Because Oversee's revised offer eliminated additional earn-out payments to Seevast, Oversee negotiated the terms of the MIP directly with Cahn and his counsel, Bill Gross.  As part of that process, Cahn also executed a three-year employment agreement with Oversee.  Ex. 9.  The employment agreement expired on December 31, 2010, following which Cahn left Oversee.  The acquisition of Moniker closed on December 14, 2007.

### C.   <u>The MIP Performance Goals Were Not Met.</u>

The MIP (ex. 1) provides for potential performance awards by measuring four "Business Segments" (TrafficClub, Registrar, Domain Sales and Oversee) over three "Determination Periods" that spanned from fourth quarter 2007 to the end of 2010.  Ex. 1, Schedule A (OVER2429).  As noted above, the MIP Performance Goals were derived from projections in the Offering Documents which were prepared by Seevast, Mr. Cahn and their investment bankers (exs. 72, 73) and the MIP language was negotiated with Mr. Cahn and his counsel.

The Moniker Business Segment Performance Goals were never achieved. Moniker's business did not just fail to grow as aggressively as projected in the Offering Documents; in fact, it declined.  Cahn's conduct during the term of the MIP exhibited his recognition of that decline.  In fact, his conduct is consistent with Oversee's contentions that: (i) none of the Moniker Performance Goals were met or were capable of being met; and (ii) any failure to set an Oversee Performance Goal was immaterial since such goals, had they been set, would not have been met in light of the company's financial decline.

Cahn repeatedly indicated that he was aware that he was *not* entitled to payments under the MIP.  In fact, within six months of the acquisition, by summer 2008, Cahn viewed the MIP as unachievable (Exhibit 94) and informed Oversee that he was no

longer incented to work there.  To keep Cahn incented, and although under no obligation to do so, Oversee offered Cahn the Incentive Compensation Plan ("ICP") which would allow him to earn additional compensation by reaching more modest targets.[6]  Exhibit 28.

### D.     The Incentive Compensation Plan.

The ICP, which covered 2008 and 2009, offered an incentive-based structure designed to take into account the economic realities of Moniker and Oversee.  The ICP provided far more modest performance targets and, accordingly, far more modest payouts than the MIP.[7]  Both the terms of the ICP and the fact that Cahn accepted payment under the ICP without protest undermine his chief contention that the parties agreed that the MIP Oversee Performance Goals would be the same as performance goals for senior management or would be tied to company budgets.  The explanation requires an understanding of the structure of the ICP.

The ICP provides that: (i) Cahn may be paid under the ICP or under the MIP, whichever results in the higher award and (ii) Cahn would not be entitled to an award in respect of the MIP's Oversee Business Segment in 2008 and 2009 unless one of the Moniker Business Segments also triggered an award in that year.  Notably, the chief source of payment under the ICP is triggered based on whether and to what extent Oversee's year-end results matched its budget EBITDA figure for that year.  Ergo, the rub is this: Cahn would never have signed an agreement to receive a much smaller bonus based on Oversee meeting a budget EBITDA figure if he truly believed that

---

[6]   Cahn received legal advice on the ICP from William Gross, the same attorney who assisted him in connection with the Employment Agreement and the MIP.

[7]   Under the ICP, Cahn's bonus for each of 2008 and 2009 was tied to the average of the Senior Team, subject to a discretionary adjustment based on the Senior Team's feedback.  Thus, while the bonus amount was more modest in comparison to the MIP, the amount itself was necessarily in line with what was customarily paid to senior executives as year-end bonuses.

Oversee meeting that **same figure** entitled him to millions under the MIP.  Stated more precisely:

- The ICP includes several bonus categories, one of which is labeled a "Company Performance" goal.  The "Company Performance" award is to be paid if Oversee achieves, in whole or in part, its "Company Budget."  Ex. 28, OVER2439.  The term "Company Budget" is defined as the EBITDA figure identified in the Oversee budget (and it specifically states that this figure is ███████ for 2008 – which was, in fact, the figure in the 2008 Oversee budget).

- Thus, the ICP uses the same Oversee EBITDA figure that Cahn claims is *also* required to be used in the MIP for purposes of Oversee Performance Goal.

- But, if Cahn truly believed that the MIP incorporated the "Company Budget" figure described in the ICP, by signing the ICP he would have done two completely inexplicable things:

  o First, he would have been agreeing to surrender completely his Oversee Performance Awards (which, under the MIP could have totaled ███ ███ in 2008 and 2009, combined), unless one of the Moniker Business Segments hit its Performance Goal; and

  o Second, he would have been doing this in exchange for a payment that was, roughly, ████.

This would have made no sense, and a concrete example drives the point home:

- In 2009, Oversee achieved more than 100% of Company Budget, and Cahn received an aggregate bonus of $████[8] under the ICP.[9]

---

[8]   The $████ bonus included approximately $████ in commissions which Cahn earned as a result of meeting some of the more modest goals in the ICP in 2009.

[9]   None of the Moniker Business Segments met their Performance Goals in 2009, thereby triggering the ICP provision which would have prevented Cahn from obtaining an award in respect of Oversee Performance Goal anyway.

- If Cahn's allegations were true that "Company Budget" was intended to be the same as the MIP Oversee Performance Goal, then achieving that budget figure would have entitled Cahn to a $█████ payment under the MIP instead of the $█████ he actually received under the ICP.

- In short, for the Court to conclude that the parties agreed under the MIP to use the EBITDA number from the Oversee budget as the Oversee Performance Goal, the Court would have to believe that Cahn was either the dumbest or the most charitable businessman who ever lived because he knowingly would have traded a $█████ MIP payment in 2009 for a $█████ ICP payment.

- Alternatively, the Court could conclude that Cahn is, in fact, a smart businessman, and he signed the ICP because he knew that there was no relationship between "Company Budget" and the MIP Oversee Performance Goals, and he further knew that he would not be due anything under the MIP.

To remove any remaining doubt about how to interpret Cahn's decision to execute the ICP, the Court can consider this: in 2009, Oversee's EBITDA slightly exceeded "Company Budget" as that term is defined in the ICP, and Cahn's ICP bonus reflected that level of achievement. If Cahn truly believed that the Company Budget number had been the same as the Oversee Performance Goal in the MIP, he would have been apoplectic over giving up a █████ Oversee Performance Award in exchange for a █████ ICP bonus. Instead, after receiving his █████ bonus, he asked a few questions about how the sum was calculated *under the ICP*, and he moved on to requesting a new alternative compensation plan (instead of relying on Moniker's ability to achieve the MIP's Performance Goals in 2010). *See* Trial Ex. 230.

