**LEWIS BRISBOIS BISGAARD & SMITH LLP**
JOHN L. BARBER, SB# 160317
　E-Mail: barber@lbbslaw.com
KENNETH D. WATNICK, SB# 150936
　E-Mail: watnick@lbbslaw.com
SONJA HARRINGTON, SB# 261053
　E-Mail: sharrington@lbbslaw.com
221 North Figueroa Street, Suite 1200
Los Angeles, California 90012
Telephone: 213.250.1800
Facsimile: 213.250.7900

Attorneys for MONTE CAHN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MONTE CAHN,<br><br>　　　Plaintiff,<br><br>　　vs.<br><br>OVERSEE.NET, a California corporation; JEFF KUPIETZKY, an individual; LAWRENCE NG, an individual; and Does 1 through 10,<br><br>　　　Defendants. | CASE NO. CV11-03800 SVW (AGRx)<br><br>The Honorable Stephen V. Wilson<br><br>**DIRECT TESTIMONY DECLARATION OF MONTE CAHN [REDACTED VERSION]**<br><br>Complaint Filed:　May 3, 2011<br>Final Pretrial Conf.: January 9, 2012<br>Trial Date:　　　January 17, 2012 |

4840-8190-2094.1

DECLARATION OF MONTE CAHN

# DECLARATION OF MONTE CAHN

I, MONTE CAHN, declare and state as follows:

1.  I am over the age of eighteen (18). I submit this declaration in accordance with the Court's Civil Trial Preparation Order [Doc. 23]. I have personal knowledge of the following facts and, if called as a witness, I could and would competently testify thereto.

## BACKGROUND

2.  I grew up in Cincinnati, Ohio where my parents ran a successful furniture business. My grandmother lived in San Diego and would constantly send me articles about the biotech industry that was booming in San Diego at that time. It was these news articles that inspired me to pursue a career in the medical field.

3.  In 1983 I attended the University of Kentucky. I graduated in 1987 with degrees in marketing, biology, and business administration. Shortly before graduation I had started my own business, marketing specialized cardiology equipment.

4.  In 1988 I was offered a position with IVAC Corporation as a sales executive. IVAC Corp. was a subsidiary of Eli Lilly Corporation. The Miami South Florida territory ranked near the bottom of Eli Lilly's national territories at #111 of 114 in the country. During my two years at IVAC, I succeeded in moving my territory up from #111 to the #4 best performing territory in sales volume and revenue. I left IVAC in 1990.

5.  In January 1990 I joined a group of other senior managers from IVAC and we helped form Pyxis Corporation. Pyxis was based in San Diego, where my original medical dreams had started with those letters from my grandmother. At Pyxis we invented automated medication and supply distribution systems that are

4840-8190-2094.1

1

DECLARATION OF MONTE CAHN

now used in almost every hospital in America and around the world. In 1995, after going Public on NASDAQ, we sold Pyxis to Cardinal Health, one of the world's largest drug distributors.

6. Between January 1996 and November 1999 I worked for MedicaLogic as a Sr. Sales Manager where I was in charge of sales of the Southeast Territory and strategic growth of the company through our Public offering in 1998.

7. In 1995 I was introduced to a brand new field, the domain name industry, through the son of one of my Pyxis customers. I was asked to read his thesis paper about how domain names were the electronic equivalent of real estate when he was a Senior in College. I was intrigued and saw the potential for an emerging business. We formed a business together, acquired more than 1000 domain names, and starting the first domain brokerage on the net called NameShop.com. I also started building my own portfolio, and after three years decided I wanted to branch out on my own and pursue more valuable domain names and broker valuable names held by others.

## MONIKER.COM

8. In 1999 I left NameShop and formed HitDomains.com. After selling a series of multi-million dollar domain names in 1999, HitDomains.com merged with SolutionHome.com in 2000, forming Domain Systems, Inc. d/b/a Moniker.com ("Moniker"). Moniker is a web-based service that provides users the ability to search for, register, manage, monetize, and sell their domain names.

