1  **LEWIS BRISBOIS BISGAARD & SMITH LLP**
JOHN L. BARBER, SB# 160317
2    E-Mail: barber@lbbslaw.com
KENNETH D. WATNICK, SB# 150936
3    E-Mail: watnick@lbbslaw.com
SONJA HARRINGTON, SB# 261053
4    E-Mail: sharrington@lbbslaw.com
221 North Figueroa Street, Suite 1200
5  Los Angeles, California 90012
Telephone: 213.250.1800
6  Facsimile: 213.250.7900

7  Attorneys for MONTE CAHN

8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10

11
MONTE CAHN,                              CASE NO. CV11-03800 SVW (AGRx)
12
            Plaintiff,
13                                        The Honorable Stephen V. Wilson
        vs.
14                                        **PLAINTIFF MONTE CAHN'S**
OVERSEE.NET, a California                **[PROPOSED] FINDINGS OF FACT**
15  corporation; JEFF KUPIETZKY, an       **AND CONCLUSIONS OF LAW**
individual; LAWRENCE NG, an              **[REDACTED VERSION]**
16  individual; and Does 1 through 10,

17          Defendants.
                                          Complaint Filed:   May 3, 2011
18                                        Final Pretrial Conf.: January 9, 2012
                                          Trial Date:        January 24, 2012
19

20

21

22

23

24

25

26

27

28

4843-9274-0622.1

PLAINTIFF MONTE CAHN'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Monte Cahn ("Cahn") hereby submits his Findings of Fact and Conclusions of Law in accordance with Local Rule 51-1.  Based on the Court's Order during the January 10, 2012 Final Pretrial Conference, Cahn has limited his findings of Facts and Conclusions of Law to the two issues for trial identified by the Court during the January 10, 2012 pretrial conference.  These issues have been identified as:  (1) Oversee's treatment of the Oversee EBITDA performance goal under the MIP; and (2) The determination of TrafficClub customers for the purpose the MIP after the combination of TrafficClub into DomainSponsor.

## I.  FINDINGS OF FACT

1.  Plaintiff Monte Cahn is a citizen of the State of Florida.

2.  Defendant Oversee.net ("Oversee") is a California corporation with its principal place of business in Los Angeles, California.

3.  In 1999 Cahn formed Domain Systems, Inc. d/b/a Moniker.com ("Moniker").

4.  Moniker is a web-based service that provides users the ability to search for, register, manage, monetize, and sell their domain names.

5.  Moniker was comprised of three business segments: TrafficClub, the Registrar and Domain Sales.

6.  TrafficClub was the business segment of Moniker relating to the monetization of internet domain names through an optimization engine of rotating third party parking/monetization platforms that used feeds from such companies as Google and/or Yahoo and others.  It created linguistically targeted single page websites and parking pages for domain names owned by others, and earned money from the advertising published on those websites using a unique combination of advertising content feeds from Google, Yahoo and others, which were rotated to provide the maximum revenue to Traffic Club and its customers.  TrafficClub also earned and managed revenue for default DNS (domain name server) traffic from the

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1 Registrar and its customers (running advertising on websites at domain names as

2 soon as they are registered but before the owner of the name points that name to

3 another website.)

4      7.      The Registrar managed revenue for default DNS traffic for its

5 customers as well as the securing, registering and renewing of internet domain

6 names.  It also generated revenue from expired name auctions and sales from

7 registrar customers that did not renew their own domain names.

8      8.      The Domain Sales business segment was involved in the auction,

9 escrowing, appraising and brokerage of domain names.

10      9.      Monte managed and operated Moniker until 2005, at which time

11 Kanoodle, which later was renamed as Seevast Corp. ("Seevast"), purchased

12 Moniker.

13      10.     DomainSponsor is Oversee's domain name monetization business.

14      11.     Prior to February 2007 DomainSponsor was a partner of TrafficClub.

15      12.     In February 2007 DomainSponsor withdrew from TrafficClub's feed.

