**LEWIS BRISBOIS BISGAARD & SMITH LLP**
JOHN L. BARBER, SB# 160317
  E-Mail: barber@lbbslaw.com
KENNETH D. WATNICK, SB# 150936
  E-Mail: watnick@lbbslaw.com
SONJA HARRINGTON, SB# 261053
  E-Mail: sharrington@lbbslaw.com
221 North Figueroa Street, Suite 1200
Los Angeles, California 90012
Telephone: 213.250.1800
Facsimile: 213.250.7900

Attorneys for MONTE CAHN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MONTE CAHN,<br><br>    Plaintiff,<br><br>vs.<br><br>OVERSEE.NET, a California corporation; JEFF KUPIETZKY, an individual; LAWRENCE NG, an individual; and Does 1 through 10,<br><br>    Defendants. | CASE NO. CV11-03800 SVW (AGRx)<br><br>The Honorable Stephen V. Wilson<br><br>**PLAINTIFF MONTE CAHN'S RESPONSE TO DEFENDANT OVERSEE.NET'S OBJECTION TO MAGISTRATE JUDGE'S ORDER ON MOTION TO COMPEL**<br><br>Complaint Filed:  May 3, 2011<br>Trial Date:          January 24, 2012 |

4832-3498-7790.1

PLAINTIFF MONTE CAHN'S RESPONSE TO DEFENDANT OVERSEE.NET'S OBJECTION TO MAGISTRATE JUDGE'S ORDER ON MOTION TO COMPEL

Plaintiff Monte Cahn ("Cahn") hereby submits his response to Defendant Oversee.net's ("Oversee") Objection to Magistrate Judge's Order on Motion to Compel [Doc. No. 234] ("Objection").

## I. PRELIMINARY STATEMENT

It is Cahn's understanding that during the January 24, 2012 trial, the Court granted a stay on Magistrate Rosenberg's January 5, 2012 Order as it relates to information regarding "existing customers of DomainSponsor as of the date of the MIP acquisition and whose business with DomainSponsor expanded after January 1, 2008." However, in order to preserve his rights, Cahn submits the following response to Oversee's Objection.

## II. APPLICABLE STANDARD

A district judge has inherent power to review a magistrate judge's decision unless a statute or court rule authorizes the magistrate judge to make a final decision. In reviewing a magistrate judge's order on a nondispositive matter, "[t]he district court shall defer to the magistrate's orders unless they are clearly erroneous or contrary to law. (*Grimes v. City & County of San Francisco*, 951 F.2d 236, 240 (9th Cir. Cal. 1991).) If the magistrate judge's order is neither clearly erroneous nor contrary to law, it must be affirmed.

A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made. (*United States v. Ruiz-Gaxiola,* 623 F.3d 684, 693 (9th Cir. 2010), *United States v. Hinkson*, 585 F.3d 1247, 1260 (9th Cir. 2009).) Ordinarily, under the clearly erroneous standard, if there are two permissible views, the reviewing court should not overturn the magistrate judge's decision solely because it would have chosen the other view. (*Westefer v. Snyder*, 472 F. Supp. 2d 1034, 1037 (S.D. Ill. 2006), *Hinkson*, 585 F.3d at 1260.)

The party filing the objection bears burden of demonstrating that magistrate judge's decision was clearly erroneous or contrary to law. (*Marks v. Struble*, 347 F. Supp. 2d 136, 149 (D.N.J. 2004).)

### III. <u>OVERSEE HAS FAILED TO MEET ITS BURDEN</u>

In order to overcome its burden, Oversee must demonstrate that Magistrate Rosenberg's Order was "clearly erroneous". (*Marks v. Struble*, 347 F. Supp. 2d 136, 149 (D.N.J. 2004).) Oversee has not met this burden.

Oversee's Opposition is simply based on the premise that it disagrees with the magistrate's findings. In essentially summarizing the parties' arguments in their respective motions, Oversee argues that its interpretation of "enhanced customers", as opposed to Cahn's interpretation, is the correct view. Based on this argument Oversee requests that this Court overrule the magistrate's Order and deny Cahn access to information which is directly relevant to determining his performance under his MIP. This is not sufficient grounds to overturn a magistrate's ruling.

A magistrate has broad discretion in ruling on discovery motions. (*Laub v. United States DOI*, 342 F.3d 1080, 1093 (9th Cir. Cal. 2003).) Oversee must demonstrate that the magistrate's order was "clearly erroneous". It cannot meet this burden by arguing that the Court should have chosen "the other view" – or its view. (*Westefer*, 472 F. Supp. 2d at 1037, *Hinkson*, 585 F.3d at 1260.) Oversee has only demonstrated that it disagrees with the magistrate's ruling, and that it believes that its interpretation should prevail. However, Oversee has not demonstrated how the magistrate's order is **clearly erroneous,** and as a result, its Opposition must be denied.

/ / /
/ / /
/ / /
/ / /

4832-3498-7790.1

2

## IV. CAHN IS ENTITLED TO DISCOVERY OF THE ENHANCED CUSTOMERS.

### A. Oversee Directed Cahn to Run and to Grow the Combined DomainSponsor Entity.

When Oversee acquired Moniker in December 2007, TrafficClub was an operating division of Moniker. However, within a month of acquisition, Oversee combined TrafficClub with Domain Sponsor. After Oversee combined TrafficClub and DomainSponsor, Cahn was told to that it was his responsibility to now grow the **combined** entity by both bringing in new customers to DomainSponsor and by adding domain names to existing DomainSponsor customer accounts, and he would receive credit under the MIP for both of these growth scenarios. Additionally, Oversee told Cahn that he and his Moniker team would earn bonuses based on any new account referrals to DomainSponsor, and for new names added that they added to existing DomainSponsor accounts. Oversee dubbed this program the DomainSponsor "SPIF".

Based on the understanding that Cahn was to receive credit for expanding existing DomainSponsor accounts, on or around March 4, 2008, Cahn advised Oversee that he had persuaded Mike Berkens to move all of his names from Skenzo to DomainSponsor and requested that Oversee make sure that these names were tracked accordingly under the MIP. Cahn also met with Jan Barta in 2008 and worked with him and his team over a period of months to help put together a finance deal where Mr. Barta borrowed $3 million and then paid the loan off by monetizing domains that he had registered at Moniker through DomainSponsor. Additionally, some other large business development deals that Cahn helped to monetize through DomainSponsor after it combined with TrafficClub included: Manila, Merlin Kaufman, Nokta, Jordan Levinson / Marlon Philips, Rick Schwartz, Roy Messer, TuCows, Marchex, and numerous others.

However, after the merger, Cahn discovered that neither he nor his staff were

receiving any credit under the MIP for his referrals of monetization business to DomainSponsor in 2008, 2009 and 2010. Oversee admits not to have credited Cahn or his staff for such referrals. Additionally, Oversee failed to make payments to Cahn and the Moniker team under the SPIF, and he never received any accounting reports under the SPIF for the referrals from Moniker to DomainSponsor. In fact, Oversee had stopped tracking the TrafficClub Business Segment, as defined under the MIP. Oversee admitted that Cahn did not did not receive any credit for any new or increased monetization customers or revenues that were generated as a result of Moniker's efforts after TrafficClub was combined with DomainSponsor.

Based on Oversee's actions as described above, Cahn is entitled to discovery of the customers that he grew, enhanced and/or expanded after Oversee combined TrafficClub and DomainSponsor.

### B. Oversee Has Misinterpreted the Terms of the MIP.

Oversee has argued that Cahn is not entitled to credit under the MIP for increased or expanded revenues from existing DomainSponsor customers who were not customers of TrafficClub as of December 14, 2007. Oversee's interpretation is based on an incorrect analysis of the defined terms "Gross Profit" and "TrafficClub Business Segment" under the MIP.

The term "Gross Profit" is defined under the MIP as:

> …total revenues from customers of the **TrafficClub Business Segment** less all cost of goods sold relating thereto (including revenue share payments); provided, however, in the case of **Shared Customers**, **Gross Profit** shall be determined by multiplying (i) the **Gross Profit** from such **Shared Customers** by (ii) the **Applicable Shared Customer Percentage**.

(Section 15(k) of MIP. (Emphasis added). The MIP used initial capitals to identify defined terms in the MIP.)

The term "TrafficClub Business Segment" is defined to mean:

> …the business of Moniker relating to the monetization of internet domain names through rotation of such internet domain names on third party parking platforms.

(Section 15(a) of the MIP.)

"Shared Customers" is defined to mean existing customers of Moniker's TrafficClub Business Segment and DomainSponsor as of December 14, 2007. This definition was contained within the definition of "TrafficClub Club Customers". It stated as follows:

> (iii) those customers of Moniker's TrafficClub Business Segment as of the date of this plan that were also customers of DomainSponsor (such customers in this clause (iii) referred to as, 'Shared Customers').

(Section 15(aa) of the MIP.)

And the term "'Applicable Customer Percentage" means:

> the percentage determined as follows: (i) the gross revenues received by Moniker from its upstream advertiser partners in respect of the domain names owned by all Shared Customers participating in the TrafficClub Business Segment during the full month preceding the adoption date of this Plan (the "Moniker Shared Customer Revenue") divided by (ii) the sum of (A) the Moniker Shared Customer Revenue and (B) the gross revenues received by the Company from its upstream advertiser partners in respect of the domain names owned by all Shared Customers participating in the DomainSponsor monetization platform during the full month preceding the adoption date of this Plan.

(Section 15(a) of the MIP.)

Thus, the term "Gross Profit" is based on the defined terms: "TrafficClub Business Segment" (Section 15(z) of the MIP); "Shared Customers (Section 15(a)(iii) of the MIP); and "Applicable Shared Customer Percentage" (Section 15(a) of the MIP). Given these definitions, Oversee cannot argue that the phrase "TrafficClub Customers" or the definitions in Sections 15(aa)(i) and (ii) of the MIP are considered in calculating TrafficClub Gross Profit. Rather, Cahn is owed bonuses based on the Gross Profits of the TrafficClub Business Segment.

Also, Sections 15(a)(i) and (ii) of the MIP do not discuss or relate to whether Cahn is entitled to credit under the TrafficClub Gross Profit Business Segment for the expansion of existing DomainSponsor customer accounts. Section 15(a)(i) relates to existing customers of Moniker's TrafficClub Business Segment who were not customers of DomainSponsor. Section 15(a)(ii) relates to **new** customers of Moniker or DomainSponsor. Neither provision discusses the treatment or characterization of Cahn's expansion of the monetization revenues for existing customers of the combined TrafficClub/DomainSponsor division. Based on this fundamental misinterpretation of the MIP, Oversee has not properly accounted for numerous revenues associated with the combined monetization business of TrafficClub and DomainSponsor, and Cahn is entitled to discovery of this information.

## V.  CONCLUSION

Based on the foregoing, the Court should deny Oversee's Objection to Magistrate Rosenberg's January 5, 2012 Order [Doc. No. 218].

1 | DATED: February 1, 2012

JOHN L. BARBER
KENNETH D. WATNICK
SONJA HARRINGTON
LEWIS BRISBOIS BISGAARD & SMITH LLP

By: _____/s/ Sonja Harrington_____
Sonja Harrington
Attorneys for MONTE CAHN