UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-03800-SVW -AGR | Date | February 6, 2012 |
|---|---|---|---|
| Title | Monte Cahn v. Oversee.net et al | | |

| Present: The Honorable | STEPHEN V. WILSON, U.S. DISTRICT JUDGE | | |
|---|---|---|---|
| Paul M. Cruz | N/A | | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. | |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| N/A | N/A |

**Proceedings:** FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I. INTRODUCTION

The instant action concerns Plaintiff Monte Cahn's relationship with his former employer, Defendant Oversee.net ("Oversee"). In 2005, Cahn sold his company Domain Systems, Inc. d/b/a Moniker.com ("Moniker") to Seevast Corporation. In 2007, Oversee acquired Moniker from Seevast. Oversee decided to retain Cahn's services. Cahn and Oversee entered into a Management Incentive Plan ("MIP") pursuant to which participants including Cahn would have earned large bonus payments if various segments of Moniker (the "Moniker Business Segments") and/or Oversee achieved certain Performance Goals. In short, Cahn alleges that he is owed millions of dollars in payments under the MIP.

On November 16, 2011, Oversee filed a Motion for Summary Judgment as to Cahn's First Claim for Relief. (Dkt. No. 63). The Court denied that Motion on December 29, 2011. (Dkt. No. 209). Cahn's First Claim essentially consists of two key issues: (1) whether the Moniker segments achieved any of the Performance Goals under the MIP; and (2) whether Oversee promised Cahn that his Performance Goal under the MIP would be identical to a target (the "Company Budget") used as part of the process for determining bonuses for Oversee legacy management employees (i.e. Oversee management who had been at the company since before the acquisition of Moniker).

On January 24 and 25, 2012, the Court held a trial on the second issue. This Order contains the Courts findings of fact and conclusions of law as to that narrow issue only. For the reasons set forth in this Order, the Court finds that Defendants did not set the Oversee Performance Goal at the same target as was used to determine bonuses for Oversee legacy employees, nor did they ever represent that they would do so. Furthermore, the Court finds that the pertinent provisions of the MIP are not reasonably susceptible to Cahn's proposed interpretation, under which Cahn claims that the Oversee Performance Goal was identical to the Company Budget.

| | : | |
|---|---|---|
| | Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-03800-SVW -AGR | Date | February 6, 2012 |
|---|---|---|---|
| Title | Monte Cahn v. Oversee.net et al | | |

## II. FACTS

### A. Acquisition of Moniker by Oversee

Moniker and Oversee are businesses that perform various functions related to internet domain names including: (1) domain name registration; (2) monetization of domain names through the use of various advertising platforms; and (3) sales and auctions of registered domain names. Plaintiff Cahn is the co-founder of Moniker. In 2005, Moniker was sold to Kanoodle (later renamed as Seevast Corp.) with Cahn remaining in place as Moniker's CEO. Seevast and Moniker agreed that, if Seevast did not have a change of control or go public within two years, Moniker executives could request that Moniker be put up for sale. Neither change occurred. Accordingly, in late 2006/early 2007, Moniker executives requested that the Seevast board put Moniker up for sale.

In 2007, Defendant Oversee began negotiations with Seevast to purchase Moniker. Oversee wanted Cahn to remain with the company post-acquisition. Accordingly, the parties negotiated a three year employment agreement. In addition, Oversee negotiated a discount on the purchase price of Moniker from Seevast used to fund the MIP. Under the MIP, participants could earn up to $12 million over a three year period if certain performance goals were met.

### B. The Management Incentive Plan

The MIP is structured as follows. (See Trial Exhibit ("Tr. Ex.") 1 at 001-013 (Schedule A to the MIP)). The MIP operated over three Determination Periods, roughly 2008, 2009, and 2010.[1] Payments under the MIP were to be based on the performance of four business "segments" during the three Determination Periods. The first three segments are known as the Moniker Business Segments.[2] The fourth business segment is the Oversee Business Segment. Each Business Segment was to be assigned a Performance Goal based on a Performance Metric (either Gross Profit or EBITDA).[3] The specific Performance Goals for the three Moniker Business Segments were set at specific numbers. The

---

[1]The first Determination Period also includes the last quarter of 2007.

[2]Specifically, the three Moniker Business Segments are called TrafficClub, Registrar and Domain Sales. The issue of whether the Moniker Business Segments achieved their Performance Goals under the MIP is not addressed in this Order as the Court conducted trial only on the narrow issue of the Oversee Performance Goal.

[3]EBITDA is a commonly used acronym for earnings before interest, taxes, depreciation and amortization. See http://www.investopedia.com/terms/e/ebitda.asp.

|  | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-03800-SVW -AGR | Date | February 6, 2012 |
|---|---|---|---|
| Title | Monte Cahn v. Oversee.net et al | | |

Performance Goal for the Oversee Business Segment was left to be determined, or "TBD."[4] The MIP also set specific payment amounts ("Baseline Awards") that would be triggered by achievement of a particular Performance Goal in a particular Determination Period. For example, Schedule A to the MIP provides that achievement of the Oversee Performance Goal in 2008 would have triggered a $400,000 Baseline Award.[5] (Tr. Ex. 1 at 001-013). The MIP provided for up to $12,000,000 in Baseline Award payments, $3.2 million of which is tied to achievement of the Oversee Performance Goals.

    **C.**    **The Incentive Compensation Plan**

In late 2008, Oversee proposed a supplemental compensation plan, the Incentive Compensation Plan ("ICP").[6] (See Tr. Ex. 28). The purpose of the ICP was to incentivize Cahn once it became clear that, according to Defendants, it was at best, highly unlikely that the Performance Goals under the MIP could be achieved due to an economic downtown and changes in the domain monetization business generally. Under the terms of the ICP, Cahn could receive payment under the ICP or the MIP, whichever would result in the higher payout. (Id. at 28-002). The ICP tied Cahn's potential bonus for the years 2008 and 2009 to the average bonus paid to senior management employees (the "Senior Team"). For example, for the year 2008, Cahn could receive the greater of (i) the average percentage of the bonus payable to Senior Team members multiplied by $100,000; or (ii) the average of the year-end bonuses paid to Senior Team members. (Tr. Ex. at 028-008-028-009). To illustrate, if the average Senior Team member bonus for 2008 was 50% of the bonus payable, and the average Senior Team bonus was $45,000, Cahn could receive $50,000 under the ICP. Furthermore, the ICP provided that Cahn could not receive payment "in respect of the Oversee goals under the MIP" unless Plaintiff also received payment under the MIP based on the performance of at least one of the Moniker Business Segments. One of the Annual Goals set forth in the ICP is achievement of the "Company Budget," which is defined as follows:

---

[4]The parties do not dispute that the letters "TBD" as used in the MIP stand for "to be determined."

[5]The MIP also provided for partial payment based on partial achievement of Performance Goals. (See Tr. Ex. 1 at p. 001-002). Specifically, Section 3(c)(i) provides a mechanism for partial payment upon achievement of 70% of a Performance Goal for any of the four Business Segments. Section 3(c)(ii) provides for partial payment if one of the Moniker Business Segments achieves 55% of its Performance Goal *and* all three Moniker Business Segments achieve 100% of the total goal for all three Moniker Business Segments.

[6]The ICP affected years 2008 and 2009 only. Cahn was paid under a separate Commission Plan for the year 2010.

    :    

Initials of Preparer    PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-03800-SVW -AGR | Date | February 6, 2012 |
|---|---|---|---|
| Title | Monte Cahn v. Oversee.net et al | | |

      The Company's EBITDA (as defined in the MIP) in the amount of (i) for the 2008 period, $51.1 million, and (ii) for the 2009 period, as set by the Company's Chief Financial Officer for incentive compensation for all members of the Senior Team.

(Tr. Ex. 28 at 028-008). As noted above, the Company Budget goal was set at $51.1 million for 2008. That goal was reduced by more than 50%, to $23.9 million for 2009. (See Tr. Ex. 265 (tracking spreadsheets used during the process of determining bonus payments for Oversee legacy employees)).

      **D.**      **The Company Budget and Legacy Oversee Employee Compensation**

      During his testimony, Defendant Jeffrey Kupietzky discussed the Company Budget as it related to calculating bonus payments for legacy Oversee employees. Legacy Oversee employees were eligible for bonus payments up to a set percentage of the employee's salary. For example, a particular employee might be eligible for a bonus of up to 50% of his or her salary. Oversee took several objective factors into consideration in deciding how large or small a bonus to award. However, the ultimate decision as to whether to give a bonus to a given employee was within Oversee's discretion. Exhibit 265 consists of 2009 Goal Tracking Worksheets for legacy Oversee employees. These worksheets contain various goals for each employee as well as a percentage indicating the weight to be given to each factor in determining that employee's bonus payment. One stated goal was the achievement of certain financial targets, including achievement of the Company Budget, which is expressed as "total EBITDA of $23.9 million" for the year 2009. The weight given to the achievement of those targets varies by employee. For example, for some employees, achievement of financial targets, including the Company Budget accounted for 20% of the total goals for that year. In other words, for some Oversee legacy employees, achievement of the Company Budget accounted only for 20% of the objective goals which Oversee considered when deciding how much of a bonus to award that employee.

**III.**      **DISCUSSION**

      Cahn's principal argument at this stage of the case is that Oversee management had committed to treat him identically as other members of the Senior Team with regards to the target to be set for the Oversee EBITDA Performance Goal under the MIP. Specifically, Cahn claims that the Company Budget figure used both as a performance metric in the ICP as well as for determining whether members of the Senior Team would receive bonuses should have been used as the metric for determining whether the Oversee Performance Goals under the MIP were achieved. At trial, the Court heard testimony from Plaintiff Cahn as well as Defendants Jeffrey Kupietzky and Lawrence Ng (via videotaped deposition). The Court also received into evidence numerous emails and documents related to the negotiations of the MIP as well as the process for determining bonuses for the Senior Team. The Court concludes that Cahn has not met his burden to show that any of the Defendants ever represented that the Company Budget would be used as the Oversee Performance Goal under the MIP. The Court further finds that the

| | : | |
|---|---|---|
| | Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-03800-SVW -AGR | Date | February 6, 2012 |
|---|---|---|---|
| Title | Monte Cahn v. Oversee.net et al | | |

MIP is not reasonably susceptible to Cahn's interpretation, under which he concludes that the Oversee Performance Goal is somehow equal to the Company Budget.
//
//

    A.    **Interpretation of the MIP**

    There are several key provisions of the MIP that must be analyzed together. Section 15(m) defines Oversee EBITDA as follows:
> "Oversee EBITDA" means, with respect to any applicable period, the net income of the Company and its Subsidiaries, determined on a consolidated basis, plus the aggregate amounts in respect of (A) interest expense and deferred financing fees, (B) the provision for federal, state, local and foreign income taxes and state franchise or similar taxes, (C) depreciation and amortization, (D) all non-cash, non-recurring expenses and charges for such period that do not represent a cash item in such period of any future period, and (E) non-cash stock-based compensation expenses for such period, in each case only to the extent that items in (A)-(E) were deducted on the Company' consolidated income statement in the determination of its net income and all determined in accordance with GAAP.

(Tr. Ex. 1 at 001-010). Section 15(u) defines Target EBITDA for all four business segments: the three Moniker Business Segments and the Oversee Business Segments. Section 15(u) provides that, with respect to Oversee EBITDA, Target EBITDA means "Oversee EBITDA as shall be determined from time to time by the Board, in consultation with Monte Cahn for so long as he is employed by the Company." (Id. at 0001-011).

    Schedule A of the MIP provides the Baseline Awards and Performance Goals for each of the four Business Segments during each of the three Determination Periods. (Id. at 001-013). While the Performance Goals for the Moniker Business Segments are clearly set forth in Schedule A, the Oversee Performance Goal is left "TBD" for each of the three Determination Periods.

    As noted above, Cahn argues that the TBD figure in Schedule A should simply be filled in with the Company Budget, which is the EBITDA target set by the Oversee board each year as a metric used in the determination of bonuses for legacy Oversee employees as well as for payments to Cahn under the ICP for the years 2008 and 2009. However, there is nothing in the language of the MIP or in the interaction of the aforementioned provisions of the MIP that yields this result. First, Section 15(m) simply defines how Oversee EBITDA is calculated. It does not set any kind of target, nor does it reference the Company Budget. Second, Section 15(u) explicitly grants the Oversee Board discretion as to where to set the Oversee EBITDA goal. Again, this section does not explicitly or implicitly reference the Company Budget. Finally, while Schedule A lists the Oversee Performance Goals as TBD, there is

| | : | |
|---|---|---|
| | Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-03800-SVW -AGR | Date | February 6, 2012 |
|---|---|---|---|
| Title | Monte Cahn v. Oversee.net et al | | |

nothing in the language of the MIP that suggests that this figure should be identical to the Company Budget.

    **B.**    **Parol Evidence**

"[W]hen a party contends the language of a contract is ambiguous the test for the admissibility of extrinsic evidence to explain the meaning of the contract is not whether the contract appears to the court to need interpreting 'but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.'" Wagner v. Columbia Pictures Industries, Inc., 146 Cal.App.4th 586, 589-90 (2007) (quoting Pacific Gas & Elec. Co. v. G.W. Thomas Drayage Etc. Co., 69 Cal.2d 33, 37 (1968)). "Therefore, the court must provisionally receive all credible evidence concerning the parties' intentions to determine whether the contract language is reasonably susceptible to the interpretation urged by a party. If in light of the extrinsic evidence the language is reasonably susceptible to the interpretation urged, then the extrinsic evidence is admitted to aid in interpreting the contract." Wagner, 146 Cal.App.4th at 590 (citing Wolf v. Superior Court, 114 Cal.App.4th 1343, 1351 (2004)). Here, the Court considers parol evidence including the parties' negotiations as well as surrounding circumstances in order to determine whether the MIP is reasonably susceptible to Cahn's interpretation. For the reasons set forth below, the Court agrees with Defendants that the MIP is not reasonably susceptible to Cahn's claim that the Oversee Performance Goal under the MIP was identical to the Company Budget.

    **1.**    **The Parties' Negotiations**

    It is undisputed that a key issue during negotiations was Cahn's desire to be treated "identically" with regards to the Oversee legacy employees. In fact, the parties continued to negotiate the language for what would become Section 15(u) of the MIP all the way up until the day of the closing, December 14, 2007. The parties submitted multiple exhibits documenting an ongoing dialogue on this topic. (See, e.g. Tr. Exs. 2-3, 76, 77, 81-85). In addition, the testimony of Cahn and Kupietzky at trial made it abundantly clear that Cahn consistently advocated his position that he should be treated "identically" with regards to the Oversee legacy employees. However, as Defendants' counsel noted, the evidence before the Court makes it equally clear that Defendants rejected Cahn's position on this issue each and every time it arose.

    For example, the parties sent each other various drafts of proposed language for the MIP in the weeks and days leading to the December 14, 2007 closing. At no point did any Oversee representative agree to language suggesting that Cahn was to be treated "identically" to Oversee legacy employees with regards to the Oversee Performance Goal under the MIP. (See Tr. Exs. 81-84). As discussed above, the final version of the MIP, executed by Cahn on December 14, 2007, does not give him the identical treatment he sought. On the afternoon of December 13, 2007, Cahn again emailed Kupietzy,

| | : | |
|---|---|---|
| | Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-03800-SVW -AGR | Date | February 6, 2012 |
|---|---|---|---|
| Title | Monte Cahn v. Oversee.net et al | | |

reiterating his claim that "you guys said you were going to be measured to the exact same criteria that I would be." (Tr. Ex. 85). Kupietzky responded several hours later, explaining that the Oversee Performance Goal for participants under the MIP would not be identical for Oversee legacy employees. (See Id.).

At trial, the Court asked Cahn why, if this so-called identical treatment was so important to him, did he not insist on a contractual provision that clearly spelled such a condition out. Cahn responded that it was his belief that Section 15(m) of the final version of the MIP provided him with that identical treatment. The Court finds Cahn's explanation on this point to be wholly unpersuasive. Cahn is a sophisticated party. By all accounts, he is a successful businessman and entrepreneur. Furthermore, Cahn was represented by counsel during the negotiations of the MIP. As noted above, there is no language in Section 15(m) that can be read as tying the Oversee Performance Goal in the MIP to any external target, let alone the target specifically set for other Oversee employees (and the target that would later be used in the ICP). Accordingly, the Court finds that Cahn's testimony that he believed that Section 15(m) gave him the "identical treatment" is not persuasive.

### 2. Surrounding Circumstances

As Oversee argued in its trial brief, circumstances surrounding its acquisition of Moniker further support the Court's conclusion that the MIP is not reasonably susceptible to Plaintiff's proposed interpretation. Cahn had made bold projections regarding Moniker's future growth based on past performance. (See Tr. Exs. 72-73). The MIP was accordingly structured as an earn-out: Oversee reduced the purchase price for Moniker and used that reduction in purchase price to fund the MIP. If the Moniker Business Segments achieved the aggressive targets set forth in the MIP, then MIP participants would be handsomely rewarded. Indeed, the first paragraph of the MIP states that the "Plan is designed to reward, though additional cash compensation, the Participants for significant contributions toward the continued or improved profitability and growth of the Company." (Tr. Ex. 1 at 001-001). The fact that the MIP sets forth improved profitability and growth as an express purpose of the MIP, coupled with the fact that the Moniker Performance Goals were based on Cahn's aggressive growth projections for Moniker strengthens the conclusion that the Oversee Performance Goal was similarly designed to reward growth, not to simply reward achievement of the annual Company Budget, regardless of whether that figure represented growth for a particular year. As noted above, the Company Budget was set at $51.1 million for 2008 and reduced to $23.9 million in 2009. Accordingly, Plaintiff's interpretation of the MIP defies the stated purpose of the MIP as well as the circumstances surrounding the creation of the MIP.

### C. Practical Construction

"[W]hen a contract is ambiguous a construction given to it by the acts and conduct of the parties

| | : | |
|---|---|---|
| | Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-03800-SVW -AGR | Date | February 6, 2012 |
|---|---|---|---|
| Title | Monte Cahn v. Oversee.net et al | | |

with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court." Rosen v. E. C. Losch, Inc., 234 Cal.App.2d 324, 330-31 (1965) (citing Work v. Assoc. Almond Growers, 102 Cal.App. 232, 235 (1929)). The Court finds that the parties' conduct further strengthens the Court's conclusion that the MIP is not reasonably susceptible to Cahn's interpretation. Of particular importance is the parties' behavior concerning the ICP.

As noted above, Oversee offered Cahn the ICP in 2008 when, at least as far as Oversee was concerned, it had become clear that the Performance Goals under the MIP could not be achieved. As Cahn argues, the ICP did not replace the MIP. Rather, the ICP created a set of more modest goals with correspondingly modest potential bonus payouts. As noted above, one metric for a payment under the ICP was achievement of the annual Company Budget. Cahn claims that this same target should have been used as the Oversee Performance Goal under the MIP. This contention is problematic for several reasons.

As noted above, the Company Budget was set at $23.9 million for the year 2009. It is undisputed that Oversee achieved that goal. It is also undisputed that Cahn received a $104,000 bonus under the ICP for 2009. Trial Exhibit 427 consists of two emails, one from Cahn to Kupietzy, and one from Kupietzy to Cahn in response. Cahn emailed Kupietzy thanking him for the bonus payment, and asking for an explanation of the specific dollar amount of that bonus. Kupietzy responded with the explanation Cahn sought. While Cahn's counsel claimed that Cahn made various complaints about the achievement of the MIP Performance Goals, Cahn did not make any specific complaints about the 2009 bonus under the ICP. However, under Cahn's proposed interpretation of the MIP, achievement of the 2009 Company Budget would have also triggered payment under the MIP. Under Schedule A to the MIP, achievement of the 2009 Oversee Performance Goal would have entitled MIP participants to a $1,000,000 payment. (Tr. Ex. 1 at 001-013). As noted above, the ICP expressly states that Cahn was entitled to the greater of payment under the ICP or MIP. Accordingly, if Cahn actually believed that the Oversee Performance Goal under the MIP was equal to the Company Budget, one would have expected his reaction to a $104,000 bonus payment to be an inquiry as to when he would be receiving an additional $896,000 payment. Instead, Cahn thanked Kupietzy for the $104,000 bonus.[7]

Cahn's argument that the Oversee Performance Goal under the MIP was identical to the

---

[7] Trial Exhibit 431 further bolsters the Court's conclusion. Exhibit 431 consists of an October 22, 2008 email from Kupietzy to Cahn in which Kupietzy responds to several questions Cahn had emailed to Kupietzy the day before. Cahn asks about a $51 million EBITDA figure and the fact that this figure does not appear in the MIP. As noted above, the Company Budget for 2008 was set at approximately $51 million. Kupietzky explained that the $51 million EBITDA figure was not in the MIP because the corresponding Oversee EBITDA target in the MIP would naturally have been higher due to the fact that it would be based in part on Cahn's aggressive projections with regards to the Moniker Business Segments.

| | : | |
|---|---|---|
| | Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-03800-SVW -AGR | Date | February 6, 2012 |
|---|---|---|---|
| Title | Monte Cahn v. Oversee.net et al | | |

Company Budget is also problematic for reasons set forth in Defendant's trial brief. As noted above, the ICP provides that, for 2008 and 2009, MIP participants could only receive a bonus payment based on achievement of the Oversee Performance Goal under the MIP if at least one of the Moniker Business Segments also achieved a Performance Goal under the MIP. Schedule A provides for a potential total of $1.4 million in payments based on achievement of the Oversee Performance Goals during 2008 and 2009. (Tr. Ex. 1 at 001-013). As Oversee argues, if Cahn truly believed that the Oversee Performance Goal in the MIP was equal to the Company Budget in the ICP, then, by signing the ICP, Cahn would have been agreeing to surrender up to $1.4 million under the MIP unless one of the Moniker Business Segments also achieved a Performance goal in exchange for roughly $100,000. Again, as noted above, Oversee achieved the Company Budget in 2009. Cahn thus received a bonus under the ICP. According to Cahn's logic, Oversee owes MIP participants $1 million. Therefore, under Cahn's proposed logic, by signing the ICP he sacrificed this $1 million payment unless a Moniker Segment also achieved a Performance Goal in 2009 for a payment of $104,000.[8] As noted above, Cahn is a sophisticated party and a successful businessman and entrepreneur. His conduct surrounding the 2009 ICP bonus was wholly inconsistent with the argument that the Oversee Performance Goal under the MIP is equal to the Company Budget.

Finally, it is worth noting that, while Cahn claims that he sought to be treated "identically" with regards to Oversee legacy employees, his proposed interpretation of the MIP would actually have given him *superior* treatment. As noted above the Company Budget was one of multiple factors used to determine whether Oversee legacy employees would receive bonuses in a given year. Those bonuses were capped at a certain percentage of salary. By contrast, the Baseline Awards set forth in the MIP are expressed not as a percentage of salary, but as specific dollar amounts well in excess of 100% of Cahn's salary. For example, as noted above, achievement of the Oversee Performance Goal in 2008 would have triggered a $400,000 Baseline Award, a number equal to 160% of Cahn's $250,000 salary under his employment agreement. Achievement of the Oversee Performance Goal in 2009 and 2010 would have resulted in even larger Baseline Awards. In essence, Cahn's proposed interpretation would have given him the best of both worlds, enabling him to earn large Baseline Awards based on achievement of the same target used to determine whether Oversee legacy employees would be given comparatively modest bonus payments. Again, Cahn's conduct surrounding the 2009 ICP bonus was wholly inconsistent with his proposed interpretation of the MIP.

**IV. CONCLUSION**

The Court finds that: (1) Plaintiff has failed to meet his burden to establish that Defendants represented to Plaintiff that the Oversee Performance Goal would be identical to the Company Budget;

---

[8] Again, for the sake of clarity, the parties' dispute as to whether the Moniker Business Segments achieved any of their Performance Goals under the MIP is not at issue in this Order.

| | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-03800-SVW -AGR | Date | February 6, 2012 |
|---|---|---|---|
| Title | Monte Cahn v. Oversee.net et al | | |

and (2) the MIP is not reasonably susceptible to Plaintiff's proposed interpretation that the Oversee Performance Goal was identical to the Company Budget for the reasons set forth in this Order.

|  | : |
|---|---|
| Initials of Preparer | PMC |