William A. Delgado (Bar No. 222666)
wdelgado@willenken.com
WILLENKEN WILSON LOH & LIEB LLP
707 Wilshire Blvd., Suite 3850
Los Angeles, CA 90017
Tel: (213) 955-9240
Fax: (213) 955-9250

Attorneys for Defendants
OVERSEE.NET, JEFFREY KUPIETZKY,
and LAWRENCE NG

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONTE CAHN, an individual,<br><br>Plaintiff,<br><br>v.<br><br>OVERSEE.NET, a California corporation; JEFF KUPIETZKY, an individual, LAWRENCE NG, an individual; and DOES 1 through 10<br><br>Defendants. | Case No. CV-11-03800 SVW (AGRx)<br><br>**DECLARATION OF JEFFREY KUPIETZKY ISO MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING TRAFFICCLUB BUSINESS SEGMENT**<br><br>**Date: April 23, 2012**<br>**Time: 1:30 p.m.**<br>**Place: Courtroom 6**<br><br>Complaint Filed: May 3, 2011<br>Pretrial Date: January 10, 2012<br>Trial Date: January 24, 2012 |

DECLARATION OF JEFFREY KUPIETZKY

124552.1

# DECLARATION OF JEFFREY KUPIETZKY

I, Jeffrey Kupietzky, do hereby declare as follows:

1. I am over the age of eighteen (18). I have personal knowledge of the facts stated herein and, if called as a witness, I could competently testify thereto.

2. I previously submitted a declaration to this Court which constituted my direct examination for the trial that occurred on January 24-25, 2012 and testified at the trial on January 25, 2012.

3. In my previous declaration, I referred to Trial Exhibit 7 which was not admitted into evidence at trial.  For authentication purposes, a true and correct copy of Trial Exhibit 7, my 12/13/2007 e-mail to various recipients including Mr. Cahn, is attached as Exhibit A.

4. As I noted in my previous declaration, by the date of the Moniker acquisition (December 14, 2007), no decision had been made as to whether and/or when to transition TrafficClub customers to DomainSponsor®.

5. However, Oversee did reintroduce the DomainSponsor® platform into the TrafficClub system almost immediately after its acquisition of Moniker as it had discussed with Cahn.  Oversee and Moniker jointly communicated that information to TrafficClub customers.  Attached as Exhibit B is Trial Exhibit 91, a true and correct copy of an e-mail from 1/9/08 from me to Genie White and Monte Cahn regarding one such type of communication.  Oversee and Moniker also communicated this information to the general public.

6. At the time of acquisition, a company named Skenzo had been providing its monetization platform for use by the TrafficClub service.  Skenzo was responsible for the vast majority of TrafficClub revenue.  Customers were primarily using TrafficClub to get access to the Skenzo feed because they did not have direct access due to Skenzo's eligibility requirements.

7. Shortly after Oversee publicly announced its acquisition of Moniker, Skenzo notified Moniker that it was terminating its relationship with TrafficClub and removing its feed from TrafficClub. Mr. Cahn forwarded me an e-mail sent by Skenzo to TrafficClub customers informing them of its decision to terminate its relationship with TrafficClub and inviting them to enter into a direct relationship with Skenzo. Attached as Exhibit C is a true and correct copy of that e-mail, which is Trial Exhibit 5.

8. Once Skenzo removed its advertising feed, TrafficClub's only remaining monetization platform of any substance was DomainSponsor®. This situation—providing customers with the same DomainSponsor® feed through TrafficClub *and* DomainSponsor—seemed to me to be unnecessarily duplicative and expensive.

9. Furthermore, Moniker did not have any full time employees working on the TrafficClub business. All technical operations were being handled by an outside consultant named Rob Montgomery whom we had difficulty reaching.

10. I and other members of Oversee's management team, including Monte Cahn, consulted about how best to handle Skenzo's termination, and we agreed to transition TrafficClub customers to DomainSponsor®.

11. It was my understanding, based on his communications with me, that Mr. Cahn agreed that it made sense to transition TrafficClub customers to DomainSponsor. One such communication is Mr. Cahn's email of January 9, 2008, a true and correct copy of which is attached as Exhibit D, which is also Trial Exhibit 18. In that email, Mr. Cahn states: "I have been thinking more and more about best future [sic] for TrafficClub and what makes sense for the overall organization as well as our customers. I think I would be willing to move towards a full transition to DomainSponsor rather than trying to migrate to TC."

12. I understand that it is Mr. Cahn's contention that TrafficClub was shut down because Oversee's operation of TrafficClub was prohibited by Oversee's contract with Google and that I knew that to be the case prior to Oversee's acquisition of Moniker.

13. In fact, I do not believe that the Google contract prohibited the reintroduction of the DomainSponsor® feed to TrafficClub because, once Oversee acquired TrafficClub, there was no longer a "fourth party" relationship, which is what I understand Google prohibited.

14. The transition of TrafficClub customers to DomainSponsor®: (i) had been discussed pre-merger; (ii) was agreed to by Mr. Cahn; and (iii) was precipitated largely by Skenzo's decision to terminate its relationship with TrafficClub.

15. As I indicated in my previous declaration, the Performance Goals of the Moniker Business Segments in the MIP were never amended. Similarly, the definition of TrafficClub Customer in Section 15(aa) was never amended.

16. Under the Incentive Compensation Plan ("ICP") which was in effect for 2008 and 2009, Mr. Cahn was provided with DomainSponsor Goals which, if met, would provide him with additional compensation. He could reach these goals as a result of opening "New Accounts" or growing existing DomainSponsor accounts which the ICP defined as "Incremental Named Account." *See* Trial Exhibit 28.

17. Mr. Cahn was not paid any money in respect of his DomainSponsor Goals in 2008 or in 2009. When Mr. Cahn was provided his ICP bonus in 2008, he did not complain that he should have received additional compensation as a result of an "Incremental Named Account." When Mr. Cahn was provided his ICP bonus in 2009, he did not complain that he should have received additional compensation as a result of an "Incremental Named Account."

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed the 7 day of March, 2012, at Ra'anana, Israel.

Jeffrey Kupietzky

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the Electronic Service List for this Case.

Dated: March 19, 2012　　　　　　　　WILLENKEN WILSON LOH & LIEB LLP


By: */s/ William A. Delgado*　　　　　　.
　　William A. Delgado
　　Attorneys for Defendants OVERSEE.NET, JEFFREY KUPIETZKY, and LAWRENCE NG