LEWIS BRISBOIS BISGAARD & SMITH LLP
JOHN L. BARBER, SB# 160317
    E-Mail: barber@lbbslaw.com
KENNETH D. WATNICK, SB# 150936
    E-Mail: watnick@lbbslaw.com
SONJA HARRINGTON, SB# 261053
    E-Mail: sharrington@lbbslaw.com
221 North Figueroa Street, Suite 1200
Los Angeles, California 90012
Telephone: 213.250.1800
Facsimile: 213.250.7900

Attorneys for MONTE CAHN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MONTE CAHN,<br><br>       Plaintiff,<br><br>vs.<br><br>OVERSEE.NET, a California corporation; JEFF KUPIETZKY, an individual; LAWRENCE NG, an individual; and Does 1 through 10,<br><br>       Defendants. | CASE NO. CV11-03800 SVW (AGRx)<br><br>The Honorable Stephen V. Wilson<br><br>**PLAINTIFF MONTE CAHN'S OPPOSITION TO OVERSEE.NET'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE: TRAFFICCLUB**<br><br>Date:   April 23, 2012<br>Time:  1:30 p.m.<br>Crtrm.: 6<br><br>Complaint Filed:   May 3, 2011 |

4814-5780-8911.1

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................... 1

II.   STATEMENT OF FACTS ............................................................................. 5

III.  OVERSEE MAY NOT REWRITE THE WRITTEN TERMS OF THE
      MIP. ............................................................................................................ 11

IV.   OVERSEE ACCEPTED CAHN'S CONDITIONS TO THE
      COMBINATION OF DOMAIN SPONSOR AND TRAFFICCLUB
      OR BREACHED THE MIP BY MAKING MATERIAL
      MODIFICATIONS WITHOUT CAHN'S CONSENT ................................... 14

V.    THE ICP IS IRRELEVANT TO OVERSEE'S CALCULATION OF
      TRAFFICCLUB GROSS PROFIT ............................................................. 18

VI.   CONCLUSION ............................................................................................ 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1

# TABLE OF AUTHORITIES

2

## STATE CASES

3   *Beck v. American Health Group Internat., Inc.*
        (1989) 211 Cal.App.3d 1555 ............................................................ 13

4

   *Founding Members of the Newport Beach Country Club v. Newport Beach*
5        *Country Club, Inc.*
        (2003) 109 Cal.App.4th 944 ........................................................... 13

6
   *Vons Companies, Inc. v. United States Fire Ins. Co.*
7        (2000) 78 Cal.App.4th 52 ............................................................. 13

8

## STATE STATUTES

9   Civ. Code, §1639 ............................................................................... 13

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

## I.      <u>INTRODUCTION</u>

Oversee's motion for partial summary judgment regarding TrafficClub must be denied as its motion is fatally flawed in three major respects.  First, and most fundamentally, Oversee's Motion is premised on the illogical contention that Oversee is entitled to summary judgment because it materially breached the Management Incentive Plan ("MIP") and/or defrauded Cahn into entering in the MIP by falsely representing that Cahn would have the opportunity to earn $1.6 million in bonuses based on the performance of the TrafficClub Business Segment during a three year period. Within a month of Oversee's acquisition of TrafficClub, Oversee's management decided to combine TrafficClub with Oversee's monetization division, DomainSponsor.  Under Section 9 of the MIP, this action was a material modification of Cahn's Performance Goal that required Cahn's written consent.  (Section 9 of the MIP, Ex. "1" to the Watnick Decl.)  Cahn agreed to this combination, provided that he received credit under the TrafficClub Performance Goal MIP for his growth and expansion of all customers within the newly constituted DomainSponsor/TrafficClub division.  (Items 1-3 of Part 2 of e-mail dated January 9, 2008 from Monte Cahn to Jeff Kupietzky and Lawrence Ng, Ex. "20" to the Watnick Decl.; Paragraph 43 of Cahn Direct Testimony Decl., Ex. "2" to the Watnick Decl.)  After reviewing Cahn's condition, Oversee's management combined the TrafficClub business division with Domain Sponsor.  In breach of the MIP, Oversee failed to track the monetization business generated by Cahn or other individuals performing services for Moniker and failed to credit Cahn under the TrafficClub Performance Goal of the MIP for the growth of customers. Instead of providing Cahn with the benefit of the promised bargain, Oversee directed Cahn and all other employees to work for the growth of the combined DomainSponsor/TrafficClub business division, *i.e.*, not to focus on growing or expanding former customers of the TrafficClub Business Segment.  (Paragraphs 41-52 of Direct Testimony Decl. of Monte Cahn, Ex. "2" to the Watnick Decl.)

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  Oversee now claims that it is entitled to summary judgment because it successfully

2  deceived Cahn and prevented him from obtaining the benefit of the bargain under

3  the MIP.  Oversee's admitted misconduct with respect to the TrafficClub Business

4  Segment is not a valid basis for this Court to grant summary judgment in favor of

5  the breaching party and against the party victimized by the fraud and breach of

6  contract.  To the contrary, it confirms that Oversee is liable for breach of contract

7  and for frustrating the purpose of the MIP.[1]

8      Second, Oversee's Motion is based upon an inapplicable provision of the

9  MIP.  Oversee's Motion relies on section 15(aa) of the MIP, the definition of

10  "TrafficClub Customer".  (Ex. "1" to the Watnick Decl.)  However, at issue here is

11  the determination of the calculation of TrafficClub's Gross Profit, under Schedule A

12  of the MIP.  The defined term "TrafficClub Customer" is not part of the calculation

13  of TrafficClub Gross Profit.

14      In determining TrafficClub's Gross Profit, the defined terms at issue are

15  "Gross Profit" and "TrafficClub Business Segment".  (Sections 15(k) and (z) of the

16  MIP, Ex. "1" to the Watnick Decl.)  With one inapplicable exception, neither

17  definition refers to or incorporates the defined term "TrafficClub Customer" (with a

18  capital "C").  Instead, the definition of Gross Profit refers to customers, with a

19  lower-case "c", in terms of "the TrafficClub Business Segment", which is defined as

---

21  [1]   This Court previously concluded that Oversee breached the MIP by never complying with its contractual obligation to set the Oversee EBITDA goal in the

22  MIP.  (P. 5, fn. 8 of Order denying Oversee's Motion for Summary Judgment [Doc. No. 209].)  This Court correctly observed that the "fact that Oversee claims that it

23  never set such a Performance Goal means that Oversee arguably acted so as to frustrate the MIP because the MIP clearly required Oversee to set an Oversee

24  Performance Goal."  (Id.)  During a bifurcated trial, this Court declined to agree with Cahn's contention that the Oversee EBITDA Performance Goal in the MIP was

25  the equivalent of the Oversee EBITDA performance goal that was disclosed to Oversee's management. While Cahn respectfully disagrees with this ruling, the

26  ruling confirms this Court's prior finding  that Oversee breached the MIP by failing to set and communicate an Oversee EBITDA Performance Goal.  The issue of

27  damages owed for this undisputed breach has to be resolved at a later stage of the proceeding.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4814-5780-8911.1                                         2
PLAINTIFF MONTE CAHN'S OPPOSITION TO OVERSEE.NET'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE: TRAFFICCLUB

1  the "business of Moniker relating to the monetization of internet domain names
2  through rotation of such internet domain names on third party parking platforms".
3  (Sections 15(k) and (z) of the MIP, Ex. "1" to the Watnick Decl.)  Oversee may not
4  rewrite the terms of the MIP and ask the Court to apply definitions or limitations
5  where they do not belong.  <u>The MIP provides that in determining TrafficClub's</u>
6  <u>Gross Profit, Cahn is entitled to all of the business of Moniker relating to</u>
7  <u>monetization, and it does not limit that business to that of TrafficClub, but would</u>
8  <u>also include DomainSponsor</u>.  To the extent that individuals performing work for
9  Moniker expanded the monetization of a customer of the combined DomainSponsor
10 division, this expanded customer must be credited under the TrafficClub Business
11 Segment.

12      Third, Oversee's Motion ignores the significance and effect of elimination of
13 TrafficClub on Cahn's ability to achieve the TrafficClub Performance Goal.  The
14 MIP contemplated that TrafficClub Target Gross Profit would grow from
15 $3,050,000 in 2008 to $5,800,000 in 2010.  (Schedule A of MIP, Ex. "1" to the
16 Watnick Decl.)  The MIP also precluded Oversee from materially amending or
17 modifying the benefit of the bargain without Cahn's written consent.  (Section 9 of
18 the MIP, Ex. "1" to the Watnick Decl.)  After Mr. Cahn advised that he would
19 consent to the closure of TrafficClub as an independent platform and its
20 combination with DomainSponsor, provided that he received credit under the
21 TrafficClub Performance Goal for all Domain Sponsor business that he generated
22 (Items 1, 2, and 3 of E-mail dated January 9, 2008 from Monte Cahn to Jeff
23 Kupietzky and Lawrence Ng, Ex. "20" to the Watnick Decl.; Paragraph 43 of the
24 Direct Testimony Decl. of Monte Cahn, Ex "2" to the Watnick Decl.), Oversee
25 combined the two business divisions.  Thus, Oversee accepted Cahn's conditions,
26 or, alternatively, breached the MIP by closing TrafficClub without securing Cahn's
27 written consent.  In either event, Oversee is liable for breach of contract and owes
28 Cahn the benefit of the bargain.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4814-5780-8911.1                                   3
PLAINTIFF MONTE CAHN'S OPPOSITION TO OVERSEE.NET'S MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: TRAFFICCLUB

1    After Oversee closed TrafficClub as a separate division in January 2008,

2  Cahn and Moniker could not promote the TrafficClub business concept to existing

3  or prospective customers.  There was no TrafficClub concept to promote, and there

4  was no business platform to grow.  Instead, Oversee ordered Cahn and others to

5  grow the DomainSponsor division, and not to focus on the growth or expansion of

6  the TrafficClub customers.  (Paragraphs 44 and 45 of Direct Testimony Decl. of

7  Monte Cahn, Ex. "2" to the Watnick Decl.)  All TrafficClub customers were placed

8  within DomainSponsor.  Cahn was appointed Vice President of Sales of

9  DomainSponsor.  Cahn and all individuals working within the DomainSponsor

10 business division were told that they were responsible for growing all customers,

11 regardless of whether they were formerly TrafficClub or always DomainSponsor.

12 (*Id.* at Paragraphs 44 through 49.)  Oversee did not track or distinguish between

13 customers of TrafficClub from those of DomainSponsor.  (*Id.* at Paragraphs 46 and

14 51.)  Thus, the parties' course of conduct demonstrates that Cahn was entitled to

15 credit under the TrafficClub Performance Goal of the MIP for the growth of

16 customers in the DomainSponsor business division.  Oversee decided to blend

17 DomainSponsor and TrafficClub into a single operating division.  Based upon this

18 merger, Cahn is entitled to credit for his growth of existing customers of this

19 combined division as well as the growth of existing customers by individuals

20 working under him.

21    Cahn is entitled to the benefit of the bargain.  Just as Oversee was not

22 permitted to "frustrate the [purpose of] the MIP" by not setting an Oversee EBITDA

23 Performance Goal (P. 5, fn. 8 of Order denying Oversee's Motion for Summary

24 Judgment [Doc. No. 209].), Oversee could not frustrate the purpose of the MIP by

25 closing TrafficClub as a separate division and refusing to credit Cahn and his

26 subordinates for growth and expansion of the combined TrafficClub/Domain

27 Sponsor division.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4814-5780-8911.1

4

## II.   STATEMENT OF FACTS

Cahn has set forth all of the relevant facts in his Motion for Summary Adjudication filed concurrently with Oversee's Motion for Partial Summary Judgment. In an effort to not burden the Court by repeating the same facts, Cahn will only set forth a summary of the facts relevant to Oversee's Motion.

On December 14, 2007 Oversee completed its purchase of Moniker from Seevast Corp. ("Seevast"). (Statement of Additional Facts ("SOAF") ¶ 1)  As part of the sale, Oversee provided Cahn with a $13,000,000 incentive to join Oversee so that he could continue to manage and grow Moniker in the same manner and fashion that he had been for the past eight years.  The $13,000,000 incentive was to be administered through Cahn's Management Incentive Plan. (SOAF ¶1.)  The MIP contains four business segments, each with its own performance goal and baseline award. (SOAF ¶2; MIP, Ex. "1" to Watnick Decl.)  The first business segment, TrafficClub, was Moniker's monetization platform or the business of creating revenue from a web user viewing a website of one of the customers of the TrafficClub Business Segment.

The TrafficClub Business Segment provided Cahn with $1.6 million out of the total $13,000,000 available under the MIP. (SOAF ¶2; Schedule 1 of MIP, Ex. "1" to Watnick Decl.)  The MIP provided that Cahn was entitled to a bonus of $400,000 if the TrafficClub Business Segment's Gross Profit for 2008 was $3,050,000; a bonus of $600,000 if the TrafficClub Business Segment Gross Profit was $4,085,000 in 2009; and a bonus of $600,000 if the TrafficClub Business Segment Gross Profit was $5,800,000 in 2010. (*Id.*)

Interestingly, prior to the acquisition, Oversee had its own monetization platform, DomainSponsor.  What distinguished the two platforms is that TrafficClub utilized a rotating feed of multiple third party providers, while DomainSponsor only utilized a single third party feed, Google. (SOAF ¶3; Paragraph 10 to Cahn Direct Testimony Decl., Ex. "2" to Watnick Decl.; Kupietzky Deposition, 135:4-16, Ex.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  "9" to the Watnick Decl.; Navach Deposition, 115:1-6, Ex. "19" to the Watnick

2  Decl.)  TrafficClub provided a competitive advantage over DomainSponsor because

3  TrafficClub used a unique combination of advertising content feeds from Google,

4  Yahoo and others, which were rotated to provide the maximum revenue to Traffic

5  Club and its customers.  (SOAF ¶¶4 and 5; Paragraph 10 to Cahn Direct Testimony

6  Decl., Ex. "2" to Watnick Decl.; Kupietzky Deposition, 135:4-16, Ex. "9" to the

7  Watnick Decl.; Navach Deposition, 115:1-6, Ex. "19" to the Watnick Decl.)

8       Unbeknownst to Cahn, Oversee's acquisition of Moniker was part of an effort

9  to induce a multi-billion dollar investment company to invest hundreds of millions

10  of dollars.  On January 15, 2008 Oversee publically announced that it received a

11  $150 million cash infusion from Oak Hill Capital Partners.  (SOAF ¶6; Ex. "3" to

12  Watnick Decl.[2])  In fact, Oversee did not receive any infusion of funds.  (This may

13  very well be the reason that Oversee decided to defraud Mr. Cahn.)

14       Instead of investing in Oversee,

15  transferred to the co-founders of Oversee, Lawrence Ng and Fred Hsu.  (SOAF ¶7;

16  Section 9 of 2008-2007 Financial Statements and Deposition of Morse, 101:20-25

17  and 103:10-13, Exs. "6" and "7" to Watnick Decl.)  Further,

18       Oak Hill investment was used to

19                                                (¶7 of SOAF; Section 7

20  of 2008-2007 Financial Statements; Morse Deposition, 102:14-103:14, Exs "6" and

21  "7" to the Watnick Decl.)

22       Oak Hill's $150 million investment was not followed by a period of growth

23  and investment, instead, almost immediately, Oversee employees, specifically

24  Moniker, was met with numerous layoffs and continuous downsizing.

25  _____

26  [2] According to its website, Oak Hill is an investment company that was formed by
    Texas billionaire Robert Bass. (Ex. "4" to the Watnick Decl.) Phil Knight, the

27  founder of Nike, and Bill Gates, the founder of Microsoft, are investors. (Ex. "5" to
    the Watnick Decl.)

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   (MCAHN002892-2893, MCAHN003025, Ex "8" to Watnick Decl.)  Also,

2   Oversee's founder, Lawrence Ng, resigned as CEO, with his share of the

3               , and turned over the reigns to Kupietzky, who was appointed

4   as President of Oversee.  (Kupietzky Depo. 33:3-21, Ex. "9" to the Watnick Decl.)

5        Shortly after the investment from Oak Hill, Oversee continued to shake things

6   up with Moniker.  In January, 2008, Oversee's management decided that it wanted

7   to combine the monetization businesses of DomainSponsor and TrafficClub into a

8   single operating division.  (SOAF ¶8; Kupietzky Deposition, 138:20-139:3, Ex. "9"

9   to the Watnick Decl.)  The proposed closure of TrafficClub and the combination of

10  TrafficClub and DomainSponsor was a material change in the bargain that had been

11  negotiated under the MIP and, under the MIP, could not occur without Cahn's

12  written consent.  (Section 9 of the MIP, Ex. "1" to the Watnick Decl.)  Mr. Cahn

13  advised that he would consent to the closure of TrafficClub as an independent

14  platform and its combination with DomainSponsor, provided that he received credit

15  for all Domain Sponsor business that he and other Moniker representatives

16  generated.  (SOAF ¶9; Items 1, 2, and 3 of E-mail dated January 9, 2008 from

17  Monte Cahn to Jeff Kupietzky and Lawrence Ng, Ex. "20" to the Watnick Decl.;

18  Paragraph 43 of Cahn Decl.)  Mr. Cahn confirmed that he would be "willing to

19  move towards a full transition [of TrafficClub] to DomainSponsor" based on certain

20  conditions:

21      1. We need full access to DS, reporting, tracking, etc because we use

22      TrafficClub as a selling tool to see large portfolio lists at the time names are

23      submitted to auction.  We need to have full access to the admin panel to do

24      the same and keep the message of domain asset management with our

25      customers and our employees.

26      2. **Regardless of overlap**, we need to be able to track our customers before

27      during and future that are referred so that sales can receive credit for their

28      work and so that we can track performance to goal.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    3.  **All would have to apply and be counted towards Moniker goals as per**

2        **the incentive plans etc.**

3   (Items 1, 2, and 3 of Part 2 of E-mail dated January 9, 2008 from Monte Cahn to

4   Jeff Kupietzky and Lawrence Ng, Ex. "20" to the Watnick Decl. (emphasis added).)

5          After receiving Mr. Cahn's e-mail, Oversee elected to combine the two

6   business divisions.  (SOAF ¶10.)  Thus, Oversee consented to the terms of Mr.

7   Cahn's January 9, 2008 e-mail.

8          Although not disclosed to Cahn, Oversee's motivation for shutting down

9   TrafficClub was partially attributed to its exclusive contract with Google related to

10  its DomainSponsor business.  Oversee's contract with Google

11

12

13

14  TrafficClub in February of 2007, and calls into question Oversee's intent for

15  TrafficClub when it offered to purchase Moniker.  (SOAF ¶11; Sections 4 through 6

16  of the Google contract, Exhibit "10" to the Watnick Decl.)  The contract also

17  requires that

18                              (*Id.* at Sections          of the Google contract.)

19  Therefore, when combined with Oversee's desire to grow the DomainSponsor

20  platform at the expense of TrafficClub, Oversee's motivation for shutting down

21  TrafficClub becomes all too clear.

22         Additionally, Jeff Kupietzky, the Oversee executive who decided to combine

23  the divisions benefitted personally from the combination since his 2008 bonus was

24  based, in part, on DomainSponsor's performance.  (Kupietzky Deposition, 50:14-17,

25  Ex. "9" to the Watnick Decl.)  By combining TrafficClub and DomainSponsor,

26  Kupietzky eliminated a viable alternative to DomainSponsor and ensured that he

27  would profit from TrafficClub's revenues.  In fact, the evidence reflects that

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    Oversee denied Cahn his MIP Bonus relating to TrafficClub so that it could, at least

2    in part, fund Mr. Kupietzky's bonuses during the period from 2008 through 2010.

3         After Oversee shut down TrafficClub, Oversee ordered Moniker, and Cahn,

4    to grow the DomainSponsor platform. (SOAF ¶¶ 12-14.)  Moniker's duties shifted

5    from growing the TrafficClub brand, to now expanding the DomainSponsor

6    platform. (*Id.*)  On March 24, 2008 Oversee implemented a new program, a

7    "SPIFF", whereby Moniker employees previously working on TrafficClub were

8    directed to add all new customers to DomainSponsor, and to add new names to

9    existing DomainSponsor accounts – to "expand" the customers.   (SOAF ¶ 15.)

10        After Oversee shut down TrafficClub Cahn became aware that Oversee was

11   not properly tracking Moniker employee's referrals to DomainSponsor, and on May

12   11, 2008 Cahn sent Kupietzky an email expressing his frustration over Oversee's

13   failure to properly track Moniker's referrals of domains, customers and traffic to

14   DomainSponsor. (SOAF ¶¶ 15 through 17; see, also, Exs. "11" to Watnick Decl.)

15        Want to make sure we are being tracked and credited properly for the parking

16        revenue we are sending as a result of the trafficclub conversion and our own

17        accounts now on DS . . . Also, my team has referred a ton of domains,

18        customers and traffic to Don Watters and crew since January . . . How do we

19        sort through this and check so that it applies towards the MIP.

20   (SOAF ¶15.)

21        Again, on July 14, 2008 Cahn sent an email to Victor Pitts regarding

22   Oversee's continued failure to track Moniker's contributions to DomainSponsor,

23   and failure to pay under the SPIFF. (SOAF ¶¶ 15 through 17; see, also, Ex. "12" to

24   Watnick Decl.)  Victor Pitts responded by confirming that "They were supposed to

25   track and do the calculations.  Did not work out." (*Id.*)  Mr. Cahn immediately

26   advised Mr. Kupietzky that "[t]his is very concerning. . . . Let me know what we can

27   do to turn this around and when I can get a full and detailed report on traffic

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  business referral so that we can start tracking towards MIP." (E-mail dated July 15,

2  2008 from Monte Cahn to Jeff Kupietzky, Ex. "12" to the Watnick Decl.)

3        Oversee's failure to track TrafficClub's performance after the shut down, and

4  failure to track Moniker's contributions to DomainSponsor was confirmed by

5  numerous Oversee employees. In fact, up until at least July of 2008, Stephen

6  O'Neill, the former Vice President of Technology for Oversee, testified that Oversee

7  had not developed any technology to track the financial performance of TrafficClub

8  after it was migrated to DomainSponsor. (SOAF ¶ 17; O'Neill Depo. 169:24-

9  170:16, Ex. "15" to the Watnick Decl.) Oversee's senior management, including

10  both of its CFOs, confirmed that they did not track TrafficClub performance results.

11  (SOAF ¶ 17; Peterson Depo., 55:14-56:12; 38:25-39:9 of Murray Depo., Exs. "15"

12  and "16" to the Watnick Decl.) Specifically, Stacey Peterson, Oversee's own CFO

13  confirmed that she did not track TrafficClub or its related revenues. (SOAF ¶ 17;

14  Peterson Depo., 55:14-56:12, Ex. "15" to the Watnick Decl.)

15        Oversee had not only dramatically changed Cahn's responsibilities at Oversee

16  after the merger, but it had completely changed the expectations and the business

17  that underlined the purpose of the MIP at the time of the merger. Oversee took over

18  any and all control Cahn had over the performance of his goals under the MIP,

19  including shutting down one of his three business segments. Kupietzky's response

20  to how Cahn was supposed to meet his goal after Oversee shut down TrafficClub

21  was that Cahn "had to deal with the ups and owns of all challenges in the business.

22  This was a challenge." (140:1-3 of Kupietzky Depo., Ex. "9" to Watnick Decl.) It

23  certainly was a challenge, especially since Oversee abandoned any and all tracking

24  of TrafficClub or of the subsequent names and traffic added to DomainSponsor by

25  Moniker employees after the migration. Cahn certainly could not meet his goals if

26  his performance was not being tracked and accounted for. Oversee's deliberate

27  actions, and intentional manipulation of Moniker's business was a direct breach of

28  the purpose of the MIP, and its duty of good faith and fair dealing.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  **III.    OVERSEE MAY NOT REWRITE THE WRITTEN TERMS OF THE**
2  **MIP.**

3       Oversee hinges its argument that "expanded" customers are not contemplated

4  under the MIP because the definition of "TrafficClub Customer" under the MIP,

5  paragraph 15(aa), does not address the numerous DomainSponsor customers that

6  Moniker employees grew (at the specific direction of Oversee management) after

7  Oversee shut down TrafifcClub.  However, the definitions under the MIP do not

8  support this theory.

9       Under the MIP, defined terms are consistently capitalized.  (SOAF ¶¶20, 21,

10  and 25.)  For example, on page 1 of the MIP, there are six defined terms, all

11  identified by being capitalized and underlined, they are: Plan, Company,

12  Participants, Board, Awards, and Performance Goals.  (P. 1 of the MIP, Ex. "1" to

13  the Watnick Decl.)  The parties maintained the same mechanism for identifying

14  defined terms throughout the MIP.

15       Under Schedule A of the MIP, the metric for calculating TrafficClub's

16  performance is TrafficClub "Gross Profit".   (SOAF ¶ 20.)  Under the MIP "Gross

17  Profit" is defined as:

18            …total revenues from customers of the TrafficClub

19            Business Segment less all cost of goods sold relating

20            thereto (including revenue share payments); provided,

21            however, in the case of Shared Customers, Gross Profit

22            shall be determined by multiplying (i) the Gross Profit

23            from such Shared Customers by (ii) the Applicable Shared

24            Customer Percentage.

25  (SOAF ¶ 20.)

26       This means that in calculating TrafficClub's Gross Profit one must determine

27  the revenues from *all* of the customers (lower case) of the "TrafficClub Business

28  Segment".   The parties did not capitalize "customers".  Instead, they left it lower

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4814-5780-8911.1                                11
PLAINTIFF MONTE CAHN'S OPPOSITION TO OVERSEE.NET'S MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: TRAFFICCLUB

1  case, meaning that it is not a defined term. On the other hand, the parties capitalized

2  TrafficClub Business Segment. The term "TrafficClub Business Segment" is then

3  defined to mean:

4      …that business of Moniker relating to the monetization of

5      internet domain names through rotation of such internet

6      domain names on third party parking platforms.

7  (SOAF ¶ 21.)

8      Taking the definition of "TrafficClub Business Segment" into account, Gross

9  Profit is then defined as -- the revenues generated from *all* of the customers created

10  from that business of Moniker relating to the monetization of internet domain names

11  through rotation of such internet domain names on third party parking platforms.

12  (SOAF ¶¶ 20 and 21.)

13      As such, contrary to Oversee's argument, "TrafficClub Customers" is not a

14  defined term when calculating TrafficClub's Gross Profit. When determining

15  Gross Profit for the purposes of the MIP, the parties specifically did NOT use the

16  defined term "TrafficClub Customer" (with a capital "C"). With one inapplicable

17  exception, Section 15 (aa) of the MIP, which defines "TrafficClub Customers" is not

18  addressed in either the definition of Gross Profit, or TrafficClub Business Segment.

19  Instead, the parties incorporated the more broad definition of "TrafficClub Business

20  Segment" which includes ALL business of Moniker related to monetization of

21  domain names.[3]

22      If Oversee wished to limit the "customers" which it intended to account for in

23  the MIP, it could have, and should have, drafted the definition of TrafficClub Gross

24  Profit, or TrafficClub Business Segment to include "TrafficClub Customers".

25

26  [3]  Section 15(aa) defined existing shared customers of DomainSponsor and TrafficClub as of December 14, 2007. This definition is, then, used for purposes of

27  defining the Applicable Shared Customer Percentage in Section 15(a) of the MIP. Prospective shared customers are not addressed in the definition.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   However, Oversee failed to do so.  Section 15(aa), which Oversee references in its

2   Motion, is not contemplated or referenced in either Sections 15(k) or (z), which

3   define TrafficClub Business Segment and Gross Profit.

4        Additionally, as Oversee explained in its own Motion, parol evidence does

5   not permit a party to contradict the terms of a written agreement.  (Cal. Code Civ.

6   Pro. § 1856(a).)  In the construction of a written contract, a court cannot rewrite the

7   agreement made by the parties in order to achieve a different result.  (*Vons*

8   *Companies, Inc. v. United States Fire Ins. Co.* (2000) 78 Cal.App.4th 52, 58-59, 92

9   Cal.Rptr.2d 597, 601.)  A contract must, in the first instance, be interpreted through

10  the language contained within its four corners.  (Civil Code Section 1639; *Founding*

11  *Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*

12  (2003) 109 Cal.App.4th 944, 955, 135 Cal.Rptr.2d 505, 513.)  Further, the

13  subjective intent of a party to an agreement is irrelevant to the court's construction

14  of the agreement.  (*Beck v. American Health Group Internat., Inc.* (1989) 211

15  Cal.App.3d 1555, 1562, 260 Cal.Rptr. 237, 242.)

16       Sections 15(k) and (z) are clear on their face, and are not susceptible to an

17  additional interpretation.  Therefore, the Court may not read into the MIP what is

18  not provided.  The document is clear, and must be applied as written.  Therefore,

19  when Oversee terminated the TrafficClub platform, and Oversee directed Moniker

20  to add new accounts to DomainSponsor and to add names to existing

21  DomainSponsor accounts (to "expand" the customers"), these new accounts and

22  names that were added to DomainSponsor by Moniker employees were created from

23  "that business of Moniker relating to the monetization of internet domain names

24  through rotation of such internet domain names on third party parking platforms"

25  and therefore the revenues from these customers must be accounted for and

26  attributed to Cahn's MIP.  The failure of Oversee to do so constitutes a material

27  breach of the MIP.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

IV.   **OVERSEE ACCEPTED CAHN'S CONDITIONS TO THE COMBINATION OF DOMAIN SPONSOR AND TRAFFICCLUB OR BREACHED THE MIP BY MAKING MATERIAL MODIFICATIONS WITHOUT CAHN'S CONSENT**

Alternatively, the definition of TrafficClub customer changed when Oversee shut down TrafficClub as an independent division and combined its operations with DomainSponsor. At the time the MIP was negotiated, TrafficClub was a fully functional, growing and profitable entity. The performance goals set forth on Schedule A contemplated significant growth and operation of TrafficClub – from $3,050,000 in Gross Profit in 2008 to nearly $6,000,000 in 2010. (SOAF ¶3; Schedule A to the MIP, Ex. "1" to the Watnick Decl.) Therefore, when the parties negotiated the definitions set forth in the MIP, they did not contemplate the complete closure of TrafficClub. As such, in calculating TrafficClub's performance under the MIP, any "new" business generated by Mr. Cahn or individuals performing services under his supervision must be taken into account.

This conclusion may be derived from the parties' conduct and the terms of the MIP. Under Section 9 of the MIP, Oversee could not materially modify or amend the Performance Goals in the MIP without Cahn's written consent. (SOAF ¶23; Section 9 of the MIP, Ex. "1" to the Watnick Decl.) The closure of TrafficClub and its combination with DomainSponsor was a material modification. TrafficClub was a brand that Cahn had spent the last eight years developing a loyal customer following. TrafficClub customers utilized TrafficClub because of its exceptional customer service and unique monetization platform – multiple rotating feeds. (SOAF ¶¶4, 5, and 9.) Cahn advised that he would only consent to the closure of TrafficClub and its combination if Oversee agreed that Cahn would receive credit for all Domain Sponsor business that he and his subordinates generated. (SOAF ¶9.) Cahn specifically stated that he would only consent to TrafficClub's closure and combination if he received credit under the TrafficClub Performance Goal for

14

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  the growth and expansion of all customers of the combined entity, regardless of

2  overlap.  (Items 1, 2, and 3 of Part 2 of e-mail dated January 9, 2008 from Monte

3  Cahn to Jeff Kupietzky and Lawrence Ng, Ex. "20" to the Watnick Decl.; Paragraph

4  43 of Cahn Decl., Ex. "2" to the Watnick Decl.)

5          Oversee expressly or impliedly consented to these terms.  As previously

6  stated, on January 31, 2008 Oversee attempted to migrate all of TrafficClub's

7  customers onto the DomainSponsor platform.  (SOAF ¶¶10 and 13 through 17.)

8  Once the two subsidiaries were combined, no new customers could be added to

9  TrafficClub, and all new customers, existing customers, and new domain names and

10  traffic, had to be added to the DomainSponsor platform. TrafficClub as an entity

11  ceased to exist; it was wholly contained within the operations of DomainSponsor.

12  (SOAF ¶ 22.)  According to Kupietzky:

13          A      There was no entity of Traffic Club. If you're

14          asking, in looking back, for the assessment of Traffic Club

15          as part of the MIP, there would not have been credit

16          associated with that specific account. If one of the

17          Moniker employees brought over an account, then that

18          could have been given credit.

19          Q      But that ends sometime in early 2008; isn't that

20          correct?

21          A      There was always SPIFS and incentives for the

22          registrar team to bring new parking business to the

23          company, but the product they sold was Domain Sponsor.

24          Q      Was any of those incentives relating to Traffic

25          Club?

26          A      The incentives were -- we didn't distinguish Traffic

27          Club, it was part of Domain Sponsor. That's what the

28          integration was.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1 (SOAF ¶ 22; 140:14-25, 147:2-17 of Kupietzky Depo., Ex. "9" to Watnick Decl.)

2      There is not one section of the MIP that contemplates the closure of

3 TrafficClub.  In fact, the MIP specifically provides that "Cahn's written consent

4 shall be required for (i) any material amendment or modification of the Plan which

5 would adversely affect Monte Cahn…"  (SOAF ¶ 21; § 9 of the MIP, Ex. "1" to

6 Watnick Decl.)  The closure of TrafficClub and the direction that Cahn and others

7 work towards the growth of DomainSponsor as a whole was a material modification

8 to the MIP as it eliminated one of Cahn's three business segments.  Cahn's written

9 consent was required for such a drastic modification to his MIP.  Oversee either

10 consented to the modification of the MIP on the terms that Mr. Cahn proposed, or

11 alternatively, Oversee failed to obtain Cahn's written consent.  In either event,

12 Oversee breached the express terms of the MIP.

13      Oversee argues that it was permitted to close TrafficClub because

14 TrafficClub's primary feed, Skenzo, terminated its relationship and because

15 DomainSponsor was the only alternative feed.  In fact, at the time that Skenzo

16 terminated its relationship with TrafficClub, TrafficClub maintained multiple feeds.

17 (Cahn Depo., 237:7-14 and 239:14-240:2, Ex. "23" to the Watnick Decl.)

18      Oversee also argues that Cahn's January 9 e-mail does not mention enhanced

19 customers.  In fact, items 1, 2, and 3 of the January 9 e-mail make clear that Cahn

20 was seeking to ensure that he received credit under the TrafficClub Performance

21 Goal for the growth of all customers of the combined division, regardless of overlap.

22 (E-mail dated January 9, 20008 from Cahn to Jeff Kupietzky and Lawrence Ng, Ex.

23 "20" to the Watnick Decl.)  Cahn confirmed this understanding in his sworn

24 declaration.  (Paragraph 43 of Cahn Direct Testimony Declaration, Ex. "2" to the

25 Watnick Decl.)  Further, this understanding is consistent with Oversee's direction

26 that Cahn and all Moniker employees were responsible for expanding the

27 DomainSponsor business, not the TrafficClub business.  (SOAF ¶13.)  It is

28 consistent with the undisputed fact that after the merger, Oversee appointed Cahn

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   the Vice President of the DomainSponsor business division, with sales responsibility

2   for the combined division.  (SOAF ¶12.)  Again, taking Cahn's time and attention

3   away from his work for Moniker and his efforts to expand the TrafficClub Business

4   Segment.  Thus, Cahn and his employees worked together to grow all of the

5   customers of the combined DomainSponsor/TrafficClub division. As noted, there

6   was no tracking of Moniker's growth and expansion of the monetization business.

7   (SOAF ¶¶16 through 18.)

8        As a result of Oversee's decision to eliminate TrafficClub and use Moniker's

9   resources to grow DomainSponsor, its own monetization platform, Oversee had

10  managed "TrafficClub" in a manner that was not contemplated during the

11  negotiation of the MIP or consistent with the terms of the MIP.  TrafficClub was

12  now DomainSponsor; there was no distinguishing between the two entities.  Oversee

13  had a duty to track and account for Moniker's contributions to the DomainSponsor

14  entity, just as it would had a duty to track, account and certify TrafficClub's

15  performance under the MIP while it was still in existence.  Moniker's contributions

16  to the DomainSponsor entity consisted of three different aspects: 1.) legacy

17  TrafficClub customers -- those that were migrated to DomainSponsor at the time of

18  the merger; 2.) new customers that Moniker employees referred to DomainSponsor

19  after the merger; 3.) any names added to existing DomainSponsor accounts after the

20  merger.  These three categories account for all of the business that Moniker

21  contributed to DomainSponsor after Oversee shut down TrafficClub.

22        Unfortunately, as Oversee admits, it failed to track TrafficClub after its

23  closure.  Both of Oversee's CFOs, Stephanie Peterson and Elizabeth Murray,

24  confirmed that they did not track TrafficClub or its related revenues.  (SOAF ¶ 15;

25  56:6-25 of Peterson Depo.; 38:25-39:9 of Murray Depo., Exs. "16" and "17" to the

26  Watnick Decl.)

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4814-5780-8911.1                    17
PLAINTIFF MONTE CAHN'S OPPOSITION TO OVERSEE.NET'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE: TRAFFICCLUB

1   The MIP was a contract which Oversee deemed irrelevant and simply

2   disregarded after the merger.  As such, Oversee is liable to Cahn for disregarding

3   and materially breaching the MIP.  Cahn is entitled to the benefit of the bargain.

4

5   **V.     THE ICP IS IRRELEVANT TO OVERSEE'S CALCULATION OF**

6   **TRAFFICCLUB GROSS PROFIT.**

7   Oversee argues that Cahn could have been paid under the Incentive

8   Compensation Plan ("ICP") for "enhanced customers" if he increased the gross

9   revenues of an existing customer by twenty percent.  (17-18 of Oversee's Motion

10  [Doc. 283].)  This analysis is entirely irrelevant to the issue before the Court.  First,

11  the issue of whether Cahn ever grew any customers by twenty percent is unknown,

12  since, as Oversee admits, it failed to track Moniker's referrals of customers, and its

13  enhancement of DomainSponsor customers.  Second, Oversee does not address the

14  possibility that while Cahn may not have enhanced any single customer by over

15  twenty percent, it may have increased numerous customers at just below twenty

16  percent, thereby creating enough revenue to meet his performance goals under the

17  MIP.  However, Oversee cannot know whether or not this is the case since it failed

18  to contemporaneously track TrafficClub's monetization business after the closure.

19  Additionally, Oversee's argument that Cahn did not sufficiently grow existing

20  DomainSponsor customers because he never complained about his ICP bonuses, and

21  because he never got paid for enhanced customers under the ICP is wholly

22  unsupported and even laughable.  Oversee's argument may as well based on the

23  argument that Cahn did not meet his goal because Oversee did not track

24  TrafficClub.  Oversee's argument is premised on its own material breach of the

25  MIP.  Oversee cannot succeed on this argument.

26  Finally, the ICP is irrelevant because it was put in place in November 2008, 9

27  months after the closure of TrafficClub in January 2008.  (Ex. "13 to the Watnick

28  Decl.)  The ICP  was not a replacement to the MIP  but an additional plan to drive

4814-5780-8911.1

18

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  business.  (See, Section entitled "Interaction with MIP", Ex. "13" to the Watnick

2  Decl.)  The ICP could not have been related to the definition of enhanced customers

3  under the MIP since it was negotiated almost a year later and after the closure of

4  TrafficClub.

6  **VI.    CONCLUSION**

7         Based on the facts and case law set forth herein, and on Oversee's multiple

8  breaches of the MIP, Cahn respectfully requests that the Court deny Oversee's

9  motion for partial summary judgment regarding TrafficClub.

11  DATED: April 2, 2012           JOHN L. BARBER
                                   KENNETH D. WATNICK
12                                 SONJA HARRINGTON
                                   LEWIS BRISBOIS BISGAARD & SMITH LLP
13

14

15
                               By: _____
16
                                   Kenneth D. Watnick
17                                 Attorneys for MONTE CAHN

PLAINTIFF MONTE CAHN'S OPPOSITION TO OVERSEE.NET'S MOTION FOR PARTIAL SUMMARY
JUDGMENT RE: TRAFFICCLUB

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

## FEDERAL COURT PROOF OF SERVICE

CAHN V. OVERSEE - File No. 31555.02

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

At the time of service, I was over 18 years of age and not a party to the action. My business address is 221 North Figueroa Street, Suite 1200, Los Angeles, CA 90012. I am employed in the office of a member of the bar of this Court at whose direction the service was made.

On April 2, 2012, I served the following document(s): **PLAINTIFF MONTE CAHN'S OPPOSITION TO OVERSEE.NET'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE: TRAFFICCLUB**

I served the documents on the following persons at the following addresses (including fax numbers and e-mail addresses, if applicable):

Attorney for Defendants:
William Delgado
WILLENKEN WILSON LOH &
LIEB LLP
707 Wilshire Boulevard, Suite 3850
Los Angeles, CA 90017
E-Mail: WDelgado@willenken.com
(213) 955-8026 ofc.
(213) 250-7900 fax

The documents were served by the following means:

☒ (BY PERSONAL SERVICE) I personally delivered the documents to the persons at the addresses listed above. ☒ For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or individual in charge of the office. ☐ For a party not represented by an attorney, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of eight in the morning and six in the evening.

I declare under penalty of perjury under the laws of the State of CALIFORNIA that the foregoing is true and correct.

Executed on April 2, 2012, at Los Angeles, California.

_____
Print

_____
Signature

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4814-5780-8911.1

20

## FEDERAL COURT PROOF OF SERVICE

CAHN V. OVERSEE - File No. 31555.02

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

At the time of service, I was over 18 years of age and not a party to the action. My business address is 221 North Figueroa Street, Suite 1200, Los Angeles, CA 90012. I am employed in the office of a member of the bar of this Court at whose direction the service was made.

On April 2, 2012, I served the following document(s): **PLAINTIFF MONTE CAHN'S OPPOSITION TO OVERSEE.NET'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE: TRAFFICCLUB**

I served the documents on the following persons at the following addresses (including fax numbers and e-mail addresses, if applicable):

Attorney for Defendants:
William Delgado
WILLENKEN WILSON LOH & LIEB LLP
707 Wilshire Boulevard, Suite 3850
Los Angeles, CA 90017
E-Mail: WDelgado@willenken.com
(213) 955-8026 ofc.
(213) 250-7900 fax

The documents were served by the following means:

☒     (BY MESSENGER SERVICE) I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed above and providing them to a professional messenger service. (A proof of service executed by the messenger will be filed in compliance with the Code of Civil Procedure.)

I declare under penalty of perjury under the laws of the State of CALIFORNIA that the foregoing is true and correct.

Executed on April 2, 2012, at Los Angeles, California.

DIANA L ARENAS