William A. Delgado (Bar No. 222666)
wdelgado@willenken.com
WILLENKEN WILSON LOH & DELGADO LLP
707 Wilshire Blvd., Suite 3850
Los Angeles, California 90017
Telephone:  (213) 955-9240
Facsimile:   (213) 955-9250

Attorneys for Defendants
OVERSEE.NET, JEFFREY KUPIETZKY, and LAWRENCE NG

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONTE CAHN, an individual,<br><br>             Plaintiff,<br><br>v.<br><br>OVERSEE.NET, a California corporation; JEFF KUPIETZKY, an individual; LAWRENCE NG, an individual; and DOES 1 through 10,<br><br>             Defendants. | Case No.: CV11-03800 SVW (AGRx)<br><br>**DEFENDANT OVERSEE.NET'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>Assigned to the Hon. Stephen V. Wilson<br><br>Complaint Filed: May 3, 2011<br>Trial date: July 10, 2012 |

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ................................................................................................ 1

II. CLAIMS AND DEFENSES (LOCAL RULE 16-14.1) ................................... 2

    A. Summary Statement of Plaintiff's Claim for Breach of Contract. ....... 2

    B. Elements of Plaintiff's Claim for Breach of Contract. ........................ 2

    C. Summary of Defendant's Evidence to Rebut Plaintiff's Claim .......... 2

        1. The performance goals for the Moniker Business Segments were not met. ............................................................. 2

            a. Moniker did not meet the Performance Goals because they were set based on Cahn's aggressive 2007 projections, but the market experienced a significant downturn beginning in 2008. ........................ 5

            b. There are no accounting "irregularities" in the Oversee account records ..................................................... 7

            c. Oversee did not impede Moniker from reaching its goals ........................................................................................ 8

    D. Summary of Defendant's Affirmative Defenses ............................... 11

        1. Elements of Defendant's affirmative defenses. ........................ 11

        2. Summary of Defendant's evidence in support of its affirmative defenses. .............................................................. 11

    E. Identification of Anticipated Evidentiary Issues ............................... 11

    F. Identification of Issues of Law .......................................................... 12

III. BIFURCATION OF ISSUES (LOCAL RULE 16-4.3) ................................ 12

IV. JURY OR BENCH TRIAL (LOCAL RULE 16-4.4) ................................... 12

V. ATTORNEYS' FEES (LOCAL RULE 16-4.5) ............................................ 13

VI. ABANDONMENT OF ISSUES (LOCAL RULE 16-4.6) ........................... 13

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Granite State Ins. Co. v. Smart Modular Techs., Inc.*,
 76 F.3d 1023 (9th Cir. 1996) .......................................................................... 12

*Okura & Co. (America), Inc. v. Careau Group*,
 783 F. Supp. 482 (C.D. Cal. 1991) ................................................................. 12

*Stevens v. Mavent, Inc.*,
 2008 WL 2824956 *2 (C.D. Cal. July 21, 2008) .............................................. 2

**State Cases**

*Green v. Travelers Indemnity Co.*,
 185 Cal. App.3d 544 (1986) ........................................................................... 11

*MacDonald v. John P. Scripps Newspaper*,
 210 Cal. App. 3d 100, 257 Cal. Rptr. 473 (1989) ............................................ 2

*US Ecology, Inc. v. State*,
 129 Cal. App. 4th 887 (2005) .................................................................... 2, 10

*Vu v. California Commerce Club, Inc.*,
 58 Cal. App. 4th 229 (1997) ............................................................................ 2

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This lawsuit centers on a financial incentive plan called the Oversee.net 2007 Management Incentive Plan ("MIP") established by Oversee.net ("Oversee") for employees who primarily provided services to its wholly-owned subsidiary DomainSystems, Inc. (d/b/a Moniker.com, "Moniker"). The MIP was "designed to reward, through additional cash compensation, the Participants for significant contributions toward the continued or improved profitability and growth of [Oversee]." MIP, Section 1. The MIP is divided into four business segments (TrafficClub, Registrar, Domain Sales, and Oversee) and three determination periods (spanning from October 1, 2007 to December 31, 2010). Consistent with its design, in order to trigger payment of the "additional cash compensation," the Moniker Business Segments (TrafficClub, Registrar, and Domain Sales) had to reach aggressive, predetermined performance goals in each of the determination periods, as set forth in Schedule A of the MIP.

It is beyond reasonable dispute that the Moniker Business Segments did ***not*** meet the Performance Goals set forth in the MIP so as to trigger a payment in any Determination Period. For that reason, Cahn vacillates between two arguments: (i) that Moniker's efforts to reach the Performance Goals were unfairly impeded by Oversee and/or (ii) that the Performance Goals in the MIP were downwardly adjusted, and Moniker's performance met the downwardly adjusted goals. As is explained, below, Cahn has no evidentiary support for either proposition.

The reality is this: in 2007, desperate to promote Moniker's sale to Oversee, Cahn provided Oversee with aggressive performance projections for Moniker and then had little choice but to agree to the use of those projections as the basis for setting the MIP performance goals. Those projections proved to be *too* aggressive, particularly once the entire economy—and the domain name industry in

particular—began to decline in 2008. Oversee is not liable for any payments under the MIP because Moniker failed to achieve overly aggressive targets set by Cahn.

## II. CLAIMS AND DEFENSES (LOCAL RULE 16-14.1)

### A. Summary Statement of Plaintiff's Claim for Breach of Contract.

At issue is the second phase of Plaintiff's single claim for breach of contract. Cahn alleges that Oversee has failed to make payments that are owed to him pursuant to the MIP with respect to the Moniker Business Segments.

### B. Elements of Plaintiff's Claim for Breach of Contract.

Assuming the MIP is a contract, a classic breach of contract claim has four elements. *Stevens v. Mavent, Inc.,* 2008 WL 2824956 *2 (C.D. Cal. July 21, 2008) ("A claim for breach of contract requires evidence of (1) the contract's existence and its terms, (2) performance by plaintiff, (3) breach by defendants, and (4) damages suffered by plaintiff as a result.") *citing MacDonald v. John P. Scripps Newspaper,* 210 Cal. App. 3d 100, 104, 257 Cal. Rptr. 473 (1989). "Causation of damages in contract cases . . . requires that the damages be *proximately caused* by the defendant's breach, and that their causal occurrence be at least reasonably certain." *US Ecology, Inc. v. State*, 129 Cal. App. 4th 887, 909 (2005) (emphasis added) (quoting *Vu v. California Commerce Club, Inc.*, 58 Cal. App. 4th 229, 233, (1997)).

### C. Summary of Defendant's Evidence to Rebut Plaintiff's Claim

**1.** *The performance goals for the Moniker Business Segments were not met.*

Participants in the MIP were eligible to earn performance awards as a result of different business segments reaching different performance goals in each of three determination periods. There are four different business segments: TrafficClub, Registrar, Domain Sales (collectively the "Moniker Business Segments") and Oversee. There are three determination periods: a First Determination Period running from October 1, 2007-December 31, 2008, a Second Determination Period

running from January 1, 2009-December 31, 2009, and a Third Determination Period running from January 1, 2010-December 31, 2010. As a result, there are twelve (12) "buckets" of potential bonuses. Because the Oversee segment was resolved during the January 24-25, 2012 trial, only nine "buckets" remain.

To receive an award for any of the remaining nine "buckets," a Moniker business segment had to achieve at least seventy-percent (70%) of its performance goal for a particular determination period. Alternatively, the MIP also contemplates that participants would receive a bonus for a Moniker Business Segment that met fifty-five percent (55%) of its performance goal but only if the performance of the three Moniker Business Segments combined achieved one hundred percent (100%) of their combined performance goal target for that determination period.

With respect to the Moniker Business Segments, the evidence establishes that neither mechanism for payment under the MIP was triggered. The Moniker Business Segments did not reach 70% of their respective performance goals in any of the First, Second, or Third Determination Periods. When combined, the Moniker Business Segments did not reach 100% of their combined performance goal target. In fact, they were not even close.

To date, Cahn has provided no calculation which would support his position that the Moniker Business Segments achieved a Performance Goal in the MIP in any Determination Period. Because he bears the burden of proof on this issue, Cahn's failure to make such a showing entitles Oversee to judgment as a matter of law.

Nevertheless, to demonstrate that there can be no dispute on this issue, Oversee retained an independent expert, George Strong Jr. of Cornerstone Research, to calculate whether the performance of the Moniker Business Segments achieved the Performance Goals. Mr. Strong also subjected his calculations to "sensitivity analyses" to help demonstrate that Moniker's performance did not just

meet the mark but, rather, missed the mark by a wide margin. Mr. Strong's report details the following results:

| Business Segment | Determination Period | Percentage of Performance Goal |
|---|---|---|
| TrafficClub | First | 60.6% |
| | Second | 26.5% |
| | Third | 11.5% |
| Registrar | First | *-15.2%* |
| | Second | 27.7% |
| | Third | 23.1% |
| Domain Sales | First | 21.1% |
| | Second | *-14.4%* |
| | Third | 5.50% |

Notably, even Cahn recognized very early on that Moniker would not achieve its performance goals. In contemporaneous e-mails from mid-2008, Cahn lamented the fact that he would not be earning compensation under the MIP. At that time, he expressed to Oversee management that he no longer felt incented as a result of being unable to reach the MIP performance goals. In response to Cahn's complaints about Moniker's inability to achieve any of the MIP performance goals, Oversee offered him an agreement that amended the MIP. That agreement, known as the Incentive Compensation Plan ("ICP") created an opportunity for Cahn to receive more modest bonus payments than were available under the MIP, but also provided him with a set of more attainable goals. As the Court is aware, Cahn received bonuses for 2008 and 2009 under the ICP. In 2010, Cahn also received a separate commission agreement, pursuant to which he earned the most money in any of his three years at Oversee.

      **a.**   <u>Moniker did not meet the Performance Goals because they were set based on Cahn's aggressive 2007 projections, but the market experienced a significant downturn beginning in 2008.</u>

Moniker's failure to achieve even 70% of any of the nine separate performance goals contained in the MIP is easily explained by two indisputable facts: the performance goals were aggressive; and both the economy and the domain name industry declined

First, the MIP targets were set during the negotiations to sell Moniker to Oversee – i.e., at a time when Mr. Cahn had far more information about Moniker's performance than Oversee had. But, Cahn agreed to aggressive performance targets because the Moniker Offering Memorandum prepared by its investment bankers and reviewed and approved by Cahn utilized very aggressive projections.[1]

In fact, the 2008 MIP targets were actually on par with, or lower than, the projections in the Offering Memorandum.[2] In other words, MIP participants were

---

[1] In fact, Moniker did not even perform consistent with the Offering Memorandum in 2007. At deposition, Cahn admitted that he knew that Moniker was not performing as expected. Though the Offering Memorandum predicted 2007 EBITDA of $6.3 million, Moniker only accomplished $3.9 million of EBITDA in 2007. So, by December 14, 2007 (i.e., the date of the closing of the Oversee-Moniker transaction), Cahn knew that Moniker's performance was declining, and he also knew that the MIP performance goals for 2008-2010 were built upon his original 2007 projections. The total EBITDA target for the Moniker Business Segment for fiscal year 2008 was approximately $8.7 million. As a result, to achieve that target (and taking into account Moniker's poor performance in 2007), Moniker would have to grow by approximately **123%** in 2008. And, from there, *continue to grow* approximately 40% in 2009 and another 40% in 2010.

[2] It is important to note that although Schedule A of the MIP presents performance goals for "2008" that "2008" goal actually represents the goal for the First Determination Period which includes the fourth quarter of 2007. Thus,

not even asked to meet Moniker's own projections; they were asked for *less*. Furthermore, the MIP goals for 2009 and 2010 utilized a growth rate that was smaller than the historic growth rates described in the Offering Memorandum.

So, there is no dispute that the MIP performance goals were intentionally made aggressive because Cahn and Moniker aggressively projected Moniker's anticipated performance in order to sell the company. Whether those goals would have been achieved in better times will never be known, but as discussed below, the performance goals were doomed when external forces gravely damaged Moniker's earning potential.

The market for Moniker's services, along with the economy as a whole, experienced a severe downturn beginning in 2008. Little needs to be said about the economy as a whole in 2008 – the only legitimate debate is whether the economy experienced a recession or a full depression. But, the evidence also will demonstrate that Moniker's business suffered unique setbacks that resulted in significantly lower revenue generation. Market forces in the domain name industry specifically (e.g., an increase in the cost of registering domain names, a decrease in the amount of money that could be made through domain name monetization, etc.) further suppressed growth. Unsurprisingly, Moniker did not grow at the rate necessary to achieve the MIP performance goals.

When aggressive projections are coupled with both macro- and micro-economic decline, there is no mystery about the reasons Moniker did not achieve its performance goals. Though Cahn is eager for someone to blame for Moniker's poor performance (discussed below), there is no one to blame. True to the old adage that "the higher the risk, the higher the reward," Cahn provided and

---

to compare the MIP performance goals to the projections in the Offering Memorandum, one needs to recognize that the Offering Memorandum 2008 projections consist of four quarters of business; the 2008 MIP targets include an extra quarter of earnings.

ultimately agreed to aggressive performance goals, which, had they been met, would have entitled MIP participants to millions of dollars. But, those performance goals were designed to reward success. Cahn was not successful; Moniker was not successful; and Oversee's overall performance during the three-year period that covered the MIP was not close to what Oversee had expected.

### b. There are no accounting "irregularities" in the Oversee account records.

Cognizant of his inability to demonstrate that the performance goals for the Moniker Business Segments were met, Cahn will undoubtedly attempt to distract the Court's attention by arguing that Oversee's accounting is filled with inaccuracies and irregularities. Most of these alleged inaccuracies and irregularities are supported only by e-mails that Cahn himself drafted. However, Cahn was known to make wildly inaccurate assertions when it came to issues regarding accounting and finance. That is not surprising, given that Cahn did not work in the Oversee finance department and played no role whatsoever in reconciling the finance of Moniker and, therefore, had no personal knowledge about these issues.[3]

Nevertheless, a few specific allegations are worth addressing here. First, Cahn argues that Moniker was "penalized" when Oversee made the post-acquisition discovery that Seevast had taken the revenues associated with $1.9 million in pre-paid customer credits. It is unclear what "penalty" Cahn believes he suffered, but the evidence will demonstrate that Oversee accounted for these credits in accordance with GAAP, as required by the MIP.

Second, Cahn complains about Moniker having been charged "phantom merchant fees" that were not attributable to Moniker. That is simply not true.

---

[3] Even while Moniker was owned by Seevast, the finances of Moniker were handled by Seevast not by Cahn.

Cahn intentionally distorts the issue by arguing that the manner of allocating merchant fees to individual Moniker employees (for purposes of determining their individual commissions) created phantom fees. In fact, all merchant fees allocated to Moniker as a whole were actually incurred as a result of Moniker business.

Lastly, Cahn will also certainly argue that Oversee improperly allocated Moniker revenue to other parts of the company such as DomainSponsor and SnapNames. Once again, that argument reflects a misunderstanding of finance (and, specifically, financial reporting). Oversee has already explained this issue in past briefing but a summary is merited. Moniker is a registrar for third party domain names which, when monetized by DomainSponsor or auctioned by SnapNames, generate revenue. For internal purposes and consistent with the principle of "segment reporting," revenue earned as a result of "default DNS" monetization was reported under DomainSponsor (where all monetization revenue was accounted for) and revenue earned as a result of expiring auctions were reported under SnapNames (where all auction revenue was accounted for). Nevertheless, for purposes of calculating Moniker's performance *under the MIP*, revenue from these two business lines was accounted for in the Registrar Business Segment. Or, put differently, Moniker received full credit for the revenues about which Cahn complains; it just didn't make a difference in achieving the Performance Goals under the MIP.

     **c.** <u>Oversee did not impede Moniker from reaching its goals.</u>

Unable to show that the performance goals of the Moniker Business Segments were achieved and unable to show that Oversee's accounting is flawed, Cahn will undoubtedly argue that Moniker was unable to meet the performance goals in the MIP because Oversee "impeded" him.

As a preliminary matter, the argument is not credible on its face. Cahn would have this Court believe that Oversee purchased Moniker for millions so that it could purposely destroy it. In fact, there are better uses for millions of dollars.

Further, Oversee would have benefitted enormously if Moniker had performed consistent with Cahn's projections, and the MIP awards would have been more than paid for by the revenues generated.[4]

Nevertheless, in furtherance of his argument, Cahn complains that reasonable and necessary Oversee business decisions really were efforts to avoid paying MIP bonuses.  For example, Cahn complains that, in February 2008, Oversee shut down TrafficClub, which is one of the business segments in the MIP. Cahn contends that Oversee did this to take away his managerial responsibility over that business segment and to deprive him the opportunity to receive a performance award for TrafficClub.  In reality, however, Cahn agreed before the Moniker transaction closed that he would **not** manage TrafficClub.  In addition, Cahn attempts to gloss over the fact that Oversee shut down TrafficClub because Skenzo, a provider of advertising feeds responsible for generating more than 80% of revenue, terminated its relationship with TrafficClub in early 2008.[5]  Oversee executives consulted with Cahn, and Cahn agreed that, following the Skenzo termination, TrafficClub should be subsumed within DomainSponsor.  After the move, Oversee could and did continue to track TrafficClub customers who were moved to DomainSponsor for purposes of MIP calculations since these customers were each given unique owner-identification, "OID", numbers in the DomainSponsor system.

---

[4] The inherently incredible aspect of Cahn's lawsuit is that he wants to receive bonuses under a *performance* plan despite his acknowledgment of the *decline* in Moniker's performance.

[5] Ironically, throughout 2007, Skenzo had made it clear to Cahn that it required an exclusive relationship with TrafficClub in order to continue to do business together, but Cahn had not shared that with Oversee.  As a result, Skenzo's decision to terminate its relationship with TrafficClub upon learning of Oversee's acquisition should not have come as a surprise to Cahn though it might have come as a surprise to Oversee.

Cahn also complains of budget cuts, particularly in the areas of public relations and staffing.  The simplest response to that complaint (and several of Cahn's other complaints) is that it is unrealistic.  The economy was declining, business was declining, and budgets had to be cut.  Furthermore, there is no contract that guarantees Moniker any particular level of resources.[6]  As a matter of law, there is no "breach" where there is no obligation.

Undoubtedly, Cahn will complain of other business decisions made by Oversee because, while Oversee was focused on company-wide shareholder return, Cahn was focused on his personal rate of return.  Nevertheless, his arguments will always run into two insurmountable legal hurdles: (i) the MIP does not constrain the ability of Oversee's board and executive management to run their business in the manner they see fit and (ii) Cahn will never be able to show that any of these business decisions are the proximate cause for the decline in Moniker's performance. *US Ecology, Inc. v. State*, 129 Cal. App. 4th 887, 909 (2005) ("Causation of damages in contract cases, as in tort cases, requires that the damages be proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain.  A proximate cause of loss or damage is something that is a substantial factor in bringing about that loss or damage.") (internal citations omitted).

In summary, the Moniker Business Segments did not reach the level of performance required by the MIP to trigger a Performance Award, and, therefore, Oversee did not breach the MIP when it did not pay such awards.

---

[6] It is worth noting that the performance goals for the Registrar and Domain Sales business segments were tied to EBITDA.  Accordingly, satisfaction of these performance goals was a function of revenue **minus** expenses.  While an increase in cost (e.g., a greater PR budget, more employees) is guaranteed to increase expense (and, therefore, decrease EBITDA), there is no guarantee such additional resources would have necessarily increased revenue.

**D.     Summary of Defendant's Affirmative Defenses**

Oversee intends to pursue an affirmative defense of equitable estoppel with respect to Plaintiff's first claim for breach of contract on the basis that Cahn accepted payment under the ICP.

**1.**     *Elements of Defendant's affirmative defenses.*

The affirmative defense of equitable estoppel has four elements: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. *Green v. Travelers Indemnity Co.*, 185 Cal. App.3d 544, 556 (1986).

**2.**     *Summary of Defendant's evidence in support of its affirmative defenses.*

As noted, *supra*, Cahn and Oversee entered into the ICP in November 2008. Pursuant to its terms, Cahn could receive payments under the ICP or the MIP but not both. Cahn accepted payments under the ICP for 2008 and 2009. Cahn never notified Oversee that he was accepting his ICP payments under protest, or that he reserved a claim that he should be paid under the MIP. Oversee would not have paid Cahn under the ICP if Cahn had instead demanded payment under the MIP. Having accepted his ICP payments, Cahn is estopped from seeking payments under the MIP for 2008 and 2009.

**E.     Identification of Anticipated Evidentiary Issues**

With respect to the January 24-25, 2012 trial, Oversee previously filed five motions in *limine*. It renews the following motions:

1.  To exclude argument that the Performance Goals of the Moniker Business Segments were downwardly amended.
2.  To exclude testimony by witnesses undisclosed by Monte Cahn.

Oversee has also filed two new motions *in limine*:

1.  To exclude argument about any alleged failure by Oversee to produce documents.
2.  To permit the testimony of George Strong, Jr. irrespective of whether testimony by David Callaghan is permitted.

**F.  Identification of Issues of Law**

At present, there appears to be only a single issue: whether Cahn can show all four elements of a breach of contract claim.

**III.  BIFURCATION OF ISSUES (LOCAL RULE 16-4.3)**

This Court has already bifurcated this matter such that only Phase II of the Plaintiff's first claim for breach of contract (i.e., the performance of the Moniker Business Segments) is at issue.

**IV.  JURY OR BENCH TRIAL (LOCAL RULE 16-4.4)**

For the reasons set forth in Oversee's Motion to Strike Jury Demand (Docket No. 52), which are expressly incorporated herein, Oversee respectfully submits that the parties waived the right to jury trial in Cahn's Employment Agreement. Even in diversity cases such as this one, the enforceability of contractual jury waiver provisions is governed by federal law which will uphold a knowing and voluntary jury waiver. *Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 76 F.3d 1023, 1026-27 (9th Cir. 1996) ("In a diversity action, federal law governs whether a party is entitled to a jury trial and if so, on what issues."); *Okura & Co. (America), Inc. v. Careau Group*, 783 F. Supp. 482 (C.D. Cal. 1991) (Wilson, J.) (federal law will uphold knowing and voluntary contractual jury waivers).

Here, Cahn's Employment Agreement with Oversee contains a broad jury waiver provision that applies to anything "relating to or arising in any way from [the] agreement or the matters contemplated [t]hereby." Given that the Employment Agreement specifically references the MIP and contains the operative

language that entitles Cahn to participate in the MIP, the MIP clearly "relates" to the Agreement, thereby triggering the jury waiver provision.

## V. ATTORNEYS' FEES (LOCAL RULE 16-4.5)

Attorneys' fees are not recoverable by either party.

## VI. ABANDONMENT OF ISSUES (LOCAL RULE 16-4.6)

Oversee states that it has not abandoned any affirmative defenses.

Respectfully submitted,

Dated: June 22, 2012

WILLENKEN WILSON LOH & DELGADO LLP

By: */s/ William A. Delgado*
William A. Delgado
Attorneys for Defendants
OVERSEE.NET, JEFFREY KUPIETZKY, and LAWRENCE NG

# **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the Electronic Service List for this Case.

Dated: June 22, 2012

WILLENKEN WILSON LOH & DELGADO LLP

By: */s/ William A. Delgado*
    William A. Delgado
    Attorneys for Defendants
    OVERSEE.NET, JEFFREY
    KUPIETZKY, and LAWRENCE NG