1  **LEWIS BRISBOIS BISGAARD & SMITH** LLP
   JOHN L. BARBER, SB# 160317
2    E-Mail: barber@lbbslaw.com
   KENNETH D. WATNICK, SB# 150936
3    E-Mail: watnick@lbbslaw.com
   SONJA HARRINGTON, SB# 261053
4    E-Mail: sharrington@lbbslaw.com
   221 North Figueroa Street, Suite 1200
5  Los Angeles, California 90012
   Telephone: 213.250.1800
6  Facsimile: 213.250.7900

7  Attorneys for Plaintiff MONTE CAHN

8
                  UNITED STATES DISTRICT COURT
9
        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
10

11 | MONTE CAHN,                          | CASE NO. CV11-03800 SVW (AGRx)
12 |            Plaintiff,
13 |       vs.                            | The Honorable Stephen V. Wilson
14 | OVERSEE.NET, a California            | **MONTE CAHN'S TRIAL BRIEF**
15 | corporation; JEFF KUPIETZKY, an      | **PURSUANT TO LOCAL RULE 16-**
   | individual; LAWRENCE NG, an          | **10**
16 | individual; and Does 1 through 10,
17 |            Defendants.               | Complaint Filed:    May 3, 2011
                                          | Trial Date:         July 10, 2012
18

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1

1

## **TABLE OF CONTENTS**

2
**Page**

3   I.      SUMMARY OF ARGUMENT ........................................................................ 1

4   II.     FACTUAL SUMMARY ................................................................................ 4

5           A.      The Purchase of Moniker .............................................................. 4

6           B.      The MIP ......................................................................................... 5

7           C.      The ICP .......................................................................................... 6

8           D.      The TrafficClub Business Segment ............................................... 6

9   III.    OVERSEE BREACHED ITS OBLIGATIONS WITH RESPECT TO
            THE TRAFFICCLUB BUSINESS SEGMENT .......................................... 7

10
11          A.      The Closure of TrafficClub and Combination was a Material
                    Modification ................................................................................... 7

12          B.      Oversee Was Required to Secure Cahn's Written Consent to the
                    Closure of TrafficClub ................................................................... 8

13
14          C.      Oversee's Own Analysis of TrafficClub Customers and
                    Applicable Shared Customer Percentages Confirms that Oversee
                    Failed to Credit Cahn for Millions of Dollars in TrafficClub
15                  Gross Profits .................................................................................. 9

16          D.      Rather than Present an Objective Analysis, Oversee's Expert
                    Improperly Manipulates Oversee's Revenue Information ............ 11

17  IV.     THE OVERSEE EBITDA GOAL UNDER THE MIP. ............................... 12

18  V.      CONCLUSION ............................................................................................ 15

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1

# <u>TABLE OF AUTHORITIES</u>

2

3

## <u>STATE COURT CASES</u>

4

*Allen v. Gardner,*
    126 Cal. App. 2d 335, 272 P.2d 99 (1954) ...................................................... 14

5

*Channell v. Anthony,*
    58 Cal. App. 3d 290, 129 Cal. Rptr. 704 (1976) ........................................... 14

6

7

*Goldberg v. City of Santa Clara,*
    21 Cal. App. 3d 857 (1971) ............................................................... 13, 14

8

*James v. Herbert,*
    149 Cal. App. 2d 741, 309 P.2d 91 (1957) .................................................... 15

9

10

*Lazar v. Hertz Corp.,*
    143 Cal. App. 3d 128 (1983) ...................................................................... 13

11

*Mann v. Jackson,*
    141 Cal. App. 2d 6, 296 P.2d 120 (1956) .................................................... 15

12

13

*Noble v. Tweedy,*
    90 Cal. App. 2d 738, 203 P.2d 778 (1949) .................................................... 14

14

*Perdue v. Crocker National Bank,*
    38 Cal. 3d 913 (1985) ............................................................................... 12

15

16

*Powell v. Central California Federal Savings & Loan Assn.,*
    59 Cal. App. 3d 540 (1976) ...................................................................... 13

17

*Ramona Manor Convalescent Hospital v. Care Enterprises,*
    177 Cal. App. 3d 1120, 225 Cal. Rptr. 120 (1986) ....................................... 14

18

19

*Scudder v. Perce,*
    159 Cal. 429 (1911) .................................................................................. 13

20

*See, Hardy v. Hardy,*
    23 Cal. 2d 244 (1943) ............................................................................... 13

21

22

## <u>STATE STATUTES</u>

Gov Code § 14 ........................................................................................................ 13

23

24

## <u>RULES AND REGULATIONS</u>

Local Rule 16-10 ............................................................................................... 1, 9

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   Plaintiff Monte Cahn ("Cahn") hereby submits his Trial Brief in accordance

2   with Local Rule 16-10 to supplement his Memorandum of Contentions of Fact and

3   Law.  Based on the Court's Order dated April 26, 2012 [Doc. No. 324], Cahn has

4   limited his trial brief to Cahn's first claim for breach of contract

5

6   I.      **SUMMARY OF ARGUMENT**

7   This lawsuit arises out of Defendant Oversee.net's ("Oversee") breach of

8   Monte Cahn's ("Cahn") Management Incentive Plan ("MIP").  There is no dispute

9   that Oversee breached the MIP in at least two material respects.  Rather, Oversee

10  appears to argue that it should have no liability for these fundamental breaches of

11  contract.

12  First, the MIP provided Cahn with the opportunity to earn bonuses based on

13  the gross profits of the TrafficClub Business Segment of the MIP.  However, almost

14  immediately after Oversee acquired Moniker, it closed TrafficClub, Moniker's

15  monetization business, as a separate business division and combined it with

16  DomainSponsor, Oversee's monetization business.  Under the MIP, Oversee was

17  precluded from making any material modifications to the MIP without Cahn's

18  written consent.  The closure of TrafficClub and its combination with

19  DomainSponsor was a material modification, particularly given that (i) Oversee

20  directed Cahn and other Moniker employees not to focus on the growth and

21  development of existing TrafficClub customers and (ii) Oversee directed Moniker

22  representatives, including Mr. Cahn, to expand the business of existing customers of

23  DomainSponsor that had not previously been customers of TrafficClub.  Given the

24  potential adverse consequences of the combination, Cahn expressly conditioned his

25  consent to TrafficClub's closure as an independent division on Oversee's agreement

26  to credit him under the MIP for the gross profits of the combined

27  DomainSponsor/TrafficClub division.  Oversee did not expressly respond.  Thus,

28  Oversee either consented to Cahn's conditions or substantially modified the MIP

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1

1  without Cahn's written consent.  In either event, Cahn achieved the TrafficClub

2  Performance Goals in 2008, 2009, and 2010.[1]

3         During the term of the MIP, Oversee failed to prepare reports tracking the

4  performance of TrafficClub customers and failed to provide Cahn with information

5  to show whether or not he achieved the TrafficClub Performance Goal in 2008,

6  2009, or 2010.  However, in late May and early June 2012, Oversee produced

7  information that confirms that Cahn did not receive credit for millions of dollars in

8  profits with respect to numerous TrafficClub Customers, as defined in the MIP.

9  Namely, Oversee and its expert confirmed that Cahn had not received credit for

10  millions of dollars associated with customers that, according to Oversee and

11  Oversee's expert, were (a)TrafficClub customers who were not customers of

12  DomainSponsor within twelve months of the merger (definition of TrafficClub

13  Customer in Section 15(aa)(i) of the MIP) or (b) shared customers of TrafficClub

14  and DomainSponsor for whom Cahn was entitled to a 100% Applicable Shared

15  Customer Percentage.  (Definition of Shared Customer and Applicable Shared

16  Customer Percentage in Sections 15(a) and 15(aa)(iii) of the MIP.)  After

17  consideration of the gross profits for these additional TrafficClub Customers, Cahn

18  achieved the TrafficClub Performance Goals in 2008, 2009, and 2010.

19         Incredibly, Oversee now disputes its own internal report identifying  those

20  customers who should be treated as 100% TrafficClub Customers for purposes of

21  the MIP calculations.  Oversee offers no evidence to show that its internal report

22  was incorrect in determining the Applicable Shared Customer Percentage for these

23  _____

24  [1]   This Court previously ruled that "enhanced" DomainSponsor Customers did not
       fall within the definition of TrafficClub Customers under Section 15(aa) of the MIP.
25     [Doc. No. 321.]   The Court denied summary judgment on, among other things,
       whether the closure of TrafficClub was a material modification of the MIP, whether
26     Oversee closed TrafficClub without Cahn's consent, whether Oversee accepted
       Cahn's conditions for the closure, and whether Cahn was damaged by Oversee's
27     conduct.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   TrafficClub Customers.  Equally disturbing, as part of Oversee's continuing effort to

2   deny Cahn the benefit of the bargain, Oversee's expert recently submitted a

3   declaration which arbitrarily reallocates TrafficClub revenues to other business

4   segments.

5      Second, Oversee breached the MIP as it relates to the Oversee Business

6   Segment.  The Performance Goal for the Oversee Business Segment was expressly

7   left "TBD" in the MIP.  § 15(u) stated that the Target EBITDA for the Oversee

8   segment "shall be determined from time to time by the Board, in consultation with

9   [Plaintiff] for so long as he is employed by [Defendant Oversee]")).  Oversee admits

10  that it never set this Target EBITDA.in disregard of its express and implied

11  obligations under the MIP, Oversee failed to determine the Oversee EBITDA Goal.

12     Oversee argues that it is entitled to judgment on this issue because this Court

13  ruled that the Target Oversee EBITDA was not the Oversee EBITDA adopted for

14  budget purposes.  This argument is wrong.  This Court's prior ruling did not rule that

15  Oversee was excused from liability for its admitted failure to set the Oversee

16  EBITDA Performance Goal, did not rule that Cahn did not meet the unspecified

17  Oversee EBITDA Performance Goal, and did not accept Oversee's argument that its

18  failure to comply with the MIP was an "idle act."  The Court simply ruled that the

19  Oversee EBITDA Goal under the MIP was not the same as Oversee EBITDA

20  budgetary goal.  The Court did not set the Oversee EBITDA goal or find that Cahn

21  did not achieve any such goal.

22     Oversee also cannot prevail on this issue by arguing that, if it had set an

23  Oversee  goal, Cahn would not have achieved it.  Oversee failed to comply with its

24  express and implied obligation to determine the Oversee EBITDA Performance Goal

25  in 2008, 2009, and 2010.  As a consequence of this breach, it is liable to Cahn for the

26  full amount of the Oversee EBITDA Performance Goal in 2008, 2009, and 2010.

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1

3

## II.  FACTUAL SUMMARY

### A.  The Purchase of Moniker

Cahn is one of the pioneers of the domain name selling, valuing and auction concept.  In 1999 Cahn formed Domain Systems, Inc. d/b/a Moniker.com ("Moniker"), a web-based service that provides users an interface to search for, register and manage domain names.  Moniker was comprised of three business segments: TrafficClub, the Registrar and Domain Sales.

TrafficClub was the division of Moniker that created websites for domain names owned by others, and earned money from the advertising published on those websites using a unique combination of advertising content feeds from Google, Yahoo and others, which were rotated to provide the maximum revenue to Traffic Club and its customers.  Traffic Club also earned and managed revenue for default DNS (domain name server) traffic from the Registrar and its customers (running advertising on websites at domain names as soon as they are registered but before the owner of the name points that name to another website.)  The Registrar managed revenue for default DNS traffic for its customers as well as the securing, registering and renewing of internet domain names.  It also generated revenue from expired name auctions and sales from registrar customers that did not renew their own domain names.  And the Domain Sales business segment was involved in the auction, escrowing, appraising and brokerage of domain names.

Cahn managed and operated Moniker as a successful business until 2005, at which time Kanoodle, which later was renamed as Seevast Corp. ("Seevast"), purchased Moniker.  Cahn believed that the sale of Moniker to Seevast would be a good partnership.  Seevast agreed to keep Moniker autonomous, and Seevast was also looking to go public, which made it attractive at the time.  Additionally, as part of the transaction Seevast and Moniker agreed that if Seevast did not have a change

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  of control or go public within two years of the sale that Moniker's executives could

2  request that the board put Moniker back up for sale.

3  　　　While at Seevast Cahn continued as CEO and successfully managed and grew

4  Moniker, generating $3.6 in EBITDA (earnings before interest, taxes, depreciation

5  and amortization) for 2006 and $4.1 in 2007.  (See Trial Exhibits 302 and 392.)

6  　　　In late 2006, early 2007, two years after Seevast's purchase of Moniker,

7  Seevast had not had a change of control or gone public, and Moniker requested from

8  the Seevast Board to have it resold again.  The Board agreed.  There were around

9  twenty different companies that were interested in the sale of Moniker at the time.

10  　　　In 2007 Oversee began negotiations with Seevast Corp. for the purchase of

11  Moniker.  Cahn, as the Founder and CEO of Moniker, was an invaluable asset to

12  Moniker.  As a result, Oversee conditioned the purchase of Moniker on Cahn's

13  continued management of Moniker while at Oversee in addition to helping Oversee

14  grow overall as a company.  In order to incentivize Cahn to agree to the sale of

15  Moniker and join Oversee, Oversee negotiated a $10 million discount from Seevast

16  to fund a very large incentive program which it offered to Cahn, known as the

17  "Management Incentive Plan" ("MIP").  However, instead of adding the cost of the

18  MIP to the purchase price, Oversee decided to take the cost of the MIP off of the

19  purchase price and use the difference to fund the MIP.

20  　　　The sale of Moniker to Oversee was completed on December 14, 2007.

21  **B.**　　**The MIP**

22  　　　Under the MIP, Cahn would be able to earn up to $13,000,000 through a three

23  year goal oriented bonus structure.  The bonus structure in the proposed MIP was

24  based on performance goals in four categories: the Registrar, Domain Sales,

25  TrafficClub, and Oversee EBITDA.  (Trial Exhibit 1.)  The first three segments are

26  known as the "Moniker Business Segments", and each of the Moniker Business

27  Segments had pre-determined performance goals for all three determination periods.

28  (Trial Exhibit 1.)   The performance goal for the fourth segment, Oversee EBITDA,

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1

was labeled "TBD" because the 2008-2010 overall Oversee budgets and EBITDA
goals were not completed at the time the MIP was negotiated, and was to be set by
the Board, in consultation with Cahn each year.  (Trial Exhibit 1.)  This would allow
the parties to take into account market conditions and Oversee's current
performance each year in setting a reasonable goal.

### C. The ICP

In late 2008, Oversee proposed and prepared a supplemental compensation
plan, the 2008 Incentive Compensation Plan ("ICP").  (Trial Exhibit 28.)  The ICP
confirmed that the MIP was to remain in full force and effect in accordance with its
terms.  (Trial Exhibit 28.)  Cahn was to be entitled to payments under either the MIP
or the ICP, whichever provided him with the higher amount.  (Trial Exhibit 28.)
Additionally, under the ICP, Cahn was entitled to earn as bonus compensation an
amount equal to at least the average bonus earned by members of the Senior
Management Team.  (Trial Exhibit 28.)  The ICP, thus, was an alternative incentive
program and was not intended to nullify the existing terms of the MIP.  (Trial
Exhibit 28.)

### D. The TrafficClub Business Segment

TrafficClub was the business segment of Moniker relating to the monetization
of internet domain names through an optimization engine of rotating third party
parking/monetization platforms that used feeds from such companies as Google
and/or Yahoo and others. DomainSponsor is Oversee's monetization segment and
unlike TrafficClub, only utilizes a single platform (Google).  When Cahn negotiated
the terms of the MIP, he negotiated the agreement with the expectation that
TrafficClub would continue to operate as its own subsidiary of Oversee and be
supported by both Oversee and DomainSponsor sales and management.  However,
this was not what Oversee had planned for TrafficClub.  Oversee had previously
demonstrated its desire to integrate TrafficClub's customers into DomainSponsor

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1

6

MONTE CAHN'S TRIAL BRIEF

1  back in February of 2007 when it attempted to poach TrafficClub's customers.

2  Oversee finally achieved the result it originally desired.

3        After TrafficClub and DomainSponsor were combined, Cahn was appointed

4  the Vice President of the DomainSponsor business division, with sales responsibility

5  for the combined division.  Cahn and the Moniker team were told to grow the

6  combined entity by bringing in new customers to DomainSponsor and by adding

7  domain names to existing DomainSponsor customer accounts.

8        Additionally, in order to make the integration of TrafficClub and

9  DomainSponsor more palatable to the Moniker team, Oversee implemented a new

10  program for the Moniker employees whereby the Moniker team and Cahn would

11  earn bonuses based on new account referrals to DomainSponsor, and for adding new

12  names to existing DomainSponsor accounts.  Oversee called this the

13  DomainSponsor "SPIF".  However, as par for the course for Oversee, Oversee failed

14  to make payments to Cahn and the Moniker team under the SPIF.  (Trial Exhibits 92

15  and 247.)   Cahn also never received any accounting reports under the SPIF for the

16  referrals from Moniker to DomainSponsor.  (Trial Exhibits 92 and 247.)

17        Oversee admits that it failed to track TrafficClub's performance under the

18  MIP, and confirmed that Cahn did not receive any credit under the TrafficClub

19  business segment for any new monetization customers that HE generated after

20  TrafficClub merged with DomainSponsor.  However, the evidence will show that

21  Cahn achieved his performance goals under the TrafficClub business segment of the

22  MIP, and is entitled to his baseline awards in the amount of $1.6 million.

23

24  **III.   OVERSEE BREACHED ITS OBLIGATIONS WITH RESPECT TO**

25       **THE TRAFFICCLUB BUSINESS SEGMENT**

26       **A.   The Closure of TrafficClub and Combination was a Material**

27          **Modification**

28       Under Section 9 of the MIP, Oversee could not materially modify or amend

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  the Performance Goals in the MIP without Cahn's written consent.  (Section 9 of the

2  MIP, Trial Exhibit 1.)  The closure of TrafficClub and its combination with

3  DomainSponsor was a material modification that required Cahn's consent.

4      First, TrafficClub was a brand that Cahn had spent the last eight years

5  developing a loyal customer following.  TrafficClub customers utilized TrafficClub

6  because of its exceptional customer service and unique monetization platform –

7  multiple rotating feeds.  The elimination of TrafficClub, as a separate entity,

8  prevented Cahn and his representatives from marketing TrafficClub's unique,

9  rotating feed technology to existing and prospective customers of TrafficClub.

10  Cahn and his representatives were, thus, required to persuade TrafficClub's existing

11  and prospective customers that the rotating feed technology of TrafficClub was of

12  no value or significance.  Such marketing efforts prejudiced Cahn's rights under the

13  MIP since Cahn and his representatives were required to repudiate years of

14  marketing.

15      Second, Oversee concedes that, as part of closing TrafficClub, it directed

16  Moniker representatives not to focus on the growth of existing TrafficClub

17  Customers or on the development of new TrafficClub Customers.  Instead, Oversee

18  directed Cahn and Moniker to, among other things, grow and develop existing

19  DomainSponsor Customers.  In fact, Mr. Cahn was appointed the Vice President of

20  Sales for DomainSponsor and given supervisory responsibility over DomainSponsor

21  accounts.  Thus, the combination of DomainSponsor and TrafficClub prejudiced

22  Cahn's ability to achieve performance goals because there were no individuals who

23  were dedicated to the growth and maintenance of TrafficClub Customers and

24  because former Moniker representatives were responsibile for the DomainSponsor

25  business.

26  **B.    Oversee Was Required to Secure Cahn's Written Consent to the
27          Closure of TrafficClub**

28  Because the TrafficClub closure and combination was a material change, it

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1

1  required Cahn's written consent.  (Sections 3(b) and 9 of the MIP.)  Cahn advised

2  that he would only consent to the closure of TrafficClub and its combination if

3  Oversee agreed that Cahn would receive credit for all Domain Sponsor business that

4  he and his subordinates generated.  Cahn specifically stated that he would only

5  consent to TrafficClub's closure and combination if he received credit under the

6  TrafficClub Performance Goal for the growth and expansion of all customers of the

7  combined entity, regardless of overlap.  (Items 1, 2, and 3 of Part 2 of e-mail dated

8  January 9, 2008 from Monte Cahn to Jeff Kupietzky and Lawrence Ng, Trial

9  Exhibit 18.)

10      Oversee combined TrafficClub and DomainSponsor without expressly

11  rejecting or accepting these conditions.  In effect, Oversee is estopped from

12  disputing that it accepted Cahn's conditions for combining the two entities.  Cahn is

13  entitled to payment of the TrafficClub Performance bonuses because the gross

14  profits of the combined entity exceeded the TrafficClub Performance Goals in 2008,

15  2009, and 2010.  (See, Monetization Gross Profit on Trial Exhibit 141.)

16      Alternatively, Oversee breached the MIP by closing TrafficClub without

17  Cahn's written consent.  Under this alternative, Cahn is entitled to the bonuses owed

18  for the TrafficClub Business Segment.  Cahn is entitled to the benefit of the bargain.

19      **C.     Oversee's Own Analysis of TrafficClub Customers and Applicable**

20                **Shared Customer Percentages Confirms that Oversee Failed to**

21                **Credit Cahn for Millions of Dollars in TrafficClub Gross Profits**

22      Under the MIP, Cahn was entitled to credit for "TrafficClub Customers".

23  "TrafficClub Customers" were defined to include (i) those customers of TrafficClub

24  that were not customers of DomainSponsor within twelve months of the December

25  14, 2007 acquisition date and (ii) a percentage of revenues (the "Applicable Shared

26  Customer Percentage") from customers of TrafficClub and DomainSponsor as of the

27  December 14, 2007.  (Section 15(aa) of the MIP, Trial Exhibit 1.)  The "Applicable

28  Shared Customer Percentage" for these shared customers was determined based on

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  the revenues that TrafficClub and DomainSponsor had generated from the customer

2  in November 2007.  (Section 15(a) of the MIP.)

3      Oversee's recently produced internal documents confirm that Oversee failed

4  to give Cahn credit for millions of dollars in gross profits associated with customers

5  who were identified as 100% TrafficClub Customers.  More specifically, Oversee

6  recently disclosed that, in or about July 2008, Jeff Kupietky directed Linda Kim, an

7  Oversee employee, to identify TrafficClub Customers and, for those "Shared

8  Customers" of DomainSponsor and TrafficClub, identify the Applicable Shared

9  Customer Percentages.

10      On May 25, 2012, Oversee's expert served a supplemental report which

11  asserted that Ms. Kim's analysis was the only contemporaneous calculation of

12  "Applicable Shared Customer Percentages."  Oversee's expert admitted, in his

13  supplemental report and in information disclosed in his June 19, 2012 deposition,

14  that Oversee did not credit Cahn for several million dollars of gross profits with

15  respect to numerous customers who are identified as "100% TrafficClub" by Ms.

16  Kim and by Oversee's expert in his supplemental report.  For example, Oversee

17  failed to provide Mr. Cahn credit for substantial revenues and gross profits

18  associated with a customer named Nokta who, according to Ms. Kim and Oversee's

19  expert, is a "100% TrafficClub Customer."

20      After consideration of all of the gross profits associated with these 100%

21  TrafficClub Customers, Cahn achieved the 2008, 2009, and 2010 Performance Goal.

22  In fact, Cahn achieved 100% of the Performance Goal in 2008 and at least 70% of

23  the Performance Goal in 2009 and 2010.[2]

24  _____

25  [2]  Oversee's expert did not reveal the missing information until his deposition on
    June 19, 2012.  Between the deposition and the submission of direct examination
26  declarations on June 22, 2012, Cahn analyzed certain customer accounts for 2008
    and 2009 but did not complete an analysis of all of the missing accounts and
27  revenues.  Through the parties' experts and Cahn, Cahn will show that he met the
    TrafficClub Performance Goal for 2008, 2009, and 2010.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1

1    Incredibly, Oversee and its expert now dispute Oversee's employee analysis.

2  Oversee believes that Oversee's employee, Ms. Kim, was incorrect in characterizing

3  certain customers as 100% TrafficClub Customers.  Oversee offers no evidence to

4  refute Ms. Kim's calculation of the Applicable Shared Customer Percentage.  In

5  fact, Oversee expressly refused to produce any Oversee revenue information for

6  November 2007 – the period used to calculate "Applicable Shared Customer

7  Percentages."

8    **D.    Rather than Present an Objective Analysis, Oversee's Expert**

9    **Improperly Manipulates Oversee's Revenue Information**

10    In an effort to avoid liability, Oversee has submitted MIP calculations that are

11  inconsistent and ever changing.  In his May 25, 2012 Supplemental Expert Report,

12  Oversee's expert, George Strong, submitted a set of calculations of TrafficClub

13  Gross Profit that materially differed from the calculations that Oversee's

14  management had prepared and attached to two declarations that Elizabeth Murray,

15  Oversee's CFO, submitted to this Court in support of Oversee's Motion for

16  Summary Judgment and in Opposition to an Ex Parte Application.

17    Incredibly, after Cahn raised questions about Mr. Strong's supplemental

18  analysis, Oversee and Mr. Strong changed their calculations again.  In his direct

19  examination declaration, Mr. Strong now claims that he incorrectly allocated certain

20  revenue to TrafficClub Gross Profits and that he now believes that this revenue

21  should be allocate to the registrar business segment.  (Paragraph 45 of Strong

22  Declaration.)  Mr. Strong does not explain the basis for this reallocation.  He also

23  does not attempt to reconcile this reallocation with Oversee's accounting treatment

24  of this revenue in 2008, 2009, and 2010.

25    Under the MIP, Oversee's Board  had responsibility for determining in good

26  faith whether or not Cahn achieved the Performance Goals.  (Section 3(b) of the

27  MIP, Trial Exhibit 1.)  Oversee was also precluded from intentionally taking any

28  action the "the purpose of which would be to manipulate Registrar EBITDA,

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1
11
MONTE CAHN'S TRIAL BRIEF

1    Oversee EBITDA, Domain Sales EBITDA or Gross Profit with respect to the

2    TrafficClub Business Segment if same would have the effect of preventing the

3    attainment of the Performance Goals contained herein."  (Section 14(a) of the MIP,

4    Trial Exhibit 1.)

5        Here, Oversee and its expert have engaged in a pattern and practice of

6    manipulating Oversee's financial data in an effort to prejudice Cahn's attainment of

7    the goals.  Mr. Strong's recent "reallocation" is but one example of  the

8    extraordinary efforts that Oversee has pursued in an effort to deny Cahn the benefit

9    of the bargain.

10

11   **IV.    THE OVERSEE EBITDA GOAL UNDER THE MIP.**

12       At the time the MIP was executed, the performance goals for the Oversee

13   business segment were "TBD" for all three determination periods.  Pursuant to

14   Oversee's own representations, these goals were to be determined after closing.

15   (¶15(u) of the MIP, Trial Exhibit 1.)  While Oversee has argued that the Board had

16   discretion to set Cahn's Oversee EBITDA goal under the MIP, the MIP specifically

17   provides that the Oversee EBITDA goal "**shall** be determined from time to time by

18   the Board, in consultation with Monte Cahn for so long as he is employed by the

19   Company."  (¶15(u) of the MIP, Trial Exhibit 1.)  Oversee claims that it failed to set

20   Cahn's Oversee EBITDA goal for any of three determination periods.  (12:15-17 of

21   Oversee's Motion for Summary Judgment [Doc. No. 91].)  When asked to explain

22   this conduct, Oversee's Board members were unable to provide any explanation as

23   to why they breached their contractual obligations to set an Oversee EBITDA.

24       Where a contract confers on one party discretionary power affecting the rights

25   of the other party, the law implies a duty to exercise that discretion in good faith and

26   in accordance with fair dealing.  (*Perdue v. Crocker National Bank*, 38 Cal. 3d 913,

27   923 (1985).)  The propriety of a party's exercise of discretion will be determined by

28   reference to whether that party's conduct was objectively reasonable under the

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  circumstances.  (*Lazar v. Hertz Corp.*, 143 Cal. App. 3d 128, 141 (1983).)

2  Additionally, contractual use of the term "**shall**" establishes a mandatory and

3  definite duty.  (*See*, *Hardy v. Hardy*, *23 Cal. 2d 244*, 246 (1943), *Scudder v. Perce*,

4  159 Cal. 429, 432 (1911); *Powell v. Central Cal. Fed. Sav. & Loan Assn.*, 59 Cal.

5  App. 3d 540, 548 (1976).)  California statutes repeatedly confirm that the term

6  "shall" creates a mandatory obligation.  (Cal Gov Code § 14 ("'Shall' is mandatory

7  and 'may' is permissive."); Cal Bus & Prof Code § 19; Cal Lab Code § 15.)  Thus,

8  under California law, "an open term in a contract must be filled in by the party

9  having discretion within the standard of good faith and fair dealing." (*Id.*)

10       This Court previously ruled that Oversee did not have discretion not to

11  determine the Oversee EBITDA Performance Goal:

12       "the Court finds that the MIP in the instant action is more plausibly

13       read as vesting Oversee with discretion as to where to set the applicable

14       target or goal that would be used to determine whether a bonus

15       payment was due, not unfettered discretion as to whether to set a target

16       or goal at all.  The Court thus agrees with Cahn that Oversee was bound

17       by the implied covenant of good faith and fair dealing to set such a

18       target.  See, e.g. *Lazar*, 143 Cal. App. 3d at 141; *Goldberg v. City of*

19       *Santa Clara*, 21 Cal. App. 3d 857, 860-861 (1971) (noting "that a party

20       to a contract may allow the amount of his compensation to be

21       determined by the other party to the contract" but if the party "acts in

22       bad faith (usually manifested by setting an unconscionably low figure),

23       the matter may be put to a [trier of fact] to decide upon the reasonable

24       value").  Had Oversee set a Performance Goal for the Oversee Business

25       Segment that Cahn simply wished were easier to achieve, Oversee

26       would have acted within its discretion under the MIP and Cahn would

27       be powerless to complain."

28  P. 5 of Order dated December 29, 2011 [Doc. No. 209].

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1

13

1    This Court also found that Oversee's failure to set the Oversee EBITDA Goal

2    at all could be construed as a frustration of the purpose of the MIP.

3         "The fact that Oversee claims it never set such a Performance Goal

4         means that Oversee arguably acted so as to frustrate the MIP because

5         the MIP clearly required Oversee to set an Oversee Performance Goal.

6         Moreover, had Oversee set a goal that was purposefully formulated to

7         award no incentive or a nominal incentive, that too could be grounds

8         for a finding of breach.  See *Goldberg*, 21 Cal. App. 3d at 860-861."

9    P. 5, fn. 8 of Order dated December 29, 2011 [Doc. No. 209].

10    Oversee cannot argue that, in the first phase of the trial, the Court resolved the

11   effect of Oversee's breach of its obligation to set the Oversee EBITDA Goal.  In

12   fact, at the conclusion of the first phase of the trial, the Court ruled that the Oversee

13   EBITDA Goal under the MIP was not the same as the Oversee EBITDA budgetary

14   goal.  Given Oversee's admitted breach, this Court did not rule (and could not rule)

15   that Oversee had set an Oversee EBITDA Performance Goal or that Cahn did not

16   achieve the Oversee EBITDA Performance Goal.  Given Oversee's admitted breach,

17   the Court did not (and could not) make any findings as to whether Cahn achieved

18   70% of the Oversee EBITDA Goal or any percentage of the goal.

19    Where the fact of damages is certain, the amount of damages need not be

20   calculated with absolute certainty.  (*Channell v. Anthony*, 58 Cal. App. 3d 290, 317,

21   129 Cal. Rptr. 704 (1976); *Noble v. Tweedy*, 90 Cal. App. 2d 738, 745-746, 203

22   P.2d 778 (1949).) The law requires only that some reasonable basis of computation

23   of damages be used, and the damages may be computed even if the result reached is

24   an approximation.  (*Allen v. Gardner*, 126 Cal. App. 2d 335, 340, 272 P.2d 99

25   (1954).) This is especially true where, as here, it is the wrongful acts of the

26   defendant that have created the difficulty in proving the amount of loss of profits.

27   (*Ramona Manor Convalescent Hospital v. Care Enterprises*, 177 Cal. App. 3d 1120,

28   1140, 225 Cal. Rptr. 120 (1986)) or where it is the wrongful acts of the defendant

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1

14

MONTE CAHN'S TRIAL BRIEF

1    that have caused the other party to not realize a profit to which that party is entitled.

2    (*Mann v. Jackson*, 141 Cal. App. 2d 6, 12, 296 P.2d 120 (1956). See also *James v.*

3    *Herbert*, 149 Cal. App. 2d 741, 749, 309 P.2d 91 (1957) [Damages consisting of

4    plaintiff's lost anticipated profits from real estate development joint venture, in

5    which defendants had conspired to deprive plaintiff of her share of the profits from

6    the venture, need not be established with certainty, so long as there was reasonable

7    probability profits would have been earned but for the breach of contract.].)

8         Here, Oversee had an affirmative obligation to set the MIP targets, and an

9    affirmative obligation to provide Cahn his MIP awards if those targets were met.

10   Oversee failed to meet its obligations under the MIP.  Therefore, Cahn is entitled to

11   damages in the amount of $3.2 million, the amount of the Oversee EBITDA

12   baseline award under the MIP.

13

14   **V.    CONCLUSION**

15        As a result of Oversee's egregious conduct in manipulating Moniker's

16   financial statements, ignoring its affirmative obligations under the MIP, and

17   breaching its duty of good faith and fair dealing, Cahn is entitled to significant

18   damages under the MIP.  Specifically, for the two business segments at issue during

19   this phase of the trial, Cahn is entitled to at least $4.8 million in damages for

20   Oversee's breach of the MIP as it relates to the TrafficClub and Oversee Business

21   Segments of the MIP.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1

15

MONTE CAHN'S TRIAL BRIEF

1  DATED: June 29, 2012          JOHN L. BARBER
2                                KENNETH D. WATNICK
                                 SONJA HARRINGTON
3                                LEWIS BRISBOIS BISGAARD & SMITH LLP
4
5
6                                By:    _/s/ Kenneth D. Watnick_____
7                                    Kenneth D. Watnick
                                     Attorneys for MONTE CAHN
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4841-8099-3038.1                    16
                          MONTE CAHN'S TRIAL BRIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

DATED: June 29, 2012                    KENNETH D. WATNICK
                                        LEWIS BRISBOIS BISGAARD & SMITH LLP



                                        By: _____/s/ Kenneth D. Watnick_____
                                            Kenneth D. Watnick
                                            Attorneys for Plaintiff Monte Cahn