1   William A. Delgado (Bar No. 222666)
2   wdelgado@willenken.com
    WILLENKEN WILSON LOH & DELGADO LLP
3   707 Wilshire Blvd., Suite 3850
4   Los Angeles, CA 90017
    Tel: (213) 955-9240
5   Fax: (213) 955-9250

6
    Attorneys for Defendants
7   OVERSEE.NET, JEFFREY KUPIETZKY,
    and LAWRENCE NG
8

9                   **UNITED STATES DISTRICT COURT**

10                 **CENTRAL DISTRICT OF CALIFORNIA**

11

12  MONTE CAHN, an individual,          |  Case No. CV-11-03800 SVW (AGRx)
                                        |
13            Plaintiff,                |  **REDACTED VERSION OF DIRECT**
                                        |  **EXAMINATION OF JEFFREY**
14       v.                             |  **KUPIETZKY**
                                        |
15                                      |
16  OVERSEE.NET, a California           |
    corporation; JEFF KUPIETZKY, an     |  Complaint Filed:  May 3, 2011
17  individual, LAWRENCE NG, an         |  Trial Date:       July 10, 2012
    individual; and DOES 1 through 10   |
18                                      |
19            Defendants.               |
                                        |
20                                      |
21                                      |
22                                      |
23  ────────────────────────────────────|

24

25

26

27

28

────────────────────────────────────────────────────────────────
                DIRECT EXAMINATION OF JEFFREY KUPIETZKY

126268.1

## DECLARATION OF JEFFREY KUPIETZKY

I, Jeffrey Kupietzky, do hereby declare as follows:

1.      I am over the age of eighteen (18). I have personal knowledge of the facts stated herein and, if called as a witness, I could competently testify thereto.

## I.      Education and Work Experience.

2.      I graduated from Columbia College in New York City in 1993 with a Bachelor of Arts degree in economics.

3.      After graduating from Colombia, I worked for two years as a Business Analyst for McKinsey & Company, a consulting firm in New York City where I provided analytic support to our clients.

4.      In 1995, I started working at Movado Watch Group in Lyndhurst, New Jersey as a Sales Support Analyst.

5.      In 1996, I left Movado to go to Harvard Business School.  I graduated from Harvard Business School in 1998 with a Masters in Business Administration degree.

6.      After graduating from Harvard in 1998, I began working for Siebel Systems as a Product Manager.  Siebel sold enterprise software for customer relationship management.  I left Siebel after two years

7.      In 2000, I joined a company in Silicon Valley, California called LoudCloud as a Senior Product Manager.  LoudCloud provided a managed service for data center operations.  Eventually, I was promoted to Head of Product Management, a position wherein I supervised sixty-five (65) people.  I left LoudCloud because I wanted to move back to Los Angeles.

8.      In 2002, I moved to Los Angeles to become Vice-President of a company called Digital Insight, a provider of online bill payment and Internet banking products. I was responsible for the consumer banking product line and had approximately seven people reporting to me.  After approximately three years, I left to pursue an earlier-stage opportunity with a younger company.

9.      In 2005, I joined X1 Technologies, a company that had only been in business for two years when I joined it, as a Vice President responsible for marketing, inside sales and products.  Approximately eight to ten people reported to me in that position.  I worked at X1 for approximately one year.

10.     After leaving X1, I began doing some consulting work for various companies including TRG and Oversee.net.

11.     As a consultant, I assisted TRG, a firm that consults companies with data center operations, by providing analytic services to help people determine whether to outsource their data center.

12.     As a consultant, I assisted Oversee with setting up a compensation plan for individuals in their sales department.

13.     For purposes of setting up the sales compensation plan, I suggested to Jack Nelson, the Head of Human Resources at Oversee, that the plan have an objective component (wherein compensation would be tied to revenue) as well as a subjective component to incent team behavior and cooperation among participants.

14.     I remained a consultant for Oversee between April 2006 and December 2006.  Between August 2006 and December 2006, Oversee was my only client.

15.     In December 2006, I joined Oversee as Executive Vice President of Domain Services, responsible for the DomainSponsor® product line.  At that time, approximately forty (40) people reported to me.  I remained Executive Vice President until November 2008.

16.     In November, 2008, I became President of Oversee.net.  In August, 2009, I became Chief Executive Officer of Oversee.net.  I held that position through August, 2011.  During my terms as President and CEO, I also served on the board of directors of ODN Holding Corporation ("ODN Board"), the parent company of Oversee, as well as on the board of directors of Oversee.net ("Oversee Board").

DIRECT EXAMINATION OF JEFFREY KUPIETZKY

2

## II.   Description of Underlying Businesses.

17.   There are three types of internet-related functions that are useful to an understanding of both Oversee.net's business and the business segments acquired as part of the acquisition of Domain Systems, LLC (d/b/a Moniker.com) ("Moniker") and identified in the Management Incentive Plan ("MIP").  I describe those three segments below.

### A.   Registrar:  Domain Name Registration

18.   The Internet consists of a public world-wide network of computers.  A "domain name" is essentially an address on the Internet.

19.   Domain names are read from right to left starting with the top level domain and then reaching the secondary level domain.  One example of a domain name is <google.com>.  In that example, the ".com" is the top level domain and the secondary level is "google."

20.   Anyone can register a domain name for a particular amount of time. Generally speaking, most registrants register domain names for a one year period. Over time, the cost of obtaining a domain name has dropped from approximately $70 for a two year registration to less than $8 for a one year registration.

21.   The organization responsible for keeping track of who owns domain names for a particular top-level domain name is known as the "registry."  For the ".com" and ".net" top level domains, the registry is a company called VeriSign.

22.   A person who wishes to register a domain name (i.e., a potential "registrant") must first determine if the domain name is available for registration. However, registrants cannot interface directly with the registry.  They must utilize a "go between" known as the "registrar" who has been accredited by Internet Corporation for Assigned Names and Numbers ("ICANN").  ICANN is, in substance, the non-profit corporation responsible for overseeing various Internet related tasks.

---

DIRECT EXAMINATION OF JEFFREY KUPIETZKY

3

23.    Moniker is an ICANN-accredited registrar, and, as the MIP discloses, the MIP participants had the prospect of compensation awards if the business met or exceeded certain Performance Goals.

24.    Predominantly, the overall process by which the Moniker registrar generated revenues works as follows:

(a)    The potential registrant visits the website of the registrar (Moniker.com) and provides the registrar with the domain name that they wish to register.

(b)    The registrar sends a query to the registry to check the availability of the domain name.

(c)    The registry responds to the query and informs the registrar as to the availability of the domain name identified.

(d)    The registrar then informs the potential registrant as to the availability of the domain name.

(e)    If the name is not available, the process either ends or begins anew with a different query for a different domain name.

(f)    If the name is available, the potential registrant can pay a registration fee to the registrar, and the registrar will then inform the registry that the domain name has been registered and, therefore, will not be available to future users.

(g)    The registration fee paid by the registrant is comprised of three elements: (i) a fee to the registry for its service, (ii) a fee to ICANN and (iii) the fee charged by the registrar for its service.

(h)    Thus, the Moniker Registrar business generated earnings based upon the volume of registrations it processed on behalf of registrants.

**B.    TrafficClub:  Domain Name Monetization.**

25.    Moniker also operated a business segment called TrafficClub, which was a domain name monetization business.  Oversee.net owned its own domain name monetization business called DomainSponsor®.  During the course of negotiations, we

recognized the possibility that the two monetization businesses would be combined and, in fact, the MIP provides a mechanism for rewarding MIP participants for TrafficClub gross profits following such a combination. *See,* MIP, ¶15(aa) (Exhibit 1 in this matter).

26.     Generally, "domain name monetization" refers to the business practice of using a domain name to make money.  More specifically, it refers to the business practice of generating revenues from a domain name (e.g., www.lawoffices.com) by populating the domain name with keywords and hyperlink advertisements from advertisers.  The process works as follows:

(a)     Having registered a domain name (or, more typically, hundreds or thousands of domain names) a registrant will submit his domain name(s) to a monetization platform or "parking company."  While registrars refer to their customers as "registrants," parking companies typically refer to their customers who have submitted their domain names for monetization as "publishers."

(b)     The parking company has a direct contractual relationship with an upstream provider (typically a search company such as Google, Yahoo, etc.) who can provide keywords and advertisements that the parking company can use to populate the web site of the domain name.  In the parlance of the industry, these are referred to as "feeds" so that it is common for the parking companies to note whether they have a "Google feed" or a "Yahoo feed."  So, in the example provided, a parking company would populate the domain name www.lawoffices.com with keywords and hyperlink advertisements that relate to the legal profession, provided by its upstream provider.

(c)     When a visitor to the domain name clicks on a hyperlink advertisement, they are transported from the domain name (www.lawoffices.com) to the website of the advertiser who provided the hyperlink advertisement.

DIRECT EXAMINATION OF JEFFREY KUPIETZKY

5

(d)    As consideration for that "traffic" (which represents a potential customer to the advertiser), the advertiser will pay a certain amount of money to the upstream provider.  That provider will keep some of the money for itself and pay some to the parking company.  In turn, the parking company will keep some of the money for itself and pay some to the registrant-publisher.  The amount of money that is split between the parking company and the publisher is determined by a "revenue share" percentage or "rev share."

(e)    TrafficClub and DomainSponsor® operated somewhat differently, as discussed below, but they both operated as domain name monetizing businesses providing advertising links to publishers in exchange for a share of revenue.

**C.**    <u>**Domain Sales:  Domain Name Sales and Auctions**</u>.

27.    Moniker also operated a domain dales platform.  As discussed below, Oversee.net acquired a domain name auction company called SnapNames shortly before Oversee acquired Moniker.  The Moniker "live auction" platform was expected to complement the SnapNames "online" platform.

28.    A domain name, like other property, can be leased and sold.  And, like other property, the sale of domain names can occur in different ways, including:

(a)    A registrant can find a purchaser for his domain name and sell it to that purchaser directly.

(b)    A registrant can retain the services of a broker who will market the name and assist in its sale in exchange for a percentage of the selling price in the same way that a real estate broker will market a real estate listing in exchange for a brokerage fee that is a percentage of the selling price.

(c)    A registrant can submit his domain name for a domain name auction where the domain name will be sold to the highest bidder, much like an art auction.

DIRECT EXAMINATION OF JEFFREY KUPIETZKY

6

(d)    A registrant can submit his domain name in an online domain name auction where the domain name will be sold to the highest bidder in the online auction, much like what occurs on the popular online auction platform, eBay.

29.    As with stocks, savvy registrants can make a considerable amount of money through speculation in the domain name market.  For example, a speculator might come across an online auction where they see <widgets.com> for sale for $10,000.  If that person believes that <widgets.com> is underpriced, he can buy <widgets.com> for $10,000 and then attempt to sell <widgets.com> at a higher price.  However, as with stocks, willingness to speculate in the domain name industry is market-driven.  In a good economy, there is a greater willingness to engage in speculation than in a bad economy.

30.    Moniker operated as a broker (i.e., matching a buyer and seller in a private sale), and it also managed periodic "live" auctions at which domain names would be sold to the highest bidder in a live auction not much different than an art auction.  SnapNames, as discussed below, ran an online domain auction platform similar to eBay.

## III.   The Business Strategy Behind the 2007 Acquisitions.

31.    In 2007, Oversee negotiated the acquisition of and ultimately acquired a company called SnapNames.com based in Portland, Oregon.  I was part of Oversee's due diligence team.

32.    SnapNames is a domain name auction marketplace where customers could buy and sell domain names through an online platform.

33.    In conjunction with the acquisition of SnapNames, the potential acquisition of a customer-facing registrar looked particularly attractive to Oversee because it would allow Oversee to provide domain name services to "domainers" (the industry term for customers) throughout the "domain name life cycle."  By acquiring SnapNames and a customer-facing registrar, Oversee could provide domainers with:

    (a)      the ability to register a domain name (through the Moniker registrar);

    (b)      the opportunity to monetize the domain names they registered (through DomainSponsor® and/or TrafficClub); and

    (c)      the ability to sell their domain names either through an online auction platform (through SnapNames) or through private brokerage or a live auction (through the Moniker Domain Sales business).

34.    In theory, Oversee could become a "one-stop shop" for all of a domainer's domain name service needs.

35.    With this potential business model in mind, Oversee set out to negotiate the acquisition of Moniker, a company recognized for its registrar business and its live auction business.

## IV.    Negotiations to Acquire Moniker.com

36.    Oversee commenced negotiating with Seevast Corp., the owner of Moniker in the Spring of 2007. I was part of Oversee's due diligence team and, towards the end, was more active in the negotiations.

37.    In connection with the negotiations with Seevast, Oversee received an Offering Memorandum from Seevast's investment banker, The Jordan, Edmiston Group, Inc., a true and correct copy of which is Exhibit 72. The Offering Memorandum contained information regarding the historical financial performance of Moniker as well as projected financial performance in 2007 and 2008.

38.    I also attended a management presentation organized to promote the sale of Moniker in the Spring of 2007. Plaintiff Monte Cahn was present. Exhibit 73 is a true and correct copy of the Management Presentation provided to Oversee, and it, too, contains the historical financial performance of Moniker as well as projected financial performance for 2007 and 2008. I collectively refer to Exhibits 72 and 73 as the "Offering Documents."

39.    On July 13, 2007, Oversee proposed in a Letter of Intent ("LOI") a purchase structure contingent, in part, on Moniker achieving the 2008 forecasts

DIRECT EXAMINATION OF JEFFREY KUPIETZKY

8

contained in the Offering Documents.  A true and correct copy of that letter is exhibit 394.  The structure proposed in the LOI called for: (i) ████████ due at closing and (ii) ████████ to be paid based on Moniker's achievement of its 2008 EBITDA forecast of ████████, as identified in the Offering Documents – a structure commonly known as an "earn-out."  The LOI further proposed that $████████ of the $████████ earn-out be paid to Moniker management.

40.     Subsequent to its initial proposal and based on the results of its due diligence, Oversee downwardly adjusted its proposed purchase price for Moniker to $████████ (from $████████).  The earn-out to Seevast was eliminated, but the revised proposal retained the contingent payment of $████████ to Moniker employees to be based on the terms of a performance-based incentive plan.  Rather than utilizing the single-year 2008 performance as the sole benchmark for performance, the incentive plan was to stretch across three years following the closing.  This proposal became the basis on which the parties negotiated their final set of agreements.

41.     The performance-based incentive plan, which ultimately became known as the Oversee.net 2007 Management Incentive Plan ("MIP"), provided for aggregate payments of up to $████████ if actual performance exceeded the targets set forth in the MIP.

42.     The stock purchase agreement reflecting the terms of the purchase and sale of Moniker between Seevast and Oversee was negotiated directly between Seevast and Oversee.

43.     The details and terms of Mr. Cahn's Employment Agreement with Oversee and the MIP were negotiated between members of the Oversee negotiation team and Oversee's outside counsel from Kirkland & Ellis, on the one hand, and Mr. Cahn and his outside counsel from Tripp Scott, on the other.  Those negotiations occurred between October and December 2007.

44.     The performance goals in the MIP, though aggressive, were based primarily upon the financial benchmarks and projections contained in the Offering

DIRECT EXAMINATION OF JEFFREY KUPIETZKY

9

126268.1

Documents and referenced in the LOI, with some adjustments (including, most notably, the three-year performance period).

45.     One adjustment that was made at Mr. Cahn's request was expanding the First Determination Period from just 2008 to include the fourth quarter of 2007 so that the First Determination Period ran from October 1, 2007 to December 31, 2008.  That was a concession on Oversee's part since it would not be receiving any of the revenue from fourth quarter 2007 prior to acquisition but would nevertheless be liable for a potential payment for performance during that time.

46.     As Schedule A of the MIP shows, the Performance Goals increased aggressively in 2009 and 2010 meaning, as a practical matter, that if the 2008 Performance Goals were not met, the goals for the succeeding Performance Periods became even more difficult to attain.  All of these goals, however, were built on the Offering Documents.

47.     Ultimately, the negotiations between Oversee and Mr. Cahn produced a three year plan that also allowed for compensation based upon the *partial* achievement of production goals.  Nevertheless, the MIP is structured to rely on the 2008 projections in the Offering Documents and to grow those projections at an aggressive rate year after year through 2010.

## V.     The Negotiations Re: TrafficClub.

48.     As noted above, monetization represented one area of overlap between Moniker and Oversee.  Moniker provided monetization services through its TrafficClub platform.  Oversee.net provided monetization through DomainSponsor®.

49.     DomainSponsor® primarily utilized a real-time advertising feed from Google but also utilized real-time advertising feeds from other upstream advertising partners.

50.     During my time as Executive Vice-President, Domain Services, I became aware of Moniker's TrafficClub monetization platform, which was a slightly different monetization platform from that of DomainSponsor®.

DIRECT EXAMINATION OF JEFFREY KUPIETZKY

10

126268.1

51.     In contrast to DomainSponsor®, Moniker's TrafficClub monetization platform purported to be a *rotator* monetization service whereby Moniker was able to choose to monetize its domains and those of its third party customers on different monetization platforms with which it had contractual relationships.

52.     TrafficClub did not have a direct contractual relationship with an upstream advertising provider such as Google.  Instead, TrafficClub had relationships with the various domain monetization companies such as DomainSponsor®, also known as "parking companies," which in turn had the relationships with the upstream advertising partners.  In fact, until February 2007, TrafficClub used DomainSponsor® as one of its rotating feeds.

53.     If one considers the chain of money that an advertiser pays for a hyperlink click, a rotator service essentially sits in between the parking company and the owner of the domain name, referred to as a registrant/publisher, so that the flow of money is changed from:  Upstream provider → Parking Company → Registrant/Publisher to Upstream provider → Parking Companies → **Rotator Service** → Registrant Publisher.

54.     In theory, the benefit to the customer of the rotator service lies in its ability to choose among the different advertising feeds utilized by the various different parking companies, thereby finding the monetization platform that provides the most amount of money for a particular domain name.

55.     Additionally, some parking companies require publishers to have minimum business thresholds to qualify for higher revenue share percentages. Typically, a publisher who generates minimal revenue by utilizing a parking company's monetization service will not receive as high a revenue share as a publisher who generates significant revenue.  If however, a number of publishers are aggregated together, such as through the Traffic Club platform, it is possible for the revenue generated from the domains of *all* of those customers to utilize the monetization service to generate higher revenues and, thus, receive a higher revenue share.

---

DIRECT EXAMINATION OF JEFFREY KUPIETZKY

11

56.     The business model of a rotator service like TrafficClub is dependent on its contractual relationship with the parking companies.  If the perceived benefit of being able to "rotate" among various providers goes away, and/or customers are provided direct access to the feeds of the parking company at the same rate provided to the rotator service, the business model of the rotator service is necessarily impaired.

57.     In February 2007, Oversee learned that Google did not approve of Oversee being a partner of TrafficClub because Google required Oversee to have a direct relationship with the registrant/publisher.  By allowing its DomainSponsor® platform to be utilized by Traffic Club customers, Oversee had a relationship with TrafficClub but not with the registrant/publishers of the domains.

58.     As a result, Oversee terminated its relationship with TrafficClub in February 2007.

59.     As early as October 2007, Oversee proposed that, post-merger, the TrafficClub Business Segment would be managed by the DomainSponsor® team at Oversee and not by Mr. Cahn.  *See* Exhibit 76, at page 3 (bullet point stating "Day-to-day management assumed by DomainSponsor team").

60.     Mr. Cahn agreed in an e-mail concerning the MIP terms that TrafficClub should be managed by Oversee.  *See* Exhibit 305 (Cahn, stating in a 10/19/07 e-mail, "I agree that TrafficClub should be managed by DS.")  Because of his loss of control over that segment, he proposed in that same email that the MIP awards for TrafficClub be lowered (with corresponding increases in the other business segments).  *Id.*

61.     Further, on December 13, 2007, I sent an e-mail to various people, including Mr. Cahn, discussing potential synergies between Oversee and Moniker, and the potential transition of TrafficClub to DomainSponsor® is one of the points I mentioned.  *See* Exhibit 7.

62.     The MIP was written to account for the potential transition of TrafficClub into DomainSponsor in two ways:

---

DIRECT EXAMINATION OF JEFFREY KUPIETZKY

12

a.  The Performance Goals for the TrafficClub Business Segment were determined on a "Gross Profit" basis instead of on an EBITDA basis like the other three segments.

b.  The term "TrafficClub Customer" (for purposes of the MIP gross profit calculation) was platform-agnostic because it was defined to include, not only existing TrafficClub customers, but also new DomainSponsor® customers brought in as a result of the substantial efforts by Mr. Cahn or another person working for Moniker and also Shared Customers of both TrafficClub and DomainSponsor®, irrespective of which actual platform they used.

63.     By the date of the Moniker acquisition (December 14, 2007), no decision had been made as to whether and/or when to transition TrafficClub customers to DomainSponsor®.

64.     However, Oversee did reintroduce the DomainSponsor® platform into the TrafficClub system almost immediately after its acquisition of Moniker.  Oversee and Moniker jointly communicated that information to TrafficClub customers and the general public.  *See e.g.*, Exhibits 4, 91.

65.     Further, as a result of its acquisition of Moniker on December 14, 2007, Oversee became responsible for making payments to TrafficClub customers for their November 2007 revenue share payments.

66.     Each DomainSponsor® client (i.e., "publisher") is given a unique Oversee ID number ("OID") in a database in order to track the performance of their domain names and so that they can be paid their respective share of revenue from the monetization of their domain names utilizing the DomainSponsor® system.

67.     To process the November 2007 payments more quickly, existing TrafficClub customers were given a unique OID on the DomainSponsor® system even though they were not on the DomainSponsor® platform yet.

---

DIRECT EXAMINATION OF JEFFREY KUPIETZKY

13

## VI.   <u>Transitioning TrafficClub Customers to DomainSponsor</u>.

68.    At the time of the Moniker acquisition, a parking company named Skenzo had been providing its monetization platform for use by the TrafficClub service.

69.    At no point while Oversee was negotiating the purchase of Moniker with Seevast and the MIP with Mr. Cahn did Mr. Cahn inform me that Skenzo contemporaneously had been seeking an exclusive relationship with TrafficClub.  I believe that if anyone on the Oversee negotiation team had been aware of this, they would have told me, as I was the executive responsible for Oversee's Domain Services division.  Since no one told me that Skenzo had been seeking an exclusive relationship, I do not believe Mr. Cahn informed anyone at Oversee as such.

70.    Skenzo was responsible for the vast majority (over 90%) of TrafficClub revenue.  Oversee discovered that customers were not really using TrafficClub as a rotator service but, rather, were primarily using TrafficClub to get access to the Skenzo feed because they did not have direct access due to Skenzo's eligibility requirements

71.    Within weeks of Oversee's acquisition of Moniker, I learned that Skenzo was terminating its relationship with TrafficClub and removing its feed from TrafficClub.  Mr. Cahn forwarded me an e-mail sent by Skenzo to TrafficClub customers informing them of its decision to terminate its relationship with TrafficClub and inviting them to enter into a direct relationship with Skenzo.  *See* Exhibit 5.

72.    Exhibit 463 is an e-mail from me to Lawrence Ng, Oversee's CEO at the time, with a copy to Monte Cahn, dated January 8, 2008.  It is forwarding an e-mail from Divyank Turakhia of Skenzo to Mason Cole, an employee of Oversee.  Mr. Turakhia's e-mail states that Skenzo had made clear over the "last six months" that its continued relationship with TrafficClub was dependent on exclusivity.

73.    Once Skenzo removed its advertising feed, TrafficClub's only remaining monetization platform of any substance was DomainSponsor®.  This situation— providing customers with the same DomainSponsor® feed through TrafficClub *and* DomainSponsor®—seemed to me to be unnecessarily duplicative and expensive.

74.    Furthermore, Moniker did not have any full time employees working on the TrafficClub business.  All technical operations were being handled by an outside consultant named Rob Montgomery whom we had difficulty reaching.

75.    I and other members of Oversee's management team, including Monte Cahn, consulted about how best to handle Skenzo's termination, and we agreed to transition TrafficClub customers to DomainSponsor®.

76.    It was my understanding, based on his communications with me, that Mr. Cahn agreed that it made sense to transition TrafficClub customers to DomainSponsor. One such communication is Mr. Cahn's email of January 9, 2008, a true and correct copy of which is Exhibit 18.  In that email, Mr. Cahn states:  "I have been thinking more and more about best future [sic] for TrafficClub and what makes sense for the overall organization as well as our customers.  I think I would be willing to move towards a full transition to DomainSponsor rather than trying to migrate to TC."

77.    I understand that it is Mr. Cahn's contention that TrafficClub was shut down because Oversee's operation of TrafficClub was prohibited by Oversee's contract with Google and that I knew that to be the case prior to Oversee's acquisition of Moniker.

78.    I do not believe that the Google contract prohibited the reintroduction of the DomainSponsor® feed to TrafficClub because, once Oversee acquired TrafficClub, there was no longer a "fourth party" relationship, which is what I understand Google prohibited.

79.    If, in fact, Google contract prohibited the reintroduction of the DomainSponsor® feed to TrafficClub, I do not believe that (i) Oversee would have re-introduced the feed immediately after the acquisition and (ii) Oversee would have publicized the fact that the feed had been reintroduced.

80.    Rather, the transition of TrafficClub customers to DomainSponsor®: (i) had been discussed pre-merger; (ii) was agreed to by Mr. Cahn; and (iii) was precipitated largely by Skenzo's decision to terminate its relationship with TrafficClub.

DIRECT EXAMINATION OF JEFFREY KUPIETZKY
15

126268.1

81.     In July 2008, I asked Linda Kim, then an Oversee employee who worked as an analyst providing support for DomainSponsor® operations, to determine the OIDs of the migrated TrafficClub customers, including the share percentage to be attributed to each "Shared Customer" as that term is used in the MIP.  Exhibit 520 is a true and correct copy of an e-mail chain between me and Ms. Kim and the attachment thereto with Ms. Kim's determination.

## VII.   **The Integration of Moniker.**

82.     After Oversee acquired Moniker, it commenced integrating Moniker into Oversee.  Exhibits 32, 33, 40, 329, 330, 341, 342, 343, 347-350, 352, 354, 357, 359 describe various integration presentations and updates regarding the integration effort.

83.     I understand that Mr. Cahn contends the Oversee's integration efforts were negligent and/or intentionally mishandled – apparently as part of a scheme to prevent the achievement of MIP Performance Goals.  That is false.  As the Executive Vice President of Domain Services at the time, my incentive was to maximize the performance of all the business units in my division which included Moniker.  Had Moniker performed at the levels set forth in the MIP, I (along with all of Oversee) would have benefitted from that performance.

84.     Later as CEO, my incentive was to maximize performance of all business units across the company, including Moniker.  Again, if Moniker had performed at the levels set forth in the MIP, I would have benefitted significantly from that performance

85.     Oversee devoted enormous amounts of time and resources to the integration efforts.  There was never any intention on my part to delay or mishandle those efforts, and I never observed any instances in which Oversee personnel deliberately delayed or mishandled the integration effort.

## VIII.  **The Decline in the Domain Name Industry.**

86.     By January 31, 2008, performance in the domain name industry had already begun to decline –a fact which Oversee management communicated to its

1   employees.  At the same time, we advised the employees of, and implemented, some

2   internal restructuring to compensate for the decline in performance.  *See* Exhibit 17.

3       87.   One reason for the decline in the performance of the domain name

4   monetization business resulted from an effort by Google to increase the "quality" of its

5   traffic such that DomainSponsor® did not get paid for various clicks on the

6   DomainSponsor platform.  Alternatively, DomainSponsor® would be paid, but Google

7   would "clawback" a certain amount of money based on quality of traffic.

8       88.   DomainSponsor's experience was typical for the industry.

9       89.   Combined, macroeconomic conditions, the decrease in domain

10  monetization revenue available to publishers, and the elimination of the practice of

11  "domain name tasting," also negatively affected the Registrar Business Segment and

12  the Domain Sales Business Segment.  Simply put, throughout 2008 and into 2009 and

13  2010, the economy was in decline generally, and the domain name business was hard

14  hit.  Fewer people were interested in registering or buying and subsequently

15  monetizing or selling domain names because it was not as profitable as it had been

16  previously.

17      90.   Exhibit 323 is a true and correct copy of an e-mail dated February 12,

18  2008 from me to Mr. Cahn with an attached pacing report showing performance under

19  the MIP which was prepared using the company's financial data at the time, which

20  would have been regularly recorded in the ordinary course of business in accordance

21  with Oversee's practices.

22      91.   As the report indicates, pacing indicated a negative variance (in other

23  words, that the Moniker Business Segments were not performing as projected in the

24  MIP).

25      92.   Exhibit 324 is a true and correct copy of an e-mail dated February 13,

26  2008 from me to Mr. Cahn with an attached revised pacing report showing

27  performance under the MIP which was prepared using the company's financial data at

28

---

DIRECT EXAMINATION OF JEFFREY KUPIETZKY

17

1   the time, which would have been regularly recorded in the ordinary course of business

2   in accordance with Oversee's practices.

3       93.    As the revised report indicates, pacing continued to indicate a negative

4   variance.

5       94.    At one point, when I asked Mr. Cahn to explain why the registrar business

6   segment was flat and not growing, he pointed to various issues including "many other

7   industry and economic" issues over which Oversee had no control, including "PPC

8   depression issues," and "price and tasting increases and ICANN/TM scares."  *See*

9   Exhibit 93.

10      95.    Several times in 2008, Mr. Cahn acknowledged to me in conversations

11  and e-mails that the performance of the Moniker Business Segments was off from the

12  performance goals contemplated by the MIP.  Exhibit 92 is an e-mail from May 2008

13  in which Mr. Cahn acknowledges that Skenzo's unilateral actions "killed" the

14  performance of TrafficClub in December 2007 and January 2008.

15      96.    On October 27, 2008, I e-mailed Mr. Cahn and Moniker's General

16  Manager at the time, Steve Yeich, to inform them that Moniker was essentially pacing

17  as a business unit that was losing money.  *See* Exhibit 424

18  **IX.    Negotiation of the Incentive Compensation Plan.**

19      97.    In the summer of 2008, Mr. Cahn approached me and informed me he was

20  no longer incented to work at Oversee because of the inability of Moniker to achieve

21  the performance goals of the MIP as a result of the economy.  My goal was to keep Mr.

22  Cahn at the company and to find an alternative way to reward him for his services

23  given that his opportunities for compensation under the MIP had virtually evaporated.

24      98.    In response to Mr. Cahn's concern that the MIP was no longer achievable,

25  I worked with in-house counsel, Todd Greene, to prepare an amendment to the MIP

26  called the "Incentive Compensation Plan" ("ICP") which would provide Mr. Cahn a set

27  of attainable goals for 2008 and 2009 which, if met, would entitle him to a bonus in

28  each of those years.

---

DIRECT EXAMINATION OF JEFFREY KUPIETZKY

99.     I communicated with Oversee's Chief Executive Officer and Chairman of the ODN Board, Lawrence Ng, and Jack Nelson, the head of human resources about the terms of the proposed ICP.  *See* Exhibit 149.

100.     Ultimately, Mr. Greene and I provided Mr. Cahn a copy of the ICP, and we engaged in an e-mail discussion regarding the terms of the amendment.  *See* Exs. 207-211.

101.     The parties executed the ICP on or about November 18, 2008.  *See* Exhibit 28.

## X.     End of Year Performance for 2008.

102.     In November 2008, Lawrence Ng stepped down as Chief Executive Officer of Oversee and ODN, its parent company.  I was promoted to President of Oversee and ODN and assumed his responsibilities of running the company on a day-to-day basis.

103.     On November 21, 2008 I also joined the ODN and Oversee Boards.  I remained on both Boards into 2011.

104.     As reported to the ODN Board, the final Oversee EBITDA number for 2008 was calculated as $■■■ million.  This number was not calculated according to GAAP nor is it calculated in the same manner as Oversee EBITDA is defined in the MIP.

105.     As President, I was responsible for proposing bonus compensation for all company employees to the compensation committee of the ODN Board.

106.     Based on the company's performance in 2008, I recommended to the budget committee of the ODN Board that Oversee's senior executives receive on average ████████████████████████████████

107.     "Target bonus amount" refers to the percentage of base salary an employee might receive as a bonus.  So, hypothetically, if the target bonus amount was 10% of base salary, then my recommendation meant that the employee would receive 55% of 10% of his salary as a bonus.

108.   On December 31, 2008, I e-mailed Mr. Cahn to inform him that his 2008 bonus would be calculated pursuant to the terms of the ICP.  *See* Exhibit 261.

109.   Based on the terms of Section 14 of the ICP, I proposed to the compensation committee that Mr. Cahn receive a 2008 bonus in the amount of $████.  This number is based on paragraph 14 of the ICP, which calls for Cahn's bonus, subject to discretionary adjustment, to be the greater of  the percentage of bonus payable for all members of the Senior Team multiplied by ████, or the average of their bonuses less specified deductions.  So, my recommendation was based on the ████████████.

110.   Exhibit 127 is a true and correct copy of the Consolidated Financial Statements, ODN Holding Corporation, Years Ended December 31, 2008 and 2007 with Report of Independent Auditors.  It is based on the company's financial data at the time, which would have been regularly recorded in the ordinary course of business in accordance with Oversee's practices, as audited by Oversee's Independent Auditors, Ernst & Young.

111.   As Page 10 of Exhibit 127 indicates, domain services revenue (i.e., domain monetization) ████████████████████████.  Overall, 2008 financial performance was ████████████████████████.

## XI.   Setting the Oversee Budget EBITDA Goal for 2009.

112.   For purposes of helping the ODN Board set the budget goal for Oversee EBITDA for 2009, I assumed that every business segment in Oversee would further deteriorate in 2009 as a result of macroeconomic and domain name industry conditions.

113.   Ultimately, the Oversee Budget EBITDA Goal for 2009 was originally set at $████.  Put in perspective, this goal represented ████████████████████████████████.

## XII.   <u>End of Year Performance for 2009</u>.

114.   I was appointed Chief Executive Officer of Oversee and ODN in August 2009.

115.   On December 31, 2009, Oversee acquired the business known as Credit Card 321.

116.   As expected, market conditions caused Oversee's EBITDA to further deteriorate in 2009.  As reported to the ODN Board, the final Oversee EBITDA number for 2009 was $██████. This number was not calculated according to GAAP nor is it calculated in the same manner as Oversee EBITDA is defined in the MIP.

117.   So, while the company exceeded its EBITDA budget target for 2009, EBITDA ████████████████████████████████████████ ███████████████.

118.   Exhibit 130 is a true and correct copy of the Consolidated Financial Statements, ODN Holding Corporation, Years Ended December 31, 2009 and 2008 with Report of Independent Auditors.  It is based on the company's financial data at the time, which would have been regularly recorded in the ordinary course of business in accordance with Oversee's practices, as audited by Oversee's Independent Auditors.

████   As Page 10 of Exhibit 130 indicates, domain monetization revenue ████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████

120.   Based, in part, on the fact that Oversee EBITDA exceeded the forecast of $██████, Oversee senior management received in excess of their target bonus.

121.   Pursuant to the terms of Section 14 of the ICP, I calculated Mr. Cahn's 2009 bonus as the "average of the year-end bonuses for the members of the Senior Team for the 2009 calendar year less, any amounts payable to [him] pursuant to the

---

DIRECT EXAMINATION OF JEFFREY KUPIETZKY
21

1  DomainSponsor and Aftermarket & Registrar payout amounts for the 2009 calendar

2  year, in each case subject to the Discretionary Adjustment."

3      122.   There were no DomainSponsor payouts under the ICP in 2009.

4      123.   The Aftermarket & Registrar payout amounts under the ICP for 2009 were

5  approximately ███████.

6      124.   To calculate the Discretionary Adjustment, I solicited input from other

7  members of the Oversee Senior Team regarding Mr. Cahn, his skills, and his

8  contribution to Oversee.  Exhibit 42 contains the responses from the Senior Team

9  which were all negative.

10     125.   Mr. Cahn received a 2009 bonus in the amount of approximately ████████

11 which included the Aftermarket & Registrar payout amount of approximately ████████.

12 This final number represented a very slight downward adjustment from the average

13 year-end bonus of the Senior Team in 2009 based on the negative feedback I had

14 received.

15     126.   Mr. Cahn and I had numerous discussions, verbally and by e-mail,

16 regarding his compensation.  In fact, I had more conversations with Mr. Cahn about the

17 subject of his compensation than with any other employee of Oversee about their

18 compensation.  He was never shy in telling me when he believed he was owed

19 additional compensation.

20     127.   At no point did Mr. Cahn ever advise me that he believed he had any

21 entitlement to a payment under the MIP in lieu of his ██████ ICP bonus.  He never

22 stated that he believed any of the Moniker Business Segment Performance Goals had

23 been met

24     128.   In fact, on February 1, 2010, after receiving his bonus under the ICP, Mr.

25 Cahn sent me an e-mail inquiring as to the methodology of how his bonus was

26 calculated under the ICP and thanking me for the bonus.  *See* Exhibit 427.  In his e-

27 mail, Mr. Cahn did not claim he was owed any money under the MIP as a result of the

28 Moniker Business Segments meeting their respective Performance Goals.

DIRECT EXAMINATION OF JEFFREY KUPIETZKY

22

### XIII.  <u>Setting the Oversee Budget EBITDA Goal for 2010.</u>

129.   For purposes of helping the ODN Board set the Oversee Budget EBITDA Goal for 2010, I assumed that Oversee's financial performance in 2010 would approximate its performance in 2009.

130.   Ultimately, the budget approved by the ODN Board included an organic EBITDA forecast for 2010 of ▮▮▮▮ million and the non-organic (i.e., accounting for acquisitions of other companies with positive EBITDA) Oversee EBITDA forecast for 2010 of ▮▮▮▮▮▮▮.

### XIV.  <u>The 2010 Commission Plan.</u>

131.   The ICP only covered 2008 and 2009.  At the beginning of 2010, Mr. Cahn requested a new alternative plan which would enable him to earn money in addition to his base salary and retention bonus.

132.   As a result, I asked Craig Snyder and Elizabeth Murray to work with Mr. Cahn to develop an alternative plan for 2010.

133.   Mr. Cahn made it clear that he was seeking a plan to maximize his compensation.

134.   Consistent with his request for a plan that allowed him to maximize his earnings and the views of senior management that Mr. Cahn's strength was in domain name sales (a view which I shared), Oversee presented Mr. Cahn with an uncapped commission plan for 2010 that focused exclusively on domain name sales.  *See* Exhibit 10.

135.   There was no registrar or DomainSponsor® component at all, because both Oversee and Mr. Cahn agreed that he could make more money in commissions for domain name sales than he could under the ICP.  At the time the Commission Plan was negotiated and executed, achievement of the performance goals in MIP was, for all practical purposes, unachievable.

136.   Oversee and Mr. Cahn agreed to the 2010 Commission Plan in Exhibit 10 on or about May 24, 2010.

137.   Under the 2010 Commission Plan, Mr. Cahn made over ██████ in commissions in 2010, nearly the equivalent of his base salary and significantly more than what he made in 2008 and 2009 under the ICP's structure which tied his bonus to the greater of some percentage of $100,000 or the average senior executive's bonus.

## XV.   End of Year Performance in 2010.

138.   On April 13, 2010, Oversee acquired the business known as About Airport Parking.

139.   On November 10, 2010, Oversee acquired all of the issued and outstanding capital stock of ShopWiki Corp., a business engaged in the retail lead generation vertical.

140.   As reported to the ODN Board and used to measure the bonus pool, the final Oversee EBITDA figure for 2010 was calculated as ██████.

141.   Exhibit 131 is a true and correct copy of the Consolidated Financial Statements, ODN Holding Corporation, Years Ended December 31, 2010 and 2009 with Report of Independent Auditors.  It is based on the company's financial data at the time, which would have been regularly recorded in the ordinary course of business in accordance with Oversee's practices, as audited by Oversee's Independent Auditors.

142.   As Page 11 of Exhibit 131 indicates, domain monetization revenue again ███████████████████████████████████████████████████ ████████

143.   Over the course of the three years between 2007 and 2010, domain name monetization revenue ████████████████████████████████████ ████████████████████

144.   Mr. Cahn's Employment Agreement with Oversee had a three year term. His last date of employment was December 31, 2010.  In accordance with his Employment Agreement, during his three years of employment with Oversee, Mr. Cahn received an annual salary of approximately ██████, a signing bonus of ██████, and annual retention bonuses of ██████.  Ex. 9, § 3(a), (e), (f).  He also

received the ICP bonuses described above, and, in 2010, in excess of ███████ in commissions under the Commission Plan.

145.   So, in 2007, Mr. Cahn received ████████ signing bonus plus a pro-rata base salary for the last two weeks of the year.  Mr. Cahn received compensation in the amount of, approximately, ██████ for his work in 2008.  He received compensation in the amount of, approximately, $ ██████ for his work in 2009.  He received compensation in the amount of, approximately, $ ██████ for his work in 2010.  During his tenure with Oversee, Mr. Cahn made in excess of $ ████████.

146.   I offered Mr. Cahn the opportunity to stay with the company in 2011 under the same terms with the same compensation plan as in the 2010 Commission Plan.  He did not accept that offer.

147.   It was not until after Mr. Cahn's employment was coming to an end that he advised me that he believed he was entitled to compensation under the MIP.

**XVI.   MIP Amendments and Oversee EBITDA Performance Goal.**

148.   The Oversee.net Board of Directors never amended any of the Performance Goals of the Moniker Business Segments during the time period that I was a director between November 2008 and August 2011

149.   The ODN Board never amended any of the performance goals of the Moniker Business Segments during the time period that I was a director between November 2008 and September 2011

150.   If either Board had amended the Moniker Performance Goals in the MIP before I began my service, I would have learned of such an amendment as a Board member, President, and eventually, as CEO.  There is no information or evidence I have ever seen that the Board ever amended the Performance Goals of the Moniker Business Segments in the MIP at any time

151.   During my tenure, Mr. Cahn never met with either the Oversee.net Board or the ODN Board and, to my knowledge, never asked to meet with either board, to

1   discuss any request to amend any of the MIP terms or to advise the Board that he

2   believed that the terms of the MIP had, in fact, been amended.

3        I declare under penalty of perjury of the laws of the United States of America

4   that the foregoing is true and correct, and that this declaration was executed the 21 da

5   of June, 2012, at _Ra'anana_, Israel.

6

7

8                                              Jeffrey Kupietzky

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28