1   William A. Delgado (Bar No. 222666)
2   wdelgado@willenken.com
    WILLENKEN WILSON LOH & DELGADO LLP
3   707 Wilshire Blvd., Suite 3850
4   Los Angeles, CA 90017
    Tel: (213) 955-9240
5   Fax: (213) 955-9250

6
    Attorneys for Defendants
7   OVERSEE.NET, JEFFREY KUPIETZKY,
    and LAWRENCE NG
8

9                  **UNITED STATES DISTRICT COURT**

10                 **CENTRAL DISTRICT OF CALIFORNIA**

11

12  MONTE CAHN, an individual,          | Case No. CV-11-03800 SVW (AGRx)
                                        |
13                     Plaintiff,       | **REDACTED VERSION OF DIRECT**
                                        | **EXAMINATION OF GEORGE G.**
14         v.                           | **STRONG, JR.**
                                        |
15                                      |
16  OVERSEE.NET, a California           | Complaint Filed:    May 3, 2011
    corporation; JEFF KUPIETZKY, an     | Trial Date:         July 10, 2012
17  individual, LAWRENCE NG, an         |
    individual; and DOES 1 through 10   |
18                                      |
19                     Defendants.      |
                                        |
20                                      |
                                        |
21
22
23
24
25
26
27
28

DIRECT EXAMINATION OF GEORGE G. STRONG, JR.

126059.1

## DIRECT TESTIMONY OF GEORGE G. STRONG, JR.

I, George G. Strong, Jr., do hereby declare as follows:

1.      I am Managing Director and General Counsel at Cornerstone Research, Inc. ("Cornerstone").  I have been retained by counsel to Oversee.net to provide expert testimony in this matter.

2.      Exhibit 467 is a true and correct copy of my original Rebuttal Report of George G. Strong, Jr. ("Original Report").   Exhibit 468 contains true and correct copies of Exhibit Nos. 1-7 to my Original Report.  Exhibit 519 is an errata to that Original Report.

3.      Exhibit 505 is a true and correct copy of my Supplemental Report of George G. Strong, Jr. ("Supplemental Report"), including the exhibits and appendix thereto.

4.      All of the matters stated in my Original and Supplemental Reports and all of the matters stated herein are true and correct of my own personal knowledge or represent opinions I have reached based upon my review of evidence and data, all as described herein and in the Original and Supplemental Reports.  I hereby testify to all of the statements contained herein and all of the statements and opinions contained in the Original and Supplemental Reports and expressly incorporate the statements in both the Original and Supplemental Reports herein.

**A.      Credentials**

5.      My background and credentials are described in Appendix A to my Original Report.  I will briefly summarize them here.  I received a B.A. in Economics from Yale University in 1969, an MBA from Harvard University in 1971, and a J.D. from University of San Diego School of Law in 1974.  I am a Certified Public Accountant, licensed by the States of California and Hawaii.  In addition, I am accredited by the AICPA in business valuation (ABV), certified in financial forensics (CFF), and I am a Certified Management Consultant.

126059.1

6.      As more particularly described in Appendix A, I spent more than 20 years with Price Waterhouse LLP and its later incarnation PriceWaterhouseCoopers LLP (collectively, "PWC").  From 1987 through 2002, I was a PWC partner and served in various capacities on PWC Boards and Committees, as more fully described in Appendix A to the Report.  From 2002 through the present, I have been Managing Director and General Counsel at Cornerstone.  I have testified in a wide variety of matters at deposition, trial, and arbitration, all as more fully described in Appendix A to my Original Report.

**B.      Assignment**

7.      My assignment was to review and comment upon the expert witness report of Mr. Cahn's expert, Mr. Callaghan, and to separately evaluate whether the performance of the Moniker Business Segments triggered any bonus payments under the MIP.  My Original Report reflects the opinions I formed with respect to the Domain Sales and Registrar Business Segments.  My Supplemental Report reflects the opinions I formed with respect to the TrafficClub Business Segment.

**C.      Setting of the MIP Goals.**

8.      The Moniker Business Segment Performance Goals identified in the MIP are consistent with Oversee's contention that the MIP Performance Goals were intended to reward the participants for achieving earnings and revenue growth consistent with the claims made to Oversee in the Offering Documents and related presentation materials (trial exhibits 72, 73) that I understand were prepared by Seevast's investment bankers, Jordan, Edmiston Group, Inc.  *See,* Original Report at ¶ 11 and Ex. 5 thereto.

**D.      Analysis of Domain Sales Business Segment.**

9.      I measured the performance of the Domain Sales Business Segment in relation to the MIP Performance Goals and determined that the performance of that Business Segment fell far below the MIP Performance Goals for each of the three Determination Periods.  *See,* Original Report, ¶¶ 17, 22, 23, and Ex. 3, thereto.

126059.1

10.     Below is a reproduction of Exhibit 3 to my Original Report, which illustrates the shortfall between actual performance of the Domain Sales Business Segment and the MIP Performance Goals:



11.     The following table is based on Exhibit 3 to my Original Report and compares the Domain Sales Business Segment Goals for each Determination Period to actual performance in numerical percentages:

|  | First Determination Period | Second Determination Period | Third Determination Period |
|---|---|---|---|
| MIP Performance Goal | ██████ | ██████ | ██████ |
| Actual Performance | █████ | █████ | █████ |
| Percentage Achieved | **21.1%** | **-14.4%** | **5.50%** |

**E.     Analysis of the Registrar Business Segment.**

12.     I measured the performance of the Registrar Business Segment in relation to the MIP Performance Goals and determined that the performance of that Business

DIRECT EXAMINATION OF GEORGE G. STRONG, JR.

3

126059.1

Segment also fell far below the MIP Performance Goals for each of the three

Determination Periods.  *See,* Original Report, ¶¶ 18, 22, 23, and Ex. 2, thereto.

13.    Below is a reproduction of Exhibit 2 to my Original Report, which

illustrates the shortfall between actual performance of the Registrar Business Segment

and the MIP Performance Goals:



14.    The following table is based on Exhibit 2 to my Original Report and

compares the Registrar Business Segment Goals for each Determination Period to

actual performance in numerical percentages:

|  | First Determination Period | Second Determination Period | Third Determination Period |
|---|---|---|---|
| MIP Performance Goal | ■ | ■ | ■ |
| Actual Performance | ■ | ■ | ■ |
| Percentage Achieved | *-15.2%* | **27.7%** | **23.1%** |

126059.1

**F.**     **Analysis of the TrafficClub Business Segment.**

15.     I measured the performance of the TrafficClub Business Segment in relation to the MIP Performance Goals and determined that the performance of that Business Segment also fell below the MIP Performance Goals for each of the three Determination Periods.  *See,* Supplemental Report, ¶¶ , 19-22 , and Ex. 8, thereto.

16.     Below is a reproduction of Exhibit 8 to my Supplemental Report, which illustrates the shortfall between actual performance of the TrafficClub Business Segment and the MIP Performance Goals:



17.     The following table is based on Exhibit 8 to my Supplemental Report and compares the TrafficClub Business Segment Goals for each Determination Period to actual performance in numerical percentages:

|  | First Determination Period | Second Determination Period | Third Determination Period |
|---|---|---|---|
| MIP Performance Goal | | | |
| Actual Performance | | | |
| Percentage Achieved | **60.6%** | **26.5%** | **11.5%** |

126059.1

**G.      Failure to Achieve Total Moniker Performance Goal.**

18.      As I noted in my Original Report, it is still possible to earn a MIP award for a particular business segment whose performance is less than 70% but greater than 55% **if** the Total Actual Moniker Performance is equal to at least 100% of the Total Moniker Performance Goal for that Determination Period.  *See* Original Report at ¶ 15.

19.      Because there is only one business segment in one Determination Period that exceeds a 55% performance threshold (i.e., the TrafficClub Business Segment in the First Determination Period), only the Total Actual Moniker Performance in the First Determination Period requires analyzing.

20.      The Total Moniker Performance Goal for the First Determination Period was ████████.  However the Total Actual Moniker Performance was only, approximately, ████████.  Thus, the performance level was only, approximately, 19%.

21.      Since the Total Moniker Performance Goal did not reach the minimum 100% level, no award is triggered.

**H.      Sensitivity Analyses**.

22.      The purpose of a sensitivity analysis is to determine the extent to which a given result would change based on altering underlying assumptions.

23.      I conducted a sensitivity analysis of the Domain Sales and Registrar Business Segments by altering five different data points:

a.  I increased Moniker's share of Expiring Auctions revenues above the ████ achieved immediately prior to Moniker's acquisition by Oversee.

b.  I increased Moniker's share of Registrar revenues above the ████ achieved immediately prior to Moniker's acquisition by Oversee.

c.  I added "stage 3" revenues earned by SnapNames using Moniker's registry.

d.  I added the revenues from the sales of domain names internally owned by the company.

DIRECT EXAMINATION OF GEORGE G. STRONG, JR.

6

126059.1

e.  I excluded payroll costs of three employees who worked primarily but

perhaps not exclusively on Moniker projects (i.e., Michele van Tilborg,

Stephen Yeich, Michael Lee).

Original Report at ¶ 25 and Exhibit 4.

24.     After performing a sensitivity analysis on these results, I concluded that it is unlikely that efforts to question these assumptions and data that underlie my analysis would change the conclusion that the actual performance of the Registrar and Domain Sales Business Segments fell below each of the MIP Performance Goals in each Determination Period.  *See,* Original Report, ¶¶ 25-27, and Exhibit 4 thereto.

25.     I conducted a sensitivity analysis of the TrafficClub Business Segment by including the gross profit from DomainSponsor accounts that were opened after 2008 whose personal name, company name, email address, street address or phone number is the same as one of the accounts I identified as a TrafficClub customer as defined by Section 15(aa) of the MIP.  *See*, Supplemental Report, ¶ 23.

26.     Even after factoring in the additional gross profit from the sensitivity analysis, Mr. Cahn does not meet the Performance Goal in any Determination Period. *See* Supplemental Report, ¶ 23.

I.      **Industry Response to 2008-10 Recession**.

27.     I also analyzed the overall performance of the Internet domain name management industry and compared it to Moniker's performance during the term covered by the MIP.

28.     This effort was designed to analyze whether there is a basis to conclude that 1) Moniker's failure to achieve its Performance Goals was consistent with the industry as a whole, and 2) the extent to which the collapsing industry and economic environments explain a significant part, if not all, of the performance shortfall of the Moniker Business Segments.

29.     As I point out in my Reports, there was a significant disconnect between Moniker's expectation pre-acquisition and market reality post-acquisition.  As can be

1   seen from the Offering Documents, Moniker management expected the domain name

2   industry to continue to expand, as it had been doing.  For example, the Moniker

3   Offering Documents anticipated Moniker would have "explosive" and "sustained"

4   double-digit growth in the "rapidly expanding" domain name management industry.

5   *See* Exhibit 72 at OVER009945 and OVER009950.  Moniker also contemplated

6   growth in the online advertising industry to grow from $24.5 billion worldwide in 2006

7   to $42.7 billion by 2009.  *Id.* at OVER009950.

8         30.    However, market conditions soured in 2008 due to factors such as the

9   general economic downturn and three industry-specific changes:

10           a.  The Internet Corporation for Assigned Names and Numbers

11             ("ICANN") implemented measures to effectively reduce and eliminate

12             the practice of "domain tasting";

13           b.  Google launched a tool to allow organizations to prevent their

14             advertisements from showing on "parked domains" such as those

15             serviced by TrafficClub and DomainSponsor;

16           c.  Google changed its algorithms to increase relevancy to actual search

17             intentions, which was expected to have a depressing effect on

18             advertising-driven domain name registrations.

19   *See* Original Report at ¶¶ 36-38, Supplemental Report at ¶ 26.

20         31.    As a result, in 2008, domain companies suffered a reported 50% decline

21   in the pay-per-click advertising segment and experienced difficulties in the domain

22   sales market as well.  *See* Original Report at ¶ 39, Supplemental Report at ¶ 27.

23         32.    According to industry press, the following year, 2009, was noted as a

24   "tough year" for the domain name management industry with the "heaviest damage" in

25   the pay-per-click advertising business "with many who park their names reporting

26   revenue declines ranging from 50-75%."  *See* Supplemental Report at ¶ 27.

27

28

126059.1

33.     Again, according to industry press, by January 2011, the pay-per-click advertising market was "still limping so severely that many believe it is beyond recovery." *See* Supplemental Report at ¶ 27.

34.     In summary,  I concluded that Moniker's poor performance was consistent with the declining industry as a whole, which supports Oversee's contention that Moniker results were neither manipulated nor artificially depressed to prevent attainment of the MIP Performance Goals.  *See, generally,* Original Report  at ¶¶ 33-41, and Ex. 6 thereto and Supplemental Report at ¶¶ 24-28.

**J.     Correlation of New Customers.**

35.     I attended my deposition in this matter on June 19, 2012.  At my deposition, I was shown a list of "New" customers compiled by Elizabeth Murray, Oversee's Chief Financial Officer, for purposes of her MIP performance calculations. The list appears at OVER_____.

36.     At the deposition, I confirmed that various DomainSponsor OIDs in Ms. Murray's list do not appear in Exhibit 9 of my Supplemental Report.  That does not, however, mean that I did not identify these accounts as "New" accounts.

37.     In fact, all of the accounts identified by Ms. Murray except one (OID 111662, which I address in the next section) are contained within the seventy-six (76) "new" accounts I identified.

38.     One can see that I identified all of the accounts identified by Ms. Murray by examining the "Florida AM" tab of the spreadsheet "MC Data Pull Jan 7" which has Bates-label OVER024661.  That tab contains OIDS for which I requested that Oversee pull data, and all of the "new" customers identified by Ms. Murray appear in that tab.

39.     However, not all of the "new" customers that I identified had non-zero revenue (and, by extension, non-zero gross profit) for 2008-2010.  Exhibit 9 contains only the customers I identified that had non-zero revenue.  Therefore, to the extent that an OID appears in Ms. Murray's list but does not appear in Exhibit 9, it is not because it was not identified but, rather, because it was identified and noted that it did not have

1  any revenue (and, therefore, no gross profit) associated with it for the relevant time

2  period.

3      40.    For the sake of clarity, to the extent that an OID appears in Exhibit 9, but

4  it shows $0 in revenue, that is because it had non-zero revenue that, when rounded to

5  the nearest dollar, rounded to zero (e.g., fractions of a penny).

6  **K.    Additional Accounts Identified at Deposition**.

7      41.    At my deposition, I was also shown a spreadsheet Bates-labeled

8  OVER024580 which contained monthly revenues for four different OIDs—63539,

9  96921, 96932, 111662—on a monthly basis between 2007 and 2010.

10      42.    It is my understanding, based on conversations with Oversee employees,

11  that Account Nos. 96921and 96932 are Moniker-owned accounts which generated

12  monetization revenue.

13      43.    I have accounted for the monetization revenue of Account No. 96921

14  under the Registrar Business Segment as Registrar Monetization Revenue for all Three

15  Determination Periods.  *See* Original Report, Appendix D, Schedules 1, 3 and 5.

16      44.    I did not account for the monetization revenue of Account No. 96932

17  under the Registrar Business Segment because the amount of money at issue ($1 in

18  2008, $4 in 2009, and $1 in 2010 for a total of $6 over 3 years) was not just immaterial

19  but also negligible.  Nevertheless, if one were to account for it, it should be accounted

20  for in the Registrar Business Segment.

21      45.    Because the monetization revenue of Account Nos. 96921 and 96932 are

22  accounted for in the Registrar Business Segment, it would be appropriate to remove

23  them from the TrafficClub Business Segment.  If one were to remove the Gross Profit

24  of these two accounts, TrafficClub's actual performance would be:

25          a.    ▮▮▮▮▮▮  in 2008 (i.e., reduced by $▮▮▮▮▮)

26          b.    ▮▮▮▮▮▮  in 2009 (i.e., reduced by $▮▮▮▮)

27          c.    ▮▮▮▮▮▮  in 2010 (i.e., reduced by $▮▮▮▮)

28

---

DIRECT EXAMINATION OF GEORGE G. STRONG, JR.

10

126059.1

46.     It is my understanding, based on conversations with Oversee employees, that Account No. 111662 is Moniker's "Default DNS" account, and it captures revenue as follows:

    a.  If a customer of the registrar does not indicate the domain name server, or "DNS", setting on a domain name they have registered, the DNS setting "defaults" to Moniker's DNS.  Alternatively, a customer might purposefully insert Moniker's DNS into that setting.

    b.  Moniker's DNS would be pointed to the DomainSponsor system where a monetization page would be created and monetization revenue could be earned by the registrar.  The 111662 account was set up to capture that monetization revenue of the registrar.

47.     Since this account captures monetization revenue generated as the result of the actions or inactions of a registrar customer, I accounted for this revenue under the Registrar Business Segment.  *See* Original Report, Appendix D, Schedules 1, 3 and 5.

48.     Lastly, I will address Account No. 63539.

49.     It is my understanding, based on conversations with Oversee employees, that throughout the course of any given year, Oversee receives monetization revenue in respect of traffic from sources unknown to Oversee.  For example, a DomainSponsor customer, or even Oversee, might send domain name traffic to the DomainSponsor system but forget to link the domain names to their DomainSponsor account.

50.     Monetization revenue received from unknown sources is credited to Account No. 63539, an Oversee "default" account that existed prior to its acquisition of Moniker.

//

//

51.     Given that Account No. 63539 captures monetization revenue from
unknown sources and predates the acquisition of Moniker, it cannot be accurately
considered a "TrafficClub Customer" and, therefore, it was proper to exclude profit
from this account from my TrafficClub calculations.

I declare under penalty of perjury of the laws of the United States of America
that the foregoing is true and correct, and that this declaration was executed this 21st
day of June, 2012, at Los Angeles, California.

_____
George G. Strong, Jr.

125948.1