William A. Delgado (Bar No. 222666)
wdelgado@willenken.com
WILLENKEN WILSON LOH & DELGADO LLP
707 Wilshire Blvd., Suite 3850
Los Angeles, California 90017
Telephone:  (213) 955-9240
Facsimile:   (213) 955-9250

Attorneys for Defendants
OVERSEE.NET, JEFFREY
KUPIETZKY, and LAWRENCE NG

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONTE CAHN, an individual,<br><br>Plaintiff,<br><br>v.<br><br>OVERSEE.NET, a California corporation; JEFF KUPIETZKY, an individual; LAWRENCE NG, an individual; and DOES 1 through 10,<br><br>Defendants. | Case No.: CV11-03800 SVW (AGRx)<br><br>**REDACTED VERSION OF DEFENDANT OVERSEE.NET'S UNREDACTED TRIAL BRIEF**<br><br>Assigned to the Hon. Stephen V. Wilson<br><br>Complaint Filed: May 3, 2011<br>Trial date:  July 10, 2012 |

126271.1

# <u>TABLE OF CONTENTS</u>

Page(s)

I. INTRODUCTION......................................................................1

II. THE CLAIMS AND BUSINESS SEGMENTS THAT ARE NOT AT ISSUE..................................................................................3

    A. The Bifurcated and Dismissed Claims..................................4

    B. Registrar Business Segment..............................................4

    C. Domain Sales Business Segment........................................6

    D. The Court Should Not Waste Time on Arguments Related to the Registrar and Domain Sales Business Segments...........................6

    E. Oversee Business Segment...............................................8

        1. The Court has already ruled on this segment. ...........................8

        2. Cahn's recycled theory runs afoul of the Court's previous findings of fact..............................................................9

        3. The Court should not rewrite the MIP....................................11

III. THE TRAFFICCLUB BUSINESS SEGMENT. ...........................................14

    A. Oversee Did Not Breach the MIP by Migrating TrafficClub Customers to DomainSponsor. ......................................14

        1. The MIP does not prevent the transition of TrafficClub customers to DomainSponsor....................................14

        2. Oversee did not violate Section 9 of the MIP or the implied covenant of good faith and fair dealing.....................14

            a. Oversee did not violate Section 9 of the MIP. ..............14

            b. Oversee did not violate the covenant of good faith and fair dealing..............................................15

    B. Cahn Has Not Shown That a Migration of TrafficClub Customers Proximately Resulted in Damages...................18

    C. Cahn's "Failure to Track" Argument Collides Head On with His Argument That the TrafficClub Performance Goals Were Met in 2008 and 2009. ........................................19

    D. The Calculations Establish That the TrafficClub Performance Goals Were Not Met. ..................................20

        1. TrafficClub Performance in 2008 and 2009........................20

2.    The sensitivity analysis.............................................................21

3.    The Oversee Default Account: 63539. ....................................21

4.    The Moniker Accounts: 96921 and 111662. ...........................22

5.    The "missing" shared accounts.................................................23

6.    Cahn's Citations to Cases on Damages Are Inapposite. ..........24

7.    Cahn's calculations forget to account for the ICP...................25

8.    Section Conclusion. .................................................................26

IV.    CAHN IS NOT ENTITLED TO ATTORNEYS' FEES. ............................26

V.    LOGISTICAL ISSUES. ...............................................................26

VI.    CONCLUSION. ...........................................................................27

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## Federal Cases

*Stevens v. Mavent, Inc.,*
2008 WL 2824956 *2 (C.D. Cal. July 21, 2008).................................................. 18

## State Cases

*Allen v. Gardner,*
126 Cal. App. 2d 335 (1954) ...................................................................... 25

*Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.,*
2 Cal. 4th 342, 826 P.2d 710 (1992) ............................................................ 16

*Channell v. Anthony,*
58 Cal. App. 3d 290 (1976) ....................................................................... 25

*Goldberg v. City of Santa Clara,*
21 Cal. App. 3d 857 (1971) ................................................................. 12, 13

*Guz v. Bechtel Nat. Inc.,*
24 Cal. 4th 317, 8 P.3d 1089 (2000) ............................................................ 16

*James v. Herbert,*
149 Cal App. 2d 741 (1957) ....................................................................... 25

*MacDonald v. John P. Scripps Newspaper,*
210 Cal. App. 3d 100 (1989) ...................................................................... 18

*Mann v. Jackson,*
141 Cal. App. 2d 6 (1956) ......................................................................... 25

*Noble v. Tweedy,*
90 Cal. App. 2d 738 (1949) ....................................................................... 25

*Ramona Manor Convalescent Hospital v. Care Enterprises,*
177 Cal. App. 3d 1120 (1986) .................................................................... 25

*US Ecology, Inc. v. State,*
129 Cal. App. 4th 887 (2005) ..................................................................... 18

*Vu v. California Commerce Club, Inc.,*
58 Cal.App.4th 229 (1997) ........................................................................ 18

126271.1

1

## Statutes

2  Cal. Civ. Code § 1565..................................................................................13

3  Cal. Civ. Code § 1580..................................................................................13

4  Cal. Civ. Code § 1644..................................................................................22

5  Cal. Civ. Code § 3301..................................................................................26

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

126271.1

# TRIAL BRIEF

## I.   INTRODUCTION.

At issue in this case is the Oversee.net 2007 Management Incentive Plan ("MIP"), which was adopted as part of Oversee.net's ("Oversee") acquisition of DomainSystems, Inc. d/b/a Moniker.com ("Moniker").  The MIP's incentive structure is divided into four business segments and three determination periods, thereby creating twelve potential "buckets" of incentive compensation.  As Oversee will demonstrate in this trial brief, **only two buckets**—TrafficClub Performance in the First Determination Period and TrafficClub Performance in the Second Determination Period—**truly remain at issue.**

The Court having already adjudicated the Oversee segment in January 2012, the focus of this trial is the performance of the three Moniker Business Segments: TrafficClub, Registrar, and Domain Sales.  As it turns out, however, Cahn has abandoned his claims in respect of the Registrar and Domain Sales Business Segments.  That is not surprising given that Oversee's uncontroverted evidence as to the performance of these segments conclusively establishes that both segments fell well short of the MIP Performance Goals in all three Determination Periods.

With respect to TrafficClub, Cahn makes two arguments that are seemingly at odds with each other: (i) that Oversee inappropriately "shut down" TrafficClub making it impossible for that segment to reach the MIP Performance Goals and (ii) that, in fact, TrafficClub *did* reach the Performance Goals in the First and Second Determination Period, and Cahn is owed a Performance Award for both periods.  Neither of these arguments is supportable.

First, Oversee did not breach the MIP by inappropriately "shutting down" TrafficClub.  Rather, Oversee transitioned TrafficClub customers to DomainSponsor in response to Skenzo, TrafficClub's greatest revenue provider, pulling its advertising feed.  At no point did Oversee stop providing TrafficClub customers with monetization services as the term "shut down" might imply.

1    Rather, Oversee continued to offer monetization services and scrambled to

2    preserve as many TrafficClub customers as possible so that they would not leave

3    Oversee to do business with Skenzo directly.  In short, the decision was completely

4    justifiable in light of the circumstances, and Mr. Cahn agreed with it at the time.

5    Notably, Cahn has never provided any evidence of the contra-factual: that if the

6    TrafficClub customers had not been migrated and TrafficClub had continued to

7    operate as a stand-alone entity, it would have met the Performance Goals under the

8    MIP.  For the foregoing reasons, Cahn cannot show that Oversee breached the MIP

9    by migrating TrafficClub customers to DomainSponsor and, even if it did, that

10   Cahn suffered damage as a result thereof.

11       <u>Second</u>, there is no evidence that the TrafficClub Business Segment

12   achieved the Performance Goals in the MIP.  Oversee's expert witness, George G.

13   Strong, Jr., has calculated TrafficClub's performance in all three Determination

14   Periods and has concluded that performance fell short in all three periods (and

15   woefully so in the Second and Third Determination Periods).  Neither Cahn nor

16   Callaghan offers their own calculations to rebut Strong's.  Instead, Cahn offers a

17   critique of Strong's calculation, arguing that Strong omitted: (i) various "house

18   accounts" and (ii) the DomainSponsor accounts of various Shared Customers.

19   According to Cahn, adding the gross profit from these two sources pushes

20   TrafficClub performance to a level that triggers an award in the First and Second

21   Determination period.

22       Cahn is wrong.  The evidence will show that the "house accounts" that Cahn

23   references should not be included in a TrafficClub calculation, and Oversee was

24   correct to omit them.  Put simply, these accounts are not "TrafficClub Customers"

25   under Section 15(aa) of the MIP.  The evidence will also show that Cahn's

26   computation with respect to the "missing Shared Customers" is erroneous.  Even if

27   one assumes that Cahn is correct and that the identified individuals are "Shared

28   Customers" so that Cahn is entitled to a portion of their DomainSponsor accounts,

1   then Cahn is required to determine the "Applicable Share Percentage" that must be

2   attributed to each individual.  MIP, Section 15(a).  Cahn fails to calculate that

3   percentage and, instead, simply assumes that the percentage is 100%.  That is a

4   false assumption because, as it turns out, in some cases the percentage is 0% which

5   means Cahn does not get credit for these customer's DomainSponsor accounts **or**

6   their TrafficClub accounts.

7         Oversee's calculations are dispositive; the Moniker Business Segments did

8   not reach the Performance Goals in the MIP.  Some segments (like Registrar and

9   Domain Sales) performed so poorly that Cahn has decided he is not even going to

10  try to challenge the calculations.  Cahn's only real contention is with respect to

11  TrafficClub in the First and Second Determination Periods.  Even then, he

12  concludes that the Performance Goals were reached only after applying erroneous

13  calculations.

14        Oversee respectfully requests that judgment be entered in its favor on Cahn's

15  First Claim for Breach of the MIP.

16  **II.    THE CLAIMS AND BUSINESS SEGMENTS THAT ARE NOT AT**

17  **ISSUE.**

18        Because Cahn's pre-trial filings go beyond the scope of this trial, it is

19  important that Oversee immediately address what is *not* at issue.

20        On August 29, 2011, the Court bifurcated Cahn's First Claim for Relief from

21  all other claims.  Therefore, claims that have been bifurcated or were dismissed

22  with prejudice at the pleading stage are not before the Court.

23        Phase I of the First Claim was tried on January 24-25, 2012, and the Court

24  issued an order with respect to Phase I on February 6, 2012 (Docket No. 273)

25  ("February 2012 Order").  On April 20, 2012, the Court issued a Trial Setting

26  Order (Docket No. 322) ("Trial Setting Order") identifying the issues for Phase II

27  of the First Claim: the performance of the three Moniker Business Segments.

28  However, based on the direct examinations of Plaintiff, Monte Cahn, and his

1  expert, David Callaghan, Plaintiff's Memorandum of Contentions of Fact and

2  Conclusions of Law ("Plaintiff's Memorandum"), and Plaintiff's Proposed

3  Findings of Fact and Conclusions of Law, it is Oversee's position that Cahn has

4  failed to carry his burden (indeed, outright abandoned his claim) with respect to the

5  Registrar and Domain Sales Business Segments.  Thus, these two segments are not

6  truly at issue.

7      Lastly, it is Oversee's position that, based on the February 2012 Order, the

8  Court has already adjudicated the facts relevant to the Oversee Business Segment,

9  need not re-litigate the same issues a second time, and that Cahn's attempt to re-

10  litigate this segment is improper.

11      **A.      The Bifurcated and Dismissed Claims.**

12      Cahn's direct testimony declaration contains a paragraph (Paragraph 81) that

13  pertains to Cahn's third claim for relief (breach of contract for failure to pay

14  commission for the sale of the domain name, restaurants.com).  That claim has

15  been bifurcated and is not at issue, rendering this paragraph irrelevant.

16      Cahn's direct testimony declaration also contains a paragraph (Paragraph 82)

17  in which Mr. Cahn complains about not receiving payments for domain name

18  monetization.  That paragraph pertains to Cahn's sixth and seventh claims for relief

19  (conversion) which were dismissed with prejudice on January 6, 2012.  Order,

20  dated January 6, 2012 (Docket No. 219).  Thus, that paragraph is also irrelevant.

21      **B.      Registrar Business Segment.**

22      The Registrar Business Segment is the second of the Moniker Business

23  Segments.  Like the other business segments, Cahn must carry his burden of proof

24  and prove that the actual performance of this segment reached certain Performance

25  Goals in a particular Determination Period before any payment in respect of this

26  segment is required.

27      Put simply, however, Cahn has presented no evidence that the Registrar

28  Business Segment's actual performance triggered a payment under the MIP.

1  Nowhere in Cahn's Direct Examination does Cahn provide any affirmative

2  evidence that proves that the Registrar Business Segment achieved any of

3  Performance Goals in the MIP for any Determination Period.  Likewise, nowhere

4  in Callaghan's Direct Examination does Cahn's expert provide any calculation or

5  affirmative evidence that proves that the Registrar Business Segment achieved the

6  Performance Goals in the MIP.  What is more, Plaintiff's Memorandum plainly

7  contains a concession that Cahn has abandoned any claim to this segment as it

8  states that "[t]he parties are only proceeding to trial on Cahn's claim for breach of

9  the MIP in relation to TrafficClub."[1]  Lastly, even the Proposed Findings of Fact

10  and Conclusions of Law submitted by Cahn implicitly concede that he has

11  abandoned his claim in respect of this segment (as well as the Domain Sales

12  Business Segment as discussed, *infra)* since the document is entirely silent on a

13  monetary award in respect of either the Registrar or Domain Sales Business

14  Segments.

15         Moreover, even though Cahn has failed to carry his burden of proof to show

16  that the Registrar Business Segments achieved the Performance Goals, Oversee has

17  submitted undisputed evidence that proves that the Registrar Business Segment did

18  **not** achieve the Performance Goals.  The direct testimony of Oversee's expert

19  witness, George G. Strong, Jr. and his calculation of the actual performance of the

20  Registrar Business Segment stand as dispositive and unassailed by either Cahn or

21  Callaghan.  These calculations prove that the actual performance of the Registrar

22  Business Segment did not reach the Performance Goals (or even 55% or 70%

23

24  ———————————

25  [1]  To be clear, while it is certainly true that *Cahn* is only proceeding to trial with

26  respect to TrafficClub, that simply means that Cahn has affirmatively chosen to abandon any claim to the Registrar and Domain Sales Business Segments, and

27  Oversee is entitled to a ruling in its favor on these segments.  As explained, herein, Oversee is ready to proceed to trial on this segment and has put forward

28  affirmative evidence that the Registrar Performance Goals were *not* met.

1  thereof) in any of the three Determination Periods.  *See* Direct Testimony

2  Declaration of George G. Strong, Jr. ("Strong Direct") at ¶¶ 12-14.

3    **C.**  **Domain Sales Business Segment.**

4    At the risk of sounding repetitive, the same thing is true with respect to the

5  Domain Sales Business Segment.  Cahn fails to present any evidence that the

6  actual performance of the Domain Sales Business Segment triggered a payment

7  under the MIP.  Nowhere in Cahn's Direct Examination does Cahn provide any

8  affirmative evidence that proves that the Domain Sales Business Segment achieved

9  any of Performance Goals in the MIP for any Determination Period.  Likewise,

10  nowhere in Callaghan's Direct Examination does Cahn's expert provide any

11  calculation or affirmative evidence that proves that the Domain Sales Business

12  Segment achieved the Performance Goals in the MIP.  And, as seen previously,

13  both Plaintiff's Memorandum and Proposed Findings of Fact confirm that Cahn

14  has abandoned his claim in respect of this segment.

15    Once again, Oversee has submitted undisputed evidence that proves that the

16  Domain Sales Business Segment did ***not*** achieve the Performance Goals.  As with

17  the Registrar Business Segment, the direct testimony of Oversee's expert witness,

18  George G. Strong, Jr. and his calculation of the actual performance of the Domain

19  Sales Business Segment stand as dispositive and unassailed by either Cahn or

20  Callaghan.  These calculations prove that the actual performance of the Domain

21  Sales Business Segment did not reach the Performance Goals (or even 55% or 70%

22  thereof) in any of the three Determination Periods.  *See* Direct Testimony

23  Declaration of George G. Strong, Jr. at ¶¶ 9-11.

24    **D.**  **The Court Should Not Waste Time on Arguments Related to the**

25      **Registrar and Domain Sales Business Segments.**

26    Given that Cahn has apparently abandoned his claim with respect to the

27  Registrar and Business Segments, it would be a waste of time and judicial

28  resources to entertain Cahn's complaints as to these business segments at trial.

1    For example, Cahn claims that "Oversee's financial reports and

2   presentations did not accurately reflect the revenues and performance of the

3   Moniker division of Oversee, i.e., the registrar and domain sales business segments

4   of Cahn's MIP."  Plaintiff Memorandum at 7:8-10.  To make these arguments

5   Cahn seems to be distorting the deposition testimony of Craig Snyder and arguing

6   that Oversee did not include "Monetization Revenue" and "Expiring Auction

7   Revenue" for the Registrar Business Segment.  Even assuming Cahn's arguments

8   to be true, however, absent proof that the argument affects the calculation of the

9   performance of either segment in a material way, the argument is meaningless and

10  need not be entertained.  It is precisely that proof that Cahn fails to provide.

11   In any event, Cahn's argument is not just meaningless; it is demonstrably

12  false.  In calculating the revenue of the Registrar Business Segment, Mr. Strong

13  clearly included "Monetization Revenue" and "Expiring Auctions Net Revenue".

14  *See* Strong's Original Expert Report at Appendix D, Schedules 1, 3, and 5.[2]  The

15  Court can see on Mr. Strong's spreadsheets that both categories of revenue appear

16  in the calculation of Registrar revenues.

17   In short, Cahn should not be permitted to waste trial time with arguments

18  with respect to two business segments for which he has provided no calculations

19  and has clearly abandoned.[3]

20

21  _____

22  [2]  Mr. Strong's Original Expert Report and the exhibits thereto are Trial Exhibits
    467, 468.  His Errata (which does not affect any argument here) is Trial Exhibit

23  519.

24  [3]  For example, paragraphs 87-91 all relate to Cahn's complaints about Oversee's
25  management vis-à-vis the Registrar and Domain Sales Business Segments.
    While these paragraphs also have evidentiary problems (e.g., they lack
26  foundation, reference hearsay, etc.), the long and the short of it is they pertain to
    the two business segments for which Cahn does not challenge Oversee's
27  calculations of performance.

28

**E.      Oversee Business Segment.**

        **1.**    *The Court has already ruled on this segment.*

On January 24-25, 2012, the Court held a trial with respect to the Oversee Business Segment.  It issued a ten page order with respect to that segment on February 6, 2012.  After cross-motions for summary judgment on the TrafficClub Business Segment and the Court's orders thereon in April 2012, the Court set a new trial date by stating:

> As the parties are aware, Cahn's First Claim essentially consists of two key issues: (1) whether the Moniker Business Segments achieved any of the Performance Goals under the MIP; and (2) whether Oversee promised Cahn that his Performance Goal under the MIP would be identical to a target used as part of the process for determining bonuses for Oversee legacy management employees.  **The Court has already adjudicated the latter issue.**  Accordingly, the parties should be prepared to try the remaining issues on the above date.

Trial Setting Order (emphasis added).[4]  In short, then, the Court has already issued a ruling on the Oversee Business Segment.

The Trial Setting Order does not state that the Court intends to revisit its earlier ruling.  The Trial Setting Order does not identify a "third" key issue (i.e., whether Oversee promised Cahn some other metric as the Oversee Performance Goal).  And, neither the Trial Setting Order nor the law contemplates giving Cahn a second bite at the apple by recycling his legal theories.  Cahn's steadfast position throughout this litigation with respect to the Oversee Business Segment was and has been that the Oversee promised him that the Oversee Performance Goals would mirror the Oversee budget goals.  After a trial on this issue, the Court found that this representation was never made and that it was not consistent with the

---

[4]   The date of the trial was subsequently continued, but the scope of the trial was not.

1   language in the MIP.  As a result, there is no need to re-litigate this segment.

2          **2.**     *Cahn's recycled theory runs afoul of the Court's previous*

3                    *findings of fact.*

4          The foregoing notwithstanding, it appears that it is precisely Cahn's intent to

5   re-litigate the Oversee EBITDA segment.  Cahn begins by citing language in the

6   Court's December 29, 2011 order (Docket No. 209) denying Oversee's motion for

7   summary judgment prior to the January 2012 trial.  Plaintiff's Memorandum at 8:3-

8   9:12.  Apparently, Cahn intends to leverage that language to argue recycle his

9   theory that, because Oversee never set an Oversee Performance Goal, Cahn is, *ipso*

10  *facto*, entitled to the Performance Award for all three Determination Periods.

11  There are two problems with this argument.

12         <u>First</u>, Cahn's argument rests on the premise that the Court earlier determined

13  that Oversee breached the MIP.  Oversee disagrees.  The language at issue—

14  dropped in a footnote in an order *denying Oversee's* motion for summary

15  judgment—simply suggested that summary judgment in Oversee's favor was

16  inappropriate because it "arguably" acted to frustrate the MIP.  Order on Oversee's

17  Motion for Summary judgment at p. 5, n. 8 (Docket No. 209).  Nevertheless, the

18  evidence and arguments as to Oversee's actions were heard at the subsequent trial

19  in the matter, and the Court issued an order thereon.  There is nothing in the

20  Court's February 6, 2012 Order that states that Oversee breached the MIP or that

21  Oversee frustrated any performance under the MIP.  Thus, Cahn's new theory is

22  based on a mistaken presumption.

23         <u>Second</u>, Cahn's theory is also fundamentally premised on his argument that

24  the Oversee Performance Goal was designed to reward growth or ***decline*** in

25  Oversee's business (notwithstanding the fact that the Oversee Performance Awards

26  increased over time).  Plaintiff's Memorandum at 8:27 ("[A] purported decline in

27  Oversee's business, Moniker's business, or in the economy as a whole is of no

28  consequence to the setting and attainment of the Oversee EBITDA Performance

Goal…").  However, the Court already rejected that proposition in its February 2012 order:

> Indeed, the first paragraph of the MIP states that the "Plan is designed to reward, through additional cash compensation, the Participants for significant contributions toward the continued or improved profitability and growth of the Company."  (Tr. Ex. 1 at 001-001).  The fact that the MIP sets forth improved profitability and growth as an express purpose of the MIP, coupled with the fact that the Moniker Performance Goals were based on Cahn's aggressive growth projections for Moniker **strengthens the conclusion that the Oversee Performance Goal was similarly designed to reward growth**, not to simply reward achievement of the annual Company Budget, regardless of whether that figure represented growth for a particular year.

February 2012 Order at p. 7 (emphasis added).

The Court's conclusion that the Oversee Performance Goal was designed to reward growth (and not decline) is further bolstered by the incentive structure of the Moniker Business Segments.  The same is true for all three segments: both the award and the performance goal increase year over year over year (i.e., the awards *and* goals increase from 2008 to 2009 to 2010).  In a similar fashion, the (large) Performance Awards of the Oversee segment increase year over year over year. This leads to only one conclusion: the Oversee Performance Goal would have also increased year after year after year.  It would not serve the purpose of the MIP (i.e. to reward "significant" contributions to growth) to offer increasingly larger Performance Awards for a *decline* in performance.  Thus, any argument premised on the notion that an award is appropriate when performance declined is simply incorrect.  Because the foundation of the argument is wrong, Cahn's argument collapses on itself.

Third, based on the Court's earlier findings, the performance of Oversee would have never triggered an award, irrespective of what the Oversee EBITDA goals would have been.  While an Oversee EBITDA goal was never set, two things

1    are known: (i) had it been set, the 2008 goal would have been more than ███

2    ███[5] and (ii) because the Oversee Performance Goal was designed to reward

3    growth, the goals would have grown over time (i.e., greater in 2010 than in 2009

4    than in 2008).  Thus, in all three determination periods, the Oversee Performance

5    Goal would have been greater than ███.

6         Yet, as the Court is aware from the first trial, Oversee's actual performance

7    in 2008 was ███, its performance in 2009 was ███, and actual

8    performance in 2010 was ███.  Direct Testimony Declaration of Jeffrey

9    Kupietzky (Docket No. 246) at ¶¶ 101, 115, 139.  All three of these numbers are

10   less than seventy percent (70%) of even ███.  It necessarily follows that

11   Oversee's performance was less than 70% of a number greater than ███

12   (i.e., what the Oversee Performance Goals would have been).  As a result,

13   Oversee's actual performance never would have triggered an award, and Cahn's

14   argument that he should be awarded $███ for the Oversee Business

15   Segment falls flat.

16            **3.**    *The Court should not rewrite the MIP.*

17        In reality, Cahn is asking the Court to do two things: (i) re-write the MIP so

18   as to eliminate the first paragraph so that the MIP rewards decline and (ii)

19   speculate as to how the Oversee Board would have set an Oversee Performance

20   Goal to reward decline (while, at the same time, keeping the awards at a very high

21   level).  The Court should decline this invitation.

22        <u>First</u>, Cahn offers no argument (and Oversee is unaware of any principle of

23   law) which allows the Court to re-write a contract to eviscerate its stated intent.

24

25   _____

26   [5]  February 2012 Order at p. 8, n. 7 ("Kupietzky explained that the $███
     EBITDA figure was not in the MIP because **the corresponding Oversee**

27   **EBITDA target in the MIP would naturally have been higher** due to the fact
     that it would be based in part on Cahn's aggressive projections with regards to

28   the Moniker Business Segments.") (emphasis added).

126271.1

The intent of the MIP, as clearly stated in Paragraph 1, was to reward growth because the MIP grew out of Cahn's own aggressive projections for growth.  There is no legal basis for re-writing the MIP so that it rewards decline.

Second, even if the MIP were re-written so that it was possible to reward decline, it would not be possible to accurately determine how the Board would have set "TBD" since "TBD" would have included an unknown objective element and an unknown subjective element, determined at the Board's discretion, intended to incentive performance.  Caselaw makes clear that the absence of a payment *trigger* (i.e., the Performance Goal) renders a contract unenforceable.  As the Court in *Goldberg v. City of Santa Clara*, 21 Cal. App. 3d 857, 861 (1971) explained:

> But what is put into the power of one party to decide, provided he act with good faith, as recognized in the cases cited above and in some cases from other jurisdictions (see 92 A.L.R. 1396 et seq.), is the *amount to be paid*. The uncertainty about this can often be resolved. **What is uncertain in the case before us is much more: not only is the amount which might be paid uncertain, but so is *what it is to be paid for*. This is a very different matter**. (See 1 Corbin on Contracts, § 100.) In our case, the extra payment is not sought for extra time; plaintiff was compensated for his time on an agreed hourly basis of $35 (or $45 for court time), and presumably he billed for all of his time. The alleged agreement is on a contingent basis; and what is the contingency? That the "savings" are "of such magnitude as, *in our opinion*, would justify additional compensation." (Italics added.) **This is too vague to impose contractual liability. No objective standard is declared. No comparable transaction or practice is referred to. No breaking-point amount is stated.**

*Id*. (italics in the original, bold emphasis added).  The *Goldberg* Court ultimately concluded that "[t]he terms of the alleged contract for additional compensation are too vague to permit a true meeting of the minds."  *Id*. at 863.

Ironically, Mr. Cahn's most recent declaration leads to the same conclusion

1   here—that there was no meeting of the minds.  In Paragraph 72 of his Direct

2   Testimony, Mr. Cahn testifies in no uncertain terms, "I never would have agreed to

3   such a proposal of having a higher EBITDA goal than Oversee had for purposes of

4   my MIP…"  And, yet, Oversee's position was exactly the opposite: it never agreed

5   (nor would it have agreed) to have the MIP's EBITDA goal for the Oversee

6   segment be the same as "budget" and would have always insisted that the MIP

7   goals be higher than budget because the MIP was based on Cahn's aggressive

8   projections.  February 2012 Order at p. 6 ("However, as Defendants' counsel

9   noted, the evidence before the Court makes it equally clear that Defendants

10  rejected Cahn's position on this issue each and every time it arose.") and p. 7

11  ("Kupietzky responded several hours later, explaining that the Oversee

12  Performance Goal for participants under the MIP would not be identical for

13  Oversee legacy employees.").

14       So, even if the Court re-wrote the MIP to eliminate the language of

15  Paragraph 1 which sets forth the MIP's intent to reward growth *and* ignored the

16  surrounding circumstances (i.e., that the MIP was an "earn out" based on Cahn's

17  aggressive projections), it would still be left with a vague contract over which there

18  was no meeting of the minds.  As *Goldberg* explains, in that circumstance, no

19  contractual liability arises.  *See also* Cal. Civ. Code § 1565 (requiring that the

20  consent of the parties to a contract must be "mutual") and Cal. Civ. Code § 1580

21  ("Consent is not mutual, unless the parties all agree upon the same thing in the

22  same sense.").

23       For the foregoing reasons, there is no basis or need to re-litigate the Oversee

24  Business Segment during Phase II of this trial.  Phase II should focus on the

25  remaining issues (i.e., the performance of the Moniker Business Segments which,

26  as it turns out, will only involve TrafficClub).

27

28

126271.1

## III.     THE TRAFFICCLUB BUSINESS SEGMENT.

### A.     Oversee Did Not Breach the MIP by Migrating TrafficClub Customers to DomainSponsor.

**1.**     *The MIP does not prevent the transition of TrafficClub customers to DomainSponsor.*

As this Court has already noted, "[i]t is undisputed that there is no provision in the MIP pursuant to which Oversee expressly represented that it would not transition or migrate TrafficClub into DomainSponsor."  Order on Cahn's Motion for Partial Summary Judgment, dated April 19, 2012 (Docket No. 320) at p. 4; *see also* Cahn's Motion for Partial Summary Judgment (Docket No. 280) at 11:26-27 (admitting that "there is no express provision in the MIP regarding the continuing operation of TrafficClub").

**2.**     *Oversee did not violate Section 9 of the MIP or the implied covenant of good faith and fair dealing.*

Because there is no express contractual obligation which Oversee could have breached, Cahn seems to argue that Oversee breached Section 9 of the MIP (which requires his consent for material modifications to the MIP that would adversely affect him) and/or the implied covenant of good faith and fair dealing implicit in the MIP by migrating TrafficClub into DomainSponsor.  Neither argument is supportable.

### a.     Oversee did not violate Section 9 of the MIP.

First, migrating TrafficClub into DomainSponsor did not constitute a "material" modification of the MIP requiring Cahn's consent.  Cahn's argument— that TrafficClub was "shut down"—has always been inaccurate.  It is not as though Oversee actually shut down that business line such that existing TrafficClub customers were no longer provided a service or new customers could not sign up for a service.  Rather, customers were simply moved from one monetization platform to another.  Existing customers continued to monetize their domain

126271.1

1   names, and new customers could continue to sign up for service.  And, with respect

2   to the MIP, specifically, its definition of "TrafficClub Customers" continued to

3   capture existing TrafficClub customers, shared customers, and new customers of

4   DomainSponsor that became customers as a result of the substantial efforts of

5   Cahn or someone providing services for Moniker.  Section 15(aa).

6        <u>Second</u>, even though his consent was not necessary, Cahn agreed with the

7   transition to DomainSponsor regardless.  His e-mail from January 2008 (Trial

8   Exhibit 18) evidences his agreement.  Now, of course, Cahn claims that his consent

9   to the transition of TrafficClub customers to DomainSponsor was "explicitly

10  conditioned" upon various points set forth in Trial Exhibit 18 and that those

11  conditions were not met.  Nevertheless, the Court would be hard-pressed to find

12  any language indicating an "explicit condition."  Cahn's e-mail does not state that

13  he was "conditioning" his "consent" pursuant to Section 9 on certain items at all.

14  To the contrary, he states he agrees with the transition and then requests: "In order

15  to do this [i.e., transition customers from TrafficClub to DomainSponsor], **please**

16  **consider** the following."  Trial Exhibit 18 (emphasis added).  Telling someone "I

17  agree with you.  Please consider the following…" is not the same as "I do not

18  agree with you unless you explicitly agree to abide by the following terms…"

19       In sum, the transition from TrafficClub to DomainSponsor did not require

20  Cahn's consent under Section 9, but, even if it did, he provided it…without any

21  "conditions."

> **b.**   <u>Oversee did not violate the covenant of good faith and</u>
>          <u>fair dealing.</u>

24  The California Supreme Court has explained:

> The covenant of good faith and fair dealing, implied by law in
> every contract, exists merely to prevent one contracting party
> from unfairly frustrating the other party's right to receive the
> *benefits of the agreement actually made*.  The covenant thus
> cannot "'be endowed with an existence independent of its

1
2
3

> contractual underpinnings.'"  It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement.

4   *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 349-50, 8 P.3d 1089 (2000) (internal

5   citations omitted) (emphasis in the original).

6         Nevertheless, in contravention of this stated principle of law that the implied

7   covenant cannot impose substantive obligations beyond those expressed in the

8   agreement, Cahn seeks to do precisely that: use the implied covenant to impose a

9   limitation on Oversee (i.e., how it could operate TrafficClub) despite the MIP's

10  silence on any such prohibition or limitation.  If Cahn wanted to limit Oversee's

11  right to manage the TrafficClub businesses, it was incumbent upon Cahn—a

12  sophisticated businessman and entrepreneur represented by counsel throughout the

13  MIP negotiations—to negotiate for such an express provision.

14        Notably, even assuming, *arguendo*, that the implied covenant somehow

15  restricted Oversee's ability to manage its business, Cahn has failed to show a

16  breach of the implied covenant.  "A party violates the covenant if it subjectively

17  lacks belief in the validity of its act or if its conduct is objectively unreasonable."

18  *Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal. 4th 342,

19  372, 826 P.2d 710 (1992).  While Cahn has always been quick to argue that

20  Oversee "shut down" TrafficClub, he has always been slow to acknowledge the

21  reasons *why* Oversee migrated TrafficClub.  Consider the facts as they existed

22  when Oversee made its decision to transition customers from TrafficClub to

23  DomainSponsor:

24    • Skenzo, a third party which accounted for more than 80% of TrafficClub

25       revenue, had terminated its advertising feed and invited TrafficClub

26       customers to set up a direct relationship with Skenzo.

27
28

- As a result, Oversee now had two monetization platforms (i.e., DomainSponsor® and TrafficClub) that offered the same DomainSponsor® advertising feed which was needlessly duplicative.

- The general economy was starting to decline, thus underscoring the need for eliminating redundancy and expense.

- Rob Montgomery, the Moniker contractor who provided TrafficClub technical support, was increasingly difficult to reach post-acquisition.

- When Cahn was approached about transitioning TrafficClub customers to DomainSponsor®, he indicated he agreed with the transition, unqualifiedly.

- During the transition, Oversee worked to preserve the relationships with all TrafficClub customers to the greatest extent possible and, in so doing, initially increased site visits and revenue for those customers.

In light of these facts, Oversee's decision to transition TrafficClub to DomainSponsor cannot be said to have been so subjectively or objectively unreasonable as to constitute a breach of the implied covenant as a matter of law. To the contrary, Oversee's actions were imminently reasonable by any standard.

Perhaps more importantly, and as explained above, the transition of TrafficClub customers to DomainSponsor did **not** deprive Cahn of the benefit of his bargain vis-à-vis the MIP. It is not as though Oversee stopped providing monetization services altogether in February 2008 and thereafter terminated its relationship with TrafficClub customers. Oversee continued to provide TrafficClub customers with an advertising feed (i.e., the DomainSponsor® feed), those customers continued to generate revenue that "counted" towards the MIP's TrafficClub Performance Goal, and those customers continued to be paid a revenue share.

**B.      Cahn Has Not Shown That a Migration of TrafficClub Customers
          Proximately Resulted in Damages.**

Notably, even if Cahn could show that the migration of TrafficClub
Customers to DomainSponsor was a "breach," he has not offered any evidence of
how that breach resulted in damages. *See, e.g. Stevens v. Mavent, Inc.,* 2008 WL
2824956 *2 (C.D. Cal. July 21, 2008) ("A claim for breach of contract requires
evidence of (1) the contract's existence and its terms, (2) performance by plaintiff,
(3) breach by defendants, and (4) damages suffered by plaintiff as a result.") (*citing
MacDonald v. John P. Scripps Newspaper*, 210 Cal. App. 3d 100, 104 (1989)).
"Causation of damages in contract cases . . . requires that the damages be
*proximately caused* by the defendant's breach, and that their causal occurrence be
at least reasonably certain." *US Ecology, Inc. v. State*, 129 Cal. App. 4th 887, 909
(2005) (emphasis added) (*quoting Vu v. California Commerce Club, Inc.*, 58
Cal.App.4th 229, 233, (1997)).

This is not the first time Oversee has pointed this out nor would it be the first
time that the Court took note of Cahn's failure to carry his burden.  The Court has
already noted on a previous occasion:

> As Oversee argues, it is not enough for Cahn to show that
> Oversee breached the MIP by shutting down TrafficClub and
> transitioning customers to DomainSponsor.  Cahn must also
> show that, had the TrafficClub entity remained operational,
> TrafficClub would have met the Performance Goals under the
> MIP. Cahn has made no attempt at this stage to make such a
> showing. Simply asserting that Oversee failed to provide Cahn
> with sufficient information to determine whether the
> Performance Goals were met does not establish that those Goals
> would have been met had Oversee kept TrafficClub intact.

Order on Cahn's Motion for Partial Summary Judgment (Docket No. 320) at pp. 5-
6.

Because Cahn has *never* provided any evidence to prove the alleged

1   damages proximately caused by this migration, he can never carry his burden with

2   respect to this argument.  Of course, it is not surprising that Cahn has not even

3   tried to make this showing.  He would have to show that TrafficClub would have

4   *grown* (i) despite losing the Skenzo advertising feed, its overwhelmingly

5   predominant source of revenue, and (ii) likely losing customers to Skenzo, and (iii)

6   in a declining market.

**C.   Cahn's "Failure to Track" Argument Collides Head On with His Argument That the TrafficClub Performance Goals Were Met in 2008 and 2009.**

10          Throughout Plaintiff's Memorandum and Cahn's direct testimony, there are

11  various accusations that Oversee failed to track TrafficClub and/or performance

12  under the MIP.  As Oversee has previously explained, that is not the case.  The

13  DomainSponsor system uses Owner Identification Numbers ("OIDs") to track its

14  customers.  While it might be true that Oversee stopped generating TrafficClub-

15  specific reports when it became clear that industry performance across the board

16  was declining, that does not mean it is *incapable* of tracking performance.  And, to

17  the extent that Cahn continues to argue that "[t]he MIP required that the Board

18  certify each year whether Cahn attained the goals…" (Plaintiff's Memorandum at

19  5:23-24), then he does so in explicit contravention of this Court's earlier statement

20  that his "argument is flatly contradicted by the plain language of Section 2 of the

21  MIP which states that the Oversee 'Board shall have the authority…to administer

22  the performance goals…and to certify whether the goals have been attained.

23  [Citation].  The authority to administer the performance goals and to certify

24  whether they had been met is not the same thing as an obligation to do so."  Order

25  on Cahn's Motion for Partial Summary Judgment (Docket No. 320) at p. 4.

26          In any event, Cahn's argument that Oversee failed to track the performance

27  of TrafficClub is explicitly contradicted by his own argument that the data on

28  actual performance shows that the MIP's Performance Goals for TrafficClub were

1   met in the First and Second Determination Period.  Perhaps Cahn does not realize

2   it, but his arguments are mutually exclusive.   Either the data was not tracked (such

3   that no one can perform the relevant calculations), or the data was tracked (and

4   calculations on actual performance are possible).

5       Obviously, it is the latter.  Both Cahn and Oversee's expert, George Strong,

6   rely on Oversee's data to make calculations about the performance of the

7   TrafficClub Business Segment.  Admittedly, they perform different calculations

8   and reach different conclusions (addressed *infra*), but the starting point is the same:

9   the Oversee data pertaining to TrafficClub.  Because that data is available to Cahn

10   and he uses it to argue that the TrafficClub Performance Goals *were met*, he cannot

11   simultaneously argue that Oversee breached the MIP by failing to track the

12   relevant data.

13       **D.    The Calculations Establish That the TrafficClub Performance**

14       **Goals Were Not Met.**

15       Cahn puts forward no original calculation prepared by his own expert that

16   shows that the TrafficClub Performance Goals were met in any of the

17   Determination Periods.  Instead, he offers critiques of the sensitivity analysis of the

18   calculations prepared by Oversee's expert, George G. Strong, Jr.  Oversee responds

19   to Cahn's critique of Mr. Strong's calculations and his (inappropriately calculated)

20   additions in turn.[6]

21       **1.    *TrafficClub Performance in 2008 and 2009.***

22       Mr. Strong originally calculated TrafficClub in the First Determination

23

---

24   [6]  This brief is limited to the First and Second Determination Period because
25   Cahn's calculations are limited to the First and Second Determination Period,
     and he admits he has not performed any calculations for the Third
26   Determination Period.  Cahn Direct at ¶ 59.  That is not surprising given that the
     actual performance in the Third Determination Period was approximately
27   $██████  while the Performance Goal was $████████.
28

126271.1

1   Period as $██████ which is below the 70% threshold of the Performance Goal

2   for that period of $██████. Mr. Strong originally calculated TrafficClub in the

3   Second Determination Period as $██████ which is below the 70% threshold of

4   the Performance Goal for that period of $██████. Strong Direct at ¶¶ 16, 17.

         **2.**    *The sensitivity analysis.*

6        To test how sensitive the TrafficClub calculations were to a change in

7   assumptions, Strong conducted a sensitivity analysis of the TrafficClub Business

8   Segment by adding the gross profit from DomainSponsor accounts that were

9   opened after 2008 whose personal name, company name, email address, street

10  address or phone number was the same as one of the accounts identified as a

11  TrafficClub customer as defined by Section 15(aa) of the MIP. Strong Direct at ¶

12  25.

13       For the First Determination Period, the sensitivity analysis yielded an

14  additional $██████ in gross profit. For the Second Determination Period, the

15  sensitivity analysis yielded an additional $██████ in gross profit. For the Third

16  Determination Period, the analysis yielded an additional $██████.

17  Nevertheless, even if one were to add these numbers to actual performance, the

18  Performance Goals were not met in any of the Determination Periods. Strong

19  Direct at ¶¶ 25, 26.

20       However, it is important to note that Strong's sensitivity analysis is precisely

21  that: an analysis of the sensitivity of the calculations. It is not a category of gross

22  profits that is automatically added to performance.

         **3.**    *The Oversee Default Account: 63539.*

24       Cahn claims that Oversee's calculations are erroneous because they failed to

25  include any gross profit from OID 63539. Cahn Direct at ¶¶ 46-50. As Strong

26  explains in his Direct Testimony, however, OID 63539 is the Oversee "default"

27  account where revenue from unknown sources is collected. *See* Strong Direct at ¶¶

28  48-51. The existence of that "default" account predated Oversee's acquisition of

1    Moniker.  *Id.*  Given that the account predates the acquisition of Moniker and the

2    revenue is from an *unknown* source, OID 63539 cannot be a "TrafficClub

3    Customer" whose profit should be counted for purposes of the MIP, and it was

4    rightfully excluded.

5           **4.**    *The Moniker Accounts: 96921 and 111662.*

6          Cahn also claims errors because Oversee's calculations do not include the

7    full profits from OIDs 96921 or any profits from 111662[7].  Cahn Direct at ¶¶ 44,

8    45 and 49.  Nevertheless, both OID 96921 and 111662 are Moniker-owned

9    accounts.  Strong Direct at ¶¶ 42-47.  Though Moniker may choose to monetize its

10    own accounts, Moniker is not an "Existing Customer," "Shared Customer," or

11    "New Customer" of TrafficClub under the MIP.

12          What makes a "customer?"  The word "customer" is defined as "a person

13    who purchases goods or services from another."  http://www.dictionary.com, last

14    visited June 26, 2012; Cal. Civ. Code § 1644 ("The words of a contract are to be

15    understood in their ordinary and popular sense…").  In monetizing its own

16    accounts through TrafficClub, Moniker does not purchase goods or services from

17    another but, rather, utilizes its own services.  Thus, it is not a "customer."

18          At best for Cahn, the monetization revenue from these two OIDs should be

19    credited towards the Registrar Business Segment, and, as discussed above, that is

20    precisely what Strong did.[8]  *See* Section II. D.  His calculation of the Registrar

21    Business Segment contains revenues for both OIDs under "Monetization

22

23

24    [7] Cahn also seems to suggest that another Moniker owned OID, 96932, is
missing.  However, the revenue in that OID is minimal ($6 over 3 years).  As

25    such, neither party has really factored that OID into their analyses.

26    [8] Ironically, Cahn seemingly admits that registrar monetization revenue should be

27    recognized as part of the Registrar Business Segment ***not*** TrafficClub.
Plaintiff's Memorandum at 7:7-10.

28

1   Revenue."  *See* Strong's Original Expert Report at Appendix D, Schedules 1, 3,

2   and 5.

3        Ironically, by highlighting these accounts, Cahn only hurts his cause.  Strong

4   does include *some* portion of their profits in the TrafficClub calculations.

5   However, since these OIDs already appear under Registrar, to avoid double-

6   counting, it would be proper to back them out of the TrafficClub calculations so

7   that actual performance is *reduced* as follows:  (i) $███████ in 2008 (i.e., reduced

8   by $█████), (ii) $███████ in 2009 (i.e., reduced by $████), and (iii) $██████ in

9   2010 (i.e., reduced by $████).

10                **5.**    *The "missing" shared accounts.*

11        Lastly, Cahn complains about Strong's sensitivity analysis.  In short, Cahn

12   argues that Oversee labeled certain customers as Existing TrafficClub Customers

13   when they should have been labeled as Shared Customers.  Correspondingly, Cahn

14   argues, Oversee failed to credit TrafficClub for the **pre**-2008 DomainSponsor

15   accounts of various customers including: Nokta, Goodwin, Matuzich, Prince,

16   Shaw, Nolte, and Schnermann.  Cahn Direct at ¶ 58.  Cahn argues that the Court

17   should take the Gross Profits from the pre-2008 DomainSponsor accounts and add

18   100% of that Gross Profit to the performance of TrafficClub.  Doing so, increases

19   performance in the First Determination Period to $███████ and $███████ in the

20   Second Determination Period.[9]  Nevertheless, there are three problems with Cahn's

21   methodology.

22        <u>First</u>, even if you accepted this methodology, TrafficClub performance in the

23   Second Determination Period ($███████) still falls below the 70% threshold of

24   the Performance Goal (i.e., 70% of $███████ = $███████).  Thus, no award

25   would be triggered in the Second Determination Period even if one assumed

26   _____

27   [9]   These general totals assume you do *not* back out the gross profits that Strong

28        calculated for the Moniker-owned OIDs (*but see* Section III. D. 4.) and that you
         *include* the gross profit from Strong's sensitivity analysis.

1  Cahn's generous math.

2      Second, Cahn's methodology is incorrect.  Even adopting Cahn's argument

3  that these customers are "Shared Customers" instead of "Existing Customers," then

4  a correct calculation requires that the gross profit they generated be accounted at

5  the "Applicable Share Percentage" *not* at 100% as Cahn assumes.  *See* MIP at

6  Section 15(a).  To calculate the Applicable Share Percentage, one must divide the

7  customer's November 2007 revenue from TrafficClub (i.e., the numerator) by the

8  sum of their November 2007 revenue from TrafficClub and DomainSponsor

9  combined (i.e., the denominator).  Of course, if the customer did not have any

10  November 2007 revenue from TrafficClub (like Goodwin and Schnermann), that

11  means that the numerator is zero, which means the percentage is 0%, which means

12  that the TrafficClub Business Segment gets $0 in credit.

13      Third, assuming once again for purposes of argument that these individuals

14  are "Shared Customers" and not "Existing Customers," then Strong's sensitivity

15  analysis actually *overstates* the gross profit in the customer's *post*-2008

16  DomainSponsor accounts which was credited at 100%.  Those post-2008 accounts

17  must also be re-calculated at the "Applicable Share Percentage" which would lead

18  to a reduction in the gross profit.

19      In sum, Cahn's "missing Shared Customers" analysis affects only the First

20  Determination Period.  Even then, his analysis is wrong because he fails to account

21  for the proper "Applicable Share Percentage."

22      **6.**    *Cahn's Citations to Cases on Damages Are Inapposite.*

23      Undoubtedly cognizant that his TrafficClub calculations are not accurate,

24  Cahn argues that "[w]here the fact of damages is certain, the amount of damages

25  need not be calculated with absolute certainty."  Plaintiff's Memorandum at 10:13-

26  14.  Even assuming that is true, the problem for Cahn is that the "fact of damages"

27  is not certain.  His erroneous calculations do *not* establish that the Performance

28  Goals were met.  In addition, as Oversee has previously noted, the MIP was a

1    document intended to cover multiple participants, but Cahn never identified who

2    those participants would be.  As a result, it is now impossible to determine what

3    portion of a Performance Award would go to Cahn individually.

4         None of the cases cited by Cahn stand for the proposition that Cahn can

5    offer an *inaccurate* analysis of damages.  Taken at its broadest, the *Channell* case

6    merely stands for the proposition that a jury may award damages beyond "out of

7    pocket" damages in fraudulent property transactions.  *Channell v. Anthony*, 58 Cal.

8    App. 3d 290, 317 (1976).  The *Noble* case speaks to estimating **future** damages

9    (which are inherently speculative) not past damages.  *Noble v. Tweedy*, 90 Cal.

10   App. 2d 738, 745-746 (1949).  The *Allen* case addresses the reliability of the

11   evidence presented by the plaintiff to prove his damages but is silent on how

12   precise the measurement of damages must be.  *Allen v. Gardner*, 126 Cal. App. 2d

13   335, 340 (1954).  The "wrongful conduct" identified in the *Ramona* case was the

14   wrongful possession into property, rendering that case wholly inapplicable.

15   *Ramona Manor Convalescent Hospital v. Care Enterprises*, 177 Cal. App. 3d

16   1120, 1140 (1986).  The *Mann* Court actually stated that damages for lost profits

17   (both present and future) had to be established with "sufficient certainty."  *Mann v.*

18   *Jackson*, 141 Cal. App. 2d 6, 12 (1956).  Lastly, the *James* case addresses the

19   certainty required to establish the loss of anticipated profits, not past damages.

20   *James v. Herbert*, 149 Cal App. 2d 741, 749 (1957).

21            **7.**    *Cahn's calculations forget to account for the ICP.*

22        Lastly, Cahn's calculations forget to account for the Incentive Compensation

23   Plan ("ICP") that he signed in November 2008.  As the Court may recall, under the

24   ICP, Cahn could receive a bonus under the MIP or the ICP (whichever was

25   greater), **but not both**.  February 6, 2012 Order at p. 3 ("Under the terms of the

26   ICP, Cahn could receive payment under the ICP or the MIP, whichever would

27   result in the higher payout.")  Cahn received a $███ bonus under the ICP in

28   2008 and a $███ under the ICP in 2009.  Therefore, even if Cahn were to

1  receive some award under the MIP in respect of TrafficClub for the First or Second

2  Determination Period, that amount would have to be reduced by the ICP bonuses

3  he received (though, of course, Oversee believes Cahn is not entitled to a MIP

4  award at all).

5          **8.**   *Section Conclusion.*

6       In short, Plaintiff had the burden of proving, with an accurate and certain

7  calculation, that the TrafficClub Business Segment achieved the levels of

8  performance required to trigger a bonus.  Cal. Civ. Code § 3301 ("No damages can

9  be recovered for a breach of contract which are not clearly ascertainable in both

10  their nature and origin.").  He did not carry that burden, and, as such, he is not

11  entitled to any relief for his first claim for breach of the MIP.

12  **IV.**   **CAHN IS NOT ENTITLED TO ATTORNEYS' FEES.**

13       In Plaintiff's Memorandum, Cahn asserts for the first time that "pursuant to

14  California law, Oversee may be liable for Cahn's attorney's fees incurred in

15  seeking employment benefits owed."

16       Cahn has waived any claim to attorneys' fees.  The Prayer for Relief in his

17  Third Amended Complaint does ***not*** contain a request for attorneys' fees.[10]

18  Moreover, in a previous court filing, Cahn unequivocally stated: "The MIP does

19  not contain an attorney's fees provision, as such, **Cahn is not claiming any**

20  **attorneys' fees under the First Cause of Action for Breach of the MIP**."

21  Cahn's Memorandum of Contentions of Fact and Law, filed 12/19/11 (Docket No.

22  169) at p. 9 (emphasis added).

23  **V.**   **LOGISTICAL ISSUES.**

24       As the Court may recall, Jeffrey Kupietzky, Oversee's former CEO, has

25  plans to be in Europe the week of July 10, 2012.  Mr. Kupietzky has altered his

26

27  _____

28   [10]  None of his earlier-filed complaints contain a request for attorneys' fees in the Prayer for Relief either.

126271.1

schedule so that he can fly from Israel to Los Angeles before he travels to Europe as he had originally planned.  Because Oversee anticipates his attendance at trial, it has submitted a direct testimony declaration for Mr. Kupietzky.

Oversee has also informed Cahn of their request to have Mr. Kupietzky taken out of order, on July 10, 2012, so that he can finish with his testimony and leave Los Angeles for Europe as soon as possible.  Cahn has indicated his agreement to cross-examining Mr. Kupietzky on July 10, 2012.

## VI.   CONCLUSION.

There is no evidence that any of the Moniker Business Segments achieved the Performance Goals.  As a result, there was no duty to make any payments under the MIP, and Oversee is entitled to judgment on Cahn's First Claim for Breach of Contract.

Dated:  June 29, 2012                              WILLENKEN WILSON LOH & DELGADO LLP


                                                   By: */s/ William A. Delgado*
                                                        William A. Delgado
                                                        Attorneys for Defendants
                                                        OVERSEE.NET, JEFFREY
                                                        KUPIETZKY, and LAWRENCE NG

126271.1