In the last section of this brief, Oversee discusses the law of practical construction. As the foregoing illustrates, the execution of the ICP, with a Company Budget definition that creates a potential bonus of approximately 1/10th the bonus achievable under the MIP, is one of the more powerful examples of the construction Cahn gave to the terms of the MIP before a dispute arose.

E.     **Issues to Be Decided.**

The balance of this brief analyzes the two issues identified by this Court as issues to be decided in the trial set for January 24.  As stated above, and as described in detail below, Oversee respectfully submits that the Court should rule as follows:

1.     TrafficClub Customers, as that term is defined in the MIP, do not include existing Oversee customers whose business relationship with Oversee Cahn claims he enhanced.

2.     Any failure to set Oversee Performance Goals in the MIP did not violate the implied covenant of good faith and fair dealing because it did not deprive Mr. Cahn of any of the benefits for which he bargained.  Furthermore, there is no objective basis that the Court can use to retroactively set an Oversee Performance Goal for the parties. Even if there were, both parol evidence and evidence of the parties' practical construction of the MIP forecloses Cahn's efforts to utilize the Oversee Company Budget as the Oversee Performance Goal in the MIP.

The MIP states that its terms are governed by California law.  Ex. 1, p. 7, ¶ 13. The analysis below thus applies California law.

## VI.   DEFINING TRAFFICCLUB CUSTOMERS.

Cahn contends that the failure to achieve the MIP TrafficClub Performance Goals is due, in part, to Oversee's failure to track gross profits generated by existing Oversee customers whose business relationship Cahn claims he expanded (hereinafter, "Expanded Customers").  Oversee is unaware of any basis for that argument but will address the definition of TrafficClub customers in this section of the trial brief.

A.     **Description of TrafficClub.**

The description of TrafficClub and the transition of TrafficClub customers to DomainSponsor® is described primarily in Section V. of Jeffrey Kupietzky's direct testimony.

As noted above, prior to Oversee's acquisition of Moniker, and continuing to this day, DomainSponsor® has been Oversee's domain name monetization platform.

DomainSponsor® primarily utilizes an advertising feed from Google. DomainSponsor® has a direct contractual relationship with Google as its other upstream advertising providers.

In contrast to DomainSponsor®, TrafficClub was a ***rotator*** monetization service. TrafficClub did not have a direct contractual relationship with an upstream advertising provider such as Google for its monetization platform. Instead, TrafficClub had relationships with the various parking companies, such as DomainSponsor®.

For DomainSponsor, the relationship was:

Upstream provider → Parking Company → Registrant/Publisher
    (e.g. Google)           (e.g. DomainSponsor)    (Website owner)

For TrafficClub, there was an additional step (and a corresponding additional cost):

Upstream provider → Parking Companies → **Rotator Service** → Registrant/Publisher
    (e.g. Google)         (e.g. DomainSponsor + others)    **(TrafficClub)**    (Website owner)

In theory, the benefit to the customer of the rotator service lies in his or her ability to choose among the various different feeds offered by the various different parking companies, thereby finding the feed that maximizes revenue. Additionally, many parking companies have minimum business thresholds, so certain registrants would not qualify to do business with them directly. The customer of a rotator service might obtain access to a parking company feed he would not have had a chance to get directly.

The business model of a rotator service like TrafficClub is dependent on its contractual relationship with the parking companies. If the perceived benefit of being able to "rotate" among various providers goes away, and/or customers obtain direct access to the advertising feeds utilized by the parking companies, the business model of the rotator service is necessarily impaired.

Once Oversee acquired Moniker, there was obvious overlap and duplication in operating both DomainSponsor® and Moniker's TrafficClub. That issue had been a

topic of discussion prior to the acquisition (Kupietzky testimony, ¶¶ 69, 70), and it was addressed in the MIP.  *See,* Ex. 1, ¶ 15(aa); Kupietzky testimony, ¶¶ 71, 72.

Very early in 2008, the decision was, in fact, made to transition TrafficClub customers to DomainSponsor® and to stop operating TrafficClub as a separate entity. However, contrary to Mr. Cahn's assertions, such decision was not a unilateral decision by Oversee but, rather, was done in consultation with Mr. Cahn.  Mr. Cahn sent an email expressing his agreement with that decision:  "I have been thinking more and more about the future for TrafficClub and what makes sense for the overall organization as well as our customers.  I think I would be willing to move towards a full transition to DomainSponsor® rather than trying to migrate TC."  Ex. 18.  Mr. Cahn's email does ask Oversee to "consider" several issues as part of the transition process, but his email does not ask to amend the MIP, and the MIP was not, in fact, amended, to account for this fully-anticipated transition.  Having contemporaneously agreed with the decision to transition TrafficClub customers to DomainSponsor®, Cahn is in no position to second-guess Oversee's decision now.  Cal. Civ. Code § 3515 ("He who consents to an act is not wronged by it.").

**B.**     **The MIP Does Not Recognize Expanded Customers as TrafficClub Customers.**

Section 15(aa) of the MIP defines "TrafficClub Customers" as:

(i)     those existing customers of Moniker's TrafficClub Business Segment as of the adoption date of this Plan that were not customers of the Company on the date of this Plan or at any time during the twelve (12) months prior to the date of this Plan, **(ii) any new customers of any domain name monetization business of Moniker or the Company added after the adoption date of this Plan which (A) were not customers of the Company at any time during the twelve (12) months prior to becoming a customer of the domain monetization business of Moniker or the Company and (B) became customers of the Company or Moniker**

1
2
3
4
5

**substantially as a result of the efforts of Monte Cahn or another employee of the Company performing services for Moniker and** (iii) those customers of Moniker's TrafficClub Business Segments as of the date of the Plan that were also customers of DomainSponsor (such customers in this clause (iii) referred to as, "Shared Customers").

6

(Emphasis added).  The bolded language is at issue here, but to set that language in

7

context, it is useful first to consider sub-paragraphs (i) and (iii).

8

Sub-paragraph (i) addresses existing TrafficClub customers who were not also

9

Oversee customers.  The MIP contemplates that 100% of the gross profits generated by

10

these customers will be included in the calculation of the TrafficClub Performance

Goals.

11

Sub-paragraph (iii) applies to shared customers – i.e., people who were **both**

12

customers of TrafficClub and DomainSponsor® as of the date of the MIP.  The MIP

13

ultimately was dated December 14, 2007.  Paragraph 15(a) of the MIP describes the

14

formula applied to allocate credit for shared customers.  *See,* Ex. 1, p. 8, ¶ 15(a).

15

Under paragraph 15(a), the parties agreed to use the gross revenues generated by a

16

shared customer in the last full month prior to the adoption of the MIP (ultimately, that

17

month was November, 2007) to divide credit for gross profits generated by shared

18

customers.   So, the TrafficClub Performance Goal attribution for shared customers

19

was set by formula:  during the three-year MIP term, TrafficClub was to be credited

20

with a fixed percentage of any shared customer's results.  That percentage would be

21

calculated by comparing the gross revenues that customer generated for TrafficClub to

22

the gross revenues generated for DomainSponsor®.

23

Sub-paragraph (ii) addresses "*new* customers" who "*became customers* . . .

24

substantially as a result of the efforts of Monte Cahn or another employee of the

25

Company performing services for Moniker . . . ."  (Emphasis added).  Subject to the

26

carve-out for people who were Oversee customers during the preceding 12 months,

27

28

TrafficClub is to be credited for the performance of "new" customers who "became" customers substantially as a result of the efforts of Cahn or his Moniker staff.

There is no room in any of these three definitions for Mr. Cahn to receive credit for Expanded Customers.  Indeed, paragraph 15(aa) forecloses credit for Expanded Customers.  Based on Cahn's description, an Expanded Customer would be an existing DomainSponsor customer who did not do business with TrafficClub as of the closing date but increased his business with DomainSponsor® after 2007.  Paragraph 15(aa) does not recognize these customers as TrafficClub customers.[10]

### C.   Cahn's Change of Duties.

Cahn apparently claims that, because his duties and responsibilities changed during his employment with Oversee, he should receive credit for Enhanced Customers.  There is no basis for such an argument under the MIP.

Cahn's argument does, however, raise a noteworthy point that he often overlooks.  Cahn was highly compensated under his Employment Agreement.  He received a base salary of ███████ and annual retention bonuses of ██████.  Yet, Cahn consistently makes arguments that ignore the fact that he was being paid to work. He was not entitled to additional compensation any time he did something helpful to Oversee.  His job was to work for Oversee, and his duties required to act in the best interests of Moniker and Oversee.  Oversee had no obligation to offer Cahn additional compensation any time Cahn did something that he did not expect to be doing.

So, Cahn's constant bickering with Oversee about every aspect of its operations and how those operations personally affected Cahn is completely inappropriate.  Like nearly everyone else, Cahn had a job to do, and sometimes that job included tasks that he would have preferred to avoid.  But, absent an express agreement with Oversee to

---

[10]  To the extent Cahn is arguing that a Shared Customer could also be an Expanded Customer, he is also wrong.  The formula for allocating revenues generated by Shared Customers is fixed by paragraph 15(a), which dictates that revenue be credited based on November, 2007 results.

the contrary, Cahn was not entitled to additional rewards every time he did a job that he felt was inconsistent with his duties.  It is not as though Cahn was receiving ████ just to get out of bed in the morning, and every request beyond that required extra compensation.

In short, the MIP's definition of TrafficClub Customer precludes Cahn's argument that he should get credit for "Expanded Customers," and, merely performing one's job as required and instructed does not alter the language of the MIP.

**D.     Change of Control.**

During the pretrial conference, Cahn's counsel cited Section 15(r) of the MIP as a basis to be compensated for Expanded Customers.  Section 15(r) defines "Sale of the Company."  Cahn apparently contends that majority control of the capital stock of Oversee changed during the term of his employment due to investments made by Oak Hill Capital Partners.

The MIP, however, states that, upon the sale of the company, the Board can elect to keep the MIP in place or to substitute new awards "on substantially the same terms and conditions . . . ."  Ex. 1, ¶ 6(a).  Cahn's argument is not clear.  The MIP clearly does not require any amendment in the event of a "Sale of the Company."  Further, there is no evidence that the Board did, in fact, change the MIP due to a "Sale of the Company."  So, Cahn's argument appears to lead nowhere.

**VII.   OVERSEE PERFORMANCE GOALS.**

As detailed above, the Oversee EBITDA Performance Goals in the MIP were left to the discretion of the Board of Directors.  But, the overall intent was the same as for the Moniker Business Segments – the Oversee Performance Goals would reward substantial **growth** in the overall company consistent with the Moniker-specific Performance Goals.

Cahn has repeatedly shifted his contentions concerning the intent behind the Oversee Performance Goals.  But, to the extent Cahn contends that parol evidence supports his contention that the Oversee Performance Goals were merely intended to

import Oversee budget figures, he is wrong.  In fact, the parol evidence shows the opposite.  The evidence at trial will demonstrate that Cahn asked to tie the Oversee Performance Goals to goals or targets set for other Oversee executives, and Oversee repeatedly rejected that request.

The evidence will also demonstrate that the Oversee Performance Goals were never set; Mr. Cahn never consulted with the Board and asked that they be set; and Mr. Cahn never designated the MIP participants entitled to any of the MIP Performance Goals.  The reason is practical:  in 2008, ███████████████████████████ ████████████████████████, and Cahn, like Oversee, recognized that the MIP Moniker Performance Goals would never be met.  The performance awards embodied in the MIP, which were premised on Moniker's achievement of significant earnings growth as detailed in the Offering Documents, quickly become moot issues, and setting an Oversee Performance Goal which also would have been based on Oversee's growth quickly became an idle act.  Armed with this knowledge, at Mr. Cahn's request, the parties negotiated the ICP (ex. 28) and later the Monte Cahn Commission Plan (ex. 10) in order to provide Mr. Cahn with more modest performance targets and, correspondingly, more modest bonus compensation for achieving those targets.

As discussed below, for each of the following reasons, Cahn is not entitled to any MIP award based upon the Oversee Business Segment:

- The "TBD" Oversee Performance Goal reflects a lack of a "meeting of the minds" and is therefore unenforceable under *Goldberg*;

- The setting of ever-increasing Oversee Performance Goals would have been an idle act and did not damage Cahn because they would not and could not be met as Oversee's business declined; and

- Both parol evidence and the parties' conduct following creation of the MIP demonstrate that Cahn and Oversee understood that the Oversee Performance Goals were **not** the same as Oversee's budgets.

1    For each of these reasons, as discussed more fully below, Cahn is not entitled to
2    recover on account of the Oversee Performance Goals in the MIP.

3        **A.**    **The Oversee EBITDA Business Segment Is Vague and Unenforceable.**

4        In its Order Denying Oversee's Motion for Summary Judgment (Docket No.
5    209), the Court expressed the view that "Oversee was bound by the implied covenant
6    of good faith and fair dealing to set [the Oversee MIP] target."  The Court cited *Lazar*
7    *v. Hertz Corp.*, 143 Cal. App. 3d 141 (1983) and *Goldberg v. City of Santa Clara*, 21
8    Cal. App. 3d 857, 860-61 (1971), in support of its conclusion.  Oversee respectfully
9    submits that neither case supports the Court's finding, and that the *Goldberg* case, in
10   fact, demonstrates why the Oversee Performance Goals in the MIP are not enforceable.

11       In *Goldberg*, the City of Santa Clara retained the Plaintiff-attorney to negotiate
12   the cancellation of a contract with Pacific Gas and Electric.  *Goldberg*, 21 Cal. App. 3d
13   at 859.  The retainer agreement contained the following provision:
14

15           If our efforts through settlement or hearing bring about savings
16           to the City of such magnitude as, in our opinion, would justify
             additional compensation, we would present our views to the
17           City at that time, but would leave to the City's judgment the
18           additional compensation to be paid. We have no hesitation in
             relying on the fairness of the City in this regard.
19

20   *Id.*  In Plaintiff's estimation, his work resulted in annual savings of at least $1,000,000,
21   but the City refused to provide any additional compensation, so he brought suit.  *Id.* at
22   860.  Defendant's demurrer was sustained without leave to amend, and Plaintiff
23   appealed.  *Id.*

24       In analyzing Plaintiff's claim, the *Goldberg* Court started by noting that "[i]t is
25   true, as appellant points out, that a party to a contract may allow the amount of his
26   compensation to be determined by the other party to the contract, and it is true that if
27   the other party, when making the decision which has been left to him, acts in bad faith
28   (usually manifested by setting an unconscionably low figure), the matter may be put to

1  a jury or judge to decide upon the reasonable value." *Id*. at 861.  This is the statement

2  cited in this Court's Order on Oversee's MSJ.  But, it is not the holding.  As discussed

3  below, the appellate court affirmed the trial court's order sustaining the demurrer on

4  grounds directly applicable here.

5       Like the MIP, the *Goldberg* retainer agreement failed to provide a basis for

6  determining whether the conditions for payment had been met.  That is the proposition

7  next addressed in the *Goldberg* ruling:

8

9           But what is put into the power of one party to decide, provided
           he act with good faith, as recognized in the cases cited above
10          and in some cases from other jurisdictions (see 92 A.L.R. 1396
           et seq.), is the *amount to be paid*. The uncertainty about this can
11          often be resolved. **What is uncertain in the case before us is**
           **much more: not only is the amount which might be paid**
12          **uncertain, but so is *what it is to be paid for*. This is a very**
           **different matter**. (See 1 Corbin on Contracts, § 100.) In our
13          case, the extra payment is not sought for extra time; plaintiff
           was compensated for his time on an agreed hourly basis of $35
14          (or $45 for court time), and presumably he billed for all of his
           time. The alleged agreement is on a contingent basis; and what
15          is the contingency? That the "savings" are "of such magnitude
           as, *in our opinion*, would justify additional compensation."
16
17          (Italics added.) **This is too vague to impose contractual**
           **liability. No objective standard is declared. No comparable**
18          **transaction or practice is referred to. No breaking-point**
           **amount is stated.**
19

20

21  *Id*. (italics in the original, bold emphasis added).  The *Goldberg* Court also noted that,

22  not only was the trigger uncertain but "[t]here is further uncertainty in the matter of

23  time when the savings of magnitude are to be computed." *Id*.  The *Goldberg* Court

24  ultimately concluded that "[t]he terms of the alleged contract for additional

25  compensation are too vague to permit a true meeting of the minds." *Id*. at 863.

26       As it was in *Goldberg*, so it is here.  In *Goldberg*, the Plaintiff left the

27  determination of the payment trigger (and the payment amount) to the determination of

28

the City (with Plaintiff's input) just as Cahn left the determination of the Oversee Performance Goals to the determination of the Board (with Cahn's input).  As in *Goldberg* where the Plaintiff was compensated for his work at an hourly rate, Cahn was compensated for his work through the base salary and bonus in his Employment Agreement.  As in *Goldberg*, the definition of Target EBITDA, for purposes of creating an Oversee Performance Goal, has no objective standard.  It references no comparable transactions or practices.  It has no breaking-point amount.  It does not set a date by which the Board must set a target but merely contemplates that the target might be set from "time to time."  As in *Goldberg,* the earnings to be achieved to trigger payment on account of the Oversee Business Segment are unknown.  That provision is, therefore, "too vague to permit a true meeting of the minds."

Although *Goldberg* is not specifically referenced in the California Supreme Court's opinion in *Scott v. Pacific Gas & Electric, Co.*, 11 Cal. 4th 454 (1995) *disapproved on other grounds*, *Guz v. Bechtel Nat. Inc.,* 24 Cal. 4th 317, 352 n. 17 (2000) the *Scott* Court did acknowledge the "doctrine of unenforceability of indefinite promises."  *Scott,* 11 Cal. 4th. at 472.  The Supreme Court's opinion in *Scott* evidences a departure from older jurisprudence which relies on the implied covenant of good faith and fair dealing (like the 1958 case of *Sabatini v. Hensley*, 161 Cal. App. 2d 172, 175 (1958)[11]) and a move toward embracing this "doctrine of unenforceability," particularly in the employment context:

> [C]ourts will not enforce vague promises about the terms and conditions of employment that provide no definable standards for constraining an employer's inherent authority to manage its enterprise.  It is to be expected that many alleged employer

---

[11]  Notably, even the *Sabatini* case does not aid Plaintiff since that case merely stands for the proposition that the "amount to be paid" can be determined as the "reasonable value of the services over the agreed salary."  *Sabatini*, 161 Cal. App. 2d at 175.  *Sabatini* is silent on how an uncertainty as to a *contingency* on which payment is premised should be resolved.

promises will be unable to cross this threshold of definition to become enforceable contract claims."

*Scott,* 11 Cal. 4th. at 473; *see also Stevens v. Mavent, Inc.*, 2008 WL 2824956 *3 (C.D. Cal. July 21, 2008) ("*Sabatini v. Hensley* [citation], cited in opposition by Plaintiff, has not been overruled, but more recent California cases, including *Ladas*, *Neisendorf*, *Scott*, and *Rochlis*, together evidence a departure from *Sabatini's* approach to indefinite contractual terms.")

     *Goldberg* and *Scott* have particular application here. The uncertainty as to the "amount to be paid" can sometimes be resolved by evidence of market price.[12] Similarly, the missing gasoline price in a rental car contract (as in *Lazar*) could be filled in by entering a reasonable sum. But, resolving the uncertainty as to the appropriate payment **condition** that a contract expressly leaves to the discretion of one party is different. This is not a matter of filling in a blank with a "reasonable" figure. For Cahn to recover on account of the Oversee Business Segments, the Court would be creating a contract to which the parties never agreed and without any objective benchmarks.

### B.    Both Parties Understood that Setting the Oversee EBITDA Performance Goal Would Have Been an Idle Act.

     "The law neither does nor requires idle acts." Cal. Civ. Code § 3532. Though Oversee would have been within its rights simply to refuse to set an Oversee EBITDA Performance Goal, the evidence will demonstrate that Oversee did not take advantage of a contractual loophole. ████████████████████████████████ ████████████████████████████████ ██████. Given the intent of the MIP, including its purpose as a performance-based, "earn-out" vehicle, setting an Oversee Performance Goal under the conditions in which Oversee found itself would have been an idle act.

---

[12] *But see Ladas v. California State Auto. Assn.*, 19 Cal. App. 4th 761 (1993) (holding that promises of "comparable" pay are too indefinite to be enforced).

██████████████████████████████████████████████. Cahn never approached the Oversee Board to request that it set the Oversee Performance Goals. And, the Board never considered setting the goals, because it was obvious to all concerned that the economic realities were such that there was no reason to do so. Under the MIP, the Oversee Performance Goals would have been set in anticipation of year over year growth and, therefore, would have reflected increased performance from 2007 to 2008, increased performance from 2008 to 2009, and increased performance again from 2009 to 2010. Nevertheless, Oversee's continuing *decline* would have made it impossible to goals that continued to increase over time.

Indeed, as the parties' relationship moved forward in 2009 and 2010, the MIP itself became completely irrelevant. In 2008, Mr. Cahn signed the ICP and received bonuses in respect of Oversee's overall performance in both 2008 and 2009. When the ICP expired in 2009, Cahn actively sought a new compensation plan because he fully recognized that he would receive nothing under the MIP. At no point in time did Cahn say he did *not* need a new performance plan because he was going to achieve the benefits under the MIP in 2010. As a result, the parties entered into the 2010 Monte Cahn Commission Plan. At the time, Cahn never asserted that Oversee's internal budgets constituted the MIP Performance Goals.

The MIP confirms Oversee's contentions. It plainly states "The Plan is designed to reward, through additional compensation, the Participants for significant contributions toward the continued or improved profitability and growth of the Company." Ex. 1, p. 1, ¶ 1. This language guides the interpretation of the document. *Beck v. Am. Health Group Internat., Inc.*, 211 Cal. App. 3d 1555 (1989) ("The objective intent as evidenced by the words of the instrument, not the parties' subjective intent, governs our interpretation.").

Schedule A of the MIP also confirms the parties' intention to reward growth. The performance goals for each of the Moniker Business Segments were increased from their 2007 levels and subsequently increased significantly in each Determination

Period.  As the performance goals increase in each Determination Period, so do the Performance Awards.  All of this reflects the stated intention of the MIP to reward contributions to substantial levels of profitability and growth.

   Although the performance goals of the Oversee Business Segment are left "TBD", the Oversee Performance Awards, like those for each of the Moniker business segments, increase in each Determination Period.  This further reflects an expectation that any Oversee Performance Goal would have increased in each year.  Mr. Cahn, however, is seeking payment on budget EBITDA numbers which *decreased* over time.

That argument is unsustainable on every level.  The chart below depicts the Moniker Performance Goals in the MIP and compares those goals with the Oversee budget figures that Cahn claims triggered his Oversee EBITDA awards, thereby highlighting the absurdity in Cahn's argument:

//

//

| Summary of MIP, Schedule A – Adding Cahn's Contention that Oversee Budgets Constituted the Oversee "TBD" Performance Goals | | | | |
|---|---|---|---|---|
| | Perf. Goal | Y/Y Change In Goal | Award | Y/Y Change In Award |
| **TrafficClub** | | | | |
| 2008 | | | | |
| 2009 | | | | |
| 2010 | | | | |
| **Registrar** | | | | |
| 2008 | | | | |
| 2009 | | | | |
| 2010 | | | | |
| **Domain Sales** | | | | |
| 2008 | | | | |
| 2009 | | | | |
| 2010 | | | | |
| **Oversee "TBD"** | | | | |
| 2008 | | | | |
| 2009 | | | | |
| 2010 | | | | |

It is not difficult to see the incongruous part of this table. Every Moniker Business Segment contains the potential for rapidly escalating awards based on rapidly escalating Performance Goals. The Oversee Business Segment similarly escalates the available Performance Awards, yet ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

This chart illustrates why the setting of an Oversee Performance Goal was viewed as an idle act and thus ignored. This is not a situation in which Oversee decided to take advantage of Mr. Cahn; rather, Oversee suffered, Moniker suffered, and nobody – least of all, Mr. Cahn – believed that there was any reason to set an Oversee EBITDA

---

13   Source: ICP (ex. 28, ¶ 13); Kupietzky direct, ¶ 85.

14   Kupietzky direct, ¶ 111.

15   Kupietzky direct, ¶ 128.

Performance Goal that, for purposes of the MIP, would have escalated upward from more than $ ███████ .[16]

## C.   Both the Parol Evidence and the Parties' Practical Construction of the MIP Demonstrate that Cahn Cannot Prevail.

On an annual basis, the ODN Board approves a budget for purposes of the company's internal budgeting.  The budget includes an anticipated year-end EBITDA figure that combines the individual EBITDA expectations for the many constituent businesses of Oversee.  Cahn contends that the company's EBITDA budgets during each of the three years of the MIP, regardless of whether Oversee budgeted for growth or contraction, became the Oversee EBITDA Performance Goals in the MIP.  He appears to make two arguments to support that contention.

First, Cahn argues that, in the absence of any action by the Board, the budget figures are the only ones that can possibly be utilized.  This argument is addressed in subsections A. and B., above.  As discussed above, the Oversee Performance Goal was not enforceable, and even if it had been enforceable, setting it would have been an idle act.

Second, Cahn argues that the intention of the parties was that the MIP Oversee Performance Goal would necessarily import the Oversee EBITDA budget figure.  This section of the brief will address Cahn's second argument and will demonstrate by reference to both parol evidence and the contemporaneous conduct of the parties during the term of the MIP (known as "practical construction"), that the MIP does not incorporate the Oversee EBITDA budget figures.

### 1.   THE PAROL EVIDENCE RULE.

The parol evidence rule does not allow a party to contradict the terms of a written agreement.  Cal. Code Civ. Proc. §1856(a).   Rather, parol evidence is

---

[16]  Even the $ ██████ budget figure would have been *below* any appropriate baseline from which to build beginning with 2008 because it did not fully capture the anticipated EBITDA that Moniker was to contribute.

admissible if it supports an interpretation to which the contract's language is reasonably susceptible. *Pacific Gas and Electric Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 442 P.2d 641, 69 Cal. Rptr. 561 (1968) (hereinafter, *"Pacific Gas"*).

The procedure required by *Pacific Gas* is explained in *Blumenfeld v. R.H. Macy & Co.,* 92 Cal. App. 3d 38, 45, 154 Cal. Rptr. 652 (1979):

> The [*Pacific Gas*] decision requires a court to follow a two-step process to determine the admissibility of extrinsic evidence to interpret a written agreement.  First, so that the court can place itself in the same situation in which the parties found themselves at the time they entered the agreement, the court should provisionally receive all credible evidence concerning the intention of the parties to determine whether or not the written agreement is reasonably susceptible to the interpretation offered by a party.  Second, if the court decides in light of this extrinsic evidence that the contract is reasonably susceptible to the offered interpretation, then the court may admit such extrinsic evidence to interpret the contract.  On the other hand, if the court decides in light of this extrinsic evidence that the contract is not reasonably susceptible to the offered interpretation, then the evidence is inadmissible to interpret the contract.

*See also, Pacific Gas*, 69 Cal. 2d at 40, n. 7.

Critically, the parol evidence rule cannot serve to insert a provision absent from the contract on the ground that silence on an issue opens up the contract to terms that are "not inconsistent" with the terms that the contract contains.  Rather, the contract is deemed to contain the entirety of the contract.

> [W]hen the terms of an agreement have been reduced to writing it is to be considered as containing *all of them* and there can be no evidence thereof other than the contents of the writing (Code Civ. Proc., § 1856), as applied to contracts [the parol evidence rule] is a rule of substantive law based on the principle that 'a certain act, the act of embodying the complete terms of an agreement in writing (the 'integration'), *becomes the contract of the parties'* and no

extrinsic evidence, oral or written, is competent to vary its terms or provisions.

*Bank of America Nat'l Trust and Sav. Ass'n v. Lamb Finance Company*, 179 Cal. App. 2d 498, 501-02 (1960) (emphasis added) (citations omitted); *see also,* Cal. Civ. Code § 1625 (the statutory integration clause); *Union Mut. Life Ins. Co. v. Mowry,* 96 U.S. 544, 548 (1877) ("For compliance with arrangements respecting future transactions, parties must provide by stipulations in their agreements when reduced to writing.").

Thus, when a contract addresses an issue, it is deemed to express the parties' full understanding on that topic.  The doctrine of "expressio unius est exclusio alterius" precludes the implication of additional implied terms.  *See, Vasquez v. Cargill, Inc.,* 509 F. Supp. 2d 903, 909-10 (C.D. Cal. 2007) ("expressio unius est exclusio alterius – the expression of one thing is the exclusion of another"); *Colangelo v. Norwest Mortg., Inc.,* 598 N.W. 2d 14, 17-18 (Minn. App. 1999) (observing that the maxim provides that "expression of specific things in a contract implies the exclusion of all not expressed.").

Parol evidence may include the circumstances surrounding the negotiation of the agreement "so that the judge may be placed in the position of those whose language he is to interpret."  Cal. Code Civ. Proc. §1860.  The court may also consider evidence of the parties' negotiations.  *Wagner v. Columbia Pictures Industries, Inc.*, 146 Cal. App. 4th 586, 590 n. 7 (2007).   But, a parties' supposed ***unexpressed*** intent is not parol evidence and is not admissible.  *Vaillette v. Fireman's Fund Ins. Co.,* 18 Cal. App. 4th 680, 690 (1993).

During the pretrial conference, this Court recognized that it is required to provisionally consider proffered parol evidence before determining whether the MIP is reasonably susceptible to the interpretations being offered by the parties.  *See, also, Blumenfeld, supra.*  As is shown below, both the language of the MIP and the parol evidence support Oversee's position that the Oversee Performance Goals were: (i) left to the complete discretion of the Board; (ii) **not** required to utilize any other metric or

budgetary figure employed by the Board; and (iii) intended, consistent with the Moniker Performance Goals, to provide further earn-out opportunities based on sustained and substantial growth in Oversee's earnings.

### a. Application of the Parol Evidence Rule: Surrounding Circumstances.

As described in detail above, the MIP began as an earn-out under which Oversee would pay additional amounts to Seevast and the Moniker team if Moniker achieved the 2008 performance projections identified in the Offering Documents (exs. 72, 73).[17] Ex. 394.  These Offering Documents projected sustained growth.  The testimony of Oversee's expert, Mr. Strong, confirms a close correlation between the projections in the Offering Documents and the Moniker Performance Goals incorporated into the MIP.

The evidence will show that the Oversee Business Segment was intended to be consistent with the Moniker Performance Goals in terms of providing outsized payment amounts for outsized performance.  Indeed, the MIP states that its purpose is "to reward . . . the Participants for significant contributions toward the continued or improved profitability and growth of the Company."  Ex. 1, p. 1, ¶ 1.

The MIP was not intended in lieu of compensation.  To that end, Cahn signed a three-year Employment Agreement that called for annual compensation of $██████, including a $██████ component as a "retention bonus."  Utilizing the MIP as an earn-out device was also consistent with Cahn's ownership interests.  Cahn had owned Moniker, sold it to Seevast, largely in return for Seevast stock, and then forced Seevast to sell Moniker when Seevast failed to go public, thus sharply limiting Cahn's ability to liquidate his Seevast stock.  In other words, while Cahn was not technically the

---

[17] Contrary to Cahn's assertions, Oversee did not "pre-fund" the MIP as a result of the reduction in purchase price.  Rather, the MIP Performance Awards would pay for themselves insofar as they were based on Performance Goals that were significantly larger than the Awards themselves.

seller of Moniker, he was the person who forced the sale, and he did so because he wanted to realize on the value of the company.

So, as the Court places itself in the position of the parties at the time of negotiation, Oversee believes that the surrounding circumstances clearly demonstrate that the MIP was a later incarnation of an earn-out that was designed to make deferred payments to MIP participants *if but only if* the Moniker acquisition proved as beneficial to Oversee as the Offering Documents represented it would.

The surrounding circumstances do not support Cahn's contention that the Oversee Performance Goals were intended to allow Mr. Cahn to earn up to $ █ █ in payments for 2009 and 2010 as long as Oversee's results met its *budget* during each of the three years of the MIP, since Oversee was budgeting for financial decline.  The surrounding circumstances explain why the setting of an Oversee Performance Goal was left to the discretion of the Board – i.e., because the Board did not want to pay MIP participants an earn-out if Moniker failed to achieve the financial results expected, and it did not want to make awards to MIP participants if Oversee's results made up for disappointing Moniker performance.

### b.     Application of the Parol Evidence Rule: Negotiations.

The relevant language in the MIP provides as follows:

> "<u>Target EBITDA</u>" means, with respect to each Determination Period, the Registrar EBITDA, Oversee EBITDA or Domain Sales EBITDA, as applicable, with respect to which 100% of the Business Segment Baseline Award with respect to such applicable Business Segment would be awarded, in the case of Registrar EBITDA and Domain Sales EBITDA as set forth on <u>Schedule A</u>, *and with respect to Oversee EBITDA as shall be determined from time to time by the Board, in consultation with Monte Cahn for so long as he is employed by the Company*."

Ex. 1, p. 11, ¶ 15 (u) (underlines in original; italics added).  The surrounding circumstances, as described in the preceding section, explain why the matter was left to

the Board's discretion.  The negotiations that led to this language confirm the conclusion that the Oversee Performance Goal was not tied to any goals set for other senior executives.

The evidence at trial will demonstrate that the Oversee Performance Goal was the last open item in the negotiation of the MIP.  This is not a situation in which a term slipped past anyone because nobody noticed it.  To the contrary, the parties exchanged numerous drafts containing conflicting proposals until Cahn relented and accepted Oversee's position, which is embodied in paragraph 15(u).

On November 26, 2007, Mr. Cahn's counsel, Mr. Gross made the following request concerning the Oversee Performance Goal:

> "The performance goals for Oversee EBITDA are 'to be determined'.  If they cannot be determined before closing, there need to be objective criteria for determining those goals.  Monte mentioned that the intent is for these goals to be the same as the goals set for the rest of Oversee senior management.  That would be acceptable, however, language to that effect should be added on Schedule A."

Ex. 123.  So, Mr. Gross requested insertion of language to say specifically what Mr. Cahn now says the MIP requires – i.e., that the MIP utilize the budget figures that triggered bonus opportunities for other Oversee senior executives.

Two weeks passed during which, according to the parties, the Moniker acquisition nearly fell apart.  Once the deal was salvaged, the parties returned to the MIP.  Oversee's counsel responded to Mr. Gross' request in exhibit 123 by proposing the following language to describe the Oversee Performance Goal:  "with respect to Oversee EBITDA as shall be determined from time to time by the Board *and which shall be the same for all Participants under this Plan*."  Ex. 81, p. MCAHN 2013 (emphasis added).

1   Mr. Gross, on behalf of Mr. Cahn, rejected this proposal "[b]ecause it gave
2   discretion to the board to do what they wanted."  Gross depo., 131:13-14.  Gross
3   responded with an email stating:
4
5       "As you mentioned, the Oversee EBITDA Goals will be determined
6       after closing.  Monte's understanding is that these goals would be
        the goals for Oversee senior management that would also be
7       applicable to participants under the Plan.  He did not understand
8       that Oversee would determine these goals for plan participants only.
        You can see that Monte's understanding had a built in check and
9       balance."[18]
10  Ex. 82.  Oversee's counsel responded with new proposed language that, in substance,
11  retained the Board's discretion to set a **different** Oversee EBITDA Performance Goal
12  for Plan participants.  Ex. 83, p. MCAHN01992.
13      Again, Mr. Gross rejected the proposal, stating:  "I spoke to Monte.  His
14  understanding is that he would be treated the same as senior executives with respect to
15  calculation of Oversee EBITDA and your proviso appears to take away what the first
16  part of the sentence give [sic]."  Ex. 84.  Mr. Gross offered his own proposed language,
17  which read:  "and with respect to Oversee EBITDA as shall be determined from time to
18  time by the Board in a manner and using principles consistent with those used for
19  determining Oversee EBITDA for purposes of other bonus and/or incentive plans
20  applicable to senior executive officers of the Company."  Ex. 84, p. OVER001387.  So,
21  again, Cahn came back with language that linked the Oversee Performance Goal to any
22  metrics used to trigger bonuses to other senior executives.
23
24
25  _____
26  [18]  Gross has explained what he meant by the term check and balance.  In substance, he
    said that he wanted to create a situation where, if Oversee imposed a high Oversee
27  Performance Goal in the MIP, it would be required to apply that same high
    Performance Goal to their other employees, "which could hurt their entire
28  business."  Gross depo., 134:1-9.

1    Oversee again rejected Cahn's proposal to limit the Board's discretion in
2    connection with the Oversee Performance Goals or to link the MIP Performance Goals
3    to targets or triggers used for other senior executives.  Indeed, according to Mr. Gross,
4    although Oversee's outside counsel initially indicated he believed Mr. Gross' proposal
5    could be acceptable, "when he ran it by his client it was not."  Gross depo., 148:9-10.
6        At that point, the attorneys stepped aside.  Cahn, through his counsel, had
7    repeatedly sought to limit the Board's discretion and specifically proposed doing so by
8    tying the Oversee Performance Goals to bonus triggers employed for other Oversee
9    employees.  Oversee had repeatedly rejected that proposal.  So, Jeff Kupietzky of
10   Oversee reached out directly to Mr. Cahn and, as memorialized in an email exchange,
11   explained that: (i) the Oversee Performance Goal in the MIP would be different than
12   the bonus trigger used for other executives; and (ii) Oversee would retain discretion in
13   setting that Performance Goal.  Ex. 85.  The parties then spoke, and Mr. Kupietzky
14   followed up with language that is substantially the same as the language in the final
15   version of the MIP.  Exs. 86, 88.
16       Mr. Cahn is expected to testify that during a telephone call with someone on the
17   Oversee side that occurred at some time after he received exhibit 85 from Mr.
18   Kupietzky, Oversee retracted the position expressed in Mr. Kupietzky's email.
19   However, that expected testimony is not credible in light of the language Mr.
20   Kupietzky proposed, and the parties ultimately incorporated into the MIP.
21       While it may be a somewhat long description, the evidence of the parties'
22   negotiations clearly demonstrates that Oversee repeatedly rejected every request by Mr.
23   Cahn to tie the Board's hands in setting an Oversee Performance Goal.  Oversee
24   refused to tie it to any defined metric, refused to tie it to bonuses paid to senior
25   management, and refused to hinder the Board's discretion in any manner.  That parol
26   evidence is consistent with the plain language of the MIP.  The Board had complete
27   discretion in the setting of the Oversee Performance Goal.  As such, Oversee did not
28   incur any enforceable obligation to Mr. Cahn under the Oversee Performance Goal

provisions, and even if the Court finds otherwise, there is no basis to support the contention that Oversee agreed that the Oversee Performance Goal would be the same as the EBITDA forecast in its annual budgets.

### c.   Application of the Parol Evidence Rule: Integration.

The MIP contains an integration clause.  Ex. 1, p. 7, ¶ 10.  Cahn affirmatively alleges that the MIP is a fully-integrated contract.  Third Amended Complaint, ¶ 41.  Thus, there can be no side-deals, no separate understandings, and no assurances outside the terms of the contract.  So, any claim that Cahn was assured or promised that the Board's discretion in setting the Oversee MIP Performance Goals would be limited is completely unenforceable.  *See also,* Cal. Civ. Code § 1625 ("The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument").

### d.   Application of Parol Evidence Rule: *Expressio Unius est Exclusio Alterius*

"The expression of one thing is the exclusion of another."  *See, Vasquez, supra.*  This doctrine is often invoked when a right is given and then limited in an agreement or statute.  The fact that a limitation is described in the agreement generally forecloses the contention that other limitations may be implied.

As relevant here, Schedule A of the MIP states that Oversee EBITDA is "TBD."  There is no dispute that those letters stand for "to be determined."  The MIP then carefully defines the meaning of "Target EBITDA" for both the Registrar and Domain Sales, identifying specific financial hurdles in Schedule A, while leaving completely unlimited the Board's discretion to set the Oversee Performance Goal.  Indeed, there is one caveat to the Oversee Performance Goal – it is to be set in consultation with Mr. Cahn (and Cahn admits that he never consulted with the Board on the setting of this Performance Goal).

The structure of the MIP is not accidental.  This brief describes in detail both the genesis of the MIP as an earn-out geared to projections of earnings growth, and Cahn's multiple efforts to tie the Oversee Performance Goal to an objective benchmark used to award bonuses to other Oversee employees.  The MIP means what it says, and when it says that Oversee Performance Goal is "TBD" the parties knowingly and intentionally left the issue to the discretion of the Board.  Expressio unius est exclusio alterius: the parties imposed definitive Performance Goals and measurement criteria on the Moniker Performance Goals, and by doing so further demonstrated their intention not to impose any such limitations on the Oversee Performance Goals.

## 2.   PRACTICAL CONSTRUCTION.

"When a contract is ambiguous a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court."  *Rosen v. E.C. Losch Co.*, 234 Cal. App. 2d 324, 330-31 (1965); *accord, Smith v. Arthur D. Little, Inc.,* 276 Cal.App.2d 391, 400, 81 Cal.Rptr. 140 (1969).

> The rationale for the admission of course of performance evidence is a practical one. "[W]hen a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court. The reason underlying the rule is that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract, and *a practical construction placed by the parties upon the instrument is the best evidence of their intention*.

*Employers Reins. Co. v. Superior Court,* 161 Cal. App. 4th 906, 921, 74 Cal. Rptr. 3d 733 (2008) (emphasis added; citations omitted); *accord, In re Tobacco Cases I,* 186 Cal. App. 4th 42, 52, 111 Cal. Rptr. 3d 313 (2010).

The parties' conduct clearly evidences their mutual understanding that: (i) there was no reason for the Board to engage in an idle act by setting the Oversee Performance Goals; and (ii) the parties had agreed that the Oversee Performance Goals in the MIP would *not* be tied to bonus triggers applicable to other Oversee employees, including the EBITDA forecast contained in the Oversee budgets.

The following facts demonstrate the practical construction the parties placed on the Oversee Performance Goals:

- Cahn never once identified MIP participants to the Board, because he knew that no payments were due.
- Cahn never asked to consult with the Board to set the Oversee MIP Performance Goals.
- Cahn repeatedly acknowledged (and complained about) the fact that the performance of the company foreclosed any MIP awards.
- Cahn executed the ICP under which he agreed to forego any MIP award under the Oversee Business Segment unless one of the Moniker Performance Goals was achieved, even though the ICP offered a bonus potential worth about $1/10^{th}$ of the 2009 Oversee Performance Goal award.
- Cahn received a $ ██████ payment under the ICP based on Oversee's achievement of more than 100% of its budgeted EBITDA forecast without ever complaining about not receiving instead a ██████ award that could have been payable under the MIP.  Ex. 427.[19]

It is nearly impossible to explain Cahn's behavior if, as he now claims, he believed that the Oversee budget forecasts constituted or amended the MIP Performance Goals.  On the other hand, the conduct of the parties is exactly consistent with their mutual recognition that there was no need to set an Oversee Performance Goal, and that if such

---

[19] Cahn also received a bonus under the ICP in 2008.

1  a goal had been set, it would have been completely unachievable based on the

2  Company's declining fortunes.

3      **D.      Conclusion on Oversee EBITDA.**

4          Having left the MIP's Oversee Performance Goal as "TBD", there was no

5  meeting of the minds as to the objective standards which would trigger an Oversee

6  Performance Goal.  As a result, that aspect of the MIP is unenforceable.  But, even if it

7  was enforceable, the surrounding circumstances indicate that the setting of an Oversee

8  Performance Goal would have been an unnecessary idle act.  The MIP is premised on

9  aggressive growth and the Performance Goals therein would have been based on

10  anticipated year over year growth.  In reality, however, all parties knew that Oversee

11  was in decline, and, therefore, it would have been impossible to achieve the type of

12  aggressive growth the MIP contemplated.  Lastly, Cahn's argument that the MIP

13  necessarily incorporated the EBITDA figure from the budget is refuted by both the

14  parol evidence and the MIP's plain language which places no limitation on the Board's

15  discretion in setting the Oversee Performance Goal.

16  **VIII.  CONCLUSION**

17          None of Cahn's arguments are supportable by fact or law.  The MIP's definition

18  of "TrafficClub Customer" clearly prohibits Cahn's notion of "Expanded Customers."

19  And, there is no basis on which to provide Cahn any award in respect of the Oversee

20  Business Segment in the MIP.  Oversee respectfully requests that the Court find in its

21  favor on these two issues.

22

23  Dated:  January 17, 2012                    WILLENKEN WILSON LOH & LIEB LLP

24

25                                               By:*/s/William A. Delgado*_____

26                                               William A. Delgado
                                                 Attorneys for Defendants OVERSEE.NET,
27                                               JEFFREY KUPIETZKY, and LAWRENCE NG

28