9. Moniker was comprised of three business segments: TrafficClub, the Registrar and Domain Sales.

10. TrafficClub was the division of Moniker that created linguistically targeted 1 page websites and parking pages for domain names owned by others, and earned money from the advertising published on those websites using a unique

combination of advertising content feeds from Google, Yahoo and others, which were rotated to provide the maximum revenue to Traffic Club and its customers. Traffic Club also earned and managed revenue for default DNS (domain name server) traffic from the Registrar and its customers (running advertising on websites at domain names as soon as they are registered but before the owner of the name points that name to another website.)

11. The Registrar managed revenue for default DNS traffic for its customers as well as the securing, registering and renewing of internet domain names. It also generated revenue from expired name auctions and sales from registrar customers that did not renew their own domain names as well as other ancillary services such as Whois Privacy and forwarding.

12. The Domain Sales business segment was involved in the auction, escrowing, appraising and brokerage of domain names in the Aftermarket.

**PURCHASE BY SEEVAST**

13. I managed and operated Moniker as a successful business until 2005, at which time Kanoodle, which later was renamed as Seevast Corp. ("Seevast"), purchased Moniker. I thought that the sale of Moniker to Seevast would be a good partnership. Seevast agreed to keep Moniker autonomous, and Seevast was also looking to go public, which made it attractive at the time. Additionally, as part of the transaction Seevast and Moniker agreed that if Seevast did not have a change of control or go public within two years of the sale that Moniker's executives could request that the board put Moniker back up for sale.

14. While at Seevast I continued as CEO and successfully managed and grew Moniker, generating $3.6 in EBITDA (earnings before interest, taxes, depreciation and amortization) for 2006 and $4.1 in 2007. (See Trial Exhibits 302 and 392.)

4840-8190-2094.1

3
DECLARATION OF MONTE CAHN

15. In February 2007 DomainSponsor, a division of Oversee, and one of our partners in our TrafficClub feed, unilaterally decided to pull out of TrafficClub. At the same time, Oversee, at the direction of Jeff Kupietzky, directly contacted all of TrafficClub's customers to inform them that DomainSponsor was pulling out, and attempted to move TrafficClub's customers over to DomainSponsor, in violation of DomainSponsor and TrafficClub's partnership agreement. Oversee indicated that DomainSponsor's partnership with Moniker violated its contract with Google, and that they couldn't have a feed from a competitive system like Yahoo or Yahoo partners, which existed on the TrafficClub system.

16. In late 2006, early 2007, two years after Seevast's purchase of Moniker, Seevast had not had a change of control or gone public, and Moniker requested from the Seevast Board to have it resold again. The Board agreed. There were around twenty different companies that were interested in the sale of Moniker at the time.

## NEGOTIATIONS FOR PURCHASE OF MONIKER

17. Tucows, Sedo, Millennium, Baker Capital and two other private equity firms made offers for the purchase of Moniker. However, Oversee, which was initially excluded from the purchase process due to the customer poaching incident earlier that year, had the highest bid through a creative tiered purchase offer and Seevast entered into an exclusivity agreement with Oversee. In mid 2007, Oversee entered into negotiations with Seevast regarding the purchase of Moniker.

18. Oversee's initial offer for Moniker was around █████████.

19. During the negotiations I was informed that as a condition to the purchase of Moniker, Oversee wanted to ensure that I would remain with Moniker and join Oversee for at least three years after the acquisition. (See Trial Exhibit 394.) Representatives of Seevast initially communicated this information to me

1  through Jeff Navach. Josh Armstrong also communicated to me that my continued
2  employment was a condition of the transaction.

3    20.    Oversee further demonstrated their intention in my Employment
4  Agreement. Section 4 of my Employment Agreement specifically provides for a
5  three year employment term. Further, the Employment Agreement was a condition
6  to the consummation of the transaction. (Trial Exhibit 9.)

7    21.    As an incentive to stay with Moniker, Oversee offered me an incentive
8  program, which came to be known as the "Management Incentive Plan" ("MIP").
9  (Trial Exhibit 1.) Instead of adding the cost of the MIP to the purchase price,
10 Oversee decided to take the cost of the MIP off of the purchase price and use the
11 difference to fund the MIP.

12    22.    After due diligence, negotiations, and the MIP payment price reduction,
13 the final purchase price of Moniker was around ▅▅▅▅▅▅. (Trial Exhibit 127.)

14    23.    After the negotiations with Seevast were finalized, Oversee and I
15 finalized the terms of both my employment agreement and the MIP. (See Trial
16 Exhibits 1 and 9.)

17    24.    The sale of Moniker to Oversee was completed on December 14, 2007.
18 (Trial Exhibit 127.)

**THE MANAGEMENT INCENTIVE PLAN ("MIP")**

21    25.    Under the terms of MIP, I would be able to earn up to $▅▅▅▅▅▅
22 ▅▅▅▅▅▅ of which had been funded by the discount provided by Seevast on the
23 Moniker Purchase) through a goal oriented bonus structure during my three year
24 employment term at Oversee.

25    26.    In reliance on this large, and what was presented to me, achievable,
26 incentive program, I joined Oversee. (Schedule A to MIP, Trial Exhibit 1.)

27    27.    The bonus structure set forth under the proposed MIP was based on my



4840-8190-2094.1

5
DECLARATION OF MONTE CAHN

attainment of certain performance goals in four categories: the Registrar Business Segment, the Domain Sales Business Segment, the TrafficClub Business Segment, and Oversee EBITDA.

28. The first three segments under the MIP are known as the "Moniker Business Segments". Each of the Moniker Business Segments had pre-determined performance goals for all three determination periods. (Schedule A to MIP, Trial Exhibit 1.)

29. The MIP also provided that the Board could amend my performance goals. (¶3(b) to MIP, Trial Exhibit 1.) However, any material amendment or modification to the MIP which would adversely affect me, required my written approval. (See ¶¶2, 3(b) and 9 of the MIP, Trial Exhibit 1.)

30. All of the business segments also had pre-negotiated bonus awards for each determination period. (Schedule A to MIP, Trial Exhibit 1.) It was my understanding that these bonuses were funded by ██████████████████████████████████████████████████████████████████████.

31. The performance goals for the Oversee business segment were left "TBD", or to be determined, because Oversee's overall budgets and EBITDA goals were not completed at the time we negotiated the MIP. (Schedule A to MIP, Trial Exhibit 1.) Jeff Navach, one of Oversee's negotiators, explained to me that the Oversee EBITDA needed to be left "TBD" so that it could be determined on an annual basis. Mr. Navach explained to me that the Oversee EBITDA goal would be determined in good faith so that my interests were properly aligned with that of Oversee's.

32. The goal for each determination period was to be set by the Oversee Board of Directors ("Board") during that period, and the Board was to consult with me in setting the goals each year. (¶15(u) of the MIP, Trial Exhibit 1.) Oversee's representatives, Lawrence Ng, Jeff Navach, Jeff Kupietzky, and Josh Armstrong,

agreed to this procedure. The above mentioned Oversee representatives told me that the Board would set the overall EBITDA goal at the beginning of the year.

33. I understood that there was only one EBITDA goal that was set for the company, and I understood that my EBITDA goal would be the same as the Company EBITDA goal that all other Sr. Executives and employees were to be measured by. During my employment with Oversee, I was not informed of any alternative means of calculating the Oversee EBITDA in the MIP.

34. Under the MIP, the Board was supposed to determine the Oversee EBITDA goal in consultation with me. The Board never consulted with me. Instead, the Board approved a target EBITDA for the company as a whole. I understood and believed that the company would compensate me based on this goal.

35. According to the MIP, my attainment of the performance goals was to be determined, in good faith, by the Board. In connection with calculating whether the goals had been attained, Oversee could not take any action to manipulate Moniker's financials if it would have the effect of preventing my attainment of my goals under the MIP. (¶14(a) of the MIP, Trial Exhibit 1.)

36. Under the MIP, Oversee was also required to provide me with the Interim Financial Statements or the Determination Period Financial Statements so that I would be able to verify Moniker's financial performance each year. (¶4(a) of the MIP, Trial Exhibit 1.) Oversee failed to provide me with any such financial statements tracking my performance under the MIP during the term of my employment with Oversee. In fact, Oversee failed to provide me with any contemporaneous accounting and tracking of my performance under the MIP. I requested financial statements and accounting numerous times during my employment without success. (Trial Exhibits 64, 247.)

37. The MIP also required that the Board certify whether I had attained my goals in each of the three determination periods. (¶2 of the MIP, Trial Exhibit 1.)

4840-8190-2094.1

7

DECLARATION OF MONTE CAHN

1  The Board failed to provide me with any such certification, indicating whether I had
2  attained my performance goals under the MIP for any of the three determination
3  periods.

4      38. During the same time that I entered my MIP, I also entered into an
5  employment agreement with Oversee. (Trial Exhibit 9.) The employment
6  agreement confirmed that I would serve as the President of Moniker. (§2 of
7  Employment Agreement, Trial Exhibit 9.) The employment agreement thus
8  recognized that I would have managerial responsibilities for the business segments
9  that would be the subject to the performance goals in the MIP, including
10 TrafficClub, Moniker's Registrar and Moniker's Domain Sales.

11     39. Although Oversee was in breach of numerous obligations under the
12 MIP, at all relevant times, I fully performed my responsibilities to the company.
13 Beginning in 2008, Oversee's management requested that I assume responsibility
14 for other business segments, including Oversee's SnapNames division. Moniker
15 was based in Florida while SnapNames was based in Oregon. I agreed to this
16 request.

17     40. Additionally, beginning in 2008, Oversee's management stripped me of
18 my responsibilities as the President of Moniker, in violation of section 2(a) of my
19 Employment Agreement. (Trial Exhibit 9.) Instead of reporting directly to the CEO
20 of the Company, as also required by section 2(a) of my Employment Agreement, I
21 was directed to report to other executives. I was also told that I would no longer
22 have managerial responsibilities. Although I disagreed with these decisions, and
23 told Oversee that I disagreed, I agreed to follow the direction and request of the
24 Oversee management team.

25 / / /
26 / / /
27 / / /
28

**TRAFFICCLUB COMBINES WITH DOMAINSPONSOR**

41. In January of 2008, just over one month after the acquisition, Oversee unilaterally made the decision to combine TrafficClub and DomainSponsor, a similar "competing" business segment to TrafficClub owned by Oversee.

42. The combination of DomainSponsor and TrafficClub was a material modification of the terms of the MIP.

43. I told Oversee that I would only agree to this merger if I received the appropriate credit under my MIP for the revenues of the combined division. I also understood that if I expanded any existing customers of DomainSponsor, I would also receive credit under my MIP since the two entities were now combined as one. (Trial Exhibit 18.)

44. After the two divisions were combined, I was appointed as the Vice President Sales for DomainSponsor with sales responsibly for the combined entity. As the Vice President of Sales I was responsible for growing the number of DomainSponsor customers by bringing in new customers, and by increasing the portfolio of the existing customers.

45. After Oversee combined TrafficClub and DomainSponsor, I was told to grow the combined entity by both bringing in new customers to DomainSponsor and by adding domain names to existing DomainSponsor customer accounts, and I would receive credit under the MIP for both bringing in new customers and by adding names to existing DomainSponsor accounts. (MCHAN003776-3777, attached as Exhibit "1" hereto.)

46. Additionally, Oversee told me that the Moniker team and I would earn bonuses based on new account referrals to DomainSponsor, and for new names added to existing DomainSponsor accounts. Oversee called this the DomainSponsor "SPIF". (MCHAN003776-3777, attached as Exhibit "1" hereto.)

47. On or around March 4, 2008 I advised Oversee that I had persuaded

1. ███████████████████████████████████████████ and requested that Oversee make sure that these names were tracked accordingly under the MIP. (OVER001708, attached hereto as Exhibit "2".)

48. I also met with Jan Barta in 2008 and worked with him and his team over a period of months to help put together a finance deal where Mr. Barta ████████████████ and then ████████████████████████████████ ████████ at Moniker through DomainSponsor. I visited him and his company in Prague to also secure this relationship.

49. Some other large business development deals that I helped to monetize through DomainSponsor after it combined with TrafficClub included: ██████ ████████████████████████████████████████████████████████████████ ████████, and numerous others.

50. However, I discovered that I was not receiving any credit under the MIP for my referrals of monetization business to DomainSponsor in 2008, 2009 and 2010.

51. After the integration, in early 2008, Oversee had stopped tracking TrafficClub and failed to account for the revenue of this combined entity under the MIP. (Trial Exhibits 92 and 247.)

52. Additionally, Oversee had failed to make payments to me and the Moniker team under the SPIF, and I never received any accounting reports under the SPIF for the referrals from Moniker to DomainSponsor. (Trial Exhibits 92 and 247.)

**THE INCENTIVE COMPENSATION PLAN**

53. In 2008, Oversee proposed and prepared a supplemental compensation plan, the 2008 Incentive Compensation Plan ("ICP"). (Trial Exhibit 242.)

54. Oversee's in-house counsel, Todd Greene, drafted the ICP and advised

1  me as to the meaning of the agreement.

2  55.  Mr. Greene and Mr. Kupietzky, explained that the ICP was not an amendment to the MIP, it was a supplemental plan that provided me with an alternative incentive program.

56.  It was agreed that I was to be bonused according to whichever plan provided the greater amount of compensation that year.  Mr. Greene assured me that the ICP did not modify, and was not intended to modify, any of the existing terms of the MIP and that the MIP was still in full force and effect.

## FINANCIAL TRACKING OF THE MIP GOALS

57.  After the merger Oversee made numerous accounting mistakes in its financial tracking and analysis of the Moniker business segments resulting in significant accounting problems and irregularities for Moniker and for my performance under my MIP.  I would repeatedly bring these mistakes to the attention of Oversee's senior management, including Lawrence Ng, Jeff Kupietzky, Jeff Navach, Stacey Peterson and Josh Armstrong.  In 2009, I would also bring these matters to the attention of Craig Snyder and Liz Murray.  (Trial Exhibit 23, 48, 54, 133, 135, 136.)

58.  In February 2008, Jeff Navach advised me that during the acquisition of Moniker from Seevast, Oversee ████████████████████████████████████████████████████████████████.  After discovering this ████████, Mr. Navach advised me that until the liability was extinguished I would not receive any credit under my MIP for any domain registrations that related to these prepaid customer accounts.  (Trial Exhibit 22.)

59.  I also discovered that Oversee was charging Moniker for fees that were not actually incurred by Moniker.  Oversee was assessing Moniker with a flat merchant fee for all its transactions even though the merchant fees were not actually



4840-8190-2094.1

11

DECLARATION OF MONTE CAHN

being incurred by Moniker. The fees artificially increased costs of goods sold thereby decreasing gross profit. (Trial Exhibits 133 and 135.)

60. In fact, there were numerous, unexplained discrepancies in expenses that were attributed to Moniker, including various bank charges, consulting charges, hosting charges, legal fees, improper charging of bonuses, salaries, healthcare, marketing expenses, tradeshow and traveling expenses. I repeatedly conveyed my objection to these accounting practices to the Senior Management of Oversee, including Jeff Kupietzky, Stacey Peterson, Josh Armstrong and Lawrence Ng. (Trial Exhibit 23, 48, 54, 133, 135, 136.)

61. During my tenure at Oversee, Oversee repeatedly claimed that the Moniker business segments were underperforming. These claims did not make sense. Upon further investigation, I realized that Oversee was diverting revenue from Moniker into other divisions of Oversee that were not a part of my MIP at the time of merger, including SnapNames and DomainSponsor, which also affected my performance under the MIP. I voiced my repeated objections to this practice in written and oral communications with numerous representatives of Oversee, including Jeff Kupietzky who was a member of the board at the time. I was informed that the diversion of Moniker revenue ████████████. (Trial Exhibit 23, 48, 54, 133, 135, 136.)

**AMENDMENT OF GOALS UNDER THE MIP**

62. In 2008 I was told by Jeff Kupetizky and Lawrence Ng that the Oversee EBITDA goal had been adjusted downward. I do not recall the precise goal that was communicated to me at that time.

63. In 2009 I was informed by Oversee that the Board had modified my performance goal for the domain sales business segment. I attended meetings and participated in conferences with management personnel, including Jeff Kupietzky,

1  who was a member of the Board, and Stacey Peterson, during which I was advised
2  that that the performance goal in 2009 for the domain sales business segment was
3  adjusted to (1.4 million).  (Trial Exhibit 140.)  I have reviewed Exhibit 140 and it is
4  consistent with my recollection of the domain sales performance goal that was
5  communicated to me in 2009.

6  64.  It is my understanding and belief that the domain sales business
7  segment met its goal of ███████ ) in 2009.  (Trial Exhibit 140.)  I have reviewed
8  Exhibit 140 and it is consistent with my recollection that the domain sales
9  performance goal that was met in 2009.

10  65.  In 2009 I was informed by Oversee that the Board had also modified
11  my performance goal for the registrar business segment.  I attended meetings and
12  participated in conferences with management personnel, including Jeff Kupietzky,
13  who was a member of the Board, and Stacey Peterson, during which I was advised
14  that that the performance goal in 2009 for the registrar business was ███████
15  ███ .  (Trial Exhibit 140.)  I have reviewed Exhibit 140 and it is consistent with
16  my recollection of the registrar performance goal that was communicated to me in
17  2009.

18  66.  In 2009 I was also informed by Oversee that the Board had approved
19  the Oversee EBITDA goal for 2009.  I attended meetings and participated in
20  conferences with management personnel, including Josh Armstrong, Lawrence Ng,
21  Jeff Kupietzky and Stacey Peterson, during which I was informed that the Oversee
22  EBITDA goal for 2009 was ██████████ llion.  (Trial Exhibit 140.)  I have
23  reviewed Exhibit 140 and it is consistent with my recollection of the Oversee
24  EBITDA performance goal that was communicated to me in 2009.

25  67.  I understood that the Oversee EBITDA goal communicated to me in
26  2009 applied to all Oversee employees.  Nobody at Oversee communicated to me
27  that I was excluded from this goal.

28



4840-8190-2094.1

13

DECLARATION OF MONTE CAHN

68. It is my understanding and belief that the Oversee met its EBITDA goal of ███████ in 2009. (Trial Exhibit 140.) I have reviewed Exhibit 140 and it is consistent with my recollection that the Oversee EBITDA performance goal was met in 2009.

69. Craig Snyder also communicated to me that Oversee achieved its 2009 Oversee EBITDA goal.

70. It is my understanding that all of the other Senior Executives were bonused in 2009 based on Oversee's attainment of its 2009 Oversee EBITDA goal.

71. In 2010 I was informed by Oversee that the Board had modified the performance goals for both the domain sales and registrar business segments. I attended meetings and participated in conferences with management personnel, including Craig Snyder, Jeff Kupietzky, and Elizabeth Murray, during which these revised goals were communicated. The revised performance goal in 2010 for these business segments was ███████. (Trial Exhibit 141.) I have reviewed Exhibit 141 and it is consistent with my recollection of the domain sales and registrar business segments goal that was communicated to me in 2010.

72. In 2010 I was also informed by Oversee that the Board had approved the Oversee EBITDA goal for 2010. I attended meetings and participated in conferences with management personnel, including Jeff Kupietzky, Craig Snyder, Peter Celeste and Elizabeth Murray, during which I was advised that the goal for 2010 was ███████████. (Trial Exhibit 141.) I have reviewed Exhibit 141 and it is consistent with my recollection of the Oversee EBITDA performance goal that was communicated to me in 2010.

73. I understood that the Oversee EBITDA goal communicated to me in 2010 applied to all Oversee employees. Nobody at Oversee communicated to me that I was excluded from this goal.

74. It is my understanding and belief that Oversee met its EBITDA goal of

4840-8190-2094.1

14
DECLARATION OF MONTE CAHN

1 in 2010. (Trial Exhibit 141.) I have reviewed Exhibit 141 and it is consistent with
2 my recollection that the Oversee EBITDA performance goal was met in 2010.

3     75.   It is my understanding that all of the other Senior Executives were
4 bonused in 2010 based on Oversee's attainment of its 2010 Oversee EBITDA goal.

5     76.   During my employment with Oversee I had multiple conversations with
6 Jeff Kupietzky. During these conversations Mr. Kupietzky repeatedly complained
7 that my salary and bonus structure far exceeded that of all of the other executives.
8 In response, I reminded him that my MIP had been negotiated as part of the Seevast
9 transaction. I also reminded him that Seevast had agreed to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ so that Oversee could fund the MIP.

12     I declare, under penalty of perjury, under the laws of the State of California
13 and of the United States of America that the statements contained in this declaration
14 are true and correct. Executed this 13th day of January, 2012 in Lauderdale by the
15 Sea, Florida.

_____     /s/ Monte Cahn     _____
                               Monte Cahn