16      13.     In February of 2007, Oversee, at the direction of Jeff Kupietzky,

17 directly contacted all of TrafficClub's customers to inform them that

18 DomainSponsor was withdrawing from TrafficClub, and attempted to move

19 TrafficClub's customers over to DomainSponsor.

20      14.     DomainSponsor's partnership with Moniker violated its contract with

21 Google.  DomainSponsor was not permitted to utilize feeds from competitive

22 systems like Yahoo or Yahoo partners, which existed on the TrafficClub system.

23      15.     In 2007, Oversee entered into negotiations with Seevast to purchase

24 Moniker.

25      16.     Oversee's initial offer for Moniker was ██████████.

26      17.     As a condition to the purchase of Moniker, Oversee wanted to ensure

27 that Cahn would remain with Moniker and join Oversee for at least three years after

28 the acquisition.  (Trial Exhibits 9, 394.)

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

18.    As an incentive to stay with Moniker, Oversee offered Cahn an incentive program, known as the "Management Incentive Plan" ("MIP").  (Trial Exhibit 1.)

19.    Oversee reduced the amount of its initial offer in order to fund the MIP.

20.    The final purchase price of Moniker ███████████.

21.    The sale of Moniker to Oversee was completed on December 14, 2007.

22.    Oversee and Cahn entered into Cahn's Employment on December 14, 2007.  (Trial Exhibit 394.)

23.    The employment agreement provided that Cahn would serve as the President of Moniker and have the normal duties, responsibilities, functions and authority as are normally associated with and appropriate for such position. (Trial Exhibit 394.)

24.    The employment agreement provided that Cahn would be subject to supervision and direction of the Chief Executive Officer of the Company.  (Trial Exhibit 394.)

25.    The parties entered into the Management Incentive Plan on December 14, 2007.  (Trial Exhibit 1.)

26.    The terms of the MIP were negotiated between Oversee and Cahn.

27.    Oversee and Cahn were both represented by counsel in connection in negotiating the terms of the MIP.

28.    Under the MIP, Cahn would be able to earn up to ██████████ through a goal oriented bonus structure.  (Schedule A to the MIP, Trial Exhibit 1.)

29.    The bonus structure set forth under the MIP was based on Cahn's attainment of certain performance goals in four categories: the Registrar Business Segment, the Domain Sales Business Segment, the TrafficClub Business Segment, and Oversee EBITDA.  (Schedule A to the MIP, Trial Exhibit 1.)

30.    The first three segments were known as the "Moniker Business Segments".  (§§ 15(v) and (y) of the MIP, Trial Exhibit 1.)

LEWIS BRISBOIS BISGAARD & SMITH LLP
ATTORNEYS AT LAW

4843-9274-0622.1

3

31.     All three of the Moniker Business Segments had pre-determined performance goals to be achieved during three defined determination periods. (Schedule A to the MIP, Trial Exhibit 1.)

32.     The first determination period was defined as October 1, 2007 through December 31, 2008.  The second determination period was from January 1, 2009 through December 31, 2009, and the third determination period was from January 1, 2010 through December 31, 2010.  (§ 15(e) of the MIP, Trial Exhibit 1.)

33.     All of the business segments had pre-negotiated bonus awards ("baseline awards") for each determination period.  (Schedule A to the MIP, Trial Exhibit 1.)

34.     Under the MIP, the TrafficClub Business Segment provided for performance goals of ▮▮▮▮▮ for 2008; $▮▮▮▮▮ for 2009; and ▮▮▮▮▮ for 2010.  (Schedule A to the MIP, Trial Exhibit 1.)

35.     Under the MIP, the TrafficClub Business Segment provided for baseline awards of ▮▮▮▮ for 2008; ▮▮▮▮ for 2009; and ▮▮▮▮ for 2010. (Schedule A to the MIP, Trial Exhibit 1.)

36.     The performance goal for the fourth segment, Oversee EBITDA, was labeled "TBD" and was to be set by the Board, in consultation with Cahn each year. (§ 15(u) and Schedule A to the MIP, Trial Exhibit 1.)

37.     Under the MIP, the Oversee Business Segment provided for baseline awards of ▮▮▮▮ for 2008; ▮▮▮▮ for 2009; and ▮▮▮▮0 for 2010. (Schedule A to the MIP, Trial Exhibit 1.)

38.     The MIP provides that the Oversee Board may amend the Performance Goals under the MIP.  (§ 3(b) of the MIP, Trial Exhibit 1.)

39.     The Board was required to obtain Cahn's written approval for any material amendment or modification to the Plan which would adversely affect Cahn. (§ 3(b) of the MIP, Trial Exhibit 1.)

40.     Cahn's attainment of the performance goals was to be determined, in

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1 | good faith, by the Oversee Board of Directors.  (§ 3(b) of the MIP, Trial Exhibit 1.)

2 | 　　　41.　　In connection with calculating whether the goals had been attained,

3 | Oversee could not take any action to manipulate Moniker's financials if it would

4 | have the effect of preventing the attainment of the performance goals under the MIP.

5 | (§ 14(a) of the MIP, Trial Exhibit 1.)

6 | 　　　42.　　Oversee was required to provide Cahn with Interim Financial

7 | Statements or the Determination Period Financial Statements in order to verify

8 | Moniker's financial performance each year.  (MIP, Trial Exhibit 1.)

9 | 　　　43.　　Oversee failed to provide Cahn with any financial statements tracking

10 | his performance under the MIP during the term of my employment with Oversee.

11 | 　　　44.　　Oversee failed to provide Cahn with any contemporaneous accounting

12 | and tracking of his performance under the MIP.

13 | 　　　45.　　The MIP required that the Board certify whether Cahn had attained his

14 | goals in each of the three determination periods.  (§ 2 of the MIP, Trial Exhibit 1.)

15 | 　　　46.　　The Board failed to provide Cahn with any certification indicating

16 | whether he had attained my performance goals under the MIP for any of the three

17 | determination periods.

18 | 　　　47.　　The MIP defines the term "Gross Profit" total revenues from customers

19 | of the TrafficClub Business Segment less all cost of goods sold relating thereto

20 | (including revenue share payments); provided, however, in the case of Shared

21 | Customers, Gross Profit shall be determined by multiplying (i) the Gross Profit from

22 | such Shared Customers by (ii) the Applicable Shared Customer Percentage.  (§

23 | 15(k) to the MIP, Trial Exhibit 1.)

24 | 　　　48.　　The MIP defines the term "TrafficClub Business Segment" as the

25 | business of Moniker relating to the monetization of internet domain names through

26 | rotation of such internet domain names on third party parking platforms.  (§ 15(z) to

27 | the MIP, Trial Exhibit 1.)

28 | 　　　49.　　The MIP defines the term "Shared Customers" as existing customers of

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4843-9274-0622.1

5

PLAINTIFF MONTE CAHN'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    Moniker's TrafficClub Business Segment and DomainSponsor as of December 14,

2    2007.  (§ 15(aa) to the MIP, Trial Exhibit 1.)

3         50.    The MIP defines the term "Applicable Customer Percentage" as

4    follows: (i) the gross revenues received by Moniker from its upstream advertiser

5    partners in respect of the domain names owned by all Shared Customers

6    participating in the TrafficClub Business Segment during the full month preceding

7    the adoption date of this Plan (the "Moniker Shared Customer Revenue") divided by

8    (ii) the sum of (A) the Moniker Shared Customer Revenue and (B) the gross

9    revenues received by the Company from its upstream advertiser partners in respect

10   of the domain names owned by all Shared Customers participating in the

11   DomainSponsor monetization platform during the full month preceding the adoption

12   date of this Plan.  (§ 15(a) to the MIP, Trial Exhibit 1.)

13        51.    Under the MIP, the term "Gross Profit" is based on the defined terms:

14   "TrafficClub Business Segment", "Shared Customers", and "Applicable Shared

15   Customer Percentage".  (§ 15(k) to the MIP, Trial Exhibit 1.)

16        52.    In 2008, Oversee's management requested that Cahn assume

17   responsibility for other business segments, including Oversee's SnapNames

18   division.

19        53.    In 2008, Oversee's management stripped Cahn of his responsibilities as

20   the President of Moniker.

21        54.    Instead of reporting directly to the CEO of the Company, Cahn was

22   directed to report to other lower level executives.

23        55.    The MIP provided that the overall Oversee EBITDA Performance Goal

24   shall be determined, from time to time, by the Board in consultation with Monte

25   Cahn.  (§ 15(u) to the MIP, Trial Exhibit 1.)

26        56.    Oversee's Board set the Oversee EBITDA performance goal on an

27   annual basis.

28        57.    Oversee only set one EBITDA goal each year for the company.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4843-9274-0622.1

6

PLAINTIFF MONTE CAHN'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    58.    Cahn's EBITDA goal under the MIP was the same as the Company

2  EBITDA goal that all other Senior Executives and employees were to be measured

3  by.

4    59.    In 2008, Oversee communicated its EBITDA goal to Cahn and other

5  members of the senior management.

6    60.    In 2008, Oversee achieved its EBITDA goal.

7    61.    In 2008, Oversee's senior executives were bonused based on Oversee's

8  achievement of its EBITDA goal.

9    62.    Cahn was not provided a bonus in 2008 based on Oversee's

10  achievement of its EBITDA goal.

11    63.    In 2009 the Board approved an Oversee EBITDA goal of ▮▮▮▮▮.

12  (Trial Exhibit 140, ¶ 111 of the Direct Examination of Jeffrey Kupietzky [Doc. No.

13  225].)

14    64.    In 2009, Oversee communicated its EBITDA goal to Cahn and other

15  members of the senior management.  (¶¶ 66, 67 of the Direct Testimony Declaration

16  of Monte Cahn [Doc. No. 227].)

17    65.    Oversee achieved its 2009 Oversee EBITDA goal, earning ▮▮▮▮

18  ▮▮▮▮.  (Trial Exhibit 140, ¶ 115 of the Direct Examination of Jeffrey Kupietzky

19  [Doc. No. 225], ¶ 68 of the Direct Testimony Declaration of Monte Cahn [Doc. No.

20  227].)

21    66.    In 2009, Oversee's senior executives were bonused based on Oversee's

22  achievement of its EBITDA goal.  (¶ 70 of the Direct Testimony Declaration of

23  Monte Cahn [Doc. No. 227].)

24    67.    Cahn was not provided a bonus in 2009 based on Oversee's

25  achievement of its EBITDA goal.

26    68.    In 2010, Oversee set an organic EBITDA forecast of ▮▮▮▮ and

27  a non-organic forecast of ▮▮▮▮.  (Trial Exhibit 141, ¶ 128 of the Direct

28  Examination of Jeffrey Kupietzky [Doc. No. 225].)



69.     In 2010, Oversee communicated its EBITDA goals to Cahn and other members of the senior management.  (¶¶ 72, 73 of the Direct Testimony Declaration of Monte Cahn [Doc. No. 227].)

70.     Oversee achieved its 2010 Oversee EBITDA goal, earning ███████ . (Trial Exhibit 141, ¶ 139 of the Direct Examination of Jeffrey Kupietzky [Doc. No. 225], ¶ 74 of the Direct Testimony Declaration of Monte Cahn [Doc. No. 227].)

71.     In 2010, Oversee's senior executives were bonused based on Oversee's achievement of its EBITDA goal. (¶ 75 of the Direct Testimony Declaration of Monte Cahn [Doc. No. 227].)

72.     Cahn was not provided a bonus in 2010 based on Oversee's achievement of its EBITDA goal.

73.     Oversee failed to pay Cahn ██████ in bonuses that were owed as a result of the achievement of the Oversee EBITDA Performance Goal under the MIP.

74.     Cahn is entitled to ██████ in bonus payments in connection with the Oversee Business Segment.

75.     On or around January 31, 2008 Oversee combined TrafficClub into DomainSponsor.

76.     Cahn offered to consent to the combination of TrafficClub and DomainSponsor, provided that Cahn would receive credit under the MIP for the revenues of the combined division.  (Trial Exhibit 18.)

77.     Oversee never secured Cahn's written consent to the modification of the TrafficClub Business Segment of the MIP.

78.     After TrafficClub and DomainSponsor were combined, Cahn was appointed the Vice President of the DomainSponsor business division, with sales responsibility for the combined division.

79.     Based on the combination of TrafficClub and DomainSponsor, Account managers from Traffic Club were also responsible for DomainSponsor and vice

4843-9274-0622.1

PLAINTIFF MONTE CAHN'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1 | versa.

2 |     80.    After Oversee combined TrafficClub and DomainSponsor, Cahn and

3 | the Moniker team was told to grow the combined entity by bringing in new

4 | customers to DomainSponsor and by adding domain names to existing

5 | DomainSponsor customer accounts, and he would receive credit under the MIP for

6 | both bringing in new customers and by adding names to existing DomainSponsor

7 | accounts.

8 |     81.    After the combination of TrafficClub and DomainSponsor, Oversee

9 | implemented a DomainSponsor "SPIF", whereby Oversee represented to Cahn that

10 | both he and the Moniker team would earn bonuses based on new account referrals to

11 | DomainSponsor, and for new names they added to existing DomainSponsor

12 | accounts.  (Trial Exhibit 263.)

13 |     82.    On or around March 4, 2008 Cahn advised Oversee that he had

14 | persuaded     [REDACTED]     to move all names from Skenzo to DomainSponsor and

15 | requested that Oversee make sure that these names were tracked accordingly under

16 | the MIP.

17 |     83.    In 2008 Cahn also met with Jan Barta and worked with him and his

18 | team over a period of months to help put together a finance deal where Mr. Barta

19 | [REDACTED] and then [REDACTED] by monetizing domains that he had

20 | registered at Moniker through DomainSponsor.

21 |     84.    Cahn also helped to monetize the following deals through

22 | DomainSponsor after it combined with TrafficClub [REDACTED]

23 | [REDACTED].

24 |     85.    After the combination of TrafficClub into DomainSponsor, Oversee

25 | stopped tracking the TrafficClub Business Segment, as defined under the MIP.

26 |     86.    Oversee did not provide Cahn with credit under the MIP  for any new

27 | or increased monetization customers or revenues that were generated by as a result

28 | of Moniker's efforts after TrafficClub was combined into DomainSponsor in 2008,

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  2009 and 2010.

2      87.    Oversee failed to make payments to Cahn and the Moniker team under

3  the SPIF.  (Trial Exhibits 92 and 247.)

4      88.    Cahn never received any accounting reports under the SPIF for the

5  referrals from Moniker to DomainSponsor.  (Trial Exhibits 92 and 247.)

6      89.    The combined entity of DomainSponsor and TrafficClub generated a

7  Gross Profit of ▮▮▮▮▮ in 2009 and ▮▮▮▮▮ in 2010.

8      90.    Oversee failed to pay Cahn ▮▮▮▮ in bonuses that were owed as a

9  result of the achievement of the TrafficClub Performance Goal under the MIP.

10     91.    Cahn is entitled to ▮▮▮▮ in bonus payments in connection with

11 the TrafficClub Business Segment.

12     92.    By agreement of the parties, Cahn had absolute discretion to designate

13 additional participants under the MIP.  If Cahn did not designate any additional

14 participants; he was entitled to the full amount of the MIP.

15     93.    No payments have been made to Cahn under the MIP.

16

17 **II.    CONCLUSIONS OF LAW**

18     1.    Pursuant to 28 U.S.C. §1332, The Court has jurisdiction over the

19 subject matter of, and parties to, this Action.

20     2.    Venue is proper pursuant to 28 U.S.C. §1391(a)(2).

21     3.    The elements of a claim for breach of contract are: (1) The existence of

22 a contract;  (2) Plaintiff's performance or excuse for non-performance; (3)

23 Defendant's breach; and (4) Resulting damage to plaintiff.  (*See* Judicial Counsel of

24 California Civil Jury Instructions, 303 (2011); *and EPIS, Inc. v. Fidelity Guarantee*

25 *Life Insu. Co.*, 156 F.Supp.2d 1116, 1124 (N.D. Cal. 2001).)

26     4.    Oversee used the benefits of the MIP as an incentive for Cahn to join

27 Oversee at the time of the merger.  Therefore, the MIP is a binding contract as it is

28 an incentive plan that was offered to Cahn to induce his employment at Oversee.

4843-9274-0622.1                          10
PLAINTIFF MONTE CAHN'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   (*See, e.g. Sabatini v. Hensley*, 161 Cal.App.2d 172, 175 (1958), *Hunter v. Ryan*, 109

2   Cal.App.736, 738 (1930) .)

3        5.     Under the terms of the MIP, Oversee had an affirmative obligation to

4   set the Oversee EBITDA goal each year.  (*See*, *Hardy v. Hardy, 23 Cal. 2d 244*, 246

5   (1943), *Scudder v. Perce*, 159 Cal. 429, 432 (1911); *Powell v. Central Cal. Fed.*

6   *Sav. & Loan Assn.*, 59 Cal.App.3d 540, 548 (1976).)

7        6.     Oversee's failure to set the Oversee EBITDA goal under the MIP is a

8   breach of the duty of good faith and fair dealing under the MIP.  (*Perdue v. Crocker*

9   *National Bank*, 38 Cal.3d 913, 923 (1985),*Lazar v. Hertz Corp.*, 143 Cal.App.3d

10   128, 141 (1983).)

11        7.     Defendants are liable for breach of the MIP for failure to award Cahn

12   his performance awards under the MIP for meeting the performance goals under the

13   TrafficClub business segment in 2008, 2009 and 2010.  (*EPIS, Inc. v. Fidelity*

14   *Guarantee Life Insu. Co.,* 156 F.Supp.2d 1116, 1124 (N.D. Cal. 2001).)

15        8.     Defendants are liable for breach of the MIP for failure to award Cahn

16   his performance awards under the MIP for meeting the performance goals under the

17   Oversee business segment in 2008, 2009 and 2010.  (*EPIS, Inc. v. Fidelity*

18   *Guarantee Life Insu. Co.,* 156 F.Supp.2d 1116, 1124 (N.D. Cal. 2001).)

19        9.     Defendants are liable for breach of the MIP for failing to track

20   TrafficClub's performance under the MIP.  (*EPIS, Inc. v. Fidelity Guarantee Life*

21   *Insu. Co.,* 156 F.Supp.2d 1116, 1124 (N.D. Cal. 2001).)

22        10.     Alternatively, Cahn is entitled to access to Oversee's database in order

23   to retrieve data and track the new customers and expanded existing customers that

24   Moniker contributed to the combined  DomainSponsor platform during the term of

25   the MIP.

26        11.     As a result of Defendant's breach of the MIP, Cahn is entitled to █████

27   █████, the benefit of the bargain with respect to the Oversee and TrafficClub

28   Performance Goals of the MIP.  Cahn is owed ████████ with respect to the

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  Oversee EBITDA Performance Goals and ▮▮▮▮▮▮▮ with respect to the

2  TrafficClub Performance Goals.  (*See Martin v. U-Haul Co. of Fresno*, 204

3  Cal.App.3d 396, 409 (1988) [finding that damages for breach of contract are

4  intended to give the injured party the benefit of his or her bargain]; *Brandon &*

5  *Tibbs v. George Kevorkian Accountancy Corp.,* 226 Cal App.3d 442, 468 (1990)

6  [damages should place the injured party in as good a position as he would have been

7  in had performance been rendered as promised]; and *Ghk Assocs. v. Mayer Group*,

8  224 Cal App3d 856, 874 (1990) [when the wrongful acts of the defendant have

9  caused plaintiff to not realize a profit to which that party is entitled, the law requires

10  only that some reasonable basis of computation of damages be used].)

11

12

13  DATED: January 17, 2012          JOHN L. BARBER
                                     KENNETH D. WATNICK
14                                   SONJA HARRINGTON
15                                   LEWIS BRISBOIS BISGAARD & SMITH LLP

16

17

18                        By:     /s/ Kenneth D. Watnick
                                 Kenneth D. Watnick
19                               Attorneys for MONTE CAHN